IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| GUN OWNERS OF AMERICA, INC., | ) | |
| GUN OWNERS FOUNDATION, and | ) | |
| BRADY BROWN, | ) | |
| | ) | Case No. _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE, and | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity AS THE DIRECTOR OF ATF, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

JURISDICTION AND VENUE ..................................................................... 1

PARTIES ......................................................................................................... 1

BACKGROUND ............................................................................................. 8

    I.    The National Firearms Act of 1934 ..................................................... 8

           A. History as a Taxing Statute .......................................................... 8

           B. Short-Barreled Rifles are an Inconsistent Vestige of a Failed Pistol Ban ........ 9

    II.    The NFA Registration Process for Short-Barreled Rifles ......................................... 10

           A. Form 1 Registration Prior to Making a Short-Barreled Rifle......................... 10

           B. Form 4 Registration Prior to Buying/Transferring a Short-Barreled Rifle .... 12

           C. Current Processing Delays within ATF's NFA Division .............................. 12

    III.    ATF's Historic Interpretation and Definition of "Rifle" ........................................... 15

           A. Definition Prior to Final Rule......................................................... 15

           B. ATF's Long History of Approving Stabilizing Braces for Non-Rifle Use .... 15

    IV.    Impact of Classification Letters.................................................................. 21

           A. Popularity of Braced Pistols......................................................... 21

           B. A Decade of Imports and Assembly Allowed Under 26 U.S.C. § 5844 and 18

           U.S.C. § 922(r) ......................................................................... 22

ATF'S FAILED NPRM (2020).........................................................................29

NOTICE OF PROPOSED RULEMAKING (2021)...................................................... 27

    I.    Worksheet 4999 Used as Basis for Classification ....................................... 27

    II.   Over 210,000 Comments Received ........................................................... 28

        A. GOA/GOF's Comments ....................................................... 29

        B. State Comments in Opposition to the NPRM................................. 33

THE FINAL RULE (2023)................................................................................. 35

THE FINAL RULE VIOLATES THE APA ........................................................... 38

    I.    The Final Rule Provides Implications Rather than Clarity, and Invites Inferences Rather than Specificity............................................................................. 38

    II.   The Final Rule Impermissibly and Unlawfully Targets Firearms (Without Braces) in Ways Not Proposed in the NPRM ....................................................... 43

    III.   The Final Rule's Definition of "Rifle" Was Issued in Violation of the Administrative Procedure Act's Notice and Comment Requirement................................. 45

    IV.  The Final Rule Is Arbitrary and Capricious in Violation of the APA (Reliance Interests)..............................................................................................52

    V.   The Final Rule Is Contrary to Statute and Exceeds the Authority Granted by Congress...............................................................................................59

    VI.  The Final Rule's Immediate Effective Date is Impermissible and Invalidates the Rule....................................................................................................60

THE FINAL RULE VIOLATES THE CONSTITUTION ......................................... 62

    I.    The Final Rule Violates the Second Amendment .................................... 62

A. Pistols are Protected "Arms"..................................................................69

B. Short-Barreled Rifles are Protected Arms.........................................72

C. Defendants' Second Amendment Arguments Are Unpersuasive.....................82

D. Short-Barreled Rifles Are No More Dangerous than Other "Arms" Like Pistols and Rifles................................................................................87

II.   The Final Rule Violates the Fifth Amendment's Protections Against Self-Incrimination................................................................................................85

A. Six States Plus DC, Where Registration is Impossible.....................................90

B. Twenty-Four States Where Registration Will Provide Evidence of State Crimes..................................................................................................92

C. A Decision to Exercise Enforcement Discretion Can Be Reversed.................95

D. ATF Will Take an "Enforcement Action" if a Form 1 Application, Submitted in Good Faith Reliance on the Final Rule, is Disapproved or Denied.....................100

E. ATF and DOJ's Enforcement Discretion Presumably Does Not Bind the Department of Defense.........................................................................102

F. The Final Rule Fails to Clarify Whether ATF's "Enforcement Discretion" Applies to the Other Federal Crimes the Final Rule Has Created......................104

III.   The Final Rule Violates the Fifth Amendment's Due Process Protection (Void for Vagueness).............................................................................................. 101

IV.   The Final Rule Is an Invalid Exercise of the Taxing Power.................................... 106

V.    The NFA's Tax on Making Firearms Is an Unconstitutional Unapportioned Direct Tax ..................................................................................................................109

VI.   The Rule of Lenity Forbids a Wholesale Administrative Reinterpretation of a Statute that Retroactively Criminalizes Possession of Previously Legal Firearms ........................... 112

FIRST CAUSE OF ACTION ............................................................................. 114

SECOND CAUSE OF ACTION ......................................................................... 115

THIRD CAUSE OF ACTION ............................................................................ 116

FOURTH CAUSE OF ACTION ........................................................................ 118

FIFTH CAUSE OF ACTION ............................................................................. 119

SIXTH CAUSE OF ACTION ............................................................................ 119

SEVENTH CAUSE OF ACTION ...................................................................... 121

EIGHTH CAUSE OF ACTION ......................................................................... 121

NINTH CAUSE OF ACTION ........................................................................... 122

TENTH CAUSE OF ACTION ........................................................................... 123

ELEVENTH CAUSE OF ACTION ................................................................... 124

Now come Plaintiffs, by and through Counsel, and for their Complaint state as follows:

1.      Plaintiffs bring this action seeking a preliminary injunction to preserve the status quo, followed by a declaratory judgment and permanent injunctive relief restraining Defendants from enforcing various parts of a Final Rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice on January 31, 2023 88 Fed. Reg. 6,478 (Jan. 31, 2023), entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" ("Final Rule" or "FR").  Alternatively, Plaintiffs seek declaratory and injunctive relief that the National Firearms Act of 1934, as amended ("NFA"), is unconstitutional as applied to short-barrel rifles.  As grounds therefor, Plaintiffs allege the following:

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

3.      Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## PARTIES

4.      Plaintiff Brady Brown is a firearm owner residing in Shiner, Texas, in Lavaca County, within this district, is an American citizen, and a member of Gun Owners of America, Inc.  Plaintiff Brown is eligible to possess firearms under state and federal law, and is an avid gun owner and Second Amendment supporter.  In addition to being a gun owner, Plaintiff Brown also is a federal firearms licensee who holds a Type 01 dealer

license issued by Defendant ATF.   Plaintiff Brown owns personally at least one AR-15 type firearm in a pistol configuration, that was equipped with a "stabilizing brace" prior to promulgation of the Final Rule, and in full conformance with ATF guidance.   Plaintiff Brown also runs a business as a licensed firearm dealer, and possesses in inventory additional pistols equipped with stabilizing braces.   Plaintiff Brown wishes to continue to possess firearms in both his personal collection and business inventory in their current configurations, without being forced to modify, destroy, surrender, or register the firearms with the federal government and mark the firearms with additional serialization, or else run the risk of felony prosecution for possession of what ATF arbitrarily now claims is an illegal short-barreled rifle.

5.     Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, VA.   GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.   GOA was formed in 1976, to preserve and defend the Second Amendment rights of gun owners.   GOA has more than 2 million members and supporters across the country, including tens of thousands within Texas, many of whom reside within this district.   Many of these gun owners, like the individual plaintiffs, are being irreparably harmed by the Final Rule, being forced by ATF to either modify their firearms into less useful configurations, destroy, register them with, or surrender them to the federal government, or else run the risk of serious felony criminal prosecution for doing nothing more than what ATF for more than a decade has said is perfectly lawful to do.   *See* Pratt Declaration, Exhibit 1.

2

6.      Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, VA.  GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country and within this district who, like the individual plaintiffs, will are being irreparably harmed by the Final Rule.  *See* id.

7.      Many of the irreparable harms to GOA and GOF's members and supporters, which are being and will be caused by implementation of the Final Rule (such as instant felony status for otherwise law-abiding gun owners), are alleged herein by GOA and GOF in a representational capacity on behalf of the interests of their members and supporters.

8.      Together, the members and supporters of GOA and GOF represent a diverse group, consisting not only of individual gun owners, but also industry partners comprised of members of the firearms community and industry, including manufacturers, distributors, and retailers of "stabilizing braces," and manufacturers, distributors, and retailers of firearms equipped with stabilizing braces.  *See id.*

9.      Members and supporters of GOA/GOF include not only consumers who purchase, transfer, possess, own, customize, accessorize, and utilize stabilizing braces and firearms equipped with stabilizing braces, but also industry members who are recipients of ATF "classification letters" providing ATF's conclusion that various stabilizing braces, when installed on a pistol, do not turn such firearms into short-barreled rifles.  *See id.* at ¶ 12. Under the Final Rule, however, all of these classifications have been revoked or radically altered.   FR 6569 ("All previous ATF classifications involving 'stabilizing brace'

3

attachments for firearms are superseded as of May 31, 2023.  As such, they are no longer valid or authoritative, and cannot be relied on.").

10.     Since publication of the Final Rule, GOA and GOF have heard from numerous of their members and supporters who own pistols equipped with stabilizing braces and who are being irreparably harmed by the Final Rule in various ways.

11.     For example, one such individual is an honorably discharged former paratrooper with the 82nd Airborne Division of the U.S. Army, who has a 100% disability rating from the VA, the result of a parachute accident years ago that has caused lifelong strength and mobility challenges.  Use of a stabilizing brace is therefore necessary for this person to ergonomically, safely, and accurately shoot an AR-15 style pistol.  *See id.* at ¶ 14.

12.     Likewise, GOA and GOF have heard from persons who own pistols with stabilizing braces and who reside in states where short-barreled rifles are illegal to possess, even if registered with ATF.  Such persons have no choice but to surrender, destroy, or modify their firearms into totally different configurations, in order to avoid felony prosecution by Defendants. *See id.* at ¶ 15

13.     Other of GOA and GOF's members and supporters live in states where possession of short-barreled rifles is unlawful unless properly registered with ATF.  As ATF now claims that millions of firearms were not property registered, this creates potential state criminal liability for such gun owners.  As discussed below, registration with ATF is impossible for these people, as they will be providing evidence of not only federal but also state crimes to both federal and state officials. Although the Final Rule claims that ATF

will exercise its enforcement discretion under federal law, nothing in the Final Rule binds state officials with respect to past violations of state law.  *See id*. at ¶ 16.

14.     Also among GOA's members and supporters are current and former U.S. military servicemembers. These servicemembers face an independent risk of prosecution by court-martial for violations of the NFA under UCMJ Article 134. *See* 10 U.S.C. § 934; *see also United States v. Alkazahg*, 81 M.J. 764, 767 (N-M. Ct. Crim. App. 2021) (noting that the appellant had been convicted of "two specifications of possessing machine guns, in violation of Article[] ... 134 of the Uniform Code of Military Justice").  Indeed, GOA has heard from at least one member or supporter who is a current member of the Armed Forces who lawfully possesses a pistol with a stabilizing brace, and who is subject to the jurisdiction of the Department of Defense.  For this person and others in similar situations, Defendant DOJ's promise to exercise its enforcement discretion is of little comfort, with respect to a Department of Defense prosecution under the UCMJ's Article 134 for owning a lawful item that ATF now has capriciously classified as a felony crime.  *See id*. at ¶ 18.

15.     In other words, GOA/GOF's members and supporters are representative of those affected by the Final Rule, which has a ubiquitous and negative effect on the firearms community and the administration of federal gun control laws.

16.     Indeed, for each of the portions of the Final Rule challenged herein, GOA/GOF has numerous members and supporters who are being and will be irreparably harmed by the Final Rule, which is already in effect.  In addition to the individual plaintiffs named herein, GOA and GOF bring this action on behalf of their members and supporters across the country, who will experience the same or similar irreparable harms.  Each of these persons

5

and entities would have standing to challenge the promulgation and implementation of the Final Rule in their own right.   Protection of these rights and interests is germane to GOA/GOF's mission, which is to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by unelected and unaccountable anti-gun bureaucrats.   Litigation of the challenges raised herein does not require participation of each of GOA/GOF's individual members and supporters, and GOA/GOF are capable of fully and faithfully representing the interests of their members and supporters without participation by each of these individuals and entities.   Indeed, GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters.

17.     In different ways and to varying degrees, each of these members and supporters of GOA/GOF will be irreparably harmed if the Final Rule goes into effect.   Some will be subjected to ever encroaching, illegal and unconstitutional infringements of their right to keep and bear arms. Some will have to dramatically change the nature of the way they do business, including the nature and types of products that they can offer for sale, in ways that Congress never intended, much less legislated.   Some companies – as conceded by ATF – may have to close their doors entirely.[1]   Indeed, if the Final Rule takes effect, tens (if not hundreds) of millions of dollars of sales will be lost, and many will lose their jobs.[2]

---

[1] *See* 86 Fed. Reg. 30847 (estimating that "this proposed rule would potentially affect at least 8 manufactures [sic] of "stabilizing braces." [I]t is anticipated 3 of them would go out of business.").

[2] *See* Regulatory Impact Analysis at 78, https://www.atf.gov/rules-and-regulations/docs/undefined/atf2021r-08stabilizingbracefrriapdf/download.

The Final Rule harms countless gun owners across virtually every corner of the firearms community. ATF "uses 3 million as the low estimate … of affected "stabilizing braces," and "1.4 million individuals affected."  FR 6560.

18.     Plaintiff the State of Texas is a sovereign state of the United States. "[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). The Final Rule adversely affects Texans' health and well-being by criminalizing the possession of unregistered weapons that are not legally required to be registered, which affects Texans' ability to defend themselves. Texas criminalizes the possession, manufacture, transportation, repair, or sale of short-barreled rifles that are not registered with ATF, but does not criminalize handguns with attached stabilizing braces. Tex. Penal Code § 46.05(a)(1)(C). Defendants admit that Texas police who possess previously legal handguns with stabilizing braces will have to expend funds to register those weapons. 88 FR at 6567.

19.     Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.  DOJ is the agency responsible for enforcing federal firearms laws.

20.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.  ATF is delegated authority to enforce federal gun control laws. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a).

7

21.     Defendant Steven M. Dettelbach is the Director of ATF, is sued in his official capacity, and is responsible for overseeing the agency's promulgation of the Final Rule challenged herein.

## BACKGROUND

### I.   The National Firearms Act of 1934

#### A.  History as a Taxing Statute

22.     Short-barreled rifles are regulated under the National Firearms Act of 1934 ("NFA"), codified at 26 U.S.C. § 5801, *et seq*.  Among its provisions, the NFA imposes a $200 tax on the making (by one not licensed to engage in the business of manufacturing firearms), manufacture (by one engaged in the business of manufacturing firearms), and transfer of machineguns, suppressors, short-barreled rifles, short-barreled shotguns, and destructive devices.

23.     But while the NFA imposes a tax on certain firearms, the goal of the NFA was not to raise revenue.  As ATF acknowledges, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms."[3]

24.     Notably, the NFA did not prohibit the making, manufacture, sale, or transfer of any of the regulated types of firearms, including machineguns (at least not until 1986, *see* 18 U.S.C. § 922(o)). However, Congress set the tax at a high amount in 1934 dollars, which would be the equivalent of approximately $4,497 in today's dollars.[4]

---

[3]     *See*   https://www.atf.gov/content/firearms/firearms-industry/national-firearms-act (last accessed February 8, 2023).

[4] *See* https://www.dollartimes.com/inflation/inflation.php?amount=1&year=1934.

25.     Allegedly in order to track payment of the tax, the NFA also requires the registration of all NFA firearms with the Secretary of Treasury.

26.     Before the NFA was amended in 1968, if the possessor of an unregistered firearm applied to register the firearm, as required by the NFA, Treasury supplied the information to State authorities to prosecute possession of the firearm in violation of the NFA.  In 1968, the Supreme Court held that the registration requirement imposed on the possessor of an unregistered firearm violated the possessor's right against self-incrimination under the Fifth Amendment of the U.S. Constitution. *See Haynes v. U.S.*, 390 U.S. 85 (1968).  In 1968, in response to *Haynes*, Congress amended the NFA in 1968 and removed the mechanism for the owner of an unregistered and untaxed NFA firearm to legally register that firearm. Congress also enacted 26 U.S.C. § 5848, which prohibits the use of "information or evidence obtained from an application, registration, or records required to be submitted or retained" regarding the "filing of the application or registration" of the NFA firearm.[5]

### B. Short-Barreled Rifles are an Inconsistent Vestige of a Failed Pistol Ban

27.     The drafters of the NFA initially intended to include pistols in the legislation.

28.     To this end, the original draft of the NFA defined 'firearm' as any 'pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun.'" Oliver

---

[5] 26 U.S.C. § 5848 excepted "furnishing false information" from the self-incrimination carveout, and applies only to violations "prior to" or "concurrently with" application.

Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 278 (2022).

29.     In effect, the $200.00 tax imposed by the NFA as it relates to short-barreled rifles and shotguns was a way to discourage or eliminate those who sought to avoid a pistol ban by cutting down a rifle to a shorter length.

30.     Paradoxically, although pistols were ultimately removed from the NFA's language before it was enacted, short-barreled rifles and weapons made from rifles were not removed and continue to be taxed.  *Id.* at 279.  Of course, this makes absolutely no sense from the perspective of "public safety" (FR at 6481) or common sense, as a person can lawfully possess, without NFA registration, both a handgun (short) and rifle (long) version of the same platform firearm (such as an AR-15 or AK-47), but cannot possess a "short barreled rifle" (medium) version of the same platform.

## II.     <u>The NFA Registration Process for Short-Barreled Rifles</u>

### A.  **Form 1 Registration Prior to Making a Short-Barreled Rifle**

31.     No one is permitted to make an NFA "firearm" (defined to mean NFA items, including a "short barreled rifle" (SBR) or "short barreled shotgun" (SBS) by 27 CFR § 479.11) without *first* registering the firearm with the federal government.  26 U.S.C. § 5841(b).  For those licensed individuals who pay hefty licensing fees and are engaged in the business of "manufacturing" such firearms, they need only "notify" ATF of each weapon they have manufactured on an ATF Form 2, "Notice of Firearms Manufactured or Imported."

32.     For all others, "prior to importing, making, or transferring" an NFA firearm, they must first apply to and receive approval from the Director to make the firearm, which renders the firearm "registered" with ATF.  26 U.S.C. § 5841(c); 27 CFR § 479.62.  *See also* 27 CFR § 479.62 ("The maker of the firearm shall not, under any circumstances, make the firearm until the application, satisfactorily executed, has been forwarded to the Director and has been approved and returned by the Director with the National Firearms Act stamp affixed.").

33.     With respect to unlicensed individuals who desire to make their own NFA "firearm," they must first seek ATF permission by the filing of an ATF Form 1, "Application to Make and Register a Firearm."  The application requires the following information: type of applicant, identity of applicant, description of firearm to be made, applicants Federal Firearms Licensee number (if any), applicants special operations tax number (if any), if the applicant is a non-immigrant alien, documentation that the applicant meets an exception under 18 U.S.C. § 922(g)(5)(B) under 18 U.S.C. § 922(y)(2), or has obtained a waiver of that provision under 18 U.S.C. § 922(y)(3). 27 CFR § 479.62(b).  An applicant must also pay a for a $200 "tax stamp" for each NFA item made and registered.

34.     Additionally, a person applying to register an NFA item must supply ATF his fingerprints, a photograph of himself, a completed application (in duplicate), and include payment of the applicable tax.  *See* 26 U.S.C. § 5822.

35.     After receiving Form 1 approval from the Director to "manufacture" an NFA firearm, an individual must thereafter mark the firearm by "engraving, casting, stamping (impressing), or otherwise conspicuously placing" identifying information, including a

serial number, name, and place of business (or place of making). 27 CFR § 479.102.  This is the case even for a Gun Control Act firearm which already contains markings required by the GCA.

**B.  Form 4 Registration Prior to Buying/Transferring a Short-Barreled Rifle**

36.     For NFA items that have already been manufactured and registered, no such weapon may be sold or transferred to and end user until approval is sought and obtained through an ATF Form 4, "Application for Tax Paid Transfer and Registration of Firearms," and another payment of $200 for a "tax stamp" for each transfer of the item (not applied to dealer-to-dealer transfers between licensees on an ATF Form 3).

37.     Whereas ATF Forms 1 and 2 must be completed by the maker or manufacturer, ATF Form 4 must be completed by the transferor and transferee, and approved by ATF before the NFA-subject firearm can be transferred between them.

**C.  Current Processing Delays within ATF's NFA Division**

38.     Traditionally, ATF's NFA Division has operated in the stone age, requiring multiple copies of paper forms be filed along with paper fingerprint cards, printed photographs stapled to the page, *etc*.  In December of 2021, however, ATF debuted its new "eForms" system, designed to make much of the NFA taxing and registration process electronic and automated.

39.     Spending millions of dollars of taxpayer money to create the eForms system, ATF promised that it would result in a significant reduction in processing times.

