IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| GUN OWNERS OF AMERICA, INC., | ) | |
| GUN OWNERS FOUNDATION, and | ) | |
| BRADY BROWN, | ) | |
| | ) | Case No. 6:23-cv-00013 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE, and | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity AS THE DIRECTOR OF ATF, | ) | |
| | ) | |
| Defendants. | ) | |


**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents...............................................................................................................i

Table of Authorities.........................................................................................................ii

Introduction ..................................................................................................................... 1

Background and Facts ..................................................................................................... 5

    I.     Handguns, Rifles, and Short Barreled Rifles................................................. 5

    II.    The Final Rule. ............................................................................................... 6

Standard ........................................................................................................................... 9

Argument ......................................................................................................................... 9

    I.     Plaintiffs Are Likely to Succeed on the Merits ...................................... 9

         A.   The Final Rule Exceeds Statutory Authority and Must be Set Aside .......... 9

         B.   The Final Rule Unconstitutionally Regulates Handguns with Attached
             Stabilizing Braces. ................................................................................... 12

             1.     The Final Rule violates the Second Amendment. ............................ 12

             2.     The Final Rule unconstitutionally taxes the exercise of a
                   constitutional right. ........................................................................... 13

             3.     The Final Rule violates the Fifth Amendment. ................................ 14

         C.   The Final Rule is Not an Exercise of the Taxing Power, so it Must
             Be Set Aside. ............................................................................................ 16

         D.   The Final Rule is Arbitrary and Capricious Because it Did Not Take
             Reliance Interests into Account and Fails to Provide a Reasoned
             Analysis. ................................................................................................... 17

         E.   The Final Rule's Definition of "Rifle" Is Not a "Logical Outgrowth"
             of the NPRM........................................................................................... 20

    II.    Plaintiffs are Suffering Irreparable Harm. .......................................... 22

    III.   The Balance of the Equities and Public Interest Favor Plaintiffs. .................... 24

    IV.   Relief Should Be Nationwide............................................................................ 25

Conclusion ..................................................................................................................... 25

Certificate of Service ..................................................................................................... 27

## TABLE OF AUTHORITIES

**Federal Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) ................................................................................... 23

*Bittner v. United States,*
   No. 21-1195, 2023 WL 2247233 (U.S. Feb. 28, 2023) ................................ 5

*BST Holdings v. OSHA,*
   17 F.th 604 (5th Cir. 2021) ...................................................................... 24

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ................................................................ 4, 11

*CIC Servs., LLC v. IRS,*
   141 S. Ct. 1582 (2021) ............................................................................. 16

*CSX Transp., Inc. v. Surface Transp. Bd.,*
   584 F.3d 1076 (D.C. Cir. 2009) ............................................................... 20

*DHS v. Regents of the Univ. of Calif.,*
   140 S. Ct. 1891 (2020) ....................................................................... 17, 19

*Dist. of Columbia v. Heller,*
   554 U.S. 570 (2008) .......................................................................... 12, 13

*Elrod v. Burns,*
   427 U.S. 347 (1976) ................................................................................. 24

*F.C.C. v. Fox Television Stations,*
   567 U.S. 239 (2012) .......................................................................... 15, 18

*FRAC v. Garland,*
   No. 23-cv-24 (D. N.D. Feb. 9, 2023) .......................................................... 2

*Gun Owners of Am., Inc. v. Garland,*
   992 F.3d 446 (6th Cir. 2021), vacated, 19 F.4th 890 (6th Cir. 2021) (*en banc*) ............ 4

*Heller v. Dist. of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ............................................................... 13

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ............................................................................ 20

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
   804 F.2d 1390 (5th Cir. 1986) ....................................................................... 22

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ........................................................................... 9

*Kiewit Offshore Servs. V. U.S. Dep't. of Labor,*
   2023 WL 417486 (S.D. Tex. Jan. 25, 2023) .................................................. 23

*Marchetti v. United States,*
   390 U.S. 39, 49 (1968) .................................................................................... 14

*Mexican Gulf Fishing Co. v. United States Dep't of Commerce,*
   No. 22-30105, 2023 WL 2182268 (5th Cir. Feb. 23, 2023) ........................... 22

*Minneapolis Star & Tribune Co. v. Minn. Commr. of Revenue,*
   460 U.S. 575 (1983) ........................................................................................ 13

*Murdock v. Pennsylvania,*
   319 U.S. 105 (1943) ........................................................................................ 13

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .................................................................................. 16, 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022) .............................................................................. 12, 14

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................................ 24

*Sonzinsky v. United States,*
   300 U.S. 506 (1937) .................................................................................. 13, 14

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2016) .......................................................................... 24

*United States v. Alkazahg,*
   81 M.J. 764 (N.M. Ct. Crim. App. 2021) ....................................................... 15

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992) ................................................................................ 11

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) .................................................................................. 9

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................................. 4

*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ................................................................ 24

*VanDerStok v. Garland*,
   No. 4:22-cv-691, 2022 WL 4009048 (N.D. Tex. Sep. 2, 2022) ..................... 4

*Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*,
   16 F.4th 528 (5th Cir. 2021) ................................................................... 25

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .............................................................................. 5

