


Updated April 19, 2021

# Handguns, Stabilizing Braces, and Related Components

On April 7, 2021, the White House announced that the Department of Justice has been directed to issue a proposed rule within 60 days (by June 6, 2021) to clarify when a device marketed as a stabilizing brace might turn a pistol into a short-barreled rifle. On December 18, 2020, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) published guidance in the *Federal Register* for public comment that indicated that it was preparing to reclassify certain **heavier, larger handguns (pistols) equipped with stabilizing braces** as more stringently regulated **short-barreled rifles**. Such a reclassification would retroactively trigger the more extensive paperwork and background check requirements of the 1934 National Firearms Act (NFA), and require registration of the owner and firearm with ATF. While this guidance was withdrawn on December 23, 2020, the proposed rule could address some of the same issues.

## Stabilizing Brace: Shooter's Assist or Shoulder Stock?

Stabilizing braces are devices that can be attached to the rearward portion (breech) of a handgun or other pistol grip firearm's frame or receiver. The brace extends backwards, generally in alignment with the axis of the barrel(s), so the firearm can be secured to the shooter's forearm, while it is held by its pistol grip or other short stock, making a heavier, larger short-stocked firearm easier to handle. The first prototype stabilizing brace was designed to assist a veteran and service-connected amputee with firing an AR-type handgun singlehandedly. Stabilizing braces and similar devices, however, could serve more generally as a quasi-shoulder stock. The addition of shoulder stock to a short-stocked firearm could possibly change a firearm's classification under current law due to definitional differences between the NFA and Gun Control Act of 1968 (GCA).

ATF has long ruled that the attachment of a shoulder stock to a handgun or pistol grip firearm transformed that GCA-regulated firearm into an NFA-regulated short-barreled rifle or shotgun. In November 2012, however, ATF determined that attaching a stabilizing brace to an AR-type pistol would not change that firearm's classification from a solely GCA-regulated handgun to an NFA-regulated short-barreled rifle. Since then, many variations of stabilizing braces have been manufactured and sold in the United States. In 2015, in an Open Letter, ATF raised questions as to the legality of using or intending to use stabilizing braces as shoulder stocks. In several private letters, made public by the addressees, ATF appeared to walk back these considerations. In 2018, however, ATF charged an individual with unlawfully possessing an unregistered short-barreled rifle—an AR-type pistol equipped with a cheek rest, which is arguably a variant of a stabilizing brace. ATF submitted that this cheek rest, when fully extended, constituted a shoulder stock, because its "length of pull" was greater than 13.5 inches (i.e., the distance from the trigger pad to the end of the cheek rest fully extended). The defendant was found not guilty by a jury, based partly on ATF's failure to take the measurement properly in alignment with the barrel's axis. This case is an example of how the absence of definitive determinations about the legality of firearms equipped with stabilizing braces and similar devices may create repercussions.

## GCA- and NFA-Regulated Firearms

When Congress passed the GCA, it significantly amended and repassed the NFA as Title II of that measure. These acts include different, but respective definitions for the term "firearm" (18 U.S.C. §921(a)(3) and 26 U.S.C. §5845(a)). Under these definitions, all firearms regulated under the NFA are first regulated under the GCA. As discussed below, the three basic types of firearms regulated under the GCA are shotguns, rifles, and handguns.

## SBSs, SBRs, AOWs, and DDs

The NFA further regulates short-barreled shotguns, or SBSs, and short-barreled rifles, or SBRs: (1) shotguns with barrels less than 18 inches in length, (2) rifles with barrels less than 16 inches in length, or (3) any existing shotgun or rifle that has been modified to be less than 26 inches in overall length by shortening its stock and/or barrel(s). (See 18 U.S.C. §§921(a)(6) and (8), and 26 U.S.C. §5845(a).)

Under "any other weapon," or AOW, the NFA regulates smoothbore handguns (less than 26 inches in overall length) and other "concealable" firearms with combination smoothbore and rifled bore barrels between 12 and 18 inches in length. The AOW classification also captures certain deceptive or disguised firearms (e.g., umbrella, belt buckle, and pen guns). The term "any other weapon" is defined at 26 U.S.C. §5845(e).

Under "destructive device," or DD, the NFA regulates "non-sporting" shotguns; firearms with barrel bore diameters greater than one-half inch (e.g., grenade launchers, bazookas, and mortars); as well as grenades, rockets, mortar rounds, mines, and other explosive devices (e.g., Molotov cocktails). Congress included similar definitions for the term "destructive device" in the GCA and NFA (18 U.S.C. §921(a)(4) and 26 U.S.C. §5845(f)). In addition, the NFA regulates machine guns and firearms silencers, which are beyond the scope of this In Focus.

