**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, *et al.*,<br><br>       *Defendants.* | Civil Action No. 6:23-cv-00013 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ..................................................................................1

BACKGROUND ..............................................................................................................2

I.     Statutory and Regulatory Background ...................................................................2

II.    ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ........................................................................4

III.   The Rule ................................................................................................................7

IV.   This Lawsuit.........................................................................................................11

LEGAL STANDARDS...................................................................................................11

ARGUMENT .................................................................................................................11

I.     Plaintiffs are unlikely to succeed on the merits of their claims.........................11

    A.    The Rule does not violate the APA.........................................................11

         1.    The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions. ...........................11

         2.    The Rule is not arbitrary and capricious. ................................................19

         3.    Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM.............................................................25

    B.    The NFA and Rule are constitutional. ....................................................28

         1.    The Rule does not infringe Second Amendment rights. ........................28

            a.    Firearm braces are not bearable arms protected by the Second Amendment..................................................................................28

            b.    Registration of short-barreled rifles does not implicate the Second Amendment.........................................................................30

            c.    Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.........................32

            d.    Historical tradition of regulation supports the Rule and the NFA...............................................................................................34

         2.    The NFA is a constitutional exercise of Congress's taxing power...................37

a. Whether the NFA taxes the "making" of firearms, as opposed to dealers of firearms, is a distinction without a difference. ...................................................................................37

b. Plaintiffs misconstrue *Sebelius*. ..................................................38

c. *Bruen* has no bearing Congress's taxing power .............................39

3. The Rule does not violate the Fifth Amendment. ....................................40

II. Plaintiffs will not suffer irreparable harm absent preliminary relief. ...............................43

III. The equities and the public interest weigh against a preliminary injunction. ..............................45

IV. In all events, any relief should be limited to redress Plaintiffs' alleged injuries. ..........................46

CONCLUSION ...................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

*Aposhian v. Barr,*
   374 F. Supp. 3d 1145 (D. Utah 2019) ................................................................. 13

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .............................................................................. 47

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board,*
   627 F.3d 547 (5th Cir. 2010) ............................................................................. 45

*BASF Wyandotte Corp. v. Costle,*
   598 F.2d 637 (1st Cir. 1979) .............................................................................. 27

*Bennett v. Spear,*
   520 U.S. 154 (1997) .......................................................................................... 12

*Bezet v. United States,*
   276 F. Supp. 3d 576 (E.D. La. 2017),
   *aff'd Bezet v. United States*, 714 F. App'x 336, 342 (5th Cir. 2017) ................ 38

*Bezet v. United States,*
   714 F. App'x 336 (5th Cir. 2017) ........................................................ 30, 31, 37, 38

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) .......................................................................................... 32

*Chacon v. Granata,*
   515 F.2d 922 (5th Cir. 1975) ............................................................................. 43

*Chem. Mfrs. Ass'n v. EPA,*
   870 F.2d 177 (5th Cir. 1989) ............................................................................. 26

*Daniels Health Sciences v. Vascular Health Sci.,*
   710 F.3d 579 (5th Cir. 2013) ............................................................................. 44

*DHS v. New York,*
   140 S. Ct. 599 (2020) ........................................................................................ 47

*DHS v. Regents of the Univ of Cal.,*
   140 S. Ct. 1891 (2020) ................................................................................. 20, 22

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................................ 28, 29, 32

*Duarte v. City of Lewisville,*
  136 F. Supp. 3d 752 (E.D. Tex. 2015) ................................................................43

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................................43

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................................20

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) ..................................................................................19, 20

*FERC v. Elec. Power Supply Ass'n,*
  577 U.S. 260 (2016) ............................................................................................23

*Flight Training Int'l, Inc. v. FAA,*
  58 F.4th 234 (5th Cir. 2023) ..............................................................................25

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ........................................................................................46

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ............................................................................................13

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ..............................................................................44

*Gourzong v. Attorney General,*
  826 F.3d 132 (3d Cir. 2016) ...............................................................................41

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) ......................................................................45, 47

*Guedes v. ATF,*
  356 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................13

*Gun Owners of Am., Inc. v. Garland,*
  19 F.4th 890 (6th Cir. 2021) ...............................................................................15

*Hohn v. United States,*
  524 U.S. 236 (1998) ......................................................................................38, 40

*Holland Am. Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) ..............................................................................44

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ..........................................................28, 32, 33, 34

*Huawei Techs. USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) .................................................................23, 26

*Huddleston v. United States,*
  415 U.S. 814 (1974) ...................................................................................3

*Int'l Harvester Co. v. Wisconsin Dep't of Tax'n,*
  322 U.S. 435 (1944) .................................................................................38

*John Doe Co. v. CFPB,*
  849 F.3d 1129 (D.C. Cir. 2017) ...............................................................43

*Kanarr Corp. v. United States,*
  188 Ct. Cl. 1051 (1969) ......................................................................16, 19

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
  846 F.3d 857 (6th Cir. 2017) ...................................................................18

*Kolender v. Lawson,*
  461 U.S. 352 (1983) .................................................................................42

*Kooritzky v. Reich,*
  17 F.3d 1509 (D.C. Cir. 1994) .................................................................26

*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012) ...................................................................31

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .....................................................................43

*Lomont v. O'Neill,*
  285 F.3d 9 (D.C. Cir. 2002) .......................................................................2

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ....................................................................47

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) .................................................................................47

*Marchetti v. U.S.,*
  390 U.S. 39 (1968) .............................................................................40, 41

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...........................................................................45, 47

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) .................................................................................11

*MediNatura, Inc. v. FDA,*
  998 F.3d 931 (D.C. Cir. 2021) ................................................................22

*Memphis A. Philip Randolph Inst. v. Hargett,*
  978 F.3d 378 (6th Cir. 2020) ..................................................................43

*Mid Continent Nail Corp. v. United States,*
  846 F.3d 1364 (Fed. Cir. 2017) ..............................................................27

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................14

*N.Y. City Transit Auth. v. Beazer,*
  440 U.S. 568 (1979) ................................................................................12

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) .....................................................................*passim*

*Nat'l Fed. of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................................39

*Nat'l Nutritional Foods Ass'n v. Mathews,*
  557 F.2d 325 (2d Cir. 1977)....................................................................18

*Nat'l Rifle Ass'n v. Brady,*
  914 F.2d 475 (4th Cir. 1990) ..................................................................13

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................46

*Or. Firearms Fed'n, Inc. v. Brown,*
  2022 WL 17454829 (D. Or. Dec. 6, 2022) ..............................................31

*PDK Lab'ys Inc. v. DEA,*
  438 F.3d 1184 (D.C. Cir. 2006) ..............................................................23

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ..................................................................................25

*Posters 'N' Things, Ltd. v. United States,*
  511 U.S. 513 (1994) ................................................................................18

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
  490 U.S. 477 (1989) ................................................................................40

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  140 S. Ct. 1492 (2020) ............................................................................19

*Rosa v. McAleenan,*
    583 F. Supp. 3d 850 (S.D. Tex. 2019) ................................................................44

*S. Terminal Corp. v. EPA,*
    504 F.2d 646 (1st Cir. 1974).................................................................................27

*Sheffield v. Bush,*
    604 F. Supp. 3d 586 (S.D. Tex. 2022) ................................................................44

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016).........................................................................17, 18

*Sipes v. United States,*
    321 F.2d 174 (8th Cir. 1963),
    *overruled on other grounds by Haynes v. United States,* 390 U.S. 85 (1968)............19

*Sonzinsky v. United States,*
    300 U.S. 506 (1937).....................................................................................37, 38

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016).............................................................................................12

*Tenth Street Residential Ass'n v. City of Dallas,*
    968 F.3d 492 (5th Cir. 2020) ...............................................................................45

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ...............................................................................42

*Tex. Tech Phys. Assocs. v. HHS,*
    917 F.3d 837 (5th Cir. 2019) ......................................................................... 19-20

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ...............................................................................44

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................................26

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ...............................................................................23

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018).........................................................................................47

*U.S. v. Coleman,*
    441 F.2d 1132 (5th Cir. 1971).............................................................................41

*U.S. v. Freed,*
    401 U.S. 601 (1971).....................................................................................40, 41

*United States v. Aiken,*
    974 F.2d 446 (4th Cir. 1992) ...............................................................39

*United States v. Al-Azhari,*
    2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ....................................29

*United States v. Ardoin,*
    19 F.3d 177 (5th Cir. 1994).................................................................37

*United States v. Boggess,*
    511 F. Supp. 3d 735 (S.D.W.V. 2021) ...............................................39

