IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| GUN OWNERS OF AMERICA, INC., | ) | |
| GUN OWNERS FOUNDATION, and | ) | |
| BRADY BROWN, | ) | |
| | ) | Case No. 6:23-cv-00013 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE, and | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity AS THE DIRECTOR OF ATF, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY SUPPORTING THEIR
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Table of Authorities .................................................................................................. ii

I.    Plaintiffs Are Likely to Succeed on the Merits. ................................................... 1
    A. The Final Rule Violates the APA............................................................... 1
        1.   A Facial Challenge Is Appropriate. ................................................. 1
        2.   ATF's Rulemaking Power Is Limited.............................................. 2
        3.   The Rule's Definition of Rifle Departs from the Statutory Definition. ........... 2
        4.   The Final Rule Is Arbitrary and Capricious..................................... 6
        5.   Logical Outgrowth. ...................................................................... 11
    B. The NFA and Rule Are Unconstitutional..................................................... 13
        1.   The Rule Infringes Second Amendment Rights. ............................. 13
        2.   Regulation of Braces Is Regulation of Conduct Covered by the Text of
            the Second Amendment. ............................................................... 14
          3.   Regulations Requiring Registration of Firearms Regulate Conduct
              Covered by The Second Amendment. ............................................ 16
          4.   SBRs Are Neither "Dangerous" Nor "Unusual," and They Are in
              Common Use. .............................................................................. 18
           5.   ATF's Grab Bag of Historical Outliers Does Not Establish an
               Analogous Historical Tradition Allowing it to Regulate Braced
               Handguns. ................................................................................... 21
    C. The Final Rule Is Not an Exercise of the Taxing Power. ............................ 26
    D. The Final Rule Violates the Fifth Amendment. ............................................. 27

II.   Plaintiffs Have Demonstrated Irreparable Harm. .............................................. 29
    A. Plaintiffs Will Suffer Irreparable Harm. ....................................................... 29
      B. GOA and GOF Represent Gun Owners Across the Nation Who
        Will Suffer Irreparable Harm........................................................................ 31
    C. Texas has Suffered Irreparable Harm .......................................................... 32
    D. If One Plaintiff Has Standing, the Court May Maintain the Suit................... 33

III.   The Balance of the Equities and the Public Interest Favor Plaintiffs................. 33

IV.   Relief Should Be Nationwide. ......................................................................... 34

Conclusion ................................................................................................................ 35

Certificate of Service ................................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) ................................................................... 32
*Antonyuk v. Hochul*,
  No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .............................. 23
*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ............................................................. 16
*Babbitt v. UFW Nat 'l Union*,
  442 U.S. 289 (1979) ................................................................... 29
*Bittner v. United States*,
  143 S. Ct. 713 (2023) ................................................................... 5
*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ................................................................ 20, 21
*CIC Servs., LLC v. IRS*,
  141 S. Ct. 1582 (2021) ................................................................. 26
*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) .......................................................... 16
*Espinoza v. Montana Department of Revenue*,
  140 S.Ct. 2246 (2020) ................................................................. 25
*F.C.C. v. Fox Television Stations*,
  556 U.S. 502 (2009) .................................................................. 7, 8
*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ................................................................... 10
*Hancock County Bd. of Supervisors v. Ruhr*,
  487 Fed. Appx. 189 (5th Cir. 2012) .................................................... 31
*Heller v. District of Columbia*,
  554 U.S. 570 (2008) ................................................................ 14, 22
*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) .................................................... 16, 20
*Hollis v. Lynch*,
  827 F.3d 436 (5th Cir. 2016) ................................................ 18, 19, 21, 32
*Jackson v. City & Cty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014) .......................................................... 15
*Janvey v. Alguire*,
  647 F.3d 585, 595 (5th Cir. 2011) ...................................................... 8
*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) .......................................................... 16
*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................... 34

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004)...................................................................... 6
*Longoria v. Paxton*,
  585 F. Supp. 3d 907 (W.D. Tex. 2022) ............................... 29, 30
*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) .................................................. 33
*Nat'l Fed. Of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)................................................................ 27
*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ................................................ 12
*New York State Rifle & Pistol Ass'n v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ................................................... 16
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...................................................... passim
*ODonnell v. Goodhart*,
  900 F.3d 220 (5th Cir. 2018) .................................................. 34
*PDK Labs v. United States*,
  438 F.3d 1184 (D.C. Cir. 2006)................................................ 8
*Peabody Twentymile Mining, LLC v. Sec'y of Labor*,
  931 F.3d 992 (10th Cir. 2019) ................................................ 11
*Sonzinsky v. United States*,
  300 U.S. 506 (1937)........................................................... 26, 27
*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .................................................. 30
*Tenth St. Residential Ass'n v. City of Dallas*,
  968 F.3d 492 (5th Cir. 2020) .................................................. 31
*Texas v. Becerra*,
  2022 WL 3639525 (N.D. Tex. Aug. 23, 2022)........................ 32
*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) .................................................. 12
*Texas v. EPA*,
  809 F.3d 134 (5th Cir. 2015) .................................................. 32
*Texas v. United States EPA*,
  983 F.3d 826 (5th Cir. 2020) .................................................... 8
*Texas v. United States*,
  555 F. Supp. 3d 351 (S.D. Tex. 2021) .................................... 34
*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .................................................. 34
*Tripoli Rocketry Ass'n v. BATFE*,
  437 F.3d 75 (D.C. Cir. 2006) ................................................... 9
*United States v. Apel*,
  571 U.S. 359 (2014)................................................................. 6

*United States v. Golding*,
 332 F.3d 838 (5th Cir. 2003) ...................................................................... 18, 19
*United States v. Hunter*,
 843 F. Supp. 235 (E.D. Mich. 1994) .................................................................. 28
*United States v. Miller*,
 307 U.S. 174 (1939) ............................................................................................ 15
*United States v. Saleem*,
 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ..................................................... 17
*United States v. Santoro*,
 242 Fed. Appx. 627 (11th Cir. 2007) ............................................................... 4, 5
*United States v. Thompson*,
 420 F.2d 536 (3rd Cir. 1970) ............................................................................. 28
*United States v. Thompson/Ctr. Arms Co.*,
 504 U.S. 505 (1992) ..................................................................................... 3, 4, 5
*United States v. Zeidman*,
 444 F.2d 1051 (7th Cir. 1971) ............................................................................. 4
*Vanderstok v. Garland*,
 No. 4:22-CV-00691, 2022 WL 4009048 (N.D. Tex. Sep. 2, 2022) ..................... 10
*VanDerStok v. Garland*,
 No. 4:22-CV-00691, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ................. 31, 32
*Wages & White Lion Invs. v. FDA*,
 16 F.4th 1130 (5th Cir. 2021) ............................................................................. 33
*Wages & White Lion Invs., LLC v. U.S. FDA*,
 16 F.4th 1130 (5th Cir. 2021) ............................................................................. 34
*Warth v. Seldin*,
 422 U.S. 490 (1975) ...................................................................................... 31, 32
*Wis. Cent. Ltd. v. United States*,
 138 S. Ct. 2067 (2018) ......................................................................................... 2
*Worman v. Healey*,
 922 F.3d 26 (1st Cir. 2019) ................................................................................ 16

**Statutes**

5 U.S.C. § 706(2)(C) ................................................................................................ 6
18 U.S.C. § 922(b)(5) .............................................................................................. 7
18 U.S.C. § 3571 ................................................................................................... 29
18 U.S.C. § 921(a)(30) ............................................................................................ 3
18 U.S.C. § 922(a)(5) .............................................................................................. 7
18 U.S.C. § 924(a)(1) ............................................................................................ 29
18 U.S.C. § 926(a)(3) .............................................................................................. 7
26 U.S.C. § 5871 ................................................................................................... 29
26 U.S.C. § 5821 ..................................................................................................... 4
26 U.S.C. § 5845(c) ................................................................................................. 2

26 U.S.C. § 5848 ...............................................................................................27, 28

Texas Penal Code § 46.05 ............................................................................... 31

Plaintiffs hereby Reply to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Resp.").

