UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS (CORPUS CHRISTI)

```
STATE OF TEXAS, et al.,          .
                                 .  Case No. 6:23-cv-00013
              Plaintiffs,        .
                                 .
     v.                          .
                                 .
BUREAU OF ALCOHOL, TOBACCO,      .
FIREARMS AND EXPLOSIVES,         .  1133 N. Shoreline Blvd.
et al.,                          .  Corpus Christi, TX 78401
                                 .
              Defendants.        .  Thursday, May 25, 2023
                                 .  3:32 p.m.
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE DREW B. TIPTON
UNITED STATES DISTRICT COURT JUDGE

TELEPHONIC APPEARANCES:

For the Plaintiffs:            Stamboulieh Law, PLLC
                               By:  STEPHEN DEAN STAMBOULIEH, ESQ.
                               P.O. Box 428
                               Olive Branch, MS 38654
                               (601) 852-3440

APPEARANCES CONTINUED.

Audio Operator:                Stacie Marthiljohni, ECR

Transcription Company:         Access Transcripts, LLC
                               10110 Youngwood Lane
                               Fishers, IN 46048
                               (855) 873-2223
                               www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):


For the State of          Office of the Texas Attorney General
Texas:                    By:  LEIF OLSON, ESQ.
                               CHRISTINA CELLA
                          300 West 15th Street, 6th Floor
                          Austin, TX 78701
                          (512) 475-2952


For the Defendants:       DOJ-Civ
                          By:  JODY LOWENSTEIN, ESQ.
                          1100 L Street Northwest
                          Washington, DC 20005
                          (202) 598-9280

1      (Proceedings commence at 3:33 p.m.)

2      THE CLERK:  Court calls Civil Action 6:23-cv-13,

3 State of Texas, et al. v. Bureau of Alcohol, Tobacco, Firearms,

4 and Explosives.  May I have appearances by counsel?

5      MR. STAMBOULIEH:  Stephen Stamboulieh for the

6 plaintiffs.

7      MR. LOWENSTEIN:  This is Jody Lowenstein with the

8 United States Department of Justice appearing on behalf of

9 defendants.

10      THE COURT:  Okay.

11      MR. OLSON:  Leif Olson on behalf of the -- oh, I'm

12 sorry, Your Honor.

13      THE COURT:  No.  That's all right.  Go ahead.

14      MR. OLSON:  Leif Olson on behalf of the State of

15 Texas, along with Christine Cella and Brian Bosch (phonetic)

16 from our office of the Solicitor General.

17      THE COURT:  Mr. Lowenstein, they have you

18 outnumbered.  Is it Lowenstein or Lowenstein?

19      MR. LOWENSTEIN:  Lowenstein.  Thank you, Your Honor.

20      THE COURT:  All right.  I apologize.  All right.  So

21 did everybody get a copy of the order that Judge Boyle signed?

22      UNIDENTIFIED:  Yes, Your Honor.

23      MR. STAMBOULIEH:  Yes, Judge.

24      THE COURT:  Okay.  I saw that about 15 minutes ago,

25 so -- I was in some other hearings this afternoon.  So I guess

1   that just kind of further raises the question about how the

2   parties react to what happened in the Mock case.  I mean, y'all

3   are all very familiar with it.  Judge O'Connor denied the

4   preliminary injunction.  It went up on appeal.  A motions panel

5   granted the preliminary injunction and limited it to the

6   plaintiffs and expedited the appeal.

7           I've looked, and it looks like it is being

8   fast-tracked pretty substantially.  I was trying to figure out

9   how to respond to that, and it looks like Judge Boyle has

10  responded to it by basically granting the preliminary

11  injunction limiting it to the plaintiffs in that case, and

12  basically sitting tight to find out what the merits panel of

13  the Fifth Circuit is going to do.

14          So I guess my question is comments?  Does everybody

15  think that that's what we should do in this case, without

16  waiving any -- obviously, Mr. Lowenstein, I'm not asking you to

17  waive any of your arguments, but just trying to figure out how

18  to respond to what has come out of the Fifth Circuit.

19          So I guess since -- I'll start with the federal

20  defendants, given the posture of the case.

21          MR. LOWENSTEIN:  Thank you, Your Honor.  You know,

22  defendants don't think that, you know, taking the same path

23  that Judge Boyle did is the right course of action here.  And I

24  think, not just -- I think it might be helpful to just consider

25  the nature of the order and the proceedings in the Mock case

1   and the order that the motions panel just handed down in that

2   case.

3          That's an unpublished order by a motions panel.

4   That's not binding precedent.  That's not binding on this

5   Court.  It's not binding on any other district court that is

6   considering related challenges.  It's not even binding on the

7   panel that will be assigned to review the interlocutory appeal

8   from Judge O'Connor's order in Mock denying the preliminary

9   injunction.

10         So I don't believe the motions panel's order really

11  offers any indication of what the Fifth Circuit will ultimately

12  decide in that interlocutory appeal and whether or not those

13  plaintiffs have demonstrated what they needed to, to obtain a

14  preliminary injunction.

15         I think the second piece is that the order contains

16  no reasoning and no explanation for why the panel made its

17  decision.  It's just a few sentences, it expedites the appeal,

18  and it grants the motion, limited to the plaintiffs, and then

19  notes that Judge Haynes would not have granted the injunction.

20         THE COURT:  Let me ask you --

21         MR. LOWENSTEIN:  So --

22         THE COURT:  Let me ask you that.  I don't mean to

23  interrupt, but I was -- I'm trying to figure out how to read

24  that slip note.  So what is the difference between a stay as to

25  the plaintiffs and granting the preliminary injunction?

1  Because she says she concurs in the order of an expedited

2  appeal; with respect to the preliminary injunction pending

3  appeal, she would grant an administrative stay to the

4  plaintiffs in the case, as to the challenged final rule for a

5  brief period of time.

6          The way that I initially read that was, is that that

7  is a temporary, you know, maybe a 7 to 14 days deal so that the

8  merits panel could actually rule on the injunction.  Is that

9  the way that you read that?

10          MR. LOWENSTEIN:  Well, Your Honor, it's not really

11  clear exactly what that administrative stay -- how that would

12  operate and how Judge Haynes was understanding how that would

13  operate.  However, I think it is relevant to the fact that, you

14  know, in order to obtain an injunction pending appeal, the

15  plaintiffs had to show, you know, the same four prerequisites

16  that plaintiffs in this case would have to show in order to

17  obtain a preliminary injunction.  Those are prerequisites.  And

18  so, you know, I guess that's the one distinction that I would

19  take from that, is that she did not think that injunction

20  should issue there.

21          THE COURT:  But then --

22          MR. LOWENSTEIN:  But I guess --

23          THE COURT:  Does the administrative stay operate as

24  an injunction, just for a shorter period of time?  I'm trying

25  to figure out what the difference is between an administrative

1  stay as to the plaintiffs -- and she says, grant an

2  administrative stay to the plaintiffs in this case as to the

3  challenged final rule for a brief period of time.  So, to me,

4  that kind of sounds like she is granting an injunction for a

5  brief period of time, making a deference to the merits panel.

6          MR. LOWENSTEIN:  Well, Your Honor, I guess that

7  reading is as good as any.  I can't --

8          THE COURT:  Okay.

9          MR. LOWENSTEIN:  -- suggest that I know exactly what

10  that administrative stay, how that would operate, but it sounds

11  much like what Your Honor just explained.  But you know, I

12  think a critical piece of this is that -- and why I think this

13  Court should, you know, decide the motion that's before it, is

14  that I don't think there's any reason why -- why we should

15  think that the panel understood its decision to instruct how

16  this Court should decide the motion that's before it, or any of

