United States District Court
Southern District of Texas
**ENTERED**
October 27, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, and BRADY BROWN, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:23-CV-00013 |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, U.S. DEPARTMENT OF JUSTICE, and STEVEN M. DETTELBACH, Director of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity, | § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

In the early 20th century, Congress sought to regulate what it perceived to be a dangerous subset of firearms in an effort to curb organized crime.  To that end, Congress first passed the National Firearms Act of 1934 ("NFA") and later the Gun Control Act of 1968 ("GCA").  These statutes remain two of the primary means for regulating and licensing firearms at the federal level.  They impose heightened requirements on the manufacture, sale, and transfer of certain firearms, including short-barreled rifles ("SBRs").  That is important in this case because pistols, revolvers, and handguns are not subject to those enhanced requirements.

Since 2012, however, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has seen a dramatic increase in the use of stabilizing braces on handguns.  These

braces were originally designed to assist people with disabilities, or mobility or strength issues so that they could safely handle heavy handguns.  Over time, some of these stabilizing braces have taken on a new function and appearance and have morphed into what looks like a shoulder stock.  As a result, handguns with those stabilizing braces attached now look like a rifle.

In January 2023, the ATF promulgated a Final Rule that modified the ATF's earlier regulations addressing how the agency would determine whether a weapon is a "rifle" for purposes of the NFA and GCA.  One of the primary changes involves whether a handgun is transformed into an SBR when certain stabilizing braces are attached.  So, the Final Rule instituted a six-part test for making this determination.

Plaintiffs have sued to invalidate the Final Rule alleging that it violates the Administrative Procedure Act and the United States Constitution.  Plaintiffs allege that the Final Rule places law abiding citizens at risk of unwittingly becoming felons overnight.  Plaintiffs ask for a preliminary injunction to prevent the rule from going into effect.  Specifically, Plaintiffs request a nationwide injunction on the rule to maintain the status quo ante prior to the Final Rule's promulgation at the start of the year.

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction.  (Dkt. No. 16).  For the following reasons, the Court **GRANTS IN PART** the Motion.

## I.    BACKGROUND

This case challenges an agency's final rule.  Therefore, the regulatory history of the Final Rule is an integral part of the Court's analysis.  The Court will review the relevant

statutes from which the ATF derived its authority to promulgate this Final Rule in order to understand its impact and decide whether a preliminary injunction is appropriate.

## A. STATUTORY HISTORY

In 1934, Congress passed the NFA. 26 U.S.C. §§ 5801–5872. The NFA was Congress's introduction to firearm regulation and "concentrated on particularly dangerous weapons and devices such as machine guns, sawedoff shotguns and silencers." *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002) (citing *Sonzinsky v. United States*, 300 U.S. 506, 511–12, 57 S.Ct. 554, 554–55, 81 L.Ed. 772 (1937)). To ensure that it covered only the most dangerous class of weapons, the NFA identified eight categories of "firearms" that the statute would regulate. *See* 26 U.S.C. § 5845(a).

The dispute in this case concerns two categories of firearms commonly referred to as SBRs. *Id.* § 5845(a)(3), (4). These two subsections describe an SBR as "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* The NFA also defines a rifle:

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and *made or remade* to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.[1]

---

[1] The GCA uses the same definition of rifle. *See* 18 U.S.C. § 921. Thus, any rules promulgated by the ATF that affect this definition implicate both the NFA and the GCA. This lawsuit, however, focuses primarily on the effects under the NFA.

*Id.* § 5845(c) (emphasis added).  The "made or remade" phrasing within the definition is construed broadly.  Specifically, the NFA defines "make" to include "manufacturing . . ., putting together, *altering*, any combination of these, or otherwise producing a firearm." *Id.* § 5845(i) (emphasis added).  Taken together, these portions of the NFA mean that a rifle—which alone would not be regulated by the NFA—can be put together or altered by its owner in a way that renders it an SBR, subject to the NFA.

To be clear, the NFA does not ban SBRs—it regulates them.  Such regulations require, *inter alia*, (1) requesting permission to create the SBR, (2) paying a $200 tax for every approved SBR made by an unlicensed person, (3) registering the SBR in the National Firearms Registration and Transfer Record, (4) and placing a serial number on the SBR.  26 U.S.C. §§ 5821, 5822.  Making or possessing an SBR in violation of any of these requirements is a crime.  *See* 26 U.S.C. § 5871.  And if charged with violating the statute, an offender could face up to 10 years in prison, up to $250,000 in fines, or both. *Id.*; 18 U.S.C. § 3571(b)(3).  Therefore, whether a specific modification to a firearm would convert it into an NFA-regulated SBR has tremendous ramifications for actual and prospective gun owners alike.

