IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS,<br>GUN OWNERS OF AMERICA, INC.,<br>GUN OWNERS FOUNDATION, and<br>BRADY BROWN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 6:23-cv-00013 |
| v. | ) ) | |
| BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, UNITED<br>STATES DEPARTMENT OF JUSTICE, and<br>STEVEN M. DETTELBACH in his official<br>capacity AS THE DIRECTOR OF ATF, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents.................................................................................................... i

Table of Authorities ............................................................................................... iii

Introcution ................................................................................................................ 1

Background .............................................................................................................. 4

   I.  Handguns, Rifles, and Short Barreled Rifles. ............................................. 4

   II.  The Rule. .......................................................................................................... 5

Standard of Review ............................................................................................... 9

   I.  Summary Judgment .................................................................................... 9

   II.  Permanent Injunction ................................................................................. 9

Argument and Authorities ................................................................................. 10

   I.  The parties have injury-in-fact. ............................................................... 10

      A.  The State of Texas has injury-in-fact. ............................................ 10

      B.  Plaintiffs Brady Brown and GOA have suffered injury-in-fact....... 15

      C.  If one Plaintiff has standing, there is no need to determine whether other Plaintiffs have standing. ...................................................... 15

      D.  It is not necessary to find all Plaintiffs have standing because vacatur of the Rule is the default rule. ...................................................... 15

   II.  The Rule exceeds statutory authority and must be set aside. ................. 16

      A.  The Rule is in is not a logical outgrowth of the Notice of Proposed Rulemaking. ........................................................................................ 16

      B.  The Rule is arbitrary, capricious, and an abuse of discretion, and is not in accordance with law........................................................................ 19

      C.  The Rule is in excess of statutory jurisdiction or authority. .............. 24

      D.  The Rule violates 5 U.S.C. § 706(2)(B). ........................................... 26

      E.  The Rule violates the Second Amendment....................................... 27

         1.  The Rule regulates conduct covered by the text of the Second Amendment.................................................................... 28

            a.  Stabilizing braces constitute "arms" under the Second Amendment............. 29

            b.  A regulation can infringe Second Amendment rights without constituting a complete "ban."........................................................ 32

            c.  Firearms equipped with stabilizing braces are not dangerous *or* unusual. ........................................................................ 34

        d.  Whether properly classified as pistols, rifles, or short-barreled rifles, firearms with stabilizing braces undoubtedly are in common use. ................ 36

    2.  There is no historical record to justify the Rule. ................................................. 38

  F.  The Rule is unconstitutionally vague. ............................................................... 41

    1.  The Rule's incomprehensible standard fails to provide fair notice of proscribed features. ............................................................................................ 41

    2.  The Rule violates the rule of lenity. ................................................................. 44

  G.  The Rule is an invalid exercise of taxing power. ............................................... 45

  H.  As applied to citizens who supposedly "make" an SBR by attaching a stabilizing brace to a handgun, the Rule is an unconstitutional unapportioned direct tax. ........................................................................... 47

  I.  The Rule violates the constitutional separation of powers. .............................. 49

III. The Court should grant a permanent injunction. ...................................................... 51

  A.  Plaintiffs have suffered irreparable injury and remedies at law are inadequate. ......................................................................................................... 51

    1.  Texas ................................................................................................................. 51

    2.  Plaintiff Brown and GOA ................................................................................ 51

  B.  The balance of hardships and public interest is served by granting a permanent injunction. ..................................................................................... 52

Conclusion ..................................................................................................................... 53

Certificate of Service .................................................................................................... 55

Certificate of Word Count ............................................................................................ 55

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son v. Puerto Rico*,
    458 U.S. 592 (1982) ........................................................................................ 13

*All. for Hippocratic Med. v. United States Food & Drug Admin.*,
    78 F.4th 210 (5th Cir. 2023) ......................................................................... 16

*Arnold v. Kotek*,
    2023 Ore. Cir., LEXIS 3886 (Or. Cir. Ct. Harney Cnty. Nov. 21, 2023)..................... 38

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
    910 F.3d 106 (3d Cir. 2018) .......................................................................... 31

*Avitabile v. Beach*,
    368 F. Supp. 3d 404 (N.D.N.Y. 2019) ........................................................... 32

*Bittner v. United States*,
    No. 21-1195, 2023 WL 2247233 (U.S. Feb. 28, 2023) ................................... 3

*Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*,
    141 S. Ct. 731 (2021) .................................................................................... 42

*Bromley v. McCaughn*,
    280 U.S. 124 (1929) ................................................................................ 47, 48

*BST Holdings v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ........................................................................... 4

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ................................................................................passim

*Camp v. Pitts*,
    411 U.S. 138 (1973) ...................................................................................... 22

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023) ......................................................... 3, 16, 45, 50

*Clean Water Action v. E.P.A*,
    936 F.3d 308 (5th Cir. 2019) ........................................................................ 22

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) .................................................................... 16

*Data Mktg. Partnership, LP v. United States Dept. of Labor*,
    45 F.4th 846 (5th Cir. 2022) ......................................................................... 16

*DHS v. Regents of the Univ. of Calif.*,
    140 S. Ct. 1891 (2020) ............................................................................ 19, 20

*District of Columbia v. Heller*,
    554 U.S. 570, 582 (2008) ............................................................ 28, 30, 34, 36

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) ....................................................................... 32

*Duncan v. Bonta*,
    2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) .............................................. 31

*eBay Inc. v. MercExchange*, L.L.C.,
  547 U.S. 388 (2006)................................................................................. 10

*Elrod v. Burns*,
  427 U.S. 347 (1976)................................................................................... 4

*Espinoza v. Montana Department of Revenue*,
  140 S.Ct. 2246 (2020)............................................................................. 39

*F.C.C v. Fox Television Stations*,
  567 U.S. 239 (2012)................................................................................. 43

*FRAC v. Garland*,
  No. 23-cv-24 (D. N.D. Feb. 9, 2023).......................................................... 2

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ................................................................... 15

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986)............................................................... 23

*Gresham v. Azar*,
  950 F.3d 93 (D.C. Cir. 2020)................................................................... 23

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011).......................................................... 31, 37

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021).................................................................... 16

*Jackson v. City & Cty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014)................................................................... 31

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) .............................................................. 11

*Kiewit Offshore Servs. V. U.S. Dep't. of Labor*,
  2023 WL 417486 (S.D. Tex. Jan. 25, 2023)............................................. 52

*Kolender v. Lawson*,
  461 U.S. 352 (1983)................................................................................ 42

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) .................................................................. 40

*Maloney v. Singas*,
  351 F. Supp. 3d 222 (S.D.N.Y. 2018) ..................................................... 32

*Maryland Shall Issue, Inc. v. Moore*,
  2023 WL 8043827 (4th Cir. Nov. 21, 2023) ............................................ 33

*Maryland v. King*,
  567 U.S. 1301 (2012)............................................................................. 11

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007)........................................................................... 13, 14

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923)................................................................................ 13

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) .................................................................. 15

iv

*Mexican Gulf Fishing Co. v. United States Dep't of Commerce,*
No. 22-30105, 2023 WL 2182268 (5th Cir. Feb. 23, 2023) .......................................... 18

*Missouri v. Holland,*
252 U.S. 416 (1920) .................................................................................................... 11

*Mock v. Garland,*
2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) ............................ 34, 37, 39, 51

*Mock v. Garland,*
75 F.4th 563 (5th Cir. 2023). ...................................................................... 7, 30, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...................................................................................................... 22

*Murphy v. I.R.S.,*
493 F.3d 170 (D.C. Cir. 2007) ................................................................................... 47

*Nat'l Ass'n for Gun Rights, Inc. v. Garland,*
2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ............................................................ 27

*Nat'l Ass'n of Home Builders v. Defs. Of Wildlife,*
551 U.S. 644 (2007) .................................................................................................... 22

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
700 F.3d 185 (5th Cir. 2012) ..................................................................................... 15

*New York State Rifle & Pistol Ass'n v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ...................................................................................... 31

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ........................................................................................passim

*Nken v. Holder,*
556 U.S. 418 (2009) .................................................................................................... 52

*Papachristou v. City of Jacksonville,*
405 U.S. 156 (1972) .................................................................................................... 43

*People v. Webb,*
131 N.E.3d 93 (Ill. 2019) ........................................................................................... 32

*Porter v. Califano,*
592 F.2d 770 (5th Cir. 1979) ..................................................................................... 27

*Rigby v. Jennings,*
630 F. Supp. 3d 602 (D. Del. 2022) ........................................................................... 32

*Sacal-Micha v. Longoria,*
449 F. Supp. 3d 656 (S.D. Tex. 2020) ....................................................................... 22

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) ................................................................................................ 49

*Seth B. v. Orleans Parish Sch. Bd.,*
810 F.3d 961 (5th Cir. 2015) ..................................................................................... 42

*Six Dimensions, Inc. v. Perficient, Inc.,*
969 F.3d 219 (5th Cir. 2020) ....................................................................................... 9

*Sonzinsky v. United States,*
300 U.S. 506 (1937) .................................................................................................... 46

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................. 10

*State v. DeCiccio*,
   105 A.3d 165 (Conn. 2014) ...................................................... 32

*State v. Delgado*,
   692 P.2d 610 (Or. 1984) ........................................................... 32

*State v. Herrmann*,
   873 N.W.2d 257 (Wis. Ct. App. 2015) ..................................... 32

*Terkel v. CDC*,
   521 F. Supp. 3d 662 (E.D. Tex. 2021) ..................................... 27

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) ............................................... 32, 35

*Texas v. Becerra*,
   575 F. Supp. 3d 701 (N.D. Tex. 2021),
   appeal dismissed, 2022 WL 2752370 (5th Cir. Jan. 24, 2022) ............ 12

*Texas v. Becerra*,
   577 F. Supp. 3d 527 (N.D. Tex. 2001) ............................. 11, 12, 13

*Texas v. Becerra*,
   623 F.Supp.3d 696 (N.D. Tex. 2022) ...................................... 12

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) .................................................... 23

*Texas v. E.P.A*,
   829 F.3d 405 (5th Cir. 2016) ................................................... 11

*Texas v. United States*,
   555 F.Supp.3d 351 (S.D. Tex. 2021) ....................................... 14

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) ................................................... 12

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2016) ................................................... 52

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ................................................................. 15

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ....................................................... 43, 49

*United States v. Miller*,
   307 U.S. 174 (1939) ................................................................. 31

*United States v. Pulungan*,
   569 F.3d 326 (7th Cir. 2009) ................................................... 43

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992) ........................................................... 26, 45

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................... 3

*VanDerStok, v. Garland*,
   86 F.4th 179 (5th Cir. 2023) .................................................... 16

vi

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022)............................................................................ 3, 49, 50
*Whitman v. United States,*
    574 U.S. 1003 (2014)............................................................................... 49
*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019)........................................................................ 32

