**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,<br><br>    *Defendants*. | Civil Action No. 6:23-cv-00013 |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.     Statutory and Regulatory Background ................................................................2

    II.    ATF's Pre-Rule Classifications of and Guidance Regarding Brace-equipped Weapons ................................................................................................................3

    III.   The Rule ................................................................................................................7

    IV.   This Lawsuit and Other Litigation Challenging the Rule ....................................10

LEGAL STANDARDS ........................................................................................................10

ARGUMENT ........................................................................................................................11

    I.     The Tax Anti-Injunction Act bars Plaintiffs' claims insofar as they seek relief that would obstruct the assessment or collection of the NFA's tax. ..........................11

    II.    The Rule properly interprets the statutory definition of "rifle." ..........................12

    III.   The Rule is not arbitrary or capricious. ...............................................................17

    IV.   The Rule complies with the APA's procedural requirements ...............................23

        A.     The Rule is not subject to notice-and-comment requirements..............................23

        B.     The Rule is a logical outgrowth of the proposed rule. ...............................26

        C.     Any error in ATF's process was harmless................................................28

    V.     Neither the Rule nor the NFA violates the Second Amendment. ..........................30

        A.     Braces are not bearable arms protected by the Second Amendment. ..................30

        B.     Short-barreled rifles are dangerous and unusual weapons....................................31

        C.     Taxation and registration of short-barreled rifles does not implicate the Second Amendment................................................................................35

        D.     Historical tradition of firearm regulation supports the Rule and the NFA..........35

    VI.    The Rule is not unconstitutionally vague.............................................................40

    VII.   The NFA is a valid exercise of Congress's taxing power. ....................................43

    VIII.  Neither the NFA nor the Rule violate separation of powers principles. ..........45

A.     The NFA and GCA provide ATF with intelligible standards to which it must conform. ........................................................................................45

B.     The Rule does not implicate the "major questions" doctrine. ...........................47

IX.    Any relief should be narrowly tailored to redress Plaintiffs' injuries. ...................48

A.     Universal vacatur of the Rule is unwarranted. ........................................................48

B.     Plaintiffs are not entitled to their proposed injunction. ...........................................50

   1.   No Plaintiff will suffer irreparable harm absent an injunction. ......................51

   2.   The balance of harms and public interest militate against an injunction. ...................................................................................................54

   3.   No relief should extend to unidentified GOA members. ...............................55

CONCLUSION ...............................................................................................................56

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. U.S.,*
  295 U.S. 495 (1935) ................................................................................................47

*All. For Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) ...................................................................................23

*Am. Transfer & Storage Co. v. Interstate Commerce Com.,*
  719 F.2d 1283 (5th Cir. 1983) ................................................................................26

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018) ...............................................................................55

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.,*
  515 U.S. 687 (1995) ................................................................................................17

*Basiardanes v. City of Galveston,*
  682 F.2d 1203 (5th Cir. 1982) ................................................................................41

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................24

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) .................................................................................39

*Bezet v. United States,*
  276 F. Supp. 3d 576 (E.D. La. 2017) .....................................................................46

*Bezet v. U.S.,*
  714 F. App'x 336 (5th Cir. 2017) .......................................................................*passim*

*Bloomberg L.P. v. SEC,*
  45 F.4th 462 (D.C. Cir. 2022) ................................................................................52

*Bob Jones Univ. v. Simon,*
  416 U.S. 725 (1974) ................................................................................................12

*British Caledonian Airways, Ltd. v. C.A.B.,*
  584 F.2d 982 (D.C. Cir. 1978) ...............................................................................26

*Britto v. ATF,*
  2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) ........................................................10

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ...................................................................................48

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ...................................................................................32

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
  2023 WL 4291992 (W.D. Tex. June 30, 2023) ...........................................54

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ...........................................................48, 49, 50

*Central S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .......................................................................52

*Chem. Mfrs. Ass'n v. EPA,*
  870 F.2d 177 (5th Cir. 1989) .......................................................................26

*CIC Servs., LLC v. IRS,*
  593 U.S. 209 (2021) ....................................................................................12

*City of Arlington v. FCC,*
  668 F.3d 229 (5th Cir. 2012) .......................................................................29

*ConocoPhillips Co. v. EPA,*
  612 F.3d 822 (5th Cir. 2010) .......................................................................28

*DHS v. Regents of the Univ of Cal.,*
  140 S. Ct. 1891 (2020) ..........................................................................18, 20

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................23, 30, 32

*Doe v. Trump,*
  2021 WL 4441462 (S.D. Ill. Sep. 28, 2021) ...............................................46

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ....................................................................................49

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................................................17

*FCC v. Prometheus Radio Proj.,*
  592 U.S. 414 (2021) ..............................................................................17, 23

*Feds for Medical Freedom v. Biden,*
  63 F.4th 366 (5th Cir. 2023) ........................................................................50

*Firearms Regul. Accountability Coal., Inc. v. Garland,*
  2023 WL 5942365 (D.N.D. 2023) .........................................................*passim*

ii

*Flight Training Int'l, Inc. v. FAA,*
    58 F.4th 234 (5th Cir. 2023) ............................................................................ 24, 25

*Flora v. U.S.,*
    357 U.S. 63 (1958) ................................................................................................. 11

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ......................................................................................... 50

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................................. 43

*Grinin v. Johnson,*
    224 F. Supp. 3d 525 (S.D. Tex. 2016) ............................................................... 11

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ............................................................................................. 50

*Guedes v. ATF,*
    920 F.3d 1 (D.C. Cir. 2019) ............................................................................... 25

*Gundy v. U.S.,*
    139 S. Ct. 2116 (2018) .................................................................................. 46, 47

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................................................................. 53

*Harris Cty. v. CarMax Auto Superstores Inc.,*
    177 F.3d 306 (5th Cir. 1999) ............................................................................. 41

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
    23 F.3d 412 (D.C. Cir. 1994) ............................................................................. 26

*Herrera v. Raoul,*
    2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ..................................................... 38

*Hoctor v. U.S. Dep't of Agric.,*
    82 F.3d 165 (7th Cir. 1996) ............................................................................... 25

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) ............................................................................. 32

*Hotze v. Burwell,*
    784 F.3d 984 (5th Cir. 2015) ....................................................................... 11, 12

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ..................................................................... 21, 26, 27

*Huddleston v. United States,*
   415 U.S. 814 (1974) ............................................................................................3

*J.W. Hampton, Jr. & Co. v. U.S.,*
   276 U.S. 394 (1928) ..........................................................................................47

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1977) ...........................................................................56

*King v. Burwell,*
   576 U.S. 473 (2015) ..........................................................................................48

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ..........................................................................................41

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ............................................................................35

*Linn v. Chivatero,*
   714 F.2d 1278 (5th Cir. 1983) ..........................................................................11

*Loving v. U.S.,*
   517 U.S. 748 (1996) ..........................................................................................47

*Louisiana v. Becerra,*
   20 F.4th 260 (5th Cir. 2021) .............................................................................51

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ..........................................................................................50

*Maracich v. Spears,*
   570 U.S. 48 (2013) ............................................................................................16

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................................................56

*MediNatura, Inc. v. FDA,*
   998 F.3d 931 (D.C. Cir. 2021) ..........................................................................20

*Mid Continent Nail Corp. v. U.S.,*
   846 F.3d 1364 (Fed. Cir. 2017) ........................................................................28

*Miller v. Garland,*
   2023 WL 3692841 (E.D. Va. 2023) ...........................................................*passim*

*Mistretta v. U.S.,*
   488 U.S. 361 (1989) ..........................................................................................47

*Mock v. Garland,*
  2023 WL 2711630 (N.D. Tex. 2023) ................................................................... *passim*

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ..................................................................... 25, 26

*Mock v. Garland,*
  2023 WL 6457920 (N.D. Tex. 2023) ............................................. 10, 22, 32, 34

*Monsanto Co. v. Geerston Seed Farms,*
  561 U.S. 139 (2010) .................................................................................. 52, 55

*Morehouse Enters., LLC v. ATF,*
  78 F.4th 1011 (8th Cir. 2023) .............................................................................54

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................................23

*Muscarello v. U.S.,*
  524 U.S. 125 (1998) ..........................................................................................16

*New York State Rifle & Pistol Association v. Bruen,*
  597 U.S. 1 (2022) ........................................................................ 22, 35, 36, 40

*Nken v. Holder,*
  556 U.S. 418 (2009) ..........................................................................................55

*Panama Ref. Co. v. Ryan,*
  293 U.S. 388 (1935) ..........................................................................................47

*PDK Lab'ys Inc. v. DEA,*
  438 F.3d 1184 (D.C. Cir. 2006) .................................................................. 21, 43

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ..................................................................................... 23, 25

*Posters 'N' Things, Ltd. v. U.S.,*
  511 U.S. 513 (1994) ................................................................................... 15, 42

*Presser v. Illinois,*
  116 U.S. 252 (1886) ..........................................................................................37

*Rest. Law Ctr. v. U.S. Dep't of Labor,*
  66 F.4th 593 (5th Cir. 2023) .............................................................................54

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
  1490 U.S. 477 (1989) ........................................................................................46

*Romag Fasteners, Inc. v. Fossil, Inc.,*
    140 S. Ct. 1492 (2020) ........................................................................................... 16

*S. Terminal Corp. v. EPA,*
    504 F.2d 646 (1st Cir. 1974) .................................................................................. 27

*Second Amend. Found., Inc. v. ATF,*
    2023 WL 7490149 (N.D. Tex. 2023) ............................................................... *passim*

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016) .................................................................................. 14

*Sonzinsky v. U.S.,*
    300 U.S. 506 (1937) ........................................................................................ 44, 45

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ................................................................................. 38

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ................................................................................. 41

*Tex. Gun Rts., Inc. v. ATF,*
    2023 WL 8352316 (N.D. Tex. Oct. 4, 2023) ...................................................... 10

*Tex. Tech Phys. Assocs. v. HHS,*
    917 F.3d 837 (5th Cir. 2019) ................................................................................. 17

*Tex. Workforce Comm'n v. U.S. Dep't of Educ.,*
    973 F.3d 383 (5th Cir. 2020) ................................................................................. 14

*Texas v. ATF,*
    2023 WL 3763895 (S.D. Tex. May 31, 2023)) ................................................ 52, 53

*Texas v. ATF,*
    2023 WL 7116844 (S.D. Tex. 2023) ........................................................ 10, 50, 52

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ................................................................................. 21

*Texas v. Lyng,*
    868 F.2d 795 (5th Cir. 1989) ................................................................................. 29

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ................................................................................. 51

*Thompson/Center Arms Co. v. Baker,*
    686 F. Supp. 38 (D.N.H. 1988) ............................................................................ 46

*U.S. v. Al-Azhari,*
2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ......................................................30

*U.S. v. Ardoin,*
19 F.3d 177 (5th Cir. 1994) ..................................................................................43

*U.S. v. Barbeau,*
2016 WL 1046093 (W.D. Wash. Mar. 16, 2016) .................................................32

*U.S. v. Bradley,*
2023 WL 2621352 (S.D. W. Va. Mar. 23, 2023) .................................................38

*U.S. v. Bolatete,*
977 F.3d 1022 (11th Cir. 2020) ...........................................................................45

*U.S. v. Clintwood Elkhorn Mining Co.,*
553 U.S. 1 (2008) .................................................................................................11

*U.S. v. Cox,*
906 F.3d 1170 (10th Cir. 2018) .....................................................................*passim*

*U.S. v. Dangleben,*
2023 WL 6441977 (D.V.I. Oct. 3, 2023) .............................................................37

*U.S. v. Davis,*
139 S. Ct. 2319 (2019) .........................................................................................16

*U.S. v. Delauder,*
2023 WL 5658924 (N.D. W. Va. Aug. 31, 2023) ...............................................36

*U.S. v. Freed,*
401 U.S. 601 (1971) .............................................................................................37

*U.S. v. Gilbert,*
286 F. App'x 383 (9th Cir. 2008) ..................................................................32, 33

*U.S. v. Golding,*
332 F.3d 838 (5th Cir. 2003) ...............................................................................33

*U.S. v. Gonzalez,*
2011 WL 5288727 (D. Utah Nov. 2, 2011) .........................................................33

*U.S. v. Gresham,*
118 F.3d 258 (5th Cir. 1997) ..........................................................................12, 44

*U.S. v. Hasson,*
2019 WL 4573424 (D. Md. Sept. 20, 2019) ........................................................30

*U.S. v. Hayes,*
  555 U.S. 415 (2009) ..................................................................................................14

*U.S. v. Holton,*
  639 F. Supp. 3d 704 (N.D. Tex. 2022) ....................................................................38

*U.S. v. Howard,*
  766 F.3d 414 (5th Cir. 2014) ...................................................................................41

*U.S. v. Johnson,*
  632 F.3d 931 (5th Cir. 2011) ............................................................................. 29, 30

*U.S. v. Libertad,*
  2023 WL 4378863 (S.D.N.Y. July 7, 2023) ............................................................38

*U.S. v. Marshall,*
  2010 WL 5169816 (S.D. Fla. Dec. 14, 2010) ..........................................................46

*U.S. v. Majid,*
  2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) ........................................................33

*U.S. v. Miller,*
  307 U.S. 174 (1939) ..................................................................................................32

*U.S. v. Miller,*
  2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) ........................................................32

*U.S. v. Padgett,*
  2023 WL 3483929 (D. Alaska Jan. 4, 2023) ............................................................37

*U.S. v. Rose,*
  695 F.2d 1356 (10th Cir. 1982) ...............................................................................16

*U.S. v. Royce,*
  2023 WL 2163677 (D.N.D. Feb. 22, 2023) ..............................................................32

*U.S. v. Rush,*
  2023 WL 403774 (S.D. Ill. Jan. 25, 2023) ..............................................................32

*U.S. v. Saleem,*
  2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ..........................................................36

*U.S. v. St. Bernard Par.,*
  756 F.2d 1116 (5th Cir. 1985) .................................................................................54

*U.S. v. Stepp-Zafft,*
  733 F. App'x 327 (8th Cir. 2018) .............................................................................32

*U.S. v. Syverson*,
  90 F.3d 227 (7th Cir. 1996) ............................................................................. 14

*U.S. v. Texas*,
  566 F. Supp. 3d 605 (W.D. Tex. 2021) ........................................................... 56

*U.S. v. Texas*,
  143 S. Ct. 1964 (2023) ............................................................................... 49, 51

