IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| GUN OWNERS OF AMERICA, INC., | ) | |
| GUN OWNERS FOUNDATION, and | ) | |
| BRADY BROWN, | ) | |
| | ) | Case No. 6:23-cv-00013 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE, and | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity AS THE DIRECTOR OF ATF, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
REPLY TO DEFENDANTS' RESPONSE TO
PLAINITFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents.................................................................................................i

Table of Authorities.........................................................................................iii

Introduction ....................................................................................................... 1

Argument ............................................................................................................ 1

  I.  The Anti-Injunction Act is Inapplicable.................................................... 1

  II.  The Rule Improperly Rewrites the Statutory Definition of "Rifle". ...................... 3

    A.  The NFA Definition of "Rifle" Controls. ........................................ 3

    B.  Defendants' Rationalizations Fail. .................................................. 8

  III. The Rule is Arbitrary and Capricious....................................................... 10

  IV. The Rule Violates the APA's Procedural Requirements. ...................... 14

  V.  The Rule is Repugnant to the Original Meaning of the Second Amendment........ 16

    A.  Braces are "Bearable Arms," Presumptively Protected Under Binding Supreme Court Precedents. .................................................. 16

    B.  Defendants Fail to Show that Short-Barreled Rifles are Historically "Dangerous and Unusual" Weapons Whose Carry Could be Regulated. 18

    C.  Conditioning Mere Possession on Onerous Taxation and Registration More than "Implicates" the Second Amendment. ............................................ 20

    D.  Defendants Fail to Prove a Founding-Era Tradition of Distinctly Similar Regulation. .................................................................... 22

      1.  The Founders Never Imposed Felony Penalties on the Unregistered Possession of Short or Concealable Rifles............................................ 23

      2.  The Founders Never Imposed Felony Penalties on the Untaxed Possession of Short or Concealable Rifles............................................ 25

  VI. The Rule is Unconstitutionally Vague. ................................................... 26

  VII.   The Rule is an Invalid Exercise of Taxing Power. .......................... 27

    A.  The Rule Impermissibly Compels Taxation of a Constitutional Right. ........... 28

    B.  The Rule Impermissibly Compels the Collection of an Unapportioned Direct Tax. ...................................................................... 29

  VIII.   The Rule Violates the Constitutional Separation of Powers....................... 29

  IX. The Rule's Sweeping Harms Warrant Broad Relief. ............................. 31

    A.  Vacatur is the Default Remedy. .................................................... 31

B. Injunctive Relief is Necessary. ........................................................... 33

    1. Plaintiffs Suffer Irreparable Harm. .............................................. 33

    2. The Equitable Factors do not Favor Defendants.................................. 34

C. Relief for GOA's Members is Appropriate. ........................................... 35

Certificate of Service ..................................................................................... 38

Certificate of Word Count .............................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Am. Physicians & Surgeons Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) .................................................................. 32
*Basinkeeper v. U.S. Army Corps of Eng'rs*,
  2018 U.S. Dist. LEXIS 237446 (M.D. La. Jan. 30, 2018)........................... 10
*Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*,
  141 S. Ct. 731 (2021)................................................................................ 6
*Bromley v. McCaughn*,
  280 U.S. 124 (1929).............................................................................. 29
*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)................................................................. 18, 19, 20
*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) .................................................................. 31
*CIC Servs., LLC v. IRS*,
  595 U.S. 209 (2021)................................................................................ 2
*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) .................................................................. 32
*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................passim
*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) .................................................................. 31
*Free Speech Coal., Inc. v. Colmenero*,
  2023 U.S. Dist. LEXIS 154065 (W.D. Tex. Aug. 31, 2023)....................... 36
*Hollis v. Lynch*,
  827 F.3d 436 (5th Cir. 2016) .................................................................. 20
*Kolender v. Lawson*,
  461 U.S. 352 (1983).............................................................................. 27
*Lara v. Comm'r Pa. State Police*,
  2024 U.S. App. LEXIS 1159 (3d Cir. Jan. 18, 2024)................................. 23
*Luis v. United States*,
  578 U.S. 5 (2016)................................................................................... 16
*Marszalek v. Kelly*,
  2021 U.S. Dist. LEXIS 107613 (N.D. Ill. June 9, 2021) ............................ 36
*Mock v. Garland*,
  2023 U.S. Dist. LEXIS 54776 (N.D. Tex. Mar. 30, 2023)....................... 4, 10
*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) .................................................... 4, 15, 16, 26
*Murphy v. I.R.S.*,
  493 F.3d 170 (D.C. Cir. 2007)................................................................ 29

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)......................................................................................passim
*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958)................................................................................35
*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)..................................................................................2
*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)................................................................31
*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002)...................................................................9
*Posters 'N' Things v. United States*,
  511 U.S. 513 ..............................................................................................8
*Presser v. Illinois*,
  116 U.S. 252 (1886)................................................................................24
*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018)............................................................................30
*Seth B. v. Orleans Parish Sch. Bd.*,
  810 F.3d 961 (5th Cir. 2016) ....................................................................6
*Sig Sauer, Inc. v. Brandon*,
  826 F.3d 598 (1st Cir. 2016)......................................................................6
*Sonzinsky v. United States*,
  300 U.S. 506 (1937)................................................................................28
*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
  143 S. Ct. 2141 (2023)............................................................................35
*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...................................................................25
*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ....................................................................19
*Tex. Pipeline Ass'n v. FERC*,
  661 F.3d 258 (5th Cir. 2011) ...................................................................30
*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021),
  *rev'd on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022) .................32
*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ...................................................................13
*United States v. Bolatete*,
  977 F.3d 1022 (11th Cir. 2020) ...............................................................28
*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) .......................................................2, 3, 28
*United States v. Gresham*,
  118 F.3d 258 (5th Cir. 1997) ...................................................................28
*United States v. Lee*,
  358 F.3d 315 (5th Cir. 2004) ...................................................................14

iv

*United States v. Matthews*,
   312 F.3d 652 (5th Cir. 2002) ................................................................. 14
*United States v. Miller*,
   307 U.S. 174 (1939)............................................................................... 16
*United States v. Pulungan*,
   569 F.3 326 (7th Cir. 2009) .................................................................. 27
*United States v. Pulungan*,
   569 F.3d 326 (7th Cir. 2009) ................................................................ 12
*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014).............................................................................. 30
*Wages & White Lion Invs., L.L.C. v. FDA*,
   2024 U.S. App. LEXIS 133 (5th Cir. 2024) ........................................... 5

## Constitutional Provisions

U.S. Const. amend. II ........................................................................... 21

## Statutes

18 U.S.C. § 845(a)(4) ........................................................................... 25
18 U.S.C. § 921(a)(17)(B) ...................................................................... 8
18 U.S.C. § 921(a)(25) .......................................................................... 17
18 U.S.C. § 922(a)(4) ............................................................................ 12
21 U.S.C. § 863(e) .................................................................................. 8
26 U.S.C. 5822 ...................................................................................... 11
26 U.S.C. § 5845(a) ............................................................................... 17

## Rules

27 C.F.R. §§ 479.62-64 ......................................................................... 11
27 CFR § 478.28.................................................................................... 12

## Other Authorities

Matthew E. Thomas,
   Historic Powder Houses of New England: Arsenals of American Independence.........25

## INTRODUCTION

Claiming that Congress has "regulated short-barreled rifles" ("SBRs") for "nearly a century[,]" Defendants' Cross-Motion for Summary Judgment (XMSJ) (ECF #88) opens with a seeming concession that there is no historical tradition of regulating SBRs.  XMSJ at 1.  Nor could there be, as the National Firearms Act (NFA) was introduced 143 years after ratification of the Second Amendment, and 66 years after ratification of the Fourteenth Amendment. In any event, Defendants fail to show that 1) the Rule is constitutional under the Second Amendment, 2) the Rule complies with the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, or 3) the Anti-Injunction Act bars Plaintiffs' case. As such, summary judgment should be granted to Plaintiffs, and the Rule should be vacated.

