# Exhibit 4

Government's Opposition to Defendant's
Motion to Dismiss Count One of the Indictment,
United States v. Taranto, 23-cr-229
(D.D.C. July 25, 2024)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-229 (CJN)** |
| | : | |
| **TAYLOR FRANKLIN TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to Defendant Taylor Taranto's Motion to Dismiss Count One of the superseding indictment (ECF No. 62 or "Mot."). Defendant raises several challenges, pointing to changes in the administrative regulation of braced pistols, the Second Amendment, vagueness, and other provisions. None of defendant's arguments has merit.

**INTRODUCTION**

Defendant challenges Count One of the superseding indictment, which charges him with the unregistered possession of a rifle with a barrel of less than 16 inches in length (*i.e.*, a CZ Scorpion) on several grounds, but none has merit.

First, defendant contends that Count One violates "both a nationwide injunction and a recent decision vacating the rule." ECF No. 62 at 2. The government is not relying on ATF's interpretive rule. The objective characteristics of Taranto's CZ Scorpion simply meet the statutory criteria articulated in 26 U.S.C. § 5845.

Second, defendant contends that Count One violates the Administrative Procedure Act (APA) because it "relies on an ATF rulemaking that failed to follow the APA's requirements." This claim fails for essentially the same reasons as his first one: the prosecution of Count One is

not based on ATF's 2023 rulemaking. Taranto is charged with violating a statute, not an agency rule. Defendant's APA-based claims are, therefore, beside the point.

Third, defendant claims that the CZ Scorpion "is not [a short-barreled rifle] under the text of the NFA." But this claim is both premature and meritless. Begin with procedure. At the motion to dismiss stage, it is sufficient for the indictment to track the operative statutory text while also specifying the time and place of the offense. Count One, which tracks the text in §§ 5861(d) and 5845(a)(3), satisfies those standards. Defendant's fact-intensive contentions must wait for trial or a Rule 29 motion. Furthermore, defendant's claim fails on the merits because the objective characteristics of defendant's CZ Scorpion meet the NFA's statutory definition of a firearm. Specifically, the firearm is a rifle ("a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . . to fire only a single projectile through a rifled bore") with a barrel or barrels of less than 16 inches in length. 26 U.S.C. §§ 5845(a), (c).

Fourth, defendant claims that Count One violates the Second Amendment because his short-barreled rifle is an "arm" within the meaning of the Amendment, and, he claims, there is no historical tradition of comparable regulation of such devices.  He is again incorrect. The Second Amendment does not protect "dangerous and unusual weapons" like the ones regulated by the NFA. Under the two-step analysis expressed in *Bruen*, the constitutional test ends there. But even at the second step, the NFA would pass constitutional muster because it is sufficiently analogous to colonial-era gun-possession laws. Moreover, the statute does not bar possession of the short-barreled rifle. It merely requires registration.

Fifth, defendant claims that Count One violates fair-notice principles because, with the ATF's 2023 rule stayed, "regulated parties . . . cannot identify with ascertainable certainty" that a CZ Scorpion is a short-barreled rifle. That is wrong. Section 5861(d) of the NFA is not vague. A

person of ordinary intelligence can understand that it requires registration of certain firearms. ATF's rulemaking also clarified the NFA's application to short-barreled rifles that were equipped with "stabilizing braces." Its interpretive rule about stabilizing braces had a four-month period between the date it was issued and the date when compliance was required—a compliance date that ended around one month before Taranto possessed the CZ Scorpion. Defendant was therefore on notice about the NFA's registration requirements.

Sixth, defendant contends that the NFA's $200 registration fee is unconstitutional because it is not "designed to meet administrative costs but to suppress firearm possession in general." But possession of a dangerous and unusual weapon like an SBR is not protected by the Second Amendment—the limits on fees that burden the exercise of constitutional rights therefore do not apply. This claim also fails because the registration fee does not substantially burden someone's ability to obtain and possess a firearm worth less than a $1,000. Moreover, Taranto could have simply removed the brace from the CZ Scorpion if he wanted to avoid the fee.

## BACKGROUND

### *The Defendant's Conduct*

On January 6, 2021, thousands of people comprising a mob of rioters attacked the U.S. Capitol while a joint session of Congress met to certify the results of the 2020 presidential election. Taranto joined a number of rioters who streamed into the U.S. Capitol Building that day. He unlawfully entered the Capitol, made his way toward the Speaker's Lobby where another rioter was shot, scuffled with police officers as he and other rioters were ushered out, and he remained on the Capitol Grounds. ECF No. 1. After the riot, Taranto returned to his home in the State of Washington, where he continued to promote conspiracy theories about the events of January 6.

3

In June 2023, Taranto returned to Washington, D.C., driving through the city and the surrounding region in his van. Defendant engaged in erratic behavior that intensified on June 28, 2023, when he livestreamed himself and suggested that he had outfitted his vehicle with a detonator. Based on this recorded statement, law enforcement personnel immediately began searching for Taranto in and around the District of Columbia. An arrest warrant was issued the next day based on a complaint charging defendant with multiple crimes related to his participation in the January 6 attack on the U.S. Capitol. ECF No. 5.

Later that day, on June 29, 2023, former President Donald Trump published what he claimed was the address of former President Barack Obama on a social media platform. Taranto re-posted the address on the same platform and thereafter started livestreaming from his van on his YouTube channel. Taranto broadcast footage of himself as he drove through the Kalorama neighborhood in Washington, D.C., claiming he was searching for "tunnels" he believed would provide him access to the private residences of certain high-profile individuals, including former President Obama. He left his van and walked around the neighborhood, which contains restricted areas protected by the United States Secret Service. He walked through the nearby woods and stated, "Gotta get the shot, stop at nothing to get the shot." After noticing the presence of the Secret Service he said, "If I were them, I'd be watching this, watching my every move." He also said, "So yeah, more than likely, these guys also all hang for treason" and "I control the block, we've got 'em surrounded." When Secret Service agents approached him, Taranto fled, but he was apprehended and placed under arrest.

Shortly following his arrest, officers located Taranto's van and multiple law enforcement agencies responded to the scene. Mindful of the possible existence of an explosive device or detonator, members of the Metropolitan Police Department and FBI Special Agent Bomb

Technicians conducted a safety sweep of the van for hazardous or dangerous materials. A lawful search was then conducted of Taranto's van, which was parked near the scene of his arrest in Kalorama. Two firearms were seized from a backpack located in the van, including a Česká Zbrojovka a.s. Uherský Brod (CZ), model Scorpion EVO 3 S1 9mm Luger caliber firearm, serial number C193454 (the "CZ Scorpion"). The CZ Scorpion had an attached folding accessory, marketed by SB Tactical as a the SBTEVO "stabilizing brace" (the "SBTEVO accessory").



*Figure 1: CZ Scorpion (circled) displayed in Taranto's van*

5



*Figure 2: CZ Scorpion and unfolded SBTEVO accessory (circled)*

### ATF and the National Firearms Act

The National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a registration-and-taxation framework "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). Under the statute, importers, manufacturers, and dealers in regulated firearms including short-barreled rifles must

6

register and pay an annual special occupational tax of $1,000 or $500. *See* 26 U.S.C. §§ 5801–5802. In addition, a qualified manufacturer must register each firearm made. *See id.* § 5841(c).

Individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. See 26 U.S.C. §§ 5821–5822. To that end, they must describe the firearm; submit identifying information; and pay a $200 tax per firearm. *See id.* To transfer such firearms, a transferor must go through the same process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811–5812.

ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements including registration and transfer restrictions. *Id.* §§ 5841, 5845(a)(3), 5861.

A short-barreled rifle has, at the front end, a receiver and a barrel of less than sixteen inches. The firearm is designed and intended to be fired from the shoulder, commonly through the use of a shoulder stock. It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 (1961); ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 (1961). It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 (1961); ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 (1961).

On January 31, 2023, ATF issued an interpretive rule entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6478 which provides background on the history of "stabilizing braces." Over the last decade, ATF has received an increasing number

of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." Factoring Criteria for Firearms with Attached "Stabilzing Braces," 88 Fed. Reg. 6478, 6482–84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *Id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks. Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples).

### *Litigation over ATF's Rule on Stabilizing Braces*

The NFA, 26 U.S.C. §§ 5801–5872, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), in part by imposing registration requirements on certain classes or types of weapons. 26 U.S.C. § 5861(d) criminalizes the receipt or possession of "a firearm which is not registered to [the receiver or possessor] in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5845(a)(3) defines a "firearm" for the purposes of the NFA as including "a

8

rifle having a barrel or barrels of less than 16 inches in length," and 26 U.S.C. 5845(c) defines a "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . ."

Until January 2023, ATF regulations defined the term "rifle" as:

> A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

27 C.F.R. § 479.11 (effective Aug. 24, 2022, to Jan. 30, 2023). On January 31, 2023, ATF issued an interpretive rule entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6478. ATF intended for the rule to clarify the framework that the agency will use to determine whether any particular firearm equipped with a stabilizing brace is a "rifle" within the meaning of the GCA and NFA—that is, when the firearm is designed, made, and intended to be fired from the shoulder. The Rule states that such a firearm will constitute a "rifle" if the brace "provides surface area that allows the weapon to be fired from the shoulder" and if "other factors, as listed in the rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* In issuing the rule, ATF noted that the agency had previously issued individual determinations evaluating whether braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to certain factors in the factual analysis. *Id.* In addition, the rule announced that, in an exercise of ATF's enforcement discretion, gun owners in possession of a

short-barreled rifle equipped with a stabilizing brace would be given until May 31, 2023 to come into compliance with the requirements imposed by the NFA. *Id.*

Following the issuance of the ATF's rule in January 2023, various plaintiffs brought civil suits challenging the rule, with multiple cases arising within the Fifth Circuit. On May 23, 2023, a Fifth Circuit Motions Panel issued a temporary injunction that barred enforcement of ATF's rule against plaintiffs in that case and some related parties pending appeal, and on August 1, 2023, the Fifth Circuit held that the plaintiffs were likely to succeed in their claim that ATF's rule violated the Administrative Procedure Act's notice-and-comment requirements. *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023). On remand back to the trial court in the Northern District of Texas, the plaintiffs in *Mock* were subsequently granted a preliminary injunction against enforcement of the rule by ATF on October 2, 2023, but the injunction was limited in scope to the plaintiffs and various related parties, with the court denying plaintiffs' request for a nationwide injunction. *See Mock v. Garland,* 23-cv-95, 2023 U.S. Dist. LEXIS 178809, at *55 (N.D. Tex. Oct. 2, 2023). On October 27, 2023, a court in the Southern District of Texas granted another set of plaintiffs a preliminary injunction against the enforcement of the rule, but again declined to extend the injunction nationwide. *Texas v. BATFE*, 23-cv-13, 2023 U.S. Dist. LEXIS 193593, at *35 (S.D. Tex. Oct. 27, 2023). On November 8, 2023, a third court, again in the Northern District of Texas, entered a universal stay of the rule's effective date under 5 U.S.C. § 705. *Britto v. BATFE*, 23-cv-19, 2023 U.S. Dist. LEXIS 200933, at *13 (N.D. Tex. Nov. 8, 2023). The preliminary rulings in *Texas*, *Britto*, and other cases in which preliminary injunctions have been granted against enforcement of the rule are presently being appealed by the government. Subsequent to the nationwide stay granted in *Britto*, courts in both the Eastern and Northern Districts of Texas have denied requests for injunctive relief from the rule. *See Second Amendment Found., Inc. v. BATFE,*

10

21-CV-116, 2023 U.S. Dist. LEXIS 202589, at *2 (N.D. Tex. Nov. 13, 2023) (denying injunctive relief both for plaintiffs and nationwide); *see also Watterson v. BATFE*, 23-cv-80, 2024 U.S. Dist. LEXIS 35973, at *56 (E.D. Tex. Mar. 1, 2024) (denying motion to reconsider and modify the court's prior denial of injunctive relief both for plaintiffs and nationwide). Similarly, courts in other circuits have also found no basis for injunctive relief from the rule. *See, e.g.*, *Miller v. Garland*, 2023 U.S. Dist. LEXIS 93105, 2023 WL 3692841 (E.D. Va., May 26, 2023) (denying preliminary injunction motion), appeal filed, (4th Cir. 2023); *Firearms Regul. Accountability Coal., Inc. v. Garland*, 23-cv-24, 2023 U.S. Dist. LEXIS 161546, 2023 WL 5942365, at *5 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion), appeal filed, (8th Cir. 2023). However, the nationwide stay imposed in *Britto* remains presently in effect, and, on June 13, 2024, the trial court in *Mock* granted a motion for summary judgment based on a finding that the rule violated the APA's procedural requirements and was not a logical outgrowth of the Proposed Rule, and vacated the rule. *Mock*, 23-cv-95, ECF No. 111, at 1 (N.D. Tex. Jun. 13, 2024).

### *The Government's Investigation and Charge*

On October 30, 2023, a Firearms Enforcement Officer with the Firearms and Ammunition Technology Division of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) received the CZ Scorpion. He examined the CZ Scorpion and the attached SBTEVO accessory, and he test-fired the weapon. Based on his examination, he concluded that the CZ Scorpion is a "rifle" as defined in 18 U.S.C. § 921(a)(7) and that it met the definition of a "firearm" as defined in 26 U.S.C. § 5845(a). Part of that conclusion was based on the fact that there was little meaningful difference between the SBTEVO accessory and the CZ-manufactured shoulder stock. Both attachments have similar exterior dimensions and objective design features that allow the shooter

11

to fire from the shoulder. Neither rearward attachment was needed for the proper cycle of operation—that is, the discrete steps involved in discharging a firearm.

In addition, the CZ Scorpion incorporates sights that, when configured in one of two settings, would require a shooter to hold and fire the weapon from the shoulder to use the sights. The CZ Scorpion's length of pull—that is, the distance from the trigger to the part of the rifle that fits against the shooter's shoulder—is similar to the exemplar Scorpion EVO 3 S1 rifle used for comparison. The length of pull of Taranto's CZ Scorpion is around 13 inches. Standard rifle designs of this type have a length of pull that ranges from 11 ¾ to 15 inches in length. The Firearms Enforcement Officer memorialized his findings in a report dated November 6, 2023. Law enforcement officials determined that the CZ Scorpion found in Taranto's van was not registered as required by law under 26 U.S.C. § 5841 in the National Firearms Registration and Transfer Record. At no point does the ATF's report and analysis cite, rely on, or mention the ATF's 2023 rulemaking regarding stablizing braces.