40.     But in spite of the agency's promises, that has not been the case.

41.     Around the time of the eForms launch, ATF stated that it is "committed to our processing goals of 90 days from receiving a completed ... application," to final approval or denial of the transfer.[6]  This 90 day goal was down from ATF's then-current delays of over a year.

42.     ATF's website suggests the wait time to receive approval after a properly completed Form 1 is submitted is 30 days for those who submit via eForm, or 45 days for those who submit via a paper form.[7]

43.     But the time period ATF reports for approval on a Form 4 transfer is far longer, with ATF's website suggesting that the wait is 270 days for an eForm 4, or 315 days for a paper-filed Form 4.  *Id.*

44.     So much for the promised 90 days.

45.     In fact, although eForms has been active for just over a year, ATF's processing times are already three times its promised time for a Form 4.

46.     In fiscal year 2022, ATF claims to have processed 709,508 NFA registrations.[8]  Of course, most of those are either (i) dealers/importers reporting firearms made/imported, or (ii) transfers to governmental entities (with no tax paid or background check run), which do not take nearly the processing time as Forms 1 and 4 by individuals.[9]

---

[6] https://twitter.com/SilencerShop/status/1526322845130825729?s=20&t=ndfjkyMQwTeY-3XTpnmPBA.

[7] https://www.atf.gov/resource-center/current-processing-times.

[8] https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.

[9] *See* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download at 13 (reporting only 40,790 Form 1s and 246,806 Form 4s in 2020).

47.     Despite findings from the Congressional Research Service ("CRS") suggesting there may be between 10 and 40 million braced pistols in existence,[10] ATF has reached its own contrary conclusion, estimating "that the more accurate figure is closer to 3 million … based on ***anecdotal commentary***" – a highly precise and scientific process, no doubt. FR at 6560 (emphasis added); *see also* at 6564 ("the Department has not collected information about [stabilizing braces] that allows it to precisely calculate their popularity.").

48.     Of this number, ATF anticipates that only 375,000 individuals are likely to register their braced pistols. RIA at 26.

49.     But even using the low numbers that ATF estimates, there is likely to be a tremendous surge in the number of registrations requested during the 120 day period that ATF is utilizing its "enforcement discretion" to allow registration of a braced pistol as an SBR.

50.     Due to this surge, even with increased resources devoted to processing Form 1 applications, current NFA wait times will undoubtedly grow longer as more and more Form 1s are added to the queue for processing.

51.     Alternatively, using the CRS *low* estimate of 10 million affected firearms, and even if only 10 percent of persons registered them (1 million), that number (all submitted in a 120 day period allowed by the Final Rule) would still exceed the entire processing of the

---

[10] William J. Krouse, Cong. Rsch. Serv., *Handguns, Stabilizing Braces, and Related Components* 2 (Apr. 19, 2021) (estimating 10 to 40 million such firearms), https://crsreports.congress.gov/product/pdf/IF/IF11763.

NFA division in 2022, which is already above capacity and falling further behind every day.

### III.  ATF's Historic Interpretation and Definition of "Rifle"

#### A. Definition Prior to Final Rule

52.  Prior to the Final Rule, federal law defined rifle as follows: "The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger. 18 U.S.C. § 921(a)(7); *see also* 27 CFR § 478.11.  In other words, the regulation has always mirrored the statute.

#### B. ATF's Long History of Approving Stabilizing Braces for Non-Rifle Use

53.  ATF's longstanding policy has led to classification of numerous firearms equipped with stabilizing braces as *not* being short-barreled rifles, and numerous stabilizing braces themselves as *not* turning firearms into short-barreled rifles under the NFA.

54.  Beginning in 2012, ATF classified the first pistol stabilizing brace. FR at 6479.

55.  At that time, the "ATF concluded that the submitted 'brace,' when attached to a firearm, did 'not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm,' and therefore, 'such a firearm would not be subject to NFA controls.'" *Id.*

56.  Since then, on multiple occasions, ATF has approved multiple, similar braced designs, issuing its decisions through classification letters. Although ATF does not make

its classification letters public, often the companies receiving these letters shared them with the public to educate customers and the industry about the referenced products.

57.    On November 26, 2012, ATF issued a classification letter concluding that a pistol stabilizing brace designed such that a "shooter would insert his or her forearm into the device while gripping the pistol's handgrip-then tighten the Velcro straps for additional support and retention…" did not qualify as a stock and so would not transform a pistol into a short-barreled rifle ("SBR") regulated pursuant to 18 U.S.C. § 921(a)(8) and 26 U.S.C. § 5845(a)(3).

58.    Also on November 26, 2012, ATF issued a determination letter to Sig Sauer stating that attaching its pistol brace to an AR-type pistol's buffer tube would not convert the firearm from a pistol to an SBR.

59.    On March 6, 2014, ATF sent a letter to Sergeant Joe Bradley of the Greenwood, CO Police Department stating that (1) "the firing of a weapon from a particular position, such as placing the receiver extension of an AR-15 type pistol on the user's shoulder, does not change the classification of the weapon"; (2) "certain firearm accessories such as the SIG Stability Brace have not been classified by [ATF Firearms Technology Branch] as shoulder stocks, and, therefore, using the brace improperly does not constitute a design change"; and (3) "[u]sing such an accessory [as the SIG Stability Brace] would not change the classification of the weapon per Federal law."

60.    On October 28, 2014, ATF sent a letter to a manufacturer stating that a shotgun with a pistol brace attached was "not a [regulated] 'firearm' as defined by the NFA provided the

<u>SigTac SB15 pistol stabilizing brace is used as originally designed and NOT used as a shoulder stock</u>."

61.     On December 15, 2014, ATF issued a determination letter to the manufacturer of the "Blade AR Pistol Stabilizer," which was a brace designed to stabilize via leverage against the user's forearm, rather than Velcro straps. The determination letter stated that attaching this blade-style brace to a pistol would not convert the pistol into a "firearm" as defined by the NFA, "<u>provided the Blade AR Pistol Stabilizer is used as originally intended and NOT used as a shoulder stock</u>." (Emphasis in original).

62.     Some of ATF's letters issued from 2014 to 2017 addressed the potential for using a stabilizing brace to fire from the shoulder, indicating that, while attaching the devices themselves to a pistol would not make the weapon an SBR, ATF may look at individual use of the firearm to determine "intent to design or redesign" such a weapon into an SBR.

63.     On January 16, 2015, ATF issued an *Open Letter on the Redesign of "Stabilizing Braces*" (hereinafter "Open Letter"). The Open Letter confirmed that a pistol stabilizing brace, if used as designed and described in the November 26, 2012 classification letter, "is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm." However, the Open Letter further stated that "use as a shoulder stock constitutes a 'redesign' of the device because a possessor has changed the very function of the item." While the Open Letter took great pains to define "redesign," it did not define "use as a shoulder stock."

64.     This 2015 ATF Open Letter led to significant confusion about the legality of various techniques for handling a brace-equipped firearm based on how ATF might perceive the

user's intent, and whether mere intent could constitute a "design or redesign" under the law.

65.     Indeed, ATF's Open Letter, claiming that merely shouldering a firearm with a stabilizing brace converted it into a short-barreled rifle, represented a significant departure from ATF's prior guidance.

66.     Even so, at no time did ATF communicate a policy whereby the mere fact of attachment of an approved brace to a firearm would automatically convert that firearm into an NFA-controlled SBR.

67.     On December 22, 2015, ATF issued a determination letter on a new design of brace, stating that an adjustable brace "utilizing two telescoping metal rods that affix to both sides of an adapter mounted to the rear of a Sig Sauer, Model SIG MPX, 9mm Luger caliber pistol" (commonly referred to in the gun industry as a "PDW-style brace") would be "approved for use as a pistol stabilizing brace provided the raised ridges are removed from the rear of the device and not added at a later time."

68.     On October 3, 2016, ATF issued a determination letter to Gear Head Works, LLC, stating that its "Tailhook" model of brace that hooks under the forearm, "when attached to an AR-type pistol, does not convert that weapon to be fired from the shoulder and would not alter the classification of the subject pistol."

69.     On January 12, 2017, ATF issued a determination letter to Gear Head Works, LLC, stating that its second generation of "Tailhook" brace, "when attached to an AR-type pistol, [does] not convert that weapon to be fired from the shoulder and would not alter the classification of the subject pistol."

70.     Then, on March 21, 2017, ATF transmitted a letter to SB Tactical, LLC, a manufacturer of pistol braces ("SB Tactical Letter"), announcing a "reversal" on firing braced firearms from the shoulder.  In the 2017 letter, ATF stated that, "[t]o the extent that the January 2015 *Open Letter* implied or has been construed to hold that incidental, sporadic, or situational 'use' of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute 'redesign,' such interpretations are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced."

71.     In other words, ATF's 2017 letter walked back its 2015 Open Letter, which had held that merely shouldering a pistol with a brace turned it into an illegal short-barreled rifle. Thus, the SB Tactical Letter suggested that "use as a shoulder stock" would not constitute a "redesign" of the brace unless other "affirmative steps to configure the device for use as a shoulder-stock" were taken, and a firearm was not redesigned by "the mere fact that the firearm was fired from the shoulder at some point."

72.     However, adding even more confusion, ATF 2017 letter did not define "incidental, sporadic, or situational use," leaving owners of pistols with braces completely in the dark as to how much "shouldering" would cross ATF's secret magic line.

73.     On October 31, 2017, ATF issued a determination letter to the manufacturer of the "Shockwave Technologies Blade Pistol Stabilizer 2.0," which was a blade-style brace of substantially similar design to that referenced in the December 15, 2014 letter. In the letter, ATF stated that it "concluded that attaching the Shockwave Blade Pistol Stabilizer to an AR-type handgun alone as a forearm brace, does not 'make' a NFA weapon. However, if

19

the shooter/possessor takes affirmative steps to configure the device for use as a shoulder-stock… and then in fact shoots the firearm from the shoulder using the accessory as a shoulder stock, that person has objectively 'redesigned' the firearm for purposes of the NFA. This conclusion is not based on upon the mere fact that the firearm was fired from the shoulder at some point."

74.     On July 24, 2018, ATF issued a determination letter to Trinity Force Corporation, manufacturer of a brace of similar design to the Shockwave brace. The letter determined that if the subject brace were "used as designed to assist shooters in stabilizing a handgun while shooting with a single hand, and the stabilizing brace is installed on an AR-15 type pistol so that the distance from the face of the trigger to the rear of the device is less than 13 ½ inches-the [sic] device is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm."

75.     While over the past decade of classification letters, ATF has clarified, adjusted, and even reversed various aspects of determinations, these letters establish a history of ATF approving the sale of braces and braced pistols, without any indication that their registration or destruction would be required or that simple possession otherwise would be made a crime.

76.     Moreover, although the Final Rule seeks to distance ATF from its prior classifications, or claim they applied only to a particular sample firearm, this history of classifications shows otherwise.  Rather, numerous ATF letters have determined that a stabilizing brace, when added *generally* to *any* pistol, does not turn the firearm into a short-barreled rifle under the NFA.

20

77.     Due to these repeated assurances from ATF that stabilizing braces are not subject to registration under the NFA, millions of consumers have lawfully purchased or manufactured pistols equipped with stabilizing braces in reliance on this long and consistent history of ATF's classifications.

## IV.     Impact of Classification Letters

### A. Popularity of Braced Pistols

78.     Millions of Americans already legally own pistols with stabilizing braces, purchased and manufactured in the years since they were invented and first approved by ATF in 2012.

79.     "From 2012-2020, there were at least ten new additions to the pistol brace market. Many companies … started manufacturing and evolving pistol braces to adjust to the users' wants and needs. These products were developed following the legal guidelines set forth by ATF in combination with industry leaders. The massive increase in the sales of pistol braces also saw an increase in the production of pistol caliber carbines, classified as pistols, that could accept a brace."[11]

80.     In a letter to Attorney General Merrick Garland, 48 Republican Senators wrote that "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for

---

[11] "History of Pistol Braces with the changing Gun Laws in the US," F5Mfg.com, available at https://f5mfg.com/news/history-of-pistol-braces-with-the-changing-gun-laws-in-the-us/.

these stabilizing braces. Millions of law-abiding Americans have purchased braces to add them to their own firearms, or purchased firearms with the braces already attached."[12]

81.    "Millions of law-abiding Americans use pistol braces, and many of those Americans rely on braces because they are disabled," notes Senator John Kennedy (R-LA).[13]

82.    Indeed, 2021 Congressional Research Service report cites estimates of from 10 to 40 million pistol braces owned by Americans.[14] Accordingly, the Final Rule threatens to make instant felons out of millions of law-abiding gun owners with a stroke of the regulatory pen.

**B.  A Decade of Imports and Assembly Allowed Under 26 U.S.C. § 5844 and 18 U.S.C. § 922(r)**

83.    ATF historically has allowed importation of semi-automatic braced pistols under 26 U.S.C. § 5844, and assembly of semi-automatic braced pistols under 18 U.S.C. § 922(r), which applies only to rifles.

84.    On the other hand, importation of NFA "firearms" is generally unlawful under Section 5844 of the Internal Revenue Code, unless the weapon falls under an exception. *See* 26 U.S.C. § 5844.[15]

---

[12]  Letter from Sen. Mitch McConnell to Attorney General Merrick Garland (June 24, 2021) available at https://www.cassidy.senate.gov/imo/media/doc/ATF%20Letter.pdf.

[13]  Ryan King, "Sen. John Kennedy pushes to scrap Biden's pistol-stabilizing brace rule," Washington Examiner (Jan. 31, 2023).

[14]  Congressional Research Service, "Handguns, Stabilizing Braces, and Related Components" (Apr. 19, 2021), available at https://crsreports.congress.gov/product/pdf/IF/IF11763.

[15]  No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction unless the importer establishes, under regulations as may be prescribed by the Secretary, that the firearm to be imported or brought in is—

85.     Section 5845(a) of the Internal Revenue Code, in relevant part, defines a firearm as "a rifle having a barrel or barrels of less than 16 inches in length [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length."

86.     In that same section, "rifle" is defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge."  *See* 26 U.S.C. § 5845(c).

87.     Therefore, if the imported foreign made braced-pistols were not in fact pistols at all, and were really SBRs all along, then their importation would not have been permitted under 26 U.S.C. § 5844 as they meet the definition of a "firearm" in § 5845(a) of the Internal Revenue Code because they would also meet the definition of "rifle" or "weapon made from a rifle" in § 5845(c).

---

**(1)** being imported or brought in for the use of the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof; or

**(2)** being imported or brought in for scientific or research purposes; or

**(3)** being imported or brought in solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer;

except that, the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with classifying the firearm. 26 U.S.C. § 5844

88.     Under 26 U.S.C. § 5861(k), it is a crime "to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844." There is no statute of limitations that would run, as possession is an ongoing activity. Yet the Final Rule does not promise "enforcement discretion" with respect to these provisions, meaning an SBR illegally imported would need to be destroyed (not simply modified or registered).

89.     Furthermore, 18 U.S.C. § 922(r) generally makes it unlawful for "any person to assemble from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) of this chapter as not being particularly suitable for or readily adaptable to sporting purposes." 18 U.S.C. § 922(r); *see also* 27 C.F.R. § 478.39.

90.     Such "imported parts" are basic parts of any firearm, and include innocuous items such as barrels, hammers, sears, handguards, triggers, and even magazine floorplates. *Id.*

91.     Making an SBR – a rifle – would logically include "assembl[ing]" one from an imported pistol by attaching a "brace" to it.[16] That weapon would contain more than 10 imported parts.

92.     Therefore, those who added a brace to an otherwise lawful imported pistol, would have violated 18 U.S.C. § 922(r) as they have now assembled (or made) an SBR.

93.     In fact, the Final Rule responds to a comment regarding 18 U.S.C. § 922(r), which "makes it unlawful 'for any person to assemble from imported parts any semiautomatic rifle,' and 27 CFR § 478.39 [which] provides that a person may not assemble a

---

[16]     https://johnpierceesq.com/does-922r-apply-when-building-an-sbr-from-an-imported-pistol/.

semiautomatic rifle using more than 10 of the imported parts listed" and notes "modification of this kind of firearm through the *removal of the relevant parts would not cure the 922(r) violation because that 'assembly' has already occurred.*"  FR 6564 (emphasis added).

94.    That is, for individuals whose imported pistols, to which they added a stabilizing brace, are suddenly reclassified as semiautomatic rifles, they will find that the adding of the brace was illegal when it occurred.  Moreover, ATF apparently believes that this status *cannot* be cured by reconfiguration (such as by removing the brace) because "assembly has already occurred" for the purposes of § 922(r), nor will registration of the now-illegal now-rifle under the Final Rule cure this *separate* violation of the statute.

95.    To be sure, historically ATF does not appear to have enforced § 922(r), much less against those adding braces to imported pistols.  Of course, up until the Final Rule, adding a brace to an imported pistol did not magically make it an SBR with more than 10 imported parts.

**ATF'S FAILED NPRM (2020)**

96.    After nearly a decade of having repeatedly approved of the use of stabilizing braces on firearms, ATF first attempted to change policy in December of 2020, publishing a Notice of Proposed Rulemaking in the Federal Register entitled "Objective Factors for Classifying Weapons with 'Stabilizing Braces,'" 85 Fed. Reg. 82,516 (Dec. 18, 2020).[17]

---

[17] https://www.regulations.gov/document/ATF-2020-0001-0001

97.     But although claiming to be "objective," ATF's 2020 NPRM instead provided a hopelessly confusing maze of vague and ambiguous concepts that it might (but need not) consider (in addition to other unnamed factors and criteria) to classify a firearm with a stabilizing brace.

98.     Plaintiffs GOA and GOF submitted comments in response to this 2020 NPRM. *See* Comments of GOA/GOF dated December 23, 2020, at 3, https://www.gunowners.org/wp-content/uploads/2020/12/GOA-Comments-to-ATF-on-Pistol-Braces.pdf.

99.     GOA and GOF explained that, contrary to ATF's claims, there was no "misunderstanding" about pistol stabilizing braces being permissible accessories without changing a firearm's classification but that, on the contrary, ATF has expressly stated as much. *Id*. at 2.

100.    Summarizing the 2020 NPRM's ridiculous attempt to delineate between GCA and NFA firearms, GOA and GOF's comments summarized that ATF's "Objective Factors" consisted of a 17-part balancing test, replete with numerous sliding scales and even secret criteria — each applied subjectively and considered "holistically."

101.    GOA and GOF's comments characterized the 2020 NPRM as Kabuki Theater, designed to clothe ATF with an air of legitimacy, but rather being purposefully designed and intended to transform law-abiding American gun owners into felons with a stroke of the pen.

102.   Eight days later, on December 31, 2020, ATF withdrew this 2020 NPRM without explanation.[18]

## NOTICE OF PROPOSED RULEMAKING (2021)

### I.   Worksheet 4999 Used as Basis for Classification

103.   Then, after waiting more than six months, ATF in June of 2021 again published a notice in the Federal Register, entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'" 86 Fed. Reg. 30826 (June 10, 2021) ("NPRM").[19]

104.   Whereas the focus of the 2020 NPRM had been a laundry list of vague concepts and standards, the NPRM submitted in 2021 claimed to attempt to provide objectivity and clarity.

105.   Thus, the keystone to the NPRM was a proposed "ATF Worksheet 4999," a worksheet that utilized an arbitrary (but clearly specified) three-part points system through which a firearm would be evaluated to determine whether it was a pistol or a rifle.  NPRM at 30841-42.

106.   First, Worksheet 4999 would have required as a prerequisite that a weapon must weigh at least 64 ounces, and be between 12 and 26 inches long, to be a "suitable host firearm" for a stabilizing brace. *Id*. at 30843.  If the weapon was too light, or was too long or short to meet the small window to be a "suitable host firearm," the addition of a brace *automatically* converted the firearm into an SBR. *Id*.

---

[18] https://www.regulations.gov/document/ATF-2020-0001-7053
[19] https://www.govinfo.gov/content/pkg/FR-2021-06-10/pdf/2021-12176.pdf

107.   Second, the Worksheet evaluated a number of "Accessory Characteristics" to determine whether a brace converted a "suitable host" pistol into an SBR. These include "accessory design," *i.e.*, whether the accessory resembles a shoulder stock, the "rear surface area" of the brace, whether the brace is "adjustable," and what sort of "stabilizing support" the brace provides. *Id*. at 30841.

108.   Then, under Section 2, the Worksheet assigned negative "points" for certain design features. If an accessory accumulated more than four points, it would be considered to convert a pistol into an SBR. If not, assessment proceeded to Step 3.

109.   Third, the Worksheet evaluated the "Configuration of the Weapon." This includes design features such as the "length of pull," "attachment method," "configuration or modification" of the brace, and "peripheral accessories" such as an attached gunsight. *Id*. at 30842.