## Statutes

5 U.S.C. § 706(2) ................................................................. 12, 14, 16, 17, 20, 22

10 U.S.C. § 934 ........................................................................................... 15

18 U.S.C. § 3571(b)(3) ................................................................................... 6

18 U.S.C. § 921(a) ................................................................................... 6, 11

18 U.S.C. § 922(r) ....................................................................................... 15

26 U.S.C. § 5821 ........................................................................................... 6

26 U.S.C. § 5822 ........................................................................................... 6

26 U.S.C. § 5845 ...................................................................................... 6, 9

26 U.S.C. § 5861 ...................................................................................... 2, 6

Tex. Penal Code § 46.05(a)(1)(C) .................................................................. 23

**Other Authorities**

Nicholas J. Johnson, *et al.*,
   FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY
   (3rd ed. 2021).................................................................................................. 5

**Regulations**

26 U.S.C. § 5822 .................................................................................. 7, 8
27 C.F.R. § 478.11............................................................................. 6, 10
27 C.F.R. §§ 479.62–64....................................................................... 8

Plaintiffs request a preliminary injunction, and ask this Court to enjoin Defendants from enforcing a regulation promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on January 31, 2023, 2021R-08F, 88 Fed. Reg. 6478 (Jan. 31, 2023), entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" ("Final Rule").  The Final Rule took effect immediately, however ATF claims it will not prosecute anyone until April 1, 2023.  Meanwhile, those in possession of a firearm with a stabilizing brace have until May 31, 2023, to destroy, forfeit, or register millions of firearms with the federal government or face ten years in prison and fines up to $250,000.  Unless enjoined, the Final Rule will have widespread and deleterious effects on the firearms community, causing billions of dollars of damages to millions of gun owners, including Plaintiffs, while also infringing Second and Fifth amendment rights.  An order enjoining implementation of the Final Rule, and preserving the status quo, is therefore necessary until the merits of this extraordinary rulemaking can be evaluated by the Court.

## INTRODUCTION

For nearly a decade, ATF repeatedly promised the American public that pistol "stabilizing braces"—firearm accessories that can be attached to the back of a handgun to secure it to the shooter's forearm, making the handgun safer and easier to handle for persons who otherwise would struggle to stabilize the gun—are lawful and unregulated accessories that *are not* shoulder stocks and *do not* transform handguns into short-barreled rifles ("SBRs") regulated under the National Firearms Act of 1934 ("NFA"), 26 U.S.C.

1

§ 5801–72.[1]   In fact, numerous ATF classification letters broadly opine that a pistol stabilizing brace, when added to *any pistol*, does not ordinarily result in an SBR.   Exhibit 7 ("stabilizing braces are perfectly legal accessories for large handguns or pistols").   ATF has even opined that shouldering a pistol with a stabilizing brace (*i.e.*, using a pistol like a rifle) does not transform handguns into SBRs.   *Id.*

In reliance on ATF's repeated statements, numerous variations of stabilizing braces have been designed, manufactured, sold, and installed on millions of firearms.   Although ATF relies on "anecdotal commentary" to estimate that three million stabilizing braces were in circulation as of 2020 (88 Fed. Reg. at 6560), the Congressional Research Service more accurately estimates between 10 and 40 million exist.   Congressional Research Service, Handguns, Stabilizing Braces, and Related Components, update April 10, 2021. Exhibit 8.   Indeed, just one brace manufacturer has reported selling more than 2.3 million units since ATF's outdated 2020-end estimate.   *FRAC v. Garland*, No. 23-cv-24 (D. N.D. Feb. 9, 2023), ECF #1 ¶ 173.

Then, with a stroke of the regulatory pen, ATF changed its mind on everything. Contrary to its earlier statements, ATF now claims that *virtually every* pistol brace installed on *virtually any* pistol, results in an illegal and unregistered SBR.   Exhibit 9, Factoring Criteria for Firearms with Attached "Stabilizing Braces" Final Regulatory Impact Analysis at 21.   The Final Rule admits a resulting economic effect of *billions* of dollars, not to

---

[1] Several such ATF classification letters are attached as Exhibits 1–6.  Unlike handguns, SBRs must be registered, and it is a felony to possess an unregistered SBR.  26 U.S.C. § 5861(d).

mention the lives that will be ruined when otherwise law-abiding Americans are charged with felony crimes for doing nothing more than what the government for years promised them was perfectly lawful to do.

ATF justifies pulling the rug out from under millions of gun owners with the ipse dixit that the agency has suddenly now reached "the best interpretation of [a] statute" that has been in effect for nearly ninety years. 88 Fed. Reg. at 6480. Dismissing dozens of its prior classification and opinion letters reaching precisely the opposite conclusion, ATF claims that this mountain of contrary authority "did not [] employ this correct understanding of the statutory terms," and therefore "all such prior classifications are no longer valid as of January 31, 2023." *Id.*

ATF sings a familiar tune, as the agency's wholesale policy reversals are becoming happenstance. For example, in a 2018 final rulemaking outlawing "bump stocks," ATF claimed all of its prior classifications—which found that bump stocks were *not* machineguns—did not reflect the best interpretation of the statute, and therefore were rescinded. 83 Fed. Reg. 66514 (Dec. 26, 2018). Likewise, in a 2022 rulemaking ATF claimed that unfinished and incomplete frames and receivers of firearms suddenly now are "firearms" under the statute, reversing scores of prior classifications and rulings promising otherwise. 87 Fed. Reg. 24672 (Apr. 26, 2022).