## Shotgun and Rifle Definitions

Congress included identical statutory standalone definitions for the terms "shotgun" and "rifle" under the GCA and NFA. The term "shotgun" means "a weapon designed or

EXHIBIT 8

redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger" (18 U.S.C. §921(a)(5) and 26 U.S.C. §5845(d)). The term "rifle" means "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger" (18 U.S.C. §921(a)(7) and 26 U.S.C. §5845(c)).

From these definitions, it can be deduced that the defining characteristic of a long gun (shotgun or rifle) is that it is intended to be shoulder-fired, from which it follows that the defining feature of a long gun is a *shoulder stock* of some type. In addition, shotguns are "smoothbore." The barrel of a rifle is "rifled bore," and consists of lines and grooves machine-cut into the interior of the barrel (the bore) to spin a bullet as it travels at a high velocity down the barrel bore.

### Handgun Definition and Other Pistol Grip Firearms

Under the GCA, the term "handgun" means "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled" (18 U.S.C. §921(a)(29)). From this definition, it can be deduced that the defining feature of a handgun is its *short stock*, and that it is designed to be fired singlehandedly. The term handgun includes both pistols and revolvers (26 C.F.R. §§478.11 and 479.11). Under current law, *rifled bore handguns* are regulated solely under the GCA and there are no restrictions on the barrel or overall length of such handguns.

*Smoothbore handguns* are regulated under the NFA under the AOW classification. Since at least 1976, however, ATF has adopted 26 inches in overall length as the determining dimension that separates NFA-regulated "concealable" smoothbore handguns, or AOWs, from GCA-regulated short-stocked, smoothbore firearms. ATF adopted this presumptive dimension of concealability from the statutory definitions for short-barreled rifles and shotguns discussed above. ATF refers to these solely GCA-regulated short-stocked, smoothbore firearms, which are greater than 26 inches in overall length, as "pistol grip firearms." The popularity of pistol grip firearms arguably increased in 2008, when ATF determined that the barrel length was "immaterial" to the classification of such firearms, while the 26 inches in overall length restriction remained unchanged. Prior to this, most firearms makers believed that the barrel of a pistol grip firearm had to be greater than 18 inches.

### "Gray Area" in the Law?

In a potentially legal gray area, some GCA-regulated handguns and pistol grip firearms are dimensionally equivalent—in terms of their barrel lengths, overall lengths, and/or barrel bores—to other NFA-regulated firearms. As discussed above, it is unlawful to modify an existing rifle or shotgun by shortening its stock and/or barrel(s) into a short-barreled rifle or shotgun without following the NFA requirements, which includes remitting a $200 making tax. However, a handgun with equivalent dimensions does not trigger the NFA requirements, as long as a shoulder stock is never affixed to its frame or receiver.

The same is true for pistol grip firearms. However, ATF holds out the possibility of reclassifying pistol grip firearms as AOWs under the NFA if they are ever used in a concealed manner in the commission of a crime. Others counter that pistol grip firearms would be more properly classified as DDs, under ATF's reasoning that these short-stocked, smoothbore firearms are "non-handguns" and "non-shotguns," and are usually firearms with barrel bores of greater than one-half inch in diameter.

### Larger, Heavier Handguns, and Pistol Grip Firearms

In the past 16 years, firearms manufacturers in the United States have successfully marketed certain larger, heavier handguns and other pistol grip firearms that arguably push the limits of current law definitions of firearms types and classes under current law. Some of these handguns are assembled around frames and receivers originally designed for AR- and AK-type rifles, and are sometimes chambered for mid-size rifle cartridges and shotgun shells.

Under the 1994-2004 Semiautomatic Assault Weapons (SAW) ban, some of these handguns could have been prohibited under its 50 ounce weight limit (unloaded) and other characteristics that defined an "assault pistol." The SAW ban did not address pistol grip firearms substantively, as many of these firearms were pump-action, as opposed to semiautomatic, when the ban was enacted. The introduction of stabilizing braces and similar components has significantly increased the popularity of heavier, larger pistols and pistol grip firearms.

In the past eight years, larger, heavier handguns and pistol grip firearms have seen increased sales likely due, in no small part, to stabilizing braces. Most major firearms manufacturers are making firearms equipped with stabilizing braces as part of their featured product lines. While there are no available statistics to gauge authoritatively the number of stabilizing braces already made and sold in the United States, unofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands, either purchased as accessories or already attached to firearms made at home or at the factory. Altering the classification of firearms equipped with stabilizing braces would likely affect millions of owners.

Today, some firearms enthusiasts view GCA-regulated handguns and pistol grip firearms equipped with stabilizing braces as viable alternatives to the more strictly NFA-regulated short-barreled rifles and shotguns. At the same time, gun control advocates have called on ATF to reverse its determinations with regard to stabilizing braces, as well as, larger, heavier handguns and other pistol grip firearms. They view such firearms as "assault pistols" or "assault shotguns," and have called on Congress to reconstitute an assault weapons ban.

**William J. Krouse**, Specialist in Domestic Security and Crime Policy

**IF11763**

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.