*United States v. Bolatete,*
    977 F.3d 1022 (11th Cir. 2020)...........................................................39

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018)...........................................29, 32, 38, 39

*United States v. Gilbert,*
    286 F. App'x 383 (9th Cir. 2008) ........................................................32

*United States v. Golding,*
    332 F.3d 838 (5th Cir. 2003) ..............................................................32

*United States v. Gonzalez,*
    2011 WL 5288727 (D. Utah Nov. 2, 2011) ........................................32

*United States v. Gresham,*
    118 F.3d 258 (5th Cir. 1997) ..........................................................37, 39

*United States v. Hasson,*
    2019 WL 4573424 (D. Md. Sept. 20, 2019) ........................................29

*United States v. Hayes,*
    555 U.S. 415 (2009)............................................................................17

*United States v. Majid,*
    2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) ...................................32

*United States v. Perez-Gallan,*
    2022 WL 16858516 (W.D. Tex. Nov. 10, 2022)..................................34

*United States v. Rose,*
    695 F.2d 1356 (10th Cir. 1982)......................................................16, 19

*United States v. Royce,*
    2023 WL 2163677 (D.N.D. Feb. 22, 2023)..........................................30

*United States v. Saleem,*
    2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)....................................................29, 31, 34

*United States v. Santoro,*
    242 F. App'x 627 (11th Cir. 2007)..................................................................16

*United States v. Schuhmann,*
    963 F.2d 381 (9th Cir. 1992).........................................................................19

*United States v. Spoerke,*
    568 F.3d 1236 (11th Cir. 2009)......................................................................39

*United States v. Syverson,*
    90 F.3d 227 (7th Cir. 1996)...........................................................................17

*United States v. Thompson/Center Arms Co.,*
    504 U.S. 505 (1992)..........................................................................3, 14, 16

*United States v. Zeidman,*
    444 F.2d 1051 (7th Cir. 1971)........................................................................16

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.,*
    828 F.2d 314 (5th Cir. 1987).........................................................................28

*Westfall v. Miller,*
    77 F.3d 868 (5th Cir. 1996)...........................................................................30

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989)........................................................................43

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................11

*Wis. Gas. Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) .......................................................................43

**U.S. Constitution**

U.S. Const. amend. V.....................................................................................40

**Federal Statutes**

5 U.S.C. § 706...............................................................................................19

18 U.S.C. §§ 921–931......................................................................................3

18 U.S.C. § 921.....................................................................................*passim*

18 U.S.C. §§ 922–923......................................................................................3

18 U.S.C. § 922 .......................................................................................................................4

18 U.S.C. § 926 ................................................................................................................4, 13

26 U.S.C. §§ 5801–5872 .........................................................................................................2

26 U.S.C. § 5801 .....................................................................................................................3

26 U.S.C. § 5802 .....................................................................................................................3

26 U.S.C. § 5811 .....................................................................................................................3

26 U.S.C. § 5812 .....................................................................................................................3

26 U.S.C. § 5821 .....................................................................................................................3

26 U.S.C. § 5822 .....................................................................................................................3

26 U.S.C. § 5841 ..................................................................................................................1, 3

26 U.S.C. § 5845 ..............................................................................................................*passim*

26 U.S.C. § 5848 ...................................................................................................................41

26 U.S.C. § 6103 ...................................................................................................................41

26 U.S.C. § 7801 ..............................................................................................................4, 13

26 U.S.C. § 7805 ..............................................................................................................4, 13

**State Statutes**

11 R.I. Gen. Laws Ann. § 11-47-8 ......................................................................................33

Ala. Code § 13A-11-63 .........................................................................................................33

Alaska Stat. Ann § 11.61.200 ...............................................................................................33

Ariz. Rev. Stat. Ann. § 13-3101 ...........................................................................................33

Cal. Penal Code § 16590 ......................................................................................................33

Colo. Rev. Stat. Ann. § 18-12-102 ......................................................................................33

D.C. Code Ann. § 7-2502.02 ...............................................................................................33

Fla. Stat. Ann. § 790.221 ......................................................................................................33

Ga. Code Ann § 16-11-121 ...................................................................................................34

Ga. Code Ann § 16-11-122 ................................................................................. 33-34

Haw. Rev. Stat. Ann. § 134-8 .................................................................................. 33

Iowa Code Ann § 724.1C ......................................................................................... 34

La. Stat. Ann. § 40:1785 ........................................................................................... 34

Md. Code Ann., Pub. Safety § 5-203 ....................................................................... 34

Mich. Comp. Laws Ann. § 750.224b ........................................................................ 34

Mo. Ann. Stat. § 571.020 .......................................................................................... 34

Mont. Code Ann. § 45-8-340 .................................................................................... 34

N.C. Gen. Stat. Ann. § 14-288.8 .............................................................................. 34

N.D. Cent. Code Ann. § 62.1-02-03 ......................................................................... 34

N.J. Stat. Ann. § 2C:39-1 .......................................................................................... 33

N.J. Stat. Ann. § 2C:39-3 .......................................................................................... 33

N.Y. Penal Law § 265.00 ........................................................................................... 33

N.Y. Penal Law § 265.01-b ........................................................................................ 33

Neb. Rev. Stat. Ann. § 28-1203 ................................................................................. 34

Nev. Rev. Stat. Ann. § 202.275 ................................................................................. 34

Ohio Rev. Code Ann. § 2923.17 ................................................................................ 34

Okla. Stat. Ann. tit. 21, § 1289.18 ............................................................................. 34

Or. Rev. Stat. Ann. § 166.272 .................................................................................... 34

S.C. Code Ann. § 16-23-250 ..................................................................................... 34

Tex. Penal Code Ann. § 46.05 ................................................................................... 34

Tex. Penal Code § 46.05 ....................................................................................... 37, 42

Va. Code Ann. § 18.2-303.1 ...................................................................................... 34

Wash. Rev. Code Ann. § 9.41.190 ............................................................................ 34

Wis. Stat. Ann. § 941.28 ............................................................................................ 34

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) ...................................................................................................2, 16

**Regulations**

27 C.F.R. part 478 ............................................................................................................4, 13

27 C.F.R. § 478.11 ............................................................................................8, 15, 16, 22

27 C.F.R. part 479 ............................................................................................................4, 13

27 C.F.R. § 479.11 ............................................................................................8, 15, 16, 22

28 C.F.R. § 0.130 .............................................................................................................4, 13

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   86 Fed. Reg. 30,826 (June 10, 2021) .............................................................8, 9, 26, 27

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   88 Fed. Reg. 6,478 (Jan. 31, 2023) .....................................................................*passim*

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
   85 Fed. Reg. 82,516 (Dec. 18, 2020) ...........................................................................8

*Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of Guidance,*
   85 Fed. Reg. 86,948 (Dec. 31, 2020) ...........................................................................8

**Other Authorities**

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822,
   (1823) .............................................................................................................................36

15 The Public Records of the Colony of Connecticut 191 (1890) ...................................36

1775-1776 Mass. Acts 18 .................................................................................................35

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191,
   (*codified at* Ark. Code. Ann. ch. 48 § 1498 (1894)) ....................................................36

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65............................................................35

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25,
   (*codified at* 1879 Tex. Crim. Stat. 24) .........................................................................36

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352....................................................36

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27......................................36

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412..............................36

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59.....................................................36

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39.........................................................35

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175................................................................35

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210,
   (*codified at* Kan. Gen. Stat. § 1003 (1901))................................................................36

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ...............................36

An Act About Powder Money,
   1759-1776 N.H. Laws 63............................................................................................36

"An Act for the better regulating of the Militia of this Province,"
   1747, McCord, *Statutes at Large*, 9:647....................................................................35

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
   1870 Haw. Sess. Laws 26...........................................................................................36

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this
   State, § 1, 1890 S.C. Acts 653 ...................................................................................36

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
   https://perma.cc/MRR9-ZBJ2......................................................................................11

CNN, *10 killed in Colorado grocery store shooting,*
   https://perma.cc/HG5S-3NAF........................................................................................8

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890)..........................36

*Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles,*
   https://perma.cc/BK6C-BRGQ ................................................................................4, 43

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28 ...................................................36

*FINAL RULE 2021R-08F,*
   https://perma.cc/W6ZW-8FUL......................................................................................14

Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record,*
   https://perma.cc/TVS8-NNVW......................................................................................33

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961)..........................16

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
   (Reid & Screws, State Printers, 1867)........................................................................36

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807,
   (1807)...........................................................................................................................36