## I. **Plaintiffs Are Likely to Succeed on the Merits.**

### A. The Final Rule Violates the APA.

#### 1. A Facial Challenge Is Appropriate.

ATF's first counter to Plaintiffs' APA claims is circular and question-begging.  ATF argues that a "facial APA challenge to the Rule is ill-suited," noting that Plaintiffs have not asked the Court to rule on any "particular weapon" and its "proper[] classif[ication]." Resp. 12.   ATF argues that any conclusion by the Court that a "particular" firearm is a SBR "would not be traceable to the Rule at all, but would instead stem solely from the statute," and "it is the statute – not the Rule – that would impose the relevant obligations…."  *Id*.   In other words, ATF argues that Plaintiffs cannot challenge its interpretation of the statute because, if the Court concluded ATF's interpretation were correct, then that interpretation would be required by the statute, not the Final Rule.

But as ATF admits, it is the Final Rule, not the statute, that "rescinded all of ATF's prior classifications of firearms equipped with 'stabilizing braces.'"  Resp. 11.  It is the Final Rule, not the statute, which results in only "1 percent of 'stabilizing braces' that, when attached to the firearm … not [] affected…."  Plaintiffs' Motion for Preliminary Injunction ("Mot."), Ex. 9 at 21.  It is the Final Rule, not the statute, that represents the sum total of "ATF's expertise and years of experience in classifying 'brace'-equipped weapons" which ATF claims this Court should accept.  Resp. 15.  And it is the Final Rule, not the statute, that promulgates a vague and ambiguous regulation that reasonable people cannot

1

hope to understand.  Under ATF's theory, no plaintiff could ever challenge a rulemaking interpreting a statute, because any effects purportedly would be dictated by the statute, not the rule.  ATF cites no legal authority for this claim, which is not surprising, as it is not the law.

### 2.  ATF's Rulemaking Power Is Limited.

Next, ATF claims (Resp. 13-15) that it had "clear authority" to promulgate the Final Rule, relying on statutes which allow ATF to "administ[er]" and "enforce[]" and "carry out" the statute, and claiming ATF thus has authority "to issue rules interpreting terms" in order to "implement[] both statutory schemes."  Resp. 13.  The limited authority to promulgate certain rules was never at issue here, but rather only how ATF has exercised that power here in violation of the APA.  ATF's generic appeal to authority is thus irrelevant.  As Plaintiffs have alleged, the Final Rule conflicts with the plain text of the statue, violates the APA on numerous fronts, and infringes several constitutional protections.  There is no statutory delegation of authority *to do that*, even allegedly "to [meet] the demands of changing circumstances.'"[1]  Resp. 14.

### 3.  The Rule's Definition of Rifle Departs from the Statutory Definition.

Plaintiffs noted that the Final Rule's new definition of "rifle" changed the statutory text from a firearm that is *designed* and *intended* to be fired from the shoulder, 26

---

[1] The Supreme Court was crystal clear when it said that "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

U.S.C. § 5845(c), to a firearm that is constructed in a way that merely *allows* a shooter to fire from the shoulder. Mot. 9–10. ATF takes issue with Plaintiffs' argument, claiming that other language in the Final Rule indicates that the weapon still must be designed and intended to be fired from the shoulder. Resp. 16. But ATF misses the underlying point. Similar to the NFA's definition of "rifle," the GCA defines a "handgun" as "a firearm which has a short stock and is *designed* to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30) (emphasis added). Mot. 11. Thus, even if a short-barreled weapon is found to be both designed and intended to be fired from the shoulder, it *also and independently* could be found to be designed to be held and fired by the use of a single hand.[2] Indeed, five members of the Supreme Court applied the rule of lenity to the NFA's definition of SBR (because the NFA contains criminal penalties) and held that the NFA does not apply to parts that *could* be made into an SBR or alternatively into non-NFA-weapons. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517-18 (1992) (opinion of Souter, J.), 519 (opinion of Scalia, J.) (1992). For the same reasons, the NFA does not apply to a brace that, when attached to a handgun, *could* convert the weapon *either* into an NFA-regulated SBR *or* into an unregulated handgun with a brace designed to be fired with

---

[2] In the NPRM, ATF conceded that a weapon that "*could* be fired from the shoulder," "*may* be designed and intended to be fired from the shoulder," or "*is likely* designed and intended to be fired from the shoulder" is *not* a rifle, 86 Fed. Reg. 30826, 30829 (June 10, 2021) (emphasis in original), and that only a weapon that "*is* designed and intended to be fired from the shoulder" is a "rifle." *Id*. (emphasis in original). Mot. 10. ATF also conceded in the NPRM that a weapon with an "attachment … that provides surface area that allows the weapon to be fired from the shoulder" is not necessarily "designed and intended to be fired from the shoulder," 86 Fed. Reg. at 30829. Mot. 10–11.

one hand.  Mot. 11.  As the Final Rule acknowledges, characteristics conducive to braced pistol firing with one hand (a rear mounted brace with fins creating surface area to be wrapped around the arm) may also create "surface area" conducive to firing from the shoulder.  Resp. 19; FR 6501.

In response, ATF disregards *Thompson*'s holding, arguing that "the plain language of the statute compels the conclusion that a pistol equipped with a 'stabilizing brace' that is designed, made, and intended to be fired from the shoulder is a 'rifle,' regardless of whether it includes design features … that *also* might permit effective single-handed firing." Resp. 19 (emphasis added).  In other words, quite the opposite of the rule of lenity, ATF believes the statute to impose a one-way ratchet in favor of a designation as an SBR.  Indeed, ATF directly argues that "Congress chose to define 'rifle' to mean a weapon designed, made, and intended to be fired from the shoulder, *irrespective of alternate use*."  *Id.* (emphasis added).

ATF's position is contrary to the logic of *Thompson*, which holds that if weapon parts could be made into a non-NFA rifle, a non-NFA handgun, or an NFA SBR, then under the rule of lenity, the parts cannot be classified as an NFA SBR.  Thus, if a brace and a handgun could be made into either a braced handgun or an SBR, then it must be classified as a non-NFA handgun under the rule of lenity.

Nor do *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971) or the unpublished opinion in *United States v. Santoro*, 242 Fed. Appx. 627, 629 (11th Cir. 2007) support ATF.  *See* Resp. 16 (citing both).  Those cases both involved handguns with attached unambiguous shoulder stocks that were not even arguably stabilizing braces with

4

an alternative use (which were not invented until 2012). The weapons there were designed and intended exclusively to be fired from the shoulder, and specifically *not* with one hand. More, *Santoro* confirmed that the "three-justice plurality in *Thompson* determined Thompson/Center had not 'made' a short-barreled rifle within the meaning of 26 U.S.C. § 5821, because the aggregation of parts within each kit could result in a dual use of either a non-prohibited firearm or a prohibited firearm." *Santoro* at 629 (citing *Thompson* at 2104–05, 2107–10).