17  the issues before it.  It's not a binding order.  It's not

18  binding precedent.  It contained no reasoning.

19          And so I think the motions panel decided that case on

20  a different record, different briefing, with different

21  plaintiffs and different arguments.  And I think the important

22  piece there is that it limited its order to the plaintiffs in

23  that case.  So I don't think it understood its order or

24  expected this order to short-circuit this Court's resolution of

25  the motion that's before it.

1            And I think there are some things to be said about

2   the fact that each case, each judge deciding each case, really

3   does help these issues and these questions percolate through

4   the federal courts.  And I don't think the motions panel

5   necessarily expected that its decision would just be, you know,

6   followed for each individual plaintiff.  It limited its orders

7   to plaintiffs in that case, and I think this Court should

8   decide the motion that's before it.

9            THE COURT:  All right.  Okay.  Who's speaking on

10  behalf of the plaintiffs?

11           MR. STAMBOULIEH:  Stephen Stamboulieh, Judge.  I'll

12  speak on behalf of the individual plaintiffs, and Mr. Leif

13  Olson will speak on behalf of Texas as necessary.

14           Your Honor, I don't disagree too much with my friend,

15  Mr. Lowenstein.  Almost seems like DOJ is listening to our

16  phone calls.  I think these -- this case -- I think, Judge, the

17  Fifth Circuit would really benefit from this Court's decision

18  on plaintiffs' motion for a preliminary injunction.  I

19  understand that it would be easier to just do the same thing

20  that Judge Boyle did, but I don't think that gives the Fifth

21  Circuit the benefit of the Court's analysis and the different

22  facts that are at issue in this case.  Of course, there were

23  different plaintiffs and different arguments that were made.

24  And we would suggest, Your Honor, that a preliminary injunction

25  is definitely appropriate.

1          What the Fifth Circuit did is that they limited it to

2    just the plaintiffs.  Now, the plaintiffs, the Mock plaintiffs,

3    have asked the Fifth Circuit to, I guess, clarify what the

4    relief would be to those plaintiffs.  And I saw DOJ's response

5    was also filed in that today, so I would assume here shortly at

6    some point we would get -- the Mock plaintiffs would get a

7    response in that case.

8          But I would agree with Mr. Lowenstein on the one

9    issue of having this Court give an analysis of the case because

10   I think that would be very helpful to the Fifth Circuit to have

11   a different judge's interpretation on the (indiscernible) ahead

12   of it.

13          THE COURT:  All right.  Mr. Olson, did you have

14   anything to add?

15          MR. OLSON:  No, Your Honor.  Just the State is happy

16   to assist the Court and participate if it wants to schedule a

17   hearing on the motion for preliminary injunction, but we don't

18   believe that's necessary.  We think that what Judge Boyle did

19   in that case is perfectly appropriate for the Court to do in

20   this case as well.

21          THE COURT:  What -- I had seen conflicting accounts

22   of what the standard for a preliminary injunction is on appeal.

23   You know, it's not every day that a preliminary injunction is

24   denied by a district court and then a preliminary injunction is

25   instituted or initiated on appeal.

1          I have seen a couple of different, I guess, thoughts

2    as to whether or not the standard is higher or is the same if

3    the Fifth Circuit -- doing what the Fifth Circuit did.

4          So, Mr. Lowenstein, do you have a -- I guess a

5    comment as to what the -- is it a heightened standard to do it

6    on appeal than this?  Or is it the same standard that was

7    presented to the district court?

8          MR. LOWENSTEIN:  My understanding, Your Honor, is

9    that an injunction pending appeal -- a motion for an injunction

10   pending appeal turns on very similar factors, the same -- very

11   similar of the four factors that are necessary for a

12   preliminary injunction, I guess.  As I read the case law, the

13   only distinction is, is a substantial likelihood of success on

14   appeal --

15         THE COURT:  So your --

16         MR. LOWENSTEIN:  -- would be --

17         THE COURT:  Yeah.  I knew that it was the same four

18   factors.  I had just seen some conflicting accounts as to

19   whether or not if you're going to do it for the first time on

20   appeal that it's a heightened standard or maybe, you know, it

21   needs to be even a stronger showing of those same four factors.

22   But it sounds like that you haven't run across that?

23         MR. LOWENSTEIN:  Your Honor, I haven't.

24         THE COURT:  Okay.  All right.  Does anybody else have

25   any comments about whether or not that is a higher standard

1    that the Fifth Circuit found was satisfied or is it the same

2    standard that was presented to the district court?

3              MR. OLSON:  Your Honor, our understanding is that in

4    Iscomex (phonetic) or Ruiz v. Estelle, it's the same four

5    factors.

6              THE COURT:  Right.

7              MR. OLSON:  And like you, I've seen conflicting

8    opinions as to whether or not there is a different standard

9    when there are contested facts below that are being resolved as

10   to whether or not they will grant particular deference to a

11   district court's finding of facts in granting or denying an

12   injunction pending appeal.  But as to the standard itself, I

13   believe it was the same.

14             THE COURT:  So one of the questions that I had is --

15   and maybe it's what is being briefed, is with the entities.  Is

16   this covering the members or is it just covering the entity?

17   Is that the issue that is -- that they sought clarification on

18   in the Fifth Circuit?

19             MR. OLSON:  Yes, Your Honor.  That's our

20   understanding.

21             THE COURT:  Okay.  So, in this case then, Mr. Olson,

22   what is Texas?

23             MR. OLSON:  In this case, Your Honor, Texas is

24   seeking relief both as parens patriae and on its own behalf as

25   the Government.

1            THE COURT:  So I was just trying to clarify what the

2    relief is, because Texas is not going to wear -- you know, is

3    not going to use these braces.  Are you saying that it applies

4    to -- that the rules should not be enforced anywhere within the

5    borders of the state of Texas?  Is that what your relief is?  I

6    know you've asked for nationwide, but I'm just trying to define

7    what "Texas" is.

8            MR. OLSON:  So the purposes of Texas as a party,

9    Your Honor, yes, would be prohibiting enforcement within the

10   state.

11           THE COURT:  Mr. Lowenstein, I guess your comment to

12   that?

13           MR. LOWENSTEIN:  Well, Your Honor, I think under, you

14   know, Massachusetts v. EPA, you know, Government of Manitoba

15   out of the DC circuit, I think, both explain pretty well that

16   the State of Texas cannot have -- does not have standing to

17   bring suit on behalf of, you know, its citizens in parens

18   patriae standing.  And so we do not think that that is

19   appropriate, and nor do we think that Texas has shown any

20   irreparable harm to itself or to its citizens, Your Honor.

21           THE COURT:  So, with respect to irreparable harm,

22   Mr. Olson, what is -- what exactly are you alleging is the

23   irreparable harm?

24           MR. OLSON:  Two irreparable harms, Your Honor.  One

25   is parens patriae will be the same irreparable harm that

 1   Mr. Brown is alleging in the GOA and the Foundation are

 2   alleging on behalf of its members.  And as the State -- the

 3   question is (indiscernible) the State to change its own

 4   enforcement of the legal code based on ATF's changing of the

 5   interpretation of federal law is an ongoing and irreparable

 6   harm, and so that is enjoined.  The pressure remains and the

 7   effect on Texas and its enforcement of its own laws persists.

 8          THE COURT:  So I thought I'd seen somewhere in the

 9   briefing that you were alleging compliance costs.  Is that --

10   first off, is that something you're alleging or am I misreading

11   that?