The power to enforce and administer the NFA is vested in the U.S. Attorney General.  18 U.S.C. § 926(a).  The Attorney General has delegated that responsibility to the ATF.  *See* 28 C.F.R. § 0.130.  Specifically, the ATF has the power to issue regulations, i.e., the ATF can publish interpretations of Congress' various gun statutes and offer explanations on how gun owners can best comply.  *See* 27 C.F.R. pts. 478, 479.  Moreover, the ATF has also made a practice of taking "classification requests," in which firearm

4

manufacturers and members of the public can "submit weapons or other devices to the ATF for a classification of whether the weapon or device qualifies as a 'firearm' under the NFA." *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NLG35G.

Near the end of 2020, the ATF turned its attention to a class of pistol attachments generally described as stabilizing braces. (Dkt. No. 22 at 22–23). Namely, the ATF grew concerned after "receiv[ing] an increasing number of classification requests for weapons equipped" with brace attachments resembling "characteristics common to shoulder stocks." (*Id.* at 21).

In January 2023, the ATF addressed its concerns with its newest rule, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" (the "Final Rule"). 88 Fed. Reg. 6478 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478, 479). The Final Rule sought to clarify the ATF's interpretation of "rifle," as defined in the NFA. 88 Fed. Reg. at 6574–75 (amending 27 C.F.R. §§ 478.11, 479.11). Under the Final Rule, the phrasing in the NFA's definition of rifle, "designed or redesigned, made or remade, and intended to be fired from the shoulder," would now be read even more broadly than before, including:

> a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder[.]

*Id.* at 6480. If a weapon after production or modification fits this description, the Final Rule then employs six factors to determine whether the weapon is now converted into a rifle under the NFA. *Id.* These factors include:

> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id.* "If a firearm with an attached 'stabilizing brace' meets the definition of a 'rifle' based on the factors indicated in this final rule, then that firearm could also be a short-barreled rifle depending on the length of the attached barrel, thus subjecting it to additional requirements under the NFA[.]" *Id.* While the ATF does not elaborate on how this rubric will operate, e.g., whether each factor is weighted the same or some more than others, the effects of the rubric are clear—almost every time a weapon is evaluated under this new framework, it will be classified as a rifle. For example, in its "Final Regulatory Impact Analysis," regarding the Final Rule, the ATF estimates there would be only "1 percent of 'stabilizing braces' that, when attached to [a] firearm, would not result" in a rifle subject to the NFA. (Dkt. No. 16-9 at 21). The Fifth Circuit has also noted that after promulgating

6

the Final Rule, the ATF has not issued a single example of a "pistol with a stabilizing brace that would constitute an NFA-exempt braced pistol." *Mock v. Garland*, 75 F.4th 563, 575 (5th Cir. 2023).

The ATF estimates in its Final Regulatory Impact Analysis that the Final Rule converted 2,970,000 weapons to NFA-regulated SBRs. (Dkt. No. 16-9 at 21). For this group of affected gun owners, the Final Rule proposed five different avenues for compliance. First, they could "[r]emove the short barrel and attach a 16-inch or longer rifled barrel to the firearm, thus removing it from the scope of the NFA." 88 Fed. Reg. at 6570. Second, the owners could register the firearm as an SBR. *Id.* This option would also be exempt from the $200 "marking tax" that the NFA traditionally requires. *Id.* at 6571. Third, the stabilizing brace could be "permanently" removed, disposed of, or altered so that it could never be re-attached. *Id.* at 6570. Fourth, the newly minted SBR owners could simply turn their weapon over to the ATF. *Id.* And fifth, the owner could destroy their firearm. *Id.* As defined by the ATF, destruction of a firearm means rendering the weapon "not restorable to firing condition and . . . otherwise reduced to scrap." *How to Properly Destroy Firearms*, Bureau of Alcohol, Tobacco, and Firearms and Explosives, https://www.atf.gov/firearms/how-properly-destroy-firearms (last visited October 27, 2023).

The Final Rule went into immediate effect on January 31, 2023. 88 Fed. Reg. at 6480. However, gun owners were given a grace period, until May 31, 2023, to choose which compliance method, if any at all, they wished to pursue. *Id.* at 6570.

### B.   PROCEDURAL HISTORY

Shortly after the Final Rule was rolled out, Plaintiffs filed this action against Defendants the ATF, the United States Department of Justice, and Steven M. Dettelbach, the Director of the ATF, in his official capacity.  (Dkt. No. 1).  Plaintiffs are comprised of an individual—Brady Brown; two non-profit corporations—Gun Owners Foundation ("GOF") and Gun Owners of America ("GOA"); and the State of Texas.  (*Id*. at 6–12).  Plaintiffs' suit alleges that the Final Rule violates the Administrative Procedure Act ("APA") and violates the Constitution in a myriad of ways.  (*Id*. at 43–131).