## Statutes

18 U.S.C. § 3571(b)(3) ................................................................................... 5
18 U.S.C. § 921(a)(30) ............................................................................. 25, 44
18 U.S.C. § 921(a)(7) ..................................................................................... 5
26 U.S.C. § 5821 ........................................................................................... 5
26 U.S.C. § 5822 ........................................................................................... 5
26 U.S.C. § 5845(a)(3) ................................................................................... 5
26 U.S.C. § 5845(a)(4) ................................................................................... 5
26 U.S.C. § 5845(i) ....................................................................................... 5
26 U.S.C. § 5861(d)............................................................................... 1, 5, 33
26 U.S.C. § 5861(f) ....................................................................................... 5
26 U.S.C. § 5861(i) ....................................................................................... 5
26 U.S.C. § 5871 ........................................................................................... 5
26 U.S.C.§ 5853 .......................................................................................... 10
5 U.S.C. § 706(2)(A) .................................................................................... 24
5 U.S.C. § 706(2)(B) ............................................................................... 26, 46
5 U.S.C. § 706(2)(D) .................................................................................... 18
Tex. Penal Code § 46.05(a)(1)(C) ................................................................. 12

## Other Authorities

George C. Neumann,
    *Hunting Guns in Colonial America*, <u>Am. Rifleman</u> (Nov. 25, 2021)............................ 39
Nicholas J. Johnson, *et al.*,
    Firearms Law and the Second Amendment: Regulation, Rights, and Policy
    (3rd ed. 2021)............................................................................................ 4
Robert G. Natelson,
    *What the Constitution Means by "Duties, Imposts, and Excises"–and "Taxes" (Direct or Otherwise)*,
    66 Case W. Res. L. Rev. 297, 318 (2015) ................................................... 48

## Regulations

27 C.F.R. § 479.11 ................................................................................................ 5

27 C.F.R. §§ 478.11 ............................................................................................. 5

27 C.F.R. §§ 479.62–64 ....................................................................................... 8

Plaintiffs The State of Texas, Gun Owners of America, Inc. ("GOA"), Gun Owners Foundation ("GOF"), and Brady Brown file this Brief in Support of their Motion for Summary Judgment and state as follows:

## INTROCUTION

For nearly a decade, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") repeatedly promised the American public that pistol "stabilizing braces"—firearm accessories that can be attached to the back of a pistol to secure it to the shooter's forearm, making the pistol safer and easier to handle for persons who otherwise would struggle to stabilize the gun—are lawful and unregulated accessories that *are not* shoulder stocks and *do not* transform pistols into short-barreled rifles ("SBRs") regulated under the National Firearms Act of 1934 ("NFA"), 26 U.S.C. § 5801–72.[1]   In fact, numerous ATF classification letters broadly opine that a pistol stabilizing brace, when added to *any pistol*, does not ordinarily result in an SBR.  *See* ECF #16-7 ("stabilizing braces are perfectly legal accessories for large handguns or pistols").  ATF has even opined that shouldering a pistol with a stabilizing brace (*i.e.*, using a pistol like a rifle) does not transform handguns into SBRs.  *Id.*

In reliance on ATF's repeated statements, numerous variations of stabilizing braces have been designed, manufactured, sold, and installed on millions of firearms.  Although ATF relies on "anecdotal commentary" to estimate that three million stabilizing braces

---

[1] Several such ATF classification letters were filed with Plaintiffs' Motion for Preliminary Injunction (ECF #16-1 through 16-6). Unlike handguns, SBRs must be registered, and it is a felony to possess an unregistered SBR.  26 U.S.C. § 5861(d).

were in circulation as of 2020 (ATF050212), the Congressional Research Service more accurately estimates between 10 and 40 million exist. Congressional Research Service, Handguns, Stabilizing Braces, and Related Components, update April 10, 2021. ECF #16-8. Indeed, just one brace manufacturer reported selling more than 2.3 million units since ATF's outdated 2020-end estimate. *FRAC v. Garland*, No. 23-cv-24 (D. N.D. Feb. 9, 2023), ECF #1 ¶ 173.

Then, with a stroke of the regulatory pen, ATF changed its mind on everything. Contrary to its earlier statements, ATF now claims that *virtually every* pistol brace installed on *virtually any* pistol, results in an illegal and unregistered SBR. Factoring Criteria for Firearms with Attached "Stabilizing Braces" Final Regulatory Impact Analysis at 21 (the "Rule") (ECF #16-9). The Rule admits a resulting economic effect of *billions* of dollars, not to mention the lives that will be ruined if otherwise law-abiding Americans are charged with felony crimes for doing nothing more than what the government has, for years, promised them was perfectly lawful to do.

ATF justifies pulling the rug out from under millions of gun owners with the ipse dixit that the agency has suddenly now reached "the best interpretation of [a] statute" that has been in effect for nearly ninety years. ATF050132. Dismissing dozens of its prior classification and opinion letters reaching precisely the opposite conclusion, ATF claims that this mountain of contrary authority "did not [] employ this correct understanding of the statutory terms," and therefore "all such prior classifications are no longer valid as of January 31, 2023." *Id*. The Fifth Circuit rejected ATF's similar attempts to outlaw bump stocks by rule and to declare unfinished and incomplete frames and receivers to be a

2

"firearm" by rule—changing past practice by supposedly finding authority in decades-old statutes where it has never found authority before. *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (bump stocks); *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023).

Undeterred, ATF presses on, invoking yet again the tired platitude that its decades of prior consistent conclusions were not based on "the best interpretation of the statute," and that millions of Americans should be imprisoned if they do not register their prior lawfully-possessed firearms with the federal government. But "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (citation omitted). Moreover, "[c]ourts may consider the consistency of an agency's views when … weigh[ing] the persuasiveness of any interpretation it proffers in court. Here, the government has repeatedly issued guidance to the public at odds with the interpretation it now asks us to adopt. And surely that counts as one more reason yet to question whether its current position represents the best view of the law." *Bittner v. United States*, 598 U.S. 85, 97 (2023). Likewise, in cases such as this, "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2608 (2022).

That the Rule technically presents a (forced) choice does not absolve its unconstitutional sins. As the Fifth Circuit observed in *BST Holdings v. OSHA*, "the loss of constitutional freedoms 'for even minimal periods of time…unquestionably constitutes

irreparable injury.'" 17 F.4th 604, 618 (5th Cir. 2021) (burden on liberty interests posed by vaccination mandate was irreparable harm) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  The vaccination mandate in *BST Holdings* "threaten[ed] to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *Id.* Here, the Rule imposes a similar choice, forcing individuals to choose between prosecution or destroying their property (not to mention their constitutional rights).

The Rule does not represent reasoned (much less lawful) decision making.  Rather, it is the handicraft of unelected bureaucrats seeking to exercise power beyond lawful limits without any oversight or accountability.  As such, this Court should grant summary judgment in favor of Plaintiffs and should vacate the Rule.

## BACKGROUND

### I.  Handguns, Rifles, and Short Barreled Rifles.

The Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921–28, imposes regulations on all types of handguns and rifles under Congress's commerce clause power.  The NFA, however, is different—it regulates only certain types of firearms and does so based on Congress's taxing power.  Nicholas J. Johnson, *et al.*, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3rd ed. 2021) at 660.

The NFA regulates specific kinds of rifles, including "a rifle having a barrel or barrels of less than 16 inches in length" and "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than

16 inches in length." 26 U.S.C. § 5845(a)(3), (4). The GCA, which also regulates these items, defines them as "short-barreled rifles" ("SBRs"). 18 U.S.C. § 921(a)(7).

The NFA defines the act of "making" broadly to include not only manufacturing by the firearms industry, but also by ordinary persons in their own homes, such as "putting together" or "altering" a weapon into a regulated configuration. 26 U.S.C. § 5845(i). The NFA imposes a $200 tax on each SBR "made" by unlicensed persons, which may not be done without first seeking ATF's *permission* and paying the tax. 26 U.S.C. §§ 5821, 5822. If ATF grants permission, it registers the SBR in the National Firearms Registration and Transfer Record, and the maker must place a serial number on the SBR. 26 U.S.C. § 5822. Making an SBR in violation of these requirements is a crime, as is possessing an unregistered or unserialized SBR. 26 U.S.C. § 5861(f), (d), (i). Violators are subject to imprisonment for up to ten years, fines up to $250,000, or both. 26 U.S.C. § 5871; 18 U.S.C. § 3571(b)(3).

## II. **The Rule.**

The Rule redefines what constitutes an NFA "rifle," now to include "a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder." ATF050226-27 (amending 27 C.F.R. §§ 478.11, 479.11). If a weapon after production or modification fits this description, the Rule then employs six factors to determine whether it is a rifle under the NFA. *Id*. These factors include:

(1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id*. "If a firearm with an attached 'stabilizing brace' meets the definition of a 'rifle' based on the factors indicated in this final rule, then that firearm could also be a short-barreled rifle depending on the length of the attached barrel, thus subjecting it to additional requirements under the NFA…." *Id*.  As the Court already recognized (ECF #80 at 6–7), "ATF does not elaborate on how this rubric will operate, *e.g.*, whether each factor is

6

weighted the same or some more than others, but the effects of the rubric are clear—almost every time a weapon is evaluated under this new framework, it will be classified as a rifle … ATF estimates there would be only '1 percent of "stabilizing braces" that, when attached to [a] firearm, would not result' in a rifle subject to the NFA.  ECF #16-9 at 21.  In fact, the Fifth Circuit noted that, after promulgating the Rule, the ATF has not issued a single example of a "pistol with a stabilizing brace that would constitute an NFA-exempt braced pistol."  *Mock v. Garland*, 75 F.4th 563, 575 (5th Cir. 2023).

The Rule has massive consequences for millions of American gun owners as, per ATF, prior to the Rule they had been unknowingly violating the NFA by possessing regulated "weapon and 'brace' combinations," even though ATF previously had concluded these weapons were not subject to the NFA.  ATF050132.

In the Rule, ATF promised that it would "exercise[e] its enforcement discretion" and give owners of braced handguns "options that they can choose from by May 31, 2023 to comply with the statutory requirements.  For example, possessors of such weapons … may register the firearms … Apart from registration, there are other options … includ[ing] modifying affected weapons … destroying the firearm, or surrendering the firearm to law enforcement."  ATF050132-33.  According to the Rule, gun owners who remove the brace and keep it unconnected to the handgun still own a "rifle" even if the brace is never reattached.  ATF050222.  Thus, in order to avoid liability, the brace, if kept, must be "alter[ed]" in a way that it could never be "reattached" to the handgun.  *Id.*

Generally, "the procedure to register short-barreled rifles, which include in certain instances firearms with 'stabilizing braces,' is through an ATF Form 1, Application to

7

Make and Register a Firearm ('Form 1'), with the approval of the Attorney General." ATF050150; *see also* 26 U.S.C. § 5822.  That Form 1 process requires submission of passport photos, fingerprints, the maker's residence address, and other identifying information.  26 U.S.C. § 5822; 27 C.F.R. §§ 479.62–64; ECF #16-10 (Form 1).  While a "$200 making tax [is] usually due upon submission of such an application to register," ATF claimed in the preamble to the Rule that it would not collect that tax for affected firearms. ATF050133.  No statute or rule authorizes such tax forgiveness.