*Union Elec. Co. v. U.S.*,
  363 F.3d 1292 (Fed. Cir. 2004) ...................................................................... 46

*U.S. v. Thompson/Center Arms Co.*,
  504 U.S. 505 (1992) .................................................................................... 2, 17

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*,
  828 F.2d 314 (5th Cir. 1987) .......................................................................... 28

*VanDerStok v. Garland*,
  86 F.4th 179 (5th Cir. 2023) ........................................................................... 49

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) .................................................................................. 42, 43

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................................ 43

*Wash. St. Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .................................................................................. 35, 41

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .................................................................................... 48

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 54

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ........................................................................ 54

*Yakus v. U.S.*,
  321 U.S. 414 (1944) ........................................................................................ 47

**Federal Statutes**

5 U.S.C. § 553 ...................................................................................................... 24

5 U.S.C. § 702 ...................................................................................................... 49

5 U.S.C. § 706 ................................................................................................ 17, 49

18 U.S.C. § 921 ...................................................................................................................*passim*

18 U.S.C. § 922 ...................................................................................................................3, 47

18 U.S.C. § 926 ...................................................................................................................3, 47

26 U.S.C. § 5801 ...................................................................................................................2

26 U.S.C. § 5811 ...................................................................................................................47

26 U.S.C. § 5845 ...................................................................................................................*passim*

26 U.S.C. § 6511 ...................................................................................................................12

26 U.S.C. § 7421 ...................................................................................................................11

26 U.S.C. § 7801 ...................................................................................................................3

26 U.S.C. § 7805 ...................................................................................................................47

**State Statutes**

11 R.I. Gen. Laws Ann. § 11-47-8(b) ...................................................................................................................34

Ala. Code § 13A-11-63(a) ...................................................................................................................34

Alaska Stat. Ann § 11.61.200(c) ...................................................................................................................34

Ariz. Rev. Stat. Ann. § 13-3101(B) ...................................................................................................................34

Cal. Penal Code § 16590 ...................................................................................................................34

Colo. Rev. Stat. Ann. § 18-12-102(1) ...................................................................................................................34

D.C. Code Ann. § 7-2502.02 ...................................................................................................................34

Fla. Stat. Ann. § 790.221(1)-(3) ...................................................................................................................34

Ga. Code Ann § 16-11-122 ...................................................................................................................34

Haw. Rev. Stat. Ann. § 134-8 ...................................................................................................................34

Ill. Comp. Stat. Ann § 24-1(a)(7)(ii) ...................................................................................................................34

Iowa Code Ann § 724.1C ...................................................................................................................34

La. Stat. Ann. § 40:1785 ...................................................................................................................34

Md. Code Ann., Pub. Safety § 5-203 ...................................................................................................................34

Mich. Comp. Laws Ann. § 750.224b ................................................................... 34

Mo. Ann. Stat. § 571.020 .................................................................................... 34

Mont. Code Ann. § 45-8-340 ............................................................................... 34

N.C. Gen. Stat. Ann. § 14-288.8 .......................................................................... 34

N.D. Cent. Code Ann. § 62.1-02-03 ..................................................................... 34

N.J. Stat. Ann. § 2C:39-3(b) ................................................................................ 34

N.Y. Penal Law § 265.00(3)(c) ............................................................................ 34

Neb. Rev. Stat. Ann. § 28-1203 ........................................................................... 34

Nev. Rev. Stat. Ann. § 202.275 ............................................................................ 34

Ohio Rev. Code Ann. § 2923.17 ........................................................................... 34

Okla. Stat. Ann. tit. 21, § 1289.18(B) .................................................................. 34

Or. Rev. Stat. Ann. § 166.272(1) .......................................................................... 34

S.C. Code Ann. § 16-23-250 ................................................................................. 34

Tex. Penal Code Ann. § 46.05(a)(1)(C) ................................................... 34, 45, 52

Va. Code Ann. § 18.2-303.1 ................................................................................. 34

Wash. Rev. Code Ann. § 9.41.190(4) .................................................................... 34

Wis. Stat. Ann. § 941.28(2)-(4) ............................................................................ 34

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) ................................................................................ 2

**Regulations**

27 C.F.R. § 478 ..................................................................................... 3, 8, 20, 24

27 C.F.R. § 479 ..................................................................................... 3, 8, 20, 24

28 C.F.R. § 0.130 ............................................................................................ 3, 47

*Factoring Criteria for Firearms With Attached "Stabilizing Braces"*
 86 Fed. Reg. 30826 (June 10, 2021) ....................................................... 8, 27, 28, 48

*Factoring Criteria for Firearms With Attached "Stabilizing Braces"*
   88 Fed. Reg. 6478 (Jan. 31, 2023) ...........................................................................*passim*

**Other Authorities**

27 Stat. 116, § 5 (1892),
   https://perma.cc/7PUE-NVDN...............................................................................38

*NFA Handbook* (Apr. 2009),
   https://perma.cc/P3NL-G35G .............................................................................. 3, 19

Ill. Stat. Ann. Crim. ch. 38 (1885),
   https://perma.cc/7LPN-T8SX ..............................................................................38

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
   America: The Legal Context of the Second Amendment,"
   25 Law & Hist. Rev. 139 (2007) .........................................................................37

St. Paul, Minn., Ordinances no. 895, § 2 (1889),
   https://perma.cc/8CKK-Q54S ..............................................................................40

## INTRODUCTION

For nearly a century, Congress has regulated short-barreled rifles, weapons it deemed uniquely dangerous and prone to criminal misuse. Federal law defines a "rifle" as a rifle-bored weapon that is "designed," "made," and "intended" to be "fired from the shoulder." 26 U.S.C. § 5845(c). When a rifle has a barrel shorter than 16 inches, it is a short-barreled rifle subject to certain regulatory requirements under the National Firearms Act ("NFA") and the Gun Control Act ("GCA").

Over the last decade, firearm manufacturers have sold short-barreled weapons equipped with devices commonly referred to as "stabilizing braces." These devices are typically designed to attach to the rear end of a pistol made with a rifle receiver but no buttstock. And although manufacturers claim that stabilizing braces are intended to assist with single-handed firing, manufacturers often design braces to imitate traditional shoulder stocks and market them as a way to convert pistols into shoulder-fired weapons. The result has been the widespread evasion of federal controls on short-barreled rifles.

In response, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") promulgated a rule that explains when a weapon equipped with a stabilizing brace is a short-barreled rifle under the NFA and the GCA. *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) ("Rule"). And to provide guidance to the regulated community, the Rule outlined the type of evidence that ATF considers when determining whether a particular brace-equipped weapon is designed, made, and intended to be fired from the shoulder, and is thus a rifle under federal law.

Plaintiffs challenge this routine rulemaking under the APA. But the Tax Anti-Injunction Act bars Plaintiffs' claims to the extent they seek to restrain enforcement of the NFA's tax. And in all events, none of Plaintiffs' claims should survive scrutiny, as the Rule is consistent with the NFA, reasonably explained, procedurally compliant, and constitutionally sound. The Court should therefore grant summary judgment in Defendants' favor on all of Plaintiffs' claims.

## BACKGROUND

I.    **Statutory and Regulatory Background**

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("'[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes."). The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger ….

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition.

Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. U.S.*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of short-barreled rifles and the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF invites manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the item qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of and Guidance Regarding Brace-equipped Weapons

In the last decade, ATF has received numerous classification requests for weapons equipped

with various types of so-called "stabilizing braces." 88 Fed. Reg. at 6482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6518. And though some manufacturers have claimed that stabilizing braces are meant to attach to or rest against a shooter's forearm, these devices often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individuals to enable a shooter to shoulder a firearm. *Id.* at 6479, 6527–29, 6544–47. So to determine whether a particular brace-equipped weapon falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF must determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and is therefore a rifle, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing brace-equipped pistols (top) to firearms equipped with traditional shoulder stocks (bottom). *See* 88 Fed. Reg. at 6494; Admin. Record ("AR") 477.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. 88 Fed. Reg. at 6482; AR 1. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. AR 1, 3. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of an AR-15 pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular brace, when configured with an AR-15 pistol, would not convert that firearm into a weapon designed or

intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 5. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of stabilizing braces of varying designs. 88 Fed. Reg. at 6479. But unlike the 2012 prototype, these newer brace designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g., id.* at 6528–29 (comparing two braces to similarly designed shoulder stocks), 6528 (manufacturer listing brace as a firearm's "stock type"), 6503, 6547. Given their stock-like function and design, ATF soon became aware that some braces were being widely marketed by manufacturers and used by individuals to fire weapons from the shoulder. *E.g., id.* at 6479, 6503, 6505, 6527, 6546–47. Accordingly, as early as 2014, ATF determined that multiple weapons configured with different braces were short-barreled rifles subject to the NFA. *Id.* at 6484; AR 18–21 (Nov. 2014), 22–25 (Nov. 2014); *see also* AR 54–57 (Nov. 2015), 70–91 (Jan. 2016).

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a brace-equipped weapon was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance regarding how a stabilizing brace might affect a weapon's classification. 88 Fed. Reg. at 6501–02. For example, some early classification letters and guidance suggested that whether a brace-equipped weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the brace, as a device assisting either single-handed fire or shoulder fire. *Id.* at 6484, 6487–88. ATF also occasionally focused on the brace itself, considering whether it had been "classified as a shoulder stock," *id.* at 6484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6501. But during this same period, the agency also explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6502 n.81; AR 13, and classified several brace-equipped weapons as short-barreled rifles after considering, *e.g.*, whether the brace served any purpose other than to extend the

rear surface to enable shouldering, 88 Fed. Reg. at 6485, or whether the brace created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6489; *see also, e.g.*, AR 18–25, 54–57, 70–72, 158.

Recognizing the inconsistencies in its early attempts to classify these novel brace-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that incidental shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the firearm. *Id.* at 6491. And in 2018, ATF informed classification requestors that, to properly evaluate how a stabilizing brace affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the brace attached. *Id.* at 6492; AR 224–275.

By mid-2020, ATF's classification letters reflected a focused analysis of the brace-equipped weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as the statutory definition of a "rifle" instructs. *See, e.g.*, AR 194 (a 2018 classification letter explaining that a weapon's "objective design characteristics must support" "a manufacturer's stated intent"); *id.* at 290 (a 2019 classification letter explaining that ATF considers a weapon's "design features" "[i]n determining whether" it "is 'intended' to be fired from the shoulder," and that ATF also "considers a manufacturer's stated intent" but "is not required to simply accept those statements when contradicted by objective evidence"). For example, in March 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 brace device. *Id.* at 387–413 (providing images). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed "objective design features" characteristic of "weapons designed and intended to be fired from the shoulder," *Id.* at 387—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. 88 Fed. Reg. at 6493; *see also* AR 393, 412 (listing the

objective design features ATF considered). The agency also considered marketing materials indicating that weapons equipped with the SBA3 were designed and intended to be rifles and widely used as such. AR 409–411. A few months later, ATF classified another brace-equipped pistol as a short-barreled rifle after applying this same analytical framework. 88 Fed. Reg. at 6493–94; AR 466–488. Notably, neither manufacturer sued to challenge these classifications.

## III.    The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a brace-equipped weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. 88 Fed. Reg. at 6496. Adding to the confusion, manufacturers were labeling stabilizing braces as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6492. Even more problematic, ATF continued to observe that manufacturers were widely marketing and members of the public were widely using braces to create short-barreled rifles without complying with NFA requirements, *id.*, which Congress designed to reduce the criminal and violent use of uniquely dangerous and concealable weapons, *supra* 2.

Then, in March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a stabilizing brace opened fire at a supermarket in Boulder, Colorado, killing ten people. This shooting came on the heels of another mass shooting in Dayton, Ohio, where a 24-year-old individual similarly armed with a brace-equipped pistol killed nine people and injured fourteen others.[1] In both instances, the shooters reportedly fired their weapons from the shoulder. 88 Fed. Reg. at 6495.

**2.** In light of its existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify

---

[1] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.

how it evaluates the classifications of brace-equipped weapons. *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the statutory term "rifle." 86 Fed. Reg. 30826 (June 10, 2021).[2] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a brace-equipped weapon submitted for classification is designed, made, and intended to be fired from the shoulder. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6497.

After carefully considering the voluminous public comments, *id.* at 6497–6569, ATF published the Rule in the Federal Register in January 2023. The Rule contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6569. The amended regulations clarify that the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a stabilizing brace) that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6511–13—are:

    (i)   whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

    (ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

    (iii)  whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

---

[2] In December 2020, ATF issued a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516, but withdrew it weeks later, 85 Fed. Reg. 86,948.

(iv)   whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)   the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)   information demonstrating the likely use of the weapon in the general community.

*Id.* at 6569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with stabilizing braces. *Id.* at 6570–71. For example, an individual who possessed an unlicensed brace-equipped short-barreled rifle before the Rule was published could come into compliance with the NFA by:

(i)   filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii)   removing the firearm from the statutory definition of "short-barreled rifle" by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

(iii)   turning the firearm into a local ATF office; or

(iv)   destroying the firearm, per ATF's published instructions.

*Id.* at 6570.

*Tax-forbearance provisions.* Under the Rule, ATF forbore certain NFA tax obligations for those who possessed brace-equipped short-barreled rifles prior to the Rule's publication. *Id.* at 6571. Individual possessors, for instance, were not subject to the $200 making tax so long as they filed the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* Finally, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of brace-equipped weapons. *Id.* at 6480. These classifications are therefore

9

no longer valid or authoritative. *Id.* at 6569.

## IV.    This Lawsuit and Other Litigation Challenging the Rule

Following the Rule's publication, Plaintiffs filed this lawsuit to challenge the Rule under the APA, Compl. ¶¶ 465–540, ECF No. 1, and moved to preliminarily enjoin its enforcement shortly thereafter, ECF No. 16. After the Fifth Circuit issued an injunction pending appeal in a separate lawsuit challenging the Rule, *Mock v. Garland*, this Court granted Plaintiffs an injunction pending resolution of that related appeal. ECF Nos. 51. Then, following the Fifth Circuit's decision in *Mock*, this Court determined that some Plaintiffs were entitled to a preliminary injunction and enjoined ATF for the remainder of this case from enforcing the Rule against them. *Texas v. ATF*, 2023 WL 7116844 (S.D. Tex. 2023), *appeal filed*, No. 23-40685 (5th Cir.).