## ARGUMENT

## I.  <u>The Anti-Injunction Act is Inapplicable.</u>

Citing the Anti-Injunction Act, 26 U.S.C. § 7421, Defendants argue that, in order to challenge "the Rule's implementation of" the "NFA's facilitative requirements," Plaintiffs are required to "pay first and litigate later."  XMSJ at 12, 11.  At the outset, Plaintiffs find it difficult to pay a tax that Defendants waived, during a purported "amnesty" that has now closed.  *See* ATF050133 ("The Department … will not … require individuals … to pay the $200 making tax usually due….").  But Defendants' invocation of the AIA also fails because the AIA does not apply.

Plaintiffs do not challenge the collection or assessment of tax, and nothing about this lawsuit threatens the government's ability to raise a "consistent stream of revenue." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 543 (2012). Defendants nevertheless argue that, "to the extent Plaintiffs' claims seek relief that would directly restrain enforcement of the NFA's tax, the AIA's plain text bars them" as well as those "claims seek[ing] to restrain enforcement of other NFA requirements." XMSJ at 12 (quoting *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018)).

But Defendants' precedent is outdated after *CIC Servs., LLC v. IRS*, 595 U.S. 209 (2021), where the Supreme Court specified that "[t]he [AIA] kicks in when the target of a requested injunction is a tax obligation—or stated in the Act's language, when that injunction runs against the 'collection or assessment of [a] tax.'" The AIA does not apply to "requirements [that] would 'facilitate collection of taxes'" and is "not keyed to all activities that may improve [the government's][1] ability to assess and collect taxes." *Id.* at 1589. Accordingly, courts no longer ask whether the AIA bars challenges to "taxing schemes," but rather ask whether the "suit is, as the [AIA] provides, for the purpose of restraining the assessment or collection of any tax? In considering a suit's purpose, we inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests." *Id.* (cleaned up). Here, none of Plaintiffs'

---

[1] The original quoted authority addressing *states'* ability to assess and collect taxes under the Tax Injunction Act, a statute that limits injunctive relief against *state* tax assessment, but the quote equally applies to the AIA, which limits injunctive relief against *federal* tax assessment and collection. The Court noted that the former act is modeled after the latter, and that it has assumed that words used in both Acts, such as "assessment" and "collection," are generally used in the same way. *Id.* at n.1.

2

requested relief attempts to restrain the assessment or collection of any tax, Compl. ¶¶465-540, and Defendants make no effort to demonstrate that any of it does. The AIA only applies to challenges to the NFA's imposition of the $200 tax, which Defendants' Rule specifically waived as part of the amnesty. ATF050133.

Finally, Defendants' citation to *Cox* undermines their very argument, XMSJ at 12, as the Tenth Circuit recognized that the NFA does far more than assess a tax: "[O]n its face, the NFA is a taxing scheme.... But the NFA does more than lay taxes." *Cox*, 906 F.3d at 1179. The AIA does not apply to Plaintiffs' challenges to the NFA.

## II. <u>The Rule Improperly Rewrites the Statutory Definition of "Rifle".</u>

### A. The NFA Definition of "Rifle" Controls.

As Plaintiffs explained in their Motion for Summary Judgment (MSJ) (ECF #85), Congress set the NFA's definition of "rifle" to mean a weapon that must be (1) **designed** or redesigned; (2) made or remade; **and** (3) **intended** to be fired from the shoulder. 26 U.S.C. § 5845(c); MSJ at 24. Defendants retort that "a brace-equipped weapon can be a rifle, and thus an [SBR], under the NFA." XMSJ at 13. Obviously, if a "brace-equipped weapon" was designed, made, **and** intended to be fired from the shoulder, then Defendants might be able to argue its proper classification as a rifle. But simply having a brace installed that an end user *could* use as a shouldering device does not change a "brace-equipped weapon" into a "rifle" under the statutory definition. That a car can be used as a getaway vehicle does not make every car a getaway vehicle.

Defendants' analysis demonstrates their flawed approach. As this Court recognized, under the Rule only "1 percent of 'stabilizing braces' that, when attached to [a] firearm,

3

would not result" in a rifle subject to the NFA." ECF #80 at 6-7. This demonstrates their true position—that the mere act of attaching a brace to a pistol automatically turns it into a "rifle" under the NFA. Defendants complain that "Congress provided no additional guidance" to determine when "a particular weapon is designed, made, and intended to be fired from the shoulder...." XMSJ at 13. Thus claiming to fill some imaginary gap left by Congress, Defendants claim that the Rule "hews to the statute's language." *Id.* Not so. As Defendants explain it, the Rule first inquires if a weapon "'provides surface area that allows the weapon to be fired from the shoulder,'" and then includes the statutory language as an afterthought. *Id.* By *italicizing* the secondary statutory language, Defendants apparently hope this Court will gloss over the first part of their test—surface area that merely *allows* a weapon to be fired from the shoulder. But when a firearm *could* be interpreted as one type or another, lenity demands the interpretation more favorable to the individual. MSJ at 45.

Curiously, Defendants cite *Mock v. Garland*, 2023 U.S. Dist. LEXIS 54776 (N.D. Tex. Mar. 30, 2023), XMSJ at 13, without noting that it was reversed and remanded by *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023). The district court in *Mock* stated that "[r]ules explaining when a brace or stabilizer actually redesigns a firearm or remakes a firearm sufficiently to [an SBR] are therefore permissible." 2023 U.S. Dist. LEXIS 54776, at *12. Defendants call this "objective evidence"[2] (XMSJ at 13; *see* MSJ at 5-6, outlining

---

[2] Likewise, Defendants cite *Second Amendment Found., Inc. v. BATFE*, 2023 U.S. Dist. LEXIS 202589 (N.D. Tex. Nov. 13, 2023), for the proposition that the "objective evidence of design and intent" are "textually grounded" from the definition of "rifle." XMSJ at 14. But for the same

the Rule's criteria) but, as explained in Plaintiffs' MSJ (at 17 and 20-21), there is nothing "objective" about the Rule, which is standardless, because it does not explain *how* these factors are weighted or applied. *See also* ECF #80 at 6 ("ATF does not elaborate on how this rubric will operate, e.g., whether each factor is weighted the same or some more than others...."). Consider a hypothetical DEA rule providing that possession of a "weight over 2 ounces" of marijuana is a crime. Unlike this objective standard, ATF's Rule compares weights of braced firearms to "similar" rifles. But that is akin to the DEA saying a person cannot have "similar weights of marijuana as compared to weights of other drugs that send you to prison." How could anyone comply with such a rule?

Rather, "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Wages & White Lion Invs., L.L.C. v. FDA*, 2024 U.S. App. LEXIS 133, at *4-5 (5th Cir. 2024) (citation omitted). The Fifth Circuit stated that there is "[n]o principle … more important when considering how the unelected administrators of the Fourth Branch of Government treat the American people. And FDA's regulatory switcheroos in this case bear no resemblance to square corners." *Id.* at *5. The same is true for Defendants and their regulatory switcheroo here. Defendants "must give regulated entities fair notice of *what* science matters. If an agency could instead move the [] goalposts and then refuse to specify the new [] goal line, the administrative process would be governed not by science

---

reasons, the "objective evidence" Defendants claim ATF now examines is meaningless, as 99% of all braced pistols are now rifles. ATF essentially rewrote the statute to capture all braced pistols as rifles.

but by diktat." *Id.* at *44.  Indeed, *how much* "surface area" is sufficient?  *See* Compl. ¶147 ("all physical objects must have some surface area").  *How long* or *how heavy* must a braced pistol be, or *how long* of a length of pull must a weapon have before Defendants consider it an SBR?  A "know it when you see it" approach "is a standardless and, for the most part, useless pronouncement that lends itself to abuse."  *Seth B. v. Orleans Parish Sch. Bd.*, 810 F.3d 961, 982 (5th Cir. 2016) (Smith, J., dissenting); *see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 141 S. Ct. 731, 732 (2021) (Thomas, J., dissenting from denial of certiorari) ("A know-it-when-you-see-it test is no good if one … sees it and another does not.").[3]

Defendants' citation to *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 602 (1st Cir. 2016), compares apples to doughnuts.  There, the firearm manufacturer utilized a part it argued was a muzzle brake.  XMSJ at 14-15.  But the First Circuit held it was a part "intended for use only in assembling or fabricating a silencer because it was designed with features that are common to all silencers but no muzzle brakes…."  826 F.3d at 602.  The First Circuit noted that the muzzle brake "prototype was designed so as to 'redirect hot gases onto the shooter's hand each time a projectile was fired,' thus making it so that the prototype could have been fired safely only if the part … was encased."  *Id.* at 604. Essentially, the part was found to be a silencer because the *only* way the prototype would *not* have harmed the user in its intended use was as a silencer.  *See id.*  Applying the First

---

[3] Nor is a "we'll-tell-you-when-you-submit-it" approach permissible, where ATF keeps the public in the dark by issuing individualized letter rulings at its discretion.  *See* ATF050221 (encouraging individuals to submit "firearms with such attachments … to ATF for reclassification").