In February 2024 a grand jury charged Taranto with violating 26 U.S.C. §§ 5861(d), 5845(a)(3). Under § 5861(d), it is "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." The term "firearm" is defined at § 5845(a)(3) as "a rifle having a barrel or barrels of less than 16 inches in length." A "rifle" is "a weapon designed . . . and intended to be fired from the shoulder and designed . . . to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." *Id.* § 5845(c); *see also* 18 U.S.C. § 921(a)(7) (substantially identical definition).

12

On February 14, 2024, a grand jury charged that:

### COUNT ONE

On or about June 29, 2023, within the District of Columbia, TAYLOR TARANTO knowingly possessed a firearm, namely a Scorpion CZ short-barreled rifle, that is not registered to him in the National Firearms Registration and Transfer Record.

(Possession of an Unregistered Firearm, in violation of Title 26, United States Code, Sections 5861(d), 5845(a)(3))

ECF No. 45.

Taranto has moved to dismiss Count One. The government is opposed.

## LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense," *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added).

13

It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the United States "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246–47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *See, e.g.*, *United States v. Bailey*, 444 U.S. 394, 413 n.9 (1980) ("[M]otions for summary judgment are creatures of civil, not criminal trials."); *Yakou*, 428 F.3d at 246–47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context."); *United States v. Oseguera Gonzalez*, 20-cr-40, 2020 WL 6342948 at *5 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts from defendants of what the United States can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *See United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016).

Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination. Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *See, e.g.*, *United States v. Bingert*, 605 F. Supp. 3d 111, 118 (D.D.C. 2022) (a motion to dismiss challenges adequacy of indictment on its face; test is whether its allegations permit a jury to find that the crimes charged were committed); *United States v.*

14

*McHugh*, 583 F. Supp. 3d 1, 26–28 (D.D.C. 2022) (a motion to dismiss involves the court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, 596 F. Supp. 3d 90, 96 (D.D.C. 2022) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." (emphasis in original) (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009))).

## ARGUMENT

### I.     This Prosecution Does Not Violate the Stay in *Britto*

Taranto argues (at 18–19) that the government was under an injunction that prohibited the enforcement of § 5861(d). This mischaracterizes the effect of the stay in the *Britto* case and its timing. Defendant also inaccurately states (at 15) that the government has told courts that it is no longer enforcing the interpretive rule.

Charging Taranto with violating § 5861(d) is entirely consistent with both the current nationwide stay covering the ATF's interpretive rule on stabilizing braces and the Department of Justice's previous representations in *Watterson v. ATF*. As discussed above, following the granting of a nationwide stay in *Britto v. ATF* on November 8, 2023, the effective date of the interpretive rule  "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" was stayed and has recently been vacated. As a result of that stay, defendant claims that the government is "enjoined from enforcing its recent rule classifying braced pistols as [short-barreled rifles]" and "is declining to prosecute in similar cases." ECF No. 59 at 4–5. The first part of that statement is correct but beisde the point since no part of this prosecution relies on ATF's recent interpretation rule; and the second part of that statement is just incorrect.

The *Britto* court stayed the effective date of ATF rule, which sought to clarify the regulatory definition of a "rifle" and the criteria ATF would apply in classifying weapons with a stabilizing brace. The *Britto* stay does not speak to the government's ability to enforce the statute.[1] That is fatal to defendant's claim because the government has not cited, mentioned, or relied on the ATF's 2023 rule in prosecuting the defendant. The superseding indictment—the sole instrument that is relevant to the inquiry at the motion to dismiss stage—does not cite, mention, or rely on that rule. Nor, for that matter, does the ATF's report and analysis mention the 2023 rule. Both rely exclusively on the statute's plain terms. And the fact that the ATF report examines some similar factors as those discussed in the rule is no surprise; as explained, the rule reflects ATF's best understanding of the underlying statutory text and so ATF's enforcement of the statute will necessarily incorporate factors like those discussed in the rule.

Defendant likewise offers no evidence at all to support his contention that the government is declining to prosecute offenses under 26 U.S.C. § 5861(d) in "similar cases." On the contrary, and as this Court is well aware, charges alleging possessory weapon offenses make up a sizeable number of current federal criminal cases,[2] and a cursory search of open federal cases shows numerous defendants across the nation (including defendants in the Fifth Circuit, where *Britto* is

---

[1] Neither the *Britto* court nor any other court to grant relief against the rule has held that the rule is an incorrect interpretation of the statute. All the courts' holdings turn on purported procedural defects with the rulemaking.

[2] For the most recently available annual period (March 31, 2022, through March 31, 2023), the Federal Judicial Caseload Statistics show 10,490 criminal cases alleging possessory firearm offenses were charged in district courts nationwide. *See* Criminal Federal Judicial Caseload Statistics, Table D-2, https://www.uscourts.gov/statistics/table/d-2/federal-judicial-caseload-statistics/2023/03/31.

being litigated) have been charged under 26 U.S.C. § 5861(d) since both the *Britto* stay was issued on November 8, 2023, and defendant's superseding indictment was filed on February 14, 2024. *See, e.g.*, *United States v. Westra*, 24-cr-40082, ECF No. 1 (D.S.D. July 11, 2024); *United States v. Moser*, 23-mj-4039, ECF No. 19 (D.N.J. July 8, 2024); *United States v. Starkey*, 24-mj-445, ECF No. 1 (N.D. Okla. July 2, 2024); *United States v. Kiley,* 24-cr-199, ECF No. 1 (D. Colo. June 27, 2024); *United States v. Payton*, 24-cr-15, ECF No. 1 (E.D. Tex. June 26, 2024); *United States v. Menjivar*, No. 24-mj-567, ECF No. 1 (N.D. Tex. June 21, 2024). Also, a motion to dismiss raising similar claims was denied in *United States v. Morgan* after the nationwide stay. 23-cr-174, 2024 WL 150340, at *5 (W.D. La. Jan. 12, 2024). And in *United States v. Miller*, the government proceeded with its prosecution after the nationwide stay. 23-cr-41, ECF No. 40, 2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) (guilty plea entered for violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 after denial of motion to dismiss). As a result, it is unclear how Taranto arrived at his claim that his prosecution represents an "exception" to a (non-existent) wider prohibition on prosecuting non-registration offenses under the NFA, as the *Britto* court made no mention of the underlying statute for Count One and other defendants continue to face liability for non-registration of weapons covered by the NFA.

Similarly, Taranto's suggestion (at 15) that the government is not enforcing the interpretive rule inaccurately frames the government's position. Taranto cites to *Watterson v. ATF*, where a supplemental filing by the government in February 2024 noted that the ATF is not currently enforcing its interpretive rule, based on the *Britto* stay. *Watterson v. ATF*, 23-cv-80, ECF No. 58, at 2 (E.D. Tex. Feb. 23, 2024). In that filing, the government wrote: "Because the Rule is stayed nationwide, ATF is not enforcing it, and Plaintiff faces no risk of imminent, irreparable injury (at least while that stay remains in effect)." *Id.* That statement is true: the government is not currently

17

enforcing the rule. But it is also true that the government was never enforcing the rule in the relevant sense, because (as explained) the government has all along understood the rule to have no legal effect. And indeed, in *Watterson* itself (as in other cases challenging the rule), the government has made clear that any relief against the rule alone would not prevent enforcement of the underlying statutory obligations. *See, e.g.*, *Watterson*, ECF No. 29-1, at 16–17 (questioning whether plaintiff "even has standing to challenge the Rule, as divorced from the statute," because "it is the statute—not the Rule in a vacuum—that imposes the relevant obligations on Plaintiff").