110.   Again, as with Section II, if the firearm accumulated four or more points, it would be considered to convert a pistol into an SBR.

111.   By the end of the Worksheet, it would be rare for any brace-equipped pistol not to accumulate the four points to be deemed a "rifle."

112.   Of course, that was the design and intent.

## II.   Over 210,000 Comments Received

113.   According to April Longwell, Chief of ATF's Public Affairs Division, the NPRM "is among the most commented on in the agency's history," with some 210,000 comments received.

114.   Moreover, the comments were "overwhelmingly negative" (*Id.*), including comments from numerous states (including Texas) and from GOA/GOF, along with countless of their members and supporters.[20]

## A. GOA/GOF's Comments

115.   As noted, Plaintiffs GOA and GOF submitted comments in opposition to the NPRM.[21]

116.   These comments pointed out that "[t]he NPRM … represents a 180-degree policy shift," given that "past ATF letters have approved of various stabilizing braces no matter the firearm on which they are used, while the … NPRM claim[s] that only particular configurations of firearms may use various braces." *Id.* at p. 8.

117.   However, GOA/GOF noted that ATF at the same time appeared to claim that the NPRM merely *explained a present policy*, although in reality it was reversing course. It noted that ATF claimed the NPRM was designed to explain "the criteria that *FATD considers* when evaluating firearm[s]," and aimed at "("[p]roviding clarity to the public and industry on *how ATF enforces* the provisions of the NFA." *Id.* at 5 (quoting NPRM at 30826 and 30847).[22]

---

[20]   Jake Fogleman, *Negative Reactions Dominate Pistol-Brace Ban Proposal as Comment Period Ends*, TheReload.com (Sept. 9, 2021), https://thereload.com/negative-reactions-dominate-pistol-brace-ban-proposal-as-comment-period-ends/.

[21]   https://www.regulations.gov/comment/ATF-2021-0002-209066.

[22]   Attempting to correct this problem, the Final Rule goes out of its way to repeatedly "acknowledge" ATF's prior conflicting policies and explain that the Final Rule represents a departure from prior policy.  *See*, *e.g.,* FR at 6502, 6507.

118.    By "clothing the NPRM and Notice as merely announcing existing policies," and "failing even to acknowledge its change in direction," GOA/GOF argued, "the agency cannot possibly be seen to have provided a 'reasoned explanation for the change,' and thus the NPRM is arbitrary and capricious." *Id*. at 10.[23]

119.    Next, GOA/GOF argued that the NPRM violated the clear text of the NFA, and was without statutory authorization. The NFA "requires a rifle to be ***both*** 'designed' ***and*** 'intended' to be fired from the shoulder. 26 U.S.C. Section 5845(c). The NPRM, on the other hand, treats these factors as if they are disjunctive, assuming that **design alone can be determinative** without evidence of intent, and that purported objective **intent alone can be determinative** in spite of design. *Id*. at 33.

120.    GOA/GOF then went on to describe many of the wholly arbitrary features of the NPRM. "For example, ATF's categories of "surface area" consist of the following descriptions: '**minimal**' surface area, '**useful**' surface area, and '**added**' surface area. [NPRM] at 30830. Of course, no one (including ATF) has any idea what any of that means." *Id*. at 20.

121.    Likewise, GOA/GOF explained that a stabilizing brace obtains either 1 or 2 points under Worksheet 4999 depending on whether it merely "*incorporates ... features" from* shoulder stocks or is "*based on* known shoulder stock design." [NPRM] at 30830. [T]hat

---

[23] Citing *FCC v. Fox TV Stations, Inc*., 556 U.S. 502, 515, 129 S. Ct. 1800, 1811 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio*…").

imaginary line in the sand is entirely open to ATF's discretion" (emphasis added). *Id*. at 20.  *See* FR at 6522 (abandoning that standard).

122.   "Likewise, ATF claims that various 'cuff-type' braces that either 'fully' or 'partially' or 'fails' to wrap around the arm are penalized between 0 and 2 points. [NPRM] at 30830. But this is a completely arbitrary standard, and depends entirely on both the length and circumference of any individual person's arm." *Id* at 21.  *See* FR 6532 (abandoning that standard)

123.   GOA/GOF noted that "the 'point value' system adopted by the NPRM is completely arbitrary. It would appear that ATF simply picked arbitrary numbers out of thin air, deciding to penalize braces between 0 and 3 points depending on the severity of the alleged violation. Moreover, some categories penalize between 0 and 1 point, some between 0 and 2 points, and some between 0 and 3 points." *Id*. at 21-22.  *See* FR 6480 (abandoning that standard).

124.   GOA/GOF further noted that, even if a braced pistol somehow avoids accruing the four points for classification as an SBR under Worksheet 4999, ATF reserves arbitrary power to *still classify it as such*. "[E]ven if a weapon accrues less than [sic] 4 points in each section, attempts by a manufacturer or maker to circumvent Federal law by attaching purported 'stabilizing braces' in lieu of shoulder stocks may result in classification of those weapons as 'rifles' and 'shortbarreled rifles.'" NPRM at 30834…. ATF claims that it will make this determination 'regardless of the points accrued on the ATF Worksheet 4999....' *Id.* ATF provides no examples of what such 'attempts' to 'circumvent[] Federal statutes'

might look like, and provides no criteria by which it proposes to make such a determination to override Worksheet 4999." *Id*. at 32.

125.   As GOA/GOF noted, "ATF thus purports to provide Worksheet 4999's allegedly 'objective factors' that can be objectively applied to pistols equipped with stabilizing braces, yet reserves to itself unlimited and unbridled discretion to reject Worksheet 4999 at any time, and determine that any particular firearm has been made in violation of the law," GOA/GOF argued. "That is the very definition of an arbitrary and capricious rule. After providing numerous pages of detailed analysis, ATF then casts it all aside in favor of a 'we'll know it when we see it' standard, with which neither gun owners nor the industry could ever hope to comply." *Id*. at 32.

126.   GOA/GOF's comments noted that the NPRM utterly fails to provide an objective and measurable standard for firearms owners to comply with the law: "the NPRM states that an ATF classification will be "of a particular firearm configuration as presented *by that sample*." *Id.* at 30827 (emphasis added). ATF claims that "[e]ven though firearms may have a similar appearance (*i.e.,* shape, size, etc.), an ATF classification of a firearm pertains *only to the particular sample* submitted because of the vast variations in submissions...." *Id.* (emphasis added). This makes reliance on ATF rulings nearly impossible, even for firearms configured nearly identically to one of which ATF has approved. It would thus appear that, if even the smallest detail is changed (such as adding different sights, or a different optic), *the entire firearm's classification could be inadvertently changed*," resulting in inadvertent criminal liability. *Id*. at 34-35.  As GOA/GOF explained, "ATF has designed a test *so complex* that ordinary gun owners will be unable to undertake it, *so*

*detailed* that any minute change to the configuration of a firearm could change its entire classification, and *so absurd* in application that virtually every stabilizing brace and virtually every firearm utilizing a brace would be classified as a short-barreled rifle under the NFA." *Id*. at 13.

127.    In the Final Rule, ATF specifically notes GOA/GOF's comments, as if to suggest that the Final Rule somehow considered them and, in some way, ameliorated these concerns. In fact, the Final Rule is perhaps more arbitrary and capricious – and more dangerous to Second Amendment rights – than was the NPRM.  Indeed, as explained further below, the Final Rule is more akin to ATF's failed 2020 NPRM than it is to the 2021 NPRM at issue here.

### B.  State Comments in Opposition to the NPRM

128.    In response to the NPRM, a group of 22 States, including Plaintiff the State of Texas, also submitted comments opposed to the NPRM.[24]

129.    Like the GOA/GOF comments, the States explained that, under Congress' statutory definition of a "rifle," "*First*, the weapon must be "designed" or "made" to be fired from the shoulder.  *Second*, … the weapon must be "intended" to be fired from the shoulder. This definition excludes pistols…." *Id*. at p 3.  Yet the NPRM departed completely from the congressional definition, redefining a "rifle" as "any weapon" "equipped with an accessory or component purported to assist the shooter stabilize the weapon while shooting

---

[24] https://www.regulations.gov/comment/ATF-2021-0002-180612.

with one hand," and designed with features "that facilitate shoulder fire" as determined by [Worksheet 4999]. 86 Fed. Reg. at 3085." *Id.* at 1.

130.    As the States explained, "whatever 'designed or redesigned, made or remade, and intended to be fired from the shoulder' means, it does not mean 'accrues four or more points under a two-page worksheet'—a worksheet that requires assessing almost 50 distinct features and that the Federal Government created half-a-century after the Act's 1968 amendment." *Id.* at 8.

131.    The States then noted that ATF recognizes that stabilizing braces are not "designed to facilitate shoulder shooting. Rather, they are "designed to be attached to large or heavy pistols and that are marketed to help a shooter 'stabilize' his or her arm to support single-handed firing" – not to be "fired from the shoulder." *Id.* at 9.

132.    Finally, the States argued that the NPRM imposes new criminal liability – and is therefore beyond ATF's authority:  "the separation-of-powers problem here is especially stark, because the Department's definition will have the effect of creating an altogether new crime." *Id.* at 1-2.

133.    The States also criticized Worksheet 4999's labyrinthine evaluation process, and argues that the Rule of Lenity prevents ATF from defining criminality through such a confusing and arbitrary process: "[E]ven if an administrative interpretation of a statute authorizing criminal enforcement could overcome application of the rule of lenity, the administrative interpretation would have to provide the adequate notice the statute lacked….The proposed rule does no such thing…. A brace that receives (for example) 5 or 6 points out of a possible 13 in "accessory characteristics" category is illegal." *Id.* at 11.

34

134.    The States thus concluded that ATF has no authority to retrospectively declare an

action criminal. Agencies may not "promulgate definitive interpretations of criminal laws

– that is a matter for courts." *Id*. at 12.[25]

## THE FINAL RULE (2023)

135.    The Final Rule amends the existing definitions of "rifle" contained in 27 C.F.R.

Sections 478.11 (GCA) and 479.11 (NFA), purportedly "clarif[ying]" that, included as a

rifle is "a weapon that is equipped with an accessory component, or other rearward

attachment (*e.g.*, a 'stabilizing brace') that provides surface area that allows the weapon to

be fired from the shoulder, provided other factors, as described in paragraph (2), indicate

that the weapon is designed, made, and intended to be fired from the shoulder."

136.    Paragraph 2, in turn, adopts six factors that ATF alleges indicate whether a firearm

is designed, made, and intended to be fired from the shoulder:

   a. Whether the weapon has a **weight or length** consistent with the weight or
      length of similarly designed rifles;
   b. Whether the weapon has a **length of pull**, measured from the center of the
      trigger to the center of the shoulder stock or other rearward accessory,
      component, or attachment (including an adjustable or telescoping attachment
      with the ability to lock into various positions along a buffer tube, receiver
      extension, or other attachment method) that is consistent with similarly
      designed rifles;
   c. Whether the weapon is equipped with **sights or a scope** with eye relief that
      require the weapon to be fired from the shoulder in order to be used as
      designed;
   d. Whether the **surface area** that allows the weapon to be fired from the shoulder
      is created by a buffer tube, receiver extension, or any other accessory,
      component, or other rearward attachment that is **necessary for the cycle of
      operations;**

---

[25] Citing *Whitman v. United States*, 574 U.S. 1003, 1004-1005 (2014) (statement of
Scalia, J., respecting the denial of certiorari)

e. The manufacturer's direct and indirect **marketing and promotional materials** indicating the intended use of the weapon; and

f. Information demonstrating the **likely use** of the weapon in the general community.  [FR at 6574-75 (emphasis added).]

137.   As noted above, all previous ATF classifications of stabilizing braces and firearms equipped with stabilizing braces are superseded, as of January 21, 2023, the date the Final Rule was published in the Federal Register.

138.   Although the Final Rule purports to have taken effect immediately upon publication on January 31, 2023 (FR at 6481), persons in possession of a firearm with a stabilization brace have until May 31, 2023 (120 days from January 31, 2023) to comply with ATF's demands.

139.   The Final Rule thus provides five "Options for Compliance for Current Unlicensed Possessors:"

a. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm;

b. Apply to make and register a firearm using ATF E-Form 1;

c. Permanently remove and dispose of, or alter, the stabilizing brace, such that it cannot be reattached;

d. Turn the firearm into local ATF office; or

e. Destroy the firearm.  [FR at 6570.]

140.   Similarly, the Final Rule provides the same "Options for Compliance for Federal Firearms Licensed Manufacturers or Importers Under GCA and Qualified as an SOT (Class 1 Importer and Class 2 Manufacturer) Under the NFA," except that such entities would simply register the firearm by filing an "ATF E-Form 2" rather than applying for permission on a Form 1.  FR 6570.

141.    Next, the Final Rule lists "Options for Compliance for Federal Firearms Licensees Not Having Paid SOT as a Class 1 Importer or Class 2 Manufacturer under the NFA," consisting of the same options as for unlicensed individuals.  FR 6570

142.    Finally, the Final Rule lists "Options for Compliance for Certain Governmental Entities," again consisting of the same options, but adding a sixth option of "Submit an application for registration of firearms acquired by certain governmental entities using ATF E-Form 10."  FR 6570-71.

143.    The Final Rule then claims ATF (in its good graces, of course) will forbear collection of the $200 NFA *making* tax from individuals and FFLs that are not Class 1 (Importer) and Class 2 (Manufacturer) SOT holders, who are in possession of firearms equipped with a stabilizing brace, provided that ATF E-Form 1 is timely submitted by May 31, 2023. FR 6571.

144.    Similarly, the Final Rule forbears the NFA *transfer* tax for the transfer of firearms that are equipped with a stabilizing brace for any transfer that occurred before January 21, 2023 – the effective date of the Final Rule.  *Id.*

145.    ATF claims that it is "appropriate to forbear this retroactive tax liability," which the agency blames on "past public confusion."  *Id*.  On the contrary, there has been no "confusion," but rather ATF has repeatedly and explicitly stated that various stabilizing braces do not turn firearms into the short-barreled firearms ATF now claims them to be.

### THE FINAL RULE VIOLATES THE APA

**I.** **The Final Rule Provides Implications Rather than Clarity, and Invites Inferences Rather than Specificity.**

146.    As noted above, whereas the NPRM's Worksheet 4999 contained criteria that, although arbitrary and heavily flawed, were mathematically precise at least somewhat objective (*i.e.*, 64 ounces, 26 inches), the Final Rule's Paragraph (2) contains no such explicit guidance or measurements.

147.    Rather, Paragraph (2) begins with a threshold question of <u>whether</u> "a weapon provides surface area that allows the weapon to be fired from the shoulder," but does not provide any guidance as to *what measurement* constitutes sufficient "surface area" (given that all physical objects must have *some* surface area) or how it is determined what surface area "allows" firing from the shoulder.  FR at 6569; *Cf.* NPRM 30841.

148.    Likewise, Paragraph (2)'s factors (i)-(iv) all begin with "<u>whether</u>" but give no indication of how the factors described therein will be counted or the relative values assigned to any particular feature or characteristic.  FR at 6569.

149.    For example, Paragraph (2)(i) considers "<u>whether</u> the weapon has a weight or length consistent with … similarly designed rifles."  While the *implication* appears to be that heavier and longer firearms are more likely to be deemed rifles, the regulation does not actually say that in so many words.  But even then, how heavy and how long is too heavy and too long?  The Final Rule does not explain.

150.    Rather, in responding to comments on the NPRM, ATF provides four pages of tables listing various weights and lengths of dozens of rifles.  FR 6514-6518.  But all this shows

is that length and weight is entirely unhelpful in deciding whether a firearm is a rifle.  For example, ATF's "weight" chart shows "rifles" ranging anywhere from 2 pounds to 9.9 pounds.  FR 6514-16.  Even when comparing rifles that have 16-inch barrels, their weights range from 4 pounds to 9.9 pounds.  *Id*. at 6515 (Keltec Sub2000 vs Germany STG44).

151.    Likewise, ATF's "length" chart shows a range anywhere from 18.75 inches to 37.75 inches – a huge variation.   Even comparing rifles with 18.5 inch barrels, the range is between 26 inches and 37.75 inches in length.  *Id*. at 6517 (FN P90 vs Ruger Mini-14).

152.    In other words, ATF's own data show that weight and length have little to no bearing on whether a firearm is a pistol or a rifle, and thereby demonstrate that the Final Rule's regulation is arbitrary and capricious.

153.    Likewise, Paragraph (2)(ii) asks "<u>whether</u>" the firearm's "length of pull" is "consistent with similarly designed rifles," but does not indicate whether longer or shorter lengths of pull is a good factor or a bad factor (presumably the longer, the worse, but the Final Rule does not say).   Unlike Worksheet 4999, the Final Rule does not give any indication of what length of pull is too long that it would indicate a finding that a firearm is an SBR instead of a pistol.

154.    But even then, "length of pull" is not a term found in any federal statute or even regulation (until now) and, even though a "well-known standard in the firearms industry" (FR 6534), it is a measurement that applies to *rifles*, not to pistols.   *See* GOA/GOF Comments at 22 n.7.  Confusingly, the Final Rule does not provide any provision for how a person would measure the length of pull of a pistol with a stabilizing brace.  In order to get any kind of idea, one must look elsewhere, such as ATF's response to comments, where

the agency claims that "[h]ow ATF would measure the length of pull under this rule *would depend* on the type of 'brace' device attached."  FR 6534-35 (describing three different ways to measure length of pull, depending on the style of stabilizing brace).

155.   In other words, one cannot even deduce how to measure the length of pull of any particular firearm with a stabilizing brace without referring to "it depends" text *outside of the regulation* that ATF has promulgated.  Yet substantive definitions necessary to understand a regulatory term should be in the promulgated regulation, not the preamble of a rulemaking, which is not binding or authoritative.  *See Bender v. Gutierrez*, Nos. 2:03CV519, 2:04CV300, 2006 U.S. Dist. LEXIS 96720, at *16-17 (E.D. Va. Sept. 19, 2006) and *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019).  Even more so in the case of a statute which imposes serious *criminal penalties* such as the statute here.

156.   Making matters worse, ATF's chart of various lengths of pull for rifles it measured indicates that rifles have all manner of lengths of pull, ranging from 11 inches to 19.5 inches.  *See* FR 6535-37 (Springfield M6 Survival rifle at 11 inches; Calico M-100 at 18.25 inches).  ATF's conclusion that "the average length of pull found on shoulder-fired weapons is approximately 13.25 to 14.25 inches" is merely an average of a huge range, and hardly demonstrates that pistols with stabilizing braces cannot have a length of pull longer than that average without being classified SBRs.

157.   Next, Paragraphs (2)(i)-(ii) use the vague term "consistent with … similarly designed rifles," without indicating what levels of consistency or similarity are evaluated

and which would require a gun owner attempting to classify a firearm to conduct a survey of the firearms market—and this, still, would yield unpredictable results.  FR at 288-89.

158.   Paragraph (2)(vi) is again nebulous and unusable by the public because, among other things, it fails to define what sort of "Information" should be evaluated or how the "likely use of the weapon" can be determined.  FR at 289.

159.   The problems in the new regulation continue, with Paragraph (2)(iv) asking "whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations…."  FR 6569.  But ATF does not explain what happens in any case, or the proper result if such surface area *is* created by a buffer tube that is "necessary for the cycle of operations," such as on an AR-15.  Is that a good thing or a bad thing with respect to classification as a pistol?  Again, one is forced to look outside of the regulation in the hopes of getting an answer.

160.   Even then, ATF is apparently unwilling to promise that even a "necessary … rearward attachment" can save a pistol from becoming an SBR.  *See* FR 6537-38 ("an AR-type pistol with a standard 6- to 6 ½-inch buffer tube *may not* be designed, made, and intended to be fired from the shoulder) (emphasis added).  In other words, **ATF is unwilling even to promise that AR-15 style pistols *without braces* (which have been around for decades) are not short-barreled rifles**.  This raises the question as to how one could ever comply with the Final Rule, as a person with an AR-15 pistol *without a stabilizing brace* could not simply "remove and dispose of … the 'stabilizing brace'…."

Moreover, the buffer tube of an AR-15 cannot simply be removed since, as ATF admits, it is "necessary" for operation.

161.   Nor does the Final Rule indicate how much impermissible "surface area" is allowed before a firearm becomes an SBR.  The NPRM suffered from the same flaw.  NPRM at 30830 (vaguely describing "minimal" surface area, "useful" surface area, and "added" surface area).  Yet even less helpfully than the NPRM, the Final Rule now claims that "ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area," but rather "any surface area" might be enough.  FR 6511.

162.   The Final Rule, then, is designed from the ground up to be vague and incomprehensible, leaving gun owners with absolutely no way to conclusively determine if their firearms are unregistered short-barreled rifles.  None of the purported factors in the regulation has any meaning, being entirely devoid of any measurable standard.