Over recent years, ATF has repeated this familiar process numerous times. First, the agency classifies firearms or accessories favorably, allowing them to be manufactured, marketed, sold, and used. Then, the agency reverses course, throwing up its hands and claiming that it was mistaken all along, that all of its past guidance can no longer be relied

3

upon, and that all the previously-lawful or unregulated items are suddenly now highly regulated (if not a criminal offense) if manufactured, sold, or possessed. The increasing frequency (and magnitude) of this pattern is drawing notice. Rejecting the bump-stock rule, the Sixth Circuit noted "ATF's frequent reversals on major policy issues." *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021), vacated, 19 F.4th 890 (6th Cir. 2021) (*en banc*). Similarly, the *en banc* Fifth Circuit held ATF's newfound "best interpretation" of the statute was in fact entirely wrong. *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023). And a district court in Texas recently enjoined ATF's enforcement of the frame-or-receiver rule, finding ATF's newly-minted explanation of the statute was "unpersuasive." *VanDerStok v. Garland*, No. 4:22-cv-691, 2022 WL 4009048, *5 (N.D. Tex. Sep. 2, 2022).

Undeterred, ATF presses on, invoking yet again the tired platitude that its decades of prior consistent conclusions were not based on "the best interpretation of the statute," and that millions of Americans should be imprisoned if they do not register their prior lawfully-possessed firearms with the federal government. But "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). Moreover, "[c]ourts may consider the consistency of an agency's views when … weigh[ing] the persuasiveness of any interpretation it proffers in court. Here, the government has repeatedly issued guidance to the public at odds with the interpretation it now asks us to adopt. And surely that counts as one more reason yet to question whether

4

its current position represents the best view of the law." *Bittner v. United States*, No. 21-1195, 2023 WL 2247233, at *7 (U.S. Feb. 28, 2023).  Likewise, in cases such as this, "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).

Here, the Final Rule does not represent reasoned (much less lawful) decision making.  Rather, it is the handicraft of unelected bureaucrats seeking to exercise power beyond lawful limits without any oversight or accountability.  This Court's intervention is therefore necessary, not only to restore order from the agency's chaos, but also to assure this nation's gun owners, and the American people, that they can have respect for – rather than contempt of – the rule of law.

## BACKGROUND AND FACTS

### I.  Handguns, Rifles, and Short Barreled Rifles.

The Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921–28, imposes regulations on all types of handguns and rifles under Congress's commerce clause power. The NFA, however, is different—it regulates only certain types of firearms, and does so based on Congress's taxing power.  Nicholas J. Johnson, *et al.*, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3rd ed. 2021) at 660.

The NFA regulates specific kinds of rifles, including "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than

16 inches in length."  26 U.S.C. § 5845(a)(3), (4).  The GCA, which also regulates these items, defines them as "short-barreled rifles" ("SBRs").  18 U.S.C. § 921(a)(7).

The NFA defines the act of "making" broadly to include not only manufacturing by the firearms industry, but also the conduct of ordinary persons in their own homes, such as "putting together" or "altering" a weapon into a regulated configuration.  26 U.S.C. § 5845(i).  The NFA imposes a $200 tax on each SBR "made" by unlicensed persons, which may not be done without first seeking ATF's *permission* and paying the tax.  26 U.S.C. §§ 5821, 5822.  If ATF grants permission, it registers the SBR in the National Firearms Registration and Transfer Record, and the maker must place a serial number on the SBR.  26 U.S.C. § 5822.  Making an SBR in violation of these requirements is a crime, as are possessing an unregistered SBR and possessing an SBR without a serial number.  26 U.S.C. § 5861(f), (d), (i).  Violators can be imprisoned for up to ten years, fined up to $250,000, or both.  26 U.S.C. § 5871; 18 U.S.C. § 3571(b)(3).

Here, the questions are whether handguns with attached stabilizing braces are SBRs, and whether ATF violated the Administrative Procedure Act in issuing a Final Rule declaring them as such.

## II.  The Final Rule.

As noted above, the NFA defines the types of rifles subject to regulation. The Final Rule, in turn, redefines what constitutes an NFA "rifle," now to include "a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder." 88 Fed. Reg. at 6574–75 (amending 27 C.F.R. §§ 478.11, 479.11).  The Final Rule sets

forth a list of factors that ATF will consider, in its complete discretion, to determine whether such a weapon does in fact amount to a regulated "rifle." *Id*. As ATF explained in its regulatory analysis, Exhibit 9, the Rule results in a situation where approximately 99 percent of handguns equipped with stabilizing braces are transformed into SBRs.

The Final Rule has massive consequences for millions of American gun owners as, per ATF, prior to announcement of the Final Rule they had been unknowingly violating the NFA by possessing regulated "weapon and 'brace' combinations," even though ATF previously had concluded these weapons were not subject to the NFA. *Id*. at 6480.