Laws of the State of Maine 546 (1830)..................................................................................36

Laws of the State of New Hampshire; with the Constitutions of the United States and
    of the State Prefixed 277 (1830)......................................................................................36

*NFA Handbook* (Apr. 2009),
    https://perma.cc/P3NL-G35G...........................................................................4, 21, 41

*Records of the Colony of Rhode Island and Providence Plantations, In New England,* 2:196
    (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857)...................35

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34.............................................................36

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
    America: The Legal Context of the Second Amendment,"
    25 Law & Hist. Rev. 139 (2007).....................................................................................35

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51,
    (James T. Mitchell & Henry Flanders comps. 1911)......................................................36

USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole,*
    https://perma.cc/89XK-SNVR.............................................................................................8

Washington Post, *There are More Guns than People in the United States, According to a New Study of
    Global Firearm Ownership,*
    https://perma.cc/LNE7-8TZQ..........................................................................................33

# INTRODUCTION AND SUMMARY

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from

the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs seek to preliminarily enjoin the Rule's enforcement but fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when "brace"-equipped weapons become "rifles," as defined under federal law, and the Rule comports with the relevant statutory provisions and complies with the Administrative Procedure Act ("APA"). Moreover, the modest registration requirements that federal law impose do not violate the Second Amendment and, in any event, the right to bear arms does not protect the use of firearm modifications to evade federal firearms laws. Nor does the Rule suffer from any other constitutional defect. Specifically, as the Supreme Court held over 80 years ago, the NFA is a valid exercise of Congress's taxing power. Lastly, registering a weapon—one of several compliance options available under the NFA and Rule—does not violate any Plaintiffs right against self-incrimination. Merits aside, Plaintiffs will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.    Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled

rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of "short-barreled rifles" and

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles* ("Commercial Guidance"), https://perma.cc/BK6C-BRGQ (providing images of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm,

"stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a "stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

5

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g., id.* at 6,528–29 (comparing two "stabilizing braces" to similarly designed shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546– 47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters (and a 2015 Open Letter) suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or shoulder fire. *Id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped weapons as short-barreled rifles after considering, *e.g.,* whether the "brace" device served any purpose other than to extend the rear surface to enable shouldering, *id.* at 6,485, or whether the device created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the firearm. *Id.* at 6,491–92. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.    The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had

confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles without complying with NFA requirements, *id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *supra* p. 2.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot.[2] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.

**2.** In light of its pre-existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces." *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. 86 Fed. Reg. 30,826.[3] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made,

---

[2] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.

[3] In December 2020, ATF published a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516, but withdrew it weeks later, 85 Fed. Reg. 86,948.

and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–6,513—are:

(i)   whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)  whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)   the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)  information demonstrating the likely use of the weapon in the general community.

9

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. For example, an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

(i)    filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii)   removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

(iii)  turning the firearm into a local ATF office; or

(iv)   destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

*Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's publication. *Id.* at 6,571. Individual possessors, for instance, will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule

rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[4]

## IV. This Lawsuit

Plaintiffs—the State of Texas, two firearms advocacy groups, and an individual who is an FFL and possesses at least one pistol equipped with a "stabilizing brace"—filed this lawsuit on February 9, 2023, claiming, *inter alia*, that the Rule is unconstitutional and otherwise violates the APA. Compl. ¶¶ 146–540, ECF No. 1. They subsequently moved to preliminarily enjoin ATF from enforcing the Rule nationwide. *See generally* Pls.' Mot. for Prelim Inj. ("Mot."), ECF No. 16.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

## I. Plaintiffs are unlikely to succeed on the merits of their claims.

### A. The Rule does not violate the APA.

#### 1. *The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.*

Plaintiffs claim that ATF lacked authority to promulgate the Rule because the Rule "alters" the statutory definition of "rifle." Mot. at 6, 9–12; Compl. ¶¶ 481–91. But the Rule fits squarely within

---

[4] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' arguments, on the other hand, misconstrue the Rule and rest largely on bare assertions that, in any event, are contrary to basic principles of statutory construction.[5]

**i.** As a threshold matter, a facial APA challenge to the Rule is ill-suited for redressing Plaintiffs' alleged injuries. One would expect Plaintiffs to bring concrete challenges to ATF's actual classifications of the *particular* "brace"-equipped weapons that they or their members possess. After all, Plaintiffs' alleged injuries stem from whether their or their members' weapons are short-barreled rifles subject to NFA and GCA controls. *Infra* pp. 45.[6] But no Plaintiff brings a legal claim to have the Court resolve whether a particular weapon is properly classified as "short-barreled rifles" under 26 U.S.C. § 5845(a)(3), (a)(4) or 18 U.S.C. § 921(a)(8). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any Plaintiff's "brace"-equipped weapon under the terms of the statute. That omission is telling: if the Court were to conclude that a Plaintiff or a Plaintiff's members possessed a short-barreled rifle within the meaning of the NFA, any purported "injury" to that individual would not be traceable to the Rule at all, but would instead stem solely from the statute. Indeed, though Plaintiffs raise abstract challenges to the Rule, it is the statute— not the Rule—that would impose the relevant obligations on Plaintiffs or their members (as the Rule is purely interpretive). For purposes of this motion, then, Plaintiffs have failed to demonstrate standing to facially challenge the Rule. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]n injury" must be "fairly traceable to the challenged conduct.").[7]

---

[5] Before reaching Plaintiffs' constitutional challenges to the Rule, the Court should first address their other contentions. *See, e.g.*, *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

[6] *See also infra* p.49 (explaining that the State of Texas cannot seek relief on behalf of its residents under a *parens patriae* theory of standing).

[7] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined" (citation omitted)).

**ii.** But setting that aside, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions); *accord Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1150–51 (D. Utah 2019). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted

by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *supra* pp. 5–6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While "stabilizing braces" are purportedly meant to assist single-handed fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its

14

existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**iii.** Still, Plaintiffs contend that the Rule "alters" the statutory definition of "rifle." Mot. at 9. But Plaintiffs offer no serious interpretive analysis to support that claim. Nor do they articulate any better interpretation of the relevant statutory provisions. At any rate, their arguments do not comport with the statute's text or purpose, prior judicial constructions, or any canon of construction that they invoke. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.

Start with what Plaintiffs do not dispute: that a pistol can be modified into a "rifle" within the meaning of § 5845(c) and § 921(a)(7). That is clear not only from the statutory text, which uses the broad and inclusive term "weapon," but also from the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's]

15

definition of rifle." 504 U.S. at 513 n.6 (citation omitted); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[8] 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

Plaintiffs contend, however, that the Rule departs from the statutory definition of "rifle" by "eliminat[ing]" the requirement that the weapon be "designed and intended" to be fired from the shoulder. Mot. at 10. Instead, they suggest, the Rule considers all weapons that are merely capable of being fired from the shoulder to be "rifles" under the NFA and the GCA. *Id.* But that's incorrect. Plaintiffs reach that conclusion by ignoring half of the definition provided under 27 C.F.R. §§ 478.11 and 479.11. They claim that the Rule deems all weapons with a rearward attachment "that provides surface area that allows the weapon to be fired from the shoulder," Mot. at 10 (quoting 88 Fed. Reg. at 6,574), without mentioning that the Rule requires that "other factors, as listed in the [R]ule, indicate that the weapon is designed, made, and intended to be fired from the shoulder," 88 Fed. Reg. at 6,569—the focal inquiry under the statutory definition of "rifle," 26 U.S.C. § 5845(c).

As the Rule explains, to properly apply the statutory definition of "rifle," ATF evaluates a

---

[8] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See, e.g.*, *Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

particular weapon's objective design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. And that ATF considers a weapon's objective design features to determine its design and intended use is especially sensible, particularly in this context, where the record shows that manufacturers' descriptions or labeling of "brace"-equipped weapons are often at odds with the weapons' design features and common use. *Id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying

solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602.

Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress

intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply

by asserting an intended use for a part that objective evidence in the record—such as a part's design

features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an

objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.*

at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513,

517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[9]

　　　And, aside from a weapon's objective design features, ATF also considers other evidence of

the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials,"

"indirect marketing or promotional materials" from accessory makers and sellers, and other

information indicating the general community's likely use of a particular weapon, if it evinces the

manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on

this type of evidence as well to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S.

at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether

an item is "primarily intended" for a specific "use"). In sum, Plaintiffs' contention that the Rule

"eliminates 'designed and intended' from the definition" of rifle is meritless.