Contrary to ATF's claim, Plaintiffs never argued that a manufacturer's description of a firearm is dispositive as to whether it is an NFA firearm. Resp. 16–18. Nor did Plaintiffs argue that even if a rifle *can* be fired without using the shoulder, it is still a rifle. Resp. 18–19. If one cares for neither accuracy or safety, an AR-15 rifle, for instance, *can be* fired with one hand—but is still a rifle because it is exclusively designed and intended to be fired from the shoulder. A braced handgun, on the other hand, is designed to be fired with one hand and, under the rule of lenity, it is a non-NFA handgun rather than a NFA SBR even if it is *capable* of *also* being fired from the shoulder. One firearm cannot have two different classifications under federal law and, even if there is competing evidence about design and intent, the rule of lenity compels the one that favors the gun owner.

ATF does not and cannot argue that the statutes it claims to "interpret" are ambiguous. Even if the NFA were ambiguous, the rule of lenity would apply. *See Bittner v. United States*, 143 S. Ct. 713, 724 (2023) (holding that the "law is settled that penal statutes are to be construed strictly" and an individual "is not to be subjected to a penalty unless the words of the statute plainly impose it."); *see also United States v. Apel*, 571 U.S.

5

359, 369 (2014) (Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference."); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("when a statute "has both criminal and noncriminal applications[,] we must interpret the statute consistently, [and] whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

The Final Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and must be "set aside."  5 U.S.C. § 706(2)(C).

### 4.  The Final Rule Is Arbitrary and Capricious.

**Reliance Interests**.  ATF coldly dismisses reliance interests in the Final Rule, denying that millions of Americans chose to own braced firearms in reliance on ATF's promises "that they were not subject to the NFA."  Resp. 20.  But Plaintiffs never claimed that ATF "had a policy" that "'stabilizing braces' are categorically outside the NFA's reach.'"  Resp. 20.  What Plaintiffs do argue, and what matters, is that while not *every* brace-configured weapon has itself been classified by ATF, *several have* been—and with respect to those that were found to *not* constitute SBRs, the Final rule compels the opposite result for nearly every such brace installed on virtually any firearm.  *See* Mot. Ex. 9 at 21. Indeed, as ATF elsewhere admits, many of its classification letters have used broad language, opining generally that certain braces can be attached to *any* pistol without "alter[ing] the weapon's classification."  Resp. 5.  Those classifications engendered real reliance interests here that ATF should not be allowed to avoid with overbroad misstatements of Plaintiffs' litigating position.

Second, an agency cannot change a policy without "good reasons," and "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations*, 556 U.S. 502 (2009). ATF's argument that *any* reliance on classification letters is illegitimate because "classifications are subject to change," Resp. 21 and on the theory that classification determinations somehow "grow[] stale," is the very agency attitude that *Fox Television* was meant to expunge.

Third, ATF is wrong to claim that few to no reliance interests exist—that "[t]he only interest identified is the avoidance of the NFA's making and transfer taxes," what ATF calls "a minimal burden." Resp. 21. This fails to recognize multiple highly relevant interests. For one, ATF sometimes denies registrations—in that case, a brace owner would have to destroy or dispose of his or her brace or else become a felon. Moreover, American gun owners also have an interest in not being placed into a national gun registry, an interest Congress itself recognized in 18 U.S.C. § 926(a)(3), which prohibits "any system of registration of firearms, firearms owners, or firearms transactions or dispositions." Additionally, gun owners have an interest in being able to sell, transfer, or take their weapons across state lines; the Final Rule prohibits them from doing so with weapons improperly classified as SBRs unless ATF indulges a request for permission. 18 U.S.C. § 922(a)(5), (b)(5). And while ATF dismisses as speculative the criminal consequences for individuals who do not get their timely registration applications approved, Resp. 21, this misses the point of a preliminary injunction: to prevent such dire consequences, where

a "substantial threat of irreparable injury" is in the air. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

The Final Rule does not recognize the extent of the reliance interests it affects, much less "provide a more detailed justification" or "reasoned explanation" for its impact on those interests.  It therefore must be set aside. *Fox Television Stations*, 556 U.S. at 515-516.

**Arbitrary and Capricious Standards**.  Plaintiffs contested the Final Rule's incomprehensible new standard for determining whether a firearm is a SBR, providing vague factors like "surface area" and "weight" and "length" without any fixed measurements or other clear guidance.  Mot. 19 ("deliberately devoid of any measurable standard").  ATF attacks this as mere "flyspeck[ing]," and that it is impossible to "reduc[e] the … necessarily [] fact-specific inquiry … to a simple measuring game."  Resp. 22-23 (rejecting the idea "that ATF was required to use precise metrics").  However, neither case ATF cites in support involved agency interpretation of *criminal law*.  *See* Resp. 23 (citing *PDK Labs v. United States*, 438 F.3d 1184 (D.C. Cir. 2006) and one other case).[3]  Under the rule of lenity which applies to criminal statutes, a much higher standard of precision is

---

[3] *Texas v. United States EPA*, 983 F.3d 826 (5th Cir. 2020), examined an EPA decision that a certain Texas county did not meet federal clean air standards, the result of which was that the State was required to "develop a state implementation plan" to achieve compliance. *Id*. at 832.  Likewise, *PDK Labs. v. United States DEA*, 438 F.3d 1184 (D.C. Cir. 2006), involved an administrative DEA order suspending importation of certain "listed chemicals" that could be used in the "clandestine manufacture of a controlled substance." *Id*. at 1185. Quite differently, this case involves interpretation and application of *a criminal statute*, the penalty for violation of which includes up to ten years imprisonment.

required when a federal agency seeks to employ a "multi-factor balancing test" on a case-by-case basis to decide which items possessed by Americans subject them to imprisonment.

Indeed, two weeks prior to its *PDK Labs* decision, the same D.C. Circuit panel decided *Tripoli Rocketry Ass'n v. BATFE*, 437 F.3d 75 (D.C. Cir. 2006), which examined an ATF classification of a certain chemical compound as "explosive," and subjected "[v]iolators [to] the possibility of *criminal sanctions*." *Id*. at 77-78 (emphasis added). The court *flatly rejected* ATF's argument, finding that "[t]he agency … never provided a clear and coherent explanation for its classification," such as "some metric for classifying materials not specifically enumerated in the statute…." *Id*. at 81. As the court explained, ATF's vague factors, such as the "unbounded relational definition" of burning "*much faster*," did not explain "[t]en millimeters per second? A hundred? A thousand?" *Id*. Likewise, the court faulted ATF's "unbounded comparative analysis" for failing to "designate[] points of comparison … necessary to make a comparison," *id*. at 82, which in this case could have been example of a precise amount of rear "surface area" that does not constitute a rifle stock.

In short, ATF has no authority to approve or disapprove on an *ad hoc* basis every single brace/firearm configuration in existence. Without obtaining ATF's blessing with respect to *each specific configuration* of weapon (as specific as, for example, the particular optic installed by the end user, *see* FR 6569-70), no gun owner could ever be sure that <u>his particular firearm</u> in its current <u>*particular configuration*</u> does not constitute a felony criminal offense, determined by ATF on a case-by-case basis. On the contrary, when it comes to federal gun control laws, the statute's "precise wording demands precise

application." *Vanderstok v. Garland*, No. 4:22-CV-00691, 2022 WL 4009048 at *6 (N.D. Tex. Sep. 2, 2022).  There is no precision at all in the Final Rule.

For these same reasons, the Final Rule is also unconstitutionally vague under the Due Process Clause of the Fifth Amendment (*see* Resp. 42-43), because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).[4]  With respect to the Final Rule's "surface area" language, ATF calls this "a feature, not a bug."  Resp. 23.