12          MR. OLSON:  As to the brief, Your Honor, I believe

13   the compliance costs that were discussed were the cost of

14   compliance for any Texas law enforcement entity that would have

15   to pay the tax and comply.  That would be an irreparable harm

16   to the extent that ATF doesn't refund that in the future.

17          But as we've discussed that only generally in the

18   briefing and didn't submit declarations to the effect of what

19   those costs would be and who would be bearing them, we're not

20   relying on that right now.  We're happy to submit declarations

21   to that effect if it helps Your Honor reach a decision.

22          THE COURT:  Well, I just want to make sure that I'm

23   clear on each of the elements, what you're alleging for

24   standing -- with Mock, they're private plaintiffs and there are

25   private claims in this case.  State of Texas is not a private

1    plaintiff.  You're alleging completely different standing and

2    completely different irreparable harm, I think, as a state, as

3    opposed to a private plaintiff.

4           Mr. Lowenstein, if there is a violation of the

5    constitution, is it presumptively irreparable harm?

6           MR. LOWENSTEIN:  Well, I think -- Your Honor, I think

7    the right way to approach that question -- I don't have the

8    exact case name in mind.  It's cited in the briefs.  It's

9    (indiscernible) case, is that, while generally speaking the

10   principle is -- is that, you know, violation of a

11   constitutional right -- an individual's constitutional right

12   would be irreparable harm, a plaintiff still needs to show

13   for -- in order to demonstrate irreparable harm to support a

14   preliminary injunction, that that individual's constitutional

15   rights will be actually and imminently harmed.  So don't think

16   the analysis would be reduced down so much to just a mere

17   finding that somebody's constitutional rights may be violated

18   at some point.

19          THE COURT:  Is that the same analysis for the

20   statutory claim?  In other words, what's the different with the

21   presumptive irreparable harm or the irreparable harm analysis

22   between the constitutional and the statutory claim?

23          MR. LOWENSTEIN:  I'm not familiar with there being a

24   presumptive harm with respect to a statutory claim.  I don't

25   know if that argument -- I don't recall that being pressed by

 1   any of the plaintiffs here, that a finding of success on the

 2   merits on their statutory claim would be -- would show any sort

 3   of irreparable harm.

 4            THE COURT:  Mr. Olson, did you have any comment on

 5   that?  A distinction between the type of harm necessary to

 6   satisfy a constitutional claim as opposed to the statutory

 7   claim?

 8            MR. OLSON:  No, Your Honor.  No comment on that.

 9            THE COURT:  All right.  I'm sorry.  I can't read --

10   the last name is so small.

11            MR. STAMBOULIEH:  Stamboulieh.

12            THE COURT:  All right.  I apologize.

13   Mr. Stamboulieh, did you have any --

14            MR. STAMBOULIEH:  That's right.  Just on one thing,

15   Your Honor.  (Indiscernible) we have the Elrod v. Burns case

16   which talks about loss of First Amendment freedoms, even for

17   small periods of time, constitutes irreparable harm.  There's

18   no reason to not extend that to the Second Amendment.  And a

19   lot of the courts have extended that or at least have cited to

20   Elrod v. Burns when they talk about constitutional harms.  So I

21   just wanted to let Your Honor know about that case.

22            THE COURT:  There's never a dull moment, is there?

23            MR. OLSON:  Well, in this case, Your Honor, we've got

24   a whole entire day between now and the holiday weekend, so I

25   feel like we're trying to help, as opposed to a couple weeks

1   ago.

2          THE COURT:  That's right.  So whether it is now or

3   later, and I'm not even trying to remotely suggest -- the one

4   question that I saw, just because it jumped out from the order,

5   was the scope of the relief, at least at the Fifth Circuit

6   motions panel level, was limited to the plaintiffs.  I'm trying

7   to figure what that is if Texas had been one of them.  Is that

8   a geographical scope or is it something else?

9          Mr. Lowenstein, I know I kind of put you on the spot,

10  but that is something I guess I would like to know.  Does that

11  just mean that the rule would be enjoined from being enforced

12  within the State of Texas?  Or is the State of Texas, as a

13  plaintiff in this case, defined as something other than its

14  geographical boundary?

15          MR. LOWENSTEIN:  Well, Your Honor, I think it would

16  depend on the harms that, you know, Texas was able to

17  demonstrate, the irreparable harm that Texas was able to

18  demonstrate.  Now, our position is that Texas has not

19  demonstrated any harms, and I think, you know, as an entity, I

20  think we just heard that Mr. Olson just admitted that Texas

21  never (audio interference) any evidence to support this

22  assertion that any law enforcement agencies that are arms of

23  the State of Texas would somehow be anywhere subject to this

24  rule, that they have any sort of weapons that would be in any

25  way a subject matter of this rule and subject to the NFA.

1          So -- and of course, as I've said and, you know,

2   Texas does not have standing to bring, you know, parens patriae

3   standing on behalf of its citizens against the United States

4   and to challenge a federal agency action.  And so I don't think

5   the scope of the injunction, if applying to Texas, accepting

6   that premise that -- judge's question, would apply in the

7   entire geographic scope of Texas.  It would depend on what

8   harms it's able to demonstrate and substantiate.

9          THE COURT:  Yeah.  And so the question I have, I

10  guess, Mr. Olson, is does it make sense for it to be even a

11  geographical boundary or does it mean Texas citizens?  And how

12  do you define a Texas citizen?  Because they could be anywhere.

13  And so I'm trying to figure out what it is, if it is limited to

14  a state.  Is it geography?  Is it citizenship?  It is

15  residency, I should say?  Domicile?  What?

16          MR. OLSON:  In that instance, Your Honor, it would be

17  residency.  And I think that the Court could avoid it being an

18  overbroad interpretation by simply limiting it to enforcement

19  within the state of Texas.  I think that's both a reasonable

20  read and a way to avoid the impossibility of an overbroad

21  prohibition on anyone's potential to act.

22          I would point out we do have here similar law

23  enforcement questions to what the Court faced in the

24  (indiscernible) case and in the 100-day pause case, where the

25  Court ruled there was in fact a parens patriae standing.  In

1    this case, we have a number of persons within Texas who now, if

2    this rule goes into effect, are going to be considered felons

3    under Texas law, both because of the operation of the ATF rule

4    itself and because of the pressures that puts on Texas to

5    conform its reading of its SBR possession statute to federal

6    law.

7              By putting the State of Texas in that position, by

8    putting it in that sort of (indiscernible) choice of how to

9    enforce its own laws, it's necessarily going to require

10   statewide effects so that the law enforcement officers

11   throughout the state of Texas aren't inadvertently violating

12   somebody's rights and so the state of Texas isn't losing its

13   rights to interpret its own laws to a way that it sees fit.

14             THE COURT:  So you heard Mr. Lowenstein's argument

15   that Massachusetts v. EPA basically did away with parens

16   patriae.  I did make that alternative finding in a case that is

17   currently pending before the Supreme Court.  I know that a

18   Fifth Circuit panel did not stay my opinion, but I don't know

19   that I saw them discuss parens patriae.  I don't know that I've

20   seen anybody buy off on parens patriae as standing since

21   Massachusetts v. EPA.

22             MR. OLSON:  I don't recall seeing any other courts do

23   that, as well, Your Honor.  But I do recall those were the

24   arguments the (indiscernible) used to assess it in the previous

25   case.  And I have not seen anyone explicitly deny parens