Shortly after filing the lawsuit, Plaintiffs requested a preliminary injunction, arguing that the Final Rule: (1) exceeds the ATF's statutory authority, (2) violates the Second Amendment, (3) unconstitutionally taxes the exercise of a constitutional right, (4) violates the Fifth Amendment, (5) is not a proper exercise of Congress' taxing power, (6) is arbitrary and capricious, and (7) was not a logical outgrowth from the notice of proposed rulemaking ("NPRM").  (Dkt. No. 16 at 15–28).  Defendants timely responded, (Dkt. No. 22), and notified the Court of a recently decided Northern District of Texas order on the same issue.  *See Mock v. Garland*, No. 4:23-CV-00095, ____ F. Supp.3d. ____, 2023 WL 2711630 (N.D. Tex. Mar. 30, 2023), *rev'd and remanded*, 75 F.4th 563 (5th Cir. 2023).  In that order, the court denied a preliminary injunction against enforcement of the same Final Rule challenged here.[2]  (Dkt. No. 25).

---

[2]     *Mock* is not the only other case challenging this Final Rule.  At this time, the Court is aware of at least eight additional challenges to the Final Rule across the country.  *See Second Amend. Found. v. ATF*, No. 3:21-CV-00116 (N.D. Tex.) (Boyle, J.); *Britto v. ATF*, No. 2:23-CV-00019 (N.D. Tex.) (Kacsmaryk, J.); *Texas Gun Rights v. ATF*, No. 4:23-cv-578 (N.D. Tex.) (O'Connor, J.); (continue)

In *Mock*, the district court denied a substantially similar motion for preliminary injunction. *See* 2023 WL 2711630 at *8. The *Mock* plaintiffs appealed and sought emergency injunctive relief in the interim. *See Mock v. Garland*, No. 23-10319, Dkt. No. 25 (5th Cir. May 17, 2023). In response, a motions panel for the Fifth Circuit enjoined the Final Rule pending expedited appellate review of the district court's decision. No. 23-10319, Dkt. No. 52 (5th Cir. May 23, 2023). Because this case involves many of the same challenges brought by the *Mock* plaintiffs, this Court granted in part Plaintiffs' request for preliminary injunction "pending resolution of the expedited appeal in *Mock v. Garland*." (Dkt. No. 51 at 7).

The Fifth Circuit has now ruled. *See Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023). In *Mock*, the Fifth Circuit reversed the district court's denial of an injunction, finding that "plaintiffs will likely succeed on the merits of their Administrative Procedure Act ('APA') challenge." *Id.* at 567. The Fifth Circuit found that the Final Rule was not a logical outgrowth of the NPRM, but it refrained from ruling on the other factors necessary for a preliminary injunction and remanded the case for consideration of those remaining factors. *Id.* After a status conference to discuss the impact of *Mock* on this case, the Parties filed supplemental briefing on Plaintiffs' Motion for Preliminary Injunction.[3] (Dkt. Nos. 73–75). Plaintiffs' Motion is now ripe for review.

---

*Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 3:23-cv-01471 (N.D. Tex) (Lindsay, J.); *Watterson v. ATF*, No. 4:23-CV-00080 (E.D. Tex.) (Mazzant, J.); *Colon v. ATF*, 8:23-cv-00223 (M.D. Fla.) (Stenson Scriven, J.); *FRAC v. Garland*, No. 1:23-CV-00024 (D.N.D.) (Hovland, J.); *Miller v. Garland*, No. 1:23-CV-00195 (E.D. Va.) (Alston, J.).

[3] After remand, the district court granted the preliminary injunction. *Mock v. Garland*, No. 4:23-CV-00095, ____ F. Supp.3d ____, 2023 WL 6457920 (N.D. Tex., Oct. 2, 2023).

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. ____, ____, 138 S.Ct. 1942, 1943, 201 L.Ed.2d 398 (2018) (quotation omitted).  Indeed, the decision to grant a preliminary injunction is "to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).  Thus, "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008) (quotation omitted).  And in determining whether injunctive relief is proper, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

A preliminary injunction "issue[s] only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  As such, "[t]he party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated" for a preliminary injunction to be granted.  *Id.*  The last two factors, "harm to the opposing party and weighing the public interest[,] merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009).

"[N]one of the [] prerequisites has a fixed quantitative value."  *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).  "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."  *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307 (5th Cir. 1974)).  For instance, "a preliminary injunction does *not* follow as a matter of course from a plaintiff's showing" of the first element, "a likelihood of success on the merits."  *Benisek*, 585 U.S. at ____, 138 S.Ct. at 1943–44 (emphasis added).  Thus, federal courts must consider whether the movant has established the three other elements as well for a preliminary injunction to issue.  *Id.* at ____, 138 S.Ct. at 1944.

## III.   DISCUSSION

Before the Court can reach the merits of Plaintiffs' Motion, the Court first revisits Plaintiffs' standing.