Independent of these statements in the Rule, ATF began to require that persons given tax amnesty provide photographs of their supposedly illegally unregistered SBRs when they submit the Form 1.  This requirement is not mentioned in the Rule or the preamble yet has been effected by ATF's amending the Form 1 in December 2022. Previously, the Form 1 listed three types of applications: Tax Paid, Tax Exempt (federal government purchase), and Tax Exempt (non-federal government purchase).  In August 2022, ATF requested permission from the OMB to change the Form 1, stating, "Due to the upcoming Amnesty Registration of Pistol Brace weapons, photos of the weapon being registered will be required to prove the weapon does utilize a pistol brace in its configuration and would qualify for an amnesty registration."  ECF #16-12 at 2.  ATF then adopted the new Form 1 which added a new option: "Tax Exempt.  Firearm is not subject to the making tax… To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the firearm to be registered."  ECF #16-10.  No statute or rule gives ATF the authority to demand pictures of weapons subject to the making tax.

Of course, the amnesty date has now passed. According to ATF spokesman Erik Longnecker, "As of June 1, 2023, ATF received 255,162 applications for tax-free registration."[2]  The millions of Americans who own stabilizing braces that can be attached to their handguns and who *did not seek* (or were denied) "tax-free registration" are now criminals, according to the ATF.

To summarize, under the Rule, if a person possesses a handgun and a stabilizing brace, that person illegally possesses—and has possessed—an unregistered SBR in violation of the NFA.

**STANDARD OF REVIEW**

## I. <u>Summary Judgment</u>

Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 224 (5th Cir. 2020).

## II. <u>Permanent Injunction</u>

In addition to demonstrating actual success on the merits, a plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

---

[2]  https://www.washingtonexaminer.com/news/washington-secrets/biden-and-atf-just-created-29-million-felons.

disserved by a permanent injunction. *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).

**ARGUMENT AND AUTHORITIES**

**I.  The parties have injury-in-fact.**

To establish Article III standing, plaintiffs bear a burden to demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

As the Court already determined, "the latter two standing requirements of traceability and redressability are comfortably satisfied in this case. This is because any injuries suffered by Plaintiffs are attributable to the implementation of the Rule, and the requested relief here—an order enjoining and, ultimately, vacating the Rule—would remedy the alleged injury. The only standing element in serious dispute is the first—injury-in-fact." ECF #80 at 12 (footnote omitted).

**A.  The State of Texas has injury-in-fact.**

The Court previously suggested that Texas may have injury-in-fact based on nonrecoverable compliance costs incurred by Texas police, as recognized in the Rule itself. ECF #51 at 4; ECF #80 at 18–19.  The Court noted that Texas had not yet provided any concrete evidence that it incurred any such nonrecoverable compliance costs.  ECF #80 at 19.  Texas now drops the argument that the Rule imposes nonrecoverable compliance costs on Texas.  Texas police's use of stabilizing braces is insignificant and Texas police are exempt from the NFA's SBR requirements.  *See* 26 U.S.C. § 5853.

10

Texas nevertheless urges that the Rule injures its sovereign interest in creating and enforcing a legal code, and its quasi-sovereign interest in the health and safety of its citizens.

First, Texas will experience irreparable harm to its sovereign interest in maintaining and enforcing its own legal code in the manner it deems fit.  Injuries to a State's sovereign interests establish irreparable harm.  *See*, *e.g. Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001)) ("[T]he State of Kansas claims the [federal government's] decision places its sovereign interests and public policies at stake, we deem the harm the State stands to suffer as irreparable if deprived of those interests…).

Harm to sovereign interests can come in many forms.  Most obviously, a State's sovereign interests are irreparably harmed if the State is "barred from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers).  So too, the federal government irreparably harms a State's sovereign interest when it "inver[ts] traditional 'federalism principles.'" *Texas v. E.P.A*, 829 F.3d 405, 434 (5th Cir. 2016); *see also Missouri v. Holland*, 252 U.S. 416, 431 (1920) (state injured because federal actions "invade[d] the sovereign right of the State and contravene its will manifested in statutes").  And a State's sovereign interests are harmed if the federal government distorts the legal field in a way that "pressure[s]" the State "to change its law." *See Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2001) (citing *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir.

11

2015)).  That is one of the many reasons why courts in this Circuit have repeatedly found that lawless federal regulatory programs inflict irreparable harm on Texas.[3]

The Rule irreparably harms Texas by distorting applicable Texas law, thereby subverting ordinary federalism principles.  For example, Texas criminalizes possession, manufacture, transportation, repair, or sale of SBRs that are not properly registered with ATF but does not criminalize handguns with attached stabilizing braces. Tex. Penal Code § 46.05(a)(1)(C).  To the extent that ATF declares millions of previously lawful handguns are now illegal SBRs, the Rule significantly and negatively affects the operation of Texas law.

When the Legislature enacted this requirement, there was no hint that ATF would stretch the NFA so far as to reach stabilizing braces, and so no hint that *State* law would reach those devices.  Indeed, ATF has long promised the public that they could buy stabilizing braces for their pistols without triggering the NFA's registration requirements. In a remarkable bit of candor, the Rule's preamble admitted that "there are no existing statutes…that explicitly regulate firearms equipped with 'stabilizing braces.'" ATF050211. The Texas Legislature necessarily thought the same thing when it enacted section 46.05(a)(1)(C) of the Texas Penal Code.

---

[3] *See*, *e.g.*, *Texas v. Becerra*, 575 F. Supp. 3d 701, 724 (N.D. Tex. 2021), appeal dismissed, 2022 WL 2752370 (5th Cir. Jan. 24, 2022) (preliminarily enjoining vaccination mandate that would "likely force [Texas] to administer a federal mandate that has a dubious statutory basis."); *Becerra*, 577 F. Supp. 3d at 557 (preliminarily enjoining mask and vaccine mandates in federal Head Start program because they "increased pressure to amend, or least decline to enforce, Texas's laws"); *Texas v. Becerra*, 623 F.Supp.3d 696, 714 (N.D. Tex. 2022) (preliminarily enjoining federal guidance on emergency care because it "constitutes federal interference with the enforcement of state law").

Now, as a result of ATF's rug pull, Texas's code is distorted in a way that the Legislature never intended. At a bare minimum, that distortion "increase[s] pressure to amend, or at least decline to enforce, Texas's laws," *Becerra*, 577 F.Supp.3d at 557, against the millions of persons the Rule suddenly declares felons. And the distortive effect of ATF's Rule is particularly pronounced in Texas where the State Constitution has been interpreted to give the State's dozens of district attorneys full independence to determine when and how to prosecute state law. *See State v. Stephens*, 63 S.W.3d 45 (Tex. Crim. App. 2021).

Second, "[a] State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982). Precedent establishes that Texas's assertion of standing to assert its quasi-sovereign interests is different than an assertion of *parens patriae* standing against the federal government on its citizens behalf. In the very case that started the revolution in state government versus federal government lawsuits, the Supreme Court specifically rejected the argument that states cannot assert quasi-sovereign interests against the federal government. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007) ("Drawing on *Massachusetts v. Mellon*, 262 U.S. 447 [] (1923) and [*Alfred L. Snapp*] the CHIEF JUSTICE claims that we 'overloo[k] the fact that our cases cast significant doubt on a State's standing to assert a quasi-sovereign interest … against the Federal Government.' Not so. *Mellon* itself disavowed any such broad reading when it noted that the Court had been 'called upon to adjudicate, not the rights of person or property, not rights of dominion

13

over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened*."
[262 U.S. at 484-485] (emphasis added)." (citations omitted)).

Texas's quasi-sovereign injury is justiciable because Texas is not merely seeking to
protect its citizens, it is also seeking to assert "its [own] rights under the" Administrative
Procedures Act ("APA").[4] *Massachusetts*, 549 U.S. at 520 n.17; *see also Texas v. United
States*, 555 F.Supp.3d 351, 380 (S.D. Tex. 2021).  One such right is for Texas to prevent
and mitigate "criminal activity" within its borders. *Id.* at 378.  That is a logical corollary
to Texas's interests in avoiding sovereign injuries.  For example, the Rule *creates* criminal
activity within Texas's borders through its distortion of Texas's legal code.  Additionally,
the Rule will impose costs on the State to deal with the fallout of this new creation of
criminal activity.  Texas will also experience ripple-effect injuries from the Rule based on
how citizens will respond.  Some who rely on braces to safely bear their handguns will
logically no longer be able to use those braces, and so not be able to as capably defend
themselves from criminals, or as safely use their handguns in other settings.  And the State
will be forced to deal with the fallout when tragedies occur.  All of that is more than
sufficient to give Texas a concrete stake in this issue. *See*, *e.g. id.* at 379-80.

Texas has standing to challenge the Rule.

---

[4] The relatively recent increase in State suits against the federal government is largely
a byproduct of the APA's generous waiver of sovereign immunity and allowance for
federal court resolution of these suits. 5 U.S.C. § 702. The Executive branch's frequent
complaints about State suits are traceable to that development, *accord Massachusetts*, 549
U.S. at 520 n.17, a legal development over which the Executive branch has no control. It
is not a byproduct, as they would have it, of judicial misapplications of standing doctrine.
*Accord, e.g., Missouri*, 252 U.S. at 431 (1920) (State had standing to sue federal
government "to assert the alleged quasi sovereign rights of [the] State").

**B. Plaintiffs Brady Brown and GOA have suffered injury-in-fact.**

In ruling on Plaintiffs' motion for preliminary injunction, the Court already found that Plaintiffs Brady Brown and GOA have injury-in-fact.  ECF #80 at 11–17.

**C. If one Plaintiff has standing, there is no need to determine whether other Plaintiffs have standing.**

Finally, "[i]t is well settled that once [courts] determine that at least one plaintiff has standing, [the court] need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) (citing *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012)).  "At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433 (2017).  Here, at least one party has injury-in-fact, and the other two prongs are not at issue.

**D. It is not necessary to find all Plaintiffs have standing because vacatur of the Rule is the default rule.**

Given that Plaintiffs should prevail on at least the logical outgrowth claim,[5] the appropriate remedy is to vacate the Rule.  In this Circuit, vacatur is "the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).  The Fifth Circuit calls vacatur the

---

[5] Plaintiffs should be found to prevail on their other claims as well.  As the Court previously explained, when declining to go beyond the "logical outgrowth" claim, "this case [wa]s only at the preliminary injunction phase. Should the case be in a different posture at the final merits stage, the Court may find it appropriate to address the additional claims brought by Plaintiffs at that time." ECF #80 at 21.