Other groups of plaintiffs have also challenged the Rule, with varying results. Several courts have refused to preliminarily enjoin the Rule's enforcement, finding that the plaintiffs' challenges are unlikely to succeed. *Second Amendment Found., Inc. v. ATF* (*SAF*), 2023 WL 7490149 (N.D. Tex. 2023), *appeal filed*, No. 23-11157 (5th Cir.); *Miller v. Garland*, 2023 WL 3692841 (E.D. Va. 2023), *appeal filed*, No. 23-1604 (4th Cir.); *Firearms Regul. Accountability Coal., Inc. v. Garland* (*FRAC*), 2023 WL 5942365 (D.N.D. 2023), *appeal filed*, No. 23-3230 (8th Cir.). Yet others have granted requests for preliminary relief. *Tex. Gun Rts., Inc. v. ATF*, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023), *appeal filed*, No. 23-11204 (5th Cir.); *Mock v. Garland*, 2023 WL 6457920, at *18 (N.D. Tex. 2023), *appeal filed*, No. 23-11199 (5th Cir.); *Britto v. ATF*, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023), *appeal filed*, No. 23-11203 (5th Cir.).[3]

### LEGAL STANDARDS

In an APA case, summary judgment "serves as the mechanism for deciding" whether the challenged action "is supported by the administrative record and otherwise consistent with the APA

---

[3] *See also Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-cv-1471 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

standard of review." *Grinin v. Johnson*, 224 F. Supp. 3d 525, 530 (S.D. Tex. 2016) (citation omitted). The agency resolves "factual issues to arrive at a decision that is supported by the administrative record," and the district court determines whether, as a matter of law, "the evidence in the administrative record permitted the agency to make" that decision. *Id.* (citation omitted). The entire case is thus a question of law. *Id.*

## ARGUMENT

**I.    The Tax Anti-Injunction Act bars Plaintiffs' claims insofar as they seek relief that would obstruct the assessment or collection of the NFA's tax.**

To the extent Plaintiffs' claims seek relief that would inhibit Defendants from enforcing the NFA's tax against any brace-equipped weapon, the Tax Anti-Injunction Act ("AIA") bars them. The AIA provides that, generally, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). That "broad and mandatory language," *U.S. v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 12 (2008), protects "the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct" tax collection, *Hotze v. Burwell*, 784 F.3d 984, 996 (5th Cir. 2015) (citation omitted). Consistent with this "protective purpose[]," the Fifth Circuit has "interpreted the Act broadly" to apply "not only to the assessment and collection of taxes," but also "to activities which are intended to or may culminate in" tax assessment or collection, like "suit[s] to restrain" the "collection of information that would aid in the assessment of taxes." *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (citation omitted). The AIA thus imposes a bright-line scheme requiring parties to "pay first and litigate later." *Flora v. U.S.*, 357 U.S. 63, 75 (1958) (citation omitted).

So, rather than bringing a pre-payment challenge, a taxpayer's principal mechanism for disputing the assessment of a tax is a refund suit. And in the NFA context specifically, the maker of a firearm who wants to challenge the assessment of the NFA's tax against him must first pay the tax

and then file a claim for a refund or credit with the Attorney General. 26 U.S.C. § 6511. If that claim is denied, the maker may then bring suit in federal district court to recover the sum. *Id.* § 7422. That refund-suit remedy offers a taxpayer "a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 (1974).

Therefore, to the extent Plaintiffs' claims seek relief that would directly restrain enforcement of the NFA's tax, the AIA's plain text bars them. But even insofar as Plaintiffs' claims seek to restrain enforcement of other NFA requirements, the AIA equally bars those claims because those requirements operate as part of the NFA's integrated "taxing scheme." *U.S. v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018). The provisions around the NFA's tax requirements (*e.g.*, registration; prohibition on unregistered possession) "facilitate enforcement" of the taxes. *U.S. v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997). Those provisions together thus reflect "the web of regulation aiding" the NFA's tax provisions' enforcement and are "a valid exercise of the taxing power." *Id.* at 262 (citation omitted); *accord, e.g.*, *Bezet v. U.S.*, 714 F. App'x 336, 342 (5th Cir. 2017). The AIA therefore bars Plaintiffs' claims challenging the NFA's facilitative requirements—and the Rule's implementation of them—to the extent they seek equitable relief that would "obstruct the collection of taxes." *See Hotze*, 784 F.3d at 996 (quotation omitted); *accord CIC Servs., LLC v. IRS*, 593 U.S. 209, 217 (2021).

## II.  The Rule properly interprets the statutory definition of "rifle."

Plaintiffs claim that the Rule's interpretation of the NFA's definition of "rifle" exceeds ATF's statutory authority. Pls.' MSJ 24–26, ECF No. 85 ("Pls.' Br."). That's not because ATF does not have the power to issue rules that interpret terms used in the NFA—it clearly does. *Mock*, 2023 WL 2711630, at *4; *SAF*, 2023 WL 7490149, at *7; *FRAC*, 2023 WL 5942365, at *6–7. Instead, Plaintiffs suggest that the Rule misconstrues the term "rifle" to include brace-equipped weapons that are merely capable of being fired from the shoulder but are not "designed" and "intended" for that purpose, as required by that term's statutory definition. Pls.' Br. 24–26. But the Rule does no such thing. Nor do

Plaintiffs' arguments comport with the statute's text or purpose, prior judicial constructions, or any interpretive canon they invoke. The Rule, in contrast, reaches the correct conclusion: that a brace-equipped weapon can be a rifle, and thus a short-barreled rifle, under the NFA.

**1.** The NFA defines a short-barreled rifle as a "rifle" with a barrel less than 16 inches in length. 26 U.S.C. § 5845(a)(3). The term "rifle" is further defined to include any weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). But Congress provided no additional guidance for determining whether a particular weapon is designed, made, and intended to be fired from the shoulder—*i.e.*, a rifle.

So to explain how a stabilizing brace can turn a weapon into a rifle under the NFA, the Rule hews to the statute's language: A brace-equipped weapon is a rifle when it "provides surface area that allows the weapon to be fired from the shoulder" and other probative evidence indicates "that *the weapon is designed, made, and intended to be fired from the shoulder.*" 88 Fed. Reg. at 6569 (emphasis added). And to clarify the proper application of this statutory design-and-intent inquiry, the Rule explains that whether a weapon is intended to be fired from the shoulder cannot turn solely on a manufacturer's stated intent (which could be divorced from reality), but must be determined by evaluating objective evidence of the weapon's intended use. *Id.* at 6495. The Rule thus spells out the type of evidence that ATF finds probative in assessing whether a particular brace-equipped weapon is designed and intended to be fired from the shoulder, including the weapon's objective design features and certain information indicating its likely use. *Id.* at 6569–70.

ATF's application of the definition of "rifle" to brace-equipped weapons is consistent with the statute's text and other traditional tools of interpretation. Indeed, every court that has addressed the Rule's statutory interpretation has concluded that terms like "designed" and "intended" "*necessarily require*" ATF "to evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is" a short-barreled rifle. *Mock*, 2023 WL 2711630, at *4 (emphasis added); *accord*

*FRAC*, 2023 WL 5942365, at *6–7; *Miller*, 2023 WL 3692841, at *4. The Rule thus engages in "an inquiry identical to the one posed by" the NFA's definition of "rifle" by evaluating objective evidence of design and intent that are "textually grounded" in that definition. *SAF*, 2023 WL 7490149, at *8.

And in this particular context, ATF's consideration of objective evidence to determine a weapon's design and intended use is sensible and consistent with other markers of statutory meaning. As explained, *supra* 4, manufacturers' descriptions of brace-equipped weapons' intended use are often at odds with these weapons' design features and common use. 88 Fed. Reg. at 6479, 6503 & n.87, 6505, 6527–29, 6546–47. Though a manufacturer's description of a weapon may be relevant to the statutory inquiry, relying solely on that description would allow manufacturers to skirt the NFA simply by claiming that a weapon is not intended to be a short-barreled rifle, even while designing and marketing it as one. *Id.* at 6544. That would obviously "frustrate Congress' manifest purpose" and render the statute a "dead letter" in many applications. *See U.S. v. Hayes*, 555 U.S. 415, 426–27 (2009). But Congress did not intend the NFA to be so toothless. *See Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (courts must adopt "a textually permissible interpretation that furthers rather than obstructs [a statute's] purpose").

Courts have approved of ATF's approach to determining intent in similar contexts. In *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), for example, the First Circuit held that ATF properly considered the objective design features of a product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g., U.S. v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. And foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed

14

regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent "is a very familiar one in the law," *id.* at 601, as also recognized in other contexts, *e.g.*, *Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended … for use").

And aside from a brace-equipped weapon's design features, ATF also considers other objective evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6544. Courts have long relied on this type of evidence to discern intent as well. *See Posters*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use"). Therefore, ATF's approach to answering the key statutory inquiry—*i.e.*, whether a weapon is designed, made, and intended to be fired from the shoulder—is consistent with the statute's text, its purpose, and well-established methods for discerning intent.

**2.** Plaintiffs' various arguments challenging ATF's interpretation are unpersuasive.

Plaintiffs principally maintain that the Rule treats brace-equipped weapons as rifles whenever they are "*capable* of being fired from the shoulder," even if they are not designed and intended for that purpose. Pls.' Br. 24–26. But that argument knocks down only a straw man. As the Rule explains, ATF determines whether a particular brace-equipped weapon is a rifle not based on whether it is capable of shoulder fire, 88 Fed. Reg. at 6521, 6534, but based on whether objective evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder," *id.* at 6569—the focal inquiry under the statute.

Plaintiffs also suggest that a brace-equipped weapon that can be fired conveniently with one

hand cannot be a rifle under the NFA. Pls.' Br. 25–26. But even if such a weapon were designed to permit effective single-handed firing, that would not be dispositive of whether it is also designed and intended to be fired from the shoulder, and is therefore a rifle. Indeed, Plaintiffs' argument rests on an incorrect premise—repeatedly rejected by courts—that a weapon can be a rifle only if designed and intended "to be fired *exclusively* from the shoulder." *U.S. v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (collecting cases). Unlike other NFA definitions, the definition of "rifle" does not include an exclusive-intent requirement. *Compare, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" to include a "part designed and intended *solely* and *exclusively*" for "use in converting a weapon into a machinegun" (emphasis added)), *and id.* § 5845(a)(7) (defining "silencer" to include a "part *intended only for use* in" the assembly of a firearm silencer or muffler (emphasis added)), *with id.* § 5845(c) (defining "rifle" to include any weapon "designed," "made," and "intended to be fired from the shoulder"). A brace-equipped weapon that is designed and intended to be fired from the shoulder is thus a rifle under the statute's plain language, regardless of whether it also allows convenient single-handed firing. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) (instructing courts not to "read into statutes words that aren't there," especially when the words are used "elsewhere" in the same statute).

Without help from traditional tools of interpretation, Plaintiffs invoke the rule of lenity. Pls.' Br. 44–45. That rule instructs courts to resolve ambiguities in a criminal statute in the defendant's favor only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity" in the statute that requires a court to "simply guess" at its meaning. *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted). But the statutory provisions here contain no grievous ambiguity for lenity to resolve. *Muscarello v. U.S.*, 524 U.S. 125, 138 (1998) ("[S]ome statutory ambiguity" does not justify lenity's "application."). As explained, *supra* 13–15, traditional interpretive tools firmly support the Rule's application of the statutory definition of "rifle" to brace-equipped weapons that are designed, made, and intended to be fired from the shoulder. *E.g.*, *Mock*, 2023 WL 2711630, at *6

16

(rejecting reliance on lenity).

Plaintiffs' citation to *Thompson/Center* does not support their contrary view. There, the plurality identified an ambiguity in the statutory term "made" when applied to a "pistol and carbine" kit containing parts that could be used to make the pistol into a short-barreled *or* a long-barreled rifle. 504 U.S. at 509–518. Given the multiple ways in which the firearm kit ultimately could be assembled, the plurality applied the rule of lenity to conclude that the kit had not yet "been 'made' into a short-barreled rifle." *Id.* at 517–18. But that analysis has no application to the statutory question in this case, which does not implicate similar statutory language.

## III.    The Rule is not arbitrary or capricious.

Plaintiffs claim that the Rule is arbitrary and capricious under the APA, but their arguments are meritless. Judicial review under the APA's arbitrary-and-capricious standard is highly "deferential," requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.* (*Prometheus*), 141 S. Ct. 1150, 1158 (2021). A court must presume that the challenged action is valid, *Tex. Tech Phys. Assocs. v. HHS*, 917 F.3d 837, 844 (5th Cir. 2019), "may not substitute its own policy judgment for that of the agency," *Prometheus*, 141 S. Ct. at 1158, and "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citations omitted).

*First*, ATF appropriately considered whether and to what extent the Rule affects potential reliance interests. *See* 88 Fed. Reg. at 6507–08. Where an agency changes course, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ of Cal.*, 140 S. Ct. 1891, 1915 (2020). But the mere existence of reliance interests does not bar the agency from changing its position: it must simply provide a "reasoned explanation" for doing so. *Id.* at 1916.

Plaintiffs contend that ATF "ignor[ed]" "significant" reliance interests that the Rule affects,

suggesting that "millions" of individuals have long possessed brace-equipped weapons only because "ATF explicitly declared" that they were not subject to the NFA. Pls.' Br. 19–20. Plaintiffs are wrong on both counts. As an initial matter, ATF has never had a policy or issued guidance suggesting that brace-equipped weapons are categorically outside the NFA's reach. *Supra* 5–7; 88 Fed. Reg. at 6507 ("ATF never declared that the marketing of a device as a 'stabilizing brace' when equipped on a firearm removes that firearm from the ambit of the NFA."). Indeed, as early as 2014, ATF classified multiple brace-equipped weapons as short-barreled rifles subject to the NFA. *Id.* at 6484; AR 18–25, 54–57, 70–91. And more recently, ATF's classification analysis has considered whether a weapon's objective design features indicate that it was designed, made, and intended to be fired from the shoulder, *supra* 6–7; any reliance on earlier classification letters was thus stale well before the Rule's promulgation.