Circuit's comment about "evad[ing] the NFA's carefully constructed regulatory regime" by claiming "an intended use for a part" when the "part's design features – indicates is not actually an intended one" is belied by the record here, where ATF approved numerous designs of braced pistols to be used in non-NFA ways.  XMSJ at 14-15.  Unlike *Sig Sauer*, it is not true that the *only* way to use a brace without injury is as a stock.  It is perplexing that the industry is accused of attempting to "evade" federal law when it asked the agency tasked with enforcement of that law its opinion, and then relied on it.  These are certainly not the "square corners" the Fifth Circuit required in *Wages & White Lion*.

Defendants claim "other objective evidence" includes the "manufacturer's own marketing materials," "'indirect marketing or promotional materials' from accessory makers and sellers," and the catch-all, "other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon."  XMSJ at 15.  Apparently, if the community finds an alternative use for a manufacturer's products, intent on behalf of the manufacturer is imputed to it, notwithstanding the manufacturer lacked intent, which is a conjunctive requirement under the statutory definition.  That a person purchases and huffs spray paint does not mean the paint manufacturer is a drug dealer, any more than a gun owner putting a braced pistol to his shoulder means he was sold a rifle.  Again, Defendants' additional "objective evidence" creates no standard at all.  To continue the analogy above, the DEA would never be permitted to send people to prison for drug possession, with the only advance warning being that it will consider (in its unilateral discretion) the "type" of drug, the "weight"

possessed as compared to other drugs, and whether the drug "allows" a person to alter his

mental state in ways comparative to other known drugs.

Defendants' reference to "drug paraphernalia" in *Posters 'N' Things v. United States*, 511 U.S. 513, 521 n.11 (1994), is unhelpful, as that statute used the term "primarily intended" rather than the term here, "intended."  XMSJ at 15.  There, the Supreme Court stated that, "[a]lthough we describe the definition of 'primarily intended' as 'objective,' we note that it is a relatively particularized definition, reaching beyond the category of items that are likely to be used with drugs by virtue of their objective features."  511 U.S. at 521 n.11; *see also* n.6 (providing a detailed list).  Whereas "primarily intended" might require an examination of how certain items are generally used in society, if Congress wanted to use "primarily intended" in lieu of "intended," it certainly knew how.  *Id.* at 521 ("'armor piercing ammunition' excludes any projectile that is 'primarily intended' to be used for sporting purposes, as found by the Secretary of the Treasury" (citing 18 U.S.C. § 921(a)(17)(B))).  Moreover, the statute at issue in *Posters* included various "matters" the agency could consider in determining if paraphernalia was "primarily intended" for drug use.  *See* 21 U.S.C. § 863(e).  Nothing like that exists in the statute at issue here.

## B. Defendants' Rationalizations Fail.

Defendants deny that their Rule elevates the mere capability of shoulder fire above the statute's conjunctive requirement of design, making, and intent.  XMSJ at 15. Dismissing Plaintiffs' textual argument as a "straw man," Defendants cite to portions of the Rule responding to public comments before insisting their Rule tracks the statute.  *Id.* But whatever unclear assurances those responses may provide, they do not control.  *See,*

*e.g.*, *Hyatt v. USPTO*, 551 F. Supp. 3d 600, 607 (E.D. Va. 2021) ("While an agency must consider and respond to comments from the public …, it is the final language of the rules adopted by the agency that controls."); *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569 (D.C. Cir. 2002) ("The preamble to a rule is not … 'an operative part....'").

Rather, the Rule's language makes clear that a rifle "shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a 'stabilizing brace') that provides surface area *that allows* the weapon to be fired from the shoulder, provided other factors" to be weighed in secret.  ATF050226 (emphasis added).  Such language of "allow[ance]" confirms the Rule's statutory revisionism, as Defendants would not even guarantee that a firearm with *no shoulder stock or brace at all* would be exempt from SBR status.  ATF050189 (claiming an AR pistol with a bare buffer tube "may not be" an SBR); *cf.* MSJ at 24 (noting "an AR-15 style firearm with a buffer tube but without a brace is capable of being shoulder fired").  In other words, Defendants use mere capability of shoulder fire as a statutory stand-in to infer design, making, **and** intent, bolstered by some indecipherable mix of 'factors' known only to them, in order to classify 99 percent of all braced pistols as SBRs.  *See* ECF #80 at 6-7.

Defendants then put words in Plaintiffs' mouths, claiming Plaintiffs "suggest that a brace-equipped weapon that can be fired conveniently with one hand cannot be a rifle under the NFA."  XMSJ at 15-16.  But "convenien[ce]" appears nowhere in the statute or in Plaintiffs' argument, which simply *quoted the statute.*  MSJ at 25.  Defendants make no attempt to dispute that "[a] 'handgun' under the GCA cannot simultaneously be a 'rifle'

9

under the NFA," *id.*, a rule that history establishes beyond dispute.  *See* Compl. ¶30 (noting "pistols were ultimately removed from the NFA's language before it was enacted").

Finally, Defendants take issue with Plaintiffs' invocation of lenity, citing the reversed district court in *Mock* and insisting that "the statutory provisions here contain no grievous ambiguity for lenity to resolve."  XMSJ at 16.  But Defendants cannot object when they created an ambiguity that did not exist before.  *See* Compl. ¶455 ("Indeed, the fact that the agency previously said one thing, and now says something entirely different, indicates that the agency is apparently not sure what the statute means when it comes to stabilizing braces.").  If Defendants insist on injecting such ambiguity into the equation now, then lenity mandates construal of the statute in the individual's favor.

## III.   <u>The Rule is Arbitrary and Capricious.</u>

Despite its glaring defects, Defendants ask this Court to uphold the Rule.  XMSJ at 17.  But "while the reviewing court affords significant deference to the agency" generally, such "review 'is not a rubber stamp.'"  *Basinkeeper v. U.S. Army Corps of Eng'rs*, 2018 U.S. Dist. LEXIS 237446, at *6 (M.D. La. Jan. 30, 2018).  First, Defendants claim that Plaintiffs' reliance interests are insignificant.  XMSJ at 17-18.  Why?  Defendants explain there was "never … a policy or issued guidance suggesting that brace-equipped weapons are categorically outside the NFA's reach."  *Id.* at 18.  But Plaintiffs never said "categorically outside the NFA's reach," and instead accurately described "numerous ATF classification letters" as "broadly opin[ing] that a pistol stabilizing brace, when added to *any pistol*, does not ordinarily result in an SBR."  MSJ at 1.