Thus, nothing about the government's statement in *Watterson* could give rise to the inference that the government was expressing a policy of declining prosecution for all weapons equipped with stabilizing braces. In addition to such a blanket declination policy being beyond the scope of the Britto stay, it would also run contrary to the ATF's own history, laid out in detail at the time of the rule's issuance, of conducting assessments of the applicability of the NFA's statutory requirements to various weapons equipped with a brace device on a case-by-case basis based on the physical design characteristics of the weapon in the years prior to the issuance of the interpretive rule. *See* 88 Fed. Reg. 6478, II. Background (Jan. 31, 2023) Although the rule is stayed (and, now, vacated), ATF is not barred from continuing to enforce the underlying statute as it always has: by making case-by-case determinations about whether particular braced firearms constitute "rifles" under the statute. And of course, because the rule reflects ATF's best understanding of the statute, those determinations will naturally tend to look substantially like the determinations that would follow from applying the clear framework outline in the rule. Perhaps more importantly in this case, nothing in *Britto* or the government's representations in *Watterson* requires the ATF to disown previous determinations about braced weapons made prior to the imposition of the *Britto* stay.

18

## II.    Defendant is Not Charged with Violating an Agency Rule

Taranto also argues (at 19–23) that the interpretive rule violates the Administrative Procedure Act (APA) and, citing *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989), asserts that a criminal prosecution founded on an agency rule should be held to the strict letter of the APA. But that claim fails for essentially the same reasons discussed above: he is not being prosecuted for violating a regulation. He is charged with violating the statute. In *Picciotto*, which defendant cites, the defendant had been engaged in a 24-hour-a-day vigil in Lafayette Park warning of the dangers of nuclear war. 875 F.2d at 346. She had been convicted of violating a rule promulgated by the United States Park Service without notice and comment. This case is easily distinguishable. As one can see from the indictment, Taranto is charged with violating the statute, not the ATF's interpretive rule.

## III.    Taranto's CZ Scorpion is a Short-Barreled Rifle

Defendant claims (at 24–28) that a braced pistol is not a short-barreled rifle under the NFA, characterizing the CZ Scorpion as a pistol left unregulated by the statute. As a threshold matter, dismissal of Count One would be inappropriate when the issue of whether Taranto's firearm is an SBR is a fact-intensive question to be resolved at trial. *See United States v. Yakou*, 428 F.3d 241, 246–47 (D.C. Cir. 2005) (no dismissal with incomplete facts); *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (no disposition under Rule 12 when contested facts may be of any assistance). One of the key contested facts for Count One is whether the CZ Scorpion is an SBR or a pistol. The government has not made a "full proffer of evidence" and the parties have not agreed to a "stipulated record," therefore the pretrial dismissal of Count One on sufficiency-of-the-evidence grounds is not permitted by Rule 12. *See Yakou*, 428 F.3d at 246–47. In addition,

19

Count One "echoes the operative statutory text while also specifying the time and place of the offense" and therefore suffices under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure. *See United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).

Also, the notion that Taranto's CZ Scorpion is not an SBR ignores the objective design features of Taranto's CZ Scorpion and the definitions in the statute. The meaning of the term "firearm" includes "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3). A "rifle" is "a weapon designed . . . and intended to be fired from the shoulder and designed . . . to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." *Id.* § 5845(c); *see also* 18 U.S.C. § 921(a)(7) (substantially identical definition).

The fact that Taranto's SBR has a SBTEVO accessory that allows a shooter to fire the CZ Scorpion from the shoulder or braced against his forearm is immaterial. Even if the SBR can be fired while braced or shouldered, it nevertheless meets the definition of a rifle—the CZ Scorpion is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). At least three other features of Taranto's CZ Scorpion militates in favor of qualifying his firearm as an SBR. The CZ Scorpion is equipped with sights that, when configured in one of two ways, require a shooter to aim from the shoulder. The SBTEVO accessory allows a shooter to do that and it is substantially similar to the CZ Scorpion's original folding stock. Also, the CZ Scorpion's length of pull is similar to the exemplar used by the Firearms Enforcement Officer. Finally, neither rearward attachment for both firearms is needed for their proper cycle of operation. The ATF's comparison of the two demonstrates this. A photograph from this report is provided below.



*Figure 3: NFC CZ Scorpion (top) compared to Taranto's CZ Scorpion (bottom)*

In addition, the SBTEVO accessory attached to Taranto's SBR is essentially a folding shoulder stock, which increases the concealability of this dangerous and unusual weapon. This is precisely the kind of "concealable weapon" that the NFA was meant to regulate. *See Thompson/Center Arms Co.*, 504 U.S. at 517. The Firearms Enforcement Officer compared Taranto's SBR with a similar exemplar, both in their folded configuration.



*Figure 4: NFC CZ Scorpion (left) compared to Taranto's CZ Scorpion (right)*

Taranto argues (at 24–28) that a braced pistol is not an SBR under the NFA for several reasons. First, he compares § 5845(a)(3), which discusses rifles, with § 5845(a)(4), which discusses weapons made from rifles, and suggests that because the statute omits the word "made" the provision applies only to SBRs produced by manufacturers. That is, because Taranto's CZ Scorpion has an attached SBTEVO accessory—which is substantially identical to the manufactured folding shoulder stock—he can avoid the NFA's registration requirement. This interpretation is pulled from thin air. As defendant concedes (at 25), the statutory definition of the word "rifle" makes no reference to whether the SBR is manufactured or modified. Adding that word contravenes "a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012)).

Taranto then cites (at 26) *Thompson/Ctr. Arms Co.* and *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), and asks the court to consider the SBTEVO accessory apart from everything else that makes the CZ Scorpion an SBR. Contrary to defendant's assertion that the SBTEVO accessory "does nothing to promote firing from the shoulder" and is merely a pistol brace, one need only look at Figure 3 (*supra* p. 20) to see the problem with that assertion. The SBTEVO accessory looks and functions like a shoulder stock. To the extent that the SBTEVO accessory could be used to brace the CZ Scorpion, that would not change the fact that it meets the statutory definition of a short-barreled rifle.

**IV. Applying Section 5861(d) to Taranto's Possession of an Unregistered CZ Scorpion Does Not Violate the Second Amendment**

Defendant asserts (at 28–37) that § 5861(d) violates the Second Amendment when examined under the two-step framework expressed in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Contrary to defendant's claim, possession of a short-barreled rifle is not conduct protected by the Second Amendment and § 5861(d) of the NFA remains valid.

**A. The Second Amendment and the National Firearms Act**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In 1939, the Supreme Court considered and rejected a Second Amendment challenge brought by two defendants indicted under the National Firearms Act (NFA) for transporting an unregistered short-barreled shotgun. *United States v. Miller*, 307 U.S. 174, 175–76 (1939). The Court determined that without evidence showing a reasonable relationship between possession of a short-barreled shotgun and the "preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178. In *District of Columbia v. Heller*, the Court read "*Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." 554 U.S. 570, 625 (2008). Under *Miller* and *Heller*, the Second Amendment protects arms "in common use at the time" but does not protect the carrying of "dangerous and unusual weapons." *Id.* at 627. The Court did not overturn this holding in *Bruen*. 142 S. Ct. at 2128 (reaffirming *Miller* and the propriety of banning dangerous and unusual weapons).