163.    That is not the rule of law.  Americans are not required to draw inferences in order to deduce whether they are committing felony crimes, at risk of having their lives ruined if ATF draws a different, arbitrary conclusion.  On the contrary, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

## II.  The Final Rule Impermissibly and Unlawfully Targets Firearms (Without Braces) in Ways Not Proposed in the NPRM

164.   As noted above, the Final Rule is so imprecise and unclear that it is note even evident that AR-15 pistols themselves – without braces – are still lawful.

165.   The Final Rule appears to make one additional foray outside of targeting firearms *equipped with* stabilizing braces, seemingly targeting certain *firearms themselves* – irrespective of whether a stabilizing brace is attached.

166.   Several times, the Final Rule refences "a 'pistol grip firearm' with a smooth bore" including the "Mossberg Shockwave" and "Remington Tac-14." *Id.* at 6484, 6496. Although the Final Rule claims these firearms are "commonly referred to as [] 'pistol grip shotguns,'" such items are neither "shotguns … [n]or … pistols," but instead are merely unclassified "firearms" under the GCA. *Id.* at 6496.

167.   With respect to braces, the Final Rule claims, categorically, that stabilizing braces can *never* be used on such firearms.  According to ATF, these shotgun-type firearms "are not designed to be held and fired in one hand like a pistol," presumably since their pump action nature typically utilizes a shooter's second hand to load shells.  Thus, according to ATF, being as the agency has concluded these are two-handed firearms, "the addition of a 'stabilizing brace'" cannot possibly "assist with single-handed firing." *Id.*[26]

---

[26] Of course, it does not appear that ATF ever stopped to consider that a brace might allow a person to shoot such a firearm with *two hands*, but not from the shoulder.

168.    Thus, to the extent that a past 2014 ATF letter involved of the use of a pistol brace on a firearm like a Mossberg Shockwave or Remington Tac-14, the Final Rule claims that "the 2014 classification described above … is no longer valid or authoritative…." *Id.* 6484.

169.    *However*, the Final Rule then goes further, addressing <u>*not only*</u> that 2014 letter (regarding the combination of a pistol grip firearm and a brace), <u>*but also*</u> opines that "the 2014 classification letter … ***and*** *any classification that provides that a pistol grip shotgun is not an NFA firearm* is no longer valid or authoritative … and the firearm should be resubmitted…." *Id.* (emphasis added).

170.    It would appear that ATF has rescinded its prior determinations that pistol grip shotgun-type firearms are not NFA weapons – even if they do not have a pistol brace attached.   Yet although purporting to overrule "any classification" regarding such "firearms," the Final Rule does not explain why ATF's prior classifications of these firearms were incorrect, or opine as to their proper classification.

171.    Indeed, this additional phrase "and any" *did not appear* in the NPRM.  *Cf.* 88 Fed. Reg. 6484 with 86 Fed. Reg. 30828.  Neither did ATF's failed 2020 NPRM include such language.  85 Fed. Reg. 82516.  This additional language, appearing to make all Mossberg Shockwaves and Remington Tac-14s into NFA items, came about only in the Final Rule.

172.    Apparently recognizing the problem with using a rulemaking on "stabilizing braces" to re-define the legalities of *firearms themselves* (without pistol braces), subsequently to publishing the Final Rule ATF spokesmen reportedly have claimed (on a Zoom video presentation, in response to a question by industry members) that the Final Rule does not

mean what it says, and that pistol-grip shotgun-type firearms are still GCA (not NFA) firearms.

173.   But agency spokesmen cannot contradict the plain text of the Final Rule.  To the extent that the Final Rule clearly purports to restrict firearms (without braces) in new ways that were entirely absent from the NPRM, this Court must strike that language.

174.   Certainly, ATF should not object to being enjoined from enforcing a gun ban that it claims it did not mean to promulgate.

### III.   The Final Rule's Definition of "Rifle" Was Issued in Violation of the Administrative Procedure Act's Notice and Comment Requirement

175.   While both the NPRM and the Final Rule propose a new definition of "rifle" that includes consideration of various factors, these two documents take _entirely different approaches_ to establishing which firearms are considered "rifles" within that definition. The Final Rule thus is not a "logical outgrowth" of the NPRM, in violation of the APA.

176.   The NPRM proposed to promulgate a worksheet, ATF Worksheet 4999, that utilized a three-part points system through which a firearm could be evaluated to determine whether the proposed rule would consider it a pistol or a rifle.  NPRM at 30841-42.

177.   Many of the Worksheet 4999 characteristics, while subject to much deserved criticism for having arbitrary thresholds and other defects, were at least measurable or had the potential to be objectively ascertained (or close to it).

178.   For instance, Worksheet 4999, Section I required that the weapon "weigh at least 64 ounces" and "have an overall length between 12 and 26 inches."  NPRM at 30841.

179.   Section II assigned points for various "Accessory Characteristics" such as whether the stabilizing brace had a "fixed design" (0 points) or was "[a]djustable or telescoping" (2 points); and whether the stabilizing brace was of the "Fin-type" or "Cuff-type" and whether these had arm straps and/or could fully or partially wrap around the shooter's arm, if at all (0-2 points, depending).  *Id.*

180.   Section III assigned points based on the "Configuration of Weapon" including the length of pull (0 points if "Less than 10-1/2 Inches," 4 points if "13-1/2 Inches and Over," and intermediate point values for measurements in between); the method of attachment of the stabilizing brace, including whether a "Folding Adapter" or "Spacers" were used (both 2 points); and whether the weapon had a "Hand Stop" (2 points), "Secondary Grip" (4 points), or "bipod / monopod" (2 points) attached to it.  *Id.* at 30842.

181.   While the NPRM's Worksheet 4999 included some subjective criteria, and the reasoning behind certain cutoffs, factors, and points values may have nevertheless been misguided, arbitrary, or otherwise contrary to law as noted in the comments received (including those submitted by Plaintiffs GOA and GOF) (*see* FR 6510, admitting various of ATF's "incorrect conclu[sions]"), its overarching characteristic was a seeming attempt to create a standardized methodology, utilizing often-objectively observable criteria that could be followed to a predictable or reproduceable outcome.  Indeed, the lack of any objective guidance likely was the reason that ATF's failed 2020 NPRM was withdrawn.

182.   Rather than properly engage with the comments submitted, and justify or modify the criteria and thresholds laid out in the NPRM, the Final Rule takes an entirely different approach –discarding Worksheet 4999 wholesale, and with it any vestige of procedural

46

transparency or veneer of objective, predictable evaluation as to whether or not a particular weapon will be classified as a rifle or a pistol.

183.    Without any reference to or mention of points or defined measurements, the Final Rule replaces the NPRM's Worksheet 4999 with "paragraph (2)":

> (2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:
>
> (i) **Whether** the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (ii) **Whether** the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
>
> (iii) **Whether** the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
>
> (iv) **Whether** the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
>
> (v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
>
> (vi) Information demonstrating the likely use of the weapon in the general community.  [FR at 6569-70.]

184.    Paragraph (2) thus provides a complete change of course in the method of determination, unpredictable to commenters to the NPRM, and cannot be considered a "logical outgrowth" of the NPRM.  To be sure, the Final Rule claims that the Paragraph

47

(2) criteria were drawn "directly from the NPRM and Proposed Worksheet 4999."  FR 6498.  However, whereas Worksheet 4999 created objective standards (precise weights, lengths, lengths of pull, *etc.*), Paragraph (2) does not, instead asking vague questions like "whether" without providing any answers in the form of fixed numerical standards.

185.   The Final Rule claims that ATF "took the relevant criteria discussed in the NPRM and Worksheet 4999 … and incorporated them into the rule's revised definitions," but a simple comparison shows that one hardly resembles the other in several key attributes.

186.   The unbridgeable differences between Worksheet 4999 and Paragraph (2) make the NPRM's and Final Rule's definitions of "rifle" so divergent from one another that the Final Rule's definition cannot be considered a "logical outgrowth" of the former.

187.   Nor does Paragraph (2) incorporate *all* of the criteria from Worksheet 4999, such as the "design" of the particular stabilizing brace, the "attachment method" to the firearm, the presence of various "peripheral accessories," etc.  NPRM at 30841-42.  Quite to the contrary.  As noted above, the Final Rule expressly abandons many of the factors and tests from the NPRM.

188.   Even worse, the approaches in the Final Rule and the NPRM yield conflicting results.  As one example, under Worksheet 4999 in the Final Rule, a firearm would score "4" points and be considered as a SBR if it had a "length of pull" over 13.5 inches, without any other considerations.  NPRM at 30842.  Yet under the Final Rule, length of pull merely, "*in combination* with other features – *could* indicate" an SBR.  FR 6534 (emphasis added).  And as ATF explains, one style of firearm may permissibly have a longer length of pull than another style of firearm.  *Id.* 6535 (compared to the NPRM, which imposed the same

length of pull measurements across-the-board).  The Final Rule does not acknowledge, much less justify, these conflicting results.

189.    In the Final Rule, ATF claims that "Worksheet 4999, including the points assigned to each criterion, was intended to facilitate the evaluation by individuals or members of the industry," and "was intended to ensure uniform consideration and application of the statutory definition of those terms," however "the proposed Worksheet 4999 and point system did not achieve these intended purposes."  FR 6510.

190.    But rather than go back to the drawing board and submit a new NPRM, ATF plodded ahead, making radical changes in the approach taken in the Final Rule, but without resubmitting the Final Rule as a new NPRM for public comment.

191.    Further proving that the Final Rule is a dramatic departure from the NPRM is the fact that, in 2020, ATF actually submitted a prior NPRM dealing with pistol braces.  85 FR 82516, "Objective Factors for Classifying Weapons with 'Stabilizing Braces,'" December 18, 2020.  The Final Rule only mentions this prior rulemaking once, in passing, buried deep within its impenetrable wall of text.  FR 6494.

192.    Yet in that 2020 failed NPRM, ATF (virtually identically to the Final Rule) provided only vague and nebulous concepts (length, weight) of how it would analyze firearms with stabilizing braces, leading to public objection significant enough that the agency withdrew that 2020 NPRM.  As GOA summarized ATF's first attempt to ban braces in that 2020 NPRM, "ATF's 'objective factors' consist of a 17-part balancing test, replete with numerous sliding scales and even secret criteria — each applied subjectively and considered 'holistically.'"  *See* Comments of GOA/GOF dated December 23, 2020, at 3,

49

https://www.gunowners.org/wp-content/uploads/2020/12/GOA-Comments-to-ATF-on-Pistol-Braces.pdf.

193.    Ironically, the failed 2020 NPRM committed the very same errors as the Final Rule does again.  For example, in 2020 ATF claimed that it would consider the "length of pull" of a firearm," but did not specify any "length of pull" that is presumptively acceptable.  GOA comments at 5.  Similarly, the 2020 NPRM claimed ATF would consider "[t]he amount of rear contact surface area," but did not state what "amount" of surface area is permissible.  *Id.* at 6.  Likewise, ATF in 2020 stated that it would consider "[t]he weight and length of the firearm used," and that firearms which are "so long" or "so heavy" are not acceptable as pistols, but again without providing fixed measurements which could provide objective standards.

194.    In other words, *the Final Rule has returned to exactly the same lack of standards as doomed the failed 2020 NPRM*, laying out precisely the same vague concepts (without any clarity) as it did in 2020.  Yet ATF never links the Final Rule to that failed 2020 NPRM, which provided a miniscule 14-day comment period.[27]

195.    But if the 2021 NPRM was so vastly different from the 2020 NPRM that a new *proposed* rule was required, then how could the Final Rule (which hearkens back to the 2020 NPRM) be a "logical outgrowth" of the NPRM?  The answer is obvious and the implication clear – the Final Rule is not a logical outgrowth of the NPRM and, instead of

---

[27]     https://www.federalregister.gov/documents/2020/12/18/2020-27857/objective-factors-for-classifying-weapons-with-stabilizing-braces

promulgating the Final Rule, ATF should have (again) gone back to the drawing board and filed another notice of proposed rulemaking.

196.   Indeed, ATF never publicly announced the definition of "rifle" promulgated in the Final Rule, nor did the agency seek comment from the public prior to publishing the Final Rule.

197.   Yet it is well established law that "a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and punctuation omitted).

198.   ATF's "repudiat[ion] of [its] proposed interpretation" of the statute in the Final Rule, and adoption of an entirely new, unrelated, and completely different definition of "rifle" *than actually proposed* in the NPRM constitutes a violation of the APA's Notice requirement and, for that reason, the Final Rule should be subjected to a new round of notice and comment proceedings.

199.   The Final Rule's adoption of an entirely new definition of "rifle," using a completely different approach from the NPRM, violates the APA's requirement for notice and comment rulemaking, and has deprived GOA and GOF, along with their members and supporters, of the opportunity to provide valuable input on the Final Rule.  Indeed, the Final Rule responds to comments made by GOA/GOF and their members and supporters but has deprived them—and the rest of the American public—the opportunity to comment

on the *actual* definition ATF wishes to implement (or anything substantially to it from which it is logically and predictably connected).

200.   Had ATF asked the public prior to promulgating the new definition of "frame or receiver" in the Final Rule, ATF may well have changed the definition (again).

## IV.   **The Final Rule Is Arbitrary and Capricious in Violation of the APA (Reliance Interests)**

201.   ATF's longstanding policy has led to the approval via classification letters of numerous stabilizing braces and/or firearms equipped with such devices as *not* qualifying as short-barreled rifles under the NFA.

202.   As noted above, ATF as recently as March 21, 2017 has even expressly determined that shouldering a pistol equipped with a stabilizing brace does not redesign or otherwise make it into a short-barreled rifle.

203.   Due to these repeated assurances from ATF that these products are not subject to registration under the NFA, millions of consumers have lawfully purchased pistols equipped with stabilizing braces, or purchased stabilizing braces to add to existing pistols, in reliance on this long and consistent history of ATF's classifications that these actions were perfectly lawful.

204.   The Final Rule thus represents a complete reversal of course from this longstanding policy.  Shockingly, the Final Rule's impact analysis estimates that ATF's bureaucratic "oopsie" will cost the gun-owning public ***between $2.3 billion and $4.9 billion***.  RIA at 63, 67.  Of course, as explained above, ATF's estimates of the number of stabilizing braces

in circulation are likely significantly low, and thus the true cost of the Final Rule is likely much larger even than ATF's astronomical estimate.

205.   As the Final Rule notes, the Supreme Court requires that "when an agency changes course from longstanding policies, reliance interests should be taken into account."  FR 6507 (citing *Regents*, 140 S. Ct. at 1913-15).

206.   The Final Rule further acknowledges "[i]t is true that 'the APA requires an agency to provide more substantial justification when … its prior policy has engendered serious reliance interests that must be taken into account." FR 6508 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015)).

207.   But the Final Rule fails to demonstrate that it has taken such reliance interests into account at all.

208.   Rather, in response to comments citing such reliance interests, ATF attempts to dodge its duty to consider such interests by merely claiming that it "has notified the public that 'classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in law or regulations.'"  FR 6507.

209.   Such a disclaimer does not negate the reliance interests ATF allowed to build up among millions of consumers over its years of issuing classification letters on stabilizing braces, nor does it absolve ATF of its duties to consider those interests when suddenly reversing course not on individual classification letters but on every single one through a wholesale, legislative change not only to policy but also to regulation.

210.   If such a disclaimer or notice were sufficient to negate reliance interests, the Supreme Court's statements in *Regents* would have no meaning as, by its nature, any

federal regulation on which one may rely is subject to change, and there mere understanding of that fact would, in ATF's erroneous reasoning, invalidate any reliance interest in any regulation ever promulgated.

211.   Indeed, this would permit all sorts of abuses by regulatory entities, up to and including ATF negligently or *even deliberately* classifying items improperly, thereby enticing the gun owning public to purchase them, with ATF turning around years or decades later and claiming that all prior classifications were erroneous, that the agency had never discovered the "best interpretation" of the statute until now, and "Mr. and Mrs. America, turn 'em all in."[28]

212.   Seemingly acknowledging the insufficiency of pointing to its generic disclaimer, the Final Rule attempts to minimize the reliance interests involved, at times resorting to falsehoods that are contradicted by other portions of the Final Rule.

213.   First, the Final Rule claims that "the individual may reconfigure the firearm to remove it from the scope of the NFA … and maintain possession of the firearm."  FR 6507.

214.   Yet reconfiguring a pistol into a rifle with a barrel length over 16 inches requires *at least* the purchase of a rifle barrel, which itself costs anywhere from perhaps $80 to several hundred dollars, and likely would involve the purchase of other components to install it, including a different length gas tube, barrel nut, appropriate length handguard, installation tools or FFL gunsmithing services, *etc.  See, e.g., BC-15 5.56 NATO 16" Parkerized M4 Barrel*, Bear Creek Arsenal, https://www.bearcreekarsenal.com/556-16-parkerized-m4-

---

[28] https://www.youtube.com/watch?v=ffI-tWh37UY

barrel-1-7-twist-mid-length.html (last visited Jan. 23, 2023); *AR-Type Barrels*, Proof Research, https://proofresearch.com/barrels/ar-type/ (last visited Jan. 23, 2023).

215.   When multiplied over the millions of firearms that owners would need to reconfigure in order to comply, this is a significant economic impact ignored by ATF.

216.   Second, for those who do not reconfigure, the Final Rule claims "the alleged reliance interest is minimal.  The only interest identified is the avoidance of the NFA's making and transfer taxes, but these taxes will not be applied retroactively.  Thus, any potential reliance interests are minimal because … individuals and FFLs will not be required to pay these taxes."  FR 6508.

217.   But this too is false because there is a class of individuals who will not be able to either reconfigure (due to cost) their firearm or register it (due to the state where they live), and so must either destroy or surrender the firearm, because the brace-equipped firearm, and so the allegedly low-cost options the Final Rule presents to avoid acknowledging reliance interests are not available to many.

218.   It is worth noting that the Final Rule *never* provides gun owners the option to "transfer" their braced pistol (now turned SBR), such as selling it to a dealer or to a resident of another state where ownership is permitted.  No doubt, ATF would claim that such a sale is an illegal "transfer" of an unregistered NFA item.

219.   Moreover, as discussed above, numerous imported firearms that previously were classified as pistols, but where a brace was added, are overnight reclassified as short-barreled rifles, suddenly and retroactively making these firearms subject to 18 U.S.C. § 922(r)'s restriction of the assembly of rifles from imported parts.

220.   While failing to mention this outcome in its section on reliance interests, the Final Rule notes later on that "ATF assumes this group" will have to comply via "another scenario, such as destroying the firearm or turning it in to ATF…"  FR 6564.

221.   Nowhere does the Final Rule provide analysis of the reliance interests of this population, the economic loss these individuals will suffer, or the other impacts of overnight becoming a felon through mere possession of a firearm that was lawfully purchased and/or assembled.

222.   ATF's Final Regulatory Impact Analysis estimates that 373,189 firearms with stabilizing braces are likely to be surrendered and another 373,189 will be destroyed by their owners as a result of the Final Rule, but the Final Rule's discussion of reliance interests ignores these nearly 750,000 firearms (representing 25% of the 2,970,000 firearms ATF estimates will be affected by the Final Rule) to be lost by their owners without compensation.   Off. of Regul. Affs., Bureau of Alcohol, Tobacco, Firearms, and Explosives, RIN 1140-AA55, *Final Regulatory Impact Analysis: Factoring Criteria for Firearms with Attached "Stabilizing Braces"* 56-57 (2023).

223.   **Being as ATF admits the Final Rule will result in nearly three-quarters of a million firearms being destroyed or surrendered, the Final Rule must be seen for what it really is – an unprecedented gun ban, and massive roundup of firearms lawfully owned by the American people.**   This is especially true, given these firearms were manufactured and owned after relying on almost a decade of ATF classification letters affirming their legal status.

224.    Further, ATF's estimate that only 2,970,000 firearms will be affected may be a vast undercount, given the firearms industry's estimate of the number of braced firearms owned by the American population. *Compare Final Regulatory Impact Analysis*, *supra*, at 21, *with* Krouse, *supra*, at 2.

225.    Therefore, ATF's claims that reliance interests are not significant because an individual may simply comply via reconfiguration or registration are, by the Final Rule's own admissions later in the document, patently false.

226.    Further, the dramatic undercounting of the number of citizens impacted by the Final Rule—as well as their property and the economic costs they and firearms businesses will endure—is itself evidence that ATF failed to provide the necessary "reasoned analysis" of the Final Rule and the policy choices it made.

227.    That is, any analysis provided is necessarily illegitimate and defective because ATF has failed to recognize empirical truths on which any analysis must be based.