ATF promises that it will "exercise[e] its enforcement discretion" and give owners of braced handguns "options that they can choose from by May 31, 2023 to comply with the statutory requirements.  For example, possessors of such weapons … may register the firearms to comply with the statutory requirements … Apart from registration, there are other options … includ[ing] modifying affected weapons to remove them from the definition of a short-barreled rifle, destroying the firearm, or surrendering the firearm to law enforcement." *Id*. at 6480–81.  According to the Final Rule, gun owners who remove the brace and keep it unconnected to the handgun still own a "rifle," even if it is never reattached.  *Id*. at 6570.  Thus, in order to avoid liability the brace, if kept, must be "alter[ed]" in a way that it could never be "reattached" to the handgun.  *Id.*

"[T]he procedure to register short-barreled rifles, which include in certain instances firearms with 'stabilizing braces,' is through an ATF Form 1, Application to Make and Register a Firearm ('Form 1'), with the approval of the Attorney General." *Id*. at 6498; *see also* 26 U.S.C. § 5822 (requiring makers of SBRs to apply for permission before making,

and deeming approval of the application to register the SBR).  The Form 1 process requires submission of passport photos, fingerprints, the maker's residence address, and other identifying information.  26 U.S.C. § 5822; 27 C.F.R. §§ 479.62–64; Exhibit 10 (Form 1). While a "$200 making tax [is] usually due upon submission of such an application to register," ATF claims in the preamble to the Final Rule that it will not collect that tax for affected firearms.  88 Fed. Reg. at 6481.  No statute or rule authorizes such tax forgiveness.

Independent of the provisions in the Final Rule, ATF has begun to require that persons given tax amnesty provide photographs of their supposedly illegally unregistered SBRs when they submit the Form 1.  This requirement is not mentioned in the Final Rule or the preamble, yet has been effected by ATF's amending the Form 1 in December 2022. Previously, the Form 1 listed three types of applications: Tax Paid, Tax Exempt (federal government purchase), and Tax Exempt (non-federal government purchase).  Exhibit 11. In August 2022, ATF requested permission from the OMB to change the Form 1, stating, "Due to the upcoming Amnesty Registration of Pistol Brace weapons, photos of the weapon being registered will be required to prove the weapon does utilize a pistol brace in its configuration and would qualify for an amnesty registration."  Exhibit 12 at 2.  ATF then adopted the new Form 1 which added a new option: "Tax Exempt.  Firearm is not subject to the making tax … To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the forearm to be registered."  Exhibit 10.  No statute or rule gives ATF the authority to demand pictures of weapons subject to the making tax.

To summarize, under the Final Rule, if a person possesses a handgun and a stabilizing brace, that person illegally possesses—and has possessed—an unregistered SBR in violation of the NFA.  But ATF promises, using "enforcement discretion," not prosecute owners of offending firearms who destroy, surrender, or (if ATF approves their application) register their braced firearms by May 31, 2023.

## STANDARD

Plaintiffs seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The APA authorizes judicial review of "agency action" taken in violation of law.  5 U.S.C. §§ 706(2)(A)–(D).  "Agency action" includes rule making.  5 U.S.C. § 501(13).

## ARGUMENT

### I.  **Plaintiffs Are Likely to Succeed on the Merits**

### A.  **The Final Rule Exceeds Statutory Authority and Must be Set Aside.**

The NFA uses a three-part conjunctive test to define "rifle."  The weapon must be (1) **designed** or redesigned; (2) made or remade; **and** (3) **intended** to be fired from the shoulder. 26 U.S.C. § 5845(c) (emphasis added).  That means that it is not enough that a

weapon is constructed in a way that merely *allows* a shooter to fire from the shoulder. It must be *designed* and *intended* to be fired from the shoulder.

In contrast, the Final Rule alters this three-part test, to "include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that **allows** the weapon to be fired from the shoulder." 88 Fed. Reg. at 6574 (amending 27 C.F.R. § 478.11); 6575 (amending 27 C.F.R. § 479.11) (emphasis added). But a weapon with a brace that is designed and intended to be fired from the forearm is not designed and intended to be fired from the shoulder, and is not a "rifle," irrespective of whether it is *capable* of being fired from the shoulder.

ATF recognized this reality in the Notice of Proposed Rulemaking, where it conceded that a weapon that "*could* be fired from the shoulder," "*may* be designed and intended to be fired from the shoulder," or "*is likely* designed and intended to be fired from the shoulder" is *not* a rifle. 86 Fed. Reg. 30826, 30829 (June 10, 2021) (emphasis in original). Rather, only a weapon that "*is* designed and intended to be fired from the shoulder" is a "rifle." *Id*. (emphasis in original). That comports with the statutory definition. Under the NPRM, it would not have been enough that the weapon *could* be fired from the shoulder, or even that the weapon *may* be or *is likely* designed and intended to be fired from the shoulder. In contrast to the NPRM, the Final Rule eliminates "designed and intended" from the definition.

The NPRM also revealed ATF's awareness that a weapon with an "attachment … that provides surface area that allows the weapon to be fired from the shoulder" is not necessarily "designed and intended to be fired from the shoulder":

10

> There are certain inherent features that may support a design as a "stabilizing brace" and also a shoulder stock. For example, a large amount of surface area on the rear of a purported "stabilizing brace" may indicate that it is designed to be fired from the shoulder and facilitate its use as a shoulder stock. However, that characteristic may also be the result of incorporating substantial stabilizing support that envelopes the shooter's arm … allowing one-handed firing of a large handgun.

86 Fed. Reg. at 30829.

The NFA does not regulate handguns, defined by the GCA as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30). A "handgun" under the GCA cannot simultaneously be a "rifle" under the NFA, because a "rifle" is "designed" and "intended" "to be fired from the shoulder," and thus not "designed to be held and fired by the use of a single hand."