　　　Finally, Plaintiffs appear to suggest that a weapon equipped with a "stabilizing brace" cannot

be a "rifle" if designed to be conveniently fired with one hand. Mot. at 11. But the fact that a particular

"brace"-equipped pistol may be designed to *also* allow effective single-handed fire is not dispositive of

whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at

6,501. Many litigants have argued that the definition of "rifle" should be limited only to weapons

---

[9] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) ("'That' a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the same provision how to impose such a limitation by defining a "silencer" to include a "part *intended only for use* in [the] assembly or fabrication" of a firearm silencer or muffler. 26 U.S.C. § 5845(a)(7) (emphasis added) (cross-referencing 18 U.S.C. § 921(a)(25)); *Romag Fasteners*, 140 S. Ct. at 1495 (noting that courts should be "doubly careful" not to read words into statutes when Congress used "the term in question elsewhere in the very same" provision). But Congress chose to define "rifle" to mean a weapon designed, made, and intended to be fired from the shoulder, irrespective of alternate use.

### 2.    *The Rule is not arbitrary and capricious.*

Plaintiffs claim that the Rule is arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A), but their arguments on this score are meritless. Judicial review under the APA's arbitrary-and-capricious standard is highly "deferential," requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project* (*Prometheus*), 141 S. Ct. 1150, 1158 (2021). A court must presume that the challenged action is valid, *Tex. Tech Phys. Assocs. v. HHS*, 917 F.3d 837, 844 (5th

Cir. 2019), "may not substitute its own policy judgment for that of the agency," *Prometheus*, 141 S. Ct. at 1158, and "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citations omitted).

*First*, the Rule appropriately considered whether and to what extent it affected any potential reliance interests. *See* 88 Fed. Reg. at 6,507–08. Where an agency shifts away from a longstanding policy, it must "assess whether there were reliance interests" created by its prior policy, "determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ of Cal.*, 140 S. Ct. 1891, 1915 (2020). But reliance on a prior policy does not preclude a change in course: the agency must simply provide a "reasoned explanation" for the change. *Id.* at 1916.

Plaintiffs contend that ATF "deliberately ignor[ed]" individual possessors' "significant" reliance interests that are affected by the Rule. Mot. at 17–18. Specifically, they suggest that "millions" of individuals who possess "brace"-equipped weapons "have for years" possessed these weapons only because "ATF explicitly declared" that they were not subject to the NFA. *Id.* Plaintiffs are wrong on both counts. As an initial matter, ATF has never had a policy or issued guidance suggesting that weapons equipped with "stabilizing braces" are categorically outside the NFA's reach. *Supra* pp. 5–7. As early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. 88 Fed. Reg. at 6,484. And insofar as any policy existed, it had shifted long before the Rule's promulgation. For the last few years, the agency's classification letters have classified several "brace"-equipped weapons as short-barreled rifles by analyzing the particular weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle" and as reflected in the Rule. *Supra* pp. 6–7. Any reliance on ATF's early classification letters and guidance

20

would therefore have grown stale well before the Rule's promulgation.[10]

Even so, the Rule does not ignore, but rather expressly acknowledges, that some individual possessors may have in fact relied on ATF's previous classifications of their particular "brace"-equipped weapons, while also considering the nature of those reliance interests. 88 Fed. Reg. at 6,507. As the Rule explains, the agency's determination of a specific weapon's classification is not immutable. *Id.* Indeed, ATF's NFA guidance instructs individual possessors that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in law or regulations." *Id.* (quoting *NFA Handbook* § 7.2.4.1). Therefore, insofar as any individual possessors of "brace"-equipped weapons relied on the agency's previous classifications of those weapons, those reliance interests were always conditional and contingent on the possibility that ATF would revisit and correct erroneous classifications, as it has done here.

The Rule nonetheless adequately considered whether it would significantly disrupt current possessors' reliance interests. As it explains, the upshot of the Rule is merely to inform these individuals that they must register their short-barreled rifles pursuant to the NFA, a minimal burden that *preserves* their interest in continued possession of their weapons. *Id.* at 6,507–08. Plaintiffs don't dispute this. Instead, they argue that ATF may "disapprove" a possessor's application to register his or her "brace"-equipped weapon, in which case their interests in continued possession would be affected. Mot. at 18. But that is, at best, entirely speculative. And Plaintiffs' suggestion that the Rule imposes criminal liability on individual possessors is similarly meritless, if for no other reason that it ignores the numerous compliance options available to these possessors, including options for *retaining* possession of their "brace"-equipped weapons. *Supra* p. 10. Indeed, the Rule adopted these

---

[10] At any rate, and as the Rule explains, it would be unreasonable for a possessor of a weapon equipped with a "stabilizing brace" to rely on individualized classification letters of particular "brace"-equipped weapons that may be configured differently. 88 Fed. Reg. at 6,507.

compliance options in part to accommodate individuals' interests in continued possession, 88 Fed. Reg. at 6,508, belying Plaintiffs' suggestion that ATF was "willful[ly] blind[]" or "deliberately ignorant" of any potential reliance interests, *see* Mot. at 18.

At any rate, ATF provided a reasonable explanation for why it adopted the Rule despite any potential reliance interests. As the Rule explains, the agency determined that these interests did not "outweigh the effective enforcement" of NFA and GCA requirements "pursuant to the best interpretation of" the relevant statutory provisions. 88 Fed. Reg. at 6,508. Because Congress chose to impose specific controls on the possession and manufacture of short-barreled rifles, ATF seeks to prevent the "circumvention of" these controls by curbing the proliferation of unregistered short-barreled rifles configured with "brace" devices, regardless of whether any individual possessor has an alleged interest in continuing to possess such a weapon. *Id.*; *see also Regents*, 140 S. Ct. at 1914 (explaining that an agency could have properly found that "reliance interests in benefits that [it] views as unlawful are entitled to no or diminished weight"). Moreover, the Rule benefits possessors and manufacturers of "brace"-equipped weapons by providing clear and enhanced guidance that they can rely upon going forward. Therefore, the Rule indicates that ATF was "cognizant" of any reliance interests affected by the Rule and explained the agency's "'good reasons' for concluding that" any such interests "were insufficient to hold off" on the Rule. *See MediNatura, Inc. v. FDA*, 998 F.3d 931, 943 (D.C. Cir. 2021) (citation omitted). The APA requires nothing more.

*Second*, the Rule reasonably explains ATF's rationale for amending 27 C.F.R. §§ 478.11 and 479.11 to make clear that a weapon equipped with a "stabilizing brace" may be a "rifle" under the NFA and the GCA and to outline the relevant criteria that ATF considers when determining whether a particular weapon is designed, made, and intended to be fired from the shoulder. Plaintiffs' attempt to flyspeck the Rule fails to undermine that conclusion.

Take first their suggestion that the Rule is arbitrary for not specifying the exact amount of

"surface area" that permits shoulder fire. Mot. at 19. True, the agency considers "whether there is any surface area on the firearm that can be used to shoulder fire the weapon," without reducing the analysis to a simple measuring game. 88 Fed. Reg. at 6,529. But that's a feature, not a bug. As the Rule explains, assessing whether a weapon's rear surface area allows shouldering is necessarily a fact-specific inquiry that does not turn solely on the *amount* of surface area. Other considerations also affect the analysis, like whether a weapon possesses a "design feature that prevents shouldering" (*e.g.*, an "attached protrusion that would dig into a shooter's shoulder"). *Id.* at 6,530. Plaintiffs' argument that ATF should have eschewed a weapon-specific analysis and instead drawn a sharp, arbitrary line at a specific measurement is hardly a reasonable suggestion.

What's more, Plaintiffs' argument appears to embrace the meritless proposition that ATF was required to use precise metrics for evaluating the factors outlined in the Rule. Mot. at 19. But agencies frequently adopt and apply standards that are not based on precise measurements, which is especially sensible when a statutory standard cannot achieve mathematical precision, like determining whether a weapon is designed, made, and intended to be fired from the shoulder. *E.g., Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"); *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained."). In such cases, the "relevant question" for examining the "rationality" of a standard is "whether the agency adequately explained why it adopted it," as ATF did here. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 458 (5th Cir. 2021); *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives.").