Next, ATF's lawyers take issue with Plaintiffs' criticism of the Final Rule's charts of various firearms' lengths, weights, and lengths of pull.  Resp. 23-24.  But their defense is generally based on argument that is flatly inconsistent with the Rule itself.  For example, ATF's lawyers claim that the agency will compare a particular firearm *specifically* "against the original rifle design," not *generally* "to the entire range of rifles listed."  *Id*. at 24.  But the *Rule* says that "it is helpful to compare the characteristics of that firearm to similar firearms."  FR 6514.  Similarly, ATF's lawyers claim that the agency will compare an "AR-15-type pistol … to a 'similarly designed' AR-15 standard rifle" (Resp. 24), but what the

---

[4] ATF's claim that, "upon request, [ATF] **will provide** any individual with a classification determination" (Resp. 43), conflicts with 27 C.F.R. 479.102(c), which states quite differently that ATF **may issue** a determination (classification)."  The regulation provides no time limit or any obligation to respond.  In response to comments that the Final Rule is unconstitutionally vague, ATF responded that it "recognizes that clarity of legal restrictions is an essential element of the Fifth Amendment," but then stated, "to the extent that an individual is unsure about whether a particular firearm with a particular attached 'stabilizing brace' constitutes a rifle, that individual is free to request a classification determination from ATF for additional clarity."  FR 6550, 6551.  ATF thus recognizes that the Final Rule can lead to uncertainty, but does not promise to answer questions.

Final Rule *actually* says is that it would be compared to "similarly designed rifles"—full stop, not merely those that are similar *AR-15s*. *Id*. Even worse, the text to which the agency's lawyers selectively quote is in the Final Rule's preamble, while the text the agency seeks to avoid appears in the regulation itself. *See Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("the preamble … cannot be read to conflict with the language of the regulation itself.").

A very similar problem occurs with respect to "rear surface area." ATF's lawyers dispute Plaintiffs' point that the Final Rule could classify pistols as rifles *even if they do not have a brace installed*, based simply on the "rear surface area" of, for example, a buffer tube, which is an indispensable part of the firing mechanism of many pistols, including an AR-15 pistol. Mot. 19-20; Compl. ¶160. In response, ATF's lawyers claim that "[a]ssuming no other attachment or material is added to that buffer tube, the rear surface area that it creates ***would*** not alone indicate that the weapon is designed and intended to be shoulder fired." Resp. 24. But the Final Rule hedged on that question, claiming "an AR-type pistol with a standard 6- to 6 ½-inch buffer tube ***may*** not be designed, made, and intended to be fired from the shoulder." FR 6537 (emphasis added).

### 5. Logical Outgrowth.

ATF next claims that the Final Rule need not have been a "logical outgrowth" of the NPRM, because no notice and comment was required in the first place. Resp. 25-26. In support, ATF claims that the Final Rule is "interpretive" in nature because it "does not impose any new legal obligations," and "interpretive rules are exempt" from notice and

comment.[5]  *Id*.  This argument is, simply, wrong.  It is impossible to characterize the Final Rule as merely interpretive, as it (1) requires registration, as SBRs, of previously legal pistols, upon pain of up to 10 years' imprisonment and $250,000 fine; (2) alternatively requires possessors to dismantle, forfeit, or destroy their property, again upon pain of imprisonment and up to a $250,000 fine; and (3) waives collection of the statutorily required $200 "making" tax under the NFA.  These requirements, including ATF's simultaneous waiver of one of them, have the force and effect of law, and "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties ... is a legislative rule."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).  The Final Rule is a legislative rule—an "action [that] creates safe harbors," which "demonstrates that legal consequences flow from it," and where "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences."  *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019).

To be sure, prior ATF classification letters dealing with braces by applying the statute to a particular sample firearm arguably may have been interpretive.  But the Final Rule creates a *generally applicable legal framework* for analyzing all such firearms in the future, and concludes that virtually all handguns with stabilizing braces are SBRs.  The

---

[5] As the D.C. Circuit explains, "[i]t is well-established that an agency may not escape the notice and comment requirements … by labeling a major substantive legal addition to a rule a mere interpretation."  *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000).  Indeed, the Fifth Circuit instructs that courts are to give "minimal … deference" to an "agency's characterization of its own rule."  *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019).  Moreover, "[s]ubstantive rules 'are those which create law, usually implementary to an existing law.'"  *Id; see also* Resp. 13 (claiming the Final Rule is part of a long ATF history of "implementing [the] statutory schemes").

context and application of the Final Rule, including ATF's litigating position here, indicate that the agency intends to use the rule for future criminal prosecutions in which the Final Rule *must* have the force of law.  The fact that ATF issued the NPRM and Final Rule as part of a notice and comment process further confirms that the agency believed itself to be engaged in rulemaking that required it, regardless of what its lawyers now claim after the fact.

As for ATF's arguments that the Final Rule is nevertheless a logical outgrowth of the NPRM, Plaintiffs anticipated them, Mot. 20–22, and will not repeat prior argument here.  Suffice it to say, the Final Rule makes an about-face on a number of substantive issues, entirely changing its methodology for the classification of millions of firearms beyond what interested parties *should* (or could) have anticipated.  Had a second round of comment occurred, Plaintiffs (and others) could have focused on an entirely different set of problems stemming from the Final Rule's vague system of analysis complained of elsewhere in this lawsuit, but ATF gave no notice of the need to do so or any reason to anticipate such a fundamental change.  This is not like the cases ATF cites in its Response (at 27), where certain elements of a rule were dropped or standards were made uniform.  Rather, the Final Rule here fundamentally alters the nature of the test the NPRM proposes, and therefore must fail for lack of proper notice and comment.

## B.  The NFA and Rule Are Unconstitutional.

### 1.  The Rule Infringes Second Amendment Rights.

The Final Rule violates the Second Amendment because handguns with stabilizing braces are in common use for lawful purposes, and additionally because there is no

historical tradition of regulating firearms by barrel length.  Mot. 12–13.  Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  142 S. Ct. 2111, 2132 (2022).  When the plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  *Id*. at 2129–30.  "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id*. at 2130.

There are no founding-era restrictions on the barrel length on firearms, otherwise delineating certain dimensions or physical characteristics of firearms as unlawful, or limiting the use of firearm accessories.  ATF does not even attempt to prove otherwise.  Although the burden is on the government, Plaintiffs have nonetheless given ample photographic evidence of historically unregulated short-barreled firearms.  Compl. ¶¶ 290–96.  Rather, ATF provides four responses.  None is compelling.

### 2. Regulation of Braces Is Regulation of Conduct Covered by the Text of the Second Amendment.

ATF first argues that it is not required to provide a historical analysis because braces are not "arms," and that "the Second Amendment extends only to 'instruments that constitute bearable arms,'" citing *Heller v. District of Columbia*, 554 U.S. 570, 582 (2008).  Resp. 28.  But *Heller* does not say that the Second Amendment covers *only* bearable arms.  By ATF's logic, all detachable rifle stocks (not to mention detachable handguards, grips,

etc.) could be banned, because they are merely "accessories" to the firearms to which they are attached.  ATF's position misses the point because ATF is not banning braces *per se*, but rather claims that a handgun with a brace attached it is now a highly regulated SBR. The arm itself—the braced pistol, which is an "arm" under the Second Amendment and presumptively protected—is the target of the Final Rule.

And at any rate, a brace is an arm.  The term "arms" is broad, and "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132.  A brace facilitates armed self-defense, so it is an "arm." *See* Resp. 29 (braces "improve the usage of a firearm").  Likewise, the Supreme Court explained that a proper understanding of "Arms" also includes "ordinary military equipment," as shown in the Court's reference to founding era statutes that required militia members to be armed not only with firearms but also other "proper accoutrements" such as "a good bayonet and iron ramrod … a cartridge box … a good knapsack and canteen," and "Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges … a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack." *United States v. Miller*, 307 U.S. 174, 181–82 (1939). The Second Amendment, of course, also covers ammunition, which is not itself "arms" under ATF's conception. *See Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.").  Likewise, several pre-*Bruen* cases have assumed

"without deciding" that magazine bans implicate the Second Amendment.[6]  ATF cites pre-*Bruen* cases finding that silencers are not protected arms (Resp. 29), but those pre-*Bruen* cases ask the wrong question and, after *Bruen*, are no longer good law.