```
1   patriae standing.  Mr. Lowenstein might correct me, if he's got
2   a case off the top of his head.  But we're confident that the
3   Supreme Court is going to find standing ultimately in that
4   case.  Whether they agree on the parens patriae ground, whether
5   they agree on the direct injury grounds, we think either way it
6   supports stay-granted relief in this case.
7              THE COURT:  All right.  So then on the direct injury
8   front, you know, with the immigration cases we have kind of
9   a -- you know, we had seen cases go to the Fifth Circuit where
10  affidavits were supplied, costs for driver's licenses and
11  education and emergency care and things like that, there were
12  hard dollars that you could actually see that were in the
13  record.
14             I don't know that I've seen that in this case, the
15  direct -- and maybe I'm overlooking it, if you'd direct me to
16  it.  But assuming that parens patriae does not exist anymore,
17  what are the direct injury numbers that you're talking about on
18  behalf of Texas?
19             MR. OLSON:  As I said, Your Honor, we did not submit
20  that through the preliminary injunction briefing.  We're happy
21  to supplement that with declarations for you, if you'd like.
22  As far as the preliminary injunction went, there we were
23  relying on our friends and our co-plaintiffs, GOA, Mr. Brown,
24  to supply standing.  But it's --
25             THE COURT:  All right.
```