### A.   STANDING

To establish Article III standing, plaintiffs bear a burden to demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).  Regarding the weight of that burden, the Supreme Court has explained that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).  Thus, "[a]t earlier stages of litigation . . . the manner

and degree of evidence required to show standing is less than at later stages." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), as revised (Oct. 30, 2020). Here, "[a]t the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Id.*

The Court finds that the latter two standing requirements of traceability and redressability are comfortably satisfied in this case. This is because any injuries suffered by Plaintiffs are attributable to the implementation of the Final Rule, and the requested relief here—an order enjoining and, ultimately, vacating the Final Rule—would remedy the alleged injury.[4] The only standing element in serious dispute is the first—injury-in-fact. Thus, the Court must decide whether Plaintiffs have clearly shown that they have suffered or will suffer "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136). The Court discusses each Plaintiffs' standing separately.[5]

---

[4]     It is worth noting that Defendants do make one traceability argument. Defendants argue that any harm claimed by the Plaintiffs would be attributable solely to the NFA—not the Final Rule. (Dkt. No. 22 at 27). Therefore, according to Defendants, Plaintiffs grievances are more properly aimed at the NFA, as opposed to the Final Rule. (*Id.*). The Court is not persuaded. While the NFA is the statute which sets out the heightened regulations of consequence and penalties for non-compliance, the weapons that give rise to this suit would not be subject to the NFA *but-for* the Final Rule. Thus, the Final Rule going into effect is causing harm to the Plaintiffs for Article III purposes.

[5]     When multiple plaintiffs seek the same form of relief, generally only "one plaintiff must have standing to seek each form of relief requested." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). However, because the Court deems party-specific injunctive relief to be the most proper remedy to Plaintiffs' motion, each party must have Article III standing to be entitled to such relief. *See VanDerStok v. Garland*, No. 4:22-CV-00691, 2023 WL 4539591, at *9 (N.D. Tex. June 30, 2023) (explaining that party-specific injunctive relief should not be granted to parties that have not "independently demonstrate[ed] standing").

1.     **Brady Brown**

Plaintiff Brady Brown alleges that he is injured by the ATF's Final Rule because it impermissibly broadens the NFA's definition of "rifle," thereby subjecting several of his firearms to new, heightened regulations.  The Supreme Court has spoken to this sort of alleged injury.  In *Lujan*, it explained that:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. *If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.*

504 U.S. at 561–62, 112 S.Ct. 2137 (emphasis added).  "It follows from *Lujan* that if a plaintiff is an object of a government regulation, then that plaintiff ordinarily has standing to challenge that regulation."  *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014).  Therefore, Brown's ability to demonstrate injury-in-fact hinges on whether he is covered by the ATF's regulation—the Final Rule.

Plaintiff Brown's Declaration, (Dkt. No. 16-14), which is not controverted, is sufficient to establish that he is likely regulated by the Final Rule.  Brown's Declaration states that, in his personal capacity,[6] he lawfully possesses at least one "AR-15 style

---

[6]     Brown also owns a business inventory of weapons—including at least one more firearm and stabilizing brace that would be subjected to NFA regulation under the Final Rule.  (Dkt. No. 16-14 at 2).  Brown alleges that even in his capacity as a firearms dealer, the Final Rule renders him unable to lawfully transfer the offending firearms to another dealer.  (*Id.*).  A regulatory action which threatens a movant's ability to sustain his business can, in some cases, constitute irreparable harm.  *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th (continue)

firearm in pistol configuration equipped with a stabilizing brace" that would now constitute an SBR under the Final Rule.  (*Id.* at 2).  And compliance with the Final Rule will almost always require time expenditures and various compliance costs.  *See infra* III.B.2.a.  Thus, Brown would suffer injury-in-fact under the Final Rule and, therefore, has Article III standing to request injunctive relief.

### 2.   GOA and GOF

Plaintiffs GOA and GOF are non-profit organizations who bring this suit and request injunctive relief on behalf of their members and supporters.  (Dkt. No. 1 at 8); (Dkt. No. 16 at 31); (Dkt. No. 16–13 at 2).  Defendants challenge whether GOF has sufficiently alleged that it is a membership organization that can bring claims on behalf of its members.  (Dkt. No. 47 at 6).  Defendants also contest whether both organizations have sufficiently alleged facts to support associational standing at all.  (Dkt. No. 47 at 5– 11).

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members."  *Texas v. Nuclear Regul.*

---

Cir. 1989).  However, because Brown has standing in his personal capacity, standing due to his business-incurred costs need not be addressed.

*Comm'n*, 78 F.4th 827, 836–37 (5th Cir. 2023).   In situations where a representational plaintiff is not a traditional member-organization, the court will "exalt form over substance . . . for purposes of determining Article III standing" and treat it as a membership organization as long as it meets "the indicia of membership test." *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828–29 (5th Cir. 1997) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345, 97 S.Ct. 2434, 2442, 53 L.Ed.2d 383 (1977).  This test seeks to determine whether the entity "represents [its 'members'] and provides the means by which they express their collective views and protect their collective interests."  *Id.* at 828 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344–45, 97 S.Ct. 2434, 2441–42, 53 L.Ed.2d 383 (1977)).