"default rule." *Data Mktg. Partnership, LP v. United States Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). *See VanDerStok, v. Garland*, 86 F.4th 179, 196 (5th Cir. 2023) ("this Court's precedent generally sanctions vacatur under the APA…."); *All. for Hippocratic Med. v. United States Food & Drug Admin*., 78 F.4th 210, 254 (5th Cir. 2023) ("Upon a successful APA claim, vacatur effectively rescinds the unlawful agency action."); *See also Cargill*, 57 F.4th at 472.[6]

## II. The Rule exceeds statutory authority and must be set aside.

### A. The Rule is in is not a logical outgrowth of the Notice of Proposed Rulemaking.

Notice under the APA "suffices if [a final rule] is a 'logical outgrowth' of the proposed rule, meaning the notice must 'adequately frame the subjects for discussion' such that 'the affected party 'should have anticipated' the agency's" final rule from the Notice of Proposed Rulemaking ("NPRM"). *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). In contrast, "a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where 'interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (cleaned up).

As the Court has recognized, the Fifth Circuit already decided "that the Final Rule fails the logical-outgrowth test and violates the APA." *Mock*, 75 F.4th at 578. ECF #80 at 20. That decision is correct.

---

[6] Because vacatur is the appropriate remedy on summary judgment, Plaintiffs will not address the issue of standing with respect to Plaintiff GOF.

The Rule's definition of "rifle" is in no way a logical outgrowth of the NPRM's definition.  The NPRM proposed an "ATF Worksheet 4999" using a three-part points system to classify a firearm as either a handgun or a rifle.  86 Fed. Reg. at 30841-42.  Yet the Rule entirely discarded Worksheet 4999, replacing it with a vague six-part test never suggested in the NPRM that is impossible to fairly implement, based on "whether" the weapon (i) is of an undefined weight or length; (ii) has an indeterminate "length of pull;" (iii) has various unspecified "eye relief" for sighting; (iv) has some indefinite amount of "surface area" in the rear; while also considering (v) imprecise "marketing and promotional materials" and (vi) unbounded "information" about how the firearm is used in practice.  ATF050221-22.  This is a wholesale change in methodology that a commenter on the NPRM (including Plaintiffs) could not have foreseen and is in no way a "logical outgrowth" thereof.  Indeed, Plaintiffs GOA and GOF (also representing Plaintiff Brady Brown) filed comments with ATF in response to the approach taken in the NPRM.  Compl. ¶98.  Plaintiff Texas did so as well.  *Id*. ¶128.  Neither set of comments anticipated, nor could have anticipated, the completely new approach ATF adopted in the Rule.  That Plaintiffs were forced to file this lawsuit shows that there was plenty in the Rule of which to be critical, but Plaintiffs were deprived the opportunity to raise their objections via notice and comment.

Worse still, the approaches in the NRPM and the Rule yield conflicting results. One example, under Worksheet 4999 in the Rule, a firearm would score "4" points and be considered a SBR if it had a "length of pull" over 13.5 inches, without any other considerations.  86 Fed. Reg. at 30842.  Yet under the Rule, length of pull merely, "in

combination with other features – could indicate" an SBR.  ATF050186.  And as ATF explains, one style of firearm may permissibly have a longer length of pull than another style of firearm.  *Id.* at 6535 (compared to the NPRM, which imposed the same length of pull measurements across-the-board).  The Rule does not acknowledge, much less justify, these conflicting results.

ATF admits that "the proposed Worksheet 4999, including the points assigned to each criterion … was intended to ensure uniform consideration and application [but] did not achieve these intended purposes."  ATF050162.  But rather than, as required by the APA, provide notice of and seek comment on the new guidelines that replaced the proposed worksheet and point system, ATF simply adopted them.

In short, the Rule represents a complete change of methodology that those commenting on the NPRM could not have predicted.  It is in no way a "logical outgrowth" from the NPRM.  By "promulgating a requirement that is different in kind than the proposed requirement, the Government did not adequately frame the subjects for discussion" and violated the logical-outgrowth requirement.  *Mexican Gulf Fishing Co. v. United States Dep't of Commerce*, 60 F.4th 956, 974 (5th Cir. 2023).

In a similar challenge to the Rule, the Fifth Circuit held that, "because the Final Rule bears almost no resemblance in manner or kind to the Proposed Rule, the Final Rule fails the logical-outgrowth test and violates the APA." *Mock*, 75 F.4th at 578. The Rule therefore should be set aside, having been adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

**B. The Rule is arbitrary, capricious, and an abuse of discretion, and is not in accordance with law.**

ATF failed to engage in the APA's requisite reasoned analysis of the Rule, instead trivializing reliance interests, ignoring alternatives, exploiting outdated statistics to downplay costs, and establishing enforcement criteria open to capricious abuse. Before adopting a rule, ATF must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1915 (2020). The reliance interests here are significant; millions of people for years have possessed firearms with stabilizing braces under a regime where ATF explicitly declared them not to be SBRs. ATF's willful blindness to those reliance interests requires that the Rule be set aside for four reasons.

First, ATF suggests that, because it can always change its mind, gun owners can never believe its pronouncements, and "any potential reliance interest is reduced." ATF050159. On the contrary, ATF must "provide a more detailed justification than what would suffice for a new policy created on a blank slate … when its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency cannot change its mind without "good reasons," and "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id*. at 515-16.

Second, ATF states that gun owners have ample options to comply with the Rule. ATF050159-60. But that has nothing to do with their reliance on the status quo.

Third, even for gun owners who chose to apply to register their weapons, ATF might disapprove (or has disapproved) an application, leaving applicants with the options of destroying or forfeiting weapons they purchased in reliance on ATF's assurances of legality.

Fourth, ATF's claim that the "only [reliance] interest identified is the avoidance of the NFA's making and transfer taxes," ATF050160, is at best deliberately ignorant. ATF itself on multiple occasions assured the public that attaching a brace to a handgun was not a taxable, potentially criminal event; however, the Rule claims that millions of individuals who took ATF at its word have become felons retroactively subject, at best, to a $200 tax and, at worst, to ten years imprisonment and $250,000 in fines.

Additionally, the APA demands reasoned analysis "when an agency rescinds a prior policy" including consideration of "the alternatives." *Regents*, 140 S. Ct. at 1913 (internal quotation marks removed). Yet ATF fails to explain the reasoning behind its arbitrary new standards for designating an SBR. On the contrary, the Rule's new standard is incomprehensible. The Rule's six-part test begins by asking a threshold question of whether "a weapon provides surface area that allows the weapon to be fired from the shoulder," ATF050221, but does not provide any guidance as to *how much* "surface area" is sufficient. Rather, the Rule lists six "factors" to be considered, the first four of which again begin by asking "whether," giving no indication of how the factors described therein will be counted or the relative values assigned to any particular feature or characteristic. *Id.* For example, factor (i) considers "whether the weapon has a weight or length consistent with … similarly designed rifles," *implying* (but not stating) that heavier and longer

20

firearms are more likely to be deemed rifles, and failing to detail how heavy or how long is too much or too little.  The Rule contains charts that show that rifle weights and lengths vary widely,[7] demonstrating that any attempt to define rifles by these variables is arbitrary and capricious.  ATF050166-70.  ATF fails to give sufficient analysis as to why such a confusing standard is preferable to more predictable and empirical alternatives, even in comparison to its prior Worksheet 4999 from the NPRM.

Similarly, the Rule asks "whether" rear surface area conducive to shouldering is created by a "necessary" component of a firearm, apparently meaning that ATF is unwilling to concede even that other gun features (for example, the buffer tube of an AR-15-style pistol) do not convert a pistol into a short-barreled pistol *even if it does not have a stabilizing brace attached*.  *See* ATF050226, ATF050189-90; *see also* ATF050136, ATF050148 (purporting to reclassify certain shotguns as possible NFA weapons even without stabilizing braces installed).  Although ATF's lawyers in briefing promised that an AR-15 pistol with a buffer tube and *without a brace* would not be classified as a rifle (ECF #22 at 24), the Rule makes no such promise and, in fact, indicates that the opposite result could be reached.  ATF05018990 (stating only that such a weapon without a brace "*may not*" be an SBR).  How any normal person could hope to navigate ATF's incomprehensible regulatory thicket, deliberately devoid of any measurable standard, is a mystery.

---

[7] In briefing, ATF's lawyers claimed that a particular weapon, such as an AR-15, would only be compared to "to a 'similarly designed' AR-15 standard rifle" (ECF #22 at 24), but the Rule provides quite differently that a firearm will be compared to "similarly designed rifles."

Moreover, when it adopted the Rule, ATF failed to conduct any type of historical analysis required by *Bruen*, even though that decision predated the Rule by more than seven months.  *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022).  There was no excuse for this oversight, and it cannot be cured now.  Because Plaintiffs have brought an APA challenge, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Indeed, courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Clean Water Action v. E.P.A*, 936 F.3d 308, 312 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In other words, even if the Rule could have been justified as compliant with the Second Amendment, it failed to engage in the proper analysis under *Bruen*, a fatal defect.

By failing to take seriously its obligation to verify regulatory conformity with the Second Amendment, ATF promulgated a rule that was statutorily defective out the gate. The APA requires courts to vacate agency action when an agency has "entirely failed to consider an important aspect[8] of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*, 551 U.S. 644, 658 (2007).  Of course, an "agency must [have] 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 666 (S.D. Tex. 2020) (quoting *Motor Vehicle Mfrs. Ass'n*,

---

[8] To say the Constitution is an "important aspect" of firearms regulation would be an understatement.

22

463 U.S. at 43).  *See also Texas v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) ("Put simply, we must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'").

For regulations affecting conduct protected by the Second Amendment, the "relevant data" to be consulted and analyzed is the Founding-era laws comprising this nation's early historical tradition of firearm regulation.  *See Bruen*, 142 S. Ct. at 2126 (emphasis added) ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").  Mere lip service to the historical record will not suffice.  As the Fifth Circuit has observed, "[s]tating that a factor was considered … is not a substitute for considering it." *Texas*, 10 F.4th at 556 (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)).  Moreover, "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."  *Id.* (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)); *cf.* ATFT050200.

Here, Defendants were required to conduct a rigorous historical analysis demonstrating that the Rule is consistent with our early historical traditions.  Such analysis is glaringly absent from the Rule, which gave short shrift to *Bruen* and the Second Amendment, first acknowledging that *Bruen* "abrogate[d] previous decisions applying the means-end test," but then stating simply that based on "historical tradition, the Second Amendment does not extend to dangerous and unusual weapons."  ATF050200 n.145.  On the contrary, conclusory allegations latching onto inapposite dicta does not constitute a

historical analysis under *Bruen*.  If the historical record supported Defendants' regulation of commonly owned arms, then the Rule should have included this wealth of Founding-era statutes in support of its enactments.  Although ATF's silence speaks volumes, even if the historical record *did* support Defendants' regulation, ATF's failure to include such an analysis at the Rule stage is procedurally fatal to its promulgation.  Accordingly, the appropriate remedy under the APA (on this ground) is vacatur of the Rule.