Still, the Rule expressly acknowledges, but properly contextualizes, the significance of potential reliance interests. Specifically, it explains that ATF's prior classification letters were always "limited to the particular firearm configured with the particular device" submitted, and "its analysis was based on the objective design features of that device or firearm." 88 Fed. Reg. at 6507. Thus, in the event an individual relied "on a classification for another person's device or firearm," they would be transferring "the agency's specific analysis to a different context and hence [be] misplaced." *Id.* Likewise, the Rule explains that ATF's determination of a specific weapon's classification is not immutable. *Id.* Indeed, ATF's NFA guidance instructs that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in law or regulations." *Id.* (quoting *NFA Handbook* § 7.2.4.1). Therefore, insofar as individuals possessing brace-equipped weapons relied on ATF's previous classifications of those weapons, their reliance interests were *always* conditioned on the possibility that ATF would revisit and correct erroneous classifications, as it has done here. And in promulgating the Rule, ATF considered evidence demonstrating that at least some of the regulated

18

public understood that to be the case.[4] The Rule thus explains that ATF reasonably concluded that any potential reliance interests are significantly reduced. *Id.* at 6508.

The Rule nonetheless accounts for any disruption to current possessors' reliance interests. The upshot of the Rule is merely to inform these individuals that they must register their brace-equipped short-barreled rifles pursuant to the NFA, a minimal burden that *preserves* their interest in continued possession. *Id.* at 6507–08. Plaintiffs don't dispute this. Instead, they argue that ATF may "disapprove" a possessor's application to register a braced weapon, affecting their interests in continued possession. Pls.' Br. 20. But that is, at best, entirely speculative, and Plaintiffs have provided no evidence that they or their members have attempted to register brace-equipped weapons and were denied, or that they even intend to attempt to register any brace-equipped weapons. *See, e.g.*, Decl. of Brady Brown ¶ 10, ECF No. 16-14 ("Brown Decl.") (stating a desire to possess his brace-equipped weapons without having to register them). And Plaintiffs' suggestion that the Rule imposes criminal liability on individual possessors is similarly meritless because it ignores the compliance options allowing individuals to continue to possess their weapons. *Supra* 10. Indeed, the Rule adopted these options, in part, to accommodate individuals' interests in continued possession, 88 Fed. Reg. at 6508, belying Plaintiffs' suggestion that ATF ignored potential reliance interests, *see* Pls.' Br. 20.

At any rate, ATF provided a reasonable explanation for the Rule's adoption, despite potential reliance interests. As the Rule explains, the agency determined that these interests did not "outweigh the effective enforcement" of NFA and GCA requirements "pursuant to the best interpretation of" the relevant statutory provisions. 88 Fed. Reg. at 6508. Because Congress imposed specific controls

---

[4] *E.g.,* AR Video, ARPistolBraceComparison_2019OCT22 at 4:15-4:38 (describing ATF's classifications and explaining, "It's gray area, it's murky. You guys need to do your own research and … realize it could change next week and [ATF] could say no more pistol braces and now we're all out of a bunch of luck and have to go get your tax stamps and register your SBRs."); AR Video, ATFCompliantSigSB15StabilizingBraceGetOneTactiholics _2014NOV19 at 6:19-6:34 ("Could the ATF change their mind and come back and say hey we're going to pull these things from the market, it does change the classification? Absolutely.").

on short-barreled rifles, ATF seeks to prevent "circumvention of" those controls by curbing the proliferation of unregistered brace-equipped short-barreled rifles, regardless of whether any individual has an alleged interest in continuing to possess such a weapon. *Id.*; *see also Regents*, 140 S. Ct. at 1914 (explaining that an agency could have properly found that "reliance interests in benefits that it views as unlawful are entitled to no or diminished weight"). Moreover, the Rule benefits possessors and manufacturers by providing clear guidance that they can rely upon going forward. Therefore, the Rule shows that ATF was "cognizant" of any reliance interests that the Rule affects and provides "'good reasons' for concluding that" such interests "were insufficient to hold off" on the Rule. *See MediNatura, Inc. v. FDA*, 998 F.3d 931, 943 (D.C. Cir. 2021) (citation omitted). The APA requires nothing more.

*Second*, the Rule reasonably explains ATF's rationale for amending 27 C.F.R. §§ 478.11 and 479.11 to clarify that a brace-equipped weapon may be a rifle under the NFA and GCA and to outline the criteria considered in determining whether a particular weapon is designed, made, and intended to be shoulder fired. Plaintiffs' attempt to flyspeck the Rule fails to undermine that conclusion.

Take first their suggestion that the Rule is arbitrary for not specifying the exact amount of "surface area" that permits shoulder fire. Pls.' Br. 20. True, the agency considers "whether there is any surface area on the firearm that can be used to shoulder fire the weapon," without reducing the analysis to a simple measuring game. 88 Fed. Reg. at 6529. But that's a feature, not a bug. As the Rule explains, whether a weapon's rear surface area allows shouldering is a fact-specific inquiry that does not turn solely on the *amount* of surface area. Other considerations also affect the analysis, like whether a weapon has a "design feature that prevents shouldering." *Id.* at 6530. Plaintiffs' argument that ATF should have eschewed a weapon-specific analysis and instead drawn an arbitrary line at a specific measurement is hardly a reasonable suggestion.

What's more, Plaintiffs' argument embraces the meritless proposition that ATF was required to adopt precise metrics for evaluating the factors outlined in the Rule. Pls.' Br. 20–21. But "[a]gencies

20

routinely employ multi-factor standards when discharging their statutory duties," *PDK Laboratories Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006), and while "numeric thresholds may be helpful or increase precision, courts have upheld agencies' use of multifactor tests even where there are none," *Miller*, 2023 WL 3692841 at *8; *see also Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"). This approach is sensible when a statutory standard cannot achieve mathematical precision, like determining whether a weapon is designed, made, and intended to be fired from the shoulder. In such cases, the "relevant question" for examining the "rationality" of a standard is "whether the agency adequately explained why it adopted it," as ATF did here. *Huawei Tech. USA, Inc. v. FCC*, 2 F.4th 421, 458 (5th Cir. 2021). A number of courts have agreed that the Rule satisfies this standard. *FRAC*, 2023 WL 5942365, at *8; *Miller*, 2023 WL 3692841, at *8. And this approach was especially reasonable here, as the adoption of precise metrics could enable manufacturers to design around them, thus undermining the Rule's goal of preventing the NFA's circumvention.

Similarly, Plaintiffs criticize the Rule for considering whether a braced weapon has a weight or length consistent with similarly designed rifles, even though "rifle weights and lengths vary widely." Pls.' Br. 21. But that misconstrues how ATF evaluates a particular braced-equipped weapon's weight and length. Contrary to what Plaintiffs suggest, ATF does not compare a specific weapon to the entire range of rifles listed in the Rule's weight and length charts. *See* 88 Fed. Reg. at 6514–18. Instead, for a weapon "marketed as a pistol that is a variant of a rifle," ATF compares its weight and length "against the original rifle design" (*e.g.*, AR-15-type brace-equipped pistol compared to a "similarly designed" AR-15 standard rifle). *Id.* at 6514, 6518. And "[f]or a firearm that is not a variant of a rifle (*e.g.*, a Glock-type pistol)," ATF compares the weapon's weight and length to those "of variants designed, made, and intended to be fired from the shoulder (*e.g.*, a Glock-type pistol with a shoulder stock)." *Id.* That differently configured rifles vary widely in weight and length is thus irrelevant to how ATF classifies

a particular braced weapon.[5]

Additionally, contrary to Plaintiffs suggestion, Pls.' Br. 21, the Rule appropriately considers whether the rear surface area of the weapon is created by a component that "is necessary for the cycle of operations." 88 Fed. Reg. at 6569. As the Rule explains, this factor acknowledges variations in firearm designs: some weapons may incorporate a rearward component integral to the firing cycle that, therefore, does not indicate that the weapon is designed or intended to be shoulder fired. For example, an AR-type pistol may have a buffer tube that houses a spring central to the firing cycle, and assuming no other material is added to that buffer tube, the rear surface area that it creates, by itself, would not indicate that the weapon is designed and intended to be shoulder fired. *Id.*

Plaintiffs also criticize the Rule for not including historical analysis pursuant to *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022), but such analysis was not required. Arbitrary-and-capricious review demands only that agency action "be reasonable and reasonably explained," *Prometheus*, 592 U.S. at 423, and that an agency not "*entirely fail*[] to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added). The Rule's Second Amendment analysis satisfies that standard.

As the Rule explains, *District of Columbia v. Heller*, 554 U.S. 570 (2008), and subsequent judicial decisions support ATF's view that NFA weapons "were not historically protected by the Second Amendment and thus fall outside [its] scope." 88 Fed. Reg. at 6548. "Nothing in … [*Bruen*] changes this analysis," and Justice Kavanaugh's concurrence "reiterat[es] *Heller*'s finding that 'dangerous and unusual weapons' are outside of the Second Amendment's protections." *Id.*; *see also id.* at 6548; *infra*

---

[5] Plaintiffs again suggest that it was unreasonable for ATF to evaluate a particular brace-equipped weapon's weight and length as compared to a similarly designed rifle without specifying "how heavy or how long is too much or too little." Pls.' Br. 21. But ATF's approach accounts for the considerable variations in rifle designs—as Plaintiffs themselves point out—which cannot be reasonably reduced to a universally applicable measurement. And as explained, the APA does not require the adoption of a metric-based approach.

22

31–34. Thus, because the Rule does not implicate the Second Amendment, historical analysis was unnecessary. *See SAF*, 2023 WL 7490149 at *12 (rejecting similar APA claim). In any event, a robust history and tradition of similar taxation and registration requirements supports the Rule and the NFA, *infra* 35–39, and therefore, any potential error in failing to include historical analysis in the Rule would be harmless. *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012). Accordingly, ATF "reasonably considered the relevant issues and reasonably explained [its] decision," and therefore "acted within a zone of reasonableness." *Prometheus*, 592 U.S. at 423.

## IV.   The Rule complies with the APA's procedural requirements.

While the Fifth Circuit's decision in *Mock* controlled whether Plaintiffs had demonstrated a *substantial* likelihood of success on the merits of their logical-outgrowth claim at the preliminary-injunction stage, "'substantial' does not mean 'certain,'" and now that this issue is presented for full consideration on the merits, the Court should reject Plaintiffs' claim. *All. For Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023).

### A.   The Rule is not subject to notice-and-comment requirements.

To begin, "[u]nder the APA, an agency must provide the public with notice and an opportunity to comment before it issues a final, legislative rule," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023), but "[n]ot all 'rules' must be issued through the notice-and-comment process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Specifically, "the notice-and-comment requirement 'does not apply' to 'interpretive rules,'" *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(b)(A)), which are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training*, 58 F.4th at 242.

Here, the Rule was "exempt from notice and comment" because it is an interpretive rule that simply "interpret[s] existing, substantive law." *Id.* at 241 n.5 (citation omitted); *see also Miller*, 2023 WL

3692841 at *6 (finding Rule interpretive). ATF issued the Rule to clarify the definition of "rifle" "as necessary to implement existing law—*i.e.*, the NFA and GCA." 88 Fed. Reg. at 6500. What's more, the Rule repeatedly states that it "does not impose any new legal obligations," and instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is" a "short-barreled rifle under the relevant statutes." *Id.* at 6478; *id.* at 6569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). Indeed, before the Rule, ATF classified multiple brace-equipped weapons as short-barreled rifles subject to the NFA, demonstrating that the Rule—like those classifications—was just interpreting existing, substantive law. *See* 88 Fed. Reg. at 6484; AR 18–21, 22–25, 54–57, 70–91. Thus, the Rule "clarifies, rather than creates, law"—the hallmark of an interpretive rule. *Flight Training*, 58 F.4th at 240 (citation omitted). Plaintiffs provide no evidence to the contrary.[6]

In concluding that Plaintiffs were likely to prevail on their claim that the Rule is legislative, the *Mock* panel looked to whether: (1) ATF "intended to speak with the force of law"; (2) the Rule was published in the Code of Federal Regulations ("CFR"); (3) ATF invoked its "general legislative authority"; (4) ATF "claimed *Chevron* deference"; and (5) the Rule would produce "significant effects on private interests." 75 F.4th at 580 (citation omitted). But the Fifth Circuit has been clear that "[w]hat makes a rule 'legislative' is that it spawns from the agency's congressionally-delegated powers (if any) to create law," and "it is only when the agency seeks to *make substantive law* that notice and comment is required." *Flight Training*, 58 F.4th at 241 n.5 (citation omitted). Thus, the first factor is the bottom-line question a court must answer—"whether the agency intended to speak with the force of law"—and "[c]entral to [that] analysis is the language" the agency "actually used." *Guedes v. ATF*, 920 F.3d 1,

---

[6] And because the Rule does not change the scope of the statutory provisions it interprets—the source of the regulatory requirements that attach to short-barreled rifles—and thus does not determine any legal rights or impose any new legal obligations, the Rule is not final agency action challengeable under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

17–18 (D.C. Cir. 2019) (citation omitted).

Here, that answer is clear on the face of the Rule: ATF did not intend to speak with the force of law. *See, e.g.*, 88 Fed. Reg. at 6501 ("[T]he rule does not create any new law; instead it simply implements the relevant statutes based on [ATF's] best interpretation of those statutes."); *id.* at 6500 ("[T]he rule is interpreting the language of the statute as written."); *id.* at 6509 ("Due to inconsistent advice" about how braces affect classification, ATF "seeks to inform the industry and public on the best interpretation regarding when 'a firearm is designed …, made …, and intended to be fired from the shoulder.'"). Where an agency's intent is unclear, the remaining four factors may assist in that determination, but this Court need not rely on such factors where ATF's intent could not be clearer.

Regardless, the other four factors offer no basis for concluding that the Rule is legislative. For instance, there is no reason to reach that conclusion simply because ATF issued the Rule through notice and comment and published it in the CFR. "[T]here is nothing in the [APA] to forbid an agency to use the notice and comment procedure in cases in which it is not required to do so," *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171–72 (7th Cir. 1996), and agencies are "free to grant additional procedural rights in the exercise of their discretion," *Perez*, 575 U.S. at 102 (citation omitted); *see also Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (publication in CFR is just a "snippet of evidence of agency intent"). Seeking public comment here was a particularly sensible way to engage the regulated community given ATF's goal of providing clarity and notice to that community, and ATF should not be penalized for affording more process than was due.