10

Moreover, Defendants classified some braced weapons as SBRs as early as 2014 (XMSJ at 18), which severely undercuts their theory that the Rule is necessary to properly classify braced-pistols as rifles.  Defendants claim that any reliance interests on ATF classifications "were *always* conditioned on the possibility that ATF would revisit and correct erroneous classifications." *Id.*  But Defendants are required to "turn square corners when it deals with" the public, and their "regulatory switcheroos … bear no resemblance to square corners." *Wages & White Lion*, 2024 U.S. App. LEXIS 133, at *5.  And as this Circuit recently held, "even when an agency lawfully changes its position, it cannot fault a party for relying in good faith on the prior one." *Id.* at *57.  Defendants' position is that Americans cannot believe what federal agencies tell them.  *But see id*. at *5 ("FDA argues that its years' worth of regulatory guidance was not worth the paper it was printed on because it was hedged with cautious qualifiers…we reject [that] proposition[].").  Adopting Defendants' position turns "the practice of administrative law [into] 'Russian Roulette.'" *Id.* at *60.

Defendants then claim that the Rule "accounts for any disruption to current possessors' reliance interests" because the Rule "merely inform[s] [them] that they must register" their braced pistols under the NFA.  XMSJ at 19.  It of course ignores all the requirements of registration for previously non-NFA firearms, including providing passport photos, fingerprints, the maker's residence address, and other identifying information.  S*ee* 26 U.S.C. § 5822; 27 C.F.R. §§ 479.62-64; ECF #16-10 (Form 1).  And it ignores that SBRs cannot be taken interstate without prior approval by ATF.  *See* 18

11

U.S.C. § 922(a)(4); 27 CFR § 478.28).[4]  So no longer can one travel with a now-NFA-regulated firearm without ATF's approval.  The Rule also ignores the harm of having to register one's constitutionally protected "arms" with the federal government.  *See* Compl. ¶¶12, 233, 284, 370.

Defendants claim that lack of an "exact amount of 'surface area'" is a "feature, not a bug."  XMSJ at 20.  But this "feature" is part of what makes the Rule unconstitutionally vague, as Defendants once claimed an AR-15 pistol with just a buffer tube and no brace would not be classified as a rifle (ECF #22 at 24), but the Rule makes no such promise and, in fact, suggests the opposite is true.  ATF050189 (stating only that such a weapon without a brace "may not" be an SBR); *see also* XMSJ at 22 (emphasis added) ("an AR-type pistol" with a buffer tube and "no other material" added to the tube "by itself, *would not indicate* that the weapon is designed and intended to be shoulder fired.").  Contrary to Defendants' position that any chosen amount of "surface area" is an "arbitrary line," it is still *more objective* than their supposed "objective criteria" that does not list any specifics.  *See* MSJ at 20-21, 41-42.  Although still unlawful, even arbitrary is better than vague—gun owners can avoid going to prison by following arbitrary rules, but they cannot when rules are vague and incomprehensible.  *See United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) ("A designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the

---

[4] *See also* https://www.atf.gov/file/11361/download (ATF Form 5320.20).

judiciary, is the sort of tactic usually associated with totalitarian r[e]gimes.  Government must operate through public laws and regulations.").

Defendants cite *Texas v. EPA*, 983 F.3d 826, 840 (5th Cir. 2020), for the proposition that courts have upheld "an agency's use of 'a multi-factor balancing test' that included no 'numeric thresholds.'"  XMSJ at 21.  In *Texas*, this Circuit said it was "likely because … designations are data-intensive, technical, and complex" and that "[g]iven significant differences among counties, a direct one-to-one comparison of the data, including the methods used to measure such data, could be inappropriate or even illogical."  *Id.* (citation omitted).  Defendants make no such claim here, where ATF could easily specify *how* heavy, *how* long a length of pull, *how* much surface area, and other specific factors it allegedly considers when determining whether a braced pistol is an SBR.[5]  Defendants counter that "precise metrics could enable manufacturers to design around them" (*id.*), but that's precisely the point.  Congress enacts laws, and private industry determines how to *comply with* that law.[6]  Designing a product that complies with the law is no crime.

Defendants then claim that historical analysis pursuant to *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), was not required because they only needed to not

---

[5] Defendants likewise have not claimed that the average person cannot use a scale or a tape measure.  These are not "data-intensive, technical, and complex" measurements to make. *But see* http://tinyurl.com/mwvuyepc (ATF mismeasured "length of pull" in criminal case, resulting in not guilty verdict).

[6] Further, *Texas* directly undermines Defendants' use of the multi-factor "test." "A numeric threshold would not make sense under such a scheme because it would render the other relevant factors suddenly irrelevant upon reaching the threshold.  That would defeat the purpose of considering multiple factors in the first place." *Id.*  Indeed, Defendants assured the public only that one factor would not "necessarily" be dispositive, implying all the others could be. ATF050131; ATF050134; ATF050147.

"entirely fail to consider an important aspect of the problem...." XMSJ at 22 (citation omitted). But their entire Second Amendment analysis in the Rule is confined to one page of the Federal Register, and did not perform the historical analysis *Bruen* requires in every case. *See* ATF050200 (88 Fed. Reg. 6,548); *see also* Section V, *infra* (rebutting Defendants' late-in-time Second Amendment arguments). Defendants claim that any "potential error in failing to include a historical analysis" is "harmless." XMSJ at 23. But as this Circuit holds, "the harmless error rule is quite narrow" and once an error is identified, the court's "work is almost always done: If the agency rests its decision on 'grounds [that] are inadequate or improper, *the court is powerless* to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" *Wages & White Lion*, 2024 U.S. App. LEXIS 133, at *68, *69. *Bruen* commands that a historical analysis be performed, and Defendants' failure to contend with that requirement is both "inadequate [and] improper." *Id.* at *69.

## IV. The Rule Violates the APA's Procedural Requirements.

Defendants seek to relitigate the Fifth Circuit's decision in *Mock*, holding that the Rule fails the logical outgrowth test. XMSJ at 23-29. But *Mock* is binding. Indeed, absent "exceptional circumstances," "an issue of fact or law decided on appeal may not be reexamined… by the district court on remand…." *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004). These "exceptional circumstances" exist in only three instances, none of which apply here. *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). Nevertheless, Defendants double-down on their foreclosed claims that (1) the Rule was interpretive and not legislative, therefore not subject to notice-and-comment requirements;

(2) the Rule was a logical outgrowth; and (3) any procedural error was harmless.  XMSJ at 23-29.  Plaintiffs dispense with each argument briefly.

First, the Rule "is properly characterized as a legislative rule," *Mock*, 75 F.4th at 583, because, *inter alia*, ATF spoke with the force of law and invoked its general legislative authority, the Rule was published in the C.F.R. and amended prior provisions, and the Rule produced significant effects on private interests.  *Id.* at 580-82. Defendants *admit* that "the Rule make[s] clear that ATF contemplated and decided to **amend** the regulatory definition of rifle," XMSJ at 26, thereby exposing millions of gun owners to previously inapplicable federal penal statutes.  *See also* Compl. ¶175 (arguing the Rule's legislative character).

Second, the Rule differs significantly from the NPRM's point-scoring worksheet, which contained objective and predictable (albeit arbitrary) criteria for determining whether a braced pistol, in ATF's view, is an SBR.  *See* Compl. ¶¶105, 146.  Accordingly, "because the [Rule] bears almost no resemblance in manner or kind to the [NPRM], the [Rule] fails the logical-outgrowth test and violates the APA."  *Mock*, 75 F.4th at 578; *see also* Compl. ¶¶175-97, 468.