### B. *Bruen*, *Rahimi*, and the Relevant Legal Framework

In *Bruen*, the Supreme Court considered a challenge made by two "law-abiding, adult citizens" to New York's requirement that, to obtain a license to carry a concealed firearm outside the home or place of business for self-defense, one must prove to the licensing officer that "proper cause exists" to issue it. 142 S. Ct. at 2123, 2125. "Proper cause" was not defined by statute, but had been interpreted by New York courts to require proof of a "special need for self-protection distinguishable from that of the general community." *Id.* at 2123 (quotation marks and citation omitted). This was a "demanding" standard. Living or working in a high-crime area was not enough; instead, applicants typically needed "evidence of particular threats, attacks, or other extraordinary danger to personal safety." *Id.* (quotation marks and citations omitted).

The Supreme Court held that New York's "proper cause" requirement violates the Second Amendment. In doing so, the Court noted the then-prevailing two-step test fashioned by the lower courts after *District of Columbia v. Heller*, 554 U.S. 570 (2008), *i.e.*, (1) determining whether the regulated conduct fell within "the original scope of the [Second Amendment] right based on its historical meaning," and if so, (2) engaging in a means-end balancing inquiry whether the challenged regulation could satisfy either strict or intermediate scrutiny, depending on whether the regulation burdened the "core" Second Amendment right. *Bruen*, 142 S. Ct. at 2125–26 (cleaned up). *Bruen* held that

> this two-step approach[ ] is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] do not support applying means-end scrutiny [*i.e.*, step two,] in the Second Amendment context.

24

*Id.* at 2127. *Bruen* explained that it was *applying*, rather than expanding or otherwise altering, the same test set forth in *Heller* to assess Second Amendment claims: "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. *See also id.* (indicating that the Court was "[f]ollowing the course charted by *Heller*"). The Court simply made the *Heller* test "more explicit," by clarifying that courts should evaluate firearm laws based only upon a "text and history" inquiry, without conducting an additional interest-balancing, means-end inquiry. *Id.* at 2128–30, 2134.

In applying the text-and-history test, the Supreme Court first concluded that the Second Amendment's text protected conduct governed by New York's "proper cause" requirement. The Court reiterated Heller's holding that the text of the Second Amendment protected "'the right of law-abiding, responsible citizens to use arms' for self-defense," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Moreover, the Court held that this right applies outside the home or place of business, such that the "proper cause" licensing requirement infringed upon it. *Id.* at 2134–35.

Second, because the Second Amendment's "text" protected conduct governed by the "proper cause" requirement, the Supreme Court considered whether New York could show that this requirement was "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The Court agreed that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138. Nonetheless, there was not "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," or of "limiting public carry only to those law-abiding citizens who demonstrate a special need for

25

self-defense." *Id.* Accordingly, the Court held, "[u]nder *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.*

The *Bruen* analysis thus consists of two steps. The first step of the *Bruen* framework is a threshold question—whether the Second Amendment's plain text applies to the conduct at issue—and it has three subparts. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). First, whether the individual challenging the law is part of "the people" covered by the Second Amendment. *Bruen*, 142 S. Ct. at 2134–35. Second, whether the weapon in question is "'in common use' today for self-defense." *Id.* And third, whether the "proposed course of conduct" is protected by the Second Amendment. *Id.*

If the first step is satisfied, then the Court should proceed to the second step of the analysis, shifting the burden to the government to "then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. "Analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court further clarified the proper inquiry. *Rahimi* involved a Second Amendment challenge to the federal law disarming individuals subject to certain domestic violence protective orders. In upholding that law, the Supreme Court observed that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Rahimi*, 144 S. Ct. at 1897. Those cases, the Court explained, "were not meant to suggest a law trapped in amber." *Id.* Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). For instance, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing

26

similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," so long as the law "comport[s] with the principles underlying the Second Amendment[.]" *Id.* In applying this standard, the Court reiterated that "many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 & n.26 (2008)).

### C.  Section 5861(d) is Constitutional Under *Bruen* and *Rahimi*

Defendant seeks dismissal of Count One, Possession of an Unregistered Firearm, claiming that § 5861(d) of the NFA is unconstitutional. However, he fails to demonstrate a Second Amendment violation. Facial attacks on the constitutionality of a statute rarely succeed, because the challenger must establish that "no set of circumstances exists under which the [a]ct would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks and citation omitted). Here, defendant bears the burden to show that § 5861(d) infringes upon the Second Amendment right of law-abiding citizens to bear arms in self-defense. Only then does "the burden fall[ ] on [the government] to show that [the challenged regulation] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

Taranto fails to satisfy his burden at the outset. Unlike the petitioners in *Bruen*, he has never proffered that he possessed the CZ Scorpion for the purpose of lawful self-defense. *See Bruen*, 142 S. Ct. at 2134–35 (course of conduct protected by the Second Amendment is that of "armed self-defense"; "self-defense is 'the *central component* of the [Second Amendment] right itself'") (quoting *Heller*, 554 U.S. at 599) (emphasis in *Heller*). Nor is he entitled to a presumption

to that effect, given that under *Bruen* he must first show that the Second Amendment regulates his proposed conduct. *See* 142 S. Ct. at 2129–30. *See also, e.g.*, *Lowery*, 3 A.3d at 1177 (refusing, on plain error review, to "erect a presumption that a defendant is an 'ordinary citizen,' entitled to exercise Second Amendment rights unless disqualifying information affirmatively appears on the record"). Accordingly, because the statute is constitutional as applied to him, his facial challenge fails.

In addition, Taranto fails to show that the CZ Scorpion—a short-barreled rifle or SBR—is not a weapon in common use today for self-defense. Although Taranto (at 32–33) references the number of SBRs in circulation generally, this oversimplifies the relevant inquiry. Instead, as the Ninth Circuit observed in the context of large capacity magazines (LCMs), *Heller*'s characterization of handguns as "the quintessential self-defense weapon" was premised on the fact that "consumers overwhelmingly chose to purchase handguns *for the purpose of self-defense*[.]" *Duncan v. Bonta*, 19 F.4th 1087, 1107 (9th Cir. 2021) (cleaned up; emphasis in original) (citing *Kolbe v. Hagan*, 849 F.3d 114, 138 (4th Cir. 2017) (same)), *judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (2022). By contrast, *Duncan* noted, there was "little evidence that [LCMs] are commonly used, or even suitable, for that purpose." *Id. Duncan* thus "decline[d] to read *Heller*'s rejection of an outright ban on the most popular self-defense weapon as meaning that governments may not impose a much narrower ban on an accessory that is a feature of some weapons and that has little to no usefulness in self-defense." *Id.* at 1108. Similarly here, Taranto offers no evidence that SBRs are commonly used for lawful self-defense.

Taranto's possession of the unregistered CZ Scorpion violated § 5861(d) of the NFA. The statutes comprising the NFA govern dangerous and unusual firearms, including short-barreled

shotguns and rifles, machine guns, silencers, and other devices. 26 U.S.C. § 5845 (defining and enumerating dangerous and unusual firearms); 26 U.S.C. § 5861 (listing prohibited acts).