228.    Third, the Final Rule asserts "any interest in avoiding the minor burden associated with registration of a rifle is also not significant.  That is both because of the minimal time and expense required for registration and…" *quite circularly* "because possession of an unregistered rifle violates the law."  FR 6508.

229.    In other words, ATF begs its own question by claiming that it need not consider reliance interests in its previous, longstanding policy from which it now departs because it would be unlawful for those citizens who relied on its previous policy to fail to comply with its radically new one.

57

230.    Further, without any substantive analysis presented about the actual burden on an individual—much less the cumulative burden on millions of firearms owners—who goes through the registration process, writes off the time and expense of collecting the required documents for registration as "minimal" without acknowledging that there are actual costs involved.

231.    For instance, a Form 1 registration requires submission of fingerprint cards, which themselves cost $10-40 to obtain, which, again, multiplied over the millions of individuals the Final Rule envisions registering their firearms, constitutes a major economic impact. *See, e.g., ATF Compliant FD-258 Fingerprint Cards for ATF NFA Paperwork*, National Gun Trusts, https://www.nationalguntrusts.com/products/atf-compliant-fd-258-fingerprint-cards-nfa-gun-trusts?variant=31546373013574 (last visited Jan. 23, 2023); *ATF Form 1: Top 10 FAQ's*, Silencer Shop, https://www.silencershop.com/atf-form-1-faqs (last visited Jan. 23, 2023).

232.    Likewise, after Form 1 registration of an NFA firearm, the manufacturer (gun owner) must have it serialized with ATF-required data, at an additional cost of at least $40 (multiplied by the millions).

233.    In addition to these fixed expenses is the significant amount of time it will take American gun owners to comply with ATF's bureaucratic edict to register their millions of firearms.  The Final Rule's RIA offensively estimates the "leisure wage" to accomplish this forced registration at $16 per hour.  RIA at 32.

234.     ATF has, therefore, failed to conduct the required analysis of reliance interests demanded by the Administrative Procedure Act and Supreme Court precedent, making the Final Rule arbitrary and capricious.

## V.     **The Final Rule Is Contrary to Statute and Exceeds the Authority Granted by Congress**

235.     The Final Rule has an extreme impact on the economy and individual rights that exceeds the authority Congress granted to ATF.

236.     In "cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority," these factors must be analyzed because Congress likely has not given such power to the agency.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).

237.     ATF estimates that the Final Rule will have an economic impact of up to $4.9 billion. RIA 63, 67.

238.     Additionally, the Final Rule subjects millions of American citizens to criminal penalties for the possession of firearms they lawfully purchased, often based on the express authorization of ATF.

239.     The Final Rule subjects millions of Americans to a firearms registration regime by declaring firearms that were not NFA items at the time of purchase or construction to now be short-barreled rifles under the NFA, a technical circumvention of federal statute that directly conflicts with Congress's express policy declaration against the creation or expansion of national gun registries in 18 U.S.C. § 926(a)(3).

240.    The Final Rule violates the Second Amendment and Fifth Amendment rights of American citizens.

241.    The Final Rule will cost hundreds of American jobs.

242.    The Final Rule is contrary to the ATF's own permissive history regarding stabilizing braces.  *See* BACKGROUND Section III.B., *supra*.

243.    The Final Rule's breadth of impact is so large and carries with it such unusual economic and political significance, for multiple reasons, as to indicate that Congress— decades ago—did not intend to give ATF the authority to create such changes.

244.    The Final Rule, therefore, is an assertion of authority in excess of what was granted to ATF by statute and is on that basis invalid.

## VI.    **The Final Rule's Immediate Effective Date is Impermissible and Invalidates the Rule**

245.    The APA specifies that a final rulemaking may not have an effective date earlier than 30 days following its publication in the Federal Register, without the agency showing "good cause" and publishing such good cause "with the rule."  5 U.S.C. § 553(d).

246.    The Final Rule has an immediate effective date upon publication in the Federal Register.  FR 6481 ("effective immediately").

247.    Good cause is typically demonstrated in "emergency situations, or where delay could result in serious harm."  *United States v. Dean*, No. 08-CR-67(LAP), 2020 WL 3073340, at *2 (S.D.N.Y. June 9, 2020).

248.    ATF has failed to publish "good cause" for this immediate effective date with the Final Rule.

249.    The Final Rule at no time even contains the phrase "good cause," much less in the context of explaining its immediate effectiveness.

250.    Nor does the Final Rule claim that such "good cause" has been established.

251.    To be sure, the Final Rule obliquely references "public safety," but does not provide any reasoning to explain why public safety requires that ATF immediately "enforce the NFA against any person or entity that—any time after the publication date of this rule— newly makes or transfers a weapon with an attached 'stabilizing brace,'" where that exact activity has been permissible for over a decade since ATF first classified a firearm with a stabilizing brace as *not* a short-barreled rifle under the NFA.

252.    That is, the Final Rule does nothing to explain why making or transferring of such a firearm without registration or taxation under the NFA, which has been legal since 2012, is suddenly a danger to public safety such that ATF cannot wait the time specified in the APA for the Final Rule to become effective.

253.    In fact, the ATF undermines any urgency by subsequently saying that it will wait 60 days to initiate enforcement actions, to account for the Congressional Review Act, 5 U.S.C. § 801(a)(3).

254.    Federal courts have vacated rules with effective dates less than 30 days from publication in the Federal Register where the agency "fail[s] to establish that any serious, imminent harm would result if there was a postponement in the [Final] Rule's effective date." *Coal. for Workforce Innovation v. Walsh*, No. 1:21-CV-130, 2022 U.S. Dist. LEXIS 68401, at *12 (E.D. Tex. Mar. 14, 2022).

255.    The Final Rule "fail[s] to establish that any serious, imminent harm would result if there was a postponement in the [Final] Rule's effective date." *See id.*

256.    The Final Rule is thus in violation of 5 U.S.C. § 553(d).

## THE FINAL RULE VIOLATES THE CONSTITUTION

### I.    <u>The Final Rule Violates the Second Amendment</u>

257.    The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

258.    In its recent opinion in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court reiterated the basic truth that the right to keep and bear arms is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).

259.    Moreover, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

260.    In order to gain a presumption of constitutional protection under the Second Amendment's plain text, three things must be true.

261.    First, a plaintiff first must belong to "the people" the amendment contemplates. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) ("'[T]he people' protected by the … Second Amendment[] … refers to a class of persons who are part of a national community

or who have otherwise developed sufficient connection with this country to be considered part of that community." (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)); *id.* at 624-25.

262.   Second, weapons at issue must be protected "arms."   Certainly, a firearm is a protected "arm" if (*at a minimum*) it is "in common use" or "typically possessed by law-abiding citizens for lawful purposes." *Heller.* at 582.   But that does not mean those are the only weapons protected.   Rather, "the Second Amendment extends, prima facie, to **_all_** instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (emphasis added); *Caetano*, 577 U.S. at 411; *see also Bruen*, 142 S. Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").   In other words, if it is in common use for lawful purposes, a weapon is a protected "arm" without further analysis required.   Alternatively, a weapon is an arm if it constitutes a "bearable arm" and the government cannot provide a broad and enduring historical tradition under *Bruen* sufficient to show that such category of weapon was outside the scope of the Second Amendment's protections, as originally understood.

263.   Third, to be presumptively protected, the regulated conduct must affect the right to "keep" or "bear arms." *Id.* at 2134-35.   The Second Amendment guarantees individuals a right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *See Heller*, 554 U.S. 570; *McDonald*, 561 U.S. 742; *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *Bruen*, 142 S. Ct. 2111.

264.    There is no question in this case that the persons (Plaintiffs, including those gun owners they represent) and the activities (keeping and bearing) are protected by the Second Amendment.  The only question, then, is whether the firearms regulated by the Final Rule are protected "arms."

265.    If they are, then Defendants have a heavy burden to justify the Final Rule. Presumptively protected persons, arms, and activities may be regulated only "if … consistent with this Nation's historical tradition" such that it "falls outside the Second Amendment's 'unqualified command.'"[29]  *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

---

[29] A number of recent federal cases have applied *Bruen* to invalidate restrictions repugnant to the original meaning of the Second Amendment. *See Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) (holding that 18- to 20-year-old adults have a right to carry firearms outside the home for self-defense); *see also Rocky Mountain Gun Owners v. Town of Superior*, No. 22-cv-01685-RM (D. Colo. July 22, 2022) (applying *Bruen*, granting a TRO, and holding that the burden is on the Government to justify a ban on assault weapons and large-capacity magazines); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 U.S. Dist. LEXIS 168329 (W.D. Tex. Sept. 19, 2022) (striking 18 U.S.C. § 922(n) by applying *Bruen*); *United States v. Price*, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va. Oct. 12, 2022) (striking 18 U.S.C. § 922(k) as unconstitutional); *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 U.S. Dist. LEXIS 204758 (W.D. Tex. Nov. 10, 2022) (striking 18 U.S.C. § 922(g)(8) as unconstitutional); *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022) (granting in part a preliminary injunction against enforcement of several New York firearm restrictions passed in defiance of *Bruen*, including various onerous licensing restrictions and "sensitive locations" off limits to firearm possession); *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022) (granting in part a preliminary injunction against enforcement of new firearm restrictions on private property).; *Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375 (homemade firearms), *14 (D.Del. Sept. 23, 2022); *United States v. Rahimi*, 2023 U.S. App. LEXIS 2693 (5th Cir. 2023) (domestic violence restraining order, 922(g)(8)); *United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397 (W.D. Ok. Feb. 3, 2023) (unlawful user of marijuana, 922(g)(3));

266.   Because, as shown below, firearms with stabilizing braces are protected "arms" regardless of whether they are GCA "pistols" or NFA "short-barreled rifles," Defendants in either case bear the heavy burden of justifying the Final Rule's regulation of protected arms by proffering a widespread pattern of identical or relevantly similar regulations from the time of the Second Amendment's adoption. *Id.* at 2136-38, 2156. Only then can a court conclude that the challenged regulation comports with the original public understanding of the right to keep and bear arms. *Id.* at 2137.

267.   Alternatively, regardless of whether they are GCA "pistols" or NFA "short-barreled rifles," firearms with stabilizing braces are in common use for lawful purposes, and therefore protected "arms" without further analysis.

268.   Thus, to the extent that the NFA is found to apply under the Final Rule to pistols equipped with stabilizing braces, then this Court should strike those provisions of the National Firearms Act, as they infringe Second Amendment rights.

**A. Pistols Are Protected "Arms"**

269.   As noted above, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller.* at 582.  Arms include "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 106 (4th ed.).... [They are] 'any thing that a man [or

---

*Siegel v. Platkin*, 2023 U.S. Dist. LEXIS 15096 (D.N.J. Jan. 30, 2023) (possession of firearms in various prohibited places).

woman] wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary [(1771)]." *Heller*, 554 U.S. at 581.

270.    *Heller* itself explained that "[u]nquestionably," the Second Amendment protects handguns, which "the American people have considered ... to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."); *McDonald*, 561 U.S. at 767 (explaining that the Second Amendment "applies to handguns because they are 'the most preferred firearm in the nation'" (quoting *Heller*, 554 U.S. at 628)); *Bruen*, 142 S. Ct. at 2134 (noting that neither party disputed that handguns are in common use).  *Heller* split no hairs as to what sorts of handguns are protected by the Second Amendment, meaning the protection should apply broadly.

271.    Indeed, as of 2021, ATF reported that there were nearly 128 million handguns in the United States.[30]  If that does not constitute "in common use," it is hard to imagine what would.

272.    This broad category of handguns generally includes both pistols and revolvers, and is statutorily defined as:

> i.  a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

---

[30]    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download, at 1-6.

       ii. any combination of parts from which a firearm described in subparagraph (A) can be assembled.   [18 U.S.C.S. § 921(a)(30) (LexisNexis 2022).]

273.   Not only are they widely available, but also historically, individuals have been able to modify their pistols by changing sights, optics, grips, etc. without losing either GCA classification or Second Amendment protection.

274.   Indeed, federal courts have recognized that even firearm components and parts deserve Second Amendment protection. Recently, the Delaware District Court explained that pursuant to *Bruen*, for the Government to prevail on an argument that firearm components fall outside Second Amendment protection, it would have to demonstrate that "firearm components are 'not typically possessed by law-abiding citizens for lawful purposes,'" which it failed to do. *Rigby v. Jennings*, No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375, at *16 (D. Del. Sept. 23, 2022).

275.   Furthermore, as pistol stabilizing braces were not invented until 2012, there can be no founding-era historical tradition of regulating handguns in a manner so as to justify the strict regulation of braced pistols now. *See* NPRM 30827.

276.   If a pistol itself is protected under *Heller* and *Bruen*, then the addition of a stabilizing brace does not deprive the pistol of Second Amendment protection.

277.   Certainly, ATF's ipse dixit that a pistol with a stabilizing brace becomes a regulated NFA item does not eliminate the pistol's protection under the Second Amendment, or somehow bootstrap a non-existent historical tradition of such regulation.

278.    Because braced pistols are bearable arms covered by the plain language of the Second Amendment, in order to restrict them, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

279.    Defendants cannot meet this burden, so this regulation of braced pistols is unconstitutional.

**B.  Short-Barreled Rifles Are Protected "Arms"**

280.    Even if Defendants were somehow able to show that the pistols involved in this case were somehow an entirely different category, type, or class of "arm," such as the NFA's definition of "short-barreled rifle," that does not mean such firearms lose Second Amendment protection.

281.    On the contrary, ATF estimates that there are at least 82 million rifles in the United States.  As with handguns, this number undoubtedly counts as "in common use."

282.    Indeed, even a "short-barreled rifle" is still a "rifle," whether it has a prohibited 15 inch barrel or a permissible 16 inch barrel.

283.    However, even with respect to rifles that are arbitrarily singled out and classified as "short-barreled rifles" under the NFA, there are at least 532,725 SBRs (plus another 162,267 short-barreled shotguns) currently on ATF federal registry (the NFRTR).[31]  Of course, this number does not include the influx, due to the Final Rule, of hundreds of

---

[31] *Firearms Commerce in the United States: Annual Statistical Update 2021*, Bureau of Alcohol, Tobacco, Firearms & Explosives 16 (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

thousands or even millions of new SBRs which were formerly classified as pistols (of course, depending widely based on what estimate one uses, ATF's 3-7 million, or CRS's 10-40 million, and depending on how many persons ultimately choose to register their firearms with ATF). *See* William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, Cong. Rsch. Serv., https://bit.ly/33fLeQw (Apr. 19, 2021) (estimating "that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands, either purchased as accessories or already attached to firearms").

284.    In other words, even considering *only* rifles that the NFA arbitrarily declares "short-barreled," there still are (and will be) more than a million such firearms registered with the federal government.  This is far more than enough to count as "in common use" under available precedent.

285.    For example, in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), Justice Alito stated in concurrence that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that just "*hundreds of thousands* of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (emphasis added).

286.    Likewise, the Eastern District of New York found nunchucks to be protected arms despite the Plaintiffs only being able to prove "64,890 nunchakus" in civilian hands. *Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018).

287.    Therefore, courts have recognized that even the existence of 65,000-200,000 examples of a particular category of weapon proves common use (let alone the over 500,000 SBRs registered already, and the 10-40 million braced pistols at issue).

288.    To be sure, it is unnecessary to define "in common use" with respect to some precise numerical standard that will no doubt be entirely arbitrary.  Suffice it to say, the number of weapons at issue here far outnumber other classes of arms determined to be "in common use."

289.    Even the Final Rule admits that SBRs are "proliferat[ing]." *See* NPRM 30848 ("If persons can circumvent the NFA by effectively making unregistered 'short-barreled rifles' by using an accessory such as a 'stabilizing brace,' these weapons can continue to proliferate....").

290.    In addition to being protected arms simply because they have been overwhelmingly adopted by the American public for lawful purposes, even short-barreled rifles (an arbitrarily defined subset of rifles) are protected arms because there is no historical tradition regulating them, much less differentiating them from other "rifles" in any way.

291.    Indeed, there are no founding era restrictions on the barrel length of one's firearm. Such restrictions did not come about until the NFA in 1934.

292.    Quite to the contrary.  There is a broad historical tradition, contemporaneously with the founding era, of short-stocked pistols or short-barreled rifles in widespread existence.

293.    For example, consider the following examples:

Ca. 1720 Flintlock Pistol with Stock

https://www.alamy.com/stock-photo-a-flintlock-pistol-with-detachable-stock-frenchflemish-circa-1720-31498114.html



Ca. 1750 Flintlock Pistols with Stocks

https://www.alamy.com/small-arms-pistols-flintlock-pistol-with-shoulder-stock-calibre-15-mm-n-duponceau-liege-belgium-circa-1750-additional-rights-clearance-info-not-available-image243247172.html



https://www.alamy.com/stock-photo-a-very-fine-flintlock-pistol-with-detachable-stockfriedrich-jakob-51532402.html



Ca. 1760 Flintlock Grenade Launcher

https://www.ambroseantiques.com/flongarms.htm



Ca. 1780 Flintlock Pistol w Stock

https://www.alamy.com/stock-photo-a-flintlock-pistol-with-detachable-butt-stock-johann-jakob-kuchenreuter-31495360.html



71

Ca. 1760-1820 Flintlock Pistol Carbine with detachable stock

https://americanhistory.si.edu/collections/search/object/nmah_418742



1790 Flintlock Blunderbuss Pistols – w detachable stocks (and bayonets)

https://www.collectorsfirearms.com/products/168509-beautiful-pair-of-stocked-flintlock-blunderbuss-pistols-w-spring-bayonets-ah8088.html



1795 Flintlock Blunderbuss – 15" barrel

https://hansord.com/weapons/an-18th-century-flintlock-blunderbuss-by-twigg-london



294.    Such weapons continued after the ratification era, through the incorporation of the

Fourteenth Amendment:

72

1820 Flintlock Ottoman Blunderbuss Pistol w stock

https://www.ima-usa.com/products/original-ottoman-empire-flintlock-blunderbuss-pistol-circa-1820?variant=31268046471237



Ca. 1820 Flintlock Cavalry Carbine 29.5" OAL

https://sinasantiques.com/shop/fine-antique-1820-flintlock-cavalry-carbine-french-belgium-rifle/



1790s/1840s Scheier Stocked Pistols

https://www.ambroseantiques.com/ppistols.htm

https://www.ambroseantiques.com/ppistols/full.htm





Ca. 1850s Howdah Pistol – with detachable stock

http://www.hallowellco.com/historical_gallery_antique%20guns.htm



1852 Austrian Flintlock Cavalry Carbine – 13 ¼ inch barrel

https://www.rockislandauction.com/detail/73/3132/austrian-flintlock-cavalry-carbine



1855 Percussion Pistol-Carbine – with detachable stock

https://www.americanrifleman.org/content/the-u-s-model-1855-pistol-carbine/



1855 Springfield Pistol-Carbine

https://www.liveauctioneers.com/item/71137886_1855-pistol-carbine-and-shoulder-stock



US 1855 Percussion Pistol-Carbine

https://www.ambroseantiques.com/ppistols/us55.htm



1860 Colt Army Revolver – Stocked Pistol

https://www.artfixdaily.com/artwire/release/3863-morphys-feb-17-19-field-and-range-firearms-auction-offers-1800+-e



https://www.rockislandauction.com/detail/78/1103/colt-model-1860-army-revolver-matching-shoulder-stock



295.     Such weapons also existed and were in common use up through enactment of the

NFA in 1934:

1881 Colt Single Action Army – Stocked Pistol

https://www.rockislandauction.com/detail/62/3221/colt-single-action-army-revolver-45-colt



Colt 1848 Dragoon Third Model – Stocked Pistol

https://www.antiq.com/bolk-antiques-142/a-scarce-antique-american-goverment-issue-colt-third-model-shoulder-stocked-6-shot-44-caliber-dragoon-percussion-revolver-a-k-a-pistol-carbine-75-inch-barrel-with-new-york-address-length-695-cm-in-very-good-condition-price-on-request-2458927



1892 Winchester 12" Carbine – made 1903

https://www.rockislandauction.com/detail/82/1089/documented-12-inch-barrel-winchester-model-1892-trapper-carbine



Artillery Luger – Ca. 1917-30s – Stocked Pistol – ATF letter exempted

https://www.rockislandauction.com/detail/1039/2468



Model 1896/1930 Broomhandle Mauser – Stocked Pistol – ATF letter exempted

https://www.rockislandauction.com/detail/76/1692/mauser-model-1930-commercial-broomhandle-pistol-with-stock



Stocked FN Hi Power – 1930s-40s – ATF letter exempted

https://www.rockislandauction.com/detail/76/3711/fn-hi-power-pistol-finnish-army-marked-numbered-stock



296.    Such firearms were never restricted with respect to who could possess them, and were never required to be registered until passage of the NFA.  *See Bruen* at 2137 ("[P]ostratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.").  And as noted above, the NFA initially attempted to regulate all handguns – something that would never be permissible after *Heller*.