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992) confirms this. That case concerned firearm parts kits that could be assembled either into firearms unregulated by the NFA or into an NFA-regulated SBR. Five members of the Court applied the rule of lenity because the NFA contains criminal penalties, holding that the NFA does not apply to parts that *could* be made into NFA weapons or alternatively into non-NFA-weapons. *Id.* at 517-18 (opinion of Souter, J.), 519 (opinion of Scalia, J.); *see also Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc) (applying rule of lenity to reject ATF's attempt to regulate bump stocks as machineguns).

Similarly, the NFA does not apply to a brace that, when attached to a handgun, *could* convert the weapon into either an NFA-regulated SBR or into an unregulated handgun with a brace. The only way that the attachment can convert the handgun into an SBR is if it *is* deliberately designed, made, and intended to be fired from the shoulder.

The Final Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and must be "set aside."  5 U.S.C. § 706(2)(C).

## B. The Final Rule Unconstitutionally Regulates Handguns with Attached Stabilizing Braces.

### 1. The Final Rule violates the Second Amendment.

Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Bruen*, 142 S. Ct. 2111, 2132 (2022).  When the plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  *Id.* at 2129–30.  "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* at 2130.  Defendants cannot plausibly justify the Final Rule under *Bruen*'s analytical framework.  The Rule identifies no founding-era precedent of regulating weapons based on barrel length—much less regulating handguns more stringently merely because the possessor happens to attach accessories to the weapon designed to increase ergonomics and accuracy.

The Second Amendment also protects types of weapons "in common use for lawful purposes."  *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008).  Stabilizing braces meet that definition, as they are in widespread use by millions of Americans for lawful purposes. ATF itself estimates (on the low end) that there are 3 million stabilizing braces currently in circulation, 88 Fed. Reg. at 6560, meaning they are in common use just like AR-15s

were in common use in 2011, as "[a]pproximately 1.6 million AR–15s alone have been manufactured since 1986." *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). Finally, the Final Rule regulates handguns, an indisputably protected weapon under the Second Amendment. *Heller*, 554 U.S. at 629. Moreover, ATF's regulation extends into the home—a person who possesses a handgun and a stabilizing brace, even if not attached, is a felon unless he registers the combination as a rifle under the NFA.

### 2. The Final Rule unconstitutionally taxes the exercise of a constitutional right.

The NFA and the Final Rule purportedly are exercises of the taxing power, yet it is a per se violation to tax the exercise of a constitutional right. *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). The NFA specifically taxes certain constitutionally protected firearms, including SBRs. As the Supreme Court said in the First Amendment context:

> A tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest. Any tax that the press must pay, of course, imposes some "burden." But, as we have observed, this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, [and] suggest[ed] that a regulation that singled out the press might place a heavier burden of justification on the State, and we now conclude that the special problems created by differential treatment do indeed impose such a burden.

*Minneapolis Star & Tribune Co. v. Minn. Commr. of Revenue*, 460 U.S. 575, 582–83 (1983).

Although the Supreme Court upheld the NFA as an exercise of the Taxing Power in *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937), that case is inapposite for two reasons. First, the issue in *Sonzinsky* was whether the NFA's $200 annual license tax on

dealers in firearms was constitutional.  *Sonzinsky* at 511.  It was not about the tax on making of SBRs, which was not imposed until 1968.  Second, *Sonzinsky* did not consider whether the tax might violate the Second Amendment, which *Heller* later concluded protects an individual right.  It did not even mention the right to keep and bear arms, and it did not review the tax placed on the exercise of that right under *Bruen*'s historical framework.  *Sonzinsky* is obsolete after *Bruen*.

The Final Rule must be set aside as "contrary to constitutional right" under 5 U.S.C. § 706(2)(B).

### 3.  The Final Rule violates the Fifth Amendment.[2]

The Final Rule unconstitutionally forces those who wish to comply (without destroying or surrendering their lawfully-acquired property) to risk incriminating themselves through ATF's registration scheme.  Tax and registration schemes that require the submission of information to law enforcement that creates a threat of self-incrimination under other federal or state laws violate the Fifth Amendment.  *Marchetti v. United States*, 390 U.S. 39 (1968) (privilege against self-incrimination properly invoked against compliance with gambling occupational tax and registration procedure requiring an individual "to provide information which he might reasonably suppose would be available to prosecuting authorities").  Registration will not prevent prosecution under state law in states where possession of SBRs is not permitted; citizens of those states must give up their braced handguns.  Other states ban possession of SBRs unless in compliance with federal

---

[2] As noted in Plaintiffs' Complaint, the Fifth Amendment self-incrimination claims are brought by Plaintiffs Brown, GOA, and GOF.

law; now that the Final Rule declares braced handguns to have *always* been unlawful SBRs, federal registration involves disclosing evidence of one's commission of a state crime.