Similarly, Plaintiffs criticize the Rule for considering whether a "brace"-equipped weapon has a weight or length consistent with similarly designed rifles, even though "rifle weights and lengths vary

widely." Mot. at 19. But that misconstrues how ATF evaluates the weight and length of a particular "brace"-equipped weapon. Contrary to what Plaintiffs suggest, ATF does not compare a specific weapon to the entire range of rifles listed in the Rule's weight and length charts. *See* 88 Fed. Reg. at 6,514–18. Instead, for a weapon "marketed as a pistol that is a variant of a rifle," ATF compares its weight and length "against the original rifle design" (*e.g.*, AR-15-type pistol equipped with a "stabilizing brace" compared to a "similarly designed" AR-15 standard rifle). *Id.* at 6,514, 6,518. And "[f]or a firearm that is not a variant of a rifle (*e.g.,* a Glock-type pistol)," ATF compares the weapon's weight and length to those "of variants designed, made, and intended to be fired from the shoulder (*e.g.*, a Glock-type pistol with a shoulder stock or installed into a carbine conversion kit)." *Id.* That differently configured rifles "vary widely" in weight and length, Mot. at 19, is thus irrelevant to how ATF classifies a particular "brace"-equipped weapon.[11]

Finally, and contrary to what Plaintiffs suggest, Mot. at 19, ATF reasonably considers whether the rear surface area of the weapon is created by a component that "is necessary for the cycle of operations." 88 Fed. Reg. at 6,569. As the Rule explains, this factor acknowledges variations in firearm designs, and that some weapons may incorporate a rearward component that is integral to the firing cycle and is not installed for purposes of shouldering. For example, an AR-type pistol utilizes a buffer tube that houses a spring that drives the bolt forward after the bolt is driven into the tube during the firing cycle. *Id.* Assuming no other attachment or material is added to that buffer tube, the rear surface area that it creates would not alone indicate that the weapon is designed and intended to be shoulder fired. *Id.*

---

[11] Plaintiffs again suggest that it was unreasonable for ATF to evaluate a particular "brace"-equipped weapon's weight and length as compared to a similarly designed rifle without specifying "how heavy or how long is too much or too little." Mot. at 19. But ATF's approach accounts for the considerable variations in rifle designs, which cannot be reasonably reduced to a universally applicable measurement. And in any event, as already explained, nothing in the APA requires an agency to adopt a strict metric-based approach. *Supra* p. 23.

In sum, the Rule is reasonable and reasonably explained, and thus substantively complies with the APA.

> 3.    *Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM.*

Plaintiffs contend that the final rule is not a "logical outgrowth" of the proposed rule, in violation of the APA. Mot. at 20. Plaintiffs' arguments fail because the Rule is not subject to notice-and-comment requirements, so the "logical outgrowth" doctrine does not apply. But in any event, the Rule plainly is a reasonable outgrowth of the proposed rule, and ATF's modest changes in response to public comments do not run afoul of logical outgrowth principles.

First, ATF cannot have violated the logical outgrowth doctrine because it doesn't apply in the first instance. Plaintiffs simply assume notice and comment was required, but "[n]ot all 'rules' must be issued through the notice-and-comment process," and in particular, interpretive rules are exempt. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023). Though an interpretive rule "may be called 'substantive,' in the sense that it is neither procedural nor a mere policy statement if it is binding on the rights and obligations of private persons," it will "still be exempt from notice and comment if all that it does is interpret existing, substantive law." *Id.* at 241 n.5 (citations omitted) (cleaned up). That a rule reverses an agency's previous interpretation of a statute does not make it legislative. *Id.* at 241 n.6.

The Rule is interpretive: it merely advises the public of ATF's interpretation of the NFA and the GCA. It repeatedly states that it "does not impose any new legal obligations" and, instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." 88 Fed. Reg. at 6,478; *id.* at 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the

relevant statutory provisions."). That ATF still sought public comment to give "notice and opportunity to comment," to "reduce[] vagueness concerns," *id.* at 6,552, does not mean it was required to do so. And because notice and comment was unnecessary, Plaintiffs cannot show a legal violation for not following that process's specific requirements. *See Texas v. EPA*, 389 F. Supp. 3d 497, 504 (S.D. Tex. 2019) ("notice-and-comment requirement" includes "logical outgrowth" test).

Regardless, the Rule is a logical outgrowth of ATF's proposed rule ("NPRM"). A rule satisfies the logical outgrowth requirement if the proposed rule "adequately frame[s] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei*, 2 F.4th at 447 (citations omitted). This standard is satisfied if the NPRM "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, an agency is not required to "specifically identify every precise proposal which [it might] ultimately adopt as a final rule." *Id.* (quotations omitted).

The NPRM fairly apprised the public of the subjects and issues ATF was considering. Indeed, the NPRM and Rule both make clear that ATF contemplated and ultimately decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30,826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA].") *with* 88 Fed. Reg. 6,478 ("[DOJ] is amending the regulations . . . to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and the Rule sets forth "objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes"); *cf. Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994) (proposed rulemaking violated § 553 when it "contain[ed] nothing, not the merest hint, to suggest" it would amend a regulation). Courts have upheld more drastic changes from the NPRM to the final rule. *See*

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) ("Courts applying the logical outgrowth doctrine have also permitted agencies to drop critical elements of proposed rules even if a resulting final rule effectively abandons an agency's initial proposal."); *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 644 (1st Cir. 1979) (upholding change from proposal of industry subcategories subject to different standards to final rule applying uniform standard to entire industry).

Further, although the Rule did not adopt the NPRM's Worksheet 4999 point system, the NPRM provided notice that ATF was considering a factor-based approach and notice of those factors. The NPRM proposed amending the regulatory definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder, as indicated on ATF Worksheet 4999"—an aim nearly identical to the final rule. 86 Fed. Reg. at 30,829. And the Worksheet set forth "[f]actoring [c]riteria," just like the final rule. *Id.* at 30,830. Indeed, contrary to Plaintiffs' suggestion, the Rule and the NPRM did not "yield conflicting results," Mot. at 21, instead, the Rule adopts a balancing test akin to an unweighted variation of the Worksheet's approach. *See S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" that were "foreshadowed in proposals and comments" during rulemaking).

Perhaps most critically, "[a]ll of the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480; *see also id.* at 6,513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet."); *id.* at 6,494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *id.* at 6,480, 6,569. Indeed, ATF addressed public comments regarding the Worksheet's factors that the Rule ultimately adopted, indicating that the NPRM notified interested persons that the final rule might consider these factors. *E.g.*, *id.* at 6,514–21 (weight and length comments); *id.* at 6,521–31, 6,537–41 (rear surface area comments); *id.* at 6,533–37 (length of pull

comments); *id.* at 6,541–43 (sights and scope comments); *see United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) ("The comments received reflected such an understanding and provided additional support for the broad final rule; the NPRM was sufficiently descriptive of the subjects and issues involved that interested parties offered informed criticism and comments.'" (cleaned up)). And the changes between the NPRM and Rule evince a careful, considered process based on the comments received, not a logical outgrowth problem. The Rule explains that ATF weighed comments "regarding the complexity in understanding the proposed Worksheet 4999 and [its] methodology," and decided "not [to] adopt" the Worksheet "and its point system," and instead, "based on [public] comments," ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle." 88 Fed. Reg. at 6,480. Thus, even if notice and comment had been required, the Rule satisfies the logical outgrowth requirement.

**B.     The NFA and Rule are constitutional.**

*1.     The Rule does not infringe Second Amendment rights.*

Plaintiffs likewise fail to demonstrate any likelihood of success on the merits of their Second Amendment challenges to the Rule. Mot. at 12–13. *First*, "stabilizing braces" are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *Fourth*, and finally, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

a.     Firearm braces are not bearable arms protected by the Second Amendment.

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms." *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the

amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[12] Courts have uniformly held that because a "silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord United States v. Saleem*, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023) (similar); *United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) (similar). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *United States v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases). "Stabilizing braces" fall outside the scope of the Second Amendment for the same reasons. In fact, Plaintiffs concede that a stabilizing brace is not a bearable arm but rather a "firearm accessor[y]." Mot. at 1, 12. The parties thus appear to agree that these devices are not weapons or arms and serve no useful purpose except as attachments to firearms.

While individuals may wish to use a brace to "improve the usage of a firearm," the firearms at issue remain effective without any brace attached. *See Hasson*, 2019 WL 4573424, at *5; Mot. at 12

---

[12] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 921(a)(25).

(averring that braces are "attach[ed]" as "accessories to the weapon" in order to "increase ergonomics and accuracy"). Attaching a firearm accessory, like a brace, to a weapon is thus "not protected by the Second Amendment." *See United States v. Royce*, 2023 WL 2163677, at \*4 (D.N.D. Feb. 22, 2023) (agreeing that use of silencer attachments do not implicate the Second Amendment). Plaintiffs' Second Amendment claim fails for this reason alone.