Moreover, the question after *Bruen* is whether certain *conduct* is covered by the Second Amendment.  The conduct regulated by the Final Rule is the possession and bearing of certain kinds of firearms.  Consequently, the Second Amendment applies.

### 3. Regulations Requiring Registration of Firearms Regulate Conduct Covered by The Second Amendment.

Next, ATF cites various pre-*Bruen* decisions, such as *Bezet v. United States*, 714 Fed. Appx. 336 (5th Cir. 2017), to claim that firearm registration "does not implicate the Second Amendment."  Resp. 30.  But *Bruen* explicitly rejected the two-step balancing test and intermediate-scrutiny standard used in cases like *Bezet*, which are no longer good law.  *See also Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) (dealing with Article III standing issues, not the constitutionality of the NFA).

More fundamentally, however, ATF confuses the issues.  The question ATF set out to answer is not whether the NFA and the Final Rule ultimately pass constitutional muster, but whether they "implicate the Second Amendment" at all.  Resp. 30.  Under *Bruen*, if "the Second Amendment's plain text covers an individual's conduct, [then] the

---

[6] *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018) (vacated and remanded for reconsideration in light of *Bruen*, 142 S. Ct. 2894); *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021) (vacated and remanded for reconsideration in light of *Bruen*, 142 S. Ct. 2895).

Constitution presumptively protects that conduct." *Bruen* at 2126. Plaintiffs clearly have made that minimal showing (Compl. ¶¶ 260-64), and ATF does not claim otherwise. Indeed, regulations requiring registration of firearm regulate conduct presumptively covered by the Second Amendment because they interfere with the ability to keep and bear firearms that must be registered. ATF therefore has the burden to show that there is a historical tradition analogous to a requirement that firearms be registered.

Initially, ATF does not make the attempt. Instead, it relies on *Bruen*'s dicta that "nothing in [the Supreme Court's] analysis should be interpreted to suggest the unconstitutionality" of certain state firearm registration regimes. Resp. 31 (citing 142 S. Ct. at 138 n.9). Second, ATF relies on Justice Kavanaugh's *Bruen* concurrence (Resp. 31) (citing 142 S. Ct. at 2162), which, by definition, was *not* the majority's holding and says nothing about the legality of the type of scheme ATF has imposed here. Nothing in *Bruen* decided the constitutionality of any other type of statute than the one before the Court. Rather, *Bruen* merely clarified that various other issues were *not* before the Court and were *not* being decided. *Id*. at 2138 n.9. Certainly, nothing in *Bruen* speaks to the NFA's constitutionality, because such constitutionality depends on whether there is a historical tradition of analogous licensing regimes going back to 1791, an inquiry ATF does not even try to perform here.[7]

---

[7] ATF also cites two district court opinions (Resp. 31), but neither of those examined the historical record, and both of which made the same error that ATF does—incorrectly equating the majority's refusal to analyze laws that were not before it as a holding that those laws were constitutional. ATF's citation to *United States v. Saleem*, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) is highly misleading, as the court there never made the

### 4. SBRs Are Neither "Dangerous" Nor "Unusual," and They Are in Common Use.

Again seeking to avoid its burden to provide a historical tradition of similar regulations, ATF next claims that "short-barreled rifles are dangerous and unusual weapons," relying almost exclusively on the Fifth Circuit's opinion in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). Resp. 32. To be sure, *Bruen* recognized "the historical tradition of prohibiting the carrying of" certain "dangerous and unusual weapons," but with the corollary that "the Second Amendment protects the possession and use of weapons that are in common use at the time." 142 S. Ct. at 2128 (cleaned up). Even assuming, wrongly, that pistols with stabilizing braces are properly categorized as SBRs, SBRs are neither dangerous nor unusual, not to mention they are within common use among the American public. ATF is therefore wrong that such firearms may be regulated on any of those bases, and without historical analysis. Resp. 32–34.

**Braced handguns are not dangerous.** No Fifth Circuit opinion holds that SBRs are "dangerous." *Hollis v. Lynch* holds that *machineguns* are "dangerous" in part because previous Fifth Circuit opinions held that unlawful possession of *a* machinegun is a crime of violence. *Id.* at 448. *Hollis*, in turn, cites *United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003), for the proposition that possession of any NFA firearm is a crime of violence. This, however, does not mean that every NFA weapon is a "dangerous" weapon;

---

holding ATF claims, stating only that it "does not reach the historical inquiry" and, by way of dicta, "that based on the record, it appears" the NFA might pass constitutional muster. Even so, *Saleem*'s dicta is wrong.

in fact, *Golding* itself recognized an earlier precedent that unlawful possession of a short-barreled shotgun, a NFA weapon, is *not* necessarily a crime of violence. *Golding* at 843 & n. 29 (citing *United States v. Diaz-Diaz*, 327 F.3d 410, 414 (5th Cir. 2003)). Moreover, even if Congress had defined carrying a handgun outside the home without a license as a "crime of violence," carrying a handgun outside the home would have been protected by the Second Amendment. *Hollis*'s reliance on definition of "crime of violence" does not survive *Bruen*.

ATF also tries to demonstrate that SBRs are dangerous by citing the Final Rule's declaration that "[s]hort-barreled rifles specifically are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." Resp. 32. But there is no evidence supporting this assertion, and in the case of braced handguns it makes no sense. Quite to the contrary, a handgun equipped with a brace is fundamentally *less concealable* (bulkier) than a handgun without a brace, both of which use identical ammunition, magazines, etc. For those reasons, a handgun with a brace has an indistinguishable "ability to cause damage" as a handgun without a brace. Moreover, ATF's claim that short-barreled rifles are so "inherent[ly] dangerous" is belied by the agency's actions over the past decade-plus, where it has repeatedly and specifically approved of the manufacture and sale of millions of firearms with stabilizing braces, never giving any indication it considered those weapons "inherently dangerous."

**Braced handguns are in common use and thus are not unusual.**  Far from being "unusual," pistols utilizing braces are in common and widespread use by the American public.  Indeed, ATF concedes that such weapons are legal to possess in 44 states, including Texas.  Resp. 33 (only "six states ban SBRs entirely"), 42 n.27 (Texas permits).  ATF argues that there are approximately 3.6 million SBRs in circulation (641,000 previously registered SBRs plus 3 million braced handguns; Resp. 33), a number that is far too low.  Mot. 2.  But even if ATF's number were correct, then SBRs are in common use and are not "unusual."  *See*, *e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (following remand) ("We think it clear enough in the record that semi-automatic rifles … are indeed in 'common use,' as the plaintiffs contend.  Approximately 1.6 million AR–15s alone have been manufactured since 1986."); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) ("[A]pproximately 200,000 civilians owned stun guns as of 2009. While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country…. "[T]he number of Tasers and stun guns is dwarfed by the number of firearms…. This observation may be true, but it is beside the point. Otherwise, a State would be free to ban *all* weapons *except* handguns.") (cleaned up, emphasis in original).