```
1              MR. OLSON:  -- some frustrations -- I'm sorry.

2              THE COURT:  No.  So and that brings the other deal.

3    So basically -- I know that one plaintiff has to -- I mean,

4    standing as to one becomes standing as to all.  However, does

5    that occur in the public/private context?  You know, we've got

6    private plaintiffs who were, you know, much smaller than the

7    entire state of Texas.  Does Texas get to piggyback on standing

8    and irreparable harm off of private plaintiffs?

9              MR. OLSON:  On standing, I would say yes, Your Honor,

10   because there's never been a distinction between public

11   plaintiffs and private plaintiffs for the standings

12   (indiscernible) standard.  As to irreparable harm, I think that

13   would go directly to the factors that the Court has to consider

14   when deciding on the scope of the injunction, whether or not

15   (indiscernible).

16             And here, the irreparable harm, as I was saying, the

17   State was not focused on the dollars and cents costs as it has

18   in the other case, but as in Texas v. EEOC, the State's focused

19   on the injuries (indiscernible) to enforce its own legal code.

20   And that injury is ongoing and irreparable.  And so the

21   enforcement of the rule is stayed or enjoined, that pressure

22   remains and that pressure cannot be remedied.

23             THE COURT:  All right.  Mr. Lowenstein, I know that

24   was a lot for you to process.  Did you want to, I guess,

25   comment on anything that you've heard?
```

1              MR. LOWENSTEIN:  There was a lot there, Your Honor,

2   and I appreciate it.  I guess, taking it in reverse order, the

3   State of Texas cannot piggyback on irreparable harm claims by

4   the plaintiffs.

5              THE COURT:  What about standing?  Before you move on,

6   what about standing?  Do they piggyback -- can a public

7   plaintiff piggyback on a private claim for standing?

8              MR. LOWENSTEIN:  You know, this was -- sorry about

9   that, Your Honor.  This was not something that the parties

10  briefed, and we'd be happy to provide this briefing on that

11  question, Your Honor.  But I know the Supreme Court has said,

12  you know, time and again, that standing is not dispensed in

13  gross.  It's got to be analyzed for every claim, and for every

14  form of relief sought.  And so, you know, I'm not sure that I

15  would agree with the proposition that Texas doesn't have to

16  demonstrate standing to bring its claims and seek all the parts

17  of relief that it seeks.

18              And what it seeks here is a preliminary injunction.

19  It has not even demonstrated irreparable harm, which is a

20  prerequisite to -- and Your Honor, just, if I can, I know you

21  asked about parens patriae standing and I would point the Court

22  to the Government of Manitoba v. Bernhardt.  This is a 2019

23  case from the DC circuit that discusses parens patriae standing

24  at length.  The cite is 923 F3.d 173.  That was a challenge to

25  an agency action, and the Court found that there was no --

1   state did not have the ability to bring parens patriae standing

2   to challenge a federal agency action.

3           THE COURT:  Okay.  All right.  On the irreparable

4   harm, I interrupted you and I apologize.  You were about to go

5   into the irreparable harm that we were talking about with

6   Texas.

7           MR. LOWENSTEIN:  Your Honor, I think I largely said

8   our position, and that is that Texas, in order to obtain

9   preliminary injunctive relief, must demonstrate irreparable

10  harm.  It has not done so here.  There is no evidence in the

11  record of any law enforcement agency that would be impacted by

12  the rule, no compliance costs whatsoever.  And the only other

13  grounds upon which it appears Texas relies on is parens patriae

14  standing by citing, you know, asserting, with no evidence of

15  how its citizens are going to be affected.

16          THE COURT:  All right.  Mr. Lowenstein, moving then

17  to substantial likelihood of success on the merits.  You know,

18  it's hard for me to look at a -- I know it's a motions panel.

19  I would not consider that necessarily binding, but it certainly

20  tells me what the temperature is in that motions panel about

21  the legal arguments on the merits for that element.

22          Do you disagree?  To me, they had to have found on

23  appeal that all four of the elements were satisfied, including

24  substantial likelihood on the merits.  Setting aside standing,

25  setting aside irreparable harm, is it -- it seems to me

1    difficult to ignore the fact that, at least on the merits, the

2    Fifth Circuit has, you know, at least sub silentio addressed

3    that particular prong.

4            MR. LOWENSTEIN:  So, Your Honor, I -- we would agree

5    that that would be a necessary showing for an injunction

6    pending appeal, which the motions panel in that case.  I would

7    just note that, you know, that motions panel reviewed different

8    briefing, different arguments, and a different record in order

9    to issue that decision.

10           Because of the nature that order, which contains no

11   reasoning, no explanation whatsoever, we don't know.  There's

12   no way for us to know (indiscernible) what the motion panel

13   found missing, what the motion panel rationale was.  And so we

14   can't really venture a guess on what its reasoning was for

15   finding a likelihood of success on the merits in that case.

16           THE COURT:  You know, I don't want to make it sound

17   like I'm flipping the burden, but I'm trying to figure out,

18   since the Fifth Circuit is moving quickly -- obviously, you

19   saw -- are you involved in that case, as well, Mr. Lowenstein?

20           MR. LOWENSTEIN:  Your Honor, I'm involved in the Mock

21   case, yes.

22           THE COURT:  Okay.  All right.  So you're aware of the

23   expedited briefing.  I'm kind of trying to figure out when I

24   saw that the -- when the briefing would close.  What is, I

25   guess, the -- the issue -- we're in a grace period right now on

```
 1   enforcing the regulations.  Is that correct?  At least for the

 2   payment amounts?