One way to apply the indicia of membership test is to look at whether nonstandard members "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (citing *Hunt*, 432 U.S. at 344–45, 97 S.Ct. at 2442).   However, the Supreme Court has recently clarified that when "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates" in order to sufficiently meet the test. *Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201, 143 S.Ct. 2141, 2158, 216 L.Ed.2d 857 (2023).

GOA and GOF do not assert claims on their own behalf as organizations.   Rather, they assert claims on behalf of their "more than two million members and supporters across the country," (Dkt. No. 1 at 8); (Dkt. No. 16-13 at 2), so they are subject to an

"associational or representational standing" analysis. *Friends of the Earth,* 129 F.3d at 828. GOA is "a non-profit membership organization . . . formed in 1976 to preserve and defend the Second Amendment rights of gun owners." (Dkt. No. 16-13 at 2). GOF is "a non-profit legal defense and educational foundation . . . supported by gun owners across the country[.]" (*Id.* at 2). As for their respective purposes, both organizations purport to preserve and defend the rights of gun owners under the Constitution.[7] (*Id.* at 3). According to their Senior Vice President, "GOA and GOF routinely litigate cases across the country in furtherance of their mission, on behalf of their members and supporters in various states." (*Id.* at 3). Many of GOA and GOF's members and supporters, which include individuals as well as industry members, "currently own pistols equipped with stabilizing braces [and are effected by] the Final Rule in various ways." (*Id.* at 3).

GOA and GOF assert their claims as though they are the same kind of entity. Defendants point out, however, that GOA is a membership organization while GOF is not. (Dkt. No. 47 at 5–6). As such, the Court first looks to whether GOF satisfies the indicia of membership test before it proceeds to whether GOF can assert associational standing. GOF did not provide explicit information regarding its organizational structure and whether its supporters elect or serve as its leadership. It did, however, assert that it is a 501(c)(3) non-profit, (Dkt. No. 16-13 at 2), which means that it is a mission-driven organization financed by supporter or member donations, *see* 26 U.S.C §§

---

[7]     Although not explicitly stated, these two organizations appear to have ties to each other as they share the same Senior Vice President and always refer to their actions, litigation, and members in the collective. (*See* Dkt. No. 16-13).

501(c)3, 509. In other words, it is likely that GOF's nonstandard members do finance the organization's activities and litigation costs. However, GOF has not defined the scope of who it considers to be its "supporters," and it is not this Court's role to operate on inferences or to impose an arbitrary scope on who those supporters might be. As such, GOF has failed to allege an identifiable set of members. Despite not being a membership organization, GOF could have representational standing on behalf of its supporters, but the Court finds that it has not sufficiently identified them here. Therefore, GOF has not satisfied the indicia of membership test as is required to have standing for a preliminary injunction.

Turning to GOA, Defendants do not contest that GOA is a membership organization, but rather argue that GOA fails to satisfy the elements of associational standing. (Dkt. No. 47 at 5–11). The Court disagrees.

First, many of GOA's members are simlar to Plaintiff Brown in that they are individuals or businesses who own weapons whose classification was altered by the Final Rule and who are now subject to injuries stemming therefrom. *See supra* III.A.1. Consequently, GOA's members would undoubtedly have standing in their individual capacities, satisfying the first prong of associational standing. Next, GOA's organizational mission is to litigate when laws affect gun owners, and here they filed suit to invalidate a federal regulation that reclassifies their members' weapons and subjects those weapons to heightened regulation. In other words, the interests that GOA seeks to protect in this lawsuit are germane to the purpose of the organization. Finally, because the claims asserted and relief requested involve invalidating a federal regulation based

on theories that do not require individualized proof, individual participation by GOA's members and supporters is not required to allow the claims to proceed.  In sum, the Court finds that GOA meets all the requirements for associational standing.

### 3.  <u>The State of Texas</u>

Although Texas does not spend much of its briefing responding to Defendants' standing arguments, the Court understands Texas to argue that the Final Rule would cause Texas (1) sovereign injury, (2) quasi-sovereign injury, and (3) nonrecoverable compliance costs.  (Dkt. No. 29 at 38–39).  In its May 31 Order, this Court previously rejected Texas's arguments regarding its alleged sovereign and quasi-sovereign injuries. (Dkt. No. 51 at 4–5).  The Court sees no reason to depart from its earlier ruling as to these arguments.  However, also in its May 31 Order, the Court found that Texas had standing due to the nonrecoverable compliance costs that the Final Rule would impose.  The Court reasoned that Texas would suffer injury in the form of compliance costs incurred by its agencies—e.g., state law enforcement—being forced to comply with the Final Rule.  (Dkt. No. 51 at 5).  In reaching this conclusion, the Court noted that injury via compliance costs is often recognized in the context of government defendants who enjoy sovereign immunity from monetary damages.  *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (holding that "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs") (emphasis in the original).  With the benefit of time and supplemental briefing, the Court now reevaluates whether Texas