The Rule must be set aside as "arbitrary and capricious" under 5 U.S.C. § 706(2)(A).

## C.  The Rule is in excess of statutory jurisdiction or authority.

Under the NFA, Congress legislated a three-part conjunctive test to define "rifle."  The weapon must be (1) **designed** or redesigned; (2) made or remade; **and** (3) **intended** to be fired from the shoulder.  26 U.S.C. § 5845(c) (emphasis added).  That means that it is not enough that a weapon is constructed in a way that merely *allows* a shooter to fire from the shoulder.  It must be *designed* **and** *intended* to be fired from the shoulder.

In contrast, the Rule alters this three-part test, to "include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that **allows** the weapon to be fired from the shoulder." ATF050226 (amending 27 C.F.R. § 478.11); ATF050227 (amending 27 C.F.R. § 479.11) (emphasis added).  But a weapon with a brace that is designed and intended to be fired from the forearm is not designed and intended to be fired from the shoulder, and is not a "rifle," irrespective of whether it is *capable* of being fired from the shoulder.  As noted above, an AR-15 style firearm with a buffer tube but *without a brace* is capable of being shoulder fired.

24

ATF recognized this reality in the NPRM, where it conceded that a weapon that "*could* be fired from the shoulder," "*may* be designed and intended to be fired from the shoulder," or "*is likely* designed and intended to be fired from the shoulder" is *not* a rifle. 86 Fed. Reg. 30826, 30829 (June 10, 2021) (emphasis in original).  Rather, only a weapon that "*is* designed and intended to be fired from the shoulder" is a "rifle."  *Id*.  (emphasis in original).  That comports with the statutory definition.  Under the NPRM, it would not have been enough that the weapon *could* be fired from the shoulder, or even that the weapon *may* be or *is likely* designed and intended to be fired from the shoulder.  In contrast to the NPRM, the Rule eliminates "designed and intended" from the definition.

The NPRM also revealed ATF's awareness that a weapon with an "attachment … that provides surface area that allows the weapon to be fired from the shoulder" is not necessarily "designed and intended to be fired from the shoulder":

> There are certain inherent features that may support a design as a "stabilizing brace" and also a shoulder stock.  For example, a large amount of surface area on the rear of a purported "stabilizing brace" may indicate that it is designed to be fired from the shoulder and facilitate its use as a shoulder stock.  However, that characteristic may also be the result of incorporating substantial stabilizing support that envelopes the shooter's arm … allowing one-handed firing of a large handgun.

86 Fed. Reg. at 30829.

The NFA does not regulate handguns, defined by the GCA as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand."  18 U.S.C. § 921(a)(30).  A "handgun" under the GCA cannot simultaneously be a "rifle" under the NFA, because a "rifle" is "designed" and "intended" "to be fired from the shoulder," and thus not "designed to be held and fired by the use of a single hand."

25

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992) confirms this. That case concerned firearm parts kits that could be assembled *either* into firearms unregulated by the NFA *or* into an NFA-regulated SBR. Five members of the Court applied the rule of lenity because the NFA contains criminal penalties, holding that the NFA does not apply to parts that *could* be made into NFA weapons or alternatively into non-NFA-weapons. *Id*. at 517-18 (opinion of Souter, J.), 519 (opinion of Scalia, J.); *see also Cargill*, 57 F.4th (en banc) (applying rule of lenity to reject ATF's attempt to regulate bump stocks as machineguns).

Similarly, the NFA does not apply to a brace that, when attached to a handgun, *could* convert the weapon into *either* an NFA-regulated SBR *or* into an unregulated handgun with a brace. The only way that the attachment can convert the handgun into an SBR is if it *is* deliberately designed, made, and intended to be fired from the shoulder.

The Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and must be "set aside." 5 U.S.C. § 706(2)(c).

**D. The Rule violates 5 U.S.C. § 706(2)(B).**

The APA requires that agency action be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As discussed in greater detail below, the Rule violates the Second and Fifth Amendment to the U.S. Constitution, and is contrary to the constitutional separation of powers, which lays out the only legitimate process for the enactment of legislation such as contained in the Rule. In enacting § 706(2)(B), "[t]he intent of Congress … was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-

making. … [§ 706(2)(B)] explicitly authorizes the court to set aside any agency action 'contrary to constitutional right . . . .'" *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979).  Because, as detailed below, the Rule violates the constitution, it must be set aside on the additional ground as being "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  *See Terkel v. CDC*, 521 F. Supp. 3d 662, 676 (E.D. Tex. 2021) (holding unlawful federal moratorium on evictions during the pandemic as "contrary to constitutional … power."); *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 2023 WL 6613080, at *17 (N.D. Tex. Oct. 7, 2023) ("the APA statutorily broadly protects against agency action 'contrary to constitutional right, power, privilege, or immunity' or 'in excess of statutory jurisdiction, authority, or limitations.'").

### E.  The Rule violates the Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   As the Supreme Court recently explained in *Bruen*, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."   142 S. Ct. at 2132.   Thus, when the plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  *Id.* at 2129-30. Should individuals' conduct meet this initial textual threshold, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* at 2130.

As detailed below, the Rule unambiguously regulates "arms" that presumptively are protected by the Second Amendment.  Moreover, Defendants cannot plausibly justify the Rule under *Bruen*'s analytical framework, because there were no Founding-era restrictions on the barrel length on firearms, otherwise delineating certain dimensions or physical characteristics of firearms as unlawful, limiting the use of firearm accessories, or requiring registration of the same.  On the contrary, although the historical burden is on Defendants, Plaintiffs nonetheless offered ample photographic evidence of historically unregulated short-barreled firearms, evincing an *opposite* tradition of unimpeded ownership and use of such firearms throughout early American history.  *See* Compl. ¶¶290-96.  For that reason, the Rule violates the Second Amendment.

## 1.  The Rule regulates conduct covered by the text of the Second Amendment.

There is no question in this case that the persons (Plaintiffs, including those gun owners represented by the organizational Plaintiffs) and the activities (keeping and bearing) are protected by the Second Amendment.  The only question, then, is whether the firearms regulated by the Rule are protected "arms."  As the Supreme Court has instructed, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); *see also Bruen*, 142 S. Ct. at 2132 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").  Since firearms equipped with stabilizing braces, without question, constitute "bearable arms" regardless of how they

28

are classified under the NFA, they are "presumptively" protected by the Second Amendment, and Defendants must show a historical tradition of similar regulation to justify the Rule.

The Rule makes two attempts to shirk this burden, claiming that "weapons regulated by the NFA, such as short-barreled rifles, fall outside the scope of the Second Amendment." ATF050200; ECF #22 at 28. First, ATF claims that, based on "historical tradition, the Second Amendment does not extend to dangerous and unusual weapons." ATF050200, n.145. Second, the Rule claims that "neither the rule nor the NFA bans the possession of the relevant firearms." ATF050200. Third, ATF's preliminary injunction briefing added the argument that stabilizing braces are not "bearable arms" at all, but instead merely "accessories" or "attachments." ECF #22 at 28-30. Plaintiffs address each of these claims, in reverse order.

### a. Stabilizing braces constitute "arms" under the Second Amendment.

First, ATF in briefing argued that braces (taken by themselves) are not "arms" in the first place, and thus do not come within the ambit of the Second Amendment. ECF #22 at 28-30. For starters, by ATF's logic all rifle stocks (not to mention detachable handguards, grips, flash hiders, magazines, etc.) could be banned outright, because they are merely "accessories" or "attachments" to the firearms to which they are attached, leaving Americans left to shoot this sort of ridiculous contraption:



On ATF's interpretation, any such non-integral part, when separated from its host firearm, would itself not be a "bearable arm," and thus could be regulated (or banned) independent from the firearm. That is a bit like saying that, while the First Amendment protects books, the government may ban reading glasses, mere "accessories" which make reading books possible (or at least easier).

On the contrary, the term "arms" is broad, and "covers modern instruments that *facilitate* armed self-defense." *Bruen*, 142 S. Ct. at 2132 (emphasis added). Stabilizing braces certainly *facilitate* armed self-defense, because they "were originally designed to assist people with disabilities, or mobility or strength issues so that they could safely handle heavy handguns." ECF #80 at 2; *see also Mock*, 75 F.4th at 588 (Willett, J., concurring) ("protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms. … ATF agrees that the weapons here are lawfully bearable pistols absent a rearward attachment. … Adding a rearward attachment—whether as a brace or a stock—makes the pistol more stable and the user more accurate.").

Moreover, while *Heller* Court said that the Second Amendment presumptively applies to "all bearable arms," the Court did not say that the Second Amendment covers

*only* bearable arms. Rather, the Court has explained that a proper understanding of "arms" also includes "ordinary military equipment," as demonstrated by the Court's reference to Founding-era statutes that required militia members to be armed not only with firearms but also other "proper accoutrements" such as "a good bayonet and iron ramrod … a cartridge box … a good knapsack and canteen," and a "Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges … a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack." *United States v. Miller*, 307 U.S. 174, 181-82 (1939). The term "arms" thus covers not only literal firearms, but accompanying objects, including magazines, optics, lights and lasers, body armor (*see Heller*, 554 U.S. at 581), holsters and pouches, and the list goes on. The Second Amendment, of course, also covers ammunition, which is not itself a literal "arm" under ATF's conception. *See Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them."); *see also Duncan v. Bonta*, 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023) ("[n]either magazines, nor rounds of ammunition, nor triggers, nor barrels are specifically mentioned in the Second Amendment … But without a right to keep and bear triggers, or barrels, or ammunition and the magazines that hold ammunition, the Second Amendment right would be meaningless."). Likewise, several pre-*Bruen* cases assumed "without deciding" that magazine bans implicate the Second Amendment.[9] *See also Rigby v. Jennings*, 630 F.

---

[9] *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018) (vacated and remanded for

Supp. 3d 602, 615 (D. Del. 2022) (emphasis added) ("Defendant has not shown that these firearms *and components* are not commonly owned by law-abiding citizens for lawful purposes."); Compl. ¶274; *Caetano*, 577 U.S. at 417 (Alito, J., concurring) (stun guns protected); *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (butterfly knives); *Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018) (nunchuks); *People v. Webb*, 131 N.E.3d 93 (Ill. 2019) (electric arms); *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (electric arms); *State v. Herrmann*, 873 N.W.2d 257 (Wis. Ct. App. 2015) (switchblades); *State v. DeCiccio*, 105 A.3d 165 (Conn. 2014) (batons and knives); *State v. Delgado*, 692 P.2d 610, 613-14 (Or. 1984) (switchblades).  It is clear that the Second Amendment applies to more than just firearms.[10]

### b.   A regulation can infringe Second Amendment rights without constituting a complete "ban."

Second, in a two-sentence paragraph, the Rule claims constitutionality because "neither the rule nor the NFA bans the possession of the relevant firearms….  Congress only requires the registration of the firearms in the [National Firearms Registration and Transfer Record] and the payment of a making or transfer tax."  ATF050200; *see also* ECF #22 at 30-31 ("[r]outine firearm registration procedures … do not offend the right to bear arms," citing pre-*Bruen* cases and a *Bruen* concurrence which was not the opinion of a

---

reconsideration in light of *Bruen*, 142 S. Ct. at 2894); *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021) (vacated and remanded for reconsideration in light of *Bruen*, 142 S. Ct. at 2895).