Nor do the remaining factors support that the Rule is legislative. ATF did not invoke *Chevron* deference. *Mock*, 75 F.4th at 580. And the Rule's statement that ATF has authority to issue regulations to administer the NFA does not suggest that ATF was intending to enact a legislative rule here. *See* 88 Fed. Reg. at 6481. Lastly, "[m]erely because a Rule has a wide-ranging effect does not mean that it is 'legislative' rather than interpretive." *British Caledonian Airways, Ltd. v. C.A.B.*, 584 F.2d 982, 989 (D.C.

Cir. 1978)). Indeed, "the substantial impact test is illogical because every significant interpretive rule choosing between two or more interpretations of … a statute has an effect ('substantial impact') … [on] those regulated" by the statute. *Am. Transfer & Storage Co. v. Interstate Com. Comm'n.*, 719 F.2d 1283, 1285 n.4 (5th Cir. 1983). For this reason, the Fifth Circuit previously declared the substantial impact test "unsound," and this factor is not helpful in determining whether the Rule is legislative. *Id.* Thus, the Rule is interpretive and not subject to notice-and-comment requirements.

### B. The Rule is a logical outgrowth of the proposed rule.

Even if the Rule were legislative, it is a logical outgrowth of ATF's proposed rule. A rule satisfies the logical-outgrowth requirement if the proposed rule "adequately frame[d] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei*, 2 F.4th at 447 (citations omitted). This standard is satisfied if the NPRM "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, an agency is not required to "specifically identify every precise proposal which [it might] ultimately adopt as a final rule." *Id.* (citation omitted); *see also Huawei*, 2 F.4th at 449 (holding notice sufficient even where the "NPRM did not specify the precise procedures the agency ultimately adopted").

The NPRM fairly apprised the public of the issues ATF was considering. The NPRM and the Rule make clear that ATF contemplated and decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating" brace-equipped weapons "to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA]."), *with* 88 Fed. Reg. at 6478 ("[DOJ] is amending the regulations" "to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and setting forth "factors that indicate a weapon is in fact a firearm or short-barreled

26

rifle under the relevant statutes.").

And although the Rule did not adopt the NPRM's point system, the NPRM provided adequate notice that ATF was considering a factor-based approach and notice of those factors. The NPRM proposed amending the definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder," just like the Rule. NPRM, 86 Fed. Reg. at 30829. And the NPRM set forth "[f]actoring [c]riteria," just like the Rule. *Id.* at 30830. Indeed, the Rule's balancing test is essentially an unweighted variation of the NPRM's approach, as it assesses "objective design features and factors" specifically "derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6480; *see also id.* at 6513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet …."); *id.* at 6494 ("The factors discussed in the NPRM will, under the [Rule], continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *id.* at 6480, 6569; *see also S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" and "foreshadowed in proposals and comments" during rulemaking). If more were needed, ATF addressed public comments regarding these factors, reflecting that "the NPRM was sufficiently descriptive of the subjects and issues involved" such that "interested parties [could] offer[] informed criticism and comments," *United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) (cleaned up). *See e.g., id.* at 6514–21 (weight and length); *id.* at 6521–31, 6537–41 (rear surface area); *id.* at 6533–37 (length of pull); *id.* at 6541–43 (sights and scope). Courts have upheld substantially more drastic changes. *See Mid Continent Nail Corp. v. U.S.*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) ("Courts applying the logical outgrowth doctrine have also permitted agencies to drop critical elements of proposed rules even if a resulting final rule effectively abandons an agency's initial proposal.").

The NPRM also included several indications that ATF might eliminate the point system, or alternatively, that the point system would not always be determinative. For instance, the NPRM

"specifically request[ed] comments on the clarity of this proposed rule and how it may be made easier to understand," 86 Fed. Reg. at 30849, indicating that ATF (like many commenters) was concerned about the point system's complexity and might adopt a less complicated methodology. Likewise, the NPRM included an alternative approach by which ATF would look to "[s]imple [c]riteria" and adopt "very short and simple parameters," *id.* at 30847, illustrating that the point system was not the only methodology ATF was considering. And even under the point system, the NPRM provided that, where manufacturers improperly attempted to designate weapons as "pistols" to circumvent federal law, the point system would be inapposite, and such weapons would be classified as rifles "regardless of the points accrued on the ATF Worksheet 4999" because there would be no "question that the intent is for the weapon to be fired from the shoulder." *Id.* at 30834.

That under the Rule's approach, some weapons may be classified differently than under the NPRM's provides no support for Plaintiffs' arguments, Pls.' Br. 17–18; to hold otherwise would require that a final rule be identical to a proposed rule, rather than merely a logical outgrowth—a proposition the Fifth Circuit has long rejected. *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 834 (5th Cir. 2010) ("We have long held that the Final Rule and the Proposed Rule need not be identical.").

In sum, the changes between the NPRM and the Rule evince a considered process based on the comments received. ATF weighed comments criticizing "the complexity in understanding the proposed [point system]," and accordingly decided "not [to] adopt" it. 88 Fed. Reg. at 6480. Instead, ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle," but appropriately employed a simpler alternative approach. *Id.*

## C.   Any error in ATF's process was harmless.

Lastly, Plaintiffs have not demonstrated prejudice. "[T]he harmless error rule requires the party asserting error to demonstrate prejudice from the error," *City of Arlington*, 668 F.3d at 243–44, but the aims of public comment may still be achieved "where the agency's decision-making process 'centered

on the identical substantive claims' as those proposed by the party asserting error, even if there were APA deficiencies." *U.S. v. Johnson*, 632 F.3d 931 (5th Cir. 2011). "[W]hen a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced." *Id.*

Plaintiffs have not carried their burden to demonstrate that they were prejudiced by ATF's process, as they have not explained what they would have said regarding the final rule that they were unable to say in response to the proposed rule. *See* Compl. ¶ 199 (specifying only that the Rule deprived the public of the "opportunity to comment on the *actual* definition ATF wishes to implement"); Pls.' PI Mot. 21–23, ECF No. 16 (no explanation of prejudice); Pls.' Reply 13, ECF No. 29 (stating only that "Plaintiffs (and others) could have focused on an entirely different set of problems stemming from the Final Rule's vague system of analysis"); Pls.' Br. 16–19 (no explanation of prejudice). Indeed, "[t]here is no suggestion that, if given the opportunity to comment, [Plaintiffs] would have presented an argument the [ATF] did not consider in issuing the [proposed] rule." *Johnson*, 632 F.3d at 931–32; *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989) ("[Plaintiffs] do not identify any new information they would have submitted to the agency if given the opportunity."). And, critically, ATF considered the claims Plaintiffs raise now. *E.g.*, 88 Fed. Reg. at 6548 (Second Amendment); *id.* at 6550–52 (vagueness); *id.* at 6499–501 (statutory authority); *id.* at 6501–508 (APA).[7] ATF likewise considered comments opposing the point system generally, *id.* at 6510–13, and those opposing its factoring criteria specifically—the same criteria from which the Rule's criteria derive, *id.* at 6513–48.

Thus, any error "was not prejudicial because" ATF "considered the arguments [Plaintiffs] asserted and responded to those arguments during" its process, *Johnson*, 632 F.3d at 932, and Plaintiffs have failed to carry their burden to show otherwise.

---

[7] Plaintiffs' public comments further support they were not prejudiced by ATF's process, as these comments made many of the same arguments Plaintiffs raise now. *See* DEX42 at 8–12, DEX43 at 33–34 (statutory authority); DEX41 at 1, DEX43 at 19–22 (vague criteria); DEX43 at 22–31 (arbitrary factors).

**V.      Neither the Rule nor the NFA violates the Second Amendment.**

Plaintiffs facially challenge the Rule under the Second Amendment. They contend that stabilizing braces are "arms" under the Second Amendment, Pls.' Br. 29-32, that the Second Amendment protects the right to keep and bear braced-equipped pistols, and that the Rule (or, alternatively, the NFA) violates that right by subjecting those weapons to registration and taxation requirements, *id.* at 32–46. That claim fails on several scores.

**A.      Braces are not bearable arms protected by the Second Amendment.**

First of all, the Second Amendment protects "the right to keep and bear *arms*," not optional attachments like stabilizing braces. *Heller*, 554 U.S. at 582. Laws that regulate the use of firearm "accessories" or "attachments" generally do not impinge on that right. For example, the NFA regulates the making of a firearm with a "silencer." Yet courts have uniformly held that, because a "silencer is a firearm accessory," "it can't be a 'bearable arm'" under the Second Amendment. *Cox*, 906 F.3d at 1186; *accord U.S. v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020). Indeed, "a silencer cannot, on its own, cause any harm" and "is not useful" unattached from a firearm, and "a firearm remains an effective weapon without a silencer." *U.S. v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases).

Stabilizing braces fall outside the scope of the Second Amendment for the same reasons. Braces, like silencers, are not arms and serve no useful purpose except as attachments to firearms, as Plaintiffs appear to concede. Pls.' Br. 1 (describing stabilizing braces as "accessories" that "can be attached to the back of a pistol"); *see also* 88 Fed. Reg. 6512 (considering braces that are not necessary for the cycle of operations). And as with silencers, a brace-equipped weapon "remain[s] effective as a weapon" without the brace. *Hasson*, WL 4573424, at *4–5. For these reasons, in other challenges to the Rule, courts have "conclude[d] that, like silencers, stabilizing braces are not 'bearable arms' under the Second Amendment," and consequently, the "the regulated activity does not fall within the scope

of the Second Amendment." *SAF*, 2023 WL 7490149, at *13; *accord FRAC*, 2023 WL 5942365, at *5;

*Miller*, 2023 WL 3692841, at *10. This Court should hold the same.

### B. Short-barreled rifles are dangerous and unusual weapons.

Plaintiffs do not dispute that at least some brace-equipped weapons are designed and intended

to be fired from the shoulder, and thus short-barreled rifles under the NFA if equipped with a short

barrel. They have been marketed, sold, and used as such, as evidenced in the Rule. *Supra* 4–7. To

prevail on this argument, then, Plaintiffs must show that short-barreled rifles are not dangerous and

unusual weapons, which the Second Amendment does not protect.

Congress recognized short-barreled rifles as particularly dangerous when it passed the NFA.[8]

*Supra* 2. Unsurprisingly given this history, courts have consistently held that short-barreled rifles are

dangerous and unusual weapons unprotected by the Second Amendment. Indeed, shortly after the

NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's

restrictions on short-barreled shotguns. *U.S. v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the

Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because

they are "dangerous and unusual" weapons. 554 U.S. at 581, 622-25 (citation omitted). As the Courts

of Appeals have repeatedly concluded, that principle applies equally to short-barreled rifles because

there is "no constitutional distinction" between the two. *U.S. v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th

Cir. 2018) (per curiam); *Cox*, 906 F.3d at 1185; *Gilbert*, 286 F. App'x at 386.[9]

---

[8] That short-barreled rifles are less concealable than standard pistols, Pls.' Br. 34, misses the relevant comparisons. Brace-equipped short-barreled rifles are *more concealable* than full-length rifles, while also being *more accurate* than traditional pistols (as Plaintiffs apparently acknowledge), and therefore more dangerous and lethal.

[9] *U.S. v. Miller*, 2023 WL 6300581, at *3 (N.D. Tex. Sept. 27, 2023); *Miller*, 2023 WL 3692841, at *11; *FRAC*, 2023 WL 5942365, at *5; *U.S. v. Rush*, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023); *U.S. v. Royce*, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023); *U.S. v. Barbeau*, 2016 WL 1046093, at *4 (W.D. Wash. Mar. 16, 2016).

Although another district court has found that "braced pistols" enjoy Second Amendment protections because they are "commonly used by law-abiding citizens for lawful purposes," *Mock,* 2023 WL 6457920, at *10, the record and case law lead to the opposite conclusion—*i.e.*, that brace-equipped short-barreled rifles are dangerous and unusual weapons that are not constitutionally protected. *First*, as explained, the pistols that are typically equipped with stabilizing braces are not the type of compact, lightweight pistols that are the "most commonly used" firearms for self-defense. *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Rather, the "pistols" commonly configured with braces are rifle-variant pistols—*e.g.*, an AR-type pistol with a rifle receiver, *supra* 4. These types of pistols are not the traditional "handguns" commonly viewed as "quintessential self-defense weapon[s]." *See Heller*, 554 U.S. at 629. The widespread use of lightweight handguns should thus have no bearing on whether brace-equipped pistols are dangerous and unusual weapons.

*Second*, application of Circuit precedent shows that brace-equipped short-barreled rifles *are* dangerous and unusual weapons. *SAF*, 2023 WL 7490149, at *13 (holding that Rule does not implicate the Second Amendment because the brace-equipped pistols the Rule addresses "are equivalent to" short-barreled rifles, which are dangerous and unusual). In *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016), the Fifth Circuit explained how courts should conduct the proper inquiries for determining whether a type of weapon—there, a machinegun, another NFA firearm—is outside the Second Amendment's ambit. *Id.* at 448–49. The Fifth Circuit first looked to the fact that unlawful possession of a machinegun is a crime of violence for purposes of a sentence enhancement. *Id.* at 449. The same is true for the unlawful possession of short-barreled rifles and other NFA firearms. *See U.S. v. Golding*, 332 F.3d 838, 843–44 (5th Cir. 2003); *accord Hollis*, 827 F.3d at 448; 88 Fed. Reg. at 6499 (short-barreled rifles "are

dangerous and unusual" because of "their concealability and their heightened ability to cause damage," achieved in part by "the ability to shoulder the firearm for better accuracy").[10]

In evaluating machineguns' commonality, the Fifth Circuit considered both (i) the "absolute number" of weapons and (ii) the number of states where they "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, the estimated 3 million brace-equipped short-barreled rifles in circulation fall short of the exemplary benchmarks that indicated widespread use in *Hollis*. *See id.* at 450 (*e.g.*, 8 million semi-automatic rifles, 50 million large-capacity magazines). The record does not support Plaintiffs' argument that 40 million brace-equipped weapons are currently in circulation. Pls.' Br. 37. Plaintiffs get that figure from a Congressional Research Service Report estimating there could be as many as 10–40 million braces (not brace-equipped short-barreled rifles) in circulation. *Id.* (citing Compl. ¶ 283). But that Report concedes that its estimate is not authoritative or based on any "available statistics," but instead relies upon undisclosed "unofficial estimates."[11] These figures thus lack a proper foundation. And in any event, the Rule addressed comments citing these materials and declined to adjust its estimate of 3 million brace-equipped short-barreled rifles. 88 Fed. Reg. 6560. Given the ATF's reasoning, the 3 million estimate is more likely accurate than Plaintiffs' inflated estimate and should be utilized for purposes of this analysis.