Finally, Defendants claim that "any error 'was not prejudicial because' ATF 'considered the arguments [Plaintiffs] asserted and responded to those arguments during' its process...." XMSJ at 29.  On the contrary, *Mock* held that "it is relatively straightforward that the [Rule] was not a logical outgrowth of the [NPRM], and *the monumental error was prejudicial*."  *Mock,* 75 F.4th at 586 (emphasis added).  Plaintiffs have "demonstrate[d] prejudice … easily," as their inability to "comment on the specifics of the [Rule] … is sufficient...."  *Id.*  Indeed, when a "bureaucratic 'oopsie' will cost the gun-owning public

**_between $2.3 billion and $4.9 billion_**," the public's right to proper procedure reaches its zenith.  Compl. ¶204.

## V.  <u>The Rule is Repugnant to the Original Meaning of the Second Amendment.</u>

### A. Braces are "Bearable Arms," Presumptively Protected Under Binding Supreme Court Precedents.

By suggesting stabilizing braces are not even "arms" under the Second Amendment's plain text but rather "optional attachments," Defendants inexplicably ignore the decades of authority that have laid this theory to rest.  XMSJ at 30.  As early as 1939, the Supreme Court recognized that the Second Amendment protects not just operable weapons but also the ancillary equipment carried on the person that is useful for their operation.  In _United States v. Miller_, 307 U.S. 174, 182, 181 (1939), the Court's reference to Founding-era statutes demonstrated this common understanding, as the early militia was required to maintain "proper accoutrements" such as "a good bayonet and iron ramrod[,] … a cartridge box properly made, … a good knapsack and canteen," and a "Pouch with a Box therein to contain not less than Twenty-four Cartridges … each Cartridge containing a proper Quantity of Powder and Ball...."; _see also Luis v. United States_, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); _Mock_, 75 F.4th at 588 (Willett, J., concurring) ("Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

Subsequent decisions only have confirmed and broadened this conception of "arms."  Indeed, "the Second Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in existence at the time of the founding," *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and "that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. Braces fall well within this definition.  In fact, Defendants *admit* that stabilizing braces allow for "better accuracy," XMSJ at 33, a benefit that certainly "facilitate[s] armed self-defense." *Bruen*, 597 U.S. at 28.

Next, Defendants' comparison of braces to silencers is unavailing.   First, Defendants invite prohibited interest balancing by claiming these items "serve no useful purpose except as attachments."  XMSJ at 30; *cf. Heller*, 554 U.S. at 634 ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.").  Second, Defendants cite no post-*Bruen* silencer challenge applying a purely textual and historical standard.  *See* XMSJ at 30-31.  Third, Plaintiffs submit that any court that has concluded that silencers are not "arms" has plainly erred based on the precedents discussed above.  *See* Compl. ¶303.  And fourth, federal law classifies silencers as "firearms" themselves.   18 U.S.C. § 921(a)(25); 26 U.S.C. § 5845(a).   All told, stabilizing braces are "arms" that enjoy a presumption of protection under the Second Amendment's plain text.  *Heller*, 554 U.S. at 582.

Also, braced *pistols* undoubtedly are "bearable arms" themselves.  *Id.*; *see* Compl. ¶¶276-78; MSJ at 28-29 ("Since firearms equipped with stabilizing braces, without question, constitute 'bearable arms' regardless of how they are classified under the NFA, they are 'presumptively' protected by the Second Amendment….").  And no "party [can]

17

dispute that handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 32.

### B. Defendants Fail to Show that Short-Barreled Rifles are Historically "Dangerous and Unusual" Weapons Whose Carry Could be Regulated.

Defendants argue the government may exempt an arm from the Second Amendment's protections simply by declaring it "dangerous and unusual." XMSJ at 31. At the outset, the so-called "dangerous and unusual" standard is no standard at all, but rather a term of art from English common law that was used in reference to early brandishing and terrorism prohibitions. *Heller*, 554 U.S. at 627; 4 Blackstone 149 ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land...."). Indeed, the Court has only ever referred to "dangerous and unusual" weapons in the context of an assumed (but not decided) *historical tradition* of prohibiting certain manners of public *carry* (*i.e.*, "bearing" arms), and not prohibiting mere ownership or possession (*i.e.*, "keeping" arms), as is the case here. *Heller*, 554 U.S. at 627 (referring to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"); *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (same); *Bruen*, 597 U.S. at 47 (same).

Accordingly, any "historical tradition" prohibiting the carrying of ostensibly "dangerous and unusual" SBRs was Defendants' burden to prove,[7] which they failed to

---

[7] Flouting *Bruen's* test, Defendants claim oppositely that "Plaintiffs must show that [SBRs] are not dangerous and unusual weapons" – *i.e.*, prove a negative. XMSJ at 31. In order to shift the historical burden to Defendants, Plaintiffs must show is that braces or braced pistols are "arms"—and Plaintiffs have done so.

meet. *See Bruen*, 597 U.S. at 17; *accord Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) (noting "'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis."). However, because the Court's assumed tradition as to "dangerous and unusual" weapons applies in the context of public carry only, Defendants cannot invoke this terminology here.

But even if "dangerous and unusual" weapons refer to discrete types of firearms, Defendants cite no pre-NFA historical sources indicating SBRs were ever so construed. Defendants claim that "Congress recognized [SBRs] as particularly dangerous when it passed the NFA" (XMSJ at 31), apparently forgetting that the NFA was enacted in 1934—and thus completely irrelevant from a historical perspective. On the contrary, Plaintiffs have compiled an extensive list of examples of historical SBRs that were *never* regulated as a class until the late-in-time NFA, so under this conception, SBRs cannot be "dangerous and unusual" as an early historical matter, either. Compl. ¶¶292-96.[8]

Next, Defendants fabricate a "common use" distinction that does not exist. By distinguishing between "pistols that are typically equipped with stabilizing braces" and traditional "lightweight pistols," Defendants claim that only the latter are *truly* in common use and therefore protected, because they are the "most commonly used." XMSJ at 32 (quoting *Caetano*, 577 U.S. at 517 (Alito, J., concurring)). But no Supreme Court majority

---

[8] And even if SBRs were once "dangerous and unusual" as some doctrinally newfangled categorical matter, their modern popularity has since removed such status. *See Bruen*, 597 U.S. at 47 ("Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

has ever conditioned the protection of arms on such 'degrees of commonality' hairsplitting. Moreover, *Heller* already rejected an iteration of this very argument: "It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  554 U.S. at 629.  In other words, Defendants lack the authority or expertise to tell the people *just how* they may go about exercising their rights.

Finally, Defendants insist that their artificially low estimate of "3 million brace-equipped [SBRs] in circulation fall[s] short of the exemplary benchmarks that indicated widespread use in *Hollis* [*v. Lynch*, 827 F.3d 436 (5th Cir. 2016)]."  XMSJ at 33.[9]  But even accepting their estimate as true, the Supreme Court found stun guns to be common with evidence of only "approximately 200,000 civilians own[ing]" them at the time. *Caetano*, 577 U.S. at 420 (Alito, J., concurring).  Defendants make no attempt to address this fact.  Nor do Defendants seek to reconcile the fact that *Hollis* was decided prior to *Bruen* and dealt with machineguns only.

### C. Conditioning Mere Possession on Onerous Taxation and Registration More than "Implicates" the Second Amendment.

Defendants revert to prohibited interest balancing, suggesting that taxation and registration of firearms "implicate no legally protected interest."  XMSJ at 35.  Privacy interests aside, Defendants' position finds no support in *Bruen*, which held that, "[w]hen

---

[9] Defendants malign the CRS estimate of 10-40 million pistol-braced firearms because it was based on "unofficial estimates" and "is not authoritative," XMSJ at 33, but forget that their own estimate was "based on anecdotal commentary."  ATF050212.  Defendants offer no colorable theory as to why their "3 million estimate is more likely accurate" when one manufacturer reports having sold 2.3 million braces subsequent to when ATF's estimate was reached.  ECF #14-2 at 2.

the Second Amendment's plain text covers an individual's conduct [*inter alia*, owning or carrying arms], the Constitution presumptively protects that conduct."  597 U.S. at 24.  By conditioning the mere ownership of certain types of firearms on taxation and registration—*on pain of felony penalties*—both the Rule and the NFA certainly interpose themselves between ("infringe") "the people" and their "keep[ing]" of arms.  U.S. Const. amend. II.

Maintaining that such plain textual infringement "pose[s] no constitutional problem," Defendants cite wholly irrelevant shall-issue carry licensing regimes discussed briefly in *Bruen*.  XMSJ at 35.  But the vast majority of these regimes either (1) are "constitutional carry," where licensing is entirely optional, or (2) allow unlicensed open carry.  *Bruen*, 597 U.S. at 13 n.1.  In other words, these regimes do not actually require "fingerprinting and background checks" to exercise a right in the first place.[10]  XMSJ at 35.  The NFA offers no such alternatives.