Support for this proposition can be found in the purpose of the NFA. The NFA was to regulate the making and receipt of "certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (highlighting congressional intent for NFA to cover "only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters"). The firearms governed by the NFA are "dangerous and unusual weapons," and because they are not common-use weapons, they have no constitutional protection. *Compare United States v. Cox*, 906 F.3d 1170, 1184–86 (10th Cir. 2018) (under *Heller* possession of SBR has no Second Amendment protection), *with Bruen*, 142 S. Ct. at 2142 (handguns are "indisputably in 'common use' for self-defense today" and, therefore, they are protected by the Second Amendment). Possession of short-barreled shotguns, for example, has been deemed to be outside the protection of the Second Amendment. *See United States v. Mayo*, 498 F.2d 713, 718 (D.C. Cir. 1974) (possession of sawed-off shotgun rarely an innocent act); *United States v. Hayes*, 7 F.3d 144, 145 (9th Cir. 1993) (sawed-off shotguns typically used violent and criminal purposes). *Cf. United States v. Miller*, 307 U.S. 174, 178 (1939) (reversing dismissal of indictment and upholding NFA registration requirement for short-barreled shotguns).

Short-barreled rifles, which are "close analogues" of short-barreled shotguns, likewise "fall[ ] outside the Second Amendment guarantee." *Cox*, 906 F.3d at 1185. Many (if not all) district courts to consider this question post-*Bruen* have concluded that SBRs are dangerous and unusual weapons outside the protection of the Second Amendment. *See, e.g., United States v. Morgan*, 23-

29

cr-174, 2024 WL 150340, at *5 (W.D. La. Jan. 12, 2024); *United States v. Miller*, 23-cr-41, 2023 WL 6300581, at *2–4 (N.D. Tex. Sept. 27, 2023); *United States v. Danielson*, 22-cr-299, 2023 WL 5288049, at *4–5 (D. Minn. Aug. 17, 2023); *United States v. Royce*, No. 22-CR-130, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023); *United States v. Rush*, 22-cr-40008, 2023 WL 403774, at *3 n.2 (S.D. Ill. Jan. 25, 2023). *Cf. United States v. Shepherd*, 23-cr-39, 2024 WL 71724, at *5 (S.D. Miss. Jan. 5, 2024) (short-barreled shotgun not subject to Second Amendment protections); *United States v. Saleem*, 659 F. Supp. 3d 683, 692–94 (W.D.N.C. 2023) (same).

As discussed above, *supra* Part III, Taranto's CZ Scorpion is an SBR. Taranto's possession of that SBR involved a "substantial risk of improper physical force" because that concealable firearm is "inherently dangerous" and "lack[s] usefulness except for violent and criminal purposes." *Cf. Hayes*, 7 F.3d at 145 (sawed-off shotguns inherently dangerous). Because it is an SBR that is not subject to the protections of the Second Amendment, the first step is not satisfied and the *Bruen* analysis ends there. *See Alaniz*, 69 F.4th at 1128. But the second step would resolve in the government's favor, too, because the NFA does not prohibit the possession of dangerous and unusual weapons, it merely requires their registration. *See Morgan*, 2024 WL 150340, at *6; *Shepherd*, 2024 WL 71724, at *6. As a textual matter, the Second Amendment demands that the right to keep and bear arms may not be "infringed"—not that the right may not be burdened in any way. *See Heller*, 554 U.S. at 626 (right under Second Amendment "is not unlimited"); *Bruen*, 142 S. Ct. at 2133 (Second Amendment is not "a regulatory straightjacket"). In addition, defendant could have avoided the small burden of registering the CZ Scorpion by permanently removing the SBTEVO accessory.

Even if SBRs are considered "arms" that are commonly used for self-defense, the NFA's registration requirement is constitutional, because it "do[es] not necessarily prevent 'law-abiding,

30

responsible citizens' from exercising their Second Amendment right[s]." *Bruen*, 142 S. Ct. at 2138 n.9. *Bruen* explained that a "central consideration" in assessing the validity of a firearms regulation is the "burden on the right of armed self-defense" that the regulation imposes. 142 S. Ct. at 2133. *Heller* approved safety-related firearm regulations because such laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns." 554 U.S. at 632. Similarly, *Bruen* noted that none of antecedent historical regulations cited by the respondents "imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime," 142 S. Ct. at 2145, and upheld "may issue" licensing regimes on the same basis. In keeping with this rationale, the D.C. Circuit held that the District of Columbia's registration statute "does not impinge upon the right protected by the Second Amendment" because "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1254–55 (D.C. Cir. 2011). This rationale was not abrogated in any way by *Bruen*. Instead, as *Bruen* emphasized, such requirements, specifically including, e.g., "requir[ing] applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" and thus fall outside the scope of the Second Amendment's text because they "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." 142 S. Ct. at 2138 n.9. This rationale thus reinforces, rather than undermines, *Heller II*'s holding.[3] Accordingly, *Heller II*

---

[3] In his dissent in *Heller II*, then-Judge Kavanaugh argued that "citizens may not be forced to register in order to exercise certain other constitutionally recognized fundamental rights, such as

remains binding. For the same reasons, the NFA's registration requirement does not impinge upon the Second Amendment, because it does not "impose[ ] a substantial burden on [the right to armed self-defense] analogous to the burden created by New York's restrictive licensing regime." *Bruen*, 142 S. Ct. at 2145.

The NFA's registration requirement is also sufficiently analogous with historical laws. In *Heller II,* the D.C. Circuit held "that basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional." 670 F.3d at 1253. Even assuming, *arguendo*, that *Bruen* would discount the Circuit's reliance on post-ratification history,[4] the registration and taxation requirements of the NFA are analogous to

---

to publish a blog[.]" 670 F.3d at 1295 n.19 (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 U.C.L.A. Law Rev. 1443, 1546 (2009)). Interestingly, however, Professor Volokh's primary thesis in that segment of his article was that "a person is just as free to defend himself with a registered gun as he would be if the gun were unregistered." 56 U.C.L.A. Law Rev. at 1546. Professor Volokh also noted that, although generally, licenses for speakers would not pass constitutional muster, it is nonetheless true that parades need permits, political contributors must disclose their identities, and couples need to get marriage licenses. *Id.*

In addition, then-Judge Kavanaugh agreed that "the government may require registration for voting," but only because this "serve[s] the significant government interest" of preventing voter fraud. *Heller II,* 670 F.3d at 1295 n.19. But this argument proves too much: to suggest that the Second Amendment right should be treated like the right to vote, and to then predicate voting registration's constitutionality on whether (and to what degree) it "serves" a "significant government interest," is to engage in the very means-end inquiry that *Bruen* rejected. Instead, if voting registration is like gun registration, it is because neither requirement prevents law-abiding people from exercising those rights.

[4] *Bruen* generally endorsed "the course charted by *Heller*" in considering "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." 142 S. Ct. at 2131–32 (citing *Heller*, 554 U.S. at 631). In holding that the Second Amendment protects an individual's right to bear arms without regard to militia service, *Heller* looked to analogous state constitutional provisions adopted during the 1789–1820 period and the interpretation of those provisions by courts and commentators in the 19th century. 554 U.S. at 602–03.

historical regulations that applied to firearm owners at the time of our Nation's founding. For example:

> A 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals. . . . A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also "of arms and munitions." . . . In the 1800s, three southern states imposed taxes on personally held firearms.

Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership. Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the established social order." (citations omitted)); Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case, 4 NYU J.L. & Liberty 293, 309 (2009) ("The Founders did have gun control. They had mandatory musters. Everyone with a gun had to show up and register their firearm . . . .").

Courts have also recognized that "colonial governments substantially controlled the firearms trade." *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017); *see also United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022). *But see Colon v. ATF*, 23-cv-223, 2024 WL 309975, at *19 (M.D. Fla. Jan. 26, 2024) (citing laws promoting the possession of arms). In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685 (citing 1 J. Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665, at 49, 138–39, 145–46 (1850)). In colonial Virginia, a law provided that its populace was at "liberty to sell armes and

ammunition to any of his majesties loyall subjects inhabiting this colony." *Teixeira*, 873 F.3d at 685 n.18 (citing Laws of Va., Feb., 1676–77, Va. Stat. at Large, 2 Hening 403).

In response to the perceived threat posed by Indian tribes, some colonies made it a crime to sell or tranfer firearms and ammunition to Native Americans. *Teixeira*, 873 F.3d at 685. "[U]nder Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Teixeira*, 873 F.3d at 685 (citing Acts of Assembly, Mar. 1675–76, 2 William W. Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 336–37 (1823)). States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See* Spitzer, *supra* p. 28, 80 Law & Contemp. Probs. at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and appointed a state inspector "to oversee or conduct the testing." *Id.* In 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." "Finally, states imposed taxes on personally held firearms as early 1607 and well into the 1800s." *Holton*, 639 F. Supp. 3d at 711.

These historical regulations are sufficiently analogous to § 5861(d) to pass constitutional muster under *Bruen*. 142 S. Ct. at 2134. *Cf. Holton*, 639 F. Supp. 3d at 711 (holding the same for § 922(k) (obliteration of serial number)). And, as the Supreme Court recently clarified in *Rahimi*, a challenged regulation need not precisely match its historical precursors. 144 S. Ct. at 1898–1900 (comparing modern firearm ban on person subject to restraining order with surety laws imposing bond of person suspected of future misbehavior, including spousal abuse).

*Rahimi* thus undermines Taranto's argument (at 35) that the government must point to a "distinctly similar" tradition of requiring registration of firearms capable of being shouldered and with barrel lengths shorter than 16 inches, rather than only "relevantly similar" analogues. Like *Bruen*, *Rahimi* never mentions a separate "distinctly similar" test; it instead clarifies that in evaluating a Second Amendment challenge, courts assess whether the challenged law "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898; *see also id.* at 1901. "[S]ome courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases" and have erroneously suggested that the Second Amendment permits only "those regulations identical to ones that could be found in 1791," *id.* at 1897—an approach similar to the one advanced in the Rahimi dissent, *see id.* at 1933 (Thomas, J., dissenting). Rather than "suggest a law trapped in amber," "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1897–98 (emphasis added).

Similarly, *Rahimi* undermines Taranto's reliance on a pre-*Rahimi* case from another district, *Colon v. ATF*, 23-cv-223, 2024 WL 309975, at *19 (M.D. Fla. Jan. 26, 2024), to argue that such historical analogues fail his more rigid test, because they have "nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire" and that the laws "were undertaken to ensure that the citizenry was well-armed."

Instead, as *Bruen* held and *Rahimi* confirmed, the analysis does not require a "historical twin" or some colonial-era law that discusses the difference between handheld or shoulder-mounted firearms or that contemplates accessories that make it easier to shoot a target with a firearm. *Bruen*, 142 S. Ct. at 2133. Colonial-era laws designed to curb the perceived threat that early Americans faced from some Native American tribes are sufficiently analogous to Congress's

effort to limit the availability of dangerous and unusual weapons often used by criminals during the Prohibition Era.

Although then-Judge Kavanaugh's *Heller II* dissent asserted that there "is no tradition in the United States of gun registration being imposed on all guns," 670 F.3d at 1292, that statement overlooks that "the historical background of the [S]econd [A]mendment seems inconsistent with any notion of anonymity or privacy insofar as the mere fact of one's possessing a firearm is concerned." Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983). Indeed, "[u]nder the militia laws (first colonial, then state and eventually federal), every household, and/or male reaching the age of majority, was required to maintain at least one firearm in good condition. To prove compliance these firearms had to be submitted for inspection periodically." *Id.* at 265.[5] Accordingly, even if the NFA's registration requirement "is not a dead ringer for historical precursors, it still [is] analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

---

[5] Then-Judge Kavanaugh dismissed this point, 670 F.3d at 1293, because (1) "[i]n general, men over age 45 and women did not have to comply with such laws," and (2) "militia members were required to submit for inspection only one or a few firearms, not all of their firearms. That's because the purpose of those early militia requirements was *not* registration of firearms, but rather simply to ensure that the militia was well-equipped." But such objections miss the mark. However broadly applied, and for whatever purpose, the founders did not view requiring citizens to identify, and to submit for government inspection, a firearm in their possession as infringing upon the right protected by the Second Amendment. To suggest, as then-Judge Kavanaugh did, that these requirements were constitutional only because they were *narrowly* applied to serve a *worthy* government "purpose" would seem to rely upon the same kind of "second step" means-end inquiry that *Bruen* rejected. Instead, *Heller* did not invalidate the registration requirement, but simply directed that "[a]ssuming that Heller is not disqualified . . . , the District must permit him to register his handgun and must issue him a license[.]" 554 U.S. at 635.

**V.  Taranto Was On Notice That His Possession of the Unregistered CZ Scorpion Was Unlawful**

Defendant argues (at 37–41) that Taranto was not fairly on notice that his possession of the unregistered CZ Scorpion was unlawful. All that defendant needed to know was that the objective characteristics of his CZ Scorpion fell within the purview of the statute. In addition, this argument disregards the long-time existence of a comprehensible statute and ATF's efforts to inform the public about how to come into compliance with the NFA.

**A.  The Standard for Vagueness**

For the vagueness inquiry, what matters is whether the statute "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). While the vagueness inquiry touches on what a law means to an ordinary person, "a statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017). To the contrary, "[a] valid statute may be marked by flexibility and reasonable breadth, rather than meticulous specificity." *Agnew v. Gov't of the Dist. of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019) (cleaned up) (quoting *Grayned*, 408 U.S. at 114 (1972)). Demanding greater specificity may curtail Congress's ability to "deal with untold and unforeseen variations in factual situations." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."). "A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in

37

violation of due process. and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. *Hoffman Estates, Inc.*, 455 U.S. at 497. To the extent a law is vague, such uncertainty may be mitigated by a scienter requirement, "especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates*, 455 U.S. at 499.

### B. Section 5861(d) is Not Vague

First, contrary to defendant's assertion (at 39), § 5861(d) is not subject to "a more stringent vagueness test" because possession of dangerous and unusual weapons is not protected by the Second Amendment. *Cf. Hoffman Estates*, 455 U.S. at 499 (legislation prohibiting sale of drug paraphernalia is "not facially overbroad or vague if it does not reach constitutionally protected conduct and is reasonably clear in its application"). Moreover, when challenging a law on its face as unduly vague and in violation of due process, the person challenging the law "must demonstrate that the law is impermissibly vague in all of its applications." *Id.* at 497.