## C. Defendants' Second Amendment Arguments Are Unpersuasive.

297.    Defendants can be expected to respond that firearms with braces (defined now to be short-barreled rifles) can be banned because they are allegedly "dangerous and unusual." *See Heller* at 624; FR 6499 (citing three pre-*Bruen* cases from this Circuit, the Tenth Circuit, and the district of Utah;[32] *see also* 6554 (arguing SBRs are "dangerous and

---

[32] The Final Rule cites to *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) for the proposition that an unregistered NFA firearm "will result in violence."  First, this "virtual inevitability" of violence is contrary to the fact that up to 40 million "braced" pistols have not been used in crimes.  Secondly, citing to this case without an explanation of the items Jennings possessed is disingenuous, as the subject matter of that case dealt with four *unregistered pipe bombs*, not a short-barrel rifle.  As the Jennings court stated, "it would be quite difficult to protect oneself or one's family with a pipe bomb. In fact, we cannot conceive of any non-violent or lawful uses for a pipe bomb." *Id*. at 798.  Yet there are numerous legitimate, lawful, and specifically self-defense applications for short-barreled rifles.  Tellingly the Government only lists two crimes associated with braced

unusual," outside the Second Amendment's scope, and the Final Rule should be reviewed "under a rational basis test.").

298.    But this claim does not even clear the starting gate, as the Supreme Court recognized historical bans only on weapons that were "dangerous ***and*** unusual."  *See Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."). Indeed, all weapons are dangerous.   Therefore, they must also be "unusual" (and historically restricted) to be outside the scope of protected "arms."   Of course, weapons cannot simultaneously be "in common use" (*i.e*., usual) and also "unusual" (*i.e.*, uncommon), and the prolific (if not ubiquitous) nature of pistols, rifles, and even short-barreled rifles means that they certainly cannot be found to be "unusual."

299.    Aside from those passing references to "dangerous and unusual" weapons, the Final Rule's entire Second Amendment analysis is confined to a single partial page of text.  FR 6548 (relying on *Heller's* "not absolute" language, misreading *Heller* to claim that military-style arms are not protected by the Second Amendment, and providing additional (largely pre-*Heller*) authorities finding that various NFA items are not protected under the Second Amendment).

300.    First, to reach their convenient conclusion that the Second Amendment is inapplicable to the Final Rule, Defendants point to a few cherrypicked passages from *Heller* which suggest that, because machineguns and short-barreled shotguns allegedly are

------

pistols,  disregarding the lawful uses for the other up to 39,999,998 braced pistols that were not used in a crime.

not "weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, under the new Rule, braced pistols (now reclassified as short-barreled rifles) are also not the type of weapons possessed by law-abiding citizens for lawful purposes. FR 6548.

301.     However, contrary to what Defendants insinuate, *Heller* did not address whether short-barreled rifles are "arms" within the meaning of the Second Amendment.[33]

302.     Second, Defendants point to a grand total of three circuit court cases (3d Circuit, 9th Circuit, 10th Circuit) and one unreported district court case that seem to suggest that SBRs are not protected by the Second Amendment. FR 6548.

303.     The first of these cases is *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018).  In *Cox*, the defendant, charged with possession of an unregistered SBR and unregistered silencer, argued the unconstitutionality of the NFA, among other reasons, on Second Amendment grounds.  *Id.*  Tellingly, the *Cox* court declined to conduct an analysis of whether SBRs were truly "dangerous and unusual," instead analogizing them to short-

---

[33] To be sure, the *Heller* Court referenced *United States v. Miller*, 307 U.S. 174 (1939), but only to conclude that the Second Amendment protects "arms" *in addition to* those used by the military (such as short-barreled rifles).  *Id.* at 624.  *Miller*, in turn, involved prosecution under the NFA for possession of an unregistered short-barreled shotgun.  In *Miller*, the Court explained that in the "absence of any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178.  *Miller* thus involved an a procedurally odd set of facts, under bizarre *ex parte* circumstances, "upholding the constitutionality of the NFA based on the submission of only one adverse party's brief – no appearance by counsel had been made for Miller or Layton." Krawczyk, *supra*, at 280-81.  *Miller* hardly stands for the proposition that short-barreled rifles fall outside of the Second Amendment's protection.

barreled shotguns, which *Miller* and later case law had *assumed* were "dangerous and unusual" and therefore antithetical to being "typically possessed" and protected under the Second Amendment. *Id.* at 1186. Consequently, the court concluded that, because Cox "offered no meaningful distinction between the two," SBRs fell outside the scope of Second Amendment protection. *Id.* Certainly, the court did not engage in a required *Bruen* analysis.

304.    Defendants' second case is *United States v. Gilbert*, where the court, in a conclusory fashion based on *Heller* and without further analysis, upheld jury instructions which stated that individuals had no Second Amendment right to possess an SBR. *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008).   That is hardly a reasoned analysis supporting the Final Rule.

305.    Defendants' third case is *United States v. Marzzarella*, like *Heller*, which does not specifically discuss SBRs, but instead reiterates that short-barreled shotguns, along with "dangerous" weapons like "bazookas, mortars, pipe bombs, and machine guns" do not receive Second Amendment protection. *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010).

306.    Of course, what all of these cases have in common is the fact that there is no clear discussion of whether SBRs are in common use, or whether they can rightly be considered so "dangerous and unusual" as to avoid Second Amendment protection.  Moreover, each of these cases predated *Bruen*, and thus did not examine the historical record to see if the NFA's regulation of SBRs can be justified by their being outside the scope of Second Amendment protection.

81

307.    Lest Defendants attempt to rationalize the Final Rule's regulation of stabilizing braces by citing to recent district court decisions, Plaintiffs note that these courts uncritically applied stale precedent and refused to engage in the analysis *Heller* and *Bruen* demand. Take *United States v. Rush*, No. 22-cr-40008-JPG, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023), for example, which denied a criminal defendant's motion to dismiss an indictment for possession of an unregistered SBR based solely on the foreclosed policy opinion that "[t]here is no reason the exclusion from Second Amendment protection of 'dangerous and unusual firearms' should not apply as well to short-barreled rifles." *Id.* at *2.

308.    Perhaps sensing the thinness of its analysis, the *Rush* court simply reiterated passages of *Bruen*'s carry licensing discussion before concluding that "*Bruen* had no impact on the constitutionality of regulating the receipt or possession [of] an unregistered short-barreled rifle." *Id.* at *3. Not so. *Bruen* established the textual and historical framework required for *all* Second Amendment challenges, even to laws that, based on judicial dicta, may enjoy some apparent presumption of constitutionality.

309.    Instead of determining under *Bruen* whether SBRs are protected "arms" via analysis of whether they are in "common use" or "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25, the *Rush* court merely concluded that it "need not reach Rush's argument that short-barreled shotguns and rifles are commonly used for self-defense. This argument runs smack into *Heller*'s finding that they are not, and Congress's decision to regulate them under the NFA precisely because they are not." *Rush*, 2023 WL 403774, at *3 n.2. This was plain error, as *Heller* made no such finding as to

SBRs, and Congress's legislative intent is inapposite to the *Bruen* test.  Indeed, if the mere likelihood of use for criminal purposes was enough to cast Second Amendment protection aside, handguns would be on the chopping block, as they are criminals' weapon of choice. *See id.* at *3 (quoting *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992)); *2019 Crime in the United States*, *infra* (reporting the overwhelming majority of homicides are committed with handguns). *But see Heller*, 554 U.S. at 629; *McDonald*, 561 U.S. at 767; *Bruen*, 142 S. Ct. at 2134 (unequivocally finding handguns to be protected "arms" whose regulation is subject to historical analysis).

### D.   Short-Barreled Rifles Are No More Dangerous than Other "Arms" Like Pistols and Rifles.

310.   Under *Bruen*, the government is no longer permitted to provide a public safety rationale as justification for a challenged restriction, such as the Proposed Rule's claim that "firearms with 'stabilizing braces' have been used in at least two mass shootings." NPRM 30828; *see also id.* at 30845 ("[T]hese weapons ... could pose an increased public safety problem given that they are easily concealable.").

311.   And, as noted above, it is not enough to merely declare a weapon to be "dangerous" in order to claim it is properly excluded from Second Amendment protection, despite its "usual[ness]" or, in this case, wild popularity.

312.   But even so, even quintessential short-barreled rifles are not especially dangerous; certainly, no more so than other clearly-protected Second Amendment "arms."

313.   Arguing to the contrary, the Final Rule points to two "mass shootings" where the perpetrator allegedly used a stabilizing brace "as a shoulder stock."  FR 6495.  Although

undoubtedly tragedies, this "ignores that firearms unquestionably protected by the Second Amendment are also sometimes used by criminals." *Rigby*, 2022 U.S. Dist. LEXIS 172375, at *16.

314.   Indeed, handguns comprise the overwhelming majority of homicide weapons according to FBI data. *See 2019 Crime in the United States*, FBI, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the.u.s.-2019/tables/expanded-homicide-data-table-8.xls (last visited Jan. 24, 2023) (reporting about 6,000-7,000 annual uses of handguns in homicides from 2015 to 2019 with about 200-400 annual uses of rifles in that period, which necessarily comprise both long- and short-barreled rifles).   Yet despite these statistics, handguns remain unequivocally protected by the Second Amendment. *Heller*, 554 U.S. at 629; *McDonald*, 561 U.S. at 767; *Bruen*, 142 S. Ct. at 2134.

315.   Nor have Defendants offered *even speculation* as to how stabilizing braces somehow made certain shootings possible, or more deadly, especially when the perpetrators (by definition, criminals who do not obey the law) could simply have used the rifle-equivalent weapon, or put an *actual* rifle stock on their pistol in lieu of a brace. Indeed, the component parts for each of these combinations (rifles, pistols, SBRs) are widely available, and entirely unregulated by the NFA until assembled in final SBR form.

316.   Nor can the current strict regulation of SBRs be said to be the reason why so few SBRs are used in crimes. In fact, when urging Congress to pass the NFA, Attorney General Homer Cummings stated: "I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position ... to convict [them] because [they have]

not complied." Krawczyk, *supra*, at 280 n.27 (alterations in original); *National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 22 (1934).

317.     Finally, Defendants themselves recognize that "consumers and dealers believed [firearms with stabilizing braces] not to be subject to the NFA when purchasing and selling them." FR 6563.   ATF's longstanding policy of treating these arms as pistols and not requiring NFA transfer applications for sales indicates the agency's similar belief.  So, by Defendants' own admission, braced pistols did not enter commerce with any intended criminality, and any criminality associated with them purely comes from their reclassification by Defendants.

## II.    The Final Rule Violates the Fifth Amendment's Protections Against Self-Incrimination[34]

318.     The Fifth Amendment, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself."

319.     As one way to remain in compliance with the Final Rule, ATF requires individuals in possession of a braced-pistol to register the pistol as an SBR via a Form 1.

320.     The Form 1, as ATF has modified it to facilitate registration of braced pistols under the Final Rule, requires submission of passport photos and fingerprints, residence address, photographs of the firearm(s) that now allegedly constitute federal crimes, and other identifying information.[35]

---

[34]    The allegations in Section II are made by Brown, GOA, and GOF.

[35]            https://www.atf.gov/rules-and-regulations/docs/undefined/eformone-externalguidancewithqapdf/download

321.   Also included on the Form 1 is a requirement to "sign under the penalty of perjury that the description of the firearm, including the type of firearm, is true, accurate, and complete." FR 6569.

322.   Defendants, however, make clear that, irrespective of the veil of legality under which braced pistols were purchased, they are in ATF's eyes "unregistered short-barreled rifles (which) have been transferred in violation of the NFA, and further possession of any such unregistered firearm continues to be a violation of the NFA." FR 6563.

323.   Said another way, ATF claims that someone who possesses a braced pistol is and has been in unlawful possession of an illegal SBR, but ATF will nonetheless allow the individual to remain in possession of their illegal SBR, provided the possessor provides ATF with their identifying information, along with identifying information for the firearm (*i.e.*, evidence of the alleged crime).

324.   ATF claims to allow this through an exercise of its "enforcement discretion." FR 6554 ("In an exercise of the Department's enforcement discretion, it has determined that any criminal liability for failure to take the necessary action to comply with Federal law for weapons that have already been made will result only for conduct occurring after the time period to register ends.").

## A.      Six States Plus DC, Where Registration is Impossible.

325.    Of course, **six** states, including California,[36] Hawaii,[37] Maryland,[38] New Jersey,[39]

New York,[40] Rhode Island,[41] plus the District of Columbia[42] independently *prohibit* SBRs,

meaning that a person cannot register a SBR with ATF without providing evidence of a

state crime.  *See* Cal. Penal Code § 33215, § 17170, § 16590; D.C. Code § 7-2502.02(a)(3),

§ 7-2507.06(a); Haw. Rev. Stat. § 134-8(a); 720 Ill. Comp. Stat. 5 / 24-1(a)(7)(ii); N.J. Stat.

Ann. § 2C:39-3(b), § 2C-39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; and R.I.

Gen. Laws § 11-47-8(b), § 11-47-2(15).

326.    Indeed, ATF will not even register an SBR in a state where possession is unlawful.

327.    This means that individuals in affected states will be subject to state restrictions on

their firearm, should they attempt to register them.  Such individuals will not be able to

register their SBRs with ATF.  Nor will they be able to transfer the firearm to a licensed

---

[36]                 https://www.atf.gov/firearms/docs/guide/california-firearms-statutes-and-codes/download see section 16590 "generally prohibited weapon"

[37]                      https://www.atf.gov/firearms/docs/guide/hawaii-firearms-statutes-and-codes/download see section 134-8

[38]                   https://www.atf.gov/firearms/docs/guide/maryland-firearms-statutes-and-codes/download see section 5-203

[39]                 https://www.atf.gov/firearms/docs/guide/new-jersey-firearms-statutes-and-codes/download see section 14.4-3.2

[40]                  https://www.atf.gov/firearms/docs/guide/new-york-firearms-statutes-and-codes/download see section 265

[41]                 https://www.atf.gov/firearms/docs/guide/rhode-island-firearms-statutes-and-codes/download see section 11-47-8(b)

[42] https://www.atf.gov/file/117186/download see section 7-2502.02

dealer or sell it to someone in another state (through an FFL), as to do so would be an illegal transfer of an unregistered NFA weapon.

328.    The Final Rule recognizes that there are some states where SBRs are entirely banned and thus cannot be registered with ATF.  RIA at 93-94.

## B.    Twenty-Four States Where Registration Will Provide Evidence of State Crimes

329.    However, ATF apparently has entirely failed to consider that there appear to be **24** additional states where an SBR can be possessed *only if in compliance with and properly registered under federal law*.  *See* Ala. Code § 13A-11-63(a), §13A-11-62(3); Alaska Stat. § 11.61.200(a)(3),  § 11.61.200(h)(1)(D);  Ariz.  Rev.  Stat.  § 13-3102(A)(3),  § 13-3101(A)(8)(a)(iv); Colo. Rev. Stat. § 18-12-102(3), § 18 12-102(1), § 18-12-101(1)(h); Fla. Stat. § 790.221(1), § 790.001(11); Ga. Code Ann. § 16-11-122, § 16-11-121(4); Iowa Code § 724.1C(2), § 724.1C(1); La. Stat. Ann. § 40:1785, § 40:1781(3); Md. Code Ann., Pub. Safety § 5-203(a), Pub. Safety § 5-201(g), Crim. Law § 4-201(f); Mich. Comp. Laws § 750.224b(1), § 750.222(k); Mo. Rev. Stat. § 571.020(1)(6)(b), § 571.010(17); Mont. Code Ann. § 45-8-340(1); Neb. Rev. Stat. § 28-1203(1), § 28-1201(9); Nev. Rev. Stat. § 202.275(1), § 202.275(2)(a); N.C. Gen. Stat. § 14-288.8(a), § 14-288.8(c)(3); N.D. Cent. Code § 62.1-02-03, § 62.1-01-01(13); Ohio Rev. Code Ann. § 2923.17(A), § 2923.11(K), § 2923.11(F); Okla. Stat. tit. 21, § 1289.18(C), § 1289.18(B); Or. Rev. Stat. § 166.272(1), § 166.210(11); S.C. Code Ann. § 16-23-230, § 16-23-210(d); Tex. Penal Code Ann. § 46.05(a)(1)(C), § 46.01(10); Va. Code Ann. § 18.2-300(B), § 18.2-299; Wash. Rev. Code § 9.41.190(1)(a), § 9.41.010(34); and Wis. Stat. § 941.28(2), § 941.28(1)(b).

330.   For example, Virginia prohibits possession of "Sawed-off rifles" which means "a rifle of any caliber, loaded or unloaded, which expels a projectile by action of an explosion of a combustible material and is designed as a shoulder weapon with a barrel or barrels length of less than 16 inches or which has been modified to an overall length of less than 26 inches." Va. Code § 18.2-299.

331.   Plaintiffs submit that registration of an "illegal" braced pistol is impossible in these states as well, as a person would be providing evidence to ATF that he has possessed an unregistered SBR – a crime under the law of his state.

332.   To be sure, *ATF* may not use a person's submission of a Form 1 as evidence for prosecution.  26 U.S.C. § 5848 (discussed below).

333.   But that same restriction does not apply to state governments.

334.   Moreover, in addition to providing *ATF* with evidence of a state crime, the Form 1 process also provides *state authorities* with the same evidence, who could then use it to prosecute the registrant.

335.   Indeed, adopted to facilitate the Final Rule, ATF Form 1 now includes a box to be checked under "Type of Application," stating "c. Tax Exempt. Firearm is not subject to the making tax pursuant to Title 26 U.S.C. §§ 7801, 7805. To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the firearm to be registered."[43]  Traditionally, on a Form 1, no photograph of a firearm is required because the applicant has yet to *make* that firearm.

---

[43]      https://www.atf.gov/firearms/docs/form/form-1-application-make-and-register-firearm-atf-form-53201/download

336.    This box was designed to facilitate registration of allegedly unregistered SBRs under the Final Rule.

337.    This box was not present on prior versions of the ATF Form 1.[44]

338.    Finally, the Form 1 *requires notice of the application be sent to local law enforcement*.  27 C.F.R. § 479.62(c).  This regulation appears to be entirely a bureaucratic creation, not required by any federal statute.

339.    Since here it will be used to provide evidence of crime to state law enforcement officials, it should be struck down as not only being unauthorized by statute, but also a Fifth Amendment violation.

340.    By seeing that box 1.c is checked on the newly-revised Form 1, local law enforcement will know that an allegedly unlawful and unregistered SBR is being registered with ATF.

341.    By seeing that no tax was paid on its registration, local law enforcement will thus know that this SBR was possessed *prior to* the Final Rule, and thus in violation of state law, because it was not properly registered with ATF.

342.    In other words, as part of the registration process (which requires notification to local law enforcement), ATF will require applicants for registration to submit photo evidence of their crimes, along with their identifying information, to the very same local law enforcement officers who would arrest and prosecute them.

_____

[44]

https://web.archive.org/web/20221020030310/https://www.atf.gov/firearms/docs/form/form-1-application-make-and-register-firearm-atf-form-53201/download

343.   Even if ATF has "enforcement discretion" to avoid federal prosecution for what they claim is a violation of the law, ATF has no authority to prevent an independent state prosecution for possession of a now reclassified (and still possessed) weapon in violation of state law.

344.   Indeed, ATF itself acknowledges that "[i]nformation regarding the application of State law to a particular weapon would be within the jurisdiction of the State agency responsible for the enforcement of the State firearms laws or other State legal authority." FR 6558.

345.   In other words, there appear to be at least **30 states** (not six) – a majority of the country – where persons cannot comply with the Final Rule by registration, without incriminating themselves under both state and federal law.

346.   The Final Rule entirely fails to grapple with this reality.

## C.    A Decision to Exercise Enforcement Discretion Can Be Reversed

347.   Furthermore, pursuant to the very nature of "enforcement discretion" (hardly a formal grant of immunity), presumably ATF (or the DOJ, which outranks ATF) could change its mind at any time, and begin enforcement, conveniently now having the identifying information of those who in good faith registered their firearms, but whom ATF alleges violated the law through illegally making and/or transferring an SBR.

348.   Previously Supreme Court examined the NFA in the context of the Fifth Amendment in *Haynes v. United States,* where the Court ultimately found that the NFA, as then written (in 1968), violated the protection against self-incrimination. *Haynes v. United States*, 390 U.S. 85 (1968).

349.    In response to *Haynes*, Congress passed a statutory limitation on ATF's ability to use information obtained in conjunction with an NFA transfer or registration application.

350.    The statutory restriction however only limits the use of the application information "directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring ***prior to or concurrently with*** the filing of the application or registration." 26 U.S.C. § 5848 (emphasis added).