Moreover, some of the organizational Plaintiffs' members and supporters serve in the military; ATF's promise of "enforcement discretion" is of little comfort with respect to a court martial under the UCMJ. Exhibit 13 at ¶¶ 14, 18; *see* 10 U.S.C. § 934; *see also United States v. Alkazahg*, 81 M.J. 764, 767 (N.M. Ct. Crim. App. 2021) (noting that the appellant had been convicted of "two specifications of possessing [NFA-regulated] machine guns, in violation of Article[] ... 134 of the Uniform Code of Military Justice"). Further, individuals with imported pistols manufactured with braces or to which braces were attached may have violated 28 U.S.C. § 5861(k) or 18 U.S.C. § 922(r)'s import and assembly prohibitions under the Final Rule's interpretation. The statute does not provide for registration or removal of the brace to remedy such past violations, and submissions of photos on a Form 1 could be incriminating evidence thereof. *See* 88 Fed. Reg. at 6564 (acknowledging this). And the Final Rule's mentions of "enforcement discretion"—which are not codified—do not bind other law enforcement agencies, and possibly not even ATF, as promised "discretion" may be reversed.

The Final Rule also violates the Fifth Amendment because it fails to give fair notice of conduct that is required to comply with its abrupt regulatory change. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012). This principle applies to an "abrupt" "regulatory change" on "any subject." *Id*. at 254. The Final Rule's six-part test fails to give adequate notice of what

will or will not be considered an SBR.  For example, the first four factors consider "whether" the weapon has certain features or characteristics, yet gives no indication of how they will be counted or the relative values assigned to any particular feature or characteristic.  88 Fed. Reg. at 6574-75.

The Final Rule must be set aside as "contrary to constitutional right" under 5 U.S.C. § 706(2)(B).

**C.  The Final Rule is Not an Exercise of the Taxing Power, so it Must Be Set Aside.**

The Final Rule is not an exercise of the taxing power because it does not actually collect any tax.  Thus, it is unjustified under the NFA.  Moreover, the Final Rule is an unconstitutional exercise of the taxing power insofar as it vests the ATF with discretion to determine whether individuals may possess SBRs.  The NFA is purportedly an exercise of the taxing power, which includes the power to assess and collect taxes and associated requirements such as "requir[ing] the submission of tax-related information that [the IRS] believes helpful in assessing and collecting taxes."  *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1586–87 (2021).  But the Final Rule's requirement that gun owners apply for permission to keep their handguns with stabilizing braces, or else discard them or turn them in to ATF, is not an exercise of the taxing power, because "Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.  Congress may not, for example, expand its power under the Taxing Clause, or escape the Double Jeopardy Clause's constraint on criminal sanctions, by labeling a severe financial punishment a 'tax.'"  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

16

The requirement to ask for permission to possess an SBR (or else suffer severe criminal penalties) is not a permissible exercise of taxing power because failure to obtain permission results in a criminal "penalty"—potential imprisonment—and not a mere collection of revenue. *Cf. e.g.*, *NFIB*, 567 U.S. at 566 (the Affordable Care Act's individual mandate was permissible exercise of taxing power because IRS was "not allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution"). Assessing a fine on those who fail to pay is one thing. That might resemble the Affordable Care Act's individual mandate. But it is quite another thing to require persons to seek permission to register their weapons—regardless of their willingness to pay a tax—and then slap criminal penalties on persons who fail to obtain the permission even though they may very well be willing to pay the requisite tax. That is not an exercise of taxing power.

The Final Rule must be set aside as "contrary to constitutional … power" under 5 U.S.C. § 706(2)(B).

### D. The Final Rule is Arbitrary and Capricious Because it Did Not Take Reliance Interests into Account and Fails to Provide a Reasoned Analysis.

ATF failed to engage in the APA's requisite reasoned analysis of the Final Rule, instead trivializing reliance interests, ignoring alternatives, exploiting outdated statistics to downplay costs, and establishing enforcement criteria open to capricious abuse. Before adopting a rule, ATF must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1915 (2020). The reliance interests here are significant;; millions of people for years have possessed firearms with stabilizing

braces under a regime where ATF explicitly declared them not to be SBRs.  ATF's willful blindness to those reliance interests requires that the Final Rule be set aside for four reasons.

First, ATF suggests that because it can always change its mind, gun owners can never believe its pronouncements, and "any potential reliance interest is reduced."  88 Fed. Reg. at 6507.  On the contrary, ATF must "provide a more detailed justification than what would suffice for a new policy created on a blank slate … when its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515.  An agency cannot change its mind without "good reasons," and "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Id*. at 515-16.

Second, ATF states that gun owners have ample options to comply with the Final Rule.  88 Fed. Reg. at 6507-08.  But that has nothing to do with reliance on the status quo.

Third, even for gun owners who choose to apply to register their weapons, ATF might disapprove an application, leaving applicants  with the options of destroying or forfeiting weapons they purchased in reliance on ATF's assurances of legality.

Fourth, ATF's claim that the "only [reliance] interest identified is the avoidance of the NFA's making and transfer taxes," 88 Fed. Reg. 6508, is at best deliberately ignorant.  ATF itself on multiple occasions assured the public that attaching a brace to a handgun was not a taxable, potentially criminal event; however, the Final Rule claims that millions of individuals who took ATF at its word have become felons retroactively subject, at best, to a $200 tax and, at worst, to ten years' imprisonment and $250,000 in fines.