> b. Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Mot. at 12, they fail to explain what requirement of the NFA or the Rule is unconstitutional. This failure to clearly explain the basis for an alleged constitutional violation alone dooms their claim. Moreover, Plaintiffs appear to concede that they may lawfully possess their firearms if they submit an application to ATF and receive approval.[13] *See* Mot. at 22 (noting that Plaintiffs may "register [the firearms] with the federal government"). And because Plaintiff Brown was in possession of his firearms before the Rule's effective date, Compl. ¶ 4, he is exempt from any tax, assuming that he timely registers with ATF. *See* 88 Fed. Reg. at 6481.

Insofar as Plaintiffs suggest that the burdens of the registration process impinge their Second Amendment rights, that argument is meritless. Routine firearm registration procedures, like those required here, do not offend the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear

---

[13] Plaintiffs do not allege that any future application would be denied, and indeed such a speculative allegation would not establish constitutional injury. The Fifth Circuit has repeatedly held that concern regarding future denial of a firearm certification or registration is insufficient to demonstrate Article III standing. *See Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996); *Bezet*, 714 F. App'x at 340.

"under a government." *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen*. *See, e.g.*, *Saleem*, 2023 WL 2334417, at *11 (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state's firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

Nor can Plaintiffs show the extraordinary circumstances left open by the Court in *Bruen*, in which otherwise constitutional licensing may still infringe on the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The length of time required for registration here is irrelevant to Plaintiffs' Second Amendment claim, because if Plaintiffs submit their applications on or before May 31, 2023, they may retain possession of their firearms until they receive ATF's response on the application. 88 Fed. Reg. at 6,559. Moreover, the Rule imposes no tax on Plaintiffs if their applications are timely filed. Plaintiffs thus fail to demonstrate why registration offends the Second Amendment.

c. Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. *Heller*, 554 U.S. at 625 (explaining that the Second Amendment, as historically understood, does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns").

The Fifth Circuit in *Hollis* outlined the proper analysis for determining when a weapon (a machinegun, in that case) is "dangerous and unusual" and thus unprotected by the Second Amendment. 827 F.3d at 451. In evaluating dangerousness, the court looked to Circuit precedent holding that the unlawful possession of a machinegun constitutes a crime of violence for purposes of a sentence enhancement. *Id.* at 449. That same precedent explains that the same conclusion applies to all NFA firearms, including short-barreled rifles. *United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). The court also relied on decisions from other courts holding that machineguns are dangerous weapons outside the Second Amendment's ambit. *Hollis*, 827 F.3d at 448. As with machineguns, courts have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond constitutional protections. *E.g.*, *Cox*, 906 F.3d at 1185; *see also* 88 Fed. Reg. at 6,499 (noting that short-barreled rifles "are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy").[14]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score, the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue

---

[14] *E.g.*, *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008); *United States v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *United States v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

"*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, even assuming that there are now approximately 3.6 million short-barreled rifles in the United States (641,000 previously registered short-barreled rifles and 3 million with "stabilizing braces"), that falls far short of the numbers in *Hollis*. 827 F.3d at 449–50 (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles"). Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms. *Id.* at 450. Conservatively estimating that there are 400 million civilian-owned firearms in the United States,[15] the number of short-barreled rifles is less than one percent of this amount (0.9%). Where, as here, the relative number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Additionally, *Hollis* rejected the argument that the "number [of firearms] by itself was sufficient" to determine "usualness." *Id.* The court also looked to the number of states where machineguns could be "lawfully possessed," including states that banned them entirely and states that banned them unless possessed legally "under federal law." *Id.* With 34 states prohibiting machinegun possession, the court found this to be further support that machineguns are unusual. *Id.* There are a similar number of state laws concerning possession of short-barreled rifles. Plaintiffs concede that at least six states ban them entirely, and 24 states ban them unless NFA registered.[16] Compl. ¶¶ 325, 329.

---

[15] Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.

[16] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; 11 R.I. Gen. Laws Ann. § 11-47-8(b); Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat.

Like in *Hollis*, these laws further show that short-barreled rifles are dangerous. Consequently, such firearms "do not receive Second Amendment protection," *Hollis*, 827 F.3d at 451.

d.   Historical tradition of regulation supports the Rule and the NFA.

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the NFA are constitutional because they rest upon centuries of similar taxation and registration requirements. Plaintiffs fault ATF for not providing a historical analysis in the Rule, Mot. at 12, but Plaintiffs cannot point to any case holding that regulations concerning firearms must themselves conduct a historical analysis. *Cf. United States v. Perez-Gallan*, 2022 WL 16858516, at *13 (W.D. Tex. Nov. 10, 2022) (noting that the Government might, in Court, "develop[] an in-depth historical analysis to uphold a regulation"). Nor was ATF required to evaluate the history of firearm regulation, given the agency's conclusion that "short-barreled rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment." 88 Fed. Reg. at 6548; *see Saleem*, 2023 WL 2334417, at *11 (explaining that where "the Second Amendment's plain text does not protect [certain] conduct" a court "need not reach the historical inquiry").

In any event, even if the Court disagrees as to whether short-barreled rifles are dangerous and unusual weapons, the Rule remains constitutional under any fair read of the historical record. Where a regulation affects the Second Amendment, the Government may justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government may do so by pointing to "a well-established and representative

_____

Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

historical *analogue*." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* For this reason, Plaintiffs err in arguing that the Government must locate "founding-era precedent of regulating weapons based on barrel length," or "regulating handguns" where "the possessor happens to attach accessories to the weapon." Mot. at 12. Indeed, the historical analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Bruen*, 142 S. Ct. at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[17] Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements.[18] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment

---

[17] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).
[18] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[19] Licenses or inspection were also required in certain states to export or sell gunpowder (akin to modern ammunition), such as in Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820).[20] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[21] And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[22]

Further, while Plaintiff Brown is exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[23] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[24]

Taken together, these laws reflect an unbroken historical tradition of American firearm

---

[19] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[20] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[21] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states also enacted prohibitions or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[22] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[23] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[24] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed by the NFA's regulations is certainly "comparable" and "comparably justified" to the numerous historical laws listed above.

2.      *The NFA is a constitutional exercise of Congress's taxing power.*

As Plaintiffs recognize, the Supreme Court upheld the NFA as an exercise of Congress's taxing power more than 80 years ago. *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937). And the Fifth Circuit has upheld various sections of the NFA as valid exercises of the taxing power since then. *See United States v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997); *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994); *Bezet*, 714 F. App'x at 342. Plaintiffs nevertheless maintain that the modern NFA is unconstitutional because it imposes taxes on the *making* of short-barreled rifles, and because it cannot survive Second Amendment scrutiny under *Bruen*. Mot. at 14. Plaintiffs separately argue that the Final Rule is unjustified under the NFA because "it does not actually collect any tax" and because the failure to "obtain permission [to possess an SBR] results in a criminal 'penalty'—potential imprisonment—and not a mere collection of revenue[,]" citing *Sebelius. Id.* at 16–17. Notably, Plaintiffs have not identified a single contrary authority to support its position that this Court should strike down the NFA as exceeding Congress's taxing power. Indeed, courts across the country have broadly rejected each of these arguments.[25]

---

[25] Many of these cases arise in the context of challenges to a criminal conviction for possession of an unregistered NFA firearm, highlighting the broad implications of a facial challenge to the NFA, such as that raised by Plaintiffs here. *See* Tex. Penal Code § 46.05(a)(1).

a.   Whether the NFA taxes the "making" of firearms, as opposed to dealers of firearms, is a distinction without a difference.