ATF attempts to cabin Justice Alito's concurrence in *Caetano*, claiming that his analysis requires examination *both* of the "absolute number" of such weapons in circulation "*plus*" the number of states where such a weapon can be owned.  Resp. 32-33.  Taking its estimate of 3 million braced firearms (which, as Plaintiffs have explained, likely is several orders of magnitude too low), ATF claims that 3.6 million braced pistols in circulation are

somehow "unusual" because they number fewer than the 50 million magazines and 8 million AR-15s mentioned in *Hollis*. *Id*. 33. But *Hollis* never imposed either of these numbers as the baseline for commonality. Even by ATF's estimate, the number of SBRs and braced firearms (3.6 million) exceeds the machineguns identified in *Hollis by a factor of twenty* (or, if the CRS numbers are used, by a factor of 227). Finally, whereas in *Hollis* there were 34 states "***prohibiting*** machineguns," ATF agrees with Plaintiffs that only "six states ban [SBRs] entirely" (44 not prohibiting them), almost identical to the "45 States" where stun guns could be possessed in *Caetano*. *Id*. at 420; *see* Resp. 42 n.27 (conceding that Texas, like most other states, "does not prohibit possession").

### 5.  ATF's Grab Bag of Historical Outliers Does Not Establish an Analogous Historical Tradition Allowing it to Regulate Braced Handguns.

ATF's final "even if" attempt to meet its burden under *Bruen* is to cite a litany of historical "survey," "licensing," and "tax" laws that it claims are "relevantly similar" to the NFA's regulation of barrel length and the Final Rule's regulation of firearm accessories.[8] Resp. 35-37. But none create the sort of broad and enduring historical tradition required by *Bruen*.

For historical analogues to be sufficiently similar to a challenged modern regulation for purposes of proving "consisten[cy] with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, the Court pointed to "at least two metrics: how and

---

[8] ATF does not actually provide any of its identified sources, either as hyperlinks or exhibits, apparently expecting Plaintiffs and this Court to find and "sift the historical materials for evidence to sustain [the] statute." *Bruen* at 2151. Although Plaintiffs have been able (on short notice) to identify some of ATF's historical sources, others have proven not readily available.

why the regulations" created restrictions on persons, arms, or activities that may otherwise seem within the Second Amendment's protections. *Id*. at 2133. Indeed, *Bruen*'s "how and why" metrics are "central considerations," and *both must be present* for a historical source to be an analogue to modern gun laws. In other words, if purported analogues regulated using entirely *different mechanisms or motivations*, the Court must disregard them as irrelevant.

First, ATF offers a series of eight early historical sources that, *inter alia*, conducted "surveys" of possessions for purposes of taxation, governed the organized militia, or required quality controls of commercially manufactured arms. Resp. 35-36. Two of these sources (1631, 1667) so "long predate[]" 1791 that they clearly do "not illuminate the scope of the" Second Amendment. *Bruen* at 2119. Moreover, they appear to have dealt with a type of "muster" of people in an early colony to provide for the common "deffence of the place against a common enemy"[9] to ensure survival of the settlement[10]–a markedly different "how" and an entirely different "why" than the NFA today. Not to mention, they are highly similar[11] to the irrelevant militia statutes on which ATF relies next.

Indeed, *Heller* forecloses ATF's reliance on 1775 and 1778 militia mustering laws (Resp. 35) altogether. Because the Second Amendment "secure[s] an individual right unconnected with militia service," *Heller*, 554 U.S. at 616, ATF cannot use laws imposing military order and discipline on early militias as evidence of Founding-era acceptance of

---

[9] https://archive.org/details/recordsofcolonyo02rhod/page/196/mode/2up
[10] https://firearmslaw.duke.edu/laws/1631-va-acts-174-acts-of-february-24th-1631-act-lvi/
[11] https://archive.org/details/statutesatlargeo09edit/page/646/mode/2up

firearm information-gathering generally. *See also Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *55-56 (N.D.N.Y. Nov. 7, 2022) (rejecting militia analogues as irrelevant under *Heller*).  Moreover, aside from these laws' dubious representativeness, they fail to establish relevant similarity under *Bruen*'s "how and why" metrics.  The NFA's regulation of SBRs does not sanction ATF inspections of registrants' arms—not on a regular basis, or ever, for that matter.

Similarly, ATF cannot rely on 1805 Massachusetts and 1821 Maine barrel proof laws to support the general criminalization of untaxed SBRs today.  These purported analogues fail under both *Bruen*'s "how" and "why" metrics because they did not regulate the lengths of barrels, and their ostensible motivation was to ensure proper functioning of arms—not their "criminal misuse."  Resp. 2.  Moreover, under *Bruen*, "19th-century evidence [i]s 'treated as mere confirmation of what ... had already been established.'"  *Id.* at 2137.  Without evidence of similar regulation dating back contemporaneously with the time of ratification, these laws are unhelpful.

Next, ATF provides a series of statutes regulating "gunpowder," which ATF claims is "akin to modern ammunition."  Resp. 36.  On the contrary, colonial era gunpowder (today classified by ATF as an "explosive"[12]) is entirely unlike smokeless powder (an accelerant or "propellant"[13]) used in modern firearm ammunition.  Colonial era gunpowder was greatly unstable, volatile, extremely hazardous, and often resulted in terrible accidents

---

[12] https://www.atf.gov/explosives/black-powder
[13] https://www.atf.gov/explosives/docs/newsletter/explosive-industry-newsletter-june-2013/download (explaining that modern ammunition powder is exempt from federal explosive requirements)

and explosions.   In contrast, even large quantities of "modern ammunition" have been shown not to create such hazards during testing.   *See* https://www.youtube.com/watch?v=3SlOXowwC4c.  During the colonial era, there indeed were various urban restrictions on powder ownership and storage (how much could be possessed, how it could be transported, requiring it to be stored in a community magazine, *etc*.), such as the 1801 Massachusetts statute ATF cites[14] ("An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same.").  Of course, these statutes had an entirely different "why" (to prevent cataclysmic explosions) than does the NFA ("to curtail the criminal misuse of firearms," Resp. 2).   They do not establish a historical tradition of regulating non-explosive ammunition, and even if they did, they are not at all relevant (different "why"), under *Bruen*.

The 1759 New Hampshire tax on "foreign ship[s]" cited by ATF[15] was an import tax, nothing like a tax on domestic, noncommercial activity, and again related only to gunpowder.  The 1857 Pennsylvania law cited by ATF, again relating to gunpowder in Philadelphia, comes far too late to be relevant.  Moreover, like above, both of these sources have different "whys" than the NFA.  For example, the New Hampshire law was not, like

---

[14]     https://firearmslaw.duke.edu/laws/1801-mass-acts-507-an-act-to-provide-for-the-storing-and-safe-keeping-of-gun-powder-in-the-town-of-boston-and-to-prevent-damage-from-the-same-ch-xx/

[15]     https://firearmslaw.duke.edu/laws/1759-76-n-h-laws-63-an-act-about-powder-money/

the NFA, "to curtail the criminal misuse of firearms" (Resp. 2), but rather "for the supply of his Majesty's fort and fortifications within this province."

Finally, ATF provides a series of twelve late-coming state statutes from the late 1800's, *inter alia* taxing various sales, requiring licenses to possess various firearms, prohibiting carry of firearms, or even banning certain guns outright.  Resp. 36.  This slew of different apples-to-oranges comparisons is entirely unhelpful for numerous reasons. Many of these sources facially conflict with the Second Amendment and the Court's holdings in *Heller* (right to possess handguns) and *Bruen* (right to bear arms in public). *Compare* Resp. 36 n.21 with *Bruen* at 2155 n.31 (rejecting an Arkansas law banning pistols as "short lived"); *id*. at 2153 (rejecting the relevance of the 1871 Texas statute cited by ATF).  The 1870 Hawaii and 1876 Wyoming statutes cited by ATF were during those jurisdictions' transient times as territories, a type of analogue *Bruen* flatly rejected.  *Id*. at 2154.