 3           MR. LOWENSTEIN:  Your Honor, I believe what

 4   Your Honor is referring to is the deadline to register a weapon

 5   with essentially a tax-free --

 6           THE COURT:  Correct.

 7           MR. LOWENSTEIN:  And that is May 31st, I believe.

 8           THE COURT:  Okay.  So that expires May 31st.

 9           MR. LOWENSTEIN:  Well, that is the deadline to file a

10   registration form and to have a tax-free registration, I

11   believe, Your Honor.

12           THE COURT:  Okay.  So there is a tax being imposed as

13   of June 1st then?

14           MR. LOWENSTEIN:  Your Honor, I believe that a

15   possessor who would register a firearm after May 31st would

16   have to pay the $200 tax.  I believe that's correct.

17           THE COURT:  Okay.  Do the plaintiffs, Texas or

18   private plaintiffs, want to weigh in on anything that they've

19   heard?

20           MR. STAMBOULIEH:  Yes, Your Honor.  Stephen

21   Stamboulieh for the private plaintiffs.  I just wanted to bring

22   the Court's attention to a case from North Dakota District

23   Court, West Virginia v. United States EPA.  It's not a code

24   citation, but it's 2023 U.S. District Lexus 64372.  That

25   district court granted a preliminary injunction for a coalition
```

1  of 24 separate states.  This was just sent to me, so I don't

2  know what the opinion is, Judge, but I wanted to --

3          THE COURT:  Is that the one from Judge Hovland?

4          MR. STAMBOULIEH:  Yes, sir.

5          THE COURT:  Okay.  He decided that?  When did he

6  decide that?

7          MR. STAMBOULIEH:  April 12th, 2023.

8          THE COURT:  Okay.  All right.

9          MR. STAMBOULIEH:  What I would like to say, Judge,

10 for -- I know we're talking a lot about Texas because they're

11 (indiscernible) plaintiff, but I would submit to the Court that

12 if the Court (indiscernible) with whether or not Texas is going

13 to have standing, you know, Gun Owners of America is a

14 nationwide organization, you know, hundreds of thousands of

15 members all over the United States.

16          We have irreparable harm with some of our members,

17 especially some of the ones that live in states like New York,

18 Hawaii, California, New Jersey, and the District of Columbia,

19 that purely cannot register their braced pistols as SBRs

20 because then it makes it illegal under state law, because

21 they're not allowed to have them in those states.

22          So those people will just have to either get rid of

23 their guns, otherwise turn them into the ATF, which is never a

24 good thing.  Then, you know, we constantly hear from members.

25 Heard from one this morning, a Marine in Dallas, who, you know,

1  doesn't want to register his gun.  He's been told that the ATF

2  said these are legal or valid.  He's got them.  He doesn't want

3  to register them.

4          And then (indiscernible) it's his prerogative.  The

5  problem is come -- what is it -- seven days from now, he may or

6  may not be a felon, Your Honor.  And I think relying on the ATF

7  for over ten years has got to stand for -- has got to count for

8  something.

9          I mean, I have an AR-15 pistol on my desk right here.

10  I'd be happy to show to the Court.  One of the (indiscernible)

11  irreparable harms for me, Judge -- I think I'm pretty good at

12  firearms law.  I can't look at this (indiscernible) right here

13  and tell the Court if it's in fact an SBR or a brace -- I'm

14  sorry, an SBR or an AR-15 pistol.  It has the standard pistol

15  buffer tube on it, which the ATF in the final rule kind of

16  waffles on back and forth as to, well, it's probably not going

17  to be an SBR if it just has the standard pistol buffer tube and

18  it's necessary for the effective use of the weapon

19  (indiscernible) whatnot.

20          However, the response kind of -- the response from

21  the ATF to the preliminary injunction kind of walked back that

22  a little bit, or I guess maybe waffled it more a little bit,

23  and seemed to suggest that it's not really dispositive if

24  there's just the pistol buffer tube on the back.  So I'm

25  sitting here looking at this and wondering if I'm going to have

1    to register it, because -- as a member of the GOA, as well.

2    And so I think there's some big time irreparable harm and that

3    it's going to apply nationwide, even to the members in Texas.

4    And I think that just further demonstrates the problems with

5    this rule, Judge.

6              THE COURT:  Well, let me ask you this.  Aren't there

7    entities, organizations, that have nationwide scope that are

8    before the Fifth Circuit in the Mock case?  And they limited it

9    to the plaintiffs, and we're trying to figure out what that

10   means.

11             MR. STAMBOULIEH:  That's one of the problems with the

12   briefing in that case, is that we've been very explicit to this

13   Court as to what we're seeking.  And I read the response in

14   that case today, the Fifth Circuit.  And maybe it would be

15   helpful to the Court to see the response (indiscernible).  But

16   they (indiscernible) preliminary injunction up to the Fifth

17   Circuit didn't really clarify what kind of relief they were

18   seeking.

19             And we've been very clear, Judge, as to what kind of

20   relief the GOA plaintiffs are seeking in this case.  That's for

21   a nationwide injunction, just because we have so many members

22   all of the place, Judge.

23             THE COURT:  Well, I'm looking at Judge Boyle's case,

24   for example.  She, in her closing paragraph, says, "The Court

25   grants in part the motion and issues a preliminary injunction

1   as to plaintiffs in this case only."  And I think we're going

2   to have to figure out what that means with Second Amendment

3   Foundation, Inc., who is a plaintiff, and Rainier Arms, LLC,

4   and then there are some individuals.

5          So the question is whether or not that means all the

6   members of it, you know, if they're across the nation.  When

7   you're talking about the scope of your requested relief, are

8   you asking for it nationwide or are you asking for the

9   membership of the organizations?

10         MR. STAMBOULIEH:  We asked for the membership of the

11  organizations.  But Your Honor, that does (indiscernible)

12  nationwide injunction on something like this.  I mean, it would

13  be very difficult to have ATF apply -- which would, you know,

14  make GOA release their membership list, which is not something

15  that I don't think any court (indiscernible) require them to

16  release it, such as this.

17         THE COURT:  I mean --

18         MR. STAMBOULIEH:  That's not something that I

19  think --

20         THE COURT:  That's not the way I would see that

21  happening.  I think what I will see is -- if there's a

22  preliminary injunction and somebody gets in trouble, they would

23  then be able to prove that they're a member on a case-by-case

24  basis if enforcement is sought against them.

25         MR. STAMBOULIEH:  So it would be like an affirmative

1  defense, if I'm understanding you correctly?