18

has provided evidence of an injury-in-fact in the form of nonrecoverable compliance costs.[8]

To establish standing for preliminary injunction purposes, Texas must make "a clear showing" of injury-in-fact under the Final Rule. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). In proving up its alleged compliance costs, Texas fails to make a "clear showing," and instead, asks the Court to speculate. Texas initially argued that its state law enforcement officers who "possess previously legal handguns with stabilizing braces will have to expend resources to register those weapons." (Dkt. No. 16 at 29–30). However, Defendants pointed out that Texas had not submitted any actual evidence to "substantiat[e] the allegation that any of its law enforcement agencies possess pistols with stabilizing braces in their inventories." (Dkt. No. 22 at 60). Texas did not address this point in its Reply. (Dkt. No. 29).

At this juncture, Texas has not even stated, let alone provided concrete evidence, that any of its law enforcement agencies actually own a braced pistol subject to the Final Rule. And according to Texas, it does not need to. (Dkt. No. 45 at 5). Because the ATF estimates that there are at least three million attached braces in circulation, Texas asks the Court to "find as a commonsense matter that Texas is highly likely either now or in the future to incur compliance costs as a result of the rule." (*Id.*). Essentially, Texas argues

---

[8]     Throughout the briefing, each Party seems to conflate the injury-in-fact standing requirement with the irreparable harm showing required for a preliminary injunction. At this stage of the case, the Court agrees that they are essentially two sides of the same coin. Compliance costs, regardless of who suffers them, will not be recoverable because Defendants are protected from monetary damages by sovereign immunity. *See* 5 U.S.C. § 702. Thus, any finding of injury-in-fact due to compliance costs would also support a finding of irreparable harm, and vice versa.

that because so many braces exist, surely at least one brace is owned by a Texas law enforcement agency.  The Court rejects Texas's request to infer harm; this does not constitute a "clear showing" of an injury.  Texas has failed to meet its Article III burden of establishing injury-in-fact under the Final Rule in order to merit injunctive relief.

The Court notes that this is only the preliminary injunction stage of this case. Accordingly, any Party will be able to supplement the record with actual evidence satisfying the standing requirement at the final merits stage.

**B.    PRELIMINARY INJUNCTION**

The Court will next evaluate the merits of Plaintiffs' Motion by working through the four preliminary injunction factors articulated by the Fifth Circuit.  *Clark*, 812 F.2d at 993.

**1.    <u>Substantial Likelihood of Success</u>**

The first inquiry is whether a Plaintiff that has standing has established a substantial likelihood of prevailing on the merits.  *Id.*  The Fifth Circuit has already decided "that the Final Rule fails the logical-outgrowth test and violates the APA."  *Mock*, 75 F.4th at 578.  Because that holding pertained to the ATF's rulemaking process, any plaintiff challenging the Final Rule on APA grounds in the Fifth Circuit has the same likelihood of success.[9]  Therefore, Plaintiffs have a substantial likelihood to succeed on the merits of their logical-outgrowth claim.

---

[9]    Both parties agree that the Court is bound by the Fifth Circuit's decision in *Mock v. Garland*.  (Dkt. No. 73 at 5); (Dkt. No. 74 at 1).

Plaintiffs argue in their supplemental briefing that the Court's analysis should not stop there and should address the remaining grounds for setting the Final Rule aside. (Dkt. No. 73 at 5).  Defendants respond that evaluating other grounds would run contrary to "[f]undamental rules of judicial restraint."  (Dkt. No. 74 at 2).  At this stage of the litigation, the Court agrees with Defendants.

"It goes without saying that constitutional questions should be avoided if there are independent 'ground[s] upon which the case may be disposed of.'"  *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 235 (5th Cir. 2012) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936)).  Since the Fifth Circuit has already decided that the Final Rule violates the APA, it would be improper for this Court to now evaluate constitutional issues.  Further, the Supreme Court has encouraged lower courts to avoid expending "'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–37, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).  A finding that any of Plaintiffs' additional claims are likely to succeed on the merits would not affect the Court's analysis regarding whether to issue a preliminary injunction.

Again, this case is only at the preliminary injunction phase.  Should the case be in a different posture at the final merits stage, the Court may find it appropriate to address the additional claims brought by Plaintiffs at that time.