[10] And, of course, all of this ignores the fact that the Rule does not regulate stabilizing braces themselves, but rather *firearms* equipped with stabilizing braces.  The Rule thus explicitly regulates items that constitute quintessential "bearable arms."

majority of the Court).  Again, analogizing to the First Amendment, that is like saying that a law does not violate the First Amendment by requiring Americans to submit to the government a list of the books they are reading.

On the contrary, possession of NFA firearms *is* banned (a felony crime) unless possessors subject themselves to onerous registration requirements, transportation restrictions, and tax payments.  *See* 26 U.S.C. § 5861(d) ("[i]t shall be unlawful for any person—to receive or possess a firearm which is not registered to him....").  Under the NFA, prohibition is the default and registered ownership is the exception.  Yet under the Second Amendment, as explained in *Bruen*, lawful ownership is the default and prohibition is the narrow exception, and only if supported by history.  To be sure, ATF is permitted to argue that the NFA's registration scheme comports with a historical tradition of similar regulation (it does not, because none exists).  But the Rule does not escape the *Bruen* analysis merely because it does not completely ban certain arms.  *See, e.g.*, *Bruen*, 142 S. Ct. at 2125 (acknowledging that the challenged New York law did not effectuate a complete carry ban, because one of the petitioners obtained a permit to "'carry concealed for purposes of off road back country, outdoor activities similar to hunting,' such as 'fishing, hiking & camping etc.,'" but nevertheless engaging in a historical inquiry); *see also Maryland Shall Issue, Inc. v. Moore*, 2023 WL 8043827, at *5 (4th Cir. Nov. 21, 2023) ("Nothing in the Amendment's text or *Bruen* says that it protects only against laws that *permanently* deprive people of the ability to keep and bear arms.").

Rather, regulations requiring registration of firearms regulate conduct presumptively covered by the Second Amendment, because they interfere with the ability

33

to keep and bear firearms.[11]   The imposition of criminal penalties for failure to register or pay taxes on firearms interferes with the very threshold of ownership and possession.   ATF therefore has the burden to show that there is a historical tradition of requiring registration of the sorts of arms implicated here.   The Rule did not even make the attempt.

### c. Firearms equipped with stabilizing braces are not dangerous *or* unusual.

In ATF's third attempt to avoid its burden to provide a historical tradition of similar regulation, the Rule claims that "short-barreled rifles" are "dangerous and unusual" weapons.[12]   *See* ATF050151 (citing *Heller*, 554 U.S. at 627).   Specifically, the Rule argues that SBRs are "dangerous and unusual" "due to both their concealability and their heightened ability to cause damage...."   *Id.* (relying on three pre-*Bruen* cases); *see also* ECF #22 at 32.   But Judge O'Connor rejected that argument, finding that the "assertion … that pistols *do* become dangerous and unusual as soon as stabilizing braces are attached to them—does not survive [the] administrative record."   *Mock v. Garland*, 2023 WL 6457920, at *9 (N.D. Tex. Oct. 2, 2023).   Quite to the contrary, a handgun equipped with a brace is fundamentally less concealable (bulkier) than a handgun without a brace, both of which use identical ammunition, magazines, etc. *See Mock*, 75 F.4th at 588 (Willett, J.,

---

[11] ATF appears to concede as much, noting only that "the length of time required for registration here is irrelevant … because Plaintiffs … may retain possession of their firearms until they receive ATF's response on the application."   ECF #22 at 31.   But, by focusing only on *prior* existing firearms subject to the Rule's amnesty, ATF ignores that all *future* firearms equipped with stabilizing braces are subject to receiving ATF's permission (after a wait of months or more) before they can be possessed.

[12] For purposes of clarity, this is a conjunctive test.   *See Caetano*, 577 U.S. at 417 (Alito, J., concurring).

concurring) ("Rearward attachments … mak[e] a pistol less concealable...."). For those reasons, a handgun with a brace has an indistinguishable "ability to cause damage" as a handgun without a brace. Or, for that matter, a full-size rifle with an actual stock, which has a longer barrel equating to *better ballistics* ("the ability to cause damage") from the same ammunition using the same "projectile design, caliber, and propellant powder" (ECF #22 at 32). Finally, ATF's claim that short-barreled rifles are inherently dangerous is belied by the agency's actions over the past decade-plus, where it has repeatedly and specifically approved of the manufacture and sale of millions of firearms with stabilizing braces, never giving any indication it considered those weapons "inherent[ly] dangerous[]." *See* ECF #22 at 32.

Finally, it is worth noting that, even when discussing "dangerous and unusual weapons," the Supreme Court never indicated that this was a way to short-circuit *Bruen*'s historical analysis. Rather, the *Bruen* Court made such statements in the context of "***the historical tradition*** of prohibiting the carrying of" certain "dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (emphasis added); *Bruen*, 142 S. Ct. at 2143 ("colonial legislatures sometimes prohibited the carrying of" such weapons); *see also Teter*, 76 F.4th at 949-50 (*Heller* "did not say that dangerous and unusual weapons are not arms.").[13] In

---

[13] It is worth noting that the Supreme Court's discussion of "dangerous and unusual weapons" only mentions "carrying," not "keeping" such arms. *See Bruen*, 142 S. Ct. at 2146 n.19 ("prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society"); 2148 ("'go armed with … [an] offensive and dangerous weapon'"); 2140 (discussing odd weapons like the launcegay which was "worn or carried only when one intended to engage in lawful combat or … to breach the peace"); *Teter*, 76 F.4th at 949 ("the relevance of a weapon's dangerous and unusual character lies in the

other words, the "dangerous and unusual" language was *the product of historical analysis*, and never intended to exempt the government from its historical burden.  Properly situated as a historical test whose burden Defendants must bear, Defendants have utterly failed to rebut braced pistols' (or short-barreled rifles') presumptive textual protection.

### d.  Whether properly classified as pistols, rifles, or short-barreled rifles, firearms with stabilizing braces undoubtedly are in common use.

Although "dangerous and unusual" is not some magic incantation that exempts a given regulation from *Bruen*'s historical scrutiny, the Supreme Court oppositely gave an example of one sort of "bearable arms" that are <u>conclusively</u> within the Second Amendment's protection – those that are "in common use" or "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 582.  In fact, according to the Court, even weapons that previously were considered "dangerous and unusual" may still be protected.  *See Bruen*, 142 S. Ct. at 2143 ("even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

In addition to its failure to demonstrate that pistols equipped with stabilizing braces are particularly "dangerous" as compared to other firearms, the Rule utterly fails to establish that such firearms are in any way "unusual"—and, in fact, demonstrates the

---

'*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'"). Thus, any category of "dangerous and unusual weapons" at best applies only to certain methods of bearing arms, provides no limitation on what sorts of arms may be "kept," and thus does not protect the Rule, which regulates both keeping and bearing.

opposite, explaining how there are between 3 and 7 million such firearms in circulation. ATF050216.   In reality, the true number is almost certainly much higher.   *See, e.g.*, ATF000859 (emphasis added) (lamenting that "these weapons … *continue to proliferate*"). As Judge O'Connor found, "the braced pistols subject to enforcement of the Rule are in common use today."   *Mock*, 2023 WL 6457920, at *9.   Whether properly viewed as handguns (of which ATF in 2021 reported 128 million nationwide, Compl. ¶271), as rifles (82 million, by ATF's estimate, Compl. ¶281), or as an arbitrary sub-category of "short-barreled rifles" (over half a million of which were already registered under the NFA according to outdated 2021 data, Compl. ¶283, plus anywhere from 3 million to 40 million more firearms equipped with stabilizing braces), the firearms regulated by the Rule are clearly "in common use.".

Indeed, by any standard, these numbers amount to braced firearms unambiguously being "in common use" by the gun-owning American public.   *See*, *e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (following remand) ("semi-automatic rifles … are indeed in 'common use,' as the plaintiffs contend.   Approximately 1.6 million AR-15s alone have been manufactured since 1986."); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("[A]pproximately 200,000 civilians owned stun guns as of 2009… stun guns are widely owned and accepted … across the country....").   Even by ATF's estimate, the number of SBRs and braced firearms (3.6 million) exceeds the machineguns identified in *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016), <u>*by a factor of twenty*</u> (or, if the CRS numbers are used, by a factor of 227).   Finally, whereas in *Hollis* there were 34 states "<u>***prohibiting***</u> machineguns," ATF agrees with Plaintiffs that only "six states ban [SBRs]

entirely" (whereas 44 states do not ban them), almost identical to the "45 States" where stun guns could be possessed in *Caetano*, 577 U.S. at 420; *see* ECF #22 at 33, 42 n.27 (conceding that Texas, like most other states, "does not prohibit possession").

### 2. There is no historical record to justify the Rule.

Finally, as it must, ATF attempted in prior briefing to show that a "historical tradition of regulation supports the Rule and the NFA." ECF #22 at 34-37. Importantly, as discussed above, the Rule does not contain this analysis or any historical justification to support its regulation (constituting a separate APA violation).

As explained by the Supreme Court in *Bruen*, for historical evidence to prove "consisten[cy] with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130, challenges to regulations purportedly addressing "a general societal problem that has persisted since the 18th century" will pose a "fairly straightforward" inquiry where "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Of course, "concealability and … heightened ability to cause damage" are not some newfangled features of firearms, nor do they present a uniquely modern societal issue. Indeed, decreased size and increased lethality are inherent features of firearms that have always been sought after,[14] and something the Founders could have addressed via

---

[14] *Arnold v. Kotek*, 2023 Ore. Cir., LEXIS 3886 at *8 (Or. Cir. Ct. Harney Cnty. Nov. 21, 2023) ("Each historical expert agreed, and the court finds, that" those who ratified the Oregon Constitution would have "want[ed] the finest firearms technology available"); *see also id.* at *37 ("wanted the best shotguns, rifles, handguns … they could afford," and "[t]here was a deep desire to have repeating features."). Indeed, the Founders valued

regulation—but chose not to.  This absence of "distinctly similar historical regulation" is dispositive here; the Rule is contrary to the original public understanding of the Second Amendment.  It is evident that, if shorter and more potent firearms had been available to the Founding generation, they would have been adopted and employed against the British, not regulated and banned by administrative fiat.