The number of states that ban machineguns outright or unless registered (34), *id.,* is similar to the number of states with analogous laws governing short-barreled rifles (30).[12] These laws, like those

---

[10] *E.g.*, *Gilbert,* 286 F. App'x at 386; *U.S. v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *U.S. v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

[11] https://crsreports.congress.gov/product/pdf/IF/IF11763 at 2.

[12] *See* Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Cal. Penal Code § 16590; Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); D.C. Code Ann. § 7-2502.02; Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Haw. Rev. Stat. Ann. § 134-8; Ill. Comp. Stat. Ann § 24-1(a)(7)(ii), § 24-2(c)(7); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b;

in *Hollis*, reinforce that short-barreled rifles are dangerous and unusual and thus not protected under the Second Amendment. *See id.* at 451.

Plaintiffs essentially suggest that, if a dangerous weapon is not immediately and effectively banned and quickly proliferates, then it will not qualify as "unusual" under Second Amendment analysis. But the court in *Hollis* noted that this very argument was rejected in *Heller*, *see id.* at 451, and it fails here too. The marketing of a novel accessory designed to evade existing regulations does not start a constitutional timer, wherein prohibition or other regulation is lawful only until sales hit a certain threshold. And short-barreled rifles are no less dangerous and unusual today simply because manufacturers were effective at selling "'braces' to consumers as a means of creating functional [short-barreled rifles]" intended to avoid federal controls. *Mock*, 2023 WL 6457920, at *2.

As the court in *SAF* succinctly stated: "Plaintiffs do not contend that the NFA or its definition of [short-barreled rifles] is unconstitutional. And no court has held that [short-barreled rifles] are no longer unusually dangerous, associated with criminal activity, or otherwise contrary to Congress's stated position during the passing of the NFA." 2023 WL 7490149, at *14. Thus, the Court should not "take the tremendous step of finding otherwise as to traditional SBRs and brace-equipped firearms equivalent to SBRs," *id.*—an extraordinary proposition that could call into question pending criminal indictments. Because at least some braced weapons are short-barreled rifles, and short-barreled rifles are dangerous and usual weapons, Plaintiffs cannot show that there is "no set of circumstances exists under which" the Rule would be constitutionally valid, and this facial challenge fails. *Wash. St. Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotations omitted).

---

N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); 11 R.I. Gen. Laws Ann. § 11-47-8(b); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

### C.   Taxation and registration of short-barreled rifles does not implicate the Second Amendment.

Plaintiffs' Second Amendment claim fails also because regulatory procedures, like the NFA's, do not infringe upon the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear. *Bezet*, 714 F. App'x at 340; *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012). In other challenges to the Rule, courts have held that the Second Amendment does not prohibit "traditional registration and licensing requirements commonly associated with firearm ownership." *Mock*, 2023 WL 2711630, at *7; *Miller*, 2023 WL 3692841, at *11; *FRAC*, 2023 WL 5942365, at *5.

Indeed, Justice Kavanaugh explained in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, [and] a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court echoed a similar point. *Id.* at 2138 n. 9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes.). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem. *U.S. v. Saleem*, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023); *accord U.S. v. Delauder*, 2023 WL 5658924, at *4 (N.D. W. Va. Aug. 31, 2023). Indeed, the routine procedures challenged here are especially unobjectionable because they apply only to a narrow set of particularly dangerous weapons.

### D.   Historical tradition of firearm regulation supports the Rule and the NFA.

But even if the Rule and the NFA implicated the Second Amendment, they still are constitutional because they rest upon centuries of similar registration and taxation requirements. The Government may justify a regulation that implicates the Second Amendment by showing "that it is consistent with the Nation's historical tradition of firearm regulation"—*i.e.*, that the regulation fits

within a "historic and traditional category" of firearms regulation. *Bruen*, 142 S. Ct. at 2130. The Government can show this by pointing to "a well-established and representative historical *analogue.*" *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar," in that they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin.*" *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

Plaintiffs characterize the NFA as containing registration requirements, transportation restrictions, and tax burdens. Pls.' Br. 33. But they cite no authority holding that the Second Amendment prohibits such regulations. And for good reason: Since colonial times, state and local governments have regulated firearm possession and manufacturing through taxation, registration, and similar requirements.

*Tradition of Registration.* The historical record leaves no doubt that there is a tradition analogous to the NFA's registration requirements. As early as 1631, Virginia required a regular survey of people, "arms[,] and munition" in the colony, and "door-to-door surveys of firearms were authorized in Rhode Island (1667), South Carolina (1747), and New Jersey (1781).[13] Militia members in Massachusetts also were required to have their firearms inspected (1775), with an official record documenting those inspections, and New York imposed similar requirements(1778).[14] These measures, like modern registration, ensured that the respective government had accurate and timely records of the individuals within their jurisdiction who owned firearms. *U.S. v. Dangleben*, 2023 WL 6441977, at *8 (D.V.I. Oct.

---

[13] DEX1 (App.003); DEX2 (App.005); DEX3 (App.010); DEX4 (App.032); Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161–62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

[14] DEX5 (App.048); DEX6 (App.057).

3, 2023) ("These muster and registration laws, in addition to taxes on personally held firearms, allowed the government to roughly account for and track the location of the firearms in colonial America.").

While Plaintiffs preemptively argue that historical analogues previously offered by Defendants were not motivated by the same concerns animating the NFA, Pls.' Br. 40, early American states and colonies exercised their militia authority to preserve "the public peace, safety, and good order," *Presser v. Illinois*, 116 U.S. 252, 268 (1886), the same goals the NFA advances, *U.S. v. Freed*, 401 U.S. 601, 609 (1971). In 1805, for example, Massachusetts required musket and pistol barrels manufactured in the state and offered for sale to be "proved" (inspected and marked by designated individuals) with payment of a fee to ensure their safe condition, and Maine enacted similar requirements in 1821.[15] *See U.S. v. Padgett*, 2023 WL 3483929, at \*9 (D. Alaska Jan. 4, 2023) ("There was significant regulation of firearms in colonial America" like "registration and safety requirements," "designed to ensure responsible and safe gun ownership.").

In addition to conditions on the sale and possession of firearms, early American governments enacted strict regulations regarding where and to whom some firearms could be sold. The colonies of Massachusetts, Connecticut, Maryland, and Virginia "enacted laws in the first half of the [17th] century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). And colonial Virginia made it a crime to "stray[] into an Indian town or more than three miles from an English Plantation[] while possessing more firearms than needed for personal use." *U.S. v. Bradley*, 2023 WL 2621352, at \*5 (S.D. W. Va. Mar. 23, 2023).

Licenses or inspection were also required in certain states—Massachusetts (1651, 1809), Connecticut (1775), New Hampshire (1820)—to commercially export or sell gunpowder (like with modern ammunition).[16] *Id.* at \*4 ("Early legislatures and Founders did not shy away from regulating

---

[15] DEX7 (App.067); DEX8 (App.072).
[16] DEX9 (App.076); DEX10 (App.080); DEX11 (App.083); DEX12 (App.086).

the trade and movement of firearms."); *accord U.S. v. Libertad*, 2023 WL 4378863, at *6 (S.D.N.Y. July 7, 2023). Many of these laws were motivated largely by the same concerns animating the NFA: "controlling and tracing the sale of firearms" and "ensuring dangerous individuals did not obtain firearms." *U.S. v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. 2022).

Later enactments also indicate a tradition of firearm registration. Illinois passed a law in 1881 requiring sellers of certain "deadly weapons" like pistols and revolvers to "keep" and have ready for inspection "at all reasonable times" "a register of all such weapons sold or given away," including the purchaser's name and age and "the purpose for which it is purchased."[17] And Congress passed a law (1892) governing the sale of certain weapons in the District of Columbia, requiring retailers to "keep a written register of the name and residence of every purchaser."[18]

This history shows a long tradition of firearm regulation analogous to, or more stringent than, the NFA's registration requirements. *Herrera v. Raoul*, 2023 WL 3074799, at *10 (N.D. Ill. Apr. 25, 2023) (holding state "registration requirement" consistent with traditional firearm regulation), *aff'd* 85 F.4th 1175 (7th Cir. 2023). While Plaintiffs complain that certain cited laws are either too early or too late to be relevant, Pls.' Br. 39, those cited above extend from the colonial era through the founding to the late-19th century.

*Tradition of Taxation.* The NFA's taxation of firearms is well-supported by the historical record. Early American governments imposed various costs like fees and licensing on firearm and ammunition sales. *Supra* 36. And as explained, from the 1600s through the early 1900s, several colonies and states required licenses or inspection to export or sell gunpowder.[19]

---

[17] Ill. Stat. Ann. Crim. ch. 38 (1885), https://perma.cc/7LPN-T8SX.
[18] 27 Stat. 116, § 5 (1892), https://perma.cc/7PUE-NVDN.
[19] *See* DEX9 (App.076); DEX10 (App.079–App.081); DEX12 (App.085–App.086); DEX11 (App.083).

Taxes on firearms also were common in early America. In 1820, Alabama imposed a $1 personal property tax on "pocket or side pistol[s]" and certain other weapons, revising this law while maintaining taxes on certain firearms in the mid-1800s.[20] Similarly, Florida (1838) imposed a $10 per year tax on individuals openly "carrying" "pocket pistols" and certain other weapons;[21] Mississippi (1844) required a $2 tax on "dueling or pocket pistol[s]," and in 1867 the state imposed taxes on, *inter alia*, rifles and shotguns, and that same year enacted a $5 to $15 tax "on every gun and pistol" in a certain county, with refusal to pay resulting in the firearm's seizure and sale;[22] and North Carolina (1851, 1857, 1859, 1866) imposed taxes on pistols and other weapons, often with the proviso that the taxes applied only to weapons intended for private use and "used or worn about the person" in the prior year.[23] And Georgia (1866) authorized certain counties to collect a tax "on every gun or pistol, musket or rifle over the number of three kept or owned" on plantations.[24] What's more, multiple states in the 19th century imposed occupational taxes or licensure fees on businesses associated with arms-sales, such as those engaged in the retail sale of firearms, gunpowder, or ammunition. Numerous states enacted such laws, or authorized their enactment on the local level, including in Alabama, California, Georgia, Minnesota, North Carolina, Ohio, and South Carolina.[25]

*       *       *

Taken together, these laws reflect an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA seeks to raise revenue through taxation,

---

[20] DEX13 (App.090–App.091); DEX14 (App.095); DEX15 (App.104); DEX16 (App.141).
[21] DEX17 (App.144).
[22] DEX18 (App.146); DEX19 (App.148); DEX20 (App.152).
[23] DEX21 (App.156–App.157); DEX22 (App.170); DEX23 (App.206); DEX24 (App.245).
[24] DEX25 (App.259–260).
[25] DEX26 (App.264); DEX27 (App.269); DEX28 (App.279); DEX29 (App.348); DEX30 (App.476); DEX31 (App.481); DEX32 (App.496); DEX33 (App.503); DEX34 (App.513); DEX35 (App.519); DEX36 (App.540); DEX37 (App.555); DEX38 (App.574); DEX39 (App.577); DEX40 (App.580); St. Paul, Minn., Ordinances no. 895, § 2 (1889), https://perma.cc/8CKK-Q54S.

regulates but do not prohibit firearm ownership, and gathers information on firearms and their owners. Any modest burden imposed by the NFA's regulations is thus certainly "comparable" and "comparably justified" to the numerous historical laws outlined above.

## VI.   The Rule is not unconstitutionally vague.

Plaintiffs also contend the Rule violates due process because it provides an "incomprehensible standard." Pls.' Br. 41. But several courts considering vagueness challenges to the Rule have concluded otherwise. Most recently, in *SAF*, the court considered similar arguments criticizing the Rule's multifactor test and factors, and held that the "Rule is likely valid" because "the multi-factor framework allows a person of ordinary intelligence to assess whether his brace-equipped firearm is designed," "made," and "intended to be fired from the shoulder." 2023 WL 7490149 at *10 (citations omitted); *accord Miller*, 2023 WL 3692841, at *9 ("[The Rule's factors] provide a cognizable standard … that aligns with the statutory definition … which is sufficient to survive a void for vagueness challenge."); *Mock*, 2023 WL 2711630, at *7.

Regardless, "[o]rdinarily, a litigant to whom a statute clearly applies lacks standing to argue that the statute is vague as to others," and here, no Plaintiff contends that they are unable to determine whether their brace-equipped weapon would be classified as an NFA firearm because of ambiguities in the Rule. *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1210 (5th Cir. 1982); *accord Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 325 (5th Cir. 1999). In fact, Plaintiff Brown avers that he understands how his weapon would be classified under the Rule. *See* Brown Decl. ¶ 5. What's more, Plaintiffs have brought a facial challenge whereby they must establish that the Rule would be valid under "*no* set of circumstances." *Wash. State Grange*, 552 U.S. at 449 (emphasis added). That Brown acknowledges the Rule is clear as applied to his brace-equipped pistols not only illustrates that he lacks standing to bring a vagueness claim, but that Plaintiffs' facial challenge necessarily fails, as "[t]here are at least some instances in which a reasonable person can infer meaning from the [Rule] to determine

whether a brace-equipped pistol is designed, made and intended to be fired from the shoulder." *SAF*, 2023 WL 7490149 at *11 (quotations omitted).

In any event, the Rule is not unconstitutionally vague. The Fifth Amendment requires that a rule or statute must be written "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord U.S. v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted).

The Rule provides regulated parties with ample opportunity to understand ATF's view of the NFA, and it's clearer and provides more notice than ATF's previous classification system. Prior to the Rule, ATF had not uniformly classified brace-equipped weapons or even adopted a framework for classifying such weapons; instead, ATF issued varied classification determinations for particular weapon-brace combinations, classifying some as short-barreled rifles, *see* 88 Fed. Reg. at 6484–85; AR 18–25; 54–57, 70–91, and others as not, *see* 88 Fed. Reg at 6488, 6490, 6492. By contrast, the Rule adopts a predictable framework for classification: ATF first considers whether a weapon has any surface area allowing for shoulder firing, and then weighs six additional factors to determine whether the weapon is designed, made, and intended to be fired from the shoulder. *Supra* 8–9.