Finally, Defendants claim that the Rule's provisions are "unobjectionable because they apply only to a narrow set of particularly dangerous weapons."  *Id.*  But again, *Heller* flatly rejected this sort of argument.  554 U.S. at 629 ("It is no answer....").  Indeed, Defendants can hardly justify infringing Second Amendment rights only to a certain category of arms that has been chosen "overwhelmingly" by the American people.  *Id.* at 628.

---

[10] Another district court called "just disingenuous" reliance on *Bruen*'s shall-issue dicta as somehow having approved of such regimes. *Antonyuk v. Hochul*, No. 1:22-cv-00986, ECF #73 (N.D.N.Y. Oct. 25, 2022), Hearing Transcript at 60:10-15, https://tinyurl.com/mr2342rx.

**D. Defendants Fail to Prove a Founding-Era Tradition of Distinctly Similar Regulation.**

*Heller* demonstrates the lack of Founding-era support for Defendants' actions, as "[f]or most of our history … the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Heller*, 554 U.S. at 625.  Defendants misstate *Bruen*'s proper analytical standard, suggesting that their historical evidence need only be "relevantly similar," "comparable," and "comparatively justified."  XMSJ at 36. This is not the rigorous methodology *Bruen* mandated.  Rather, Defendants' history must be "distinctly similar," because this case presents no uniquely modern, "unprecedented societal concern[]" warranting a loosening of analogical stringency.  *Bruen*, 597 U.S. at 26, 27.  Indeed, SBRs existing before, during, and after the Founding, and whatever societal risks their ownership posed,[11] neither the Founders nor subsequent generations ever saw fit to tax or regulate them, much less treat them as felonious contraband.  Compl. ¶¶290-96.  Consequently, in order to justify "the Rule and the NFA," XMSJ at 35, Defendants

---

[11] According to Defendants, SBRs pose some unique risk based on their accuracy and concealability.  XMSJ at 31 n.8.  Yet they show no corresponding crime wave, nor has there ever been one.  Compl. ¶¶313-16.  Indeed, Defendants cite only *two* shootings in which braced pistols were alleged to have been used, ATF050147, a far cry from the sheer number of crimes committed with "lightweight pistols," to borrow Defendants' terminology.  XMSJ at 32; http://tinyurl.com/pd4vuk3f (detailing recent Chicago shootings).

were required to show a Founding-era tradition[12] of taxation and registration of SBRs based on their perceived dangerousness.  They failed.[13]

While this Court may end its *Bruen* inquiry on that ground alone, Plaintiffs note a number of analogical defects with Defendants' lesser, purportedly "relevantly similar" analogues, whose use *Bruen* endorsed only in modern cases where true 1:1 comparisons are impossible.  Yet even if these analogues were analytically proper, they must align with the Rule (or NFA) on "at least two metrics" of relevant similarity, the "how" and "why," or the mechanisms and motivations.  *Bruen*, 597 U.S. at 29.  Defendants make no attempt to explain how their history is remotely relevant under these metrics and, on closer examination, it is not.

### 1. The Founders Never Imposed Felony Penalties on the Unregistered Possession of Short or Concealable Rifles.

Defendants begin with four "survey" laws, most of which were colonial.  XMSJ at 36 (1631 VA, 1667 RI, 1747 SC, 1781 NJ).  Rather than bearing any similarity to the Rule or NFA, these were *census* laws that imposed *no* criminal penalties on the mere possession of arms.  *See, e.g.*, App.003.  These laws provide as much justification for the registration of SBRs as they do the registration of "women and children, … gardens, and orchards."

---

[12] *See Bruen*, 597 U.S. at 37 ("19th-century evidence [i]s 'treated as mere confirmation....'"); *accord Lara v. Comm'r Pa. State Police*, 2024 U.S. App. LEXIS 1159, at *17 (3d Cir. Jan. 18, 2024) (holding "that the Second Amendment should be understood according to its public meaning in 1791").

[13] Indeed, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

*Id.*  These laws fail both the "how" and "why," and Defendants offer no evidence that they persisted into ratification or beyond.

Next, Defendants offer two militia inspection laws with the ostensible "why" of "preserv[ing] 'the public peace, safety, and good order.'"  XMSJ at 36 (1775 MA, 1778 NY), 37 (quoting *Presser v. Illinois*, 116 U.S. 252, 268 (1886)).  First, these laws did not purport to prevent crime, but rather ensured a functioning defensive force, thereby failing *Bruen*'s "why."  *See* App.047.  Second, these laws *required* the ownership of arms, and did not ban them absent registration, thereby failing *Bruen*'s "how."  *Id.*  (providing "each … shall equip himself, … with a good Fire-Arm").  Finally, the Second Amendment protects "an individual right unconnected with militia service."  *Heller*, 554 U.S. at 582.

Defendants then offer two inapposite late-in-time firearm barrel inspection laws. XMSJ at 37 (1805 MA, 1821 ME).  These quality-control measures ensured the proper functioning of arms and did not otherwise prohibit their possession on pain of a felony. App.068 (imposing a nominal fine of $10 "by action of debt," not criminal prosecution). Relying on these laws would require rewriting the NFA to *encourage* ownership of SBRs with durable barrels—a markedly different "why."

Next, Defendants point not to identifiable anti-Indian sale laws, but rather to cases discussing them.  XMSJ at 37.  But "we are not obliged to sift the historical materials for evidence to sustain [Defendants'] statute.  That is [Defendants'] burden."  *Bruen*, 597 U.S. at 60.  In any case, Defendants' authority belies their position, as "[t]he emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons."  *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir.

2017).   Moreover, these laws merely restricted sales of arms to persons who were essentially foreigners, not members of "the people," and they made no prohibition on providing arms to those among "the people."  *Id.*; *see also Heller*, 554 U.S. at 580.

Defendants compound their analogical errors by relying on gunpowder laws, which amounted to early fire-prevention efforts to prevent catastrophic accidents, *not* crime.  XMSJ at 37-38 (1651 MA, 1809 MA, 1775 CT, 1820 NH); *see* Matthew E. Thomas, Historic Powder Houses of New England: Arsenals of American Independence 16-17 (2013) (noting risk of lightning storms, which "might strike the building and ignite the hidden supply of gunpowder").  In contrast, modern gunpowder is much less volatile and poses no such risks.  *See* 18 U.S.C. § 845(a)(4) (exempting smokeless powder from explosive storage requirements).  Both the "how" and the "why" are lacking here.

Defendants conclude with just *two* "register" laws passed nearly a century after the Second Amendment's adoption.  XMSJ at 38 (1881 IL, 1892 DC).  But these laws burdened only the *sellers* of firearms to keep records and did not prohibit the unregistered individual ownership (or making) of an SBR.  *Id.*  They are also far too late in time to elucidate the meaning of the Second Amendment in 1791.  *See Bruen*, 597 U.S. at 36-37.

**2.  The Founders Never Imposed Felony Penalties on the Untaxed Possession of Short or Concealable Rifles.**

Finally, Defendants offer a smattering of late-in-time taxation laws related to firearms.  XMSJ at 39 (spanning 1820 to 1867).  Not one of these laws targeted SBRs for taxation, yet Defendants rely on such evidence to sustain taxation on these firearms today.  *See id.*  Moreover, many of these laws taxed *carried* firearms, with Florida's 1838 example

existing prior to its 1845 statehood.  *See id.* (Florida imposing annual tax on open carry, North Carolina imposing tax on weapons carried the prior year); *Bruen*, 597 U.S. at 67 (rejecting transient territorial laws).

Defendants' occupational licensing laws from the 1870s and 1880s fare no better, as they did not prohibit the untaxed possession of SBRs by individuals.  *See* XMSJ at 39 and n.25.  Nor have Defendants shown that anything like them ever existed near the Founding.