Taranto does not contend that the statute's plain terms are vague or difficult for a person of ordinary intelligence to decipher. Instead, he relies (at 39–41) on the notion that ATF's interpretive rule caused confusion. The opposite is true: ATF's interpretive rule sought to minimize or eliminate any confusion associated with case-by-case classification determinations. In addition, the government must prove beyond a reasonable doubt a "knowing" violation of § 5861(d). *See Rogers v. United States*, 522 U.S. 252, 254–55 (1998); *Staples v. United States*, 511 U.S. 600, 619 (1994). Accordingly, to the extent that § 5861 is at all vague (and it is not), it is mitigated by the scienter requirement. *See Hoffman Estates*, 455 U.S. at 499.

ATF's regulatory actions also undermine defendant's claim that he lacked fair notice. Defendant's CZ Scorpion was seized on June 29, 2023. At that time, no nationwide stay against the ATF's interpretive rule existed. Besides, ATF's actions over many years served to put people on notice that braced firearms may be SBRs.

The ATF's interpretive rule also cuts against Taranto's assertions. The interpretive rule was issued January 31, 2023. 88 Fed. Reg. at 6478. The public was informed that ATF would exercise its enforcement discretion until May 31, 2023 and that possessors of braced SBRs would have to come into complinace with the statute by that date to avoid being subject to enforcement. *Id.* Also, alongside the interpretive rule, ATF published a list of "commercially available firearms" and other "common weapons platforms" as representative examples of firearms that it expected would eventually be classified as short-barreled rifles. *See ATF, Commercially Available Firearms Equipped with a "Stabilizing Brace" That Are Short-Barreled Rifles, https://perma.cc/BK6C-BRGQ; ATF, Common Weapon Platforms with Attached "Stabilizing Brace" Designs That Are Short-Barreled Rifles, https://perma.cc/GX8K-A4TW; ATF, PowerPoint Training on Final Rule 2021R-08F, https://perma.cc/W6ZW-8FUL.* This was done to give the public and manufacturers as much notice as possible to aid compliance with the statute before May 31, 2023. Taranto was nevertheless in possession of the unregistered CZ Scorpion on June 29, 2023. Under these circumstances, Taranto was on fair notice this was unlawful.

**CZ, model Scorpion EVO 3 S1 with SBTEVO Attached – Short-barreled Rifle**





*Figure 5: Excerpt from ATF Publication, Commercially Available Firearms Equipped with a "Stabilizing Brace" That Are Short-Barreled Rifles*



*Figure 6: Excerpt from PowerPoint Training on Final Rule 2021R-08F*

## VI.     The NFA Does Not Violate the Supreme Court's Fee Jurisprudence

Taranto argues (at 41–43) that the NFA violates the Supreme Court's fee jurisprudence. While "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution," *see Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (license tax unconstitional as applied to distribution of religious pamphlets), certain fees are permissible to meet expenses related to administration and maintenance of public order, *see Cox v. State of New Hampshire*, 312 U.S. 569, 577 (1941) (permissible fee to defray cost of religious procession up to $300[6]). Here, however, possession of a dangerous and unusual weapon is no such right—that is not protected by the Second Amendment. *See Heller*, 554 U.S. at 627. Possession of a concealable and unregistered SBR is a far cry from distributing religious pamphlets.

First, defendant mischaracterizes the amount of the fee (at 42), suggesting that it changes with inflation. The standard NFA tax is an unadjusted $200 (or roughly $6,200 less than a parading fee that passed constitutional muster, *see Cox*, 312 U.S. at 577). And even if the $200 NFA tax fell within the ambit of fee jurisprudence, defendant fails to show how a $200 fee would overly burden someone willing to pay, for example, around $850 for a CZ Scorpion and $125 for a SBTEVO attachment.[7] Contrary to defendant's argument, *Bauer v. Becerra* is instructive. *See* 858 F.3d 1216, 1223 (9th Cir. 2017).

---

[6] When adjusted for inflation, $300 in March 1941 has the same buying power as $6,445.96 in June 2023. *See* CPI Inflation Calculator, Bureau of Labor Statistics, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=300&year1=194103&year2=202406.

[7] CZ USA prices the CZ Scorpion EVO 3 S1 at $849.00, which was discontinued in 2015. CZ Scorpion EVO 3 S1 Pistol, https://cz-usa.com/product/cz-scorpion-evo-3-s1-pistol/ (last visited Jul. 22, 2024). MSRP $124.99 for a SBTEVO-G2 attachment, https://www.sb-tactical.com/product/sbtevo-g2/ (last visited Jul. 22, 2024). These models are akin to the weapon

In *Bauer*, the 9th Circuit determined that a $19 fee did not substantially burden someone's ability to obtain and possess a firearm. *See* 858 F.3d at 1223. That court pointed to *Kwong v. Bloomberg*, where the Second Circuit suggested that "even a $340 licensing fee might not be a 'substantial burden' on Second Amendment rights." *Bauer*, 858 F.3d at 1222 (citing *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013)). And in *Kwong*, the Second Circuit found it "difficult to say that the [$340] licensing fee . . . is anything more than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights especially considering that plaintiffs have put forth *no evidence* to support their position that the fee is prohibitively expensive." 723 F.3d at 167 (emphasis in original) (citing *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012)).

Such marginal, incremental or even appreciable restraints on the right to keep and bear arms are not problematic. *See Decastro*, 682 F.3d 160, 166 (2d Cir. 2012). To the contrary, "reasonable fees associated with the constitutional requirements of registration and fingerprinting are also constitutional." *Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015) ($13 registration fee per firearm); *see also Bruen*, 597 U.S. at 39 n.9 (approving lincensing regimes, but reserving the possibility of as-applied Second Amendment challenges "where, for example, . . . *exorbitant* fees deny ordinary citizens their right to public carry") (emphasis added). Given this jurisprudential backdrop, Taranto cannot prevail on this claim, especially when he has offered no evidence that the $200 NFA tax was prohibitively expensive and hampered his ability to register

---

and attachment in this case and are meant to illustrate costs associated with purchases. The government does not contend that Taranto paid these prices.

the CZ Scorpion. This is especially true when Taranto could have avoided the registration fee by permanently removing the CZ Scorpion's SBTEVO accessory.

## CONCLUSION

Taranto may insist that his SBR is just a braced pistol. A piece of velcro on an SBR's shoulder stock is not enough to make this argument stick. Charges alleging violations of § 5861(d) that are based on the possession of an unregistered SBR turn on the objective characteristics of the firearm and whether it meets the statutory definitions of a "firearm" and "rifle," including whether the weapon may be fired from the shoulder. It does not matter if the shoulder stock could also function as a "pistol brace"—that is not enough to circumvent the NFA's registration requirements in this case. For the foregoing reasons, the United States respectfully requests that the defendant's motion to dismiss Count One be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By: */s/ Carlos A. Valdivia*
CARLOS A. VALDIVIA
DC Bar No. 1019242
ALLISON K. ETHEN
MN Bar No. 0395353
SAMUEL WHITE
NC Bar No. 44908
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
(202) 252-7508
Carlos.Valdivia@usdoj.gov

43