351.    The Supreme Court thereafter reviewed the revised NFA in *United States v. Freed*, and found it passed constitutional muster. *United States v. Freed*, 401 U.S. 601 (1971).

352.    Notably, § 5848 does not limit the use of any information learned ***after*** the application has been submitted.

353.    One of the reasons that the Court in *Freed* found the revised act to be constitutional in the context of self-incrimination was that "Under the present Act only possessors who lawfully make, manufacture, or import firearms can and must register them; *the transferee does not and cannot register." United States v. Freed,* 401 U.S. 601, 603 (1971).

354.    Therefore, the Supreme Court found no self-incrimination concerns, since it viewed the act as not requiring someone who was in possession of an NFA item (the transferee) to register.

355.    The Court further explained that "The transferor -- not the transferee -- makes any incriminating statements. True, the transferee, if he wants the firearm, must cooperate to the extent of supplying fingerprints and photograph. But the information he supplies makes him the lawful, not the unlawful, possessor of the firearm." *Id.* at 606.

356.   And it is true that the applicant normally is not providing criminalizing information, in that normally the applicant is not in possession of an unregistered firearm, because in the context of a Form 4, the weapon has not yet been transferred to the transferee, or in the context of a Form 1, because the weapon has not yet been manufactured.

357.   However, these "normal circumstances" do not apply to the Final Rule, where ATF has turned the system on its head.

358.   In the Final Rule ATF explains that braced pistols are illegal already-made-unregistered-SBRs, but allows their continued possession, provided registration occurs within 120 days of publication of the final rule.

359.   Thus, unlike the situation considered in *Freed*, in this situation, the applicant remains in possession of the unregistered SBR, and ATF can use the information they obtained *after* the time of filing against the unregistered possessor.

360.   In fact, the statute of limitations for tax crimes is found in 26 U.S.C. § 6531, imposing a three or six-year limitation depending on the nature of the crime.

361.   However, this limitations period would not apply to the extent that ATF might later claim that even good-faith Form 1 registration of a braced pistol was ineffective, even though the agency demanded it.

362.   Indeed, in the past, ATF repeatedly has taken the position that unlawfully manufactured or transferred items (such as those in this case) *cannot be registered* and are *forever contraband*.

363.   For example, ATF recently changed its policy and claimed that solvent traps (accessories used to clean firearms) are actually unregistered suppressors.

364.    When persons attempted to register such solvent traps on Form 1's, ATF replied

with the following notice, including the language that "THE PART FROM WHICH YOU

INTEND TO MAKE A SILENCER ALREADY MEETS THE NFAS DEFINITION OF

SILENCER.  THE PART WAS NOT REGISTERED NOR [SIC] TRANSFERRED IN

COMPLIANCE WITH THE NFA.  THEREFORE, YOUR EFORM 1 APPLICATION TO

MAKE A SILENCER IS DISAPPROVED.  NFA DIVISION NOTES THAT IT IS

UNLAWFUL FOR YOU TO POSSESS A SILENCER MADE OR TRANSFERRED IN

VIOLATION OF THE NFA."



365.    Likewise, when AmmoLand News reached out to ATF to clarify this statement,

ATF doubled down that "An approved Form 1 does not legitimize a prior transfer of a

device or part that falls under the federal definition of silencer that did not comply with the tax, transfer, and registration requirements of the NFA."[45]

366.   The Final Rule, however, claims just the opposite, that Form 1 registration of a braced pistol-turned SBR will legitimize its prior alleged unlawful manufacture and unlawful transfer.

367.   At best, the Final Rule represents a 180 degree departure from this prior longstanding agency policy, without so much as acknowledging the prior policy much less providing a reasoned explanation for the change.

368.   Moreover, the case of *U.S. v. Hunter* is instructive, as the court explained that introduction of protected records is prohibited in a trial by 26 U.S.C. § 5848, but that the code "does not appear to proscribe the Government's utilization of the records…*to investigate and indict* Defendants." *United States v. Hunter*, 843 F. Supp. 235, 249–53 (E.D. Mich. 1994) (explaining that even if the records themselves would be prohibited at trial, the information learned can still be used in furtherance of the investigation, but not admitted as evidence) (emphasis added).

369.   The registration requirement to provide evidence to ATF of a crime, which could be prosecuted at both the state and federal level, violates the protection of the Fifth Amendment against self-incrimination.

370.   And while registration with ATF is not the only option for unlawful possessors, ATF presents a Hobsons choice: 1) possess an unregistered SBR (in violation of the law)

---

[45] https://www.scribd.com/document/624607616/ATF-Solvent-Trap-Reply

2) destroy the weapon or brace attachment 3) get rid of the weapon in its pistol format, or

4) attempt to register it, and in doing so, admit evidence of a crime.

**D. ATF Will Take An "Enforcement Action" if a Form 1 Application, Submitted in Good Faith Reliance on the Final Rule, Is Disapproved or Denied.**

371.    The Final Rule does not appear to take into account the very real possibility that not

all Form 1 applications are approved.

372.    In the Final Rule, ATF has promised to exercise "enforcement discretion" only with

respect to *past* manufacture or possession, and "any criminal liability for failure to take the

necessary action to comply with Federal law for weapons that have already been made will

result only for conduct occurring after the time period to register ends."   FR 6554.

Moreover, 26 U.S.C. § 5848 prohibits ATF from prosecuting someone based on *past* and

*concurrent* possession or attempted registration.   By their plain text, then, neither the Final

Rule nor federal law exempt possession that occurs *after* a person has unsuccessfully

attempted to register a braced pistol that ATF now claims to be an SBR.

373.    At least three problems thus arise.

374.    The first is for a person who is actually prohibited from firearm possession (a

prohibited person) who attempts to register a firearm with a pistol brace attached, but is

denied.  Although ATF could not prosecute based on the application, presumably a special

agent could "follow up" (by phone or home visit) to "verify" that the prohibited person still

possesses the unregistered firearm, and then make an arrest when the person attempts to

comply, thinking it is part of the registration process and not realizing he is incriminating

himself.

375.    The second problem arises because not all Form 1 applications are "approved" or "denied."  ATF requires that every Form 1 applicant undergo a background check, the same as for any GCA firearm transfer.

376.    For a typical GCA firearm, if the FBI is unable to complete that background check and provide an "approved" response, the FBI has 90 days before it must delete its records (28 CFR § 25.9(b)(1)(ii)), something the FBI does on day 88.[46]  If the background check stays open that long, it is recorded as simply "open," and the firearms dealer has the option (after three business day) to transfer the firearm (18 U.S.C. § 922(t)(1)(B)(ii)).

377.    Based on FBI's own data, approximately 2 percent of background checks stay "open" for 88 days and therefore are never resolved one way or the other.

378.    For an NFA application, however, a person is *applying* to manufacture a firearm, an application which must be either "approved" or "denied."  Thus, if a background checks stays "open" for 88 days and the record is purged, ATF cannot "approve" the Form 1. Rather, ATF would disapprove the application for failure to pass a background check.[47]

379.    When ATF was recently asked directly what would occur in such a case – where a law-abiding gun owner had his background check delayed and had his Form 1 application disapproved by ATF – the agency responded that such a disapproval would lead to ATF taking "an enforcement action."[48]

---

[46] https://www.oig.dhs.gov/sites/default/files/assets/2022-12/OIG-23-05-Dec22.pdf at 4.

[47] *See* https://www.scribd.com/document/622599931/Automatic-Denial-of-Tax-Stamps-If-NICS-Check-Isn-t-Completed-In-88-Days#

[48] https://www.youtube.com/watch?v=DggOmUXxVWY&t=36s

380.   Third, NFA applications are routinely denied not due to background check problems, but merely if an applicant makes an error on the Form 1, or fails to submit all the required documents and paperwork.

381.   To be sure, the Final Rule promises that "Provided the registration form is *properly submitted and documented* within the defined time period, the Department will consider individuals to be in compliance with the statutory requirements between the date on which a person's application is filed and the date a person receives ATF approval or disapproval of the application." FR 6480-81 (emphasis added).

382.   But the Final Rule does not state what will occur if the 120-day registration window has passed and a person has attempted in good faith to submit the required application paperwork, but has made something as simple as a clerical error.

383.   Presumably, in such case, the applicant will be in possession of an SBR for which ATF will apparently no longer offer enforcement discretion.

**E. ATF and DOJ's Enforcement Discretion Presumably Does Not Bind the Department of Defense.**

384.   Although in the Final Rule ATF (part of the Department of Justice) promises not to bring criminal charges for what ATF now claims were millions of felony crimes by law-abiding gun owners, the Department of Defense has not made a similar promise.

385.   Indeed, Article 134 of the Uniform Code of Military Justice is a catch-all provision under which a soldier, Marine, sailor, or airman can be charged for violation of other

federal laws, as "offenses involve noncapital crimes or offenses which violate Federal law

including law made applicable through the Federal Assimilative Crimes Act."[49]

386.   Thus, those members of the Armed Forces represented by the organizational

Plaintiffs potentially could be charged under the UCMJ for possessing an unregistered

firearm with a  pistol brace that ATF now claims to be an SBR, especially if possessed on

base housing.  *See, e.g., United States v. Alkazahg*, 81 M.J. 764, 767, 2021 CCA LEXIS

452, *1 (NMCCCA 2021) (unanimously reversing a Marine's conviction for possession of

a bump stock firearm accessory, finding it not to be a machinegun under federal law, as

ATF had claimed in a rulemaking not unlike this one).

387.   The Department of Defense can prosecute crimes committed by servicemembers

without involvement or approval by the Department of Justice. *See, e.g.*, *Department of

Defense Memorandum of Understanding*, U.S. Dep't Just. Archives, https://bit.ly/40yEczc

(Jan. 21, 2020).  Consequently, any exercise of enforcement discretion on DOJ's part has

no bearing on that of DOD, which can initiate criminal prosecutions for unregistered braced

pistols possessed by servicemembers *even during DOJ's grace period*, using ATF's current

interpretation of federal law.

388.   Not only might this nation's service members who possess firearms with pistol

braces still be charged under the UCMJ irrespective of ATF's exercise of "enforcement

discretion," but also for those persons deployed overseas, *compliance with the Final Rule*

---

[49] https://www.sapr.mil/public/docs/ucmj/UCMJ_Article134_General_Article.pdf

*may be entirely impossible* if the service member will not return home within the 120-day grace period ATF so generously provides.

**F. The Final Rule Fails to Clarify Whether ATF's "Enforcement Discretion" Applies to the Other Federal Crimes the Final Rule Has Created.**

389.    In addition to unlawful manufacture, unlawful transfer, and unlawful possession of an unregistered NFA weapon, the Final Rule also impacts separate crimes under 18 U.S.C. § 922(r), which makes it generally a crime to assemble from imported parts any semiautomatic rifle, and 26 U.S.C. § 5861(k), which criminalizes possession of an illegally imported weapon.

390.    Indeed, 26 U.S.C. § 5861(k) makes it unlawful to "to receive or possess a firearm which has been imported or brought into the United States in violation of 26 U.S.C. § 5844, defined under 26 U.S.C. § 5845(a) to include (with limited exceptions):  "(3) a rifle having a barrel or barrels of less than 16 inches in length; [or] (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length."

391.    If imported braced weapons are really SBRs, as the Final Rule claims, then the majority of them were imported in violation of 26 U.S.C. § 5844, and their possession is a crime, punishable under 26 U.S.C. § 5861(k) by up to ten years in prison, and a fine of up to $250,000. 26 U.S.C. § 5871.

392.    Although ATF indicates it will use its "enforcement discretion" not to prosecute violations of §§ 5861(b)-(f), nowhere in the Final Rule does ATF indicate that it intends to exercise "enforcement discretion" for violations of 26 U.S.C. § 5861(k).

393.   Furthermore, while assembling and possessing a pistol from imported parts is generally legal, if one assembles from imported parts a semiautomatic rifle, unless ATF finds it suitable for a sporting purpose, the assembly generally violates 18 U.S.C. § 922(r).

394.   In the Final Rule, ATF makes clear the "criminal violation under 18 U.S.C. § 922(r) is for the "assembl[y]" (not possession) of the semi-automatic rifle, and therefore, modification of this kind of firearm through the removal of the relevant parts would not cure the § 922(r) violation because the "assembl[y]" has already occurred." FR 6564.

395.   Therefore, for possessors of imported pistols *who added a brace*, and therefore, according to ATF "made" rifles, the Form 1 presents an opportunity to self-incriminate on an entirely separate crime, punishable by up to five years in prison. 18 U.S.C. § 924(a)(1)(D).   Like above, the Final Rule does not explicitly promise "enforcement discretion" with respect to this provision.

396.   For all of these reasons, the registration portion of the Final Rule violates the Fifth Amendment in that it requires the submission of self-incriminating information.

## III.   The Final Rule Violates the Fifth Amendment's Due Process Protection (Void for Vagueness)

397.   The Supreme Court has made clear that "the prohibition of vagueness in criminal statutes ... is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'"   *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

398.   The Final Rule's incomprehensibility is described in further detail above, as part of Plaintiffs' APA challenge.

399.   The Final Rule actually admits this vagueness several times. It states that "ATF makes classifications **based on the configuration of a particular firearm**, as submitted to ATF." FR 6507 (emphasis added).

400.   Likewise, the Final Rule states that "[i]n making the determination of whether surface area 'allows' for shoulder firing, **ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area**." FR 6511 (emphasis added). Instead, "[i]f the firearm includes surface area that can be used for shoulder firing the weapon, the weapon **potentially qualifies** as a "rifle".... To assess whether a potential rifle is in fact a rifle, **ATF would then consider ... other factors**...." *Id.* (emphasis added).

401.   The Final Rule is quite open that ATF does not expect firearms owners to necessarily be able to determine whether their particular weapon violates the law, thus providing that "to the extent that an individual is unsure about whether a particular firearm with a particular attached "stabilizing brace" constitutes a rifle, **that individual is free to request a classification determination from ATF** for additional clarity." FR 6552 (emphasis added).

402.   On the contrary, an agency cannot escape judicial review by reserving unto itself the dictatorial power unilaterally to resolve any confusion that its own poorly drafted rulemaking has created.

403.   Rather, precision must be required, as the Final Rule "interprets" statutes that are criminal in nature. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (explaining that there is a "greater tolerance of enactments with

civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").   As the Court explained in *Hoffman*, "perhaps the most important factor affecting the clarity … is whether it threatens to inhibit the exercise of constitutionally protected rights" (*id*. at 499), as the Final Rule does here.

404.   Indeed, "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Bouie v. Columbia*, 378 U.S. 347, 351 (1964).

405.   "The Fifth Amendment provides that '[n]o person shall ... be deprived of life, liberty, or property, without due process of law.'" *Johnson v. United States*, 576 U.S. 591, 595 (2015).   "The Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.*

406.   The Final Rule is a 180-degree about-face from ATF's longstanding interpretation that a stabilizing brace does not *ipso facto* convert a pistol into a rifle.

407.   Indeed, ATF itself has admitted that "the brace concept was inspired by the needs of disabled combat veterans who still enjoy recreational shooting but could not reliably control heavy pistols without assistance. Consequently, ATF agrees that there are legitimate uses for certain 'stabilizing braces.'" 85 Fed. Reg. 82517.

408.   ATF further admits that "the changes in ATF's classification process, and the inconsistencies in ATF's analysis of 'braces' attached to firearms may have led to confusion" among firearms owners. FR 6501.

409.   ATF even concedes that "[t]he Department agrees with commenters ... that the analyses in some of ATF's prior opinions regarding incidental firing from the shoulder and the use of 'stabilizing brace' devices on firearms have been inconsistent." FR 6501.

410.   In a November 26, 2012 letter to pistol brace manufacturer SB Tactical, ATF assured the manufacturer that attachment of the brace "does not convert that weapon to be fired from the shoulder and **would not alter the classification** of a pistol or other firearm."[50]

411.   In a March 15, 2014 letter, in response to an inquiry from Sgt. Joe Bradley of the Greenwood Police Department, ATF stated that "placing the receiver extension of an AR-15 type pistol on the user's shoulder **does not change the classification of a weapon**" from a pistol to a rifle.[51]

412.   ATF explained that even though shouldering of a pistol equipped with a stabilizing brace constitutes misuse "not intended by the manufacturer," using the brace improperly "does not constitute a design change," and that ATF does not classify weapons based on how an individual person may choose to use them. *Id.*

413.   In 2017, ATF again clarified that "incidental, sporadic or situational 'use' of an arm brace ... equipped firearm from a firing position at or near the shoulder" would not "constitute 'redesign.'"[52]

---

[50] FTB Letter 2013-0172 (Nov. 26, 2012) (emphasis added).
[51] FTB Letter 301737 (Mar. 5, 2014) (emphasis added).
[52] FATD Letter 5000 (Mar. 21, 2017).

414.   As a result of ATF's repeated assurances that the addition of a brace to a non-NFA firearm would not trigger reclassification into an NFA firearm, the sale of stabilizing braces increased over several years, in reliance on ATF's promises.[53]

415.   "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Bouie v. Columbia*, 378 U.S. 347, 351 (1964).

416.   Yet the Final Rule states, for example, that "[i]n making the determination of whether surface area 'allows' for shoulder firing, **ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area.**" FR 6511 (emphasis added).

417.   In an effort to evade the due process question, ATF argues that "to the extent that an individual is unsure about whether a particular firearm with a particular attached 'stabilizing brace' constitutes a rifle, that individual is free to request a classification determination from ATF...." FR 6552.

418.   ATF's argument is a *de facto* admission that the Final Rule, promulgated against a historical background of ATF approving and even inviting manufacture and transfer of

---

[53] Letter from the Hon. Mitch McConnell, et. al. to the Hon. Merrick Garland (June 24, 2021) ("McConnell letter") (explaining "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces" and that "demand over the last five years is surely attributable to ATF's classification letters and much publicized effective 2017 letter effectively rescinding its 2015 ruling against stabilizing braces").

pistol braces, leaves people of common intelligence unable to guess what actions will subject them to federal criminal liability.

419.    "In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  Moreover, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

420.    It is no solution to the due process issue for ATF to argue that it has provided a process to register the unlawful braced pistols in a hurried 120-day window.  Indeed, when ATF allowed registration of Streetsweeper, Striker-12, and USAS-12 shotguns as destructive devices, it allowed a near 7-year amnesty window.[54]

421.    The Final Rule violates due process and should be struck down.

## IV.    <u>The Final Rule Is an Invalid Exercise of the Taxing Power</u>

422.    The Constitutional authority that justifies the NFA is the taxing power. *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937). "While the National Firearms Act of 1934 is based on Congress's tax power and only covered [a] small fraction of the American gun

---

[54]        https://www.atf.gov/firearms/docs/open-letter/all-ffls-apr2001-open-letter-end-registration-period-streetsweeper-striker/download

supply, the Gun Control Act of 1968 applies to all firearms manufactured after 1898 and is based on the interstate commerce power." <u>Firearms Law And The Second Amendment: Regulation, Rights, And Policy</u>, Nicholas J. Johnson, et al. (3rd ed. 2021) at 660.

423.    In promulgating the Final Rule, therefore, ATF can only rely upon the taxing power to justify its regulation.

424.    BATFE claims that the Final Rule is an exercise of the authority to tax the making of short-barreled rifles.

425.    Indeed, the NFA imposes a $200 tax on the making of firearms covered by the NFA, including short-barreled rifles. 26 U.S.C. § 5821.

426.    BATFE confirms that there is no legal prohibition on making firearms (including short-barreled rifles), with or without a license to do so, but that "the making of an NFA firearm requires a tax payment and advance approval by ATF."[55]

427.    The Final Rule, however, expressly states that BATFE *will not require anyone* who registers their affected weapon with a stabilizing brace *to pay the $200 tax*. FR 6481.

428.    Because the Final Rule does not collect taxes, it is not an exercise of the Taxing Power.

429.    Quite to the contrary, the Final Rule is a great expansion of regulatory authority asserted by ATF that will affect millions of law-abiding citizens, masquerading as a taxing regulation but whose purpose cannot possibly be the collection of revenue (since the Final Rule will result in precisely zero dollars of tax revenue being collected).

---

[55]     https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (last accessed January 30, 2023).

430.   The Final Rule, therefore, exceeds the statutory and Constitutional authority on which the NFA—from which it derives its own regulatory authority—is based.

431.   As a power- and gun-grab that does not even purport to achieve the statutory purpose on which it relies, the Final Rule must fail for ATF's lack of authority to promulgate it.

432.   ATF tries to navigate this problem by the Final Rule's statement that "ATF may enforce the NFA against any person or entity that—any time after the publication date of this rule—*newly* makes or transfers a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA." FR 6481 (emphasis added). But while that might justify the registration of *newly* manufactured firearms going forward, it does not explain ATF's retroactive registration of millions of weapons that were *previously* made.