Additionally, the APA demands reasoned analysis "when an agency rescinds a prior policy" including consideration of "the alternatives." *Regents*, 140 S. Ct. at 1913 (internal quotation marks removed). Yet ATF fails to explain the reasoning behind its arbitrary standards for designating an SBR. On the contrary, the Final Rule's new standard is incomprehensible. The Final Rule's six-part test begins by asking a threshold question of whether "a weapon provides surface area that allows the weapon to be fired from the shoulder," 88 Fed. Reg. at 6569, but does not provide any guidance as to *how much* "surface area" is sufficient. Rather, the Final Rule lists six "factors" to be considered, the first four of which again begin by asking "whether," giving no indication of how the factors described therein will be counted or the relative values assigned to any particular feature or characteristic. *Id.* For example, factor (i) considers "whether the weapon has a weight or length consistent with … similarly designed rifles," *implying* (but not stating) that heavier and longer firearms are more likely to be deemed rifles, and failing to detail how heavy or how long is too much or too little. The Final Rule contains charts that show that rifle weights and lengths vary widely, demonstrating that any attempt to define rifles by these variables is arbitrary and capricious. 88 Fed. Reg. at 6514–18. ATF fails to give sufficient analysis as to why such a confusing standard is preferable to more predictable and empirical alternatives, even in comparison to its prior Worksheet 4999 from the NPRM.

Similarly, the Final Rule asks "whether" rear surface area conducive to shouldering is created by a "necessary" component of a firearm, apparently meaning that ATF is unwilling to concede even that other gun features do not convert a pistol into a short-

barreled pistol *even if it does not have a stabilizing brace attached.  See* 88 Fed. Reg. 6574,

6537-38; *see also* at 6484, 6496 (purporting to reclassify certain shotguns as possible NFA

weapons even without stabilizing braces installed).  How any normal person could hope to

navigate ATF's incomprehensible regulatory thicket, deliberately devoid of any

measurable standard, is a mystery.

The Final Rule must be set aside as "arbitrary and capricious" under 5 U.S.C. §

706(2)(A).

**E. The Final Rule's Definition of "Rifle" Is Not a "Logical Outgrowth" of the NPRM.**

Notice under the APA "suffices if [a final rule] is a 'logical outgrowth' of the

proposed rule, meaning the notice must adequately frame the subjects for discussion such

that the affected party should have anticipated" the agency's final rule from the notice of

proposed rulemaking. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021).

"[A] final rule fails the logical outgrowth test and thus violates the APA's notice

requirement where interested parties would have had to divine [the agency's] unspoken

thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX*

*Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (cleaned up).

That is what happened here.

The Final Rule's definition of "rifle" is not a logical outgrowth of the NPRM's

definition.  The NPRM proposed an "ATF Worksheet 4999" that used a three-part points

system to classify a firearm as either a handgun or a rifle.  86 Fed. Reg. at 30841-42.  Yet

the Final Rule entirely discards Worksheet 4999, replacing it with a vague six-part test

20

never suggested in the NPRM that is impossible to fairly implement, based on "whether" the weapon (i) is of an undefined weight or length; (ii) has an indeterminate "length of pull;" (iii) has various unspecified "eye relief" for sighting; (iv) has some indefinite amount of "surface area" in the rear; while also considering (v) imprecise "marketing and promotional materials" and (vi) unbounded "information" about how the firearm is used in practice.  88 Fed. Reg. at 6569-70.  This is a wholesale change in methodology that a commenter on the NPRM could not have foreseen, and is in no way a "logical outgrowth" thereof.  In fact, the approaches in the Final Rule and the NPRM yield conflicting results, which the Final Rule does not acknowledge, much less justify.  As one example, under Worksheet 4999 in the Final Rule, a firearm would score "4" points and be considered a SBR if it had a "length of pull" over 13.5 inches, without any other considerations.  86 Fed. Reg. at 30842.  Yet under the Final Rule, length of pull merely, "in combination with other features – could indicate" an SBR.  88 Fed. Reg. at 6534.  And as ATF explains, one style of firearm may permissibly have a longer length of pull than another style of firearm.  *Id*. at 6535 (compared to the NPRM, which imposed the same length of pull measurements across-the-board).  The Final Rule does not acknowledge, much less justify, these conflicting results.

ATF admits that "the proposed Worksheet 4999, including the points assigned to each criterion … was intended to ensure uniform consideration and application [but] did not achieve these intended purposes."  88 Fed. Reg. at 6510.  But rather than, as required by the APA, provide notice of and seek comment on the new guidelines that replace the proposed worksheet and point system, ATF simply adopted them.

In short, the Final Rule represents a complete change of methodology that those commenting on the NPRM could not have predicted.  It is in no way a "logical outgrowth" from the NPRM. By "promulgating a requirement that is different in kind than the proposed requirement, the Government did not adequately frame the subjects for discussion" and violated the logical-outgrowth requirement.  *Mexican Gulf Fishing Co. v. United States Dep't of Commerce*, No. 22-30105, 2023 WL 2182268, at *13 (5th Cir. Feb. 23, 2023).

The Final Rule therefore should be set aside, having been adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

* * *

For each of the foregoing reasons, Plaintiffs are likely to prevail on the merits of their claims.

## II. __Plaintiffs are Suffering Irreparable Harm.__

To show irreparable injury, Plaintiffs need not demonstrate that harm is inevitable and irreparable.  *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Rather, they "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  *Id*.