As Plaintiffs concede, the NFA imposes a "tax on making of SBRs." Mot. at 14. *See Bezet v. United States*, 276 F. Supp. 3d 576, 618–19 (E.D. La. 2017), *aff'd Bezet v. United States*, 714 F. App'x 336, 342 (5th Cir. 2017). And in *Sonzinsky*, the Supreme Court upheld the NFA as a valid exercise of Congress's taxing power, . explaining that the NFA is "productive of some revenue" and "[i]n the exercise of its constitutional power to lay taxes, Congress may select the subjects of taxation, choosing some and omitting others." *Sonzinsky*, 300 U.S. at 512, 514. This Court is bound by *Sonzinsky*, which rejects Plaintiff's taxing-power contentions. *See Hohn v. United States*, 524 U.S. 236, 252–53, (1998) ("Our decisions remain binding precedent until we see fit to reconsider them . . . ."); *Cox*, 906 F.3d at 1179–83 (citation omitted). That *Sozinsky* specifically addressed a tax on firearms dealers, rather than the NFA's making tax, makes no material difference. *United States v. Cox*, 906 F.3d 1170, 1179–83 (10th Cir. 2018) (holding that "though times may have changed since the Court decided *Sonzinsky* in 1937, [the appellants] point to no differences, either in the NFA or in courts' understanding of the national taxing power, that justify departing from *Sonzinsky*'s conclusion that the NFA is a valid exercise of Congress's power."); *Bezet*, 714 F. App'x at 343 n.3 ("The fact that the defendant in *Sonzinsky* was a firearms dealer does nothing to distinguish the case."). Moreover, nothing about the making tax "completely prohibit[s] Plaintiff from exercising his rights." *Bezet*, 276 F. Supp. 3d at 618–19. Thus, Congress "validly exercised its constitutional authority under its taxing power when it [enacted the making tax]." *Id.*

Separately, Plaintiffs emphasize that the Rule "does not actually collect any tax." Mot. at 8, 16. But the power to tax includes the power to forgive taxes, *see Int'l Harvester Co. v. Wisconsin Dep't of Tax'n*, 322 U.S. 435, 441 (1944) (holding that "[t]he power to tax . . . includes the power to postpone the tax" under certain circumstances), and the ATF has enforcement discretion under the NFA.

    b. Plaintiffs misconstrue *Sebelius*.

  *Sebelius* does not call *Sonzinsky* into doubt as Plaintiffs suggest. Mot. at 17. *Sebelius* upheld a health-insurance provision of the Affordable Care Act as a tax, rather than a penalty. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 565 (2012). In doing so, the Supreme Court expressly described NFA taxes on firearms as "obviously regulatory," as opposed to impermissible penalties, favorably citing *Sonzinsky*. 567 U.S. 519, 567 (2012); *Cox*, 906 F.3d at 1181 ('… *Sebelius* reaffirmed the NFA's constitutional legitimacy[.]"). Both before and after *Sebelius*, courts have recognized that the NFA's enforcement mechanisms, including requiring registration of firearms and criminalizing the possession of unregistered firearms, make it "far more likely" that the appropriate taxes will be paid and thus do not constitute impermissible penalties. *United States v. Boggess*, 511 F. Supp. 3d 735, 742 (S.D.W.V. 2021) ("At bottom, an application of the 'functional framework' of *Sebelius* does not take this case outside of the holdings of *Sonzinsky*[.]"); *see also United States v. Aiken*, 974 F.2d 446, 448–49 (4th Cir. 1992); *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009) ("Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons."). Because the NFA's enforcement mechanisms are rationally related to the taxing power and revenue generation, they are a constitutional exercise of Congress's authority, and not an impermissible penalty. *See Boggess*, 511 F. Supp. 3d at 742; *Gresham*, 118 F.3d at 263 (the NFA's registration requirements are "part of the web of regulation aiding enforcement of the . . . tax provision).

    c. *Bruen* has no bearing Congress's taxing power.

  Lastly, nothing in *Bruen* or otherwise emerging from Second Amendment jurisprudence calls *Sonzinsky* into question. *Contra* Mot. at 14; *Cox*, 906 F.3d at 1188 (NFA is not an unconstitutional burden on the exercise of Second Amendment rights); *United States v. Bolatete*, 977 F.3d 1022, 1033 (11th Cir. 2020) (same, under plain-error review). It is permissible to tax firearms, and whatever the Second Amendment implications for taxing other firearms, there is no question that it is permissible

to tax stabilizing braces, which are just accessories, and which constitute dangerous and unusual weapons when used to create short-barreled rifles. Indeed, *Bruen* did not address Congress's taxing power or the National Firearms Act. And even if *Sonzinsky* "appeared to rest on reasons rejected in" *Bruen*—which it does not—the Court must apply it and leave to the Supreme Court "the prerogative of overruling its own decision." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *Hohn*, 524 U.S. at 252–53.

   3.  *The Rule does not violate the Fifth Amendment.*

   Nor does the Rule violate the Fifth Amendment, either by requiring the submission of potentially self-incriminating information to law enforcement, or by failing to provide fair notice of what the law requires. *See* Mot. at 14–16.

   The Fifth Amendment "provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *U.S. v. Freed*, 401 U.S. 601, 605 (1971) (quoting U.S. Const. amend. V). In challenges to registration requirements, "[t]he central standard . . . [is] whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. U.S.*, 390 U.S. 39, 53 (1968); *see id.* at 54.

   Plaintiffs contend that by federally registering their SBRs, they risk incriminating themselves and exposing themselves to potential prosecution by state and/or military authorities. Mot. at 14–15. Their fears are misplaced for multiple reasons. There is no realistic possibility that any registration information they provide could be obtained by any prosecuting authority, and even if it was, federal law precludes the use of such information as evidence of a prior or concurrent criminal violation in any criminal proceeding. [26] Indeed, the Supreme Court's decision in *Freed* all but forecloses Plaintiffs'

---

  [26] Additionally, the Rule does not compel registration or the submission of any information at all: Plaintiffs may register their weapons, but as Plaintiffs acknowledge, they also have the options to destroy, surrender, or modify them. *See* Mot. at 14; 88 Fed. Reg. at 6,480–81.

argument. 401 U.S. at 605. There, considering a similar Fifth Amendment challenge to the NFA, the Court held that registration did not pose "a substantial and real" risk of incrimination, "first by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses," and "second by reason of the unavailability of the registration data, as a matter of administration, to local, state, and other federal agencies." *Id.* at 606 (citations omitted); *see also U.S. v. Coleman*, 441 F.2d 1132, 1133 (5th Cir. 1971) (same). These barriers protect Plaintiffs here, and there is thus no risk of incrimination.

First, NFA registration information is not available to state or military prosecutors. "NFA forms are treated as tax returns and registration information in the [National Firearm Registration and Transfer Record] is considered to be tax return information," and "ATF is generally prohibited from disclosing tax returns and tax return information." NFA Handbook, 3.4.2 (citing 26 U.S.C. § 6103); *see also Freed*, 401 U.S. at 605 (explaining NFA registration information "as a matter of practice, is not available to state or other federal authorities"); *cf. Marchetti*, 390 U.S. at 58–59 (holding petitioner could not be punished for failure to comply with wagering tax system where it was "quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational tax to be provided to interested prosecuting authorities").

And second, even if a prosecuting authority somehow came into possession of Plaintiffs' registration information, federal law prohibits the use of that information in a criminal prosecution. The NFA provides:

> No information or evidence obtained from an application, registration, or records required to be submitted . . . in order to comply with any provision of this chapter or regulations issued thereunder, shall . . . be used directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence.

26 U.S.C. § 5848(a); *Freed*, 401 U.S. at 606 (explaining NFA registration information "as a matter of law, cannot be used as evidence in a criminal proceeding"); *see also Gourzong v. Attorney General*, 826 F.3d 132, 140 (3d Cir. 2016) (holding courts-martial "are typically genuine criminal proceedings"

(quotations omitted)). Therefore, even assuming acquisition of Plaintiffs' NFA registration information, that information could not be used against Plaintiffs in any state or Uniform Code of Military Justice proceeding. Thus, the same barriers the *Freed* Court found determinative protect Plaintiffs here, and there is no substantial risk that any information they provide to comply with the Rule and NFA will be used to incriminate them.[27]

Plaintiffs also challenge the Rule for failing "to give fair notice of conduct that is required to comply with its abrupt regulatory change." Mot. at 15. But the Fifth Amendment requires only that an enactment "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted); a*ccord Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

The Rule provides regulated parties with ample notice of what the NFA requires and prohibits, and indeed, it provides significantly better notice than ATF's previous classification system. Prior to the Rule, ATF had not uniformly classified "brace"-equipped weapons or even adopted a classification framework for such weapons; instead, ATF issued varied determinations for particular weapons, classifying some as short-barreled rifles and others as not. *Supra* pp. 5–7. By contrast, the Rule adopts a consistent, predictable framework for classification: ATF first considers whether a weapon provides surface area allowing it to be shoulder fired, and then weighs six factors to determine whether the weapon is designed, made, and intended to be fired from the shoulder. *Supra* p. 9. And although Plaintiffs criticize the Rule for not specifying how the factors will be weighed against one another, *see*

---

[27] Additionally, Plaintiffs' Motion cites no law and provides no evidence to support that Plaintiff Brown or any of Plaintiff GOA or GOF's members are at risk of prosecution. Indeed, Texas—where Plaintiff Brown resides, *see* Compl. ¶ 4—does not prohibit the possession of a short-barreled firearm, so long as it is registered with ATF, *see* Tex. Penal Code 46.05(a)(1)(C), and does "not criminalize handguns with attached stabilizing braces." Mot. at 23. Thus, it is not clear Texas would consider a "brace"-equipped handgun like Plaintiff Brown's a short-barreled firearm, *see* Compl. ¶ 4, and regardless, because the Rule merely requires "brace"-equipped weapons to be registered before May 31, 2023, it is not obvious that timely registration would create any risk of prosecution.