Lastly and most importantly, these late-coming statutes cannot create an *early American tradition*.  As the Supreme Court made clear even prior to *Bruen*, in *Espinoza v. Montana Department of Revenue*, "more than 30 States" that created a statute or analogue in the mid-to-late 19th century "cannot by itself establish an early American tradition." 140 S. Ct. 2246, 2258–59 (2020); s*ee also Bruen*, 142 S. Ct. at 2137 (using 1800's sources only "as mere confirmation of what the Court thought already had been established"); *id.* at 2163 (2022) (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful

25

to caution 'against giving postenactment history more weight than it can rightly bear.'"). In other words, whatever the usefulness of laws that postdate the founding, they *have no relevance at all unless they confirm* a tradition that existed contemporaneously with ratification. Since there is no founding-era tradition of such laws ever having existed, statutes concocted nearly a century later cannot be relied on to create one.

ATF has not justified the Final Rule by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. To be sure, the agency would have another attempt to do so before final judgment. Consequently, at this juncture, Plaintiffs have a substantial likelihood of prevailing on their claim that the Final Rule violates the Second Amendment.

## C. The Final Rule Is Not an Exercise of the Taxing Power.

The taxing power includes the power to assess and collect taxes and associated requirements such as "requir[ing] the submission of tax-related information that [the IRS] believes helpful in assessing and collecting taxes." *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1586–87 (2021). It includes the power to force citizens to pay taxes and to punish them if they refuse, but does not include the power to force citizens to apply for permission to make things and then—regardless of their willingness to pay the tax—*deny* the permission and then impose criminal penalties for failure to obtain the permission. Mot. 16–17.

*Sonzinsky v. United States*, 300 U.S. 506 (1937) is materially distinguishable and does not support ATF. That case involved the NFA's "annual license tax on dealers [of] firearms," *id*. at 511—there was no application process to register, and then, if the IRS

26

allowed, to pay the tax; instead, a business would simply make the payment on "July 1st of every year." Act of June 26, 1934, 48 Stat. 1236, 1237 § 2. Here, by contrast, ATF is seeking to force individual citizens who merely connect, or have already connected, a brace to a pistol retroactively to *seek permission* through a "registration" application to actually possess the resulting weapon—*regardless of whether they are willing to pay the tax*. This is not an exercise of "taxing" authority. ATF also cites three cases which "upheld various sections of the NFA as valid exercises of the taxing power since" *Sonzinsky*, Resp. 37, but likewise none of those cases concerned the application requirement.

The Supreme Court's recent characterization of *Sonzinsky* in *Nat'l Fed. Of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) *hurts* ATF's argument, *contra* Resp. 39. It only affirmed that Congress can "tax[] … sawed-off shotguns," 567 U.S. at 567, not that it can force persons to apply for permission to make and register sawed-off shotguns, which ATF may deny in its discretion.

**D. The Final Rule Violates the Fifth Amendment.[16]**

ATF first responds to the argument that the Final Rule violates the Self-Incrimination Clause by arguing that "the Rule does not compel registration" because those subject to it have other options to comply (such as destroying their firearm). Resp. 40 n.26. But that is beside the point. If a person chooses one of the paths (registration) ATF has set out, he is forced to self-incriminate, regardless of what other conceivable paths might be available (such as simply ignoring the Final Rule and becoming a felon). Indeed, the only

---

[16] As noted in Plaintiffs' Complaint, the Fifth Amendment self-incrimination claims are brought by Plaintiffs Brown, GOA, and GOF.

action that would allow Plaintiffs to maintain possession of their firearms as currently configured involves a real, rather than imagined, risk of self-incrimination.

Second, ATF acknowledges that 26 U.S.C. § 5848 only precludes the use of application information as "evidence of a prior or concurrent criminal violation."  Resp. 40.  In a normal case, this protection would be sufficient, as the typical filing of a Form 1 evidences a desire to make a firearm and pay the requisite tax in advance of actually making, thereby establishing "the legality, rather than illegality, of possession of a firearm." *United States v. Thompson*, 420 F.2d 536 (3rd Cir. 1970).  Here, however, an applicant already possesses and would *remain in possession* of what the government contends is an illegally-made, unregistered SBR.  As Plaintiffs noted, if an application were, for example, disapproved (but not denied), as often occurs after the FBI fails to follow through and complete a background check within the statutory 90-day window, § 5848 would not protect against the applicant's *continued* possession, of which ATF would now have been made aware.  Indeed, while it is true that federal courts generally have read § 5848 to bar "the use of such records *as evidence,*" at least one court has read this provision to allow the utilization of the records "in order *to investigate and indict* Defendants."  *United States v. Hunter*, 843 F. Supp. 235, 252 (E.D. Mich. 1994). Moreover, for those who choose a path other than registration (disassembly or forfeiture, for example), neither § 5848 nor ATF's exercise of "enforcement discretion" would protect GOA's members and supporters in the military who possess braced firearms.  *See* Declaration of Erich Pratt, ECF #1-1 at ¶18.

Finally, Plaintiffs cannot be reassured by some alleged general unavailability of tax data to other law enforcement agencies, given that ATF's procedures *require* applicants supply local law enforcement (many of whom are in jurisdictions which separately criminalize possession of SBRs absent strict NFA compliance) with copies of their application information, which provides evidence of past, current, and potentially even future state crimes.

## II. <u>Plaintiffs Have Demonstrated Irreparable Harm.</u>

### A. **Plaintiffs Will Suffer Irreparable Harm.**

Plaintiff Brown (and other owners of braced firearms represented by GOA and GOF) suffers irreparable harm by the threat of prosecution alone.  The Supreme Court has been crystal clear that "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Babbitt v. UFW Nat 'l Union*, 442 U.S. 289, 302 (1979) (internal quotation omitted). A fear of prosecution is only "'imaginary or wholly speculative' where plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible.'"  *Longoria v. Paxton*, 585 F. Supp. 3d 907, 919-920 (W.D. Tex. 2022) (rev'd on other grounds) (quoting *Babbitt*, 442 U.S. at 302).

As the Fifth Circuit has held in the First Amendment context, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."

*Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (internal quotation omitted). Moreover, "a plaintiff may also establish a substantial threat of enforcement simply by showing that she is 'either presently or prospectively subject to the regulations, proscriptions, or compulsions [being challenged].'" *Longoria*, 585 F. Supp. 3d at 920.

This interpretation is buttressed by ATF's own threatening language in the Final Rule: "These violations under the GCA are punishable by up to five years in prison and a fine of up to $250,000. *See* 18 U.S.C. §§ 924(a)(1), 3571. Violations of the NFA are punishable by up to 10 years in prison and a fine of up to $10,000. 26 U.S.C. 5871." 88 Fed. Reg. at 6482. As to the imminence of potential criminal liability, the Final Rule warns, "**After the 120-day registration period** following publication of this rule, **registration of previously made or manufactured weapons with a 'stabilizing brace' that constitute NFA firearms will not be permitted**. The Department **at that time may take enforcement action against any person in possession** of an affected firearm that is a short-barreled rifle for which a registration has not been submitted." 88 FR 6481 (emphasis added).