2          THE COURT:  Well, I think it would just be saying I'm

3  not violating -- I'm not -- that you can't enforce a rule

4  against me because I'm covered by this injunction.  I don't

5  know that that's an affirmative defense.  You've just

6  established you're covered.

7          MR. STAMBOULIEH:  I trust that ATF -- that they're

8  going to enforce this rule, Judge, come June 1st.  I would like

9  my plaintiffs, the members and supporters of the GOA and GOF to

10  be protected from this enforcement of the final rule.  I don't

11  exactly -- I understand what the Court's saying.  If that's

12  what -- the relief that the Court orders, then, you know, so be

13  it --

14          THE COURT:  I'm not saying that.  I'm trying to

15  figure out the scope.  And it seems to me we need to hear from

16  the Fifth Circuit what they meant when they said, you know, the

17  plaintiffs, and it's an entity.

18          MR. STAMBOULIEH:  I understand that, Judge, and I'm

19  not super familiar with the relief requested from that piece.

20  I think Mr. Lowenstein would probably be a better person to ask

21  as to what they requested and to what SAF requested in Judge

22  Boyle's case, as well, because I'm not familiar with the

23  pleadings in that case, Your Honor.  But I am familiar with

24  ours, and I do know that we asked for nationwide relief.

25          And it could be that in the next couple days that the

1  Fifth Circuit will have something and clarify the scope of that

2  relief; but I'm not sure, Your Honor, that that would control

3  here, because they could have asked for different things,

4  seeing what Fifth Circuit gave them, and tried to expand that

5  injunction -- I'm not saying that that's what they did, Judge,

6  but that's not what we did in the case that's at the bar --

7            THE COURT:  I understand.  But the Fifth Circuit saw

8  fit to limit it to the plaintiffs.  Not everybody in this

9  nation is a member of your organization.

10           MR. STAMBOULIEH:  Right.

11           THE COURT:  So, you know, at best, it would seem that

12 it would be limited to the members of your organization.

13           Mr. Lowenstein, I guess you're a lot more familiar

14 than all of us with what's going on in the Mock case, I guess,

15 on this particular issue, and anything else that you've heard.

16           MR. LOWENSTEIN:  Well, just to make the record clear,

17 in Mock, a nationwide injunction was requested from the Fifth

18 Circuit.  It obviously denied that.

19           I do also want to just clarify that the North Dakota

20 case that was mentioned from -- that is before Judge Hovland, I

21 mean, my friend on the other side cited, that is not the FRAC

22 case that has to do with this rule.  I just want to make that

23 clear.

24           THE COURT:  That's what I thought.  I would have been

25 surprised to have heard that he had ruled on that.  I thought

1    that was still pending.

2            MR. LOWENSTEIN:  That is still pending, Your Honor.

3    You're correct.

4            THE COURT:  Okay.  That's why you saw --

5            MR. STAMBOULIEH:  I'm sorry, Your Honor.

6            THE COURT:  I would have been surprised.  We're

7    tracking as many of these cases that we know about, and I

8    thought -- I thought that was still pending, this particular

9    rule.

10           MR. LOWENSTEIN:  Yes.

11           MR. STAMBOULIEH:  I apologize if I was unclear.

12           MR. LOWENSTEIN:  The preliminary injunction before

13   Judge Hovland in <u>FRAC</u> is still pending.  My friend on the other

14   side was just mentioning, it sounds like, a different case that

15   they've cited in April that doesn't have to do with this rule.

16           THE COURT:  Okay.  It doesn't have to do with this

17   brace.

18           MR. LOWENSTEIN:  This --

19           MR. STAMBOULIEH:  (Indiscernible) --

20           THE COURT:  (Indiscernible) challenge in this case.

21   Okay.  That's all right.  What about the relief -- all right.

22   What does it ask for the Fifth Circuit to clarify about what

23   "plaintiffs" means when there's an entity?

24           MR. LOWENSTEIN:  Your Honor, what was requested -- it

25   seemed like there was three points that were requested for

1    clarification from the plaintiffs in <u>Mock</u>.  With respect to the

2    association or the organizational plaintiff, what was requested

3    was whether or not it applied to members of that organization

4    or just the organization itself.

5            THE COURT:  And that went to the motions panel.  Is

6    that correct?  Is that where --

7            UNIDENTIFIED:  (Indiscernible) --

8            THE COURT:  (Indiscernible) --

9            MR. LOWENSTEIN:  I'm not sure, Your Honor, who will

10   decide that motion for clarification, so I don't want to speak

11   on that.

12           THE COURT:  Okay.  So, to the extent that I am

13   entertaining something similar to what Judge Boyle did, you

14   know, it seems to me that it would be helpful to know what the

15   Fifth Circuit is going to do.

16           Mr. Olson, I think it would be helpful for me to get

17   clarity on the standing and the irreparable harm for Texas and

18   what it means to be "Texas" as a plaintiff in this case.

19           MR. OLSON:  Yes, Your Honor.

20           THE COURT:  Is that clear?  I mean, based on the

21   discussions we've had, you understand what I'm asking.

22           MR. OLSON:  Yes, Your Honor.  And I --

23           THE COURT:  And I would ask all of the other parties,

24   also, Mr. Lowenstein, particularly you, to weigh in on those

25   issues, as well.  What does it mean if it is granted as to a

1  plaintiff and the plaintiff is the State of Texas?  Is it

2  geography?  Is it citizens?  Is it domiciles?  Is it something

3  else?  What are we talking about?

4          And same thing for the membership of the entity, the

5  organization.  Basically, the same question before the Fifth

6  Circuit.

7          MR. LOWENSTEIN:  And Your Honor, just as a point of

8  clarification, would it be most helpful to provide that as

9  briefing?  And if so, would -- you know, our request would be

10  that it be standard briefing, that we would be able to respond

11  to whatever it is that Texas files, so that we're not speaking

12  past each other or so that, you know, we're not responding to

13  arguments that they do not make.

14          THE COURT:  Well, you know, why don't we do this?

15  What day of the week is this?  It's Thursday.  All my days are

16  running together.  So Monday, of course, is the holiday.  I

17  don't want to step on that as much as possible.  Is it possible

18  for everybody -- everybody to weigh in at once by close of

19  business Wednesday, and to reply by the end of the week?

20          MR. STAMBOULIEH:  If I could, Judge, just for the

21  private plaintiffs, that would kick us over to June 2nd, which

22  means that we would have hit the harm that's going to befall

23  our members, because that would be June -- let me look at my

24  calendar -- yes, sir, June 2nd.

25          THE COURT:  All right.  Then why don't we have -- all