### 2.   Irreparable Harm[10]

Plaintiff Brown, according to his declaration, personally owns at least one "AR-15 style firearm in pistol configuration equipped with a stabilizing brace" that would now constitute an SBR under the Final Rule.  (Dkt. No. 16–14 at 2).  Plaintiff Brown also owns a business inventory consisting of at least one more such firearm.  (*Id.*).  Plaintiff GOA is a non-profit organization who, in this suit, represents the interests of its members and supporters.[11]  (Dkt. No. 16–13 at 2).   GOA exists to advocate for the Second Amendment rights of its members and supporters, and "routinely litigate[s] cases across the country in furtherance of [its] mission." (*Id.* at 3).   These members and supporters include gun owners across the nation, some of whom "purchase, transfer, possess, own, customize, accessorize, and utilize" stabilizing braces or weapons equipped with stabilizing braces. (*Id.*).   Absent an injunction, the Court finds that Brown and the similarly situated individuals represented by the GOA would be forced to comply with the Final Rule and therefore suffer irreparable harm.

"A showing of irreparable harm requires a demonstration of 'harm for which there is no adequate remedy at law.'" *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th

---

[10]    Having found that only Plaintiffs Brown and GOA have established standing, the Court will not address possible harms to the other Plaintiffs.

[11]    The Government seems to insist that GOA must assert exactly which individuals are being represented and how each of them are being irreparably harmed.  (Dkt. No. 47 at 5).  The Supreme Court has rejected this requirement.  *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 116 S. Ct. 1529, 1532, 134 L. Ed. 2d 758 (1996) (explaining that "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" (cleaned up)).

Cir. 2013)).  Harm is generally irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (cleaned up).  And in lawsuits arising from potentially invalid federal rules and regulations, the federal government "generally enjoy[s] sovereign immunity for any monetary damages." *Wages & White Lion Invs.*, 16 F.4th at 1142.  Thus, in the Fifth Circuit, "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."  *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023).

Under the Final Rule, compliance will almost always come at a cost.  When the Fifth Circuit sent *Mock* back to the district court, the court evaluated the irreparable harm, if any, that several private plaintiffs in the case would suffer.  *Mock*, 2023 WL 6457920, at *7.  Because the *Mock* plaintiffs owned firearms and stabilizing braces that the Final Rule would classify as an SBR, the plaintiffs had "no trouble establishing a substantial threat of irreparable harm in the form of nonrecoverable compliance costs."  *Id*.  That logic is equally applicable here.

The ATF gave affected gun owners until May 31, 2023, to register their stabilizing braces.  88 Fed. Reg. at 6570.  Because that deadline has now passed, complying with the Final Rule would require the private Plaintiffs to do one of four things: (1) permanently modify their weapon to remove it from the scope of the NFA, (2) dispose of or "alter" their stabilizing brace so that it can never be reattached, (3) turn over their weapon to the ATF, or (4) destroy their weapon completely.  *Id*.  As the ATF acknowledges, each of these

avenues come at a cost to gun owners.[12]  Furthermore, even if a gun owner had registered their weapon with the ATF prior to the May 31 deadline, the weapon must still be "marked," to reflect its new classification.  *Id.*  The ATF estimates that each engraving, or marking, would cost gun owners anywhere from $30 to $65.  *Id.* at 6563.  And as the Fifth Circuit noted regarding these engraving costs, "[t]here is no given process for undoing or recouping those compliance costs."  *Mock*, 75 F.4th at 576 n.29.  Thus, under the Final Rule, Plaintiffs would incur costs regardless of their chosen method of compliance.  And because sovereign immunity would prevent them from recouping their costs from the ATF, *see* 5 U.S.C. § 702, GOA and Brown would be irreparably harmed absent injunctive relief.

### 3.    Balance of Equities and Public Interest

"[T]he balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent."  *Winter*, 555 U.S. at 32, 129 S.Ct. at 381.  This means the Court must "explore the relative harms to [Plaintiffs] and [Defendants], as well as the interests of the public at large."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580, 137 S.Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (quoting *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305, 112 S. Ct. 1, 3, 115 L. Ed. 2d 1087 (1991) (Scalia, J., in chambers)).

---

[12]    For example, in the ATF's "Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis," (Dkt. No. 16-9), it estimates the various harms that an individual would incur by complying with the statute past the registration date: (1) $270 for disposing of a stabilizing brace, (*id.* at 60), (2) $567 for adding barrel length to a weapon to remove it from the "short barrel rifle" classification, (*id.* at 44), and (3) $2,500 to destroy or turn in the firearm and brace altogether, (*id.* at 38).

Plaintiffs argue that no harm befalls the ATF if the Final Rule is enjoined because that would merely maintain the status quo prior to its promulgation.  (Dkt. No. 16 at 30). In contrast, Plaintiffs urge that they will suffer substantial harm if the Final Rule stays in effect, citing the threat of prosecution, the destruction of their property that was originally legal when purchased, and compliance costs for a regulatory scheme that is unconstitutional, among their concerns.  (Dkt. No. 16 at 31); (Dkt. No. 29 at 39–40). Additionally, they assert "there is no public interest in the perpetuation of unlawful agency action." (Dkt. No. 16 at 31 (quoting *Wages & White Lion Invs.*, 16 F.4th at 1143). Defendants respond that the Final Rule benefits public safety by clarifying the law Congress passed to regulate firearms it determined pose a greater risk to public safety. (Dkt. No. 22 at 61).  In other words, Defendants contend that the public benefits from greater clarity by the ATF about which weapons are considered SBRs.  Defendants further urge that enjoining the Final Rule would create ambiguity about SBRs that would make the public less safe.  (*Id.*).  Plaintiffs reply that Defendants cannot point to any concrete public harm prevented by the Final Rule remaining in effect while this suit pends, and that in the end, the only harm to Defendants is a delay in processing paperwork and collecting a tax that it has already agreed to waive.  (Dkt. No. 29 at 39–40).