Finally, any late-coming statutes cannot evince an *early American tradition*.  As the Supreme Court made clear even prior to *Bruen* in *Espinoza v. Montana Department of Revenue*, "more than 30 States" that created a statute or analogue in the mid-to-late 19th century "cannot by itself establish an early American tradition."  140 S. Ct. 2246, 2258-59 (2020); s*ee also Bruen*, 142 S. Ct. at 2137 (using 19th-century sources only "as mere confirmation of what the Court thought already had been established"); 2163 (Barrett, J., concurring) (rejecting "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.  On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'").   In other words, whatever the usefulness of laws that postdate the Founding, they *have no relevance at all unless they confirm* a tradition that existed contemporaneously with Ratification.  Since there is no Founding-era tradition of such

---

features and modifications that increased the effectiveness of their arms.  *See, e.g.*, *Mock*, 2023 WL 6457920, at *11 ("Founding Era gunsmithing involved modifying lawfully bearable pistols with extended grips and rearward stocks to facilitate greater stability, control, and accuracy in single-handed self-defense fire."); *see also* George C. Neumann, *Hunting Guns in Colonial America*, <u>Am. Rifleman</u> (Nov. 25, 2021), https://tinyurl.com/yse34u5f (describing early American rifles as "evolv[ing] toward lighter designs").

laws ever having existed, statutes concocted nearly a century later cannot be relied on to create one.

As noted, the Rule did not even attempt to justify its promulgations by demonstrating them to be consistent with the Nation's historical tradition of firearm regulation. In prior briefing, the government did attempt to marshal an anemic historical record, pointing to Colonial-era (i) firearm inspection rules (ensuring that the populace was sufficiently armed with modern technologies so that it could form an effective fighting force, far different from the purpose of the Rule to limit ownership of certain weapons), (ii) barrel "proof" laws requiring manufacturers (not end users) of firearm products to demonstrate them to be of sufficient quality (a concept foreign to the Rule), and (iii) gunpowder storage laws (designed to prevent cataclysmic explosions from mass storage of unstable forms of gunpowder that no longer exist).[15] ECF #22 at 34-37. But each of these examples of historical laws had both a different "how" and a different "why" than the Rule. *See Bruen*, 142 S. Ct. at 2133 (explaining that both the "how" and the "why" must match in order to be a valid historical analogue).

Because it regulates protected conduct, and lacks a well-established historical tradition, the Rule violates the Second Amendment and must be set aside.

---

[15] In the Rule, ATF also cited various pre-*Bruen* decisions, such as *Bezet v. United States*, 714 F. App'x 336 (5th Cir. 2017), to claim that firearm registration "does not implicate the Second Amendment." ATF050151. But *Bruen* explicitly rejected the two-step balancing test and intermediate-scrutiny standard used in cases like *Bezet*, which are no longer good law. *See also Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) (dealing with Article III standing issues, not the constitutionality of the NFA).

### F.  The Rule is unconstitutionally vague.

#### 1.  The Rule's incomprehensible standard fails to provide fair notice of proscribed features.

In place of the precise (albeit arbitrary) point-scoring worksheet proposed in the NPRM, the Rule dispenses with any sense of objectivity by imposing on gun owners an amorphous and entirely unpredictable six-factor regulatory "test" to determine whether braced pistols are in fact short-barreled rifles.  *See* ATF050226-27; Compl. ¶146.  As a threshold inquiry, the Rule conditions analysis of its six factors on "[w]hen a weapon provides surface area that allows the weapon to be fired from the shoulder," ATF050226, but fails to illuminate just *how much* surface area would suffice.  *See* Compl. ¶147 ("all physical objects must have *some* surface area").  Such failure to define exactly what ATF is looking for pervades the entire test, which cryptically inquires "whether" certain features "allow[]" or are "consistent with" usage as a rifle, giving no specifics.  ATF050226.  Indeed, these four "whether" factors "give no indication of how each will be counted or the relative values assigned to any particular feature or characteristic."  Compl. ¶148; 88 ATF050226.  Left unanswered (and therefore anyone's guess, except ATF's) is *how long* or *how heavy* a braced pistol may be, or *how long* of a length of pull[16] such a weapon may have before ATF will consider it a short-barreled rifle.

Naturally, this imprecise determination will fall on enforcement authorities, who will have no concrete standards to apply other than the Rule's directive that they consider "whether" certain features are "consistent with" those of rifles.  But while beauty may be

---

[16] This term is not found in any federal statute or any other regulation.

41

in the eye of the beholder, felony liability cannot rest on subjectivity.  Indeed, a "know it when you see it" approach "is a standardless and, for the most part, useless pronouncement that lends itself to abuse."  *Seth B. v. Orleans Parish Sch. Bd.*, 810 F.3d 961, 982 (5th Cir. 2016) (Smith, J., dissenting); *see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 141 S. Ct. 731, 732 (2021) (Thomas, J., dissenting from denial of cert.) ("A know-it-when-you-see-it test is no good if one … sees it and another does not.").  Armed with a nebulous balancing test and no guidance as to whether (or which) factors may be dispositive, or in what amount, the Rule will undoubtedly "encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Incredibly, the Rule admits as much, suggesting that gun owners seek *individualized determinations* from ATF as to whether possession of their braced pistols is a felony.  *See* Compl. ¶¶399-401.[17]  But requiring guesswork to determine if one is a felon violates the basic protection of due process.

---

[17] ATF's claim that, "upon request, [ATF] **will provide** any individual with a classification determination" (ECF# 22 at 43), conflicts with 27 C.F.R. § 479.102(c), which states quite differently that ATF "**may issue** a determination (classification)."  The regulation provides no time limit or any obligation to respond.  In response to comments that the Rule is unconstitutionally vague, ATF responded that it "recognizes that clarity of legal restrictions is an essential element of the Fifth Amendment," but then stated "to the extent that an individual is unsure about whether a particular firearm with a particular attached 'stabilizing brace' constitutes a rifle, that individual is free to request a classification determination from ATF for additional clarity."  ATF050202-03.  ATF thus recognizes that the Rule can lead to uncertainty, inviting gun owners to seek individualized dispensation from the agency as to particular firearms.  But the Rule's inherent vagueness, and ATF's promise to provide person-by-person guidance, necessarily encourages arbitrary and discriminatory enforcement.  And "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually

Federal criminal laws must "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). Accordingly, a law is void for vagueness where it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). The Rule provides no meaningful standard for owners of braced pistols to consult in determining whether their arms constitute short-barreled rifles, yet it acknowledges that criminal liability attaches to mere unlawful possession. ATF050220.

The Constitution does not tolerate such uncertainty in the criminal law. Rather, "[i]n our constitutional order, a vague law is no law at all. … Vague laws transgress … constitutional requirements." *United States v. Davis*, 139 S. Ct. 2319. 2323 (2019). But bad as vague laws may be, vague *regulations* are even worse, because they are made by bureaucrats, operating entirely outside the political process, and with no opportunity for accountability. *See F.C.C v. Fox Television Stations*, 567 U.S. 239, 253-254 (2012) (explaining that this "fundamental principle" applies particularly to an "abrupt" "regulatory change" on "any subject").

Worse still are vague regulations that implicate constitutional rights. When constitutional rights are "involved, rigorous adherence to those [due process] requirements is necessary to ensure that ambiguity does not chill protected [conduct]." *Id.* The Supreme

---

associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

Court underscored courts' special sensitivity to the chilling effect of vague regulations in the First Amendment context as follows:

> The Commission's lack of notice … "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited."  This would be true with respect to a regulatory change this abrupt on any subject, but it is surely the case when applied to the regulations in question, regulations that touch upon "sensitive areas of basic First Amendment freedoms...."  [*Id.* at 254 (citation omitted).]

Here, the Rule abruptly reversed a decade of guidance that braced pistols did not come within the ambit of the NFA, Compl. ¶75, and so the Fifth Amendment demands a similar "rigorous adherence" to its protection against vagueness.  Indeed, because the Rule touches on a constitutional right – in this case, the Second Amendment – it is even more important than usual that the criminal law is clear.  *See Bruen*, 142 S. Ct. at 2156 (cautioning that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").  But as it stands, the Rule is hopelessly *un*clear as to the conduct it proscribes, and thus is void for vagueness.

## 2.  The Rule violates the rule of lenity.

The rule of lenity demands resolution of any ambiguities regarding the NFA status of braced pistols in the citizens' favor.  The NFA does not regulate handguns, defined by the GCA as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand."  18 U.S.C. § 921(a)(30).  A "handgun" under the GCA cannot simultaneously be a "rifle" under the NFA, because a "rifle" is "designed" and "intended" "to be fired from the shoulder," and thus not "designed to be held and fired by the use of a single hand."  *See* 18 U.S.C. § 921(a)(7).

44

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992), confirms this, having examined firearm parts kits that could be assembled either into firearms unregulated by the NFA *or* into an NFA-regulated SBR.  Five members of the Court applied the rule of lenity given the NFA's criminal penalties, holding that the NFA does not apply to parts that *could* be made into NFA weapons or alternatively into non-NFA weapons.  *Id.* at 517-18 (opinion of Souter, J.), 519 (opinion of Scalia, J.); *see also Cargill*, 57 F.4th  (en banc) (applying rule of lenity to reject ATF's attempt to regulate bump stocks as machine guns).

Similarly, under *Thompson*, the NFA does not apply to a brace that, when attached to a handgun, *could* be interpreted (by ATF, at least) to convert the weapon into either an NFA-regulated SBR or into an unregulated handgun with a brace.  The only way that the attachment can convert the handgun into an SBR is if it *is* deliberately designed, made, and intended to be fired from the shoulder.  As the Fifth Circuit recently observed in *VanDerStok*, "should the [statutory] text be at all unclear, we err on the side of those citizens who now face unforeseen criminal liability under ATF's new definitions86 F.4th at 196 n.26.  With felony penalties hanging in the balance, the rule of lenity requires invalidation of the Rule.

### G. The Rule is an invalid exercise of taxing power.

The NFA and the Rule purportedly are exercises of the taxing power, yet it is a per se violation to tax the exercise of a constitutional right.  *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).  The NFA specifically taxes certain constitutionally protected firearms, including SBRs.  As the Supreme Court said in the First Amendment context:

> A tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest. Any tax that the press must pay, of course, imposes some "burden." But, as we have observed, this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, [and] suggest[ed] that a regulation that singled out the press might place a heavier burden of justification on the State, and we now conclude that the special problems created by differential treatment do indeed impose such a burden.

*Minneapolis Star & Tribune Co. v. Minn. Commr. of Revenue*, 460 U.S. 575, 582–83

(1983). Thus, applying a general tax on manufacturing, making, selling, or distributing

tangible personal property to manufacturing, making, selling, or distributing firearms

(including SBRs) would be constitutional. But specifically taxing the manufacturing,

making, selling, or distributing only of certain types of firearms (including SBRs) is

unconstitutional for the same reasons as is specifically taxing speech.