In connection with the Rule, ATF also issued multiple interim guidance documents to help the regulated public understand how the Rule would operate in practice. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (directing courts to "consider any limiting construction" an "agency has proffered" that may clarify a challenged provision). The guidance identifies commonly available weapon-brace combinations that ATF will consider short-barreled rifles. *See Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*,

https://perma.cc/BK6C-BRGQ; *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY. The interim guidance both notifies individual possessors of those weapon-brace combinations that are subject to the NFA under the Rule's methodology and allows individuals possessing similarly configured weapons to appreciate how their weapons may be classified under the Rule. ATF also intends to draft and send formal classification letters to manufacturers to ensure that they and their customers are properly notified of ATF's actual classifications. Further, an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552; *see also Vill. of Hoffman Ests.*, 455 U.S. at 498 (relaxing vagueness test when party may clarify a regulation's meaning "by its own inquiry").[26]

Plaintiffs criticize the Rule's failure to adopt precise metrics but cite no authority requiring an agency's analysis to be tied to numerical requirements to satisfy due process, and it is entirely permissible for agencies to draw lines with less-than-mathematical precision. "[P]erfect clarity and precise guidance have never been required," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), and agencies need not achieve "meticulous specificity" at the cost of "flexibility and reasonable breadth," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). And as explained, *supra* 20–21, agencies routinely employ, and courts regularly uphold, multi-factor tests without specific measurements or precise metrics. *PDK Labs.*, 438 F.3d at 1194; *Texas*, 983 F.3d at 839–40. Therefore, "a test without numeric thresholds is not dispositively vague." *SAF*, 2023 WL 7490149, at *10 (citation omitted).

And, even without numeric thresholds, the Rule's factors have readily understandable meaning. Take the threshold rear-surface-area factor: as the court in *SAF* explained, the language of

---

[26] Contrary to Plaintiffs' suggestion, Pls.' Br. 42, there is no expectation that individuals will need to seek individualized determinations. The Rule's factors are clear, and individuals will be able to apply them, as Plaintiff Brown has done here. And further, the interim guidance and manufacturer classifications provide additional notice regarding how the Rule applies to most braced weapons. Individual determinations are simply one *more* option ATF has provided to ensure that all affected individuals have adequate notice of how the NFA applies to their weapons.

this factor "identifies a straightforward goal: identifying whether there is *a* surface area permitting the user to fire a firearm from the shoulder." 2023 WL 7490149 at *10. That goal "derives directly from the statutory definition of 'rifle' as being 'fired from the shoulder,'" and the Rule includes a "pictorial example supporting that the language means the [braced] firearm has some surface area that one would use to fire from the shoulder like a rifle." *Id.* (citing, *inter alia*, 88 Fed. Reg. at 6529). Likewise, the Rule's factors considering whether a weapon has a "weight or length consistent with the weight or length of similarly designed rifles" or a "length of pull … consistent with similarly designed rifles" are not vague.[27] 88 Fed. Reg. at 6569. These factors simply consider whether a brace-equipped weapon has features consistent with traditional, comparable rifle designs—weapons explicitly designed and intended to be shoulder fired—as such similarities indicate that the brace-equipped weapon may also be designed and intended to be fired that way. The Rule includes example weights, lengths, and lengths of pull as points of comparison for further guidance. *Id.* at 6514–18, 6535–37. The court in *SAF* also held that these factors pose no problem. 2023 WL 7490149, at *10.

Lastly, this Court need not exhibit "special sensitivity" toward vagueness concerns simply because the Rule potentially "touches on a constitutional right," namely, the Second Amendment. Pls.' Br. 44. Plaintiffs cite no authority for this proposition, and recent Supreme Court precedent (including the case they cite) confirms only that vagueness principles operate most forcefully "[w]hen speech is involved." *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 19 (2010). And in any event, as explained, the Rule does not implicate the Second Amendment. *Supra* 30–35.

## VII.   The NFA is a valid exercise of Congress's taxing power.

The Supreme Court upheld the NFA as an exercise of Congress's taxing power more than 80

---

[27] "Length of pull is a well-known standard in the firearms industry," defined as "[t]he distance from the center of the trigger to the center of the buttplate or recoil pad." 88 Fed. Reg. at 6534.

years ago. *Sonzinsky v. U.S.*, 300 U.S. 506, 514 (1937). And since then, the Fifth Circuit has upheld various NFA provisions as valid exercises of the taxing power. *U.S. v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997); *U.S. v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994); *Bezet*, 714 F. App'x at 342. Plaintiffs nevertheless maintain that the NFA is unconstitutional because it imposes taxes on individuals for making short-barreled rifles. Pls.' Br. 45-49. Yet they cite no authority for the proposition—repeatedly rejected by courts—that the NFA exceeds Congress's taxing power.[28]

In *Sonzinsky*, the Supreme Court upheld the NFA as a valid exercise of Congress's taxing power, explaining that the NFA is "productive of some revenue" and "[i]n the exercise of its constitutional power to lay taxes, Congress may select the subjects of taxation, choosing some and omitting others." 300 U.S. at 512, 514. *Sonzinsky* squarely forecloses Plaintiffs' taxing-power claim. And that *Sozinsky* specifically addressed a tax on firearms dealers, rather than the NFA's making tax, makes no material difference. *Cox*, 906 F.3d at 1179–83 (finding no justification for "departing from *Sonzinsky*'s conclusion that the NFA is a valid exercise of Congress's power"); *Bezet*, 714 F. App'x at 343 n.3 ("[T]hat the defendant in *Sonzinsky* was a firearms dealer does nothing to distinguish the case."). Moreover, nothing about the making tax "completely prohibit[s] Plaintiff[s] from exercising [their] rights." *Bezet*, 276 F. Supp. 3d at 618–19. Thus, Congress "validly exercised its constitutional authority under its taxing power when it [enacted the making tax]." *Id.*

Nothing in *Bruen* undermines *Sonzinsky*, as Plaintiffs suggest. Pls.' Br. 46; *see also Cox*, 906 F.3d at 1188 (NFA is not an unconstitutional burden on the exercise of Second Amendment rights); *U.S. v. Bolatete*, 977 F.3d 1022, 1033 (11th Cir. 2020) (same, under plain-error review). Indeed, *Bruen* did not address Congress's taxing power or the NFA. And even if *Sonzinsky* "appeared to rest on reasons rejected in" *Bruen*—it does not—this Court must apply it, leaving to the Supreme Court "the

---

[28] Many of these cases involve challenges to a criminal conviction for possessing an unregistered NFA firearm, showing the broad implications of Plaintiffs' facial challenge to the NFA.

prerogative of overruling its own decision." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

Moreover, even if *Sonzinsky* does not foreclose Plaintiffs' arguments, the NFA's making tax is not an unconstitutional direct tax simply because it applies to private individuals. Pls.' Br. 47–49; *see also Bezet v. U.S.*, 276 F. Supp. 3d 576, 618–19 (E.D. La. 2017), *aff'd Bezet v. U.S.*, 714 F. App'x 336 (5th Cir. 2017). Excise taxes, which include taxes on the manufacture, sale, or use of goods, are indirect taxes, regardless of who pays the tax. *Union Elec. Co. v. U.S.*, 363 F.3d 1292, 1302 (Fed. Cir. 2004); *see also* Black's Law Dictionary (11th ed. 2019) (defining excise tax). At least one court has specifically rejected the argument that Plaintiffs make here—*i.e.*, that the NFA's making tax is an unconstitutional direct tax as applied to individuals. *U.S. v. Marshall*, 2010 WL 5169816, at *6 (S.D. Fla. Dec. 14, 2010). Other courts have likewise recognized that the NFA's making tax is an indirect excise tax, not a direct tax. *See also Doe v. Trump*, 2021 WL 4441462, at *6 (S.D. Ill. Sep. 28, 2021); *Thompson/Center Arms Co. v. Baker*, 686 F. Supp. 38, 41–42 (D.N.H. 1988). Plaintiffs identify no case holding to the contrary.

## VIII.   Neither the NFA nor the Rule violate separation of powers principles.

Plaintiffs argue that the Rule violates constitutional separation of powers because it usurps a uniquely legislative function and violates the "major questions" doctrine. Pls.' Br. 49–51. Each argument fails.

### A.   The NFA and GCA provide intelligible standards to which ATF must conform.

At the outset, while Plaintiffs recognize Congress's power to delegate rulemaking authority, they fail to acknowledge the deferential standard applicable to such delegations. Pls.' Br. 49; *Gundy*, 139 S. Ct. at 2129. "So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (cleaned up). Only twice has the Supreme Court struck down legislation as violating the non-delegation

doctrine, nearly a century ago. *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). Since then, the Supreme Court has upheld, "without deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373.

Here, Congress defined the terms "firearm" and "short-barreled rifle" in the NFA and GCA. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7), (a)(8). Congress expressly delegated to the Attorney General the authority to prescribe "such rules and regulations as are necessary to carry out" the GCA, and the authority to create "all needful rules and regulations for" the NFA's "enforcement." 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). In turn, the Attorney General has delegated this responsibility to ATF, 28 C.F.R. § 0.130, and ATF enacted the Rule pursuant to this delegation. 88 Fed. Reg. at 6481, 6500. Numerous courts have found that the express delegations in these statutes permit rulemaking. *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1186 (W.D. Tex. 2020) (collecting cases), *overruled on other grounds*. And given that the Supreme Court has repeatedly upheld "very broad delegations," like ones requiring an agency merely "to regulate in the 'public interest,'" the delegations, statutory definitions, and regulatory scheme underlying the Rule pass the "intelligible principle" test. *Gundy*, 139 S. Ct. at 2129.

That there may be criminal consequences for individuals who fail to register their weapons does not change this result. As an initial matter, those consequences flow directly from the statute, not the Rule. *See* 18 U.S.C. § 922(a)(4); 26 U.S.C. §§ 5811–12, 5821–22, 5841. And in any event, it is well-established that Congress can delegate authority to the Executive Branch to engage in rulemaking without violating nondelegation principles, even where violating the underlying statute may lead to criminal consequences. *Loving v. U.S.*, 517 U.S. 748, 768 (1996); *see also, e.g., J.W. Hampton, Jr. & Co. v. U.S.*, 276 U.S. 394 (1928)); *Yakus*, 321 U.S. at 418; *U.S. v. O'Hagan*, 521 U.S. 642 (1997). Thus, ATF has not exercised a "uniquely legislative function" in promulgating the Rule simply because it relates to statutes with criminal consequences. Pls.' Br. 50; *see also supra* 12–15.

Plaintiffs cite no case in which an agency's regulation was invalidated as an unconstitutional

delegation simply because violating the underlying statute carried criminal penalties. Instead, Plaintiffs rely on *Cargill v. Garland*, 57 F.4th 447, 471–72 (5th Cir. 2023), but there, the Fifth Circuit "d[id] not reach" the delegation issue, addressing it only in dicta. *Id.* at 472 & n.6. *Cargill* thus provides no sound basis to find a violation of delegation principles.

### B.     The Rule does not implicate the "major questions" doctrine.

Plaintiffs' reliance on the "major questions doctrine," Pls.' Br. 50, is similarly misplaced for several reasons. *First*, this doctrine applies only in "extraordinary cases" involving "decisions of vast economic and political significance" or assertions of "extravagant statutory power over the national economy" or of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022) (citations omitted). The Rule—which interprets the NFA and the GCA as they relate to firearms classifications, ATF's bread and butter—bears none of these features, either as a matter of reach or impact. Regarding the economic significance of the Rule, ATF anticipates the cost of the Rule to be $266.9 million, annualized. 88 Fed. Reg. 6481. These costs fall far short of those held to be economically significant in *King v. Burwell*, 576 U.S. 473 (2015) ("tens of billions of dollars" *every year*), *West Virginia* (billions of dollars of *annual* compliance costs; *see also* RIA for Final Rule 3-22 (2015)), and *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) (estimated costs over $1 billion *annualized*; *see also* 86 Fed. Reg. 6163).

*Second*, Plaintiffs neglect to mention that major-questions principles are relevant only when an agency action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions. *Id.* at 2605. ATF has long exercised clear delegated authority in issuing rules clarifying terms within the NFA and the GCA and issuing firearm classifications in accordance with those terms. Consistent with that longstanding practice, the Rule amends existing regulations to clarify ATF's understanding of the proper application of one specific statutory phrase, the meaning

of which has been the subject of substantial confusion.[29] That can hardly be described as an enormous, "transformative expansion [in the agency's] regulatory authority," *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), resting on an "ancillary provision," *see West Virginia*, 142 S. Ct. at 2605.

*Third*, before applying these principles, the Supreme Court has considered whether the challenged action is outside the agency's traditional field of expertise, whether it intrudes on matters typically governed by state law, *id.* at 2606, 2612–13, and whether Congress has already expressly considered and rejected the measure, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). None of these factors are present here, and Plaintiffs have shown nothing to the contrary.

## IX. Any relief should be narrowly tailored to redress Plaintiffs' injuries.

Even if Plaintiffs succeed on their claims, the sweeping remedies they request are unjustified and contrary to the constitutional and equitable constraints on this Court's remedial authority.

### A. Universal vacatur of the Rule is unwarranted.

Plaintiffs begin by asking the Court to vacate the Rule in its entirety, rather than limit any relief to the parties. Pls.' Br. 15–16. The Court should decline that invitation for several reasons.

*First*, Plaintiffs are mistaken that universal vacatur is *required* to remedy an APA violation. *See id.* Although Fifth Circuit precedent recognizes vacatur as an available remedy for a successful APA challenge,[30] it is a discretionary, equitable remedy that is neither automatic nor compelled upon finding an APA violation. *See, e.g., Cargill*, 57 F.4th at 472; *VanDerStok*, 86 F.4th at 196–97; *Central S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *see also* 5 U.S.C. § 702(1) (clarifying that "nothing" in

---

[29] The Rule does not "claim[] that literally nothing ATF has ever said about pistol braces is true," as Plaintiffs suggest. Pls.' Br. 50. Indeed, while the ATF acknowledges that some early classification letters misrelied on manufacturers' representations regarding the intended use of stabilizing braces, the Rule incorporates criteria considered in past classifications. *Supra* 6–7.