All told, Defendants' purported "analogues" are too few, too late, and too irrelevant. They fail to prove the Founders would have accepted the Rule (or the NFA) as comporting with the Second Amendment.  The historical record compiled by Plaintiffs in their Complaint shows that SBRs were widespread even during the Founding, and certainly were never regulated and taxed upon pain of felony imprisonment.  *See* Compl. ¶¶292-96.

## VI. <u>The Rule is Unconstitutionally Vague.</u>

Defendants observe that "several courts considering vagueness challenges to the Rule have concluded" that the Rule does not violate due process.  XMSJ at 40.  But Defendants fail to engage with the Fifth Circuit's repeated, stinging criticisms of the Rule's vague standards.  For example, the Fifth Circuit found that the Rule "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale."  *Mock*, 75 F.4th at 584.  Moreover, the Rule's amorphous "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace" such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol[] and … whether a specified braced pistol requires NFA registration."  *Id.* at 584-85.

Plaintiffs maintained the same position, noting that the Rule deliberately hides the ball and encourages "gun owners [to] seek *individualized determinations* from ATF as to whether possession of their braced pistols is a felony." MSJ at 42. But as Plaintiffs noted earlier, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian r[e]gimes." *United States v. Pulungan*, 569 F.3 326, 328 (7th Cir. 2009).

Defendants simply disagree that the object of the criminal law should be total predictability and uniformity of application. At bottom, Defendants believe that "[t]he Rule provides regulated parties with ample opportunity to understand ATF's view of the NFA" because "the Rule adopts a predictable framework" for ATF to apply *arbitrarily* and *in private*. XMSJ at 41. Predictable for ATF as this system may be, Plaintiffs are not so confident. *See, e.g.*, Compl. ¶161. The Rule mandates precisely the sort of "arbitrary and discriminatory enforcement" that the Constitution prohibits. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

## VII. The Rule is an Invalid Exercise of Taxing Power.

Defendants have failed to explain just *how* they had the power to promulgate the Rule in the first place. *See* XMSJ at 43-45. Indeed, as an invocation of the congressional taxing power underlying the NFA, the Rule ought to have *collected taxes*, yet it established an *ultra vires* tax amnesty. *See* Compl. ¶¶422-27; ATF050133. Defendants are silent on how they can invoke the taxing power to collect no taxes. But outside the Rule's amnesty

27

period, the taxation of millions of commonly owned arms poses serious constitutional concerns.

## A.  The Rule Impermissibly Compels Taxation of a Constitutional Right.

Plaintiffs have echoed courts' concerns that "the government … can't impose a general revenue tax on the exercise of such a [constitutional] right." *Cox*, 906 F.3d at 1187; *see also* MSJ at 45-48.  By compelling the taxation of millions of constitutionally protected arms on pain of felony prosecution, forfeiture, or destruction, Defendants have unconstitutionally taxed the exercise of a constitutional right.

In response, Defendants cite opinions where the NFA was upheld under the taxing power, XMSJ at 43-44, but none are binding precedent because none considered the constitutional argument.  *See Sonzinsky v. United States*, 300 U.S. 506, 512 (1937) (plaintiff arguing that "the present levy is not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms, the local regulation of which is reserved to the states because not granted to the national government"); *Cox*, 906 F.3d at 1188 (court denying that the Second Amendment even applied); *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020) (plaintiff arguing that "the [NFA] is not a tax but instead a public safety measure thinly disguised as a tax"); *United States v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997) (plaintiff arguing that "Congress has used the taxation power as a pretext to prohibit the possession of certain disfavored weapons, without any rational relationship to the revenue-raising purposes of the Internal Revenue Code").

28

None of these pre-*Bruen* opinions address whether the NFA can constitutionally tax the exercise of a constitutional right.  Post-*Bruen*, the NFA unconstitutionally "impose[s] a general revenue tax on the exercise of a [constitutional] a right."  *Cox*, 906 F.3d at 1187.

## B. The Rule Impermissibly Compels the Collection of an Unapportioned Direct Tax.

Moreover, the NFA's tax on SBRs is a direct tax that must be apportioned among the several States, but is not, and so it violates the Constitution.  MSJ at 47-49.  Contrary to Defendants' claims, XMSJ at 45, a tax on personal property is a direct tax, *Murphy v. I.R.S.*, 493 F.3d 170, 181 (D.C. Cir. 2007), as it is a tax that is "no different from a tax on the property itself."  *Bromley v. McCaughn*, 280 U.S. 124, 137 (1929).  A tax on taking some items of personal property and making them into a new item of personal property for personal, non-commercial use is a direct tax because it is "no different from a tax on the property itself."

Defendants respond by citing a smattering of district court opinions which found, with little or no analysis, that the making tax is an excise tax, which is an indirect tax. XMSJ at 45.  This Court should reject those opinions because a citizen who owns a brace and a handgun, and who places the brace on the handgun, has not performed a transaction that can be taxed by an indirect excise tax.  To hold otherwise sanctions an unconstitutional direct tax that is not apportioned among the several States.

## VIII. <u>The Rule Violates the Constitutional Separation of Powers.</u>

Defendants freely admit that they "**amend[ed]** the regulatory definition of rifle." XMSJ at 26 (emphasis added).  But the Supreme Court has repeatedly "reaffirm[ed] the

core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).   Accordingly, agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011).   By muddling the statutory terms rather than merely enforcing them, Defendants have usurped the legislative power reserved for Congress and Congress alone.

Defendants waive a semantic wand, claiming the Rule simply "interprets the NFA and the GCA as they relate to firearms classifications."   XMSJ at 47.   But saying it does not make it so.   Congress defined the term "rifle," which cannot be "amended" by the executive branch, as Defendants have done here.   The Supreme Court has repeatedly instructed that "the separation of powers … requir[es] that Congress, rather than the executive … branch, define what conduct is sanctionable and what is not."   *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

Finally, Defendants claim that the major questions doctrine "applies only in 'extraordinary cases' involving 'decisions of vast economic and political significance....'"   XMSJ at 47.   This is precisely one such "extraordinary case."   Indeed, Defendants acknowledge that the Rule will cause *several billion dollars* of damage to the nation's economy, specifically in a constitutionally protected industry.   ATF048881; AFT048885; Compl. ¶204.   If billions in costs and millions of new felonies are not vastly significant economic and political issues, it is difficult to imagine what is.

**IX.** **The Rule's Sweeping Harms Warrant Broad Relief.**

    **A. Vacatur is the Default Remedy.**

        Defendants object to Plaintiffs' request for vacatur of the Rule, urging that such remedy is merely "discretionary," while string-citing several cases in apparent support of that proposition. XMSJ at 48. Yet one case Defendants cite provides that "vacatur of an agency action is the default rule in this Circuit," meaning Defendants actually seek an *exception*. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). Indeed, the Fifth Circuit holds that "[v]acatur is *the only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) (emphasis added);[14] *accord Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("… when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *cf.* XMSJ at 48 (vacatur is merely "an available remedy").

        Defendants' reliance on *Cargill* for a more limited remedy is misplaced. Acknowledging that "the parties ha[d] not briefed the remedial-scope question," the Fifth Circuit "express[ed] no opinion on that question other than to observe that the district court is well-placed to answer the question in the first instance." *Cargill*, 57 F.4th at 472. Indeed, this Court is "well-placed" to order vacatur with the benefit of the parties' briefing now. *Id.*

---

[14] The APA clearly requires reviewing courts to "hold unlawful and set aside agency action … found to be" defective. 5 U.S.C. § 706(2).

Even so, Defendants maintain that vacatur would be inappropriate when "more limited remedies would fully redress Plaintiffs' asserted injuries."  XMSJ at 49.  But then, Defendants argue against the more limited "party-specific remedies[,]" demanding that Plaintiff organizations name their members and supporters, a proposition entirely irreconcilable with the doctrine of representational standing.  *Id.*; *id.* at 55; *see, e.g.*, *Ass'n of Am. Physicians & Surgeons Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Nevertheless, limiting relief to the parties would be inappropriate for at least two reasons.  First, as already discussed, the well-established Fifth Circuit "default rule" is vacatur.  *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).  And second, as Defendants observe, a remedy should "'be no more burdensome' to Defendants 'than necessary to provide complete relief' to Plaintiffs."  XMSJ at 49.  Here, enforcement uniformity via vacatur (or using APA language, "set aside") is the *least* burdensome remedy against Defendants.  Indeed, limiting relief to only certain people and organizations would create an untenable enforcement predicament where a federal penal statute's reach would depend upon whether any given person is a card-carrying member of a Plaintiff organization.  Anything other than vacatur would turn any injunction into, at best, an affirmative defense from prosecution (after arrest and seizure).

Finally, the gravity of the Rule's statutory and constitutional violations is a relevant consideration in vacating a rule.  *See Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022) (considering "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur").

Defendants' suggestion of a "remand without vacatur" similarly lacks merit, as there is no "serious possibility" that mere procedural compliance would cure the Rule's defects when the Rule still would criminalize the mere possession of millions of commonly owned arms. XMSJ at 50; *see* Compl. ¶47.

## B. Injunctive Relief is Necessary.

At the prospect of an injunction, Defendants demur that Plaintiffs "failed to establish any" of the required factors. XMSJ at 51. Yet as this Court already has found, "Plaintiffs have a substantial likelihood to succeed on the merits," Plaintiffs "suffer irreparable harm," and the equitable factors favor Plaintiffs. ECF #80 at 20, 22, 25-26. Nothing has changed on these fronts since this Court first issued preliminary relief, so an injunction remains appropriate now.

### 1. Plaintiffs Suffer Irreparable Harm.

At the outset, Defendants make the incredible claim that an injunction would have no effect because "the obligation to comply with the NFA's controls is attributable not the Rule but to Congress." XMSJ at 52-53. Rather, it is *the Rule* that claimed application of an existing statute to millions of firearms owned by Plaintiffs and gun owners nationwide, so it is *the Rule* that is directly attributable to Plaintiffs' newfound compliance obligations. Before the Rule, Plaintiff Brown's braced pistol was not regulated under the NFA as an SBR – Defendants said as much. Moreover, the Fifth Circuit's finding that the Rule is legislative necessarily means that it is "an effort to 'directly govern[] the conduct of

members of the public, affecting individual rights and obligations,'" thereby foreclosing Defendants' argument entirely.  *Mock*, 75 F.4th at 581.[15]

Defendants cite compliance costs as "strictly theoretical," a mystifying choice of words considering the compliance costs apparently were real enough to report in the Rule itself.  XMSJ at 53; *see* MSJ at 52; Compl. ¶204 ("the Final Rule's impact analysis estimates that ATF's bureaucratic 'oopsie' will cost the gun-owning public ***between $2.3 billion and $4.9 billion.***").  Insisting that nonrecoverable costs on the order of hundreds to thousands of dollars per firearm are somehow "de minimis," XMSJ at 53, Defendants utterly fail to engage with or respond to Plaintiffs' arguments—or this Court's earlier opinion.  *See* MSJ at 52; ECF #80 at 23 ("in the Fifth Circuit, 'nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.'").

Finally, for the reasons stated in Section V, *supra*, Defendants cannot exempt certain firearms from the Second Amendment's protection simply because they say so.  Whether braced pistols or SBRs, Plaintiffs' arms are protected by the Second Amendment and the Rule infringes their rights to keep and bear those arms.

### 2.  The Equitable Factors do not Favor Defendants.

Paradoxically, Defendants claim a public interest in "promot[ing] regulatory clarity," despite failing to articulate *just how* the Rule's factors are weighed.  XMSJ at 54; *cf.* MSJ at 41 ("Such failure to define exactly what ATF is looking for pervades the entire

---

[15] Similarly, Defendants' claim that "the Rule imposes no criminal sanctions" misses the entire point—the Rule unilaterally expanded the scope of a federal penal statute, extending its criminal sanctions to new and previously unaffected conduct.  XMSJ at 54.

test, which cryptically inquires 'whether' certain features 'allow[]' or are 'consistent with' usage as a rifle, giving no specifics.").  In other words, rather than providing clarity, the Rule sows chaos.  The public interest is better served *without* regulations muddling the meaning of federal penal statutes, so Defendants' interest in "regulatory clarity" actually favors Plaintiffs.

Moreover, Defendants' "public safety" justification has no basis in reality.  XMSJ at 55.  As Plaintiffs reported in their Complaint, annual violent crimes committed with rifles (including SBRs) are many orders of magnitude lower than annual violent crimes committed with handguns, which are *more* concealable.  Compl. ¶314.  Whether called braced pistols or SBRs, the "proliferation" of these arms has caused no corresponding "proliferation" in crime.  XMSJ at 55; Compl. ¶314.

### C. Relief for GOA's Members is Appropriate.

Defendants conclude with a seeming attempt to do away with the settled constitutional doctrine of representational standing, which definitively does not require the identification of all individual members in order to obtain relief on their behalf.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023).  Indeed, Defendants cite no authority for the proposition that all of GOA's members and supporters must be identified before they may enjoy such remedy.  *See* XMSJ at 55-56.  But as this Court observed, "[t]he Supreme Court has rejected this requirement," ECF #80 at 22 n.11, and to hold otherwise now would violate associational freedoms inherent in anonymous membership.  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("Compelled disclosure of membership in an organization engaged in advocacy

of particular beliefs is" an "effective … restraint on freedom of association.").[16]  And, to the extent "an association does have to identify a member with individual standing," Plaintiffs already have with specificity.  *Free Speech Coal., Inc. v. Colmenero*, 2023 U.S. Dist. LEXIS 154065, at *14 (W.D. Tex. Aug. 31, 2023); *see* Compl. ¶4 ("Plaintiff Brady Brown is … a member of Gun Owners of America, Inc."); *Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at *10-11 (N.D. Ill. June 9, 2021) ("Only one qualifying member is needed to satisfy this requirement, and he need not be named.").  Plaintiffs have gone above and beyond what is required of them.

---

[16] Defendants likewise ignore this Court's previous holding that the "claims asserted and relief requested involve invalidating a federal regulation based on theories that do not require individualized proof, individual participation by GOA's members and supporters is not required to allow the claims to proceed."  *See* ECF #80 at 17-18.

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH*
Mississippi Bar No. 102784
Southern District of Texas No. 3554925
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

ANTHONY R. NAPOLITANO*
Arizona Bar No. 034586
Southern District of Texas No. 3837680
Bergin, Frakes, Smalley & Oberholtzer,
PLLC
4343 E. Camelback Road, Suite 210
Phoenix, Arizona 85018
(602) 848-5449
anapolitano@bfsolaw.com

GILBERT J. AMBLER*
Virginia Bar No. 94325
Southern District of Texas No. 3834055
20 S. Braddock St
Winchester, VA 22601
(540) 550-4236
gilbert@amblerlawoffices.com

*Counsel for Plaintiffs Brady Brown,
Gun Owners of America, Inc., and Gun
Owners Foundation

KEN PAXTON**
Attorney General of Texas

BRENT WEBSTER**
First Assistant Attorney General of Texas

RALPH MOLINA
Deputy Attorney General
    for Legal Strategy

/s/ Charles K. Eldred
CHARLES K. ELDRED**
Chief, Legal Strategy Division
Texas Bar No. 00793681
Southern District of Texas No. 20772

CHRISTINA CELLA**
Special Counsel for Legal Strategy
Texas Bar No. 24106199
Southern District of Texas No. 3355870

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Charles.Eldred@oag.texas.gov
Christina.Cella@oag.texas.gov

**Counsel for Plaintiff State of Texas

**CERTIFICATE OF SERVICE**

I certify that on February 12, 2024, I filed this motion through the Court's CM/ECF system, which automatically served it upon all counsel of record.

*/s/ Charles K. Eldred*

**CERTIFICATE OF WORD COUNT**

I certify that this motion for summary judgment, according to the word-count function of Microsoft Word, on which this motion for summary judgment was prepared, contains 10,000 words.

*/s/ Charles K. Eldred*