433.   Further evidencing the lack of any authority of the taxing power, as noted above there are just over a half million short-barreled rifles currently registered in the NFRTR. Yet the Final Rule would expand that entire list of tax-*paid* registrations with many hundreds of thousands or millions of tax-*not-paid* registrations, hardly fulfilling the NFA's purpose to generate revenue.

434.   The Final Rule is unlawful agency action that must be set aside because it is not in accordance with law, contrary to constitutional power, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

435.   The Anti-Injunction Act, 26 U.S.C. § 7421 ("AIA"), does not bar this claim because Plaintiffs are irreparably harmed and because under no circumstances can the government ultimately prevail. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962).

436.   The AIA does not bar this claim because the government is not assessing or collecting taxes.

437.   The AIA does not apply to requirements that citizens apply for and receive permission to make short-barreled rifles or to requirements that citizens register and place serial numbers on short-barreled rifles because those are neither the assessment nor the collection of taxes. *CIC Services, LLC v. Internal Revenue Service*, 141 S. Ct. 1582, 1592 (2021).

## V.   The NFA's Tax on Making Firearms Is an Unconstitutional Unapportioned Direct Tax.

438.   The NFA's tax on making short-barreled rifles is a direct tax that must be apportioned among the several States. U.S. Const. Art. I, § 2, cl. 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons"); § 9, cl. 4 ("No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken.").

439.   To counsel for Plaintiffs' knowledge, no court has ever decided whether a tax on making property is a direct tax or an indirect tax.

440.   "Only three taxes are definitely known to be direct: (1) a capitation, U.S. Const. art. I, § 9, (2) a tax upon real property, and (3) a tax upon personal property." *Murphy v. I.R.S.*, 493 F.3d 170, 181 (D.C. Cir. 2007). Thus, a tax on personal property is a direct tax.

441.   But taxes "upon the exercise of one of the numerous rights of property [that are] clearly distinguishable from a tax which falls upon the owner merely because he is owner … were not understood to be direct taxes when the Constitution was adopted." *Bromley v. McCaughn*, 280 U.S. 124, 137 (1929). For instance, a tax on selling personal property (a sales tax) is not a direct tax that must be apportioned.

442.   Yet the line between taxing exercises of the rights of property and taxing the property itself can be blurry. The Supreme Court recognizes the possibility that "since property is the sum of all the rights and powers incident to ownership [and] that one of the uses of property is to keep it, and that a tax upon the possession or keeping of property is no different from a tax on the property itself." *Id.* at 138. The Court has reserved the question of whether "a tax levied upon all the uses to which property may be put, or upon the exercise of a single power indispensable to the enjoyment of all others over it, would be in effect a tax upon property, and hence a direct tax requiring apportionment." *Id.* (emphasis added, citation omitted).

443.   A tax on taking some items of personal property and making them into a new item of personal property for personal, non-commercial use is a direct tax because it is "no different from a tax on the property itself." *Id.*

444.   Additionally, according to one originalist scholar, "Despite the variety among the objects of direct taxation, one can divine a unifying principle: A tax was direct if it was imposed on people's lives, homes, or on the productive occupations by which they supported and expressed themselves. Direct taxes, in other words, were levies on living and producing." Robert G. Natelson, *What the Constitution Means by "Duties, Imposts,*

110

*and Excises"–and "Taxes" (Direct or Otherwise)*, 66 Case W. Res. L. Rev. 297, 318 (2015).

445.    A tax on making short-barreled rifles is a tax on living and producing. Therefore, it is a direct tax.

446.    The NFA's tax on making short-barreled rifles is a direct tax that is not apportioned among the several States. It is unconstitutional for that additional reason.

447.    The Final Rule is based on the NFA's unconstitutional tax on making firearms. Consequently, the Final Rule is unlawful agency action that must be set aside because it is not in accordance with law, contrary to constitutional power, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

448.    The Anti-Injunction Act, 26 U.S.C. § 7421 ("AIA"), does not bar this claim because Plaintiffs are irreparably harmed and because under no circumstances can the government ultimately prevail. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962).

449.    The AIA does not bar this claim because the government is not assessing or collecting taxes.

450.    The AIA does not apply to requirements that citizens apply for and receive permission to make short-barreled rifles or to requirements that citizens register and place serial numbers on short-barreled rifles because those are neither the assessment nor the collection of taxes. *CIC Services, LLC v. Internal Revenue Service*, 141 S. Ct. 1582, 1592 (2021).

## VI.   The Rule of Lenity Forbids a Wholesale Administrative Reinterpretation of a Statute that Retroactively Criminalizes Possession of Previously Legal Firearms

451.   ATF attempts to justify its about-face on pistol braces by arguing that "the rule does not create any new law," but simply "clarifies the definition of 'rifle' under 27 CFR § 478.11 and § 479.11, as necessary to implement existing law…."  FR 6500-01.  *See also* at 6478 ("merely conveys more clearly" when an item constitutes a short-barreled rifle).

452.   ATF argues that it enjoys "some measure of discretion to determine what regulations are in fact 'necessary'" to implement the NFA and GCA. *National Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990).  On the contrary, ATF has no "discretion" to decide what items constitute firearms regulated under the NFA.

453.   Moreover, the statute ATF is now "reinterpreting" is a criminal statute, and the Supreme Court "ha[s] never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014).

454.   To be sure, the purported "interpretation" that ATF has offered of the statute in the Final Rule is incomprehensible, arbitrary, and capricious and certainly is not the "best interpretation" of the law.  It must be struck on that basis alone.

455.   However, to the extent that the answer to the underlying question were ambiguous (whether stabilizing braces with legitimate non-SBR uses can transform a lawful pistol into an unregistered SBR), then the rule of lenity must apply.  Indeed, the fact that the agency previously said one thing, and now says something entirely different, indicates that the agency is apparently not sure what the statute means when it comes to stabilizing braces.

456.   The Supreme Court has been clear that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. 808, 812 (1971).

457.   As the Fifth Circuit recognized in striking down ATF's ban on bump stocks, "in relation to Chevron" deference, the Supreme Court has specifically "declin[ed] to defer to agency interpretations of criminal statutes." *Cargill v. Garland*, 2023 U.S. App. LEXIS 344, at *44 (5th Cir. 2023).

458.   ATF's claim of "discretion" for its 180-degree about-face on the legality of pistol braces is misplaced. "[W]hatever else one thinks about Chevron, it has no role to play when liberty is at stake." *Guedes v. BATFE*, 140 S.  Ct. 789, 790 (2020) (Gorsuch, J., statement respecting denial of certiorari).

459.   This is particularly true where, as here, "ATF has adopted an interpretive position that is inconsistent with its prior position." *Cargill*, 2023 U.S. App. LEXIS 344, at *44.

460.   "An agency *interpretation* of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30 (1987).

> Chevron's application in this case may be doubtful for other reasons too. The agency used to tell everyone that bump stocks don't qualify as 'machineguns.' Now it says the opposite. The law hasn't changed, only an agency's interpretation of it. How, in all this, can ordinary citizens be expected to keep up? . . . And why should courts, charged with the independent and neutral interpretation of the laws Congress has enacted, defer to such bureaucratic pirouetting? *Guedes*, 140 S. Ct. at 45 (Gorsuch, J., statement respecting denial of certiorari).

461.   "The concern is only magnified where, as here, the Government's interpretation of the underlying statute carries implications for criminal liability." *Cargill*, 2023 U.S. App. LEXIS 344, at *46.

> With deference to agency interpretations of statutory provisions to which criminal prohibitions are attached, **federal administrators can in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain**. Undoubtedly **Congress may make it a crime to violate a regulation, … but it is quite a different matter for Congress to give agencies— let alone for us to presume that Congress gave agencies—power to resolve ambiguities in criminal legislation**." *Whitman v. United States*, 574 U.S. 1003, 1004 (Scalia, J., statement respecting denial of certiorari) (emphasis added).

462.   Contrary to ATF's position, "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States,* 573 U.S. 169, 191 (2014).

463.   If Congress wishes to criminalize braced pistols, it can amend the NFA to do so. This "preserves the separation of powers by ensuring that legislatures, not executive officers, define crimes." *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1023 (6th Cir. 2016) (rev'd. on other grounds, *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017)).

464.   But Congress has not done so, and ATF's sudden reversal violates the Rule of Lenity.

## FIRST CAUSE OF ACTION

## (VIOLATION OF APA 5 U.S.C. §§ 553 and 706(2)(D))

## WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

465.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

466.   The APA at times requires that agencies engage in notice and comment rulemaking. 5 U.S.C. § 553(b).

467.   This requirement applies to the Final Rule.

468.    The Final Rule, however, did not abide by this requirement, as its definition of "rifle" is not the "logical outgrowth" of the original definition from the agency's proposed rulemaking.

469.    The purpose of notice and comment rulemaking is to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…."  5 U.S.C. § 553(c).

470.    The organizational plaintiffs herein, along with tens of thousands of their members and supporters, submitted comments critical of the definition of "rifle" as originally proposed by ATF.

471.    However, the new definition is nothing like the original definition.

472.    By failing to provide the opportunity for comment its most recent attempt to define "rifle" in the Final Rule, the agency has failed to consider all the relevant arguments and important aspects of the problem.

473.    The Final Rule thus violated 5 U.S.C. § 553 and § 706(2)(D).

## SECOND CAUSE OF ACTION

### (VIOLATION OF APA 5 U.S.C. § 706(2)(A))

### ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW

474.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

475.    The Final Rule challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

476.   Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

477.   A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

478.   An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious.  In this case, ATF has dispensed with countless of its prior determinations and classifications, and adopted entirely new approaches and practices with respect to interpreting and applying the statutes it is tasked with enforcing.  ATF has failed to provide the required reasoned explanation for these tectonic policy shifts.

479.   Additionally, the Final Rule adopts various vague and arbitrary standards and tests that invite future arbitrary and capricious actions on the part of ATF.

480.   Finally, the Final Rule in conflicts with the plain text of the statutes it purports to interpret and implement, making it not in accordance with law.

## THIRD CAUSE OF ACTION

## (VIOLATION OF APA 5 U.S.C. § 706(2)(C))

## IN EXCESS OF STATUTORY JURISDICTION OR AUTHORITY

481.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

482.   Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

483.   The Final Rule constitutes a final agency action that is ultra vires and should be set aside by the Court.

484.   Defendants may only exercise the authority conferred upon them by statute, and may not legislate through regulation in order to implement the perceived intent of Congress or purported congressional purpose behind federal gun control statutes.

485.   The Final Rule forces millions of gun owners into a registration scheme for firearms they legally purchased and that were not regulated by the NFA or subject to registration at the time.

486.   The Final Rule requires the confiscation or destruction for all of the millions of legally-purchased firearms subject to registration where the owner does not wish to submit to registration.

487.   The Final Rule will cause billions of dollars in economic damage or loss.

488.   The Final Rule expands the applicability of federal crimes to make millions of otherwise law-abiding citizens subject to felony charges should they fail to comply with the Final Rule.

489.   Congress did not authorize ATF to, decades after the law was passed and at least a decade after the first stabilizing brace was permissively classified, reverse its longstanding policy, materially revise definitions, and alter the classification of millions of lawfully-purchased firearms to bring them under the NFA's control.

490.    The abovementioned impacts, both jointly and severally, of the Final Rule are too great allegedly to have been authorized by Congress decades ago, but only now to be discovered and applied.

491.    The Final Rule is in excess of the authority Congress granted ATF and is therefore in violation of the APA, 5 U.S.C. § 706(2)(C).

## FOURTH CAUSE OF ACTION

## (VIOLATION OF APA 5 U.S.C. § 706(2)(B))

## CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE OR IMMUNITY

492.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

493.    The APA requires agency action be set aside if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

494.    Plaintiffs Gun Owners of America, Inc. and Gun Owners Foundation have representational standing to assert the interests and protect the rights of their members and supporters.

495.    The Final Rule is contrary to the Second Amendment, in that it purports to regulate (and infringe) the ability to own a rifle with a barrel of certain lengths despite lawful, unregistered ownership of rifles with such barrel lengths existing in and beyond the founding era.

496.    The Final Rule is contrary to the Fifth Amendment, which requires that the criminal law be clear and unambiguous, so that persons of ordinary intelligence may understand it, comprehend what is proscribed, and remain law abiding, and so that no person shall be deprived of life, liberty, or property without due process of law.

118

497.    The Final Rule is contrary to the Fifth Amendment, which protects the rights of individuals to not engage in self-incrimination.[56]

498.    The Final Rule is contrary to the constitutional separation of powers, which lays out the only legitimate process for the enactment of legislation.  See, e.g., Terkel v. CDC, 521 F. Supp. 3d 662, (2021).

## FIFTH CAUSE OF ACTION

### (VIOLATION OF APA 5 U.S.C. § 553(d))
### UNLAWFUL EFFECTIVE DATE

499.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

500.    The APA provides that, absent a showing of good cause or the meeting of other, limited criteria, the "publication … of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).

501.    The Final Rule is a substantive rule.

502.    The Final Rule was published on its effective date.

503.    The Final Rule does not provide good cause for its immediate-upon-publication effective date, 5 U.S.C. § 553(d)(3), nor does it claim that such good cause has been satisfied.

504.    The Final Rule, therefore is invalid and should be vacated for its publication upon its effective date in violation of the APA, 5 U.S.C. § 553(d).

## SIXTH CAUSE OF ACTION

### (SECOND AMENDMENT)
### RIGHT TO KEEP AND BEAR ARMS

---

[56] This claim is brought by Brown, GOC, and GOF.

505.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

506.   The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

507.   The Final Rule regulates items that Plaintiffs believe are GCA pistols, are in "common use" by millions of Americans, and for which there is no historical analogue to regulate and require to be registered with the government, along with payment of a tax.

508.   Alternatively, the Final Rule regulates items that ATF claims are rifles, which are also in "common use" by millions of Americans, and for which there is no historical analogue to regulate and require to be registered with the government, along with payment of a tax.

509.   Alternatively, the Final Rule regulates items that Congress arbitrarily has defined to be "short-barreled rifles," which are *also* in "common use" by millions of Americans, and for which there is no historical analogue, prior to 1934, to regulate and require to be registered with the government, along with payment of a tax.

510.   Nor are short-barreled rifles "dangerous and unusual" firearms, as an item which is "in common use" (*i.e.*, usual) by millions of Americans cannot possibly be unusual (*i.e.*, uncommon).

511.   Moreover, short-barreled rifles are no more dangerous than the pistols or full-length rifle versions of the same weapon, all of which are readily available throughout the country in countless configurations, and without NFA registration.  At best, the Final Rule regulates

only the conduct of law-abiding gun owns, not criminals who, by definition, do not obey the law.

512.   The Final Rule thus violates the Second Amendment to keep and bear arms, and must be struck down.

## SEVENTH CAUSE OF ACTION

### (FIFTH AMENDMENT)

### SELF-INCRIMINATION

### (Brought by Brown, GOA, and GOF)

513.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

514.   The Fifth Amendment of the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself," known as the right against self-incrimination.

515.   The Supreme Court interprets this right against self-incrimination to apply not just to in-court testimony, but also to tax and registration schemes through which compliance creates a threat of self-incrimination. *Marchetti v. United States*, 390 U.S. 39 (1968).

516.   Compliance with the Final Rule through registration requires the submission of information to law enforcement that creates a threat of self-incrimination.

517.   The Final Rule thus violates the Fifth Amendment's protection of the right against self-incrimination.

## EIGHTH CAUSE OF ACTION

### (FIFTH AMENDMENT)

### VOID FOR VAGUENESS

518.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

519.    A law is void for vagueness where it "'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

520.    The provisions of the Final Rule fail to give a person of ordinary intelligence fair notice as to which firearms are subject to the registration and tax requirement and which are not.

521.    The Final Rule is therefore void for vagueness.

## NINTH CAUSE OF ACTION

## <u>(CONSTITUTION ARTICLE I, SECTION 8)</u>
### INVALID EXERCISE OF TAXING POWER

522.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

523.    Article I, § 8 of the U.S. Constitution provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."

524.    The relevant portions of the NFA, including its tax and registration scheme for short barreled rifles under which the Final Rule is promulgated, derive their authority from the Article I, § 8, taxing power granted to Congress.

525.    The Final Rule waives the NFA's $200 tax on brace-equipped firearms it now deems short-barreled rifles when registered within 120 days of its effective date, yet it keeps the registration scheme.

526.    Short-barreled firearms that are currently owned and configured with stabilizing braces cannot be lawfully registered after 120 days from the Final Rule's effective date.

527.    The Final Rule, therefore, expands the registration requirement and criminal penalties for firearms but does not raise revenue. *See Sonzinsky*, 300 U.S. at 514 ("Here, the annual tax of $200 is productive of some revenue.").

528.    The registrations on which no tax is paid cannot be used to "pay the Debts and provide for the common Defence and general Welfare of the United States."

529.    The Final Rule is thus an invalid exercise of, and cannot be justified under, the taxing power.

## TENTH CAUSE OF ACTION

## (CONSTITUTION ARTICLE I, SECTION 9)

## PROHIBITED UNAPPORTIONED DIRECT TAX

530.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

531.    Article I, § 9 of the U.S. Constitution provides that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken."

532.    A tax on property is considered a direct tax.

533.    The Final Rule imposes a tax on the current ownership of firearms that were not previously, but now will be, considered short-barreled rifles.

534.    The Final Rule is thus a tax on property, and so a direct tax.

535.    The Final Rule is not laid in proportion to the Census or apportioned by other constitutionally-approved enumeration.

536.   The Final Rule, therefore, violates the Constitution's prohibition on unapportioned direct taxes.

## ELEVENTH CAUSE OF ACTION

## (CONSTITUTION ARTICLE I, SECTIONS 1 AND 7)
### SEPARATION OF POWERS

537.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

538.   Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

539.   Article I, § 7, Clause 2 of the Constitution mandates that "[e]very Bill … shall have passed the House of Representatives and the Senate" and "shall ... be presented to the President of the United States … before it become a Law…."

540.   The Final Rule violates these provisions, usurping legislative powers.  The Final Rule represents an attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic fiat, rather than through legislation.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

(1) Declare that the Final Rule violates the Administrative Procedure Act as it is unlawful and an *ultra vires* agency action;

(2) Declare that the Final Rule violates the Administrative Procedure Act as it is "not in accordance with law";

(3) Declare that the Final Rule violates the Administrative Procedure Act as it is arbitrary and capricious;

(4) Declare that the Final Rule violates the Administrative Procedure Act as it is not the logical outgrowth of the NPRM and does not abide by the requirements of the Act;

(5) Declare that the Final Rule violates the Administrative Procedure Act insofar as it is contrary to constitutional right, power, privilege, or immunity;

(6) Declare that the Final Rule violates the right to keep and bear arms protected by the Second Amendment;

(7) Declare that the Final Rule violates the Fifth Amendment's privilege against Self Incrimination;[57]

(8) Declare that the Final Rule violates the Fifth Amendment's Due Process clause by being void for vagueness;

(9) Declare that the Final Rule is an invalid use of the constitutional taxing power;

(10) Declare that the Final Rule violates the Separation of Powers doctrine embodied in the United States Constitution;

(11) Declare (if the Final Rule is found to validly apply to the weapons at issue in this case) the National Firearms Act is unconstitutional insofar as it applies to the manufacture, possession, transfer, or registration of short-barreled rifles;

---

[57] This claim is brought by Brown, GOC, and GOF.

(12) Declare that Defendant ATF's chief law enforcement officer notification requirement contained in 27 C.F.R. § 479.62(c) is entirely without statutory authority, in violation of constitutional rights, and therefore is both unlawful and unconstitutional;

(13) Issue an injunction prohibiting Defendants and anyone acting in concert with them from enforcing the Final Rule or from taking any action inconsistent with the rescission of the Final Rule;

(14) Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action; and

(15) Grant Plaintiffs such other relief as the Court deems just and proper and as justice so requires.

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH*
Mississippi Bar No. 102784
Southern District of Texas No. 3554925
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

GILBERT J. AMBLER*
Virginia Bar No. 94325
Southern District of Texas No. 3834055
20 S. Braddock St
Winchester, VA 22601
(540) 550-4236
gilbert@amblerlawoffices.com

*Counsel for Plaintiffs Brady Brown, Gun Owners of America, Inc., and Gun Owners Foundation*

KEN PAXTON**
Attorney General of Texas

/s/ Aaron F. Reitz
AARON F. REITZ**
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771

LEIF A. OLSON**
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695

CHARLES K. ELDRED**
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Southern District of Texas No. 20772

CHRISTINA CELLA**
Assistant Attorney General
Texas Bar No. 24106199
Southern District of Texas No. 3355870

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Leif.Olson@oag.texas.gov
Charles.Eldred@oag.texas.gov
Christina.Cella@oag.texas.gov

**Counsel for Plaintiff State of Texas*