Plaintiff Brown, like countless members and supporters of the organizational Plaintiffs, is suffering and will continue to suffer irreparable harm at the hands of the Final Rule.  Exhibit 13; Exhibit 14.  If these persons do not soon comply, they run the risk of felony arrest, prosecution, imprisonment, and accompanying loss of Second Amendment rights (by the "choice" to either destroy or modify firearms, or register them with the

federal government).  *Id*.    Additionally, surrendering or destroying a firearm and stabilizing brace will cause irreparable economic loss.    Exhibit 9, Regulatory Impact Analysis at 34-35 (estimating $471.3 million in costs from surrendering firearms, including $2,526 in costs to an average individual and $8,754 to the average federally licensed firearms dealer); *Kiewit Offshore Servs. V. U.S. Dep't. of Labor*, 2023 WL 417486, at *9 (S.D. Tex. Jan. 25, 2023) ("Although the Fifth Circuit has yet to speak directly as to this issue, case law from other district courts suggests that where economic losses are unrecoverable because of sovereign or governmental immunity, the harm may be irreparable").

The State of Texas, too, will suffer irreparable harm from Defendants' unlawful Final Rule, which violates its sovereign and quasi-sovereign interests in its own territory and the welfare of its own citizens, thousands of whom are arbitrarily and capriciously declared felons by the Final Rule.    For example, Texas criminalizes possession, manufacture, transportation, repair, or sale of SBRs that are not properly registered with ATF, but does not criminalize handguns with attached stabilizing braces. Tex. Penal Code § 46.05(a)(1)(C).  To the extent that ATF declares millions of previously lawful handguns are now illegal SBRs, the Final Rule significantly and negatively affects the operation of Texas law.    Moreover, "a State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).  The Final Rule adversely affects Texans' health and well-being by criminalizing the possession of previously lawful weapons, diminishing Texans' ability to defend themselves.    Finally, Texas police who possess

previously legal handguns with stabilizing braces will have to expend resources to register those weapons.  *See* 86 Fed. Reg. at 6567.

The fact that the Final Rule technically presents a (forced) choice does not absolve it of its unconstitutional sins.  As the Fifth Circuit observed in *BST Holdings v. OSHA*, "the loss of constitutional freedoms 'for even minimal periods of time ... unquestionably constitutes irreparable injury.'"  17 F.4th 604, 618 (5th Cir. 2021) (burden on liberty interests posed by vaccination mandate was irreparable harm) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  The vaccination mandate in *BST Holdings* "threaten[ed] to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)."  *Id.*  Here, the Final Rule imposes a similar choice, forcing individuals to choose between destroying their property or prosecution.

### III.    <u>The Balance of the Equities and Public Interest Favor Plaintiffs.</u>

When the government is a party, the balance-of-equities and public-interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2016) (same).  A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest."  *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).  There is no harm to ATF from pausing enforcement of the Final Rule and maintaining the status quo.  The Final Rule claims to "enhance[] public safety," 88 Fed. Reg. at 6481, yet ATF is able to point to only two handgun braces (out of millions) that have been criminally misused, *see* 88 Fed. Reg. at 6495.  Even then, there is no evidence that those crimes could not have been committed

using a different firearm.  Weighing against this are the very real and ongoing irreparable harms to Plaintiffs discussed above.  Indeed, the public is served when the law is followed, and "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*, 16 F.4th 528, 560 (5th Cir. 2021) (citation omitted).  The balance of equities and public interest weigh heavily in favor of an injunction.

## IV.   <u>Relief Should Be Nationwide.</u>

GOA and GOF have members and supporters nationwide.  Exhibit 13 at ¶ 6.  The geographic scope of interests presented, as well as the complications inherent to a piecemeal implementation or injunction of the Final Rule, which impacts criminal prosecutions and fundamental rights, support this Court granting nationwide relief.

## CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin Defendants from enforcing the Final Rule.

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH*
Mississippi Bar No. 102784
Southern District of Texas No. 3554925
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

ANTHONY R. NAPOLITANO*
Arizona Bar No. 034586
Southern District of Texas No. 3837680
Bergin, Frakes, Smalley & Oberholtzer,
PLLC
4343 E. Camelback Road, Suite 210
Phoenix, Arizona 85018
(602) 848-5449
anapolitano@bfsolaw.com

GILBERT J. AMBLER*
Virginia Bar No. 94325
Southern District of Texas No. 3834055
20 S. Braddock St
Winchester, VA 22601
(540) 550-4236
gilbert@amblerlawoffices.com

*Counsel for Plaintiffs Brady Brown,
Gun Owners of America, Inc., and Gun
Owners Foundation

KEN PAXTON**
Attorney General of Texas

AARON F. REITZ**
Deputy Attorney General for
Legal  Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771

LEIF A. OLSON**
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695

/s/ Charles K. Eldred
CHARLES K. ELDRED**
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Southern District of Texas No. 20772

CHRISTINA CELLA**
Assistant Attorney General
Texas Bar No. 24106199
Southern District of Texas No. 3355870

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Leif.Olson@oag.texas.gov
Charles.Eldred@oag.texas.gov
Christina.Cella@oag.texas.gov

**Counsel for Plaintiff State of Texas

26

**CERTIFICATE OF SERVICE**

I certify that on March 6, 2023, I filed this motion through the Court's CM/ECF system, which automatically served it upon all counsel of record.

/s/ Charles K. Eldred