Mot. at 16, agencies routinely rely on unweighted multi-factor tests without constitutional concern, and Plaintiffs cite no authority to the contrary. *See supra* p. 23. Plus, ATF has taken additional steps to ensure that regulated parties have fair notice. ATF (1) has issued interim guidance to identify firearm-brace combinations it will consider short-barreled rifles, *see* Commercial Guidance; (2) is sending manufacturers individual classification letters; and (3) upon request, will provide any individual with a classification determination, 88 Fed. Reg. at 6,552. Simply put, ATF has gone beyond what the Constitution requires to provide regulated parties with notice of how the Rule affects them.

## II.   Plaintiffs will not suffer irreparable harm absent preliminary relief.

Plaintiffs have also failed to show that they are likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). In addition, a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

*Brady Brown.* Plaintiffs argue that Brown will suffer irreparable harm in the form of loss of Second Amendment Rights, economic loss associated with destroying a firearm and stabilizing brace, and the risk of prosecution. Mot. at 22–23. Each of these arguments fail.

First, Defendant agrees with the general proposition that if a plaintiff demonstrates a constitutional violation, no further irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). But a preliminary injunction is inappropriate "unless the party seeking it can demonstrate that '[constitutional] interests are either threatened or in fact being impaired at the time relief is sought.'" *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (citation omitted); *see also Daniels Health Sciences v. Vascular Health Sci.*, 710 F.3d 579, 585 (5th Cir. 2013) (speculation and conclusory allegations are insufficient to show irreparable harm). Thus, courts in this District have routinely declined to find irreparable harm based solely on a plaintiff's allegation that his constitutional rights have been violated, absent a showing of likely success on the merits. *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022) (Brown, J.); *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 884 (S.D. Tex. 2019) (Rodriguez, J.). Here, Plaintiffs have shown no likelihood of success on the merits of their constitutional claim, and their conclusory allegations cannot give rise to a cognizable injury. *Supra* Part I.B.

Second, as noted above, Brown has not established that his weapon equipped with a stabilizing brace is subject to the NFA. *Supra* I.A.1.*i*. Even if it were, he is not required to destroy it. Rather, he can comply with the NFA by registering the weapon, free of charge, before May 31. 88 Fed. Reg. at 6,570. His conclusory allegation to the contrary is insufficient to establish irreparable harm.

Finally, Brown's fear of criminal prosecution does not constitute irreparable harm because the cost of complying with the NFA is *de minimis*, and such fears are not well-founded. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *see also Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam). And as stated, the criminal penalties associated with failure to register a qualifying weapon flow from the NFA, not from the Rule itself. *See, e.g.*, 26 U.S.C. § 5871. Thus, enjoining the Rule would not obviate the need to register a qualifying weapon under the NFA.

*The State of Texas.* The State of Texas argues that it is suffering irreparable harm because the Rule "adversely affects Texans' health and well-being by criminalizing the possession of previously

lawful weapons," and because "Texas police who possess previously legal handguns with stabilizing braces will have to expend resources to register those weapons." Mot. at 23, 24. As noted, *infra* n.29, Texas cannot seek relief on behalf of all of its residents under a *parens patriae* theory of standing. *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–183 (D.C. Cir. 2019). And it has offered no evidence substantiating the allegation that any of its law enforcement agencies possess pistols with stabilizing braces in their inventories. Nor have they shown the estimated compliance costs of surveying existing police inventories to identify these weapons. Indeed, the only support they cite for this otherwise conclusory allegation is the Rule itself, 88 Fed. Reg. at 6567. But there, ATF determined that "this rule will not affect many States or political subdivisions" and "the rule will not have a substantial direct effect on States or localities." Because Texas has not substantiated any of its alleged irreparable harm, no injunction should issue in its favor.

   *Institutional Plaintiffs, Gun Owners of America and Gun Owners Foundation.* The only harm alleged on behalf of the organizational plaintiffs is derivative of that of its members, including Brown, and fails for the same reasons. Mot. at 22. Further, Plaintiffs offer no basis to infer that each of the institutional Plaintiffs' members is suffering an Article III injury, much less that each member faces irreparable harm absent injunctive relief, as would be separately required to extend an injunction to their entire membership. *See Tenth Street Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) ("Associational standing requires that the individual members of the group each have standing[.]"). Moreover, any claim challenging the Rule requires a fact-intensive inquiry of a particular weapon configuration, *supra* pp. 11–12, requiring the participation of individual members and thwarting associational standing. *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board*, 627 F.3d 547, 552 (5th Cir. 2010). The institutional Plaintiffs have not carried their burden to establish a right to seek injunctive relief on behalf of their members, and they do not attempt to establish any concrete,

non-speculative irreparable harm on their own. Therefore, no injunction should issue in the institutional Plaintiffs' favor or that of their broader membership.

## III. The equities and the public interest weigh against a preliminary injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

In particular, the Rule benefits public safety. Congress passed the NFA for the express purpose of regulating firearms, like short-barreled rifles, that it determined posed a greater risk to public safety because of their unusual and dangerous nature. 88 Fed. Reg. at 6,566. The Rule enhances public safety by clarifying and supporting the enforcement of NFA controls that Congress designed to address these risks. *Id.* Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety by facilitating widespread circumvention of these controls. Any harm to Plaintiffs in complying with the NFA is, by comparison, minimal.

In addition, the Rule serves the public interest by providing regulated parties with greater clarity. ATF initiated the rulemaking process, in part, because the prior system of *ad hoc* classification determinations, at times, resulted in inconsistent classifications of "brace"-equipped pistols. The 98-page Rule, however, thoroughly explains ATF's uniform approach. Further, ATF has also published interim guidance identifying pistol-"brace" combinations likely to be considered short-barreled rifles under the Rule and will issue classification letters directly to manufacturers. *Supra* pp. 4, 43. And the Rule provides that "an individual may contact ATF to receive a [classification] determination." 88 Fed. Reg. 6,481. Thus, the public interest is better served by the Rule than by its absence.

## IV. In all events, any relief should be limited to redress Plaintiffs' alleged injuries.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no

broader than necessary to redress Plaintiffs' alleged, cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And consistent with traditional equity principles, "injunctive relief should be no more burdensome" to Defendants "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

Plaintiffs ask this Court to grant them far greater relief, however, by preliminarily enjoining ATF's from "enforcing" the Rule nationwide, against Plaintiffs and non-parties alike. Mot. at 25. But no such relief is warranted or appropriate. Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring) (lamenting the "asymmetric" effects of nationwide injunctions on "the government's hope of implementing any new policy"). Further, the Rule is subject to litigation in at least seven other cases in six different federal districts,[28] underscoring why this Court should not attempt to decide its legality for all parties nationwide—particularly on a motion brought by only four Plaintiffs. *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (explaining that "[p]rinciples of judicial restraint" counsel against granting relief to non-parties— particularly where, as here, "[o]ther courts are considering these same issues" at the same time); *see also*

---

[28] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

*Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).[29]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

Dated: March 27, 2023        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALAMDAR S. HAMDANI
United States Attorney

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Faith E. Lowry*
FAITH E. LOWRY (TX Bar No. 24099560)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
TAYLOR PITZ (CA Bar No. 332080)
Trial Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: faith.e.lowry@usdoj.gov

*Attorneys for Defendants*

---

[29] Although the State of Texas purports to bring this suit to protect its residents, Compl. ¶ 18, it cannot seek relief on behalf of these third parties under a *parens patriae* theory of standing. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–183 (D.C. Cir. 2019).

48

## CERTIFICATE OF WORD COUNT

I certify that the foregoing is 19,083 words, excluding the portions excepted by Local Rules 18(c).

*/s/ Faith E. Lowry*
FAITH E. LOWRY
Trial Attorney
U.S. Department of Justice

## CERTIFICATE OF SERVICE

On March 27, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Faith E. Lowry*
FAITH E. LOWRY
Trial Attorney
U.S. Department of Justice