ATF demurs that Plaintiffs can simply choose to comply with the law, claiming that compliance is "*de minimis*." Resp. 44. On the contrary, Brown (like countless gun owners who are represented by GOA and GOF) stands in immediate danger of felony conviction and substantial jail time if he refuses to either register or destroy his legally purchased weapons, or if he is disapproved registration. ATF claims, again, that any consequences to Plaintiffs "flow from the NFA, not the Rule itself," but as explained above, *see* Part I.C., this is simply wrong. Next, ATF is wrong that "Brown has not established that his weapon

equipped with a stabilizing brace is subject to the NFA." Resp. 44. On the contrary, Brown attested "I personally own at least one AR-15 style firearm in pistol configuration and equipped with a stabilizing brace which … under the Final Rule, ATF now would classify … as a short-barreled rifle." ECF #16-14 ¶5. Finally, ATF is correct that deprivation of constitutional rights constitutes irreparable harm when they are "threatened or in fact [] impaired," Resp. 44, which is why Plaintiffs made that very showing.

**B. GOA and GOF Represent Gun Owners Across the Nation Who Will Suffer Irreparable Harm.**

GOA and GOF represent similarly situated gun owners across the country. These persons, who are represented by GOA and GOF, will suffer irreparable harm and are represented by GOA and GOF under the well-established concept of "representational standing." As the Supreme Court established in 1975, "an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Citing *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020), ATF claims that "[a]ssociational standing requires that the individual members of the group **each** have standing." But this is a plainly incorrect statement of the law, at odds with prior Fifth Circuit precedent and the clear teaching of the Supreme Court. As a decision last year from the Northern District of Texas pointed out, "Circuit precedents conflict on this point." *VanDerStok v. Garland*, No. 4:22-CV-00691, 2022 WL 4809376, at *7 (N.D. Tex. Oct. 1, 2022). That court concluded that the accurate statement of law was to be found in *Hancock County Bd. of Supervisors v. Ruhr*, 487 Fed. Appx. 189, 195 (5th Cir. 2012), which explained that "[t]he first prong of the associational standing test requires that at

least one member of the association satisfy the Article III elements and have standing to sue in his or her own right." The court continued that *Warth v. Seldin* "seems to settle this dispute in Plaintiffs' favor," and that "an association may be an appropriate representative of its members' so long as any one of them suffers injury." *VanDerStok* at *7. Since "at least one" of the associations' members could sue in their own right (indeed, many could), the organizations too have standing to challenge the Final Rule.

### C. Texas has Suffered Irreparable Harm

Texas also suffers irreparable harm because the Final Rule "affects [its] 'quasi-sovereign interests by imposing substantial pressure . . . to change [its] laws." *Texas v. EPA*, 809 F.3d 134, 153 (5th Cir. 2015). Specifically, Texas Penal Code § 46.05 makes it unlawful to possess a short-barreled rifle unless it is registered under the NFA. And the Fifth Circuit has already recognized the linkage between that Penal Code provision and federal law sufficient to find standing in a suit against ATF. *Hollis,* 827 F.3d at 442. The distortive effect that the Rule has on Texas's penal law gives rise to irreparable injury. *See*, *e.g.*, *Texas v. Becerra*, 2022 WL 3639525, at *29 (N.D. Tex. Aug. 23, 2022). Similarly, Texas suffers irreparable injury in its "quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). The Final Rule materially adversely affects Texans' health and well-being by delaying or prohibiting Texans' ability to use braced handguns to defend themselves. And Texas will also experience irreparable injury for every law enforcement officer who must now, and in the future, register his brace with the ATF to comply with the NFA. Mot. 23–24. Every dollar spent on registration is irreparable

because unrecoverable from the federal government.  *Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

### D.  If One Plaintiff Has Standing, the Court May Maintain the Suit.

"It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).  Because at least one party has standing (they all do), the Court has standing to rule on Plaintiffs' Motion for a Preliminary Injunction.

## III.   The Balance of the Equities and the Public Interest Favor Plaintiffs

ATF ignores Plaintiffs' argument about why the balance of equities and the public interest favor Plaintiffs. Mot. 24–25. Instead, ATF argues that these factors favor it, because the Rule "benefits public safety" and serves the public interest by providing regulated parties with "greater clarity." Resp. 46. Those purported interests are ephemerae: ATF points to no threat to public safety that the Final Rule ameliorates—indeed, identifies only two crimes that allegedly have been committed with a braced firearm. Nor does ATF explain how "public safety" is furthered, or even begin to theorize how any crime committed with a firearm equipped with a brace could not be identically committed by other configurations of the same firearm which the Final Rule does not seek to regulate under the NFA.

To the contrary, the interests and equities that Plaintiffs identified in their Motion, Mot. 22–25, continue to favor a preliminary injunction.  Individuals must choose between the threat of prosecution; the destruction of their property with no compensation from the

33

agency compelling its destruction; or compliance with a regulatory regime that is likely, as described above, to violate both the underlying statutes and the Constitution. ATF, meanwhile, at most faces a delay in its processing of paperwork and its collection of a tax *that it has already agreed to waive*.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Wages & White Lion Invs., LLC v. U.S. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (granting stay against enforcement of agency rule). Set against that principle is the very real threat that Brown, members of GOA, and Texans on whose behalf Texas sues will be subjected to criminal prosecution and imprisonment. The equities and public interest favor the Plaintiffs and a preliminary injunction barring enforcement of the Final Rule.

## IV. Relief Should Be Nationwide.

Plaintiffs argued that relief should be nationwide because GOA has members nationwide.[17] Mot. 25. ATF never responds to this point, instead relying on familiar policy arguments about nationwide relief. Resp. 46–48. The Fifth Circuit, though, has rejected those arguments, *see Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), leaving the only question as whether a nationwide injunction would "remedy the specific action which gives rise to" this lawsuit. *Texas v. United States*, 555 F. Supp. 3d 351, 440 (S.D. Tex. 2021) (cleaned up).

---

[17] ATF does not contest that GOA has members throughout the nation.

The "specific action" to which the Court must "narrowly tailor an injunction," *see ODonnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) (disapproved on other grounds, *Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) (en banc)), is the imposition of a nationwide Final Rule by ATF. That rule applies everywhere in the United States that Texans or GOA members may find themselves should ATF choose to make an example of them. Only nationwide relief will protect them.

Plaintiffs argued that relief should be nationwide because GOA and GOF represent similarly situated gun owners across the country.  Mot. 25.  ATF never responds to this point, instead relying on familiar policy arguments about nationwide relief.  Resp. 46–48. Nationwide relief is appropriate in this case.

## CONCLUSION

The Court should preliminarily enjoin ATF from enforcing the Final Rule.

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH*
Mississippi Bar No. 102784
Southern District of Texas No. 3554925
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

ANTHONY R. NAPOLITANO*
Arizona Bar No. 034586
Southern District of Texas No. 3837680
Bergin, Frakes, Smalley & Oberholtzer, PLLC
4343 E. Camelback Road, Suite 210
Phoenix, Arizona 85018
(602) 848-5449
anapolitano@bfsolaw.com

GILBERT J. AMBLER*
Virginia Bar No. 94325
Southern District of Texas No. 3834055
20 S. Braddock St
Winchester, VA 22601
(540) 550-4236
gilbert@amblerlawoffices.com

*Counsel for Plaintiffs Brady Brown, Gun Owners of America, Inc., and Gun Owners Foundation

KEN PAXTON**
Attorney General of Texas

AARON F. REITZ**
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771

LEIF A. OLSON**
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695

/s/ Charles K. Eldred
CHARLES K. ELDRED**
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Southern District of Texas No. 20772

CHRISTINA CELLA**
Assistant Attorney General
Texas Bar No. 24106199
Southern District of Texas No. 3355870

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Leif.Olson@oag.texas.gov
Charles.Eldred@oag.texas.gov
Christina.Cella@oag.texas.gov

**Counsel for Plaintiff State of Texas

**CERTIFICATE OF SERVICE**

I certify that on April 3, 2023, I filed this motion through the Court's CM/ECF system, which automatically served it upon all counsel of record.

/s/ Charles K. Eldred