```
 1   right.  Everybody can thank the individual plaintiffs for this.

 2   Now it's going to be Tuesday, the 30th.  And then why don't you

 3   respond by the next day, 31st.  I'd like to get everybody's

 4   candid, you know, unfiltered thoughts, or unresponsive to each

 5   other's arguments thoughts as to those, and anything else that

 6   you'd like to opine on, basically dealing with the impact of

 7   Mock and now with the Second Amendment Foundation case that --

 8   Judge Boyle's order, by the end of business on Tuesday, and

 9   then respond by the close of business the next day.

10            MR. STAMBOULIEH:  And that would be -- close of

11   business is 5 p.m. Central time, Judge?

12            THE COURT:  That's correct.  5 p.m. on May 31st.

13            MR. STAMBOULIEH:  And one other point of

14   clarification, Judge.  I've asked too many questions here.  Is

15   there any limit, like five pages, ten pages?

16            THE COURT:  I don't particularly care.  And it

17   doesn't need to be formal or pretty.  It just needs to be

18   informative.  I don't care if it's a letter, just something

19   that tells me what you think.

20            MR. STAMBOULIEH:  Perfect.  And you want that filed

21   on the docket, sir?

22            THE COURT:  Please.  And if you want to file it

23   early, that's fine.  Let me just ask.  Does that schedule work

24   for everybody?

25            MR. OLSON:  I was going to ask to clarify,
```

```
 1    Your Honor.  Did you want all of us to file our first takes,

 2    and then respond the next day to what the other side files?

 3              THE COURT:  To the extent you find it necessary, yes.

 4    That was -- to the extent you find it necessary.  I'm not

 5    begging for responses.  I'm just saying if you see something

 6    that you disagree with or think needs -- that isn't dealt with

 7    in your primary filing.

 8              MR. OLSON:  I was just going to say, Your Honor, that

 9    Texas also would like to make sure that this is done -- before

10    you -- before the date rolls around.  So if you're simply

11    seeking something from the plaintiffs and then the federal

12    defendants, we'd be happy to have something to you by close of

13    business tomorrow, if that will help the federal defendants get

14    a response by close of business on Tuesday.  But if you'd like

15    everyone to file their responses, I'm not going to put

16    Mr. Lowenstein on the spot and ask him to --

17              THE COURT:  Yeah.  I imagine Mr. Lowenstein's life is

18    fairly busy right now, so -- Mr. Lowenstein, from a briefing

19    perspective, what is, I guess, the easiest for you?

20              MR. LOWENSTEIN:  Your Honor, what Your Honor proposed

21    filing, you know, our initial take on these issues on Tuesday,

22    and then responding to anything necessary on the 31st I think

23    is probably a more reasonable proposal.

24              THE COURT:  Okay.  Given the fact that that's that

25    May 31st cutoff, I will modify it a little bit.  If you would
```

1  file your initial takes on May 30th by noon Central time, and

2  responses within 24 hours, by noon the following day.  So that

3  give you the same 24 hours, but I just want to make sure that

4  we've got, you know, time to process it and do whatever we're

5  going to do by the close of business on May 31st.

6          All right.  Well, thank you very much.  I know there

7  was short notice and there's a lot of moving parts and pieces,

8  and it's been very helpful, and I look forward to seeing what

9  the parties have to say.

10         MR. OLSON:  Thank you, Your Honor.  We appreciate it.

11         THE COURT:  All right.  Thank you.

12         MR. LOWENSTEIN:  Thank you, Your Honor.

13         THE COURT:  Have a good day.

14         MR. STAMBOULIEH:  Thank you, Judge.

15     (Proceedings concluded at 4:20 p.m.)

16                        *  *  *  *  *

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Michelle Costantino, court-approved transcriber,

4  hereby certify that the foregoing is a correct transcript from

5  the electronic sound recording provided for transcription and

6  prepared to the best of my ability.

7

8

9  _____          DATE:   June 2, 2023

10  MICHELLE COSTANTINO, AAERT NO. 589

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25