The Court finds that the balance of equities tips in Plaintiffs favor because the Final Rule's effect on Plaintiffs is immediate and imminent while the effect on Defendants, especially the ATF, is more administrative and speculative.  Defendants' arguments of harm to the public are unavailing.  Although Defendants can point to a few incidents where pistols with stabilizing braces were used to harm the public, *see* (Dkt. No. 22 at 23);

(Dkt. No. 74 at 5–6), the NFA regulates, *but does not ban*, gun owners from possessing these weapons. So, permitting the Final Rule to continue in effect would not necessarily protect the public from any like incidents recurring. Further, the fact that the Final Rule clarifies for gun owners which criteria the ATF uses to classify braced weapons as SBRs is beneficial, but its absence—*i.e.*, a return to the lack of direction provided by the ATF for the last ten years—does not create a public harm if the Final Rule is temporarily enjoined from enforcement. Conversely, Plaintiffs, who represent a portion of the public, will suffer imminent harm, as discussed above. *See supra* III.B.2. While Defendants are eager to provide improved guidance to gun owners about which weapons are classified as SBRs, that does not mean that public harm necessarily results absent such guidance. But for Plaintiffs, a pause in the Final Rule's effect provides a safe harbor from immediate injury. Further, Plaintiffs are correct that "there is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up), and the Fifth Circuit has already found that the Final Rule is likely unlawful, *see Mock*, 75 F.4th at 578. Therefore, the public interest and balance of equities favor Plaintiffs.

## C.    SCOPE OF RELIEF

Plaintiffs collectively seek a nationwide injunction. (Dkt. No. 16 at 31). GOA and GOF argue it is appropriate because their affected members live nationwide. Texas joins in that request, arguing that piecemeal implementation across the country impacts criminal prosecutions and fundamental rights. (*Id.* at 31); (Dkt. No. 29 at 34–35). Defendants oppose such a broad injunction, asserting that principles of judicial restraint

counsel against granting relief to non-parties, particularly when the Final Rule is subject to litigation in several other jurisdictions.  (Dkt. No. 22 at 62).  The Court agrees with Defendants.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Int'l Refugee Assistance Project*, 582 U.S. at 579, 137 S.Ct. at 2087.  "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward."  *Id.* at 580, 137 S.Ct. at 2087.  "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).  And the injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Id.*  At this stage, only Plaintiffs GOA and Brown have shown a likelihood of irreparable harm with respect to their individual compliance costs.  Injunctive relief nationwide or within the borders of the State of Texas would be overbroad to protect the interests of the Parties with standing before the Court.  *See VanDerStok v. BlackHawn Mfg. Grp. Inc.*, No. 4:22-CV-00691, 2022 WL 16680915, at *2 (N.D. Tex. Nov. 3, 2022) (observing that "an injunction must redress the plaintiff's particular injury, and no more") (cleaned up).

In its May 31, 2023 Order, the Court held that the appropriate scope of the preliminary injunction pending resolution of the appeal in *Mock* was limited.  (*See* Dkt. No. 51 at 7).  Private Plaintiff organizations' members, including Brown, and those members' household family members were entitled to relief from the Final Rule as were

individuals employed directly by the State of Texas or its agencies.  (*Id.*).  However, after revisiting standing and irreparable harm, a different scope of relief is now required.

"Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."  *Dep't of Homeland Sec. v. New York*, ____ U.S. ____, 140 S.Ct. 599, 600, 206 L.Ed.2d 115 (2020) (Gorsuch, J., concurring). To this end, "[w]hen a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place."  *Id.*  "But when a court goes further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies."  *Id.*  Although preliminary injunctive relief is warranted, the Court declines to grant it on a nationwide basis and instead limits relief to Brown, GOA members, and their resident family members.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Preliminary Injunction. (Dkt. No. 16). Therefore, it is **ORDERED** that:

1.   Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from enforcing and implementing the Final Rule against Plaintiffs Brady Brown and his resident family members, as well as GOA's current members and their resident family members.

2.   This preliminary injunction shall remain in effect pending a final resolution of the merits of this case or until a further Order from this Court, the United

States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

No security bond is required under Federal Rule of Civil Procedure 65(c).

It is SO ORDERED.

Signed on October 27, 2023.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**