Although the Supreme Court upheld the NFA as an exercise of the Taxing Power in

*Sonzinsky v. United States*, 300 U.S. 506, 514 (1937), that case is inapposite because the

Court did not consider whether the tax might violate the Second Amendment. The opinion

did not even mention the right to keep and bear arms, and it certainly did not review the

tax placed on the exercise of that right under *Bruen*'s historical framework. Defendants

cannot meet their burden to show a historical tradition of taxing firearms because there is

no such tradition. *Sonzinsky* is obsolete after *Bruen*.

Therefore, the Rule must be set aside as "contrary to constitutional right" under 5

U.S.C. § 706(2)(B) for that additional reason.

**H. As applied to citizens who supposedly "make" an SBR by attaching a stabilizing brace to a handgun, the Rule is an unconstitutional unapportioned direct tax.**

The NFA's tax on making short-barreled rifles is a direct tax that must be apportioned among the several States. U.S. Const. Art. I, § 2, cl. 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons"); § 9, cl. 4 ("No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken.").

To counsel for Plaintiffs' knowledge, no court has ever decided whether a tax on making property is a direct tax or an indirect tax.

"Only three taxes are definitely known to be direct: (1) a capitation, U.S. Const. art. I, § 9, (2) a tax upon real property, and (3) a tax upon personal property." *Murphy v. I.R.S.*, 493 F.3d 170, 181 (D.C. Cir. 2007). Thus, a tax on personal property is a direct tax.

But taxes "upon the exercise of one of the numerous rights of property [that are] clearly distinguishable from a tax which falls upon the owner merely because he is owner … were not understood to be direct taxes when the Constitution was adopted." *Bromley v. McCaughn*, 280 U.S. 124, 137 (1929). For instance, a tax on selling personal property (a sales tax) is not a direct tax that must be apportioned.

Yet the line between taxing exercises of the rights of property and taxing the property itself can be blurry. The Supreme Court recognizes the possibility that, "since

47

property is the sum of all the rights and powers incident to ownership [and] that one of the uses of property is to keep it, and that a tax upon the possession or keeping of property is no different from a tax on the property itself." *Id*. at 138. The Court has reserved the question of whether "a tax levied upon all the uses to which property may be put, or upon the exercise of a single power indispensable to the enjoyment of all others over it, would be in effect a tax upon property, and hence a direct tax requiring apportionment." *Id*. (emphasis added, citation omitted).

A tax on taking some items of personal property and making them into a new item of personal property for personal, non-commercial use is a direct tax because it is "no different from a tax on the property itself." *Id*.

Alternatively, according to one originalist scholar, "[d]espite the variety among the objects of direct taxation, one can divine a unifying principle: A tax was direct if it was imposed on people's lives, homes, or on the productive occupations by which they supported and expressed themselves. Direct taxes, in other words, were levies on living and producing." Robert G. Natelson, *What the Constitution Means by "Duties, Imposts, and Excises"–and "Taxes" (Direct or Otherwise)*, 66 Case W. Res. L. Rev. 297, 318 (2015). A tax on making short-barreled rifles is a tax on living and producing. Therefore, it is a direct tax.

The NFA's tax on making short-barreled rifles is a direct tax that is not apportioned among the several States. It is unconstitutional for that additional reason. Consequently, the Rule is unlawful agency action that must be set aside because it is not in accordance

with law, contrary to constitutional power, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

## I.  The Rule violates the constitutional separation of powers.

Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  Article I, § 7, cl. 2, in turn, mandates that "[e]very Bill … shall have passed the House of Representatives and the Senate" and "shall … be presented to the President of the United States … before it become a Law...."  These bright-line constitutional standards clearly delineate the legislative function as belonging to Congress alone.  To be sure, the judiciary has permitted Congress to delegate certain lesser legislative functions to agencies to fill-in-the-blanks, but **not** when it comes to "major policy" questions with great "economic and political significance."  *West Virginia*, 142 S. Ct. at 2608-09.  And **never** when it comes to the criminal law.

This latter axiom seems almost too obvious to require further proof.  The Supreme Court repeatedly has instructed that "the separation of powers … requir[es] that Congress, rather than the executive … branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *see also Whitman v. United States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., respecting the denial of cert.) ("legislatures, not executive officers, define crimes"); *Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws.").

In striking down an earlier ATF attempt to rewrite the criminal laws it is tasked with enforcing, the Fifth Circuit similarly reminded that "[i]t is the legislature, not the Court,

which is to define a crime, and ordain its punishment." *Cargill,* 57 F.4th at 451 (citation omitted).  The Rule is yet another attempt by ATF to expand the NFA by executive fiat and usurp Congress's uniquely legislative function, as its net effect is the prohibition of the (previously lawful) unregistered possession of ubiquitous braced pistols, sweeping once-lawful conduct within the reach of existing crimes.  If Congress wished to criminalize the new technology represented by pistol braces, it certainly is free to amend the NFA to do so.[18]  But ATF is not free to suddenly discover an interpretation of federal law that results in new criminal liability attaching to millions of law-abiding Americans.

For that reason, the Rule also violates the principle that agencies have no authority to decide "major questions" or set national policy on issues of "economic and political significance." *West Virginia*, 142 S. Ct. at 2610, 2608.  Importantly, the Rule does not, for example, target one or two new models of pistol braces and declare them to be rifle stocks.  Rather, the Rule claims that literally nothing ATF has ever said about pistol braces is true, that every one of ATF's classification letters on the subject is rescinded (ATF050132), and that millions of Americans are now guilty of felony crimes for having done what ATF promised them was lawful to do.  ATF also acknowledges that the Rule will cause *several billion dollars* of damage to the nation's economy.  ATF048881, ATF048885.[19]  If billions

---

[18]  Of course, whether such an amendment would comport with the Second Amendment remains to be seen.

[19]  ATF estimates the Rule's financial impact between $2.3 billion and $4.9 billion dollars, based on its estimate of between 3-7 million pistol braces in circulation.  *See* Compl. ¶¶204, 283.  Using the Congressional Research Service estimate of 10-40 million such devices, the Rule's financial impact easily could be in the tens of billions of dollars.

of dollars and millions of felonies does not constitute a "significant … economic and political" issue, it is hard to see what would qualify.

Because the Rule represents an unauthorized attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic fiat, the Rule violates the constitutional separation of powers.

### III.   The Court should grant a permanent injunction.

### A. Plaintiffs have suffered irreparable injury and remedies at law are inadequate.

#### 1.   Texas

For the same reasons that Texas has injury-in-fact, the Rule imposes irreparable injury to Texas's sovereign and quasi-sovereign interests.  See *supra* part I.A.  Such injuries cannot be repaired by money damages.  Only equitable relief—a permanent injunction against enforcing the Rule in Texas—can make Texas whole.

#### 2.   Plaintiff Brown and GOA

The Court has already found that the Rule inflicts irreparable harm on Brown and GOA. "Because the *Mock* plaintiffs owned firearms and stabilizing braces that the Final Rule would classify as an SBR, the plaintiffs had 'no trouble establishing a substantial threat of irreparable harm in the form of nonrecoverable compliance costs.' [Citing *Mock*, 2023 WL 6457920, at *7 (N.D. Tex. Oct. 2, 2023).]  That logic is equally applicable here." ECF #80 at 23.

Plaintiff Brown, like countless members of GOA, will suffer irreparable harm at the hands of the Rule, should it be allowed to take effect.  ECF #16-13 and #16-14.  If they do not comply with ATF's demands (and now without any amnesty period), they run the risk

of felony arrest, prosecution, imprisonment, and accompanying loss of Second Amendment rights (by the "choice" to either destroy or modify firearms, or register them with the federal government). *Id*. Additionally, surrendering or destroying a firearm and stabilizing brace will cause irreparable economic loss. ATF048852-53 (estimating $471.3 million in costs from surrendering firearms, including $2,526 in costs to an average individual and $8,754 to the average federally licensed firearms dealer). Likewise, ATF estimates that modifying firearms to be Rule-compliant will cost hundreds of dollars per firearm (ATF048861), a cost to be borne by the law-abiding gun owner, not the bureaucrats who suddenly decided he is a felon. *See Kiewit Offshore Servs. V. U.S. Dep't. of Labor*, 2023 WL 417486, at \*9 (S.D. Tex. Jan. 25, 2023) ("Although the Fifth Circuit has yet to speak directly as to this issue, case law from other district courts suggests that where economic losses are unrecoverable because of sovereign or governmental immunity, the harm may be irreparable").

Finally, and more importantly, because "loss of constitutional freedoms 'for even minimal periods of time ... unquestionably constitutes irreparable injury,'" *See BST Holdings*, 17 F.4th at 618 (citation omitted), Plaintiffs have irreparable injury because the Rule violates the Constitution.

## B. The balance of hardships and public interest is served by granting a permanent injunction.

When the government is a party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2016) (same). As the Court has already determined, "there is generally

no public interest in the perpetuation of unlawful agency action" (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up), and the Fifth Circuit has already found that the Rule is likely unlawful, *see Mock*, 75 F.4th at 578.Therefore, the public interest and balance of equities favor Plaintiffs.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of Plaintiffs, should vacate the Rule, and should permanently enjoin Defendants from enforcing the Rule and from taking any action inconsistent with vacatur of the Rule.

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH*
Mississippi Bar No. 102784
Southern District of Texas No. 3554925
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

ANTHONY R. NAPOLITANO*
Arizona Bar No. 034586
Southern District of Texas No. 3837680
Bergin, Frakes, Smalley & Oberholtzer, PLLC
4343 E. Camelback Road, Suite 210
Phoenix, Arizona 85018
(602) 848-5449
anapolitano@bfsolaw.com

GILBERT J. AMBLER*
Virginia Bar No. 94325
Southern District of Texas No. 3834055
20 S. Braddock St
Winchester, VA 22601
(540) 550-4236
gilbert@amblerlawoffices.com

*Counsel for Plaintiffs Brady Brown, Gun Owners of America, Inc., and Gun Owners Foundation*

KEN PAXTON**
Attorney General of Texas

BRENT WEBSTER**
First Assistant Attorney General of Texas

GRANT DORFMAN**
Deputy First Assistant
   Attorney General of Texas

RALPH MOLINA
Deputy Attorney General
   for Legal Strategy

/s/ Charles K. Eldred
CHARLES K. ELDRED**
Chief, Legal Strategy Division
Texas Bar No. 00793681
Southern District of Texas No. 20772

CHRISTINA CELLA**
Special Counsel for Legal Strategy
Texas Bar No. 24106199
Southern District of Texas No. 3355870

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Charles.Eldred@oag.texas.gov
Christina.Cella@oag.texas.gov

**Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on November 30, 2023, I filed this motion through the Court's CM/ECF system, which automatically served it upon all counsel of record.

*/s/ Charles K. Eldred*

**CERTIFICATE OF WORD COUNT**

I certify that this motion for summary judgment, according to the word-count function of Microsoft Word, on which this motion for summary judgment was prepared, contains 14,965 words.

*/s/ Charles K. Eldred*