[30] Still, the APA does not mention vacatur. And there is little indication that Congress intended to create a new and radically different remedy in the form of universal vacatur by directing courts to "set aside" agency "action, findings, and conclusions," 5 U.S.C. § 706(2). *See U.S. v. Texas*, 143 S. Ct. 1964, 1980–85 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment).

the APA affects "the power or duty" of a court to "deny relief on" any "equitable ground"). In *Cargill*, for example, the Fifth Circuit held that a rule violated the APA. But rather than reflexively vacate the rule—as one would expect if vacatur were the mandatory remedy for an APA violation—the court recognized that "a more limited remedy" than vacatur may be "appropriate," and instructed the district court on remand to determine the proper remedy, whether "injunctive, declaratory, or otherwise." 57 F.4th at 472. So contrary to Plaintiffs' argument, it is entirely appropriate for a court not to vacate agency action at all where more limited remedies would fully redress Plaintiffs' asserted injuries.

*Second*, where (as here) party-specific remedies are capable of providing plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial authority. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any "remedy must be tailored to redress" Plaintiffs' "particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And traditional principles of equity reinforce that constitutional limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-319 (1999), instructing that a remedy "be no more burdensome" to Defendants "than necessary to provide complete relief" to Plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *accord Texas*, 2023 WL 7116844, at *12.

Despite these well-established principles, Plaintiffs provide no argument or evidence to prove that universal vacatur of the Rule is necessary to fully redress their asserted injuries. *See Feds for Medical Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023) ("[Plaintiffs must] *prove* that whatever [relief] they request is broad enough to protect against their proven injuries and no broader."). And at any rate, that claim appears inconsistent with this Court's determination at the preliminary-injunction stage that universal relief was unwarranted and that a party-specific remedy would afford complete relief to the Plaintiffs who have standing. *Texas*, 2023 WL 7116844, at *12. Plaintiffs do not contest that conclusion, nor offer any sound reason why far broader relief is necessary at final judgment. They

49

have thus hardly demonstrated that they are entitled to the sweeping remedy of universal vacatur.

*Third*, universal vacatur of the Rule would effectively countermand other district court decisions that have denied relief to other plaintiffs challenging the Rule. *See SAF*, 2023 WL 7490149, at *20; *Miller*, 2023 WL 3692841, at *12; *FRAC*, 2023 WL 5942365, at *11. Such relief would thus not only contravene traditional limitations on this Court's remedial authority, but would also undermine basic principles of comity by providing these other plaintiffs with the very relief to which sister courts—including another court within this Circuit—decided they likely were not entitled. *See, e.g.*, *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) ("[Where] [o]ther courts are considering [the] same issues" at the same time, "[p]rinciples of judicial restraint" counsel against universal remedies.); *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment) (recounting the well-known systemic issues created by universal remedies that courts should, at the very least, "carefully consider … before granting such sweeping relief" (cleaned up)).

*And finally*, Plaintiffs' argument ignores that some APA violations should be corrected by an equitable remedy that the Fifth Circuit has described as "remand without vacatur." *See, e.g.*, *Texas v. U.S.*, 50 F.4th 498, 529 (5th Cir. 2022). Such relief is "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so" and where vacatur would be "disruptive." *See id.* (citation omitted). For example, if this Court were to find that ATF failed to comply with the APA's notice-and-comment requirements in promulgating the Rule, or that ATF did not adequately explain its actions, that would at most justify an instruction to cure the asserted failure without granting additional relief. That approach would accord with established equitable principles by not "needlessly disrupting" the regulated community by returning it to a classification regime without generally applicable guidelines, risking further confusion. *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 477–78 (D.C. Cir. 2022); *accord Central & S.W. Servs.*, 220 F.3d at 692 (declining to vacate a rule because "it would be disruptive" to "the regulated community").

**B.**      **Plaintiffs are not entitled to their proposed injunction.**

In addition to universal vacatur of the Rule, Plaintiffs ask the Court to permanently enjoin Defendants, seemingly nationwide, from "enforcing the Rule and from taking any action inconsistent with vacatur of the Rule." Pls.' Br. 53. But like with their request for universal vacatur, Plaintiffs fail to show that a nationwide injunction is needed to redress their injuries. *Supra* 49. Indeed, as this Court has already observed, "it is hard to see how" it could enjoin the Rule's enforcement "with respect to those who are strangers" to this suit while still "acting" within the bounds of its "judicial role." *Texas*, 2023 WL 7116844, at *12 (citation omitted). A nationwide injunction would therefore be improper.

But so would a party-specific injunction. To justify such relief, Plaintiffs needed to make a clear showing that (i) they will suffer irreparable harm without the injunction, (ii) other available remedies are inadequate, (iii) the balance of equities tips in their favor, and (iv) the injunction would serve the public interest. *Monsanto*, 561 U.S. at 156–67. But they failed to establish any of these prerequisites, thus precluding issuance of a permanent injunction of any scope. *Id.*

**1.**      **No Plaintiff will suffer irreparable harm absent an injunction.**

Each Plaintiff has failed to show that it will suffer irreparable harm unless the Court enjoins the Rule's enforcement—an essential requirement for injunctive relief. *Monsanto*, 561 U.S. at 158, 162.

_State of Texas._ Texas contends, as it has in the past, that it will suffer harm to both its sovereign and quasi-sovereign interests absent an injunction. Pls. Br. 51. But this Court has twice rejected those claims, *Texas v. ATF*, 2023 WL 3763895, at *3 (S.D. Tex. May 31, 2023); *Texas*, 2023 WL 7116844, at *8, and Texas offers no sound reason why the Court should rethink its earlier rulings.[31]

Regarding its alleged sovereign interest, Texas claims that the Rule essentially changes the meaning of a state law regulating "short-barreled firearms," *see* Tex. Penal Code § 46.05(a)(1)(c), thus

---

[31] By the same token, Texas lacks Article III standing to challenge the Rule. *Texas*, 2023 WL 7116844, at *8.

preventing Texas from enforcing that law as it wishes. Pls.' Br. 11–13. But as this Court has explained, the Rule does not affect the meaning of section 46.05(a)(1)(C)—which "stands independent from" federal law—or constrain Texas's authority to interpret or enforce it. *Texas*, 2023 WL 3763895, at *3; *see also* Defs.' Resp. to Pls.' Supp. Br. 4–6, ECF No. 50. That alone forecloses Texas's claim that the Rule harms its sovereign interests.

Texas also continues to maintain, despite this Court's contrary conclusion, *Texas*, 2023 WL 3763895, at *3, that it has standing to challenge the Rule to protect "its quasi-sovereign interest in the health and safety of its citizens," Pls.' Br. 11–13. But again, Texas fails to acknowledge the long-settled rule that a "State does not have standing as *parens patriae* to bring an action against the *Federal Government*" to protect its residents' health and well-being, *Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (citation omitted)—the only standing "vehicle" a state has for asserting such an interest, *Texas*, 2023 WL 3763895, at *2. Nor does it grapple with any of the Court of Appeals decisions (discussed in prior briefing) rejecting similar efforts by states to proceed as *parens patriae* against the federal government. *See* Defs.' Supp. Br. 2 n.1, ECF No. 47. There is thus no legally sound basis upon which to find that Texas has standing to seek injunctive relief to protect its residents' health and well-being.[32]

*Gun Owners of America and Brady Brown.* The Gun Owners of America ("GOA"), for its part, alleges on behalf of its members several theories of irreparable harm, each of which is also asserted by Brady Brown. None of these theories has merit.

*First*, GOA and Brown complain about the financial cost of having to bring an unregistered brace-equipped pistol that appears to be a short-barreled rifle into compliance with the NFA. Pls.' Br. 51–52. But the obligation to comply with the NFA's controls is attributable not the Rule but to

---

[32] Texas's suggestion that it may nevertheless assert its quasi-sovereign interest in its residents' health and well-being because "the Rule *creates* criminal activity within Texas's borders," Pls.' Br. 14, is so vague, conclusory, and speculative that it prevents a substantive response. It also rests on the assertion that the Rule changes the meaning of Texas's legal code, *id.*, a claim that this Court has already rejected.

Congress. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[A plaintiff] must show that the alleged harm will directly result from the action which [he] seeks to enjoin."). So even if this Court were to enjoin the Rule's enforcement, that would not change Brown's or any other GOA member's statutory obligations. *See U.S. v. St. Bernard Par.*, 756 F.2d 1116, 1123 (5th Cir. 1985) ("It is black letter law that an injunction will not issue when it would be ineffectual.").

At any rate, the various compliance costs that GOA and Brown cite—*i.e.*, the cost of modifying, surrendering, or destroying a brace-equipped pistol—are strictly theoretical. Nowhere does Brown claim that he intends to take any of those actions absent an injunction, such that he would actually incur the associated costs. And there's no evidence that any other GOA member intends to either. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 2023 WL 4291992, at *6 (W.D. Tex. June 30, 2023) (an irreparable injury must be "actual," not "theoretical").

Moreover, there is no evidence that these alleged compliance costs would be more than de minimis if Brown or another GOA member actually incurred them. *See White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (a plaintiff must substantiate a claim of irreparable injury with "independent proof, or no injunction may issue"). "[A]lleged compliance costs," even if unrecoverable, "must be more than de minimis" to constitute irreparable harm sufficient to support injunctive relief. *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) (cleaned up)). So where, as here, a plaintiff "provide[s] no meaningful information about the specific nature or extent of" compliance costs, "nor any concrete indication that they impose more than a de minimis burden," such costs do not amount to irreparable harm. *Career Colls.*, 2023 WL 4291992, at *8–10 (citation omitted); *accord SAF*, 2023 WL 7490149, *16–18 (rejecting claim of irreparable harm based on alleged but unsubstantiated compliance costs in challenge to the Rule); *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1018 (8th Cir. 2023).

*Second*, Plaintiffs maintain that Brown and GOA's members will suffer harm to their Second Amendment rights if required to "destroy," "modify," or "register" their brace-equipped pistols. Pls.'

Br. 52. But as already explained, *supra* 30–35, neither the Rule nor the NFA's regulation of short-barreled rifles implicates the Second Amendment; therefore, Brown and GOA have not established irreparable injury based on the deprivation of a constitutional right. *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

*And third*, Plaintiffs suggest that Brown and GOA members could be subject someday to criminal sanction if they do not comply with the NFA. Pls.' Br. 51–52. But again, the Rule imposes no criminal sanctions; any penalties for possessing an unregistered short-barreled rifle flow from the NFA. So enjoining the Rule's enforcement would not immunize Brown or any other GOA member from those penalties. Nor is there any indication in the record that this speculative threat of criminal sanction is likely or imminent, and thus "a permanent injunction is not now needed to guard against" this alleged harm. *Monsanto*, 561 U.S. at 162. Regardless, there's no dispute that any threat of criminal penalties can be easily avoided—*e.g.*, by reconfiguring a brace-equipped weapon to remove it from the NFA's purview. And if Plaintiffs are unsure about whether a particular weapon is subject to the NFA, they can request a classification from ATF. *Supra* 3.[33]

### 2. The balance of harms and public interest militate against an injunction.

When the government is a party, the third and fourth equitable factors—the balance of harms and the public interest—"merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009), in recognition that "the government's interest *is* the public interest," *U.S. v. Texas*, 566 F. Supp. 3d 605, 690 (W.D. Tex. 2021) (citation omitted). And here, permanently enjoining the Rule's enforcement against Plaintiffs will undermine critical public interests in real, concrete ways.

*First*, the Rule promotes regulatory clarity and consistency. ATF initiated the rulemaking process in part because its prior, case-by-case approach to classifications resulted in inconsistent

---

[33] Gun Owners Foundation alleges no injury sufficient to support Article III standing or the issuance of injunctive relief.

determinations and confusion about how a brace may affect a weapon's classification. The Rule, however, fully explains ATF's generally applicable framework for classifying brace-equipped weapons, a framework that ensures a clear, consistent application of federal law, to the benefit of regulated parties and the agency. A permanent injunction against the Rule would thus undermine that regulatory clarity and consistency, and potentially resow confusion among regulated parties.

*Second*, the NFA—and the Rule's application of it—benefits public safety. As explained, *supra* 2, Congress determined that short-barreled rifles are dangerous and concealable weapons uniquely susceptible to criminal misuse, and designed the NFA's registration-and-taxation requirements to minimize their proliferation among non-law-abiding individuals. The Rule reinforces those controls by reducing their widespread circumvention.

*And third*, enjoining the Rule's enforcement would impinge on ATF's ability to effectuate the NFA's controls, pursuant to statutorily delegated duties. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time" a court enjoins the government "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (cleaned up)). This stands in contrast to the "overriding public interest" in an agency "adher[ing] to its statutory mandate." *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977).[34]

### C.   No relief should extend to unidentified GOA members.

Finally, no relief should extend to any GOA member who has not been identified in this case and agreed to be bound by this Court's judgment. Such a restriction would promote the longstanding equitable principle that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 395–98 (Sutton, C.J., concurring) (explaining the

---

[34] As explained, *supra* 50, if this Court were to find, for example, that ATF did not comply with the APA's notice-and-comment requirements in promulgating the Rule, such error could (and should) be remedied by an instruction to the agency to cure the failure. In such circumstances, an adequate remedy would exist, thus precluding injunctive relief.

problems with "asymmetric" suits). That concern is particularly relevant in this context, where several large membership organizations have challenged the Rule in different venues. To the extent there is overlap between these organizations' members, permitting each organization to litigate on behalf of all its members would allow improper duplication of individual members' claims, provide these members multiple bites at the apple, and eviscerate Rule 23's class-action requirements.

## CONCLUSION

The Court should grant summary judgment in Defendants' favor on all of Plaintiffs' claims.

Dated: January 12, 2024             Respectfully submitted,

                                    BRIAN M. BOYNTON
                                    Principal Deputy Assistant Attorney General

                                    BRIGHAM J. BOWEN
                                    Assistant Branch Director

                                    */s/ Jody D. Lowenstein*
                                    JODY D. LOWENSTEIN (MT Bar No. 55816869)
                                    TAYLOR PITZ (CA Bar No. 332080)
                                    FAITH E. LOWRY (TX Bar No. 24099560)
                                    Trial Attorneys
                                    U.S. Department of Justice
                                    Civil Division, Federal Programs Branch
                                    1100 L Street NW
                                    Washington, DC 20005
                                    Phone: (202) 598-9280
                                    Email: jody.d.lowenstein@usdoj.gov

                                    *Attorneys for Defendants*

## CERTIFICATE OF WORD COUNT

I certify that the foregoing document is 19,973 words, excluding the portions excepted by Local Rule 18(c).

## CERTIFICATE OF SERVICE

On January 12, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice