# Exhibit 6

Transcript of Oral Argument, United States v. Texas, No. 22-58 (U.S. Nov. 9, 2022)

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - - -

UNITED STATES, ET AL.,                    )

            Petitioners,          )

         v.                         ) No. 22-58

TEXAS, ET AL.,                            )

            Respondents.          )

- - - - - - - - - - - - - - - - - - - -

Pages:  1 through 151

Place:  Washington, D.C.

Date:   November 29, 2022

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

Official Subject to Final Review

1

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - - -

UNITED STATES, ET AL.,                    )

            Petitioners,            )

            v.                      ) No. 22-58

TEXAS, ET AL.,                            )

            Respondents.            )

- - - - - - - - - - - - - - - - - - - -


                        Washington, D.C.

                    Tuesday, November 29, 2022


        The above-entitled matter came on for

oral argument before the Supreme Court of the

United States at 10:04 a.m.


APPEARANCES:


GEN. ELIZABETH B. PRELOGAR, Solicitor General,

    Department of Justice, Washington, D.C.; on behalf

    of the Petitioners.

JUDD E. STONE, II, Solicitor General, Austin, Texas;

    on behalf of the Respondents.

Official Subject to Final Review

2

                    C O N T E N T S

ORAL ARGUMENT OF:                              PAGE:

GEN. ELIZABETH B. PRELOGAR, ESQ.

     On behalf of the Petitioners            3

ORAL ARGUMENT OF:

JUDD E. STONE, II, ESQ.

     On behalf of the Respondents            73

REBUTTAL ARGUMENT OF:

GEN. ELIZABETH B. PRELOGAR, ESQ.

     On behalf of the Petitioners            147

                Heritage Reporting Corporation

Official – Subject to Final Review

3

P R O C E E D I N G S

(10:04 a.m.)

CHIEF JUSTICE ROBERTS:  We'll hear argument this morning in Case 22-58, United States versus Texas.

General Prelogar.

ORAL ARGUMENT OF GEN. ELIZABETH B. PRELOGAR ON BEHALF OF THE PETITIONERS

GENERAL PRELOGAR:  Mr. Chief Justice, and may it please the Court:

There are more than 11 million removable non-citizens in this country, and DHS has about 6,000 interior enforcement officers. To focus the agency's limited resources on threats to public safety, national security, and border security, DHS adopted enforcement priorities.  But the district court issued a sweeping ruling vacating the guidelines nationwide.  This Court should reverse.

First, the states lack standing.  They argue states can challenge any federal policy that imposes even one dollar of indirect harms on their own taxing or spending.  That theory has no limiting principle.  It's incompatible with our constitutional structure, and it

Official Subject to Final Review

4

contradicts more than 200 years of history and tradition where states could not sue the United States on this basis.  Federal courts should not now be transformed into open forums for each and every policy dispute between the states and the national government.

On the merits, the INA does not create an unyielding mandate to apprehend and remove every non-citizen described in provisions that use the term "shall."  This Court has repeatedly held that the word "shall" does not displace background principles of enforcement discretion.

Across 25 years and five presidential administrations, the agency has never implemented the INA in the manner that Respondents suggest.  Given congressional funding choices, it would be impossible for DHS to do so.

Adopting Respondents' reading would not lead to more immigration enforcement.  Instead, it would just deprive the Secretary of his statutory authority to set priorities to protect the nation's security and borders.

Finally, as to remedies, the APA did not create a novel remedy of universal vacatur,

5

and the INA specifically bars that remedy. Section 1252(f)(1) prohibits the lower courts from granting coercive relief against the operation of the covered INA provisions, and vacatur is plainly coercive.

I welcome the Court's questions.

JUSTICE THOMAS: General, does that same provision, 1252(f), also affect redressability for standing purposes?

GENERAL PRELOGAR: Well, you know, I think that we've obviously analyzed these issues in two separate ways, and I think that here, assuming that there were standing, it would have been possible to get a different remedy, like a declaratory judgment, which the state sought in their complaint.

JUSTICE THOMAS: But you don't think that 1252(f) precludes a declaratory judgment?

GENERAL PRELOGAR: That's right, we do not think that. So long as the declaratory judgment is not issued in such a way that the court has made clear that it's coercive and, for example, would be backed up by contempt, that would effectively function like an injunction. We're not disputing that litigants would be able

Official - Subject to Final Review

6

to obtain a declaratory judgment in line with Section 1252(f)(1).

JUSTICE THOMAS: So which remedies would it preclude in this case?

GENERAL PRELOGAR: So it would preclude the nationwide vacatur that the states obtained here, and the reason for that is because the -- the statute clearly focuses on forms of coercive relief.

As the Court said in Aleman Gonzalez last term, it prevents orders that would require DHS officials to take or refrain from taking action to implement the covered INA provisions while a suit proceeds, and that's because Congress's judgment in this area was that only this Court should have authority to enter that kind of broad programmatic interference with the operation of the statute while a suit is proceeding.

So we think that here, vacatur shares the -- the same feature as an injunction in terms of preventing DHS from being -- being able to implement these covered INA provisions while the litigation runs its course.

CHIEF JUSTICE ROBERTS: Your Linda

7

R.S. argument under standing, doesn't that mean that no state would ever have standing to challenge immigration policies concerning apprehension or removal of aliens?

GENERAL PRELOGAR: That's right. We think that the Court articulated a principle there that an individual or a state doesn't have a judicially cognizable injury in seeking enforcement of the law against a third party.

CHIEF JUSTICE ROBERTS: Well, what about Biden against Texas?

GENERAL PRELOGAR: The MPP case from last term? There --

CHIEF JUSTICE ROBERTS: Four -- four months ago. Your position seems inconsistent with that to me.

GENERAL PRELOGAR: Well, we did protest the state's standing in that case as well. In the lower courts, we litigated that issue, and the Fifth Circuit and the district court ultimately rejected our arguments.

We had also contested the state standing at the stay stage in this Court, and the Court ultimately declined to grant us stay relief and found that the states had a

8

likelihood of success on the merits.

And, at that point, we went back to the drawing board and thought hard about these arguments and believe very strongly that the states here lack standing both under the kind of constitutional --

CHIEF JUSTICE ROBERTS: So you went from one argument to believing very strongly the other way?

GENERAL PRELOGAR: This has been a through line. We have been protesting state standing, broad theories of state standing in the lower courts, and, Mr. Chief Justice, the lower courts have not been accepting those arguments, but we think that the lower courts are fundamentally misunderstanding this Court's precedents as it relates to our constitutional structure and the kind of separation --

CHIEF JUSTICE ROBERTS: I would have thought you'd have a little more concern about an opinion of ours that's four months old. I mean, it's not even out of the cradle yet and you're throwing it under the bus --

GENERAL PRELOGAR: No, no.

CHIEF JUSTICE ROBERTS: -- to kind of

Official - Subject to Final Review

9

mix the analogies there.

GENERAL PRELOGAR:  We -- we certainly aren't suggesting that that opinion should be thrown under the bus.  We were obviously briefing these issues with multiple mistakes that we thought the district court had made in that case, but I don't think this is a -- you know, this is a jurisdictional principle, and I don't think that it would prevent the Court here from recognizing that the kind of theories of state standing that the states here are pressing and that the lower courts are accepting would really remove every possible restriction that could exist in this space, and that's just fundamentally incompatible with the constitutional structure and the separation of powers.

JUSTICE ALITO:  Let me ask you about another case.  Is it the position of the United States that the states lacked standing in the Little Sisters of the Poor case from two years ago because their expected additional healthcare spending was an indirect injury?

GENERAL PRELOGAR:  Justice Alito, I can't recall whether the government made

Heritage Reporting Corporation

Official - Subject to Final Review

10

standing arguments in that case.

JUSTICE ALITO:  Well, I'm just asking you now what do you think about that.  The argument was that they -- the states, Pennsylvania, I believe, and another state, had standing because the regulation they were challenging would have the effect of imposing -- it would remove healthcare from certain residents, students who were away at college in other states, and thereby impose an additional cost on the states.

Was that wrong?

GENERAL PRELOGAR:  So, if I understand the facts of the case correctly, I think that it's possible that that would constitute the kind of direct injury that this Court's precedents have recognized in this space if the challenged regulation operated directly on the states with respect to dictating, for example, their federal funds or requiring curriculum and directly --

JUSTICE ALITO:  No.  It's just they -- no, they just said that they would have to pick that up under state programs.  Well, let me move on to something else.

Heritage Reporting Corporation

Official - Subject to Final Review

11

On this indirect/direct injury distinction that you're drawing, should we hold that injury -- that an indirect injury is never injury in fact for Article III purposes for all plaintiffs?

GENERAL PRELOGAR:  No, we're not asking for that.

So we think that this is a distinctive principle that the Court has applied when states are seeking to vindicate sovereign or quasi-sovereign interests, and the reason for that, I think the reason the Court's precedents recognize that the states are then under an obligation to show this form of direct injury is about our constitutional structure.  It's for that --

JUSTICE ALITO:  So this is a -- this is a special standing rule for states that disfavors state standing?

GENERAL PRELOGAR:  Well, let me be perfectly clear that when the states are seeking to proceed on the basis of proprietary harms, the same kinds of interests that other private litigants can bring --

JUSTICE ALITO:  Yes, but --

Heritage Reporting Corporation

Official - Subject to Final Review

12

GENERAL PRELOGAR:  -- we think that the same rules apply.

JUSTICE ALITO:  Yes, but an injury that would be sufficient for Article III purposes for an individual or for a private entity is not sufficient in your view for the states?  There's a special rule for the states?

GENERAL PRELOGAR:  With respect to quasi-sovereign and sovereign interests, yes. And the reason that we think the Court has --

JUSTICE ALITO:  So this is a rule of special hostility to state standing.  How is that consistent with Massachusetts versus EPA, where the Court said that there is a special solicitude for state standing?

GENERAL PRELOGAR:  Special solicitude, as we understand it in this Court's precedents, reflects the fact that states have more theories of injury available to them, so they're not limited to the same proprietary interests that other parties can assert with respect to their contract rights where being regulated as an employer.  Instead, special solicitude reflects the fact that states can also seek to proceed on the basis of sovereign or quasi-sovereign harms.

Heritage Reporting Corporation

Official — Subject to Final Review

13

But I don't think it's right to suggest that the Court's rules or framework in this area amount to hostility.  This is about recognizing that when one sovereign is suing another sovereign under our constitutional structure, that implicates fundamental constitutional principles.

And I think a contrary rule --

JUSTICE ALITO:  Well, maybe you don't like the --

GENERAL PRELOGAR:  -- would effectively mean that states can sue about anything.

JUSTICE ALITO:  -- maybe you don't like the -- you don't like the word "hostility," but you have a special rule for state standing that disfavors the states.  The states are in a less favorable position than they would have been if they were a private entity or an individual.

Let me move on to one other case.  Do you concede that Federal Election Commission versus Akins acknowledges that Congress can permit civil actions challenging nonenforcement decisions?

GENERAL PRELOGAR:  Yes, in that case, I recognize that the Court concluded obviously over Justice Scalia's dissent, but that is an example where the Court allowed standing in that circumstance.

JUSTICE SOTOMAYOR:  General --

JUSTICE ALITO:  And why doesn't that principle apply here?

GENERAL PRELOGAR:  Well, I think that the -- the more on point precedent in this case is Sure-Tan, where the Court specifically took the Linda R.S. principle and said that it applied in the realm of immigration law as well.

JUSTICE KAVANAUGH:  What do you do with Heckler versus Chaney, where the Court recognized that general principle but also said, when Congress puts specific limits on executive enforcement, that courts have authority to enforce those limits?

GENERAL PRELOGAR:  Well, in that case, of course, the Court wasn't confronted with standing questions.  That was a case about whether a decision was committed to agency discretion by law.

And I think the Court's recognition

Official - Subject to Final Review

15

there is that Congress has statutory authority to make its own judgments that sometimes will direct agencies in the exercise of discretion. But we think that that presents a merits issue and it raises the question whether you should interpret particular statutory language to create that kind of displacement of discretion in the first place.

JUSTICE SOTOMAYOR:  General, assuming hypothetically that I don't accept your argument, that the costs to a state could give it standing in a certain situation, Judge Sutton, in a related case to this one or a similar case to this one, pointed out, however, that under Arizona versus Wynn we have said that if you're going to claim costs, you have to show us that it's a net cost.

Could you address that as an alternative theory here?

GENERAL PRELOGAR:  Yes, of course, Justice Sotomayor.

And we think, here, getting into the facts of this case, that there was no basis in this record to conclude that the states will actually incur these kinds of indirect effects

Official Subject to Final Review

16

on their own taxing or spending or regulating.

The district court seemed to think that these enforcement priorities would suppress overall levels of enforcement such that there would be the prospect that there might be additional non-citizens present in Texas.

But, if you look at how the enforcement priorities are intended to operate, this is not about reducing enforcement of the immigration laws.  It's about prioritizing limited resources to say go after person A instead of person B, and there is no reason to conclude that that's actually going to lead to less enforcement against individuals overall.

JUSTICE ALITO:  Suppose Congress passed a law that said that every person must buy seven apples per week.  And let's say I don't like apples, and the cost of seven apples is, I don't know, $8, and that's -- I say that's a pocketbook injury for me, so I have standing to challenge that.

Do I -- do I have standing, or do I have to show that the net benefit to me, monetary benefit to me of buying all these apples is that it will improve my long-term

Official Subject to Final Review

17

health and so I will -- healthcare costs that I might have otherwise incurred I'll avoid by buying all these apples.  If I buy them, I'll feel that I have to eat at least some.

GENERAL PRELOGAR:  Justice --

JUSTICE ALITO:  Do I have to show net injury there?

GENERAL PRELOGAR:  Justice Alito, I acknowledge that in that hypothetical, no, you could challenge that regulation that is directly operating on you.

But I think the problem for the states here is that they're asserting indirect harms. They're suggesting that there, through an attenuated chain of events, there is going to be perhaps the prospect of one additional non-citizen in their borders and that's going to cause them harms.

JUSTICE ALITO:  Well, no, no.  You're --

GENERAL PRELOGAR:  And there I think you need to substantiate it.

JUSTICE ALITO:  -- you're -- you've gone back to a different argument.  I understood those to be two separate arguments.  You have

Official — Subject to Final Review

18

the direct/indirect argument and you have the net cost argument.

GENERAL PRELOGAR:  Well, here, I think I was trying to --

JUSTICE ALITO:  Well, I'm talking about the --

GENERAL PRELOGAR:  -- engage on whether the district court could have reasonably concluded that there would be that kind of actual out-of-pocket expense for the states, and I was trying to make the overarching point that that's not how these enforcement priorities work in the first place.  But, even on the specific conclusions that the district court reached, we think that the findings were fundamentally flawed.

JUSTICE BARRETT:  So clearly erroneous?

GENERAL PRELOGAR:  Yes.

JUSTICE BARRETT:  To agree with you, we have to find -- because you didn't talk a lot about the clearly erroneous standard in your brief, so I wondered whether you were saying that the district court's factual findings were clearly erroneous or that the

Official Subject to Final Review

19

district court made an error of law because it didn't offset burdens with benefits.

GENERAL PRELOGAR:  No, we are arguing that these factual findings are clearly erroneous.  And I recognize that the Court infrequently delves into facts like these, but I guess what I would say is that if any facts are clearly erroneous, it's -- it's these facts, and it's not hard to see on the record why.

The district court committed really two independent errors here.  The first thing is that it looked at the wrong time frame.  It focused on fiscal year 2021 to suggest that the states had incurred costs.  But that was a time period before these guidelines even took effect, and so it was improper to draw those kinds of causal errors based on that data.

But, even putting that to the side and looking at the data, it doesn't support the district court's analysis.  The court said DHS is not detaining the same number of criminal non-citizens.  But the -- the very chart that the district court included at JA 314 shows that over the time in question, the number of criminal non-citizens in custody remained

Official - Subject to Final Review

20

essentially unchanged.

And then, with respect to removals, the district court said DHS has done far less enforcement action with removals and focused on a comparison between fiscal year 2019, about 250,000 removals, and fiscal year 2021, where there were about 55,000. But the district court ignored entirely that that was during the pandemic and the CDC's public health order under Title 42 was in effect, and DHS excluded more than a million non-citizens under the Title 42 order. So the bottom-line conclusion here that there was less immigration enforcement overall, I think, was clear error.

JUSTICE JACKSON: General --

CHIEF JUSTICE ROBERTS: General, if I could move to the merits, let's say that I disagree with you on standing and on the remedies and I have to reach the merits, and when we get to the merits, I think "shall" means "shall." Then we're in a position where, as you see it, Congress has passed a law that is -- it is impossible for the executive to comply with.

Now it's our job to say what the law is, not whether or not it can be possibly

Heritage Reporting Corporation

Official Subject to Final Review

21

implemented or whether there are difficulties there.  And I don't think we should change that responsibility just because Congress and the executive can't agree on something that's possible to address this -- this problem.  I don't think we should let them off the hook.  So shouldn't we just say what we think the law is, even if we think "shall" means "shall," and then leave it for them to sort that out?

GENERAL PRELOGAR:  Well, Mr. Chief Justice, let me take a stab at trying to persuade you that these considerations of resource constraints do properly inform the task for this Court, which is to interpret the meaning of "shall" and the statute itself.

And the first thing --

CHIEF JUSTICE ROBERTS:  Well, it seems to me that you're arguing with one of the predicates to my question, that we think -- I think anyway -- "shall" means "shall."  What do we do in that situation?

GENERAL PRELOGAR:  If this Court were to actually adopt that interpretation of the statute, then I think that it would be incredibly destabilizing on the ground.

Heritage Reporting Corporation

Official - Subject to Final Review

22

CHIEF JUSTICE ROBERTS: No, I didn't ask you what it would be. I want to know what we should do. Should we still fulfill our responsibility to say what the law is, and then it's up to Congress and the executive to figure out a way to comply with that?

GENERAL PRELOGAR: I think, if the Court did that -- and the reason I'm turning to the practical implications here is because, in the meantime, while Congress and the executive try to figure it out, it would absolutely scramble immigration enforcement efforts on the ground. It would mean that DHS, I think, if it were under this kind of judicially enforceable obligation to treat each of those "shalls" as a mandatory "shall," would have to --

CHIEF JUSTICE ROBERTS: So you're still arguing -- I'm sorry to --

GENERAL PRELOGAR: Yeah.

CHIEF JUSTICE ROBERTS: You're still arguing that that would be wrong, to say "shall" means "shall"?

GENERAL PRELOGAR: I think it would -- I think it would be wrong to say that "shall" means "shall," and I would -- I would welcome

Heritage Reporting Corporation

Official - Subject to Final Review

23

the chance to explain as a matter of statutory interpretation why that's so, but, at the very least, I don't think the Court should announce it as a judicially cognizable injury here that could justify interference by the courts in light of the practical ramifications.

And they're really two sides of the same coin, because I think one of the reasons the Court has recognized that there is enforcement discretion in this area is precisely because of the practical necessity that agencies cannot proceed against every violation of the statute.  That's what the Court said in Heckler, or in Town of Castle Rock.  The Court emphasized that an arrest mandate, if it were truly a mandatory, judicially enforceable duty, would be a duty of entirely uncertain scope and priority and duration.  It would be impossible to comply with it.  And the Court said that these background principles of enforcement discretion are a practical necessity.

JUSTICE KAVANAUGH:  Are those --

JUSTICE JACKSON:  But --

JUSTICE KAVANAUGH:  -- are those background principles constitutional principles?

Official - Subject to Final Review

24

In other words, if Congress says "shall" means "shall" and we really mean "shall" means "shall," is that unconstitutional?

GENERAL PRELOGAR:  So not in each and every case.

JUSTICE KAVANAUGH:  Is it -- is it ever --

GENERAL PRELOGAR:  I -- I -- I think that --

JUSTICE KAVANAUGH:  -- is it ever unconstitutional?  In other words, does the President have an Article II ability to say I possess enforcement discretion under the Constitution and any attempt by Congress to restrict that enforcement discretion by saying "shall" means "shall" would itself violate Article II?  You gestured Article II briefly in your brief, but you don't really unpack it very much.  I'm curious what your answer is to whether that could be unconstitutional.

GENERAL PRELOGAR:  So I think that, yes, there could be certain circumstances where Congress has engaged in a really intrusive effort to command the executive to take particular enforcement actions to prosecute

Official Subject to Final Review

25

individuals in a particular way where we would say that that does transgress Article II limits.

JUSTICE KAVANAUGH:  And does this one --

GENERAL PRELOGAR:  But we're not --

JUSTICE KAVANAUGH:  -- does this one transgress Article II, this statute, if -- if the Chief Justice posits "shall" means "shall"?  I don't see an argument in your brief that if the statute is read to mean what it says, "shall" means "shall," that the statute would be unconstitutional.  But I just want to make sure I'm reading your brief correctly.  I didn't see an argument that that would be unconstitutional.

GENERAL PRELOGAR:  That's right, we haven't argued that the statute would be unconstitutional.  And we accept that Congress in various provisions of the INA has created mandatory duties.

JUSTICE SOTOMAYOR:  General, can --

JUSTICE JACKSON:  But can --

JUSTICE SOTOMAYOR:  -- can -- General, can we break down 1226(c)'s "shall"?

GENERAL PRELOGAR:  Yes.

JUSTICE SOTOMAYOR:  Section 20 --

Official - Subject to Final Review

26

1226(a) applies to arrest and detention pending a decision on whether the alien is to be removed, correct?

GENERAL PRELOGAR:  That's correct.

JUSTICE SOTOMAYOR:  In Reno and elsewhere, we have repeatedly recognized the agency's broad prosecutorial discretion to not put someone in removal proceedings and to drop proceedings, correct?

GENERAL PRELOGAR:  That's right.  The Court said that exists at all stages of the removal process, including whether to charge a non-citizen in the first place.

JUSTICE SOTOMAYOR:  So, if someone's not in a removal proceeding, you have the discretion to drop them -- if they are, if they're not, you can say we're not going to remove you, correct?

GENERAL PRELOGAR:  That's correct, yes.

JUSTICE SOTOMAYOR:  We've said that in a legion of cases.

GENERAL PRELOGAR:  Yes.

JUSTICE SOTOMAYOR:  So (c) is only applicable, mandatory detention, when there's a

Official - Subject to Final Review

27

removal proceeding in place, correct?

GENERAL PRELOGAR:  That is correct, yes, under --

JUSTICE SOTOMAYOR:  And so --

GENERAL PRELOGAR:  -- the provision in (a).

JUSTICE SOTOMAYOR:  -- so we would have to basically say that (c) trumps (a), and (c) trumps a discretionary power we've recognized for decades, correct?  That you cannot proceed with removal, correct?

GENERAL PRELOGAR:  That's right, I think, if you were focused on the decision whether --

JUSTICE SOTOMAYOR:  All right.

GENERAL PRELOGAR:  -- to proceed with removal in the first place.  And we don't --

JUSTICE SOTOMAYOR:  So the only issue is, if there is a proceeding, if someone is in removal already, whether or not you are mandatorily required under (c) to put them into removal, correct --

GENERAL PRELOGAR:  Yes.

JUSTICE SOTOMAYOR:  -- and take custody of --

Official - Subject to Final Review

28

GENERAL PRELOGAR:  The -- the state's assertion here is that we would have a mandatory obligation, I think, to seek out and identify and go out and apprehend every person who could possibly be described under that provision.

JUSTICE SOTOMAYOR:  That's the logic of their -- that's the logic of us saying that "shall" means "shall" in all contexts.  It means that you have to go look for everybody, even when you don't know where they are, correct?

GENERAL PRELOGAR:  That's right.  And I want to --

JUSTICE SOTOMAYOR:  So --

GENERAL PRELOGAR:  -- emphasize it's not just this provision.  There are "shalls" throughout the INA that would, if it were interpreted to mean a mandatory, inflexible duty that displaces enforcement discretion, would create these kinds of unyielding mandates across the realm of actions and --

JUSTICE ALITO:  Well, I don't understand the states' argument to depend on the proposition that the executive must detain everybody even if it doesn't have the capacity to detain them.  I understood their argument to

Heritage Reporting Corporation

Official Subject to Final Review

29

be centered on something quite different.

So let's just assume for the sake of argument that there isn't an issue about how many people you were going to detain but only a question about which ones you were going to detain. And the -- the problem that I see with your final memorandum is that Congress has established its own set of priorities and has said that certain categories of aliens must be detained, shall be detained. And the final memorandum says -- tells ICE officers don't do that. Don't detain anybody based solely on that person's criminal history. You must make a totality-of-the-circumstances decision about every single alien whom -- who you're considering for detention. Isn't that correct?

GENERAL PRELOGAR: No, that's incorrect, and let me be really clear about how the Guidelines operate with respect to detention. They don't govern the question of continued detention at all. They're focused on apprehension and removal, and, therefore, when DHS officers have someone in custody and there are -- there are pending removal proceedings, the Guidelines leave it to the statute to

Heritage Reporting Corporation

Official - Subject to Final Review

30

dictate those kinds of detention decisions, and DHS does treat 1226(c)(2) as mandatory in that circumstance.

JUSTICE JACKSON: And so, therefore, it's sort of analogous to mandatory pretrial detention statutes, where Congress says, if you as a prosecutor determine that you're going to go after somebody, you're going to prosecute them in the criminal realm, there are certain people you have to detain during the prosecution. There are certain -- you know, people who have been convicted of certain crimes. We have statutes where Congress says those people have to be detained. But that doesn't speak to the antecedent determination of whether or not to prosecute those people.

I think the problem that I'm seeing with the state's argument is that they appear to be conflating Congress's mandates with respect to detention and Congress's statements with respect to removal and that the idea of 1226 -- 1226(c) is that once the determination has been made pursuant to prosecutorial discretion that you're going to remove someone, if those people fall into the particular criminal alien

Of Document Subject to Final Review

31

categories, they have to be detained for the purpose of that removal.

Am I reading that correctly?

GENERAL PRELOGAR: Yes. So the way that DHS has long understood and implemented this provision is that if we have a non-citizen in custody with pending removal proceedings, as 1226(a) requires, then, if the non-citizen is described in 1226(c), detention is mandatory.

And the reason for that is not because it says "shall detain." We don't think that that bare use of "shall" alone displaces enforcement discretion. It's because in 1226(c)(2) Congress specifically delineated the permissible bases for -- for release and said the Secretary may release only for narrow witness protection purposes --

JUSTICE JACKSON: And isn't it also --

JUSTICE ALITO: General, if we --

GENERAL PRELOGAR:  -- and that kind of mandatory language.

JUSTICE JACKSON:  -- isn't it also -- isn't it also related to sort of conceptions of government power?  In other words, the reason why you are -- you have the authority to detain

Official Subject to Final Review

32

someone is because you made the determination that they're going to be removed.

The government doesn't just go around detaining people without having made a determination about their prosecutorial ability without the fact that they're going to prosecute these people or they're going to remove these people. That's where the authority comes from, right?

GENERAL PRELOGAR: Yes. And I think that this relates both to the colloquy that I was having with Justice Sotomayor and with Justice Kavanaugh. It would be a really extraordinary thing for Congress to have dictated to the executive that it has to seek out, identify, apprehend, and remove as an inflexible mandate each and every non-citizen who's described in a provision that uses the word "shall" in the INA.

JUSTICE KAGAN: Well, is that true -- I -- I -- I guess your stronger argument is where their removal proceedings have not been initiated. But how about, are there some circumstances in which there are pending removal proceedings so that 1226 kicks in, but you

Official - Subject to Final Review

33

haven't apprehended the person?  And are you then saying that you don't have an obligation to apprehend the person even while removal -- even once you've initiated a removal proceeding?

Has that ever happened?  Is that your argument?  Why is it your argument?

GENERAL PRELOGAR:  Yes.  So it's possible that that could happen in a circumstance, for example, where DHS encounters someone at the border who lacks papers and so they're removable and they're issued a notice to appear and have pending removal proceedings, but the agency isn't aware that they're a non-citizen described in 1226(c) and then later gains that kind of information after the non-citizen has already been released and therefore is aware of the information at that juncture.

But I do want to be clear that it's not as though DHS has a database and an awareness ex ante of each and every non-citizen who might have a 1226(c) credit because --

JUSTICE SOTOMAYOR:  Answer that question which is the one Justice Kagan did.  If someone is in removal proceedings, you know it,

Heritage Reporting Corporation

Official - Subject to Final Review

34

can you release them?

GENERAL PRELOGAR: So I -- I --

JUSTICE KAGAN: No, that was -- that was not the question. The question was that the person had not been apprehended.

GENERAL PRELOGAR: Yes.

JUSTICE KAGAN: And the question is does this statute force you to apprehend the person once you've initiated removal proceedings as to that person.

GENERAL PRELOGAR: The answer to that question is no, we think that the "shall take into custody" language has to be read against the backdrop of enforcement discretion, and it would be totally unmanageable to have a judicially enforceable duty to go out and apprehend, because how many officers do we have to put on the manhunt? How long do we have to look? How many resources do we have to devote to it?

But I should also be clear about the factual premise, which is that we would know with certainty that the person is subject to 1226(c). That's actually a really complicated legal analysis under this Court's categorical

Heritage Reporting Corporation

Official Subject to Final Review

35

approach. It requires parsing the elements of the state statute, comparing that to the generic federal offense or the federal crime, deciding whether there's an overmatch, deciding whether the statute's divisible, tracking down the Shepard documents.

So it's not as though DHS conducts that analysis or knows in advance. Instead, it conducts the 1226(c) analysis when it's making release determinations for people who are already in its custody.

CHIEF JUSTICE ROBERTS: Counsel, maybe we can move on to individual questions now, and I'm sure that some of it'll deal with remedy, which is the one area -- area we haven't addressed yet. And, in that area, your -- your position on vacatur, that sounded to me to be fairly radical and inconsistent with, for example, you know, with those of us who were on the D.C. Circuit, you know, five times before breakfast, that's what you do in an APA case.

And all of a sudden you're telling us that, no, you can't vacate it, you do something different. Are you overturning that whole established practice under the APA?

Official — Subject to Final Review

36

GENERAL PRELOGAR:  Yes, I acknowledge, Mr. Chief Justice, that the lower courts, including the D.C. Circuit, have in our view been getting this one wrong.  They have reflexively assumed that vacatur is authorized under Section 706 of the APA.

But what I would say is that they haven't reached --

CHIEF JUSTICE ROBERTS:  Wow.

GENERAL PRELOGAR:  -- that conclusion with --

CHIEF JUSTICE ROBERTS:  I mean, this is a long -- that's what the D.C. Circuit and other courts of appeals have been doing all the time as a staple of their decision output.

GENERAL PRELOGAR:  But they haven't been doing it with any attention to the text, context, and history of the provision.  So it's not as though there are decisions out there that have really engaged with these arguments and come out the other way.

Instead, it seems like this happened and came about because courts just reflexively transposed remedies that were available under special statutory review provisions, which do

Official - Subject to Final Review

37

sometimes authorize vacatur, to the APA context writ large.

And our argument is that if you actually drill down on the text of 706 and look at its context and also look at the history of the APA, which was not intended to create any kinds of new remedies but instead to simply provide for the remedies that had preexisted the statute's enactment and the traditional forms of legal action under Section 703, it demonstrates that the courts have erred here.

CHIEF JUSTICE ROBERTS:  How --

GENERAL PRELOGAR:  And I don't think --

CHIEF JUSTICE ROBERTS:  -- how many cases would you say that we have issued over the past year, decade, whatever, where we have upheld decisions vacating agency rulings under the APA?

GENERAL PRELOGAR:  The Court has --

CHIEF JUSTICE ROBERTS:  Thousands?

GENERAL PRELOGAR:  -- done it in a -- in a number of cases.  Some of those involve special statutory review provisions, so I do want to box those off.  But I acknowledge, yes,

38

the Court has sometimes affirmed decisions that we think the agency --

CHIEF JUSTICE ROBERTS:  No, no, sometimes, over and over and over again.

GENERAL PRELOGAR:  But also never with attention to the remedial arguments that we're making here, and I -- I don't think it's ever too late for this Court to give the statute its proper construction when you actually look at its text, context, and history.

CHIEF JUSTICE ROBERTS:  Thank you.

GENERAL PRELOGAR:  And I don't think --

CHIEF JUSTICE ROBERTS:  Justice Thomas?

Justice Alito?

JUSTICE ALITO:  Well, I want to come back to the last question that I asked you and break it down, and I hope you can give me a succinct answer to these questions that I'm going to ask.

If "shall" means "shall," is there a -- well, let me amend that.  Does the statute say that an alien who has been convicted of an aggravated felony shall be detained?

Official - Subject to Final Review

39

GENERAL PRELOGAR:  Yes, it says that in Section 1226(c).

JUSTICE ALITO:  All right.  And I'm looking at the final memorandum, pages 114 to 115 of the Joint Appendix, where you set out certain aggravating factors, which includes a serious prior criminal record, the gravity of the offense of conviction and the sentence imposed, and then a list of mitigating factors, advanced or tender age, mental condition, various others, military or public service.

And then you say on 115:  "Our personnel should not rely on the fact of conviction or the result of the database search alone."

Now that's what I was getting at.  Congress has set out certain priorities.  With respect to an alien convicted of an aggravated felony, it says that person shall be detained.

And what your final memorandum says is no, that person shall not be detained based solely on this prior conviction for an aggravated felony.  You have to take into account that as one of the aggravating factors and then all of these mitigating factors and

Heritage Reporting Corporation

Official Subject to Final Review

40

then the officer must make a determination.

So we have one set of priorities established by Congress and a different set of priorities established by the executive branch. Isn't that correct?

GENERAL PRELOGAR:  No, that's wrong because the Guidelines govern only decisions about apprehension and removal, whether to charge a non-citizen in the first place.  And I think that the kind of mismatch here is that 1226(c) governs when DHS has already made the charging decision, so there are pending removal proceedings, and at that point, if we have a non-citizen in custody, we will detain them if they're described in Section 1226(c).  ICE does not make release determinations without running that analysis.

And so I don't think that there is any fundamental override here of the detention provisions because the Guidelines don't have anything to do with continued detention.

CHIEF JUSTICE ROBERTS:  Justice Sotomayor?

JUSTICE SOTOMAYOR:  Let's break that down again, okay?  (a) and (c) operate only when

Official - Subject to Final Review

41

you've decided to remove somebody, correct?

GENERAL PRELOGAR:  Correct, because of the pending removal proceedings --

JUSTICE SOTOMAYOR:  All right.

GENERAL PRELOGAR:  -- pending a decision on whether the non-citizen --

JUSTICE SOTOMAYOR:  Nothing in (a) and (c) takes away your discretion, explicitly or otherwise, to decide not to remove any particular person?

GENERAL PRELOGAR:  That's correct.

JUSTICE SOTOMAYOR:  What it says is you have to do something when you decide to arrest and detain and remove, correct?

GENERAL PRELOGAR:  And, at that point, we are prohibited from release if there are pending removal proceedings.

JUSTICE SOTOMAYOR:  So that at any point in this process, you're saying the Guidelines -- we're focusing in on the Guidelines as making the determination of whether to detain, you're saying, no, you're making a determination as to whether to remove or not, correct?

GENERAL PRELOGAR:  Yes, that's

Heritage Reporting Corporation

Official Subject to Final Review

42

correct.

JUSTICE SOTOMAYOR:  And it's only then that (a) and (c) come into effect?

GENERAL PRELOGAR:  Yes.

JUSTICE SOTOMAYOR:  All right.

GENERAL PRELOGAR:  And we've been talking about 1226, but, Justice Sotomayor, your questions touch on 1231 as well, which has in -- in subsection (a) a directive that DHS shall remove non-citizens with final orders of removal.  But this Court already said in Reno versus AADC, in -- in Justice Scalia's opinion for the Court, that the executive retains discretion not to remove at all stages, including after a final order of removal.

So I think we see the same kinds of situations, and these principles of enforcement discretion apply there.

JUSTICE SOTOMAYOR:  Thank you.

CHIEF JUSTICE ROBERTS:  Justice Kagan?

JUSTICE KAGAN:  You referred a little while ago to past administrations' practice and said what you were doing was consistent with that or at least that Texas's view would be inconsistent with that, and I wondered if you

Official Subject to Final Review

43

could give a little bit more detail on that.

And I'll tell you just that it seems to me that your -- the -- you have a quite strong argument under 1231, but I'm not so sure of your argument under 1226. And so if you would address each of the two provisions and what prior administrations have done.

GENERAL PRELOGAR: Yes, I would be happy to. So the -- the agency has always implemented these provisions, which were added to the INA in 1996, in recognition that it retains its background principles of enforcement discretion. And so it has never implemented the statute with respect to 1226, 1231, or some of the other big ones, like 1225, that use "shall" as creating an inflexible mandate to -- to go after each and every one of the non-citizens described in those provisions. And that has been constant.

With respect to 1226(c) itself, the other thing that's been constant is what I was describing to Justice Alito, which is that DHS has long understood (c)(2) to require mandatory detention in circumstances where we have pending removal proceedings and already have an

44

individual in custody.  But it has never interpreted that provision as requiring it to go out and arrest every individual who's described in that provision, both because that would be an impossible burden and because it's never understood that the "shall" language, the bare use of "shall" with respect to the "take into custody" provision to create that kind of inflexible mandate.

JUSTICE SOTOMAYOR:  Thank you.

CHIEF JUSTICE ROBERTS:  Justice Gorsuch?

JUSTICE GORSUCH:  We haven't had a chance to discuss 1252 much, and I'd like your thoughts on that.  In particular, if we were to agree with you on that, do we have to address your standing arguments, let alone the merits?

GENERAL PRELOGAR:  No, I think that if the Court agreed with us on the scope of 1252(f)(1) as prohibiting the vacatur that was ordered here, the Court can say that alone and stop.  That's also a jurisdictional threshold issue in this case.

JUSTICE GORSUCH:  Is it jurisdictional, though?  We've had some question

about that last term, as you'll recall, as well and whether it's just a remedial -- a limitation on remedial options for the district court or whether it is truly a jurisdictional statute.

GENERAL PRELOGAR:  So we think that it is clearly a jurisdictional obstacle to entering a form of relief, and Congress is free to attach the jurisdictional label and the jurisdictional consequences to provisions like this one which take particular remedies off the table.  And 1252(f)(1) itself says that courts shall not have jurisdiction to -- to issue these kinds of orders that enjoin or restrain.  So we think that it does clearly function as a jurisdictional limit.

JUSTICE GORSUCH:  Okay.  And your -- your friend on the other side has made certain arguments about why 1252 doesn't apply, and I just want to give you a chance to address those.

GENERAL PRELOGAR:  So we think that their arguments are fundamentally inconsistent with both the text and the purpose of the statute.  Their argument seems to be that the word "restrain" in the statute does no work at all, that "enjoin and restrain" is just

Official — Subject to Final Review

46

superfluous, Congress didn't need to use that term.  But we think that that clearly ignores the fact that the Court generally doesn't interpret statutory language to produce that kind of superfluity.

And then there's a second statutory principle here, where the very next subsection of (f)(2), 1252(f)(2), uses just the term "enjoin."  And that implicates the principles this Court has articulated that Congress generally means different things when it uses different language in adjacent subsections of the same provision.

And then, on top of all of that, we think that Texas's arguments would essentially create a giant loophole in what Congress was attempting to do with this statute.  The whole point of this provision is to prevent lower courts, not this Court, the lower courts from entering coercive programmatic relief while the case is being litigated, and that's precisely the effect of universal vacatur here.

JUSTICE GORSUCH:  You indicated earlier, I believe, that you thought a district court could still enter a declaratory judgment,

Heritage Reporting Corporation

Official - Subject to Final Review

47

and at least my recollection is the federal government tries to abide by declarations of the law. So how is that -- how does that fit into your theory?

GENERAL PRELOGAR: So I think a declaratory judgment would not have been coercive in the same way. If the district court had entered a declaratory judgment here, it wouldn't have required us to comply. We would have thought that that judgment was entered in error. We would have pursued our appeal rights. And I think that DHS would have been free to continue to apply the Guidelines in the interim while the case was proceeding.

JUSTICE GORSUCH: Okay. And on the APA argument, some of us didn't have the benefit of sitting on the district -- the D.C. Circuit --

(Laughter.)

JUSTICE GORSUCH: -- five times before breakfast entering these orders. And, you know, I stare at the language and I -- I'm -- I hear your argument. I think your friend on the other side's going to point us most specifically to the -- the language "set aside" in 706 and --

Official - Subject to Final Review

48

and hang his hat there if I had to guess, and I'd just like to hear your response.

GENERAL PRELOGAR: So we have never disputed that "set aside" can sometimes mean "vacate." But I think it's equally clear that that text can sometimes bear the meaning of "disregard" or literally "set to the side." That's how the Court uses it when it reviews federal statutes. For example, if the Court thinks a statute is invalid, it might say we're setting aside the statute --

JUSTICE GORSUCH: We don't erase them from the books.

GENERAL PRELOGAR: Correct. You do not vacate or void the statute and take it off the statute books. Instead, you literally disregard it for purposes of fixing the rights of the parties before you. And we think that's how Section 706 uses the term.

The reason for that is because 706 is setting forth a rule of decision that governs across all of the cases where APA claims can be brought, including things like habeas actions or judicial enforcement -- or judicial review of -- of agency enforcement actions. And there, it

49

would be just like a statute.  You can't vacate an agency regulation in a habeas case.  You would have to set it to the side.

It's Section 703 that sets forth the remedies under the APA, not 706, and we think that if you look at the context here and also the history that there was no intent by Congress to create a truly unprecedented, sweeping, non-party-specific remedy, it -- it fortifies the conclusion that that would not be the proper interpretation of the text.

JUSTICE GORSUCH:  I think it is kind of interesting that remedies are expressly listed in 703, that Congress would sneak in the most important remedy and by far the most sweeping one in Section 706, what is it, (2)(b), something like that, which governs the scope of review, and that nobody at the time, Davis, Jaffe, you know, people who noticed things, noticed this innovation.

GENERAL PRELOGAR:  That's correct.  We think that certainly, if Congress were going to take the action of creating this kind of unprecedented remedy that operates directly on the agency rule itself rather than with respect

Heritage Reporting Corporation

Official Subject to Final Review

50

to the parties, someone would have said something and Congress would have made that much clearer in the text of the statute and not separately addressed remedies in 703.

JUSTICE GORSUCH:  Thank you, General.

CHIEF JUSTICE ROBERTS:  Justice --

JUSTICE KAVANAUGH:  I have questions on each bucket.  So, on standing, if a new administration comes in and says we're not going to enforce the environmental laws, we're not going to enforce the labor laws, your position, I believe, is no state and no individual and no business would have standing to challenge a decision to, as a blanket matter, just not enforce those laws, is that correct?

GENERAL PRELOGAR:  That's correct under this Court's precedent, but the framers intended political checks in that circumstance. You know, if -- if an administration did something that extreme and said we're just not going to enforce the law at all, then the President would be held to account by the voters, and Congress has tools at its disposal as well.

JUSTICE KAVANAUGH:  And what -- and

Official — Subject to Final Review

51

what are those tools?  Because you mentioned earlier this would be extraordinary.  But I think Congress in 1996 and today, but in 1996, which is the relevant date, thought the immigration problem in the United States was extraordinary and the lack of enforcement to the degree that Congress as of 1996 wanted.  And so that's why they toughened the laws and constrained the executive's discretion.  At least that would be, I think, the position.

So, if courts aren't going to be able to enforce those congressional mandates, what are the exact tools that Congress has to make sure that the laws are enforced in the United States?

GENERAL PRELOGAR:  Well, I think that Congress obviously has the power of the purse. It can make the executive's life difficult with respect to its decisions about how to appropriate funds.  Congress has oversight powers.

These were the same kinds of considerations that the Court cited in Raines versus Byrd when it was confronted with some of these same separation of powers, structural,

Official Subject to Final Review

52

constitutional considerations and re -- and -- and identified the fact that Congress wasn't powerless to act.

But, Justice Kavanaugh, if I could just for a minute press on the premise of your question that Congress in 1996 intended these to be judicially enforceable mandates, I guess I would say two things.

One is that Congress has never actually appropriated funds to DHS to permit treating all of these "shalls" as mandatory, judicially enforceable "shalls," and the other thing is that Congress specifically precluded judicial review in provisions like 1226(e) and 1231(h) --

JUSTICE KAVANAUGH:  And --

GENERAL PRELOGAR:  -- which we haven't had a chance to discuss.

JUSTICE KAVANAUGH:  Right.  Those are --

GENERAL PRELOGAR:  And I think that demonstrates --

JUSTICE KAVANAUGH:  -- those are good arguments, except we have precedent that's against you on those, so -- at least on 1226.

53

And I -- I take -- I know you have a response to that, but we don't need to go into it now.

But -- but I think your position is, instead of judicial review, Congress has to resort to shutting down the government or impeachment or dramatic steps if it -- if some administration comes in and says we're not going to enforce laws or at least not going to enforce the laws to the degree that Congress by law has said the laws should be enforced, and -- and that's forcing -- I mean, I understand your position, but it's forcing Congress to take dramatic steps, I think.

GENERAL PRELOGAR:  Well, I think that if those dramatic steps would be warranted, it would be in the face of a dramatic abdication of statutory responsibility by the executive.

And there's a reason we don't see that throughout our history because of those political checks that prevent the executive from taking those kinds of actions.  And it would be like saying, if the President decided to pardon every federal criminal and release them all, obviously, no one could sue about that, but there's a reason that doesn't happen.

Of Council — Subject to Final Review

54

JUSTICE KAVANAUGH:  Right, but there's also -- just to press on this a little more, you -- you make a big point in your brief this -- this is unusual, this is rare, but it's unusual for Congress to mandate particular exercises of enforcement or prosecutorial discretion.  Most statutes in -- do not say the executive shall detain, shall prosecute.  And I think that's why this is an unusual situation, but I take your point on that.

Can I move to remedy then because I still have -- I have some problems with that, as you might imagine.

Set aside, you said the judges on the D.C. Circuit haven't paid attention to text, context, and history.  I guess I would respectfully push back pretty strongly on that. I sat with judges like Silberman and Garland and Tatel and Edwards and Williams.  They paid a lot of attention to that.

And the government never has made this argument in all the years of the APA, at least not that I remember sitting there for 12 years. I haven't seen it made.  It's a pretty radical rewrite, as the Chief Justice says, of what's

Official - Subject to Final Review

55

been standard administrative law practice.

And you devote three pages in your brief to this complete change that all these judges have been doing for all these years, and the government comes up and acknowledges that in case after case after case with labor, energy, environmental.  And I think it's a big step.

And you say they're not paying attention to the text.  Yeah, we did.  "Set aside" means "set aside."  That's always been understood to mean the -- the rule's no longer in place.  No one's really had this -- no case has ever said what you're saying anywhere.

No one -- you know, it's a recent law review proposal, good for that, but, you know, that's not been the law.  And so I find it pretty astonishing that you come up here and make -- and I realize it's not your -- you know, the main part of your submission, but I'm just going to push back pretty strongly on the, you know, three pages for just -- just toss out decades of -- of this Court's law, of circuit law.

And you've got Public Citizen and Texas coming after you on this.  They don't

Official - Subject to Final Review

56

usually unite in a administrative law case in my experience, and they both say your position is completely unprecedented on that.  So that's not really a question, but that is a --

(Laughter.)

JUSTICE KAVANAUGH:  -- that is a comment on which -- what I think is a pretty extreme argument, and I know it's not your whole argument, but this piece of the argument -- so I don't want to overstate what I'm saying here -- just this piece of your argument I think is pretty extreme, so --

GENERAL PRELOGAR:  So, Justice Kavanaugh, let me say first, let me clarify, that, of course, I didn't mean that the D.C. Circuit isn't generally paying attention to text, context, and history, and I should have been more precise that I don't think that the Court has ever had the opportunity to actually engage with the arguments that we're making here in this case.

And -- and what I was trying to -- to point out is that I don't think it's too late for courts to start to engage with these arguments.  And I recognize that we ourselves

Official Subject to Final Review

57

are landing on them somewhat late in the day, but we have been making these arguments consistently.

I think the first time we started to make them was in 2008 in the Summers versus Earth Island Institute case. We've repeated it pretty consistently since the Little Sisters case in the last administration and in cases here, and some lower courts, now that they are actually looking at our arguments, have recognized the force of those arguments.

It's not accurate to say that no court ever has considered this or accepted it. The Fourth Circuit has said that universal vacatur is not a permissible remedy under the APA. Chief Judge Sutton in the Arizona versus Biden case in his separate concurrence recognized the force of our arguments about vacatur under Section 706. A few courts --

JUSTICE KAVANAUGH: And what does it mean just in this case if -- does it mean, for example, if we rule against you on the other issues but then agree with you on the remedy, the -- the set aside point, does that mean the government can then ignore the substance of this

Official - Subject to Final Review

58

Court's ruling in other states?

GENERAL PRELOGAR:  No, not at all.  I think, if this Court then --

JUSTICE KAVANAUGH:  Why not?

GENERAL PRELOGAR:  -- determined to issue -- well, this Court would have authority, of course, to issue a declaratory judgment and we would abide by that throughout the nation if this Court said what the law meant in this area.

So I don't think it suggests that courts are going to be powerless to issue remedies here.  They'll just be confined to the traditional legal remedies that preexisted the APA, as Congress intended, and that can include in other contexts injunctions, injunctive relief.  It can include declaratory judgments and any other permissible remedy that preexisted the APA.

JUSTICE KAVANAUGH:  Thank you.

CHIEF JUSTICE ROBERTS:  Justice Barrett?

JUSTICE BARRETT:  Let me pick up on the vacatur point.  So one question I have, obviously, the Chief and Justice Kavanaugh have pointed out that the courts of appeals,

Official - Subject to Final Review

59

particularly the D.C. Circuit, have employed the remedy of vacatur for a long time.

Why isn't it possible -- and let's say that I agree with you and agree with some of the scholarship that says that this was not contemplated at the time of the APA's enactment.

Why can't remedial authority evolve over time?  You know, even if injunctions and declaratory judgments are what those, you know, who enacted the APA, Congress at the time, scholars at the time, Jaffe, thought that didn't -- vacatur didn't occur to them.

Remedial authority is a flexible concept, and so maybe the courts of appeals have expanded that concept.  Why would that be impermissible?

GENERAL PRELOGAR:  Well, I think it would be inconsistent with how the Court ordinarily approaches these types of questions of statutory interpretation.

And I think, if you agreed with us that this is not what Congress meant to authorize when it enacted Section 706 of the APA, then there would be kind of no basis to alter the text at this state and to suggest that

Official - Subject to Final Review

60

actually the Court can read into that language that all agree was not intended to cover vacatur to --

JUSTICE BARRETT:  But set aside is broad, right?  It's not specific.  And even in 703, it says including actions for declaratory judgments or writs of, you know, probatory or mandatory injunctions.  It doesn't exclude it.

And given that set aside is broad, you know, it's -- it's -- it's -- you're asking for a narrowing construction of it.  And I guess what I'm saying is, when set aside could be read to include vacatur, doesn't preclude it, why is it not subject to evolution?

GENERAL PRELOGAR:  Well, I think that there is an additional problem here with trying to expand it in that basis insofar as it would expand beyond party-specific relief, and that implicates its own considerations under Article III and implicates the same arguments we've been making about nationwide injunctions, that when courts issue remedies that go beyond the parties in the case, it can take courts beyond the traditional forms of relief that are authorized, whether under Article III or under the statute.

Official – Subject to Final Review

61

So I think, here, reading into the statute a new unprecedented remedy that would apply on the agency action itself instead of with respect to the parties would be problematic.

JUSTICE BARRETT: Okay. I'm glad you brought that up because I have a question about that too. Why don't you treat this then as a jurisdictional argument?

You concede that vacatur could be appropriate in a special statutory scheme but say simply that as a matter of statute, statutory interpretation, that APA doesn't authorize it.

Why isn't it a matter of Article III jurisdiction? Why do you concede that it would be acceptable if Congress specifically authorizes it?

GENERAL PRELOGAR: Well, you know, as this Court well knows from its various cases, trying to parse that line on whether specific statutes are jurisdictional or not, it -- it can often require Congress to speak very clearly if it's trying to attach that jurisdictional label. And, here, with respect to the remedies that the

Official Subject to Final Review

62

APA contemplates, we don't --

JUSTICE BARRETT:  No, no, no.  I mean as a matter of Article III.

GENERAL PRELOGAR:  As a matter of Article III jurisdiction, you know, I guess it would be possible to think about it that way. We haven't made that argument, but I wouldn't want to shut the door on it because of the -- the particular concerns with extending beyond party-specific relief.

JUSTICE BARRETT:  Last question on jurisdiction.  You know, in response to some of Justice Gorsuch's questions about whether we should interpret 1252 to be a preclusion of remedial authority or actually tied into jurisdiction, you said you thought it was jurisdictional.

If you think that the APA doesn't authorize the remedy of vacatur, is that jurisdictional --

GENERAL PRELOGAR:  We --

JUSTICE BARRETT:  -- by that same logic, I mean?

GENERAL PRELOGAR:  So no, because I think, if the APA doesn't authorize vacatur in

Official - Subject to Final Review

63

the first place, then you wouldn't have any issue under Section 1252(f)(1). So we're not disputing that a set-aside order in the terms of just setting an unlawful agency action to the side for purposes of rendering the --

JUSTICE BARRETT: No, no. Maybe I didn't articulate my question well. I understand that 1252 precludes jurisdiction.

GENERAL PRELOGAR: Yes.

JUSTICE BARRETT: I'm saying that if a court lacks jurisdiction when it lacks the authority to issue a particular remedy, why wouldn't we understand the APA then -- why wouldn't we understand this issue as a matter of statutory interpretation to be jurisdictional? Because, if the district court is entertaining an action to award a particular kind of relief that it lacks authority to award, would that be jurisdictional?

GENERAL PRELOGAR: We have not previously argued that this APA limit is jurisdictional. The reason we made the arguments under 1252 is because it specifically says no court shall have jurisdiction to do this, and we think that that is Congress clearly

Heritage Reporting Corporation

Official - Subject to Final Review

64

acting to attach jurisdictional consequences to an exercise of remedial authority.  But I take the point and I think it might be possible to conceive of a jurisdictional basis as well if a statute is actually preventing a remedy from being ordered.

JUSTICE BARRETT:  Okay.  Last question.  This one goes to the merits.  So Justice Alito was asking you -- you were kind of going back and forth with him about the complexities of making the determination whether a non-citizen even falls in one of these categories in the first place.

And I just wanted to give you a chance to address how -- you know, there's a portion of the statute that talks about your -- it's in (c) -- (d), "the Attorney General shall devise and implement a system to make available daily on a 24-hour basis to state, federal, and local authorities to determine whether individuals arrested for such authorities for aggravated felonies are aliens."  And then it goes on.

Why isn't that where the discretion and the resources should be channeled as a matter of statute rather than into the holistic

Of Docunent 1 Subject to Final Review

65

inquiry that the memorandum dictates?

GENERAL PRELOGAR:  So I -- I certainly acknowledge the point that Congress might have anticipated that it would be easier to make this determination about aggravated felony status and it set up mechanisms to try to ensure that there was information sharing between the federal government and the states, and I think maybe Congress couldn't have anticipated the -- the developments in this Court with respect to the categorical approach and the legal complexities that would raise about trying to monitor any number of varied state statutes that can be drafted in very different ways, with the end result being that before it's possible to determine with certainty that someone is subject to 1226(c)(2), it often involves an investment, a considerable investment, of resources and consultation between officers and -- and legal advisors to try to ascertain the scope of that provision.

JUSTICE BARRETT:  But you do have such a system?

GENERAL PRELOGAR:  Yes, we do have systems to share information between states and

Official - Subject to Final Review

66

the federal government with respect to those who -- who have criminal convictions in state court.

JUSTICE BARRETT:  Thank you.

CHIEF JUSTICE ROBERTS:  Justice Jackson?

JUSTICE JACKSON:  Yes.  As you might imagine, I would like to circle back to the concerns that the Chief Justice and Justice Kavanaugh raised about vacatur and the argument that you're making in this case.  And --

JUSTICE KAGAN:  Seems to be a kind of D.C. Circuit cartel.

(Laughter.)

JUSTICE JACKSON:  It is.  It is.

And, in particular, the -- the -- the conceptual problem that I'm having with your argument, you point to text, context, and history, and I understand those things, but, ordinarily, there's a symmetry between the claim that is being made in a case and the remedy that is provided to a successful plaintiff.  And your remedy, the way that you're reading this, actually creates a disconnect for me.

Here's what I mean.  It is clear that the claim under the APA is about the manner in

Official - Subject to Final Review

67

which the agency has exercised its discretion. And we know -- we know that agencies have no inherent authority. They get all of their power to make valid and legally binding policies from Congress, and Congress has said in the APA that in order to make valid and legally binding policies, agencies have to follow certain procedures. So, when a plaintiff is making a claim under the APA, they're complaining about the agency's failure to follow the procedures that are necessary in order to reach a valid and legally binding result.

Given that that's the case, I think there's a disconnect to say that the successful plaintiff only gets a remedy that is about the application of that rule to them, because their complaint is not about the application. Their complaint is that the agency did not have the authority to do what it did because it didn't follow the procedures under the APA. It's as though they're saying what the agency did is void. It's a null set because they did not follow the procedures that Congress required.

So I just don't even understand -- setting aside the -- how you read the statute to

Official - Subject to Final Review

68

get to that result, it seems to me to not make sense to say that the remedy is to allow the agency to apply its void, defective rule to anyone else who's not the plaintiff.

GENERAL PRELOGAR:  So, Justice Jackson, I think where I disagree with the -- with your analysis is in suggesting that a plaintiff in a case isn't protesting the application of the invalid agency regulation to that party.  That's the very nature of this kind of dispute.  Now it might be the case that the -- the arguments they're making outlie --

JUSTICE JACKSON:  But, I'm sorry, it's not the nature, because -- I mean, obviously, they -- they are saying it was applied to them as a matter of standing.  You have to have it applied to you in order to make the charge.

But the claim is that the agency has failed to have notice and comment where it was required or the agency has engaged in arbitrary and -- and capricious decision-making.  And, if that's true, what it means is that the agency does not have a valid exercise of its discretion per Congress's requirements.  The result then is that the agency doesn't have a rule that it can

Heritage Reporting Corporation

Official - Subject to Final Review

69

apply.

And the statute says very plainly the most commonsense result of that is just like in a contracts case.  If a court were to find in a contracts case that the contract is void because it wasn't properly formed, you don't -- the result is not you can apply it to whomever, just not the plaintiff standing there.  It's -- it's not a thing anymore.  And -- and -- and that's to me what the statute says.  You set it aside because you haven't formed it properly and consistently with what Congress has said.

GENERAL PRELOGAR:  I certainly acknowledge that when a plaintiff is challenging the agency's decision-making, their legal theory could suggest that the agency regulation is invalid in all of its applications and as applied to other parties too.  But I still think that in that case, just like in the case of interpreting a statute, the proper remedy is the party-specific relief of --

JUSTICE JACKSON:  But we don't have -- the APA is a different kind of claim.  It's not a -- the statutory claim is not about Congress's authority to make the policy decision.  Did they

Official Subject to Final Review

70

follow the right procedures in making it?

Let me ask you about 1252(f) because that's another basis that you sort of suggest that courts' authority is limited.  When I look at 1252(f), it says that there's no jurisdiction or authority to enjoin or restrain the operation of the provisions of this subchapter, which seems to me as though Congress is prohibiting an injunctive -- an injunction of the statute.  You've interpreted it, I think, to mean operation in the sense of any regulations, any policies of the government that are implementing that statute.

But I guess I'm concerned about that because, in (e)(3), just the provision prior, Congress was very clear about spelling out things like regulations, guidelines, et cetera.  I know that's a different provision because it applies to expedited removal, but Congress knows how to say when it's talking about claims being brought about guidelines, procedures, and things that the agency does.  And yet, in this statute, in (f), which would, I think, also apply to (e), it talks about the operation of the statute.

So why isn't really what's going on

Official - Subject to Final Review

71

here that Congress didn't want its new regulations, its new policies concerning immigration to themselves be enjoined, and it wasn't really talking about the agency's implementation in this -- in this provision?

GENERAL PRELOGAR: So I think that that approach would be inconsistent with the Court's decision last term in Aleman Gonzalez, where the claims of the non-citizens in that case is that they were entitled to bond hearings under these provisions, and the Court recognized that this bar prevents an injunction that would prevent the executive from implementing its policies with respect to bond under that statutory language. And so I think that the same argument potentially could have been made there, that that's not actually enjoining the statute; it's enjoining the agency's policies that are consistent with, in the agency's views, those statutory provisions. But the Court --

JUSTICE JACKSON: All right. So what do we do about (f) as it applies to (e)? And, again, I know (e) is not in this case, but, if we're going to be interpreting (f), do you -- do you -- is it your view that the limitation on

Heritage Reporting Corporation

Of Document — Subject to Final Review

72

injunctive relief, as you have interpreted it in (f), applies to challenges on the validity of the system in (e), in the -- in the expedited removal context?

GENERAL PRELOGAR:  Yes.  I think that we would take that position because I -- you know, as we understand this Court's interpretation in Aleman Gonzalez, it focuses on whether the claims in the case are premised on these statutory provisions and are seeking to require DHS to implement the covered INA provisions in a particular way.

And so, if the theory of the case were under 1226, any of its provisions, DHS is required to interpret the statute in a particular way or to take particular action, that comes within the bar that --

JUSTICE JACKSON:  All right.  But then why --

GENERAL PRELOGAR:  -- 1252 announces.

JUSTICE JACKSON:  -- then -- then -- then -- then we have a statute here at (e) in which Congress has authorized very specifically a claim that Congress has said that you can bring a case in order to challenge a regulation,

Official Subject to Final Review

73

policy directive, written policy guideline, or written procedure of the Attorney General or, here, DHS, Congress has allowed that, and you're suggesting that the only relief is declaratory relief under those circumstances that you don't even have to follow really?

GENERAL PRELOGAR:  So there is the opportunity for declaratory relief in any court. 1252(f)(1) also permits coercive relief on behalf of individual non-citizens, and 1252(f)(1) preserves this Court's authority to enter any form of relief.  So I think that those are the remedies that Congress delineated under these statutory provisions.

JUSTICE JACKSON:  Thank you.

CHIEF JUSTICE ROBERTS:  Thank you, counsel.

General Stone?

ORAL ARGUMENT OF JUDD E. STONE, II,
ON BEHALF OF THE RESPONDENTS

MR. STONE:  Thank you, Mr. Chief Justice, and may it please the Court:

The states proved their standing at trial based on harms well recognized by this Court's precedents, prevailed on merits

Heritage Reporting Corporation

Official Subject to Final Review

74

arguments grounded firmly in the INA's text, and received vacatur, the standard APA remedy.

Petitioners respond by attempting to rewrite the law of Article III, the INA, and the APA. They are wrong.

Petitioners call the states' standing illegitimate because -- because it is based on the costs states incur when Petitioners violate federal law. But such costs fall well within those held as sufficient in at least Massachusetts versus EPA and Department of Commerce.

As this Court has recognized before, the states bear many of the consequences of federal immigration decisions. Those consequences fit comfortably in this Court's traditional Article III standing framework.

On the merits, the final memorandum is unlawful for multiple reasons, most clearly because it treats Section 1226(c) as discretionary, while both this Court and every previous administration have acknowledged it as mandatory.

Petitioners respond by appealing to resource constraints and their prosecutorial

Official - Subject to Final Review

75

discretion, both of which are beside the point.

The states do not claim the Petitioners must remove anyone in particular. Rather, Petitioners' detention obligations run only to -- arise before and after their decision to prosecute and run only to a small subset of this nation's illegal aliens.

Finally, eliminating the APA's vacatur remedy would jettison nearly a century of administrative practice. When Congress empowered federal courts under Section 706 to set aside agency action, it authorized courts, consistent with pre-APA practice, to vacate unlawful rules, not merely to disregard them. This Court should not hold otherwise.

I welcome the Court's questions.

JUSTICE THOMAS: General Stone, I'd like you to respond to some of our back and forth about 1252(f), particularly as it affects your standing in this case and whether or not you can obtain the remedies that you seek.

For example, is vacatur -- vacatur actually possible under 1252(f)?

MR. STONE: Certainly, Justice Thomas.

So, in our view, vacatur is left

Official - Subject to Final Review

76

available by 1252(f)(1) for several reasons. First of all, vacatur is not injunctive relief. The terms "enjoin" and "restrain" in 1252(f)(1) speak to two traditional kinds of injunctive relief:  injunctions and temporary restraining orders.

And perhaps if there were other orders that operated like them in key regards, which is to say they operated in personam, they had a prohibitory or a mandatory character, it might bar those as well.

Vacatur is, as this Court has put in Monsanto, a much less drastic remedy, and the most important way in which it's less drastic can easily be seen by the perspective of someone who, in fact, has been enjoined.

A party who's been enjoined to do or not do something is effectively under the supervision of a federal district judge and has to go to that district judge or suffer their counterparty going to that district judge if they want to attempt to re-implement or otherwise take the action that's been -- that's been subject to that injunction.  No such obligation and no collateral contempt potential

Official - Subject to Final Review

77

exposure exists with vacatur.

Now my friend on the other side said quite -- quite candidly that in the event that Texas were to have received a declaration, of course, and I believe her words were, the United States would follow that declaration or would be bound by it.

It's very hard to explain how it is that vacatur, which acts against -- directly against a rule and does not in personam bind any officer or agency of the United States, is coercive or otherwise prohibited in the meaning of 1252(f)(1), but that declaratory relief, which the United States acknowledges it would, in fact, follow, is somehow not coercive.

I think -- I think that line is evanescent, if it exists at all, and so the best reading of 1252(f)(1) is only to injunctions and those sorts of orders and that Texas, the state --

JUSTICE KAGAN:  It strikes me, General, that you had a better argument on this score and maybe a good argument before Aleman Gonzalez, but after Aleman Gonzalez, it -- it seems hard to me for you to make the case.

Heritage Reporting Corporation

Official - Subject to Final Review

78

I'm just going to read you a quote there.  We held that 1252(f)(1) "barred orders that require officials to take actions that in the government's views are not required by the INA and to refrain from actions that again in the government's view are allowed by the INA."

So wouldn't vacating the Guidelines here require DHS officials to take enforcement actions that in the government's view are not required by the INA?  It just falls with the -- the direct language of that decision?

MR. STONE:  I don't think so, Your Honor, and I have two points.  First, vacatur is self-executing.  The vacatur order is affirmed by this Court or, if it's issued otherwise in any court, it acts against the -- it acts against the challenged thing, the challenged rule or order on its own and makes it legally void.  It does not require any action whatsoever.  It does not on its own prohibit any action whatsoever.

And second, to the extent that Petitioners have been attempting to draw a distinction consistent with Aleman Gonzalez between vacatur and declaratory relief, again, I

Official - Subject to Final Review

79

think there's no -- for purposes of what would coerce or otherwise would restrain in the sense of Aleman -- Aleman Gonzalez petitioners, an adverse declaration saying that their -- that the Guidelines, the final memorandum, has been unlawful under 1226(c) and 1231 certainly has at much -- at least as much coercive pressure -- I think that's none -- but the same amount of coercive pressure.

And so, if that's the case, if -- if Petitioners are saying that 1230 -- that 1252(f)(1) removes all available remedies, then, one, it's a very strange way of writing that provision, and, two, they should come out and say it and then say that, in fact, there are no remedies available whatsoever. I just don't think -- the vacatur/declaratory relief distinction doesn't work.

JUSTICE GORSUCH: General, I take your point about declaratory judgments, but just -- I just want to press a little bit further on this same point, and -- and that is, for purposes of -- of standing and -- and redressability, you -- you took the position, I believe, that vacatur does solve Texas's problems because the

Official - Subject to Final Review

80

immigration laws will be enforced differently without the Guidelines than with the Guidelines, right?

MR. STONE:  Yes.  And to be a little more specific, there are findings of fact from the trial court --

JUSTICE GORSUCH:  Sure.  Sure.

MR. STONE:  -- that the Guidelines --

JUSTICE GORSUCH:  That support that. Yeah.

MR. STONE:  Yes.

JUSTICE GORSUCH:  So, without the Guidelines, the government will enforce the immigration laws differently in a way that satisfies Texas?

MR. STONE:  Without the Guidelines, yes.  And just to specify a little bit, that without the Guidelines, federal immigration officials will no longer view their discretion -- their mandatory obligations as discretionary.

JUSTICE GORSUCH:  We can spin it out as long as you want.

MR. STONE:  I'm agreeing, Justice --

JUSTICE GORSUCH:  But the answer is yes, right?

81

MR. STONE:  Yes, Your Honor.

JUSTICE GORSUCH:  Okay.  And if that's the case, then why isn't a vacatur of the Guidelines enjoining in the language that we used last term the government's ability to enforce the immigration laws in a certain way?

MR. STONE:  In part because, Your Honor, the essence of an injunction is not whether or not people will react to it in a way that -- that remedies someone's harm.  It's that they're compelled to.

Something about injunction doesn't just say fix this person's injury.  It says, you must under pain of court supervision, under pain of penalty, you must do these things or refrain from them going --

JUSTICE GORSUCH:  Well, isn't that Texas's whole point, is that under 1226, 1231, the government must do certain things and it's not doing it because of the Guidelines.  Getting rid of the Guidelines will fix the problem, and, therefore, the government is now effectively required to enforce the immigration laws differently than it otherwise would.

MR. STONE:  Those are our merits

Official Subject to Final Review

82

arguments as to 1226 and 1232(a).

JUSTICE GORSUCH:  Mm-hmm.

MR. STONE:  Our remedy is simply, because the Guidelines are unlawfully causing DHS agents essentially not to treat mandatory things as -- or rather to treat mandatory things as discretionary, they are as a matter of fact reducing the number of detentions, et cetera. But our relief would not coerce them into doing anything.  It's merely a matter of fact that DHS agents would so respond.  We're not asking for anything coercive.

JUSTICE GORSUCH:  Thank you.

JUSTICE BARRETT:  But they could -- I mean, the Guidelines are gone, but that doesn't mean that ICE officers or DHS couldn't more informally say we're going to exercise our prosecutorial discretion not to institute a removal proceeding against this particular non-citizen.

MR. STONE:  That certainly might well be the case, Your Honor.  Of course, that would have been the kind of evidence that would have attacked our redressability, that had Petitioners submitted that to the district court

Official - Subject to Final Review

83

certainly would have undermined a number of the findings.

JUSTICE BARRETT:  But it's your burden to show standing, right?

MR. STONE:  Yes, Your Honor, and we did by, again, findings supported by clear error showing the causal relationship between actual enforcement actions and this memorandum, including, for example, 22 e-mails specifically citing the Guidelines as -- as a reason for removing detainers.

JUSTICE JACKSON:  But why isn't the causal relationship the chain broken in the sense that you have voluntary decision-making by Texas, say, in relation to the criminal justice costs, that you are -- you feel compelled or you want to go after individual people?

In other words, aren't the costs associated with Texas's decision to incarcerate or parole certain non-citizens if the federal government decides not to detain them, aren't those a result of the state's own policy choices in a way, you know, that we have recognized or decided is not sufficient in a case like Pennsylvania versus New Jersey?

Official Subject to Final Review

84

MR. STONE:  Your Honor, I think, ordinarily, in the Court's Article III standing analysis, for example, in -- in the DACA case in Regents, the Court didn't go, well, California is -- is suffering this injury in the first place because they have chosen to employ individuals subject to this immigration right, et cetera, and so, really, to some extent, the loss of these individuals is a self-inflicted injury.

More to the point, Texas suffers injuries regardless of what it does, whether it detains, releases, or paroles individuals, because we have not only law enforcement costs but social services costs and very serious threats of recidivism that must be considered.

JUSTICE JACKSON:  All right.  Well, separate -- separate out the -- the -- can we just for a second separate out the criminal justice costs from the healthcare and other things that would be required?  With respect to the criminal justice costs, presumably -- first of all, the federal government has said that they have determined that these particular individuals aren't going to be a high risk and

Official - Subject to Final Review

85

so that's why they're not detaining them.

So why isn't Texas's determination to detain them on Texas?  I mean, presumably, there will be other states that might agree with the federal government and say, you know, we're not going to expend any money to try to supervise or detain these particular individuals.

MR. STONE:  Well, two points, Your Honor.  First of all, there are district court findings of fact.  This was a disputed subject at the trial court regarding whether or not the rates of recidivism were unacceptably high, what kinds of risks Texas was exposed to by these releases.  And, more to the point, Congress has made the determination specifically in the passage of IIRAIRA and 1226(c) whether or not these individuals are unacceptably --

JUSTICE JACKSON:  Well, that's on the merits.

MR. STONE:  -- high of a risk.

JUSTICE JACKSON:  That's a merits question.  I mean, you know, I guess my point is just in terms of injury and who is bearing the cost and why.  Isn't it Texas's determination to go after and detain or keep detained these

Official - Subject to Final Review

86

people, you know, a cost that Texas has chosen to incur? The Guidelines don't require states to keep these people in custody.

MR. STONE: No, Your Honor, and I think that's because Texas is put to what we call -- might call sort of an Article III dilemma where it either pays the costs of continued detention or pays the costs that are incurred through recidivism, again, recidivism in this case being a hotly contested question at trial upon which there was direct testimony from one of the largest counties in Texas regarding the criminal population there, actual evidence of recidivism by specific individuals who had been detained and released pursuant to detainers --

JUSTICE JACKSON: All right.

JUSTICE KAVANAUGH: Does --

JUSTICE JACKSON: So can we answer Judge -- Justice Sotomayor's question about net costs then? So, fine, there might be costs with respect to this group of people, but the government -- the federal government says that you're going to save a whole lot based on other aspects of the operation of the Guidelines.

Official Subject to Final Review

87

What -- what's your response to that?

MR. STONE:  Two responses to that question.  The first is somewhat straightforward, which is to say that's in the nature of a factual assertion, a factual assertion about which Petitioners offered zero evidence whatsoever.  That was a disputed fact question at trial.  They offered no evidence.

If there were, in fact, evidence, I think that would go -- that would be powerful evidence attacking our standing.  Their assertions afterwards --

JUSTICE SOTOMAYOR:  I'm sorry.

MR. STONE:  -- are not a kind of evidence.

JUSTICE SOTOMAYOR:  You have to prove standing.  And we have said in Arizona, the Arizona case, that you have to show the net effect.  And you didn't.  You didn't show the -- what the government has said and what the record clearly proves is that there's been a surge at the border; if left unattended, that surge would overwhelm all of the border states, not just Texas; and that the cost of doing that has to give them greater priorities in terms of aliens

Official Subject to Final Review

88

who are already here.

But we know that many of those people coming in will be risks to the State of Texas, et cetera.  Why haven't you shown that that net effect of keeping more people out is going to mean less than the few people that they decide to erroneously let go?

MR. STONE:  Respectfully, Your Honor, I think there's two points here.  One is that this Court doesn't typically treat standing as an accounting exercise as to whether or not an individual who shows --

JUSTICE SOTOMAYOR:  No, but you have to -- you have to show -- you can't look at a piece of a policy and say I don't like a piece. You have to look at the policy altogether.

MR. STONE:  Well, certainly, Justice Sotomayor, what we are looking at here is a very specific challenge to the exercise of detention authority under two sections.  I don't think it's an Article III vice that Texas isn't challenging the entire immigration code's application in all cases.

JUSTICE KAGAN:  General, do you think that there's any immigration policy that you

Official Subject to Final Review

89

could not challenge under the way you view standing?

MR. STONE: I think that's hard to discuss in the abstract. There might well be, Your Honor, but it shouldn't come as a --

JUSTICE KAGAN: It's hard to think of, I guess is what I'm saying. I mean, if all you need to do is to say we have a dollar's worth of costs and you don't even need to think about the benefits on the other side, I mean, every immigration policy, you let in more people, you let in fewer people, is going to have some effect on a state's fiscal condition. Maybe they'll get less or more tax dollars. Maybe they'll have to spend less or more money. I mean, every single immigration policy. And then, you know, not to mention all the other policies in the world that if a state comes in and says I got a dollar's worth of costs that I can show you.

I mean, we're just going to be in a -- in a situation where every administration is confronted by suits by states that can, you know, bring a policy to a dead halt, to a dead stop, by just showing a dollar's worth of costs?

Heritage Reporting Corporation

Official - Subject to Final Review

90

MR. STONE:  Two points, Your Honor. The first is -- and I can't speak for all states, obviously, even though 37 of them are participating in this case, and none have adopted the United States' theory of standing. Texas has more than half of the southern border.

JUSTICE KAGAN:  That's not responsive to my question.

MR. STONE:  Yes, Your Honor.  Texas --

JUSTICE KAGAN:  I mean, look -- and this isn't anything that has to do with this Administration.  You know, some other administration will come in and the California solicitor general will be standing where you are.

And, you know, there's an issue here, especially with respect to immigration policy. Immigration policy is supposed to be the zenith of federal power, and it's supposed to be the zenith of executive power.  And, instead, we're creating a system where a combination of states and courts can bring immigration policy to a dead halt.

MR. STONE:  Two points, Your Honor. The first is, again, speaking at least for

Official - Subject to Final Review

91

Texas, it shouldn't be particularly surprising that we would suffer outsized Article III injuries given the fact that half of the southern border immediately abuts Texas.

JUSTICE KAGAN:  But would you --

MR. STONE:  We're --

JUSTICE KAGAN:  You're -- you're not saying that you have a special kind of injury here.  You're saying all the usual rules apply, maybe more than the usual rules, and all you need to show is a dollar's worth of costs.

MR. STONE:  We are indeed saying the usual rules apply, with one twist, which is, to the extent the usual rules don't apply, immigration surely is the kind of sort of sovereign prerogative that in the sense of Massachusetts versus EPA, Texas has had to surrender to the union as a part of the state of joining the union, and Texas has been given a procedural right, just like in Massachusetts versus EPA, to vindicate those interests that it has had to surrender to the federal government. So --

JUSTICE KAGAN:  I guess what strikes me is that these very broad arguments that the

Official - Subject to Final Review

92

Solicitor General is making, maybe we shouldn't -- even if we don't think that we should accept them as broad prohibitions, the fact that you are not the party directly regulated, the fact that you are challenging an enforcement action, particularly an enforcement action where the most discretion has been given to executive officials, but -- but those form the backdrop by which we should say, you know, it's just not enough that you're coming in here with a set of speculative possibilities about your costs.  You have to do more than that given the backdrop of -- of what has become, I think, a system that nobody ever thought would occur, which is that the states can go into court at the drop of a pin and stop federal policies in their tracks.

MR. STONE:  So, Your Honor, I think there's two points there, the first being, to the extent you're describing a rule that sort of shows special skepticism of the states, that's at minimum -- that's at minimum in the teeth of Massachusetts versus EPA.

JUSTICE KAGAN:  Yeah, I'm -- I'm saying that, like, coming in and saying, you know, it seems to us that we have some costs

Heritage Reporting Corporation

Official - Subject to Final Review

93

associated with this and we're not going to look at the benefits and we're not going to look at the fact that, as Judge Sutton said, the fact that there are priorities, you know, that person A will be -- you know, will -- will not be removed versus person B will, that -- that that doesn't particularly show that your net costs are -- even that your -- your -- your gross costs are going to rise, let alone your net costs.

And all of the speculation and all of this kind of like we think we kind of showed it is just not enough given the backdrop of this case.

MR. STONE:  We don't think we showed it, Your Honor.  A trial court judge reviewable for clear error thinks that we showed it, and he based that on --

JUSTICE KAGAN:  Can I -- can I --

CHIEF JUSTICE ROBERTS:  Thank you.

JUSTICE KAGAN:  -- say something about that?  Can I -- one more?

CHIEF JUSTICE ROBERTS:  One more.

(Laughter.)

JUSTICE KAGAN:  I mean, just to think

94

about just the backdrop of this case and what's going on here, I mean, just add to the notion, not your fault, this is not, you know, but in Texas, there are divisions within districts. You can pick your trial court judge.

You know, you play by the rules, that's fine, but you pick your trial court judge.  One judge stops a federal immigration policy in its tracks because you have a kind of sort of speculative argument that your budget is going to be affected.

MR. STONE:  Respectfully, Your Honor, it's not speculative.  In fact, this is how concrete it is.  We have at least one example in the record of a specific alien, Ruben Abonza, who specifically had a detainer placed on him. That detainer was removed.  He had a final order of removal and was a 1226(c) alien.

That detainer was removed.  He was released.  And then he was reapprehended for committing human trafficking.  That commits the kind of cost, both law enforcement and recidivism, that certainly forms the basis of an Article III injury.  That is not speculative. It occurred.

Heritage Reporting Corporation

Official - Subject to Final Review

95

CHIEF JUSTICE ROBERTS:  Thank you, counsel.  I'd like to move to the merits a little bit.

The Solicitor General on the -- on the other side responded to some of my questioning about the impossibility by emphasizing that, well, that's a good reason to think that Congress really didn't intend that result.

You know, it's -- it's -- it's a compelling argument, and what is your answer?  I mean, to the extent it is impossible -- it is impossible for the executive to do what you want him to do, right?

MR. STONE:  I don't think so, Your Honor, at least as applied to the narrow 60- to 80,000 -- and this is a matter of finding of fact, there is evidence in the record, so I want to just claim that -- the 60- to 80,000 pool of individuals who are criminal aliens under subsection C.

CHIEF JUSTICE ROBERTS:  Are there 60- to 80,000 empty beds?

MR. STONE:  No, Your Honor, but the way that those beds work is they work both in terms of having a bed and the velocity with

which the individuals are removed under the system. And, of course, under 1226(c), the government's detention obligation runs only until they make a determination whether or not to remove the individual.

If the government says we made a determination we're not going to remove, the 1226(c) obligation ends instantly.

CHIEF JUSTICE ROBERTS: Well, assuming we think it would be, if not impossible, surprising and very difficult for the executive to comply, isn't that a consideration we should take into account in trying to figure out if "shall" means "shall"? Because, certainly, there are cases where we've said "shall" means "may."

MR. STONE: Your Honor, I don't think so for two reasons, one being the backdrop that "shall," indeed, means "shall" and that 1226 has a variety of other intertextual clues that suggest this "shall" especially means "shall," it's contradistinction with "may" in 1226(a), its extremely tight restrictive possible release provision in 1221(c)(2).

But, more importantly, Congress

Official - Subject to Final Review

97

actually considered this exact excuse in the

transition rules following IIRAIRA, where

Congress gave the executive two years, saying,

if the executive in any given 1226 case believes

it simply does not have the enforcement ability,

doesn't have the resources, that will excuse

mandatory detention.

After two years, the executive went

back to Congress and asked for renewal of that.

Congress said no, and then immediately, then the

Clinton Administration acknowledged that the

obligations under 1226(c) became mandatory.

JUSTICE KAVANAUGH:  But the -- but the

resources are still not there.  And so I guess,

on both standing and to pick up on Justice

Kagan's question, standing and merits, and the

Chief Justice's questions as well, there's a

tradition of not allowing people to challenge

non-enforcement decisions.  Linda R.S. stands as

probably the lead precedent on that.

And so too on the merits question,

there is a tradition of reading statutes with --

against the backdrop of prosecutorial discretion

that at least in the federal context is rooted

in Article II and then Castle Rock talks about

Heritage Reporting Corporation

Official - Subject to Final Review

98

that background principle in the state context.

Those two things together are both probably united by the fact that there are never enough resources or almost never enough resources to detain every person who should be detained, arrest every person who should be arrested, prosecute every person who's violated the law.

And so those two principles seem to me to come from the same problem, and that problem, even after the two-year period you described, is present today, right?

MR. STONE:  Taking as an assumption that it would not be possible, we think that's at least disputable, that it's not possible to detain everyone covered by this.

A couple of points.  First of all, the prosecutorial discretion, typically, prosecutorial discretion means the power to bring a criminal action and then pursue it or not pursue it against someone, or in this context a notice to appear, and to bring that all the way through to a final order of removal and execute or not execute it.

Prosecutorial discretion doesn't prevent, as you pointed out, for example, in

Official - Subject to Final Review

99

Heckler versus Chaney, Congress setting enforcement priorities, and it's not an excuse for an executive not to comply with a mandate on the executive itself.

Now I take the exception, of course, for a possibility that Congress said you must prosecute this individual.  I think that would be the sort of very core of an argument.

JUSTICE KAVANAUGH:  How about if Congress said you must prosecute, that the executive must prosecute everyone who violates this law?

MR. STONE:  I think that would be the strongest possible Article II argument available.  Nothing in the text, nothing in the states' theory --

JUSTICE KAVANAUGH:  That would be a problem under Article II, don't you think?

MR. STONE:  I think so, Your Honor, yes, Your Honor, I think that would be the strongest possible --

JUSTICE KAVANAUGH:  Well, isn't -- how is that different from what we have here in terms of -- you know, let's change that hypothetical, you must arrest, the executive

Official - Subject to Final Review

100

must arrest everyone who there's probable cause to believe violated the law.  How is that different from, theoretically, from this -- this provision?

MR. STONE:  Certainly, because -- two reasons:  One, because arrest -- essentially, prosecutorial discretion doesn't cover every potential possible act of enforcement from soup to nuts in the process.  It is -- the core of prosecutorial discretion is the ability to choose whether or not to bring charges and prosecute them.

Now I agree that perhaps that Article II question gains strengths or loses it depending on how intrusive the invasion is. But, here, 1226(c)(1) as read alongside 1226(a) and 1230 -- 12 -- 1231(a)(1), both respect the executive's prosecutorial discretion immensely.

1226(c)(1) only applies until they have made a decision whether or not to prosecute.  If they decide not to, it immediately ends.

JUSTICE SOTOMAYOR:  Counsel, I -- I --

JUSTICE KAVANAUGH:  Right, but the --

JUSTICE SOTOMAYOR:  I'm sorry, go

Official - Subject to Final Review

101

ahead.

JUSTICE KAVANAUGH:  I was -- the last question to tie this up, I'm sorry, is, if you prevail here, what will happen?  That's a concern because I'm not sure much will change because they don't have the resources to change. So what -- what do you envision?

I know Florida's amicus brief says, well, the executive will then strive to meet its obligations.  "Strive to" is not a usual term of a judicial order.  So what do you think happens if you prevail here?

MR. STONE:  We think, consistent with the district court's findings, that individual officers in ICE will go back to -- to not believing that their enforcement discretion has been restrained in the ways the prosecutorial -- the -- rather, the Guidelines and those have -- have caused that to be.

More specifically about the -- the lack of -- the lack of resources, though, Your Honor, there is an on-the-record finding of bad faith in this specific context for two reasons. One, here, Petitioners have repeatedly sought to decrease their enforcement capabilities, to

102

decrease their detention capabilities, and, two, they've persistently underused them.

JUSTICE KAVANAUGH:  Okay.  Why don't you go to Justice Sotomayor.

JUSTICE SOTOMAYOR:  Counsel, I don't know that I understand your theory, but maybe I'm getting it.

Number one, you're saying there is no command to remove anyone who falls under 1226 and 1231?

MR. STONE:  We're certainly not saying that there is, Your Honor, whether or not --

JUSTICE SOTOMAYOR:  All right.  You're -- you're -- you're saying there is complete and absolute discretion for the government to say anybody charged with any crime, we're not going to remove you?

MR. STONE:  I -- I'm not sure that I'd concede that much, but we're certainly not arguing otherwise.

JUSTICE SOTOMAYOR:  All right.  So what are you arguing?  Are you arguing that only if they are told that there is a criminal who fits the 1226(c) or 1231 conditions, that they must remove those people?

Official – Subject to Final Review

103

MR. STONE:  Our argument doesn't run to removal at all, Justice Sotomayor.

JUSTICE SOTOMAYOR:  All right.  So --

MR. STONE:  It runs to arrest and detention.

JUSTICE SOTOMAYOR:  -- why isn't the policy guidelines exactly what the government said, which is this has nothing to do with detention, it has to do with removal.  We've made a decision that certain categories of people, we're not going to spend the money on giving them a notice of appearance or giving -- or removing them.

MR. STONE:  Well, Your Honor, in part because the Guidelines on their face -- and 1226(c) contains an arrest requirement.  We believe that's the natural reading of "take into custody."  But the Guidelines on their face refer to individuals who should be subject to arrest detainers and removal proceedings.

JUSTICE SOTOMAYOR:  Should be, but you just said to me they don't have to be.

MR. STONE:  They don't have to remove --

JUSTICE SOTOMAYOR:  The government has

Official - Subject to Final Review

104

the discretion to say I don't want to remove this person, correct?

MR. STONE:  I apologize, Justice.  I was referring to how this does affect detainers. I agree once again we are not seeking to have any individual in specific removed.

JUSTICE SOTOMAYOR:  So, really, this case is all about the people that a detainer has been put on and that the government can't withdraw that detainer once they put it on?

MR. STONE:  This case is about, under two different --

JUSTICE SOTOMAYOR:  Answer yes or no to that.  Is that -- because there's a lot of states, for example, that don't cooperate with ISIS and they don't tell the government about somebody, but maybe the government found out about it.  Do they have to go and put the detainer on that person?

MR. STONE:  The -- the answer to your previous question is no.  The answer to this question is yes.

JUSTICE SOTOMAYOR:  All right.  So they have to go and spend the resources to sit outside of that prison and find out what day

that person is going to be released so they can arrest that person that day?

MR. STONE:  1226(d) actually directs the federal government to create a 24-hour accessible system for purposes of having this --

JUSTICE SOTOMAYOR:  I -- I just asked you a direct question.  Does the government now have to put the resources in place to watch the prison every day to see if someone has been released?

MR. STONE:  The government must attempt to fulfill its mandatory detention.  How it does it in terms of --

JUSTICE SOTOMAYOR:  How -- how --

MR. STONE:  -- individual resources or expenditures --

JUSTICE SOTOMAYOR:  You -- you -- you just told me something contradictory.

How do you deal with 1231(h) and the fact that it says that the statute, 1231, "does not create any right or benefit that is legally enforceable by any party"?

MR. STONE:  May I?

CHIEF JUSTICE ROBERTS:  Sure.

JUSTICE SOTOMAYOR:  So how do you get

into court under 1231(h)?

MR. STONE:  Two points, Your Honor. The first is this Court in Zadvydas v. Davis said that 1231 of its own force only prevents an individual from saying that 1231 gives them essentially a right or cause of action.  It did not block it --

JUSTICE SOTOMAYOR:  Well, that -- that's -- you're any person.  You're Texas.  You saying you have a right or a cause of action, under your theory of indirect harm, that permits you to attack it under the APA, to attack it under whatever else, you fit right in any person saying that you have a right or a benefit under the APA to attack 1231, a policy?

MR. STONE:  No, Your Honor.  At least two points.  One, no more than an individual seeking release under 2241 did.  And that was a very good --

JUSTICE SOTOMAYOR:  It doesn't say any more than an individual.  It says that you -- does not create any -- and "any" is very broad -- right or benefit that is legally enforceable by any party.  It doesn't say any alien party. It doesn't say anything like that.

Official - Subject to Final Review

107

MR. STONE:  I agree, Justice Sotomayor.  And in Zadvydas, an individual alien through a habeas corpus action was claiming his detention was illegal because of a violation of 1231 --

JUSTICE SOTOMAYOR:  Well, that -- that may be prototypical, but that's not -- the language isn't limited to that situation.

MR. STONE:  But --

JUSTICE SOTOMAYOR:  It doesn't say any right or benefit that is legally enforceable by an undocumented alien.  It says any party.

MR. STONE:  But the Court --

JUSTICE SOTOMAYOR:  You're any party.

MR. STONE:  -- the Court didn't hold that 2241 -- that act of -- that exercise of jurisdiction illegal.  It said 1231 was restricted only to that section, and the use of 2241 was permitted.  The APA is at least as separate from Section 1231 as the general habeas statute.  And more to the point --

CHIEF JUSTICE ROBERTS:  Counsel, why -- why don't we just spend a little bit of time on remedy before we move to individual questioning, and on that, an important question

Official - Subject to Final Review

108

for me was the one raised by Justice Gorsuch.

How did the APA's new vacatur remedy slip by unnoticed from all these administrative law scholars?

MR. STONE:  It -- I can't speak as to the attention of the administrative law scholarship universe, Mr. Chief Justice, but I can tell you that the -- the vacatur remedy recognized in 706(2) was consistent with then-existing APA practice.  And to put a fine point on it, this Court around 1920, reviewing generally speaking Interstate Commerce Commission orders, specifically described the relief that was being sought below and that it sometimes affirmed, sometimes refused, as orders attempting to annul or revoke a given commission rule.  Idaho versus United States actually does double work for us here.  One, this Court affirmed an order annulling an Interstate Commerce clause -- an Interstate Commerce Commission order.  And then, also, Idaho's theory of harm was entirely premised on the federal regulation of a private party in its state.  So --

CHIEF JUSTICE ROBERTS:  Well, as -- as

the Solicitor General on the other side pointed out, the courts really haven't dealt with the analysis that raises this question, namely, the one in Professor Harrison's article.

MR. STONE: I think --

CHIEF JUSTICE ROBERTS: The D.C. Circuit may have been doing it for a long time but sort of did not address the arguments that are being raised today.

MR. STONE: And perhaps that might be a reason why, strictly speaking, they aren't precluded by stare decisis, Your Honor, but the fact that the lower courts had --

JUSTICE GORSUCH: That they're precluded by stare decisis from a lower court? I mean, lower -- lower courts often do things for long periods of time, unthinkingly or maybe thinkingly and thoughtfully, that turn out to be wrong, and --

MR. STONE: I'm sorry, that --

JUSTICE GORSUCH: -- this Court doesn't afford stare decisis effect.

MR. STONE: I said that it wasn't. I'm sorry.

JUSTICE GORSUCH: Oh, I'm sorry.

Official Subject to Final Review

110

MR. STONE:  I -- I must have either misspoken or meant to say it was not.

JUSTICE GORSUCH:  I -- I'm sure I misheard, General.  I'm sorry.

MR. STONE:  That it does not -- it is not precluded by stare decisis.  But it is, again, a thoughtful 80-year history that has essentially informed everything Congress has done subsequently.  Congress has enacted subsequent review statutes using the same language, for example, 28 U.S.C. 2342, with a specific administrative review statute --

JUSTICE GORSUCH:  There are definitely specific administrative review statutes that contemplate this.  But let's put those aside for the moment and just look at the APA itself.

Isn't it a little odd that -- that Section 706 governs the scope of review and proceeds to tell us to review questions of law de novo, and that's a whole other kettle of fish, whether we do that, but tells us to do that and then goes on and tells us, when we find an unlawful agency action, finding, or conclusion, we should set it aside.  We don't think of negating or vacating or erasing

Heritage Reporting Corporation

111

findings or conclusions.  We -- we -- we put them aside and go ahead and decide the case without them usually.

Why -- why wouldn't the same apply to -- to errors of law under a de novo standard of review, especially when 703 does list all the remedial forms available in an APA action, declaratory judgment, injunctions?  It -- it would seem like it would be a monster swallowing all of the other remedies that -- that sits in these five words, you know, hold unlawful and set aside.  It's in a scope of review section. It's -- just on its face, putting aside our learned friends on the D.C. Circuit on the one hand and our learned friends from the Sixth and the Fourth on the other.

MR. STONE:  So I think the answer, Your Honor, is to look at both 703 and 706 together.  I disagree with you that 703 provides remedies, and I think taken sentence by sentence, it's just that it doesn't --

JUSTICE GORSUCH:  Well, take a look at it again, counsel, and tell me if you really think that, because I look at it, and it talks about venue and forms of proceeding, and the

112

forms of proceeding listed include injunctive relief and declaratory judgments. Those are classic remedial forms of relief or forms of proceeding.

MR. STONE: Well, Your Honor, two points. First of all, I don't think anyone has ever thought that Federal Rule of Civil Procedure 2, which provides one form of action -- and this is the same words you here used, form of proceeding -- and it specifies --

JUSTICE GORSUCH: That's different.

MR. STONE: -- the applicable legal form of action. I don't think anyone thinks --

JUSTICE GORSUCH: Forms of proceeding and it lists them as declaratory and injunctive. You -- you'd agree those are remedies?

MR. STONE: I agree they are forms of action, Your Honor. I think that -- and, yes, they can --

JUSTICE GORSUCH: Remedies?

MR. STONE: -- include remedies, yes.

JUSTICE GORSUCH: Okay. So those are remedies, declaratory relief, injunctions. There they are in 703. So it's a little odd that there'd be those giant remedies that

Official - Subject to Final Review

113

swallow the whole of 703 lurking over in 706.

And then put -- put that aside too. What about 702, which limits the power of certain persons to come into court under the APA, limits them to aggrieved persons who have actually been personally and concretely injured? There, Congress is carefully respecting our standing rules at the front end. Wouldn't it be odd for it to blow a giant hole in our traditional remedial rules at the back end through five words in 706?

MR. STONE: I don't think so, Your Honor. Two points, the first being this Court has recognized, I believe in Lujan in 1990, that the APA provides an especially generous sort -- form of judicial review. Ordinarily, you have to have some sort of legal right typically, and this provides, as you point out, Justice Gorsuch, both availability for someone suffering a legal wrong as well as a party adversely affected or aggrieved. So I think that's much broader than the traditional form of action.

JUSTICE GORSUCH: It's -- it's -- it's not everybody in the world who has a generalized grievance.

MR. STONE:  Certainly not.

JUSTICE GORSUCH:  It has to be someone who's specifically harmed, consistent with Article III, right?

MR. STONE:  That's certainly true. That's certainly true, Justice Gorsuch.  The fact that Congress created -- and I'm going to speak specifically to the assumption that vacatur exists on your Article III question and then I could step back --

JUSTICE GORSUCH:  Oh, yeah.  Where does that word appear in the APA?

MR. STONE:  It comes from "set aside," as you -- as you previously --

JUSTICE GORSUCH:  It doesn't appear in the APA, right?

MR. STONE:  It does not.  It comes from --

JUSTICE GORSUCH:  It's just -- it's just -- it just -- we assume it from those five words.

MR. STONE:  And from previous practice, Justice Gorsuch, previous practice that had been recognized in this Court more than 10 times.  As a matter of fact, it had been --

Official - Subject to Final Review

115

had been recognized in this Court in the terms of "annul" or "revoke," synonyms that were recognized by contemporary legal dictionaries at the time as being synonymous with "set aside."

JUSTICE JACKSON:  And synonyms that relate to the claim at issue in the case.  I mean, aren't -- aren't -- what is your thought on my point about the claim at issue in this case being about the agency's invalid exercise of authority because it didn't follow the right procedures?

MR. STONE:  I agree with you, Justice Jackson, that to the extent the kind of claims that Congress provided for underneath the Administrative Procedure Act included claims that run to the essential invalidity of a thing, that it's -- that it simply is not valid exercise of power.

Congress chose to give that power over both orders and rules when it provided for review of agency action, a term defined in statute to include both.  And so I agree with you that vacatur is the natural remedy, which is to say vacating the actual thing itself that is -- that is categorically invalid.

Heritage Reporting Corporation

Official - Subject to Final Review

116

JUSTICE JACKSON:  And it's in Section 06, along with the kinds of claims that people can make.  What the Court is reviewing and looking for are these kinds of errors by the agency, and we're told that when they exist, you set aside the -- the -- the agency action.

MR. STONE:  I agree with you.  Both 706(1) and 706(2) follow the same structure, which is to say the initial words provide the remedy, order, agency action, and then the next component says what the substantive standard you have to meet is.

JUSTICE JACKSON:  And wouldn't it be odd for the Court to go back to 703?  I mean, it seems to me that if you read all of the provisions in order, there's sort of a logical progression of how one brings an action, the form of action you can bring, the venue of the proceeding, that's 702, 703; which actions are reviewable, 704; and then, when we finally get to 706, it's what the court is looking for and the relief that can be provided.

MR. STONE:  I agree with you.  I would only point out 705, which you skipped over --

JUSTICE JACKSON:  Yes.

Official - Subject to Final Review

117

MR. STONE:  -- which provides the ability for a court in interim relief to delay the effective date of agency action.

CHIEF JUSTICE ROBERTS:  Counsel, what --

MR. STONE:  Delaying the --

CHIEF JUSTICE ROBERTS:  I'm sorry, go ahead.

MR. STONE:  I was just going to say that delaying the effective date unquestionably acts on the action itself and is against all the world, and I think that's a strong textual clue Congress intended that sort of remedy.

CHIEF JUSTICE ROBERTS:  Why don't we move to individual questions.

Justice Alito?

JUSTICE ALITO:  Well, I was quite surprised by the argument based on Aleman Gonzalez.  I don't have a proprietary interest in the opinion.  However, I understood the issue there to be the meaning of the operation of a statute, not the meaning of an injunction.

Have I misread that?

MR. STONE:  No, Your Honor, and part of the thrust of our argument is what is meant

Heritage Reporting Corporation

Official - Subject to Final Review

118

by an order that enjoins or restrains.

JUSTICE ALITO:  And I also see --
admittedly, this is not the slip opinion or the
United States report, but it's the Supreme Court
Reporter, so probably this is accurate.

There's a Footnote 2 which says that
at oral government, the government suggested
that 1252(f)(1) not only bars class-wide
injunctive relief but also prohibits any other
form of relief that is "practically similar to
an injunction, including class-wide declaratory
relief."  And we, according to this footnote,
specifically reserved decision on that, on that
question.

Is your -- is your -- is it your
understanding that that's actually an accurate
footnote and that we took pains in this decision
to reserve decision on -- on whether injunction
means something that's not formally an
injunction but might have the effect of -- an
effect that is analogous to an injunction?

MR. STONE:  I agree entirely, Justice
Alito, and would only add that the line between
vacatur and declaratory relief that my friend on
the other side suggests here and that that note

119

I think suggests that the United States' position might be something else in a subsequent case is another reason why their interpretation should be rejected.

JUSTICE ALITO:  Now, like Justice Gorsuch, I did not have the -- the benefit of serving many years on the D.C. Circuit and vacating regulations three times before breakfast or however many -- five times -- five times before breakfast, but this does seem to me like a pretty big issue.

And, as Justice Kavanaugh mentioned, we have three pages -- we have three pages from the government on this in its opening brief. The argument is based primarily on a law review article, a innovative law review article that appeared in 2020, and then you came back with three pages on this, and then the government expanded their argument to four pages in -- in the reply brief.

Now what do we do with this?  We -- are we supposed -- are we left to do all of the scholarship that would be required to figure out whether this new interpretation is the correct interpretation?

Official - Subject to Final Review

120

But you do say -- and -- and you're right -- that this is not a clear case of stare decisis, so how would you approach -- how would you suggest we approach that?

MR. STONE:  I don't think it's clearly presented, fairly eclipsed within the questions presented, Your Honor.  It's just that the United States made such a colossal argument or an argument with such far-flung consequences that we would have been remiss not to address it.  I think this Court can essentially choose to charitably ignore it on that ground.  Of course, we believe that the 80 years of practice and for the reasons we outline in our brief, that they're also wrong on the merits.

CHIEF JUSTICE ROBERTS:  Justice Sotomayor?

JUSTICE SOTOMAYOR:  Yes.  We could also assume that it's not encompassed by the question presented and deal just with the 1252 issue, correct?

MR. STONE:  Yes, Justice Sotomayor.

JUSTICE SOTOMAYOR:  All right.  Now, secondly, you said the Guidelines were binding on immigration officers, that that's what the

district court held.  I'm not sure I understand its holding.

Do you understand the district court to have said that the Guidelines are wrong because they impose on immigration officers a bunch of factors to look at before they decide whether to remove someone?

MR. STONE:  I think my answer is in two parts.

JUSTICE SOTOMAYOR:  Okay.

MR. STONE:  The first is that the district court found as a matter of fact that -- that -- that as a matter of fact, that individuals applying these items would treat them as mandatory.  And then there's a problem with all --

JUSTICE SOTOMAYOR:  Mandatory to consider, correct?

MR. STONE:  No, Your Honor.  The finding was that they would think that the -- the framework provided by the Guidelines was, in fact, mandatory, period.

JUSTICE SOTOMAYOR:  The framework. The framework says you look at the totality of circumstances, you look at all of these things.

Official - Subject to Final Review

122

If that's all the Guidelines say, would you have a day in court today?

MR. STONE:  Certainly, Your Honor, in part because the essence of 1226(c), of Congress's considered judgment behind that provision --

JUSTICE SOTOMAYOR:  So you are going back on what you said to me earlier.  You're saying that you believe that this statute, 1226 and 1231, take away all discretion to decide whether to remove somebody or not?

MR. STONE:  No, Your Honor, only discretion whether to detain them pending the decision for removal.

JUSTICE SOTOMAYOR:  Well, I know you keep going back to that.  But the Guidelines are talking about a decision to remove someone, to arrest, detain, or remove.  And if a DHS officer looks at the totality of circumstances and says this is a person we're not going to remove, can you argue about that?

MR. STONE:  At that point, I think the 1226(c)(1) -- assuming that was the final decision, the 1226(c)(1) obligation is resolved by 1226(a).  The problem --

JUSTICE SOTOMAYOR:  Which says pending removal, okay.

MR. STONE:  Pending a decision.

JUSTICE SOTOMAYOR:  All right.  So, if -- did the district court anywhere say that the Guidelines categorically prevent DH officers from ever going outside of the priorities?

MR. STONE:  He -- he made a finding that those three categories were looked at as exclusive.  And that's in part backed up by, for example, an internal tool, the ART tool that was promulgated by DHS to its line-level officials, which specifically --

JUSTICE SOTOMAYOR:  But that has to go to the issue of removal.  Everybody has to use Guidelines in determining whether to remove someone.

If there are Guidelines to look over where are we spending our money to remove, what are we doing to remove, I don't know why, if that power is within my discretion, I can't set binding, mandatory, whatever you want to call it, Guidelines on my officers to say these are the people that I want to remove and these are the people I don't want to remove.

Official - Subject to Final Review

124

MR. STONE:  As I -- as I understood your previous question, Justice Sotomayor, I thought you were asking me whether or not there was something showing that officers did not have the discretion to go outside of the Guidelines.

JUSTICE SOTOMAYOR:  Right.

MR. STONE:  There is, in fact, and I believe it's record 11610, it states in bold other priority, as in not one of the three Guidelines components, is no longer permitted. It says that in bold text in internal training.

JUSTICE SOTOMAYOR:  All right.  Then we're back to my point.  You are basically trying to sneak into -- you want to cabin removal and say you must remove these people, whether or not you want to or not.

MR. STONE:  No, Your Honor, we have repeatedly --

JUSTICE SOTOMAYOR:  So, once you say that, then how can the Guidelines be wrong? Because it's simply a statement that says these aliens we're not going to remove.

MR. STONE:  Because the Guidelines also say we have the absolute discretion to decide whether to arrest or detain anyone.

Heritage Reporting Corporation

125

Congress has -- and, again, I want to make clear we're disclaiming that any of our arguments require the Petitioners to remove any individual in particular.

JUSTICE SOTOMAYOR:  So, once they decide they're not, and that's what a decision not to arrest or detain means, we're not going to remove you.

MR. STONE:  I don't think that's accurate, Your Honor.  I think -- I think, conceivably, Petitioners could make all three decisions at once.  The problem is they have said that every --

JUSTICE SOTOMAYOR:  Well, at the moment that they make the decision, if they know the person is in jail, they don't put a detainer on them, they don't file a notice to appear, all of those acts says, at this moment today, I'm not removing you.

MR. STONE:  They have to actually make that decision before their 1226(c) obligation is absolved.  In the circumstance where they simply haven't --

JUSTICE SOTOMAYOR:  Well, but they have by saying we're not going to put a detainer

126

on you.

MR. STONE: I think some of the slippage here is the situation where the United States simply hasn't made a decision at all relative to some given alien covered by 1226(c). 1226 --

JUSTICE SOTOMAYOR: Well, that might be, but I don't know how you would ever know that, because I know the things I see. I know he's here. I know I could put a detainer on him. I choose not to because I'm not going to choose to remove him.

MR. STONE: Well, the United States postulated there would be individuals in this category that were part of 1226(c)(1) --

JUSTICE SOTOMAYOR: That -- by mistake. That --

MR. STONE: -- that they were unaware of.

JUSTICE SOTOMAYOR: Exactly, but you're not saying to me, and I think you disavowed earlier, that they have to spend the resources to find everybody who falls into these categories and to affirmatively then say I'm not going to remove you.

Heritage Reporting Corporation

Official - Subject to Final Review

127

MR. STONE: They certainly have to make that affirmative statement because of the inter- -- the way that 1226(c) --

JUSTICE SOTOMAYOR: Well, they have to -- they have to not remove. Okay. Thank you.

MR. STONE: 12 --

CHIEF JUSTICE ROBERTS: Justice Kagan?

JUSTICE KAGAN: You might get a chance to clarify that because I completely lost the thread, and I apologize, General Stone, but are you saying that 1226(c) applies only once removal proceedings are pending?

MR. STONE: We are not. We are saying it applies until a decision regarding removal has been made. So, with the --

JUSTICE KAGAN: I don't understand how you can possibly read 1226(a) and (c) to be about anything other than what happens pending removal -- pending the removal decision, in other words, when removal proceedings are ongoing.

MR. STONE: In our view, 1226(a)'s "pending a removal decision" does not just begin with a notice to appear. Of course, the removal decision begins when the executive decides

Heritage Reporting Corporation

Official - Subject to Final Review

128

whether or not to bring a notice to appear. Until that decision has been made and anywhere along the lines of that initial prosecutorial judgment, all the way through the end of enforcing a -- enforcing an order, at any time, Petitioners can say we made the decision not to -- we made the decision not to remove, and the obligation under 1226(c) comes to an end instantly.

JUSTICE KAGAN:  I guess the question is, where does the -- the -- it start in your view?  In other words, prior to the government initiating removal proceedings, do you think 1226 applies?

MR. STONE:  Yes.  That's in 12 --

JUSTICE KAGAN:  Okay.  Because 12 -- -- that seems to me a pretty hard argument to make and not consistent with our precedent.  I mean, Demore v. Kim addresses this issue pretty precisely, and it just says that this is -- what this is about is it's about while removal proceedings are pending, while they're taking place.

MR. STONE:  At a minimum, Your Honor, first of all, Demore doesn't speak to the

Official - Subject to Final Review

129

situation where there's an individual required to be detained about which the United States hasn't yet made a decision.  1226(c) says -- or (c)(1) says when it applies in some terms, when an alien is released.  1226(d) directs the Attorney General, or now the federal executive, to create a system in order to know when these individuals -- individuals are going to be released.  And then that obligation ends in 1226(a) when they've made a decision pending removal.  That could be --

JUSTICE KAGAN:  Okay.  I mean, I guess what -- what -- what -- what I'm drawing from this is that even putting aside the does "shall" really mean "shall" argument, that -- that -- that you're reading the "shall" to kick in at a place where we've never understood it to kick in before.

MR. STONE:  I don't believe that this Court's passed one way or another on that question.  But even if not, that would be a small subset -- subset of individuals.  And these Guidelines claim the power to treat detention as discretionary for individuals in removal proceedings as well.

Official - Subject to Final Review

130

JUSTICE KAGAN:  And if I could ask about 1231 a similar question, which is, like, even putting aside all the Castle Rock issues, especially in a context in which we know that DHS can't really do what -- what -- whatever the "shall" means, but, even putting that aside, if you look at the language of 1231, it's the Attorney General "shall detain" the alien.  It doesn't say anything about shall remove.  It doesn't say anything about shall apprehend, shall arrest.  It just says "shall detain."  And -- and, again, these Guidelines don't say anything about detention.

MR. STONE:  First, I believe that on -- by speaking as to arrest and detainer, they do, but that's a small point compared to the rest of your question, Justice Kagan.  1231(a) -- or 1231(a)(1) specifies the circumstances under which the detention obligation exists, which is only where the United States has used its prosecutorial discretion to bring a notice to appear, to prosecute that all the way to a final removal -- an order of removal, and then they have a final order of removal.

Only then do Petitioners have an

Official - Subject to Final Review

131

obligation to detain, and under no circumstances release for a subset of individuals, that alien. If at any point they choose to discontinue proceedings, they're not bringing them in the first place, 1231 at no point attaches.

JUSTICE KAGAN:  But -- but -- but it seems to me that you're reading 1231 to impose an obligation on DHS to go apprehend people, and 1231 specifically does not use that language. It's used in lots of other places in this statute.  But 1231 only imposes an obligation to detain certain people who have orders of removal already made.  It doesn't obligate anybody to do anything with respect to finding them.

MR. STONE:  At a minimum, Your Honor, 1226(c)'s "take into custody" certainly means to arrest, but as far as -- I think, in context, 1231(a)(2)'s "shall detain" and then the "under no circumstances" language should be best read as a mandatory requirement of both acquiring an individual, of arresting them, as well as detaining, in part because, for example, in the Fourth Amendment context, this Court understands detention or if someone's been asking if they're detained as significant for purposes of an

Official - Subject to Final Review

132

arrest --

JUSTICE KAGAN:  And reading in context to insert a different word, which actually is an extraordinarily onerous obligation on DHS, to go around finding people, everybody that -- who has had orders of removal put in that -- where they don't have the faintest idea where they are, I mean, talking about distorting the agency's priority.  And you're basically saying it doesn't really say that.  It's just we're reading this in context to imply it.

MR. STONE:  Your Honor, I think "detained" can be fairly meant -- and for some of the resources that we cite in our brief, can be fairly understood to also mean arrest.  If someone has to be detained, it can --

JUSTICE KAGAN:  Well, then we would have a question about why be -- why this statute uses "arrest" and "apprehend" all over the place and not in that section.

MR. STONE:  Certainly.  Certainly, Your Honor.  I might also point out that there's the -- the second sentence, the individuals -- under no circumstances.  Petitioners agree that that is mandatory.  There is a complete overlap

Official - Subject to Final Review

133

between those --

JUSTICE KAGAN:  They do agree that that's mandatory because that's a person that they know where the person is, and -- and so they don't have to do anything to apprehend that person.  We already have them.  We're not releasing them.  And -- and that -- the language in the statute is very different and makes that completely clear, and they're complying with that language.

MR. STONE:  Respectfully, Your Honor, I don't think that's accurate.  I think before my friends on the other side noted they don't always know where a 1226(c)(1) individual is. Every single individual --

JUSTICE KAGAN:  I was talking about 1231.

MR. STONE:  Yeah -- I understand, Justice Kagan.  Every individual covered by 1226(c)(1) who has a final order of removal falls into that second sentence.

JUSTICE KAGAN:  Thank you.

MR. STONE:  So, if they're --

JUSTICE KAGAN:  Thank you, General.

CHIEF JUSTICE ROBERTS:  Justice

Official - Subject to Final Review

134

Gorsuch?

Justice Kavanaugh?

JUSTICE KAVANAUGH:  I have a few questions.  So, first, on the resource constraints issue that's been raised, I'm just trying to figure out how this will play out if you were to prevail.  So the government says we don't have the money to comply.  Then -- then what do you do?

MR. STONE:  I don't think we even have final agency action at that point to sue over, let alone that we could point at 1226(c) or 1231.

JUSTICE KAVANAUGH:  So nothing changes?

MR. STONE:  If the government said that they didn't have -- they didn't have money to comply and then continued ignoring this Court's order, we might be able to put together some sort of de facto rule --

JUSTICE KAVANAUGH:  Well, it's not ignoring it; it's just we don't have -- if -- if they say we don't have the money to comply with the -- with the court's order or the statute as written, as construed by you, the "shall" --

Heritage Reporting Corporation

Official - Subject to Final Review

135

MR. STONE:  I agree that presents a difficult hypothetical, Justice Kavanaugh.  But, in this case, where there are findings of fact regarding persistently underused detention ability, it's a much harder case where there's a world where, as a matter of fact, Petitioners are using in their own best judgment all of the resources they have.  I think that's a much harder case.  It would be a harder case at least on redressability grounds.  That's not this case, and there are findings of fact in this -- on this record supported by ample evidence that --

JUSTICE KAVANAUGH:  If you play it out and you go into district court, the district court would have to issue an order then essentially mandating arrests.

MR. STONE:  Certainly not, Your Honor. We're only seeking vacatur of the Guidelines. Now --

JUSTICE KAVANAUGH:  No, here.  I'm talking about, if you win here, then the government doesn't do anything because it says we don't have the money to do anything, then you try some action.  I guess you already said there

Official - Subject to Final Review

136

wouldn't be final agency action then.

MR. STONE:  I don't believe there would be --

JUSTICE KAVANAUGH:  Okay.  So that's --

MR. STONE:  -- final agency action after that.

JUSTICE KAVANAUGH:  Okay.  Second, the hypothetical raised by the government which I don't think has been raised -- would -- could a state challenge the President's exercise of war powers, for example, being a violation of -- of the Constitution or the war powers resolution? They raise that as a -- an issue that your theory would lead to.

MR. STONE:  I don't believe so, Your Honor, in part because, for example --

JUSTICE KAVANAUGH:  Why not?

MR. STONE:  Well --

JUSTICE KAVANAUGH:  There would definitely be cost to the state from its people going into a foreign war, so why couldn't the state then challenge under your theory here?

MR. STONE:  At a minimum, the President -- the President isn't an agency, so

Official - Subject to Final Review

137

the President typically -- neither is Congress --

JUSTICE KAVANAUGH:  So that you'd bring -- you'd bring something against the Secretary of Defense, as was -- has been done before?

MR. STONE:  I -- I think almost certainly political question doctrine then also to some extent ends up coming --

JUSTICE KAVANAUGH:  I don't know about that after Zivotofsky, but that's a different argument.

Okay.  So I'll go on to my next question.  Justice Kagan raises a good point about the problem of government programs getting shut down quickly.  Now, first, that -- that can only happen -- this is a helpful question to you, but that can only happen if you not only have standing, but you have a successful claim on the merits, likelihood of success on the merits, correct?

MR. STONE:  That's correct.

JUSTICE KAVANAUGH:  Okay.  And if you -- you know, I think the follow-up question was you might get a judge with an idiosyncratic view

Heritage Reporting Corporation

Official - Subject to Final Review

138

of a particular issue and that -- that can shut down a government program, but you can seek an immediate -- the government can seek an immediate appeal in that circumstance or an emergency motion, correct?

MR. STONE:  Not only can but frequently does and sought it in this Court.

JUSTICE KAVANAUGH:  We are aware. Yeah.  Okay.  And -- okay.  The last question is on the set aside, I just want you to say more. I -- I have obviously shown what I think about that, but the set-aside argument is not just new as I understand it, but it was wrong from the beginning is your point and that 706 deals with remedies not just in 706(2) but 706(1) as a remedy.  Just say a couple sentences about why you think it's wrong from the beginning, not just wrong because a few judges like me did it for years on the D.C. Circuit.

MR. STONE:  Certainly, Justice Kavanaugh.  So contemporary legal dictionaries, indeed, even the dictionary, Merriam-Webster's, on which Petitioners cite in its E definition, define -- defined "set aside" to mean annul or to overrule, that's in (1)(b) of their

Official - Subject to Final Review

139

definition. That -- that fits comfortably with the history recognized in this Court prior to and leading up to the Administrative Procedure Act. That definition pairs 706(2)'s whole unlawful and set aside, which has the vacatur remedy we've been discussing, along with 706(1), which is a -- which unquestionably provides a remedy to order agency action unreasonably withheld.

So the textual clues, the intertextual clues and history from this Court and administrative practice prior to and leading up to the APA all point in the same direction that courts have properly been issuing vacatur under 706(2) since the beginning.

JUSTICE KAVANAUGH: Thank you.

CHIEF JUSTICE ROBERTS: Justice Barrett?

JUSTICE BARRETT: Just a quick one on vacatur. I mean, I -- I agree with Justice Alito this is a huge issue, and -- and, frankly, I wasn't expecting the 706 briefing. I thought we were just going to get briefing about the 1252(f)(1) issue. But, you know, this Court, when it comes to jurisdiction, gives little

Official – Subject to Final Review

140

weight to drive-by jurisdictional rulings, you know, and the Solicitor General pointed out that this is not an issue -- we might think of these as drive-by remedial rulings because it's not an issue that this Court or -- or maybe even the lower courts have analyzed in depth.

If I think you're wrong about the original meaning of the APA or what people expected "set aside" meant at that time and these are all drive-by remedial rulings, do you lose?

MR. STONE:  If you think I'm wrong, then I think you'd have to ask whether or not you thought it was fairly within the question presented.  I agree that the lower courts' rulings don't bind this Court and this Court's previous rulings.  I think the fact this Court has -- has affirmed vacatur many, many times should give you pause before thinking that we're wrong.  But, yes, I'd agree with that point. You could rule against us on the merits.

JUSTICE BARRETT:  Thanks.

CHIEF JUSTICE ROBERTS:  Justice Jackson?

JUSTICE JACKSON:  Yes.  So, on the

141

merits, it was very clarifying to me in your exchanges with Justice Sotomayor and Justice Kagan that you said you're not challenging the removal determination, that you're saying this is really about detention, as the statute says, and that you're interpreting Section 1226(c) to require the detention of certain criminal non-citizens before DHS decides to initiate removal proceedings.  Am I right about that?

MR. STONE:  And arrest, which we think both of those come from take into custody.  But, yes.

JUSTICE JACKSON:  But it's before -- before.

MR. STONE:  Yes.

JUSTICE JACKSON:  You said, when they make the decision not to remove someone, then that -- then their duty dissipates and they can let them go.

MR. STONE:  It attaches once the -- the individual is released and it dissipates as soon as they make a decision.

JUSTICE JACKSON:  The reason why that's troubling me so, and you mentioned the Fourth Amendment at one point, the reason why

Official - Subject to Final Review

142

that's troubling me so is that isn't the executive branch's authority to take people into custody because they're going to effectuate their removal, that you get to arrest and detain this person based on your decision?

And -- and -- and I'm sort of thinking about a hypothetical situation in which it might take the government nine months, a year, or whatnot, to make a decision as to whether or not to remove such a person.  Is it your view that once this person has served their criminal sentence in state court and they're about to be released, the government -- federal government has to, per the statute, come in and detain that person even if they haven't decided to remove them and they could hold them, I suppose, indefinitely until they make that determination?

MR. STONE:  Two parts.  The first part is a very direct yes.  But the second part is perhaps in certain extreme circumstances there might be an as-applied constitutional challenge.

That having been said, to me, the idea that the federal government hasn't decided whether to prosecute but will detain someone sounds analogous to that the federal government

143

believes someone has committed a crime and has probable cause and arrests them and then may perhaps choose later to let them go if they decide to null prosse.

JUSTICE JACKSON: Yeah, but we don't -- but, under our criminal system, don't you have a limited amount of time as the government to decide whether or not to prosecute someone, that you might arrest them based on probable cause, but then the government's got to pretty promptly arraign them, meaning charge them and, you know, start the prosecution. You can't just indefinitely hold people.

And so what -- what I'm worried about is that your conception of this is that the government has to come in even before they've decided whether or not they're going to remove this person and -- and detain them and, apparently, according to this very detailed statute, there's no limit from Congress as to how long this person can be detained prior to the determination of bringing charges? That just seems totally anathema to what we've thought of in terms of valid exercises of government detention power.

144

MR. STONE: Three points, Your Honor, the first being that this Court has held previously that exercises of detention over non-citizens can be constitutionally tolerable even when they're constitutionally intolerable against citizens.

The second being it may very well be the case there could be an as-applied constitutional challenge in an extreme case here for some --

JUSTICE JACKSON: Well, wouldn't -- wouldn't Congress have to be clear that that's what that was actually trying to do? I mean, I would think constitutional avoidance would counsel us to read their statute not to -- to even, you know, create the kind of constitutional problem you're talking about.

And there is a very legitimate way to read it, which is the way that many of the Justices have been pointing out and that the Solicitor General points out, which is this applies to detention once the determination has been made. That makes it similar to criminal, that makes it consistent with the Constitution, everything that we've -- we've said.

Official - Subject to Final Review

145

MR. STONE:  I think it applies to both arrest and detention from take into custody. But not to lose the forest for the trees, Justice Jackson, even if, in fact, this Court held that that's the duration permissible begins only with a notice to appear, the final memorandum would still be unlawful because it says essentially that Petitioners have the unbridled, absolute discretion to arrest or detain or not arrest or not detain anyone under any circumstances, including individuals who have, in fact, committed actions that subject them to mandatory detention under 1226(c).

So, even if -- even if we stipulated that that was how the Court were to interpret 1226(a), that the detention period ends upon the -- doesn't attach until the beginning of a notice to removal proceeding, which I think doesn't follow from the statute's text, even stipulating that --

JUSTICE JACKSON:  But -- I'm sorry -- can I just say one more thing?  And I know we're running low on time.

The statute's text in (a) says, "... pending a decision on whether the alien is to be

Official - Subject to Final Review

146

removed from the United States."  And, as Justice Kagan pointed out in -- in Demore, we made very clear that there -- that that's a process, that it starts with the -- the -- the DHS's determination that they're going to seek removal and it ends ultimately with an order of removal.  So it seems to me that (a) is talking about detention during the duration of that period.

What you're saying is they can detain them prior to the United States' determination that they're even going to seek the person's removal and -- and I guess indefinitely until they make that decision?

MR. STONE:  The problem, Your Honor, is that pending a determination about whether someone is to be removed itself in that passive voice contemplates the possibility that will be a negative determination.  Otherwise, Congress would have said something like you must detain these individuals for the duration of their removal proceedings or something to indicate removal proceedings had already begun.  That's just not the text.

CHIEF JUSTICE ROBERTS:  Thank you,

counsel.

Rebuttal, General Prelogar.

REBUTTAL ARGUMENT OF GENERAL ELIZABETH B. PRELOGAR ON BEHALF OF THE PETITIONERS

GENERAL PRELOGAR:  Thank you, Mr. Chief Justice.

On 1252(f)(1), my friend fundamentally misunderstands the difference between a declaratory judgment and vacatur.  If the district court here had entered a declaratory judgment, we would have still had the enforcement priorities and DHS would have been entitled to rely on those while it continued to pursue its appeal rights.  It's not a course of remedy.

Vacatur stands in an entirely different posture because the district court voided the Guidelines, and that prevented DHS officials from being able to continue to rely on those while the case was litigated, and that is precisely contrary to the judgment that Congress made in 1252(f)(1).

On the merits, make no mistake it is impossible for DHS to comply with each and every "shall" in the INA if that is truly a judicially

enforceable duty.  I don't think that my friend can reasonably contest that point.

Justice Kavanaugh, you asked what the consequences of that would be on the ground. Here's what I think it would mean.  If this Court actually said that "shall" displaces all enforcement discretion, then DHS would be under a judicially enforceable obligation to take enforcement action against whomever it first encounters on the ground who might be subject to one of these provisions.

But there are non-citizens out there who have criminal convictions for serious offenses like murder and sex offenses that -- that wouldn't qualify under a "shall" because of the court's categorical approach, and that means we wouldn't have the resources or ability to go after those individuals who are threats to public safety, national security, and border security.  That is a senseless way to run an immigration enforcement system, and it is not the statute that Congress enacted.

On standing, my friend has articulated no limits on the -- the circumstances that would permit a state to sue.  He gestured at the idea

Official - Subject to Final Review

149

that maybe it's when states have relinquished their sovereignty to the federal government. But that explains every exercise of the federal government's powers.  It's always pursuant to the enumerated powers -- powers where there has been that relinquishment of sovereignty.

He agrees that even one more non-citizen or one fewer, one dollar of indirect costs on taxing and spending would get states into court, and that would be an indirect effect of every single federal government policy because the national government and the states share sovereignty over the same people.

And what means is that anytime we regulate with respect to the people of the states, the states will be able to point at those kinds of indirect, incidental downstream effects on their own taxing and spending.  That has not provided a basis for standing if you look at our history and tradition, and the Court should make that limit clear.

Finally, I think it's worth taking a step back here.  We think the district court committed a lot of different independent errors, any one of which would entitle us to relief,

Official - Subject to Final Review

150

and it gives the Court options about how to resolve this case.

But I think it's worth pausing on the consequences of the district court's very broad conception of standing here and its claim of remedial authority. Under the versions of state standing that the lower courts have been accepting, it means that states can challenge the federal government with any policy with which they disagree. All 50 state Attorneys General can come to court. They can file multiple suits, as they frequently do, in multiple jurisdictions. And, at that point, the federal government has to run the table. We have to win each and every one of those cases, as we did here with these enforcement guidelines in the Sixth Circuit.

But, if the states can persuade even one single district judge in a forum of their choosing to be skeptical of the federal government's position, then that judge can claim authority to issue a universal remedy that is going to immediately put the federal government's policies on hold. And that puts -- that resolves the issue for everyone everywhere

Official - Subject to Final Review

151

and puts the government in the position where it frequently has to seek emergency relief from this Court, as the Court well knows.  As members of the Court have recognized, that requires high-stakes decision-making with very little time and in a situation where it has stymied the ability of the Court to rely on lower courts to vet the issues and give them consideration because one district judge has claimed authority to resolve the issue for the nation.

And I think that that is bad for the executive branch.  I think it's bad for the American public.  And I think it's bad for Article III courts.  So we would encourage this Court to say that and to reverse.

CHIEF JUSTICE ROBERTS:  Thank you, counsel.  The case is submitted.

(Whereupon, at 12:20 p.m., the case was submitted.)

Official - Subject to Final Review

**$**

**$8** [1] **16**:19

**0**

**06** [1] **116**:2

**1**

**1)(b** [1] **138**:25
**10** [1] **114**:25
**10:04** [2] **1**:15 **3**:2
**11** [1] **3**:11
**114** [1] **39**:4
**115** [2] **39**:5,12
**11610** [1] **124**:8
**12** [5] **54**:23 **100**:17 **127**:6 **128**:15,16
**12:20** [1] **151**:18
**1221(c)(2** [1] **96**:24
**1225** [1] **43**:15
**1226** [15] **30**:21 **32**:25 **42**:7 **43**:5,14 **52**:25 **72**:14 **81**:18 **82**:1 **96**:19 **97**:4 **102**:9 **122**:9 **126**:6 **128**:14
**1226(a** [8] **26**:1 **31**:8 **96**:22 **100**:16 **122**:25 **127**:17 **129**:10 **145**:16
**1226(a)'s** [1] **127**:22
**1226(c** [29] **30**:22 **31**:9 **33**:14,22 **34**:24 **35**:9 **39**:2 **40**:11,15 **43**:20 **74**:20 **79**:6 **85**:16 **94**:18 **96**:2,8 **97**:12 **102**:24 **103**:16 **122**:4 **125**:21 **126**:5 **127**:3,11 **128**:8 **129**:3 **134**:12 **141**:6 **145**:13
**1226(c)'s** [2] **25**:23 **131**:16
**1226(c)(1** [7] **100**:16,19 **122**:23,24 **126**:15 **133**:14,20
**1226(c)(2** [3] **30**:2 **31**:14 **65**:17
**1226(d** [2] **105**:3 **129**:5
**1226(e** [1] **52**:14
**1230** [2] **79**:11 **100**:17
**1231** [23] **42**:8 **43**:4,14 **79**:6 **81**:18 **102**:10,24 **105**:20 **106**:4,5,15 **107**:5,17,20 **122**:10 **130**:2,7 **131**:5,7,9,11 **133**:17 **134**:13
**1231(a** [1] **130**:17
**1231(a)(1** [2] **100**:17 **130**:18
**1231(a)(2)'s** [1] **131**:18
**1231(h** [3] **52**:15 **105**:19 **106**:1
**1232(a** [1] **82**:1
**1252** [7] **44**:14 **45**:18 **62**:14 **63**:8,23 **72**:20 **120**:20
**1252(f** [6] **5**:8,18 **70**:2,5 **75**:19,23
**1252(f)(1** [17] **5**:2 **6**:2 **44**:20 **45**:11 **63**:2 **73**:9,11 **76**:1,3 **77**:13,18 **78**:2 **79**:12 **118**:8 **139**:24 **147**:7,22
**1252(f)(2** [1] **46**:8

**147** [1] **2**:10
**1920** [1] **108**:11
**1990** [1] **113**:14
**1996** [5] **43**:11 **51**:3,3,7 **52**:6

**2**

**2** [2] **112**:8 **118**:6
**2)(b** [1] **49**:16
**20** [1] **25**:25
**200** [1] **4**:1
**2008** [1] **57**:5
**2019** [1] **20**:5
**2020** [1] **119**:17
**2021** [2] **19**:13 **20**:6
**2022** [1] **1**:11
**22** [1] **83**:9
**22-58** [1] **3**:4
**2241** [3] **106**:18 **107**:16,19
**2342** [1] **110**:11
**24-hour** [2] **64**:19 **105**:4
**25** [1] **4**:13
**250,000** [1] **20**:6
**28** [1] **110**:11
**29** [1] **1**:11

**3**

**3** [1] **2**:4
**314** [1] **19**:23
**37** [1] **90**:3

**4**

**42** [2] **20**:10,11

**5**

**50** [1] **150**:10
**55,000** [1] **20**:7

**6**

**6,000** [1] **3**:13
**60** [3] **95**:15,18,21

**7**

**702** [2] **113**:3 **116**:19
**703** [12] **37**:10 **49**:4,14 **50**:4 **60**:6 **111**:6,18,19 **112**:24 **113**:1 **116**:14,19
**704** [1] **116**:20
**705** [1] **116**:24
**706** [17] **36**:6 **37**:4 **47**:25 **48**:19,20 **49**:5,16 **57**:19 **59**:23 **75**:11 **110**:18 **111**:18 **113**:1,11 **116**:21 **138**:14 **139**:22
**706(1** [3] **116**:8 **138**:15 **139**:6
**706(2** [4] **108**:9 **116**:8 **138**:15 **139**:15
**706(2)'s** [1] **139**:4
**73** [1] **2**:7

**8**

**80** [1] **120**:13
**80,000** [3] **95**:16,18,22
**80-year** [1] **110**:7

**A**

**a.m** [2] **1**:15 **3**:2
**AADC** [1] **42**:12
**abdication** [1] **53**:16
**abide** [2] **47**:2 **58**:8
**ability** [9] **24**:12 **32**:5 **81**:5 **97**:5 **100**:10 **117**:2 **135**:5 **148**:17 **151**:7
**able** [6] **5**:25 **6**:22 **51**:11 **134**:19 **147**:19 **149**:16
**Abonza** [1] **94**:15
**above-entitled** [1] **1**:13
**absolute** [3] **102**:15 **124**:24 **145**:9
**absolutely** [1] **22**:11
**absolved** [1] **125**:22
**abstract** [1] **89**:4
**abuts** [1] **91**:4
**accept** [3] **15**:10 **25**:17 **92**:2
**acceptable** [1] **61**:17
**accepted** [1] **57**:13
**accepting** [3] **8**:14 **9**:12 **150**:8
**accessible** [1] **105**:5
**according** [2] **118**:12 **143**:19
**account** [3] **39**:24 **50**:22 **96**:13
**accounting** [1] **88**:11
**accurate** [5] **57**:12 **118**:5,16 **125**:10 **133**:12
**acknowledge** [5] **17**:9 **36**:1 **37**:25 **65**:3 **69**:14
**acknowledged** [2] **74**:22 **97**:11
**acknowledges** [3] **13**:23 **55**:5 **77**:14
**acquiring** [1] **131**:20
**Across** [3] **4**:13 **28**:19 **48**:22
**act** [5] **52**:3 **100**:8 **107**:16 **115**:15 **139**:4
**acting** [1] **64**:1
**action** [37] **6**:13 **20**:4 **37**:10 **49**:23 **61**:3 **63**:4,17 **72**:16 **75**:12 **76**:23 **78**:19,21 **92**:5,6 **98**:19 **106**:6,10 **107**:3 **110**:23 **111**:7 **112**:8,13,18 **113**:22 **115**:21 **116**:6,10,17,18 **117**:3,11 **134**:11 **135**:25 **136**:1,6 **139**:8 **148**:9
**actions** [13] **13**:24 **24**:25 **28**:20 **48**:23,25 **53**:21 **60**:6 **78**:3,5,9 **83**:8 **116**:19 **145**:12
**acts** [5] **77**:9 **78**:16,16 **117**:11 **125**:18
**actual** [4] **18**:10 **83**:7 **86**:13 **115**:24
**actually** [24] **15**:25 **16**:13 **21**:23 **34**:24 **37**:4 **38**:9 **52**:10 **56**:19 **57**:10 **60**:1 **62**:15 **64**:5 **66**:23 **71**:17 **75**:23 **97**:1 **105**:3 **108**:17 **113**:6 **118**:

**16** **125**:20 **132**:3 **144**:13 **148**:6
**add** [2] **94**:2 **118**:23
**added** [1] **43**:10
**additional** [5] **9**:22 **10**:10 **16**:6 **17**:16 **60**:16
**address** [8] **15**:18 **21**:5 **43**:6 **44**:16 **45**:19 **64**:15 **109**:8 **120**:10
**addressed** [2] **35**:16 **50**:4
**addresses** [1] **128**:19
**adjacent** [1] **46**:12
**administration** [9] **50**:9,19 **53**:7 **57**:8 **74**:22 **89**:22 **90**:12,13 **97**:11
**administrations** [2] **4**:14 **43**:7
**administrations'** [1] **42**:22
**administrative** [10] **55**:1 **56**:1 **75**:10 **108**:3,6 **110**:12,14 **115**:15 **139**:3,12
**admittedly** [1] **118**:3
**adopt** [1] **21**:23
**adopted** [2] **3**:16 **90**:5
**Adopting** [1] **4**:19
**advance** [1] **35**:8
**advanced** [1] **39**:10
**adverse** [1] **79**:4
**adversely** [1] **113**:20
**advisors** [1] **65**:20
**affect** [2] **5**:8 **104**:4
**affected** [2] **94**:11 **113**:21
**affects** [1] **75**:19
**affirmative** [1] **127**:2
**affirmatively** [1] **126**:24
**affirmed** [5] **38**:1 **78**:14 **108**:15,19 **140**:18
**afford** [1] **109**:22
**afterwards** [1] **87**:12
**age** [1] **39**:10
**agencies** [4] **15**:3 **23**:11 **67**:2,7
**agency** [35] **4**:14 **14**:23 **33**:13 **37**:18 **38**:2 **43**:9 **48**:25 **49**:2,25 **61**:3 **63**:4 **67**:1,18,21 **68**:3,9,18,20,22,25 **69**:16 **70**:22 **75**:12 **77**:11 **110**:23 **115**:21 **116**:5,6,10 **117**:3 **134**:11 **136**:1,6,25 **139**:8
**agency's** [9] **3**:14 **26**:7 **67**:10 **69**:15 **71**:4,18,19 **115**:9 **132**:8
**agents** [2] **82**:5,11
**aggravated** [5] **38**:25 **39**:18,23 **64**:21 **65**:5
**aggravating** [2] **39**:6,24
**aggrieved** [2] **113**:5,21
**ago** [3] **7**:15 **9**:22 **42**:22
**agree** [24] **18**:20 **21**:4 **44**:16 **57**:23 **59**:4,4 **60**:2 **85**:4 **100**:13 **104**:5 **107**:1 **112**:16,17 **115**:12,22 **116**:7,23 **118**:22 **132**:24 **133**:2 **135**:

**1** **139**:20 **140**:15,20
**agreed** [2] **44**:19 **59**:21
**agreeing** [1] **80**:23
**agrees** [1] **149**:7
**ahead** [3] **101**:1 **111**:2 **117**:8
**Akins** [1] **13**:23
**AL** [2] **1**:3,6
**Aleman** [9] **6**:10 **71**:8 **72**:8 **77**:23,24 **78**:24 **79**:3,3 **117**:18
**alien** [15] **26**:2 **29**:15 **30**:25 **38**:24 **39**:18 **94**:15,18 **106**:24 **107**:2,12 **126**:5 **129**:5 **130**:8 **131**:2 **145**:25
**aliens** [7] **7**:4 **29**:9 **64**:22 **75**:7 **87**:25 **95**:19 **124**:22
**ALITO** [30] **9**:18,24 **10**:2,22 **11**:17,25 **12**:3,11 **13**:9,14 **14**:7 **16**:15 **17**:6,8,19,23 **18**:5 **28**:21 **31**:19 **38**:16,17 **39**:3 **43**:22 **64**:9 **117**:16,17 **118**:2,23 **119**:5 **139**:21
**allow** [1] **68**:2
**allowed** [3] **14**:4 **73**:3 **78**:6
**allowing** [1] **97**:18
**almost** [2] **98**:4 **137**:7
**alone** [6] **31**:12 **39**:15 **44**:17,21 **93**:9 **134**:12
**alongside** [1] **100**:16
**already** [11] **27**:20 **33**:16 **35**:11 **40**:11 **42**:11 **43**:25 **88**:1 **131**:13 **133**:6 **135**:25 **146**:23
**alter** [1] **59**:25
**alternative** [1] **15**:19
**altogether** [1] **88**:16
**amend** [1] **38**:23
**Amendment** [2] **131**:23 **141**:25
**American** [1] **151**:13
**amicus** [1] **101**:8
**amount** [3] **13**:3 **79**:8 **143**:7
**ample** [1] **135**:12
**analogies** [1] **9**:1
**analogous** [3] **30**:5 **118**:21 **142**:25
**analysis** [8] **19**:20 **34**:25 **35**:8,9 **40**:17 **68**:7 **84**:3 **109**:3
**analyzed** [2] **5**:11 **140**:6
**anathema** [1] **143**:23
**announce** [1] **23**:3
**announces** [1] **72**:20
**annul** [3] **108**:16 **115**:2 **138**:24
**annulling** [1] **108**:19
**another** [6] **9**:19 **10**:5 **13**:5 **70**:3 **119**:3 **129**:20
**answer** [12] **24**:19 **33**:23 **34**:11 **38**:20 **80**:24 **86**:19 **95**:10 **104**:13,20,21 **111**:17 **121**:8

Heritage Reporting Corporation

**ante** [1] **33**:21
**antecedent** [1] **30**:15
**anticipated** [2] **65**:4,9
**anybody** [3] **29**:12 **102**:16 **131**:13
**anytime** [1] **149**:14
**anyway** [1] **21**:20
**APA** [41] **4**:24 **35**:21,25 **36**: 6 **37**:1,6,19 **47**:16 **48**:22 **49**:5 **54**:22 **57**:15 **58**:14,18 **59**:10,24 **61**:13 **62**:1,18,25 **63**:13,21 **66**:25 **67**:5,9,20 **69**:23 **74**:2,5 **106**:12,15 **107**:19 **108**:10 **110**:16 **111**: 7 **113**:5,15 **114**:12,16 **139**: 13 **140**:8
**APA's** [3] **59**:6 **75**:8 **108**:2
**apologize** [2] **104**:3 **127**: 10
**apparently** [1] **143**:19
**appeal** [3] **47**:11 **138**:4 **147**: 14
**appealing** [1] **74**:24
**appeals** [3] **36**:14 **58**:25 **59**: 14
**appear** [10] **30**:18 **33**:12 **98**: 21 **114**:12,15 **125**:17 **127**: 24 **128**:1 **130**:22 **145**:6
**appearance** [1] **103**:12
**APPEARANCES** [1] **1**:17
**appeared** [1] **119**:17
**Appendix** [1] **39**:5
**apples** [5] **16**:17,18,18,25 **17**:3
**applicable** [2] **26**:25 **112**: 12
**application** [4] **67**:16,17 **68**:9 **88**:23
**applications** [1] **69**:17
**applied** [6] **11**:9 **14**:13 **68**: 15,17 **69**:18 **95**:15
**applies** [11] **26**:1 **70**:19 **71**: 22 **72**:2 **100**:19 **127**:11,14 **128**:14 **129**:4 **144**:22 **145**: 1
**apply** [14] **12**:2 **14**:8 **42**:18 **45**:18 **47**:13 **61**:3 **68**:3 **69**: 1,7 **70**:23 **91**:9,13,14 **111**:4
**applying** [1] **121**:14
**apprehend** [10] **4**:8 **28**:4 **32**:16 **33**:3 **34**:8,17 **130**:10 **131**:8 **132**:19 **133**:5
**apprehended** [2] **33**:1 **34**: 5
**apprehension** [3] **7**:4 **29**: 22 **40**:8
**approach** [6] **35**:1 **65**:11 **71**:7 **120**:3,4 **148**:16
**approaches** [1] **59**:19
**appropriate** [2] **51**:20 **61**: 11
**appropriated** [1] **52**:10
**arbitrary** [1] **68**:20
**area** [7] **6**:15 **13**:3 **23**:10 **35**:

15,15,16 **58**:9
**aren't** [8] **9**:3 **51**:11 **83**:18, 21 **84**:25 **109**:11 **115**:7,7
**argue** [2] **3**:21 **122**:21
**argued** [2] **25**:16 **63**:21
**arguing** [7] **19**:3 **21**:18 **22**: 18,21 **102**:20,22,22
**argument** [57] **1**:14 **2**:2,5,8 **3**:4,7 **7**:1 **8**:8 **10**:4 **15**:11 **17**:24 **18**:1,2 **25**:9,14 **28**: 22,25 **29**:3 **30**:18 **32**:21 **33**: 6,6 **37**:3 **43**:4,5 **45**:23 **47**: 16,23 **54**:22 **56**:8,9,9,11 **61**: 9 **62**:7 **66**:9,17 **71**:16 **73**: 19 **77**:22,23 **94**:10 **95**:10 **99**:8,14 **103**:1 **117**:18,25 **119**:15,19 **120**:8,9 **128**:17 **129**:15 **137**:12 **138**:12 **147**: 3
**arguments** [26] **7**:21 **8**:4, 15 **10**:1 **17**:25 **36**:20 **38**:6 **44**:17 **45**:18,21 **46**:15 **52**: 24 **56**:20,25 **57**:2,10,11,18 **60**:20 **63**:23 **68**:12 **74**:1 **82**: 1 **91**:25 **109**:8 **125**:2
**arise** [1] **75**:5
**Arizona** [4] **15**:15 **57**:16 **87**: 17,18
**around** [3] **32**:3 **108**:11 **132**:5
**arraign** [1] **143**:11
**arrest** [27] **23**:15 **26**:1 **41**: 14 **44**:3 **98**:6 **99**:25 **100**:1, 6 **103**:4,16,20 **105**:2 **122**: 18 **124**:25 **125**:7 **130**:11,15 **131**:17 **132**:1,15,19 **141**:10 **142**:4 **143**:9 **145**:2,9,10
**arrested** [2] **64**:21 **98**:6
**arresting** [1] **131**:21
**arrests** [2] **135**:17 **143**:2
**ART** [1] **123**:11
**Article** [29] **11**:4 **12**:4 **24**:12, 17,17 **25**:2,7 **60**:19,25 **61**: 15 **62**:3,5 **74**:4,17 **84**:2 **86**: 6 **88**:21 **91**:2 **94**:24 **97**:25 **99**:14,18 **100**:13 **109**:4 **114**:4,9 **119**:16,16 **151**:14
**articulate** [1] **63**:7
**articulated** [3] **7**:6 **46**:10 **148**:23
**as-applied** [2] **142**:21 **144**: 8
**ascertain** [1] **65**:20
**aside** [29] **47**:25 **48**:4,11 **54**: 14 **55**:10,10 **57**:24 **60**:4,9, 12 **67**:25 **69**:10 **75**:12 **110**: 15,24 **111**:2,12,13 **113**:2 **114**:13 **115**:4 **116**:6 **129**: 14 **130**:3,6 **138**:10,24 **139**: 5 **140**:9
**aspects** [1] **86**:25
**assert** [1] **12**:21
**asserting** [1] **17**:13
**assertion** [3] **28**:2 **87**:5,6

**assertions** [1] **87**:12
**associated** [2] **83**:19 **93**:1
**assume** [3] **29**:2 **114**:20 **120**:19
**assumed** [1] **36**:5
**assuming** [4] **5**:13 **15**:9 **96**: 9 **122**:23
**assumption** [2] **98**:12 **114**: 8
**astonishing** [1] **55**:17
**attach** [4] **45**:7 **61**:24 **64**:1 **145**:17
**attaches** [2] **131**:5 **141**:20
**attack** [3] **106**:12,12,15
**attacked** [1] **82**:24
**attacking** [1] **87**:11
**attempt** [3] **24**:14 **76**:22 **105**:12
**attempting** [4] **46**:17 **74**:3 **78**:23 **108**:16
**attention** [7] **36**:17 **38**:6 **54**: 15,20 **55**:9 **56**:16 **108**:6
**attenuated** [1] **17**:15
**Attorney** [4] **64**:17 **73**:2 **129**:6 **130**:8
**Attorneys** [1] **150**:10
**Austin** [1] **1**:22
**authorities** [2] **64**:20,21
**authority** [25] **4**:22 **6**:16 **14**: 18 **15**:1 **31**:25 **32**:8 **58**:6 **59**:7,13 **62**:15 **63**:12,18 **64**: 2 **67**:3,19 **69**:25 **70**:4,6 **73**: 11 **88**:20 **115**:10 **142**:2 **150**:6,22 **151**:9
**authorize** [5] **37**:1 **59**:23 **61**:14 **62**:19,25
**authorized** [4] **36**:5 **60**:24 **72**:23 **75**:12
**authorizes** [1] **61**:18
**availability** [1] **113**:19
**available** [8] **12**:19 **36**:24 **64**:18 **76**:1 **79**:12,16 **99**:15 **111**:7
**avoid** [1] **17**:2
**avoidance** [1] **144**:14
**award** [2] **63**:17,18
**aware** [3] **33**:13,17 **138**:8
**awareness** [1] **33**:21
**away** [3] **10**:9 **41**:8 **122**:10

**B**

**back** [18] **8**:2 **17**:24 **38**:18 **54**:17 **55**:20 **64**:10 **66**:7 **75**: 18 **97**:9 **101**:15 **113**:10 **114**:10 **116**:14 **119**:17 **122**: 8,16 **124**:13 **149**:23
**backdrop** [7] **34**:14 **92**:8, 12 **93**:13 **94**:1 **96**:18 **97**:23
**backed** [2] **5**:23 **123**:10
**background** [5] **4**:12 **23**: 20,25 **43**:12 **98**:1
**bad** [4] **101**:22 **151**:11,12, 13
**bar** [3] **71**:12 **72**:17 **76**:11

**bare** [2] **31**:12 **44**:6
**barred** [1] **78**:2
**BARRETT** [19] **18**:17,20 **58**:21,22 **60**:4 **61**:6 **62**:2, 11,22 **63**:6,10 **64**:7 **65**:22 **66**:3 **82**:14 **83**:3 **139**:18,19 **140**:22
**bars** [2] **5**:1 **118**:8
**based** [11] **19**:17 **29**:12 **39**: 21 **73**:24 **74**:7 **86**:24 **93**:18 **117**:18 **119**:15 **142**:5 **143**: 9
**bases** [1] **31**:15
**basically** [3] **27**:8 **124**:13 **132**:9
**basis** [11] **4**:3 **11**:22 **12**:25 **15**:23 **59**:24 **60**:17 **64**:4,19 **70**:3 **94**:23 **149**:19
**bear** [2] **48**:6 **74**:14
**bearing** [1] **85**:23
**became** [1] **97**:12
**become** [1] **92**:13
**bed** [1] **95**:25
**beds** [2] **95**:22,24
**begin** [1] **127**:23
**beginning** [4] **138**:14,17 **139**:15 **145**:17
**begins** [2] **127**:25 **145**:6
**begun** [1] **146**:23
**behalf** [9] **1**:20,23 **2**:4,7,10 **3**:8 **73**:10,20 **147**:4
**behind** [1] **122**:5
**believe** [16] **8**:4 **10**:5 **46**:24 **50**:12 **77**:5 **79**:24 **100**:2 **103**:17 **113**:14 **120**:13 **122**: 9 **124**:8 **129**:19 **130**:14 **136**:2,16
**believes** [2] **97**:4 **143**:1
**believing** [2] **8**:8 **101**:16
**below** [1] **108**:14
**benefit** [8] **16**:23,24 **47**:16 **105**:21 **106**:14,23 **107**:11 **119**:6
**benefits** [3] **19**:2 **89**:10 **93**: 2
**beside** [1] **75**:1
**best** [3] **77**:17 **131**:19 **135**:7
**better** [1] **77**:22
**between** [11] **4**:5 **20**:5 **65**:7, 19,25 **66**:19 **78**:25 **83**:7 **118**:23 **133**:1 **147**:8
**beyond** [4] **60**:18,22,23 **62**: 9
**Biden** [2] **7**:11 **57**:16
**big** [4] **43**:15 **54**:3 **55**:7 **119**: 11
**bind** [2] **77**:10 **140**:16
**binding** [5] **67**:4,6,12 **120**: 24 **123**:22
**bit** [5] **43**:1 **79**:21 **80**:17 **95**: 3 **107**:23
**blanket** [1] **50**:14
**block** [1] **106**:7
**blow** [1] **113**:9

**board** [1] **8**:3
**bold** [2] **124**:8,11
**bond** [2] **71**:10,14
**books** [2] **48**:13,16
**border** [7] **3**:16 **33**:10 **87**: 22,23 **90**:6 **91**:4 **148**:19
**borders** [2] **4**:23 **17**:17
**both** [20] **8**:5 **32**:11 **44**:4 **45**: 22 **56**:2 **74**:21 **75**:1 **94**:22 **95**:24 **97**:15 **98**:2 **100**:17 **111**:18 **113**:19 **115**:20,22 **116**:7 **131**:20 **141**:11 **145**: 1
**bottom-line** [1] **20**:12
**bound** [1] **77**:7
**box** [1] **37**:25
**branch** [2] **40**:4 **151**:12
**branch's** [1] **142**:2
**break** [3] **25**:23 **38**:19 **40**: 24
**breakfast** [4] **35**:21 **47**:21 **119**:9,10
**brief** [11] **18**:23 **24**:18 **25**:9, 13 **54**:3 **55**:3 **101**:8 **119**:14, 20 **120**:14 **132**:14
**briefing** [3] **9**:5 **139**:22,23
**briefly** [1] **24**:17
**bring** [12] **11**:24 **72**:25 **89**: 24 **90**:22 **98**:19,21 **100**:11 **116**:18 **128**:1 **130**:21 **137**: 4,4
**bringing** [2] **131**:4 **143**:22
**brings** [1] **116**:17
**broad** [9] **6**:17 **8**:12 **26**:7 **60**:5,9 **91**:25 **92**:3 **106**:22 **150**:5
**broader** [1] **113**:22
**broken** [1] **83**:13
**brought** [3] **48**:23 **61**:7 **70**: 21
**bucket** [1] **50**:8
**budget** [1] **94**:10
**bunch** [1] **121**:6
**burden** [2] **44**:5 **83**:3
**burdens** [1] **19**:2
**bus** [2] **8**:23 **9**:4
**business** [1] **50**:13
**buy** [2] **16**:17 **17**:3
**buying** [2] **16**:24 **17**:3
**Byrd** [1] **51**:24

**C**

**c)(1** [1] **129**:4
**c)(2** [1] **43**:23
**cabin** [1] **124**:14
**California** [2] **84**:4 **90**:13
**call** [4] **74**:6 **86**:6,6 **123**:22
**came** [3] **1**:13 **36**:23 **119**:17
**candidly** [1] **77**:3
**cannot** [2] **23**:12 **27**:11
**capabilities** [2] **101**:25 **102**:1
**capacity** [1] **28**:24
**capricious** [1] **68**:21

Heritage Reporting Corporation

Official - Subject to Final Review

**carefully** [1] **113**:7
**cartel** [1] **66**:12
**Case** [79] **3**:4 **6**:4 **7**:12,18 **9**:7,19,21 **10**:1,14 **13**:21 **14**:1,10,20,22 **15**:13,14,23 **24**:5 **35**:21 **44**:23 **46**:21 **47**:14 **49**:2 **55**:6,6,6,12 **56**:1,21 **57**:6,8,17,21 **60**:23 **66**:10,20 **67**:13 **68**:8,11 **69**:4,5,19,19 **71**:10,23 **72**:9,13,25 **75**:20 **77**:25 **79**:10 **81**:3 **82**:22 **83**:24 **84**:3 **86**:10 **87**:18 **90**:4 **93**:14 **94**:1 **97**:4 **104**:8,11 **111**:2 **115**:6,9 **119**:3 **120**:2 **135**:3,5,9,9,11 **144**:8,9 **147**:20 **150**:2 **151**:17,18
**cases** [9] **26**:22 **37**:16,23 **48**:22 **57**:8 **61**:20 **88**:23 **96**:15 **150**:15
**Castle** [3] **23**:14 **97**:25 **130**:3
**categorical** [3] **34**:25 **65**:11 **148**:16
**categorically** [2] **115**:25 **123**:6
**categories** [6] **29**:9 **31**:1 **64**:13 **103**:10 **123**:9 **126**:24
**category** [1] **126**:15
**causal** [3] **19**:17 **83**:7,13
**cause** [6] **17**:18 **100**:1 **106**:6,10 **143**:2,10
**caused** [1] **101**:19
**causing** [1] **82**:4
**CDC's** [1] **20**:9
**centered** [1] **29**:1
**century** [1] **75**:9
**certain** [19] **10**:8 **15**:12 **24**:22 **29**:9 **30**:9,11,12 **39**:6,17 **45**:17 **67**:7 **81**:6,19 **83**:20 **103**:10 **113**:4 **131**:12 **141**:7 **142**:20
**certainly** [25] **9**:2 **49**:22 **65**:2 **69**:13 **75**:24 **79**:6 **82**:21 **83**:1 **88**:17 **94**:23 **96**:14 **100**:5 **102**:11,19 **114**:1,5,6 **122**:3 **127**:1 **131**:16 **132**:21,21 **135**:18 **137**:8 **138**:20
**certainty** [2] **34**:23 **65**:16
**cetera** [4] **70**:17 **82**:8 **84**:8 **88**:4
**chain** [2] **17**:15 **83**:13
**challenge** [14] **3**:21 **7**:3 **16**:21 **17**:10 **50**:13 **72**:25 **88**:19 **89**:1 **97**:18 **136**:11,23 **142**:21 **144**:9 **150**:8
**challenged** [3] **10**:18 **78**:17,17
**challenges** [1] **72**:2
**challenging** [6] **10**:7 **13**:24 **69**:14 **88**:22 **92**:5 **141**:3
**chance** [6] **23**:1 **44**:14 **45**:19 **52**:18 **64**:14 **127**:8
**Chaney** [2] **14**:15 **99**:1

**change** [5] **21**:2 **55**:3 **99**:24 **101**:5,6
**changes** [1] **134**:15
**channeled** [1] **64**:24
**character** [1] **76**:10
**charge** [4] **26**:12 **40**:9 **68**:17 **143**:11
**charged** [1] **102**:16
**charges** [2] **100**:11 **143**:22
**charging** [1] **40**:12
**charitably** [1] **120**:12
**chart** [1] **19**:22
**checks** [2] **50**:18 **53**:20
**CHIEF** [60] **3**:3,9 **6**:25 **7**:10,14 **8**:7,13,19,25 **20**:16 **21**:10,17 **22**:1,17,20 **25**:8 **35**:12 **36**:2,9,12 **37**:12,15,21 **38**:3,11,14 **40**:22 **42**:20 **44**:11 **50**:6 **54**:25 **57**:16 **58**:20,24 **66**:4,8 **73**:16,21 **93**:20,23 **95**:1,21 **96**:9 **97**:17 **105**:24 **107**:22 **108**:7,25 **109**:6 **117**:4,7,14 **120**:16 **127**:7 **133**:25 **139**:17 **140**:23 **146**:25 **147**:6 **151**:16
**choices** [2] **4**:17 **83**:22
**choose** [6] **100**:11 **120**:11 **126**:11,12 **131**:3 **143**:3
**choosing** [1] **150**:20
**chose** [1] **115**:19
**chosen** [2] **84**:6 **86**:1
**circle** [1] **66**:7
**Circuit** [16] **7**:20 **35**:20 **36**:3,13 **47**:17 **54**:15 **55**:22 **56**:16 **57**:14 **59**:1 **66**:12 **109**:7 **111**:14 **119**:7 **138**:19 **150**:17
**circumstance** [6] **14**:5 **30**:3 **33**:9 **50**:18 **125**:22 **138**:4
**circumstances** [13] **24**:22 **32**:24 **43**:24 **73**:5 **121**:25 **122**:19 **130**:18 **131**:1,19 **132**:24 **142**:20 **145**:11 **148**:24
**cite** [2] **132**:14 **138**:23
**cited** [1] **51**:23
**citing** [1] **83**:10
**Citizen** [1] **55**:24
**citizens** [1] **144**:6
**civil** [2] **13**:24 **112**:7
**claim** [16] **15**:16 **66**:19,25 **67**:9 **68**:18 **69**:23,24 **72**:24 **75**:2 **95**:18 **115**:6,8 **129**:23 **137**:19 **150**:5,21
**claimed** [1] **151**:9
**claiming** [1] **107**:3
**claims** [7] **48**:22 **70**:20 **71**:9 **72**:9 **115**:13,15 **116**:2
**clarify** [2] **56**:14 **127**:9
**clarifying** [1] **141**:1
**class-wide** [2] **118**:8,11
**classic** [1] **112**:3
**clause** [1] **108**:20
**clear** [17] **5**:22 **11**:21 **20**:14

**29**:18 **33**:19 **34**:21 **48**:5 **66**:24 **70**:16 **83**:6 **93**:17 **120**:2 **125**:1 **133**:9 **144**:12 **146**:3 **149**:21
**clearer** [1] **50**:3
**clearly** [14] **6**:8 **18**:17,22,25 **19**:4,8 **45**:6,14 **46**:2 **61**:23 **63**:25 **74**:19 **87**:21 **120**:5
**Clinton** [1] **97**:11
**clue** [1] **117**:12
**clues** [3] **96**:20 **139**:10,11
**code's** [1] **88**:22
**coerce** [2] **79**:2 **82**:9
**coercive** [12] **5**:3,5,22 **6**:9 **46**:20 **47**:7 **73**:9 **77**:12,15 **79**:7,9 **82**:12
**cognizable** [2] **7**:8 **23**:4
**coin** [1] **23**:8
**collateral** [1] **76**:25
**college** [1] **10**:9
**colloquy** [1] **32**:11
**colossal** [1] **120**:8
**combination** [1] **90**:21
**come** [13] **36**:21 **38**:17 **42**:3 **55**:17 **79**:14 **89**:5 **90**:13 **98**:9 **113**:4 **141**:11 **142**:14 **143**:16 **150**:11
**comes** [10] **32**:8 **50**:9 **53**:7 **55**:5 **72**:17 **89**:18 **114**:13,17 **128**:8 **139**:25
**comfortably** [2] **74**:16 **139**:1
**coming** [5] **55**:25 **88**:3 **92**:10,24 **137**:9
**command** [2] **24**:24 **102**:9
**comment** [2] **56**:7 **68**:19
**Commerce** [4] **74**:12 **108**:12,20,20
**Commission** [4] **13**:22 **108**:13,16,21
**commits** [1] **94**:21
**committed** [5] **14**:23 **19**:10 **143**:1 **145**:12 **149**:24
**committing** [1] **94**:21
**commonsense** [1] **69**:3
**compared** [1] **130**:16
**comparing** [1] **35**:2
**comparison** [1] **20**:5
**compelled** [2] **81**:11 **83**:16
**compelling** [1] **95**:10
**complaining** [1] **67**:9
**complaint** [3] **5**:16 **67**:17,18
**complete** [3] **55**:3 **102**:14 **132**:25
**completely** [3] **56**:3 **127**:9 **133**:9
**complexities** [2] **64**:11 **65**:11
**complicated** [1] **34**:24
**comply** [10] **20**:23 **22**:6 **23**:18 **47**:9 **96**:12 **99**:3 **134**:8,18,23 **147**:24
**complying** [1] **133**:9

**component** [1] **116**:11
**components** [1] **124**:10
**concede** [4] **13**:22 **61**:10,16 **102**:19
**conceivably** [1] **125**:11
**conceive** [1] **64**:4
**concept** [2] **59**:14,15
**conception** [2] **143**:15 **150**:5
**conceptions** [1] **31**:23
**conceptual** [1] **66**:16
**concern** [2] **8**:20 **101**:5
**concerned** [1] **70**:14
**concerning** [2] **7**:3 **71**:2
**concerns** [2] **62**:9 **66**:8
**conclude** [2] **15**:24 **16**:13
**concluded** [2] **14**:2 **18**:9
**conclusion** [4] **20**:12 **36**:10 **49**:10 **110**:24
**conclusions** [2] **18**:14 **111**:1
**concrete** [1] **94**:14
**concretely** [1] **113**:6
**concurrence** [1] **57**:17
**condition** [2] **39**:10 **89**:13
**conditions** [1] **102**:24
**conducts** [2] **35**:7,9
**confined** [1] **58**:12
**conflating** [1] **30**:19
**confronted** [3] **14**:21 **51**:24 **89**:23
**Congress** [85] **13**:23 **14**:17 **15**:1 **16**:15 **20**:22 **21**:3 **22**:5,10 **24**:1,14,23 **25**:17 **29**:7 **30**:6,13 **31**:14 **32**:14 **39**:17 **40**:3 **45**:7 **46**:1,10,16 **49**:7,14,22 **50**:2,23 **51**:3,7,13,17,20 **52**:2,6,9,13 **53**:4,9,12 **54**:5 **58**:14 **59**:10,22 **61**:17,23 **63**:25 **65**:3,9 **67**:5,5,23 **69**:12 **70**:8,16,19 **71**:1 **72**:23,24 **73**:3,13 **75**:10 **85**:14 **95**:8 **96**:25 **97**:3,9,10 **99**:1,6,10 **110**:8,9 **113**:7 **114**:7 **115**:14,19 **117**:13 **125**:1 **137**:1 **143**:20 **144**:12 **146**:19 **147**:21 **148**:22
**Congress's** [6] **6**:15 **30**:19,20 **68**:24 **69**:24 **122**:5
**congressional** [2] **4**:16 **51**:12
**consequences** [7] **45**:9 **64**:1 **74**:14,16 **120**:9 **148**:4 **150**:4
**consider** [1] **121**:18
**considerable** [1] **65**:18
**consideration** [2] **96**:12 **151**:8
**considerations** [4] **21**:12 **51**:23 **52**:1 **60**:19
**considered** [4] **57**:13 **84**:16 **97**:1 **122**:5
**considering** [1] **29**:16
**consistent** [10] **12**:13 **42**:

**23 71**:19 **75**:13 **78**:24 **101**:13 **108**:9 **114**:3 **128**:18 **144**:24
**consistently** [3] **57**:3,7 **69**:12
**constant** [2] **43**:19,21
**constitute** [1] **10**:15
**Constitution** [3] **24**:14 **136**:13 **144**:24
**constitutional** [13] **3**:25 **8**:6,17 **9**:16 **11**:15 **13**:5,7 **23**:25 **52**:1 **142**:21 **144**:9,14,17
**constitutionally** [2] **144**:4,5
**constrained** [1] **51**:9
**constraints** [3] **21**:13 **74**:25 **134**:5
**construction** [2] **38**:9 **60**:11
**construed** [1] **134**:25
**consultation** [1] **65**:19
**contains** [1] **103**:16
**contemplate** [1] **110**:15
**contemplated** [1] **59**:6
**contemplates** [2] **62**:1 **146**:18
**contemporary** [2] **115**:3 **138**:21
**contempt** [2] **5**:23 **76**:25
**contest** [1] **148**:2
**contested** [2] **7**:22 **86**:10
**context** [18] **36**:18 **37**:1,5 **38**:10 **49**:6 **54**:16 **56**:17 **66**:17 **72**:4 **97**:24 **98**:1,21 **101**:23 **130**:4 **131**:17,23 **132**:2,11
**contexts** [2] **28**:8 **58**:15
**continue** [2] **47**:13 **147**:19
**continued** [5] **29**:21 **40**:21 **86**:8 **134**:18 **147**:13
**contract** [2] **12**:22 **69**:5
**contracts** [2] **69**:4,5
**contradictory** [1] **105**:18
**contradicts** [1] **4**:1
**contradistinction** [1] **96**:22
**contrary** [2] **13**:8 **147**:21
**convicted** [3] **30**:12 **38**:24 **39**:18
**conviction** [3] **39**:8,14,22
**convictions** [2] **66**:2 **148**:13
**cooperate** [1] **104**:15
**core** [2] **99**:8 **100**:9
**corpus** [1] **107**:3
**correct** [30] **26**:3,4,9,18,19 **27**:1,2,10,11,22 **28**:10 **29**:16 **40**:5 **41**:1,2,11,14,24 **42**:1 **48**:14 **49**:21 **50**:15,16 **104**:2 **119**:24 **120**:21 **121**:18 **137**:21,22 **138**:5
**correctly** [3] **10**:14 **25**:13 **31**:3

Heritage Reporting Corporation

cost [9] 10:11 15:17 16:18 18:2 85:24 86:1 87:24 94: 22 136:21

costs [26] 15:11,16 17:1 19: 14 74:8,9 83:16,18 84:14, 15,20,22 86:7,8,21,21 89:9, 19,25 91:11 92:11,25 93:7, 9,10 149:9

couldn't [3] 65:9 82:16 136:22

Counsel [11] 35:12 73:17 95:2 100:23 102:5 107:22 111:23 117:4 144:15 147: 1 151:17

counterparty [1] 76:21

counties [1] 86:12

country [1] 3:12

couple [2] 98:16 138:16

course [12] 6:24 14:21 15: 20 56:15 58:7 77:5 82:22 96:2 99:5 120:13 127:24 147:14

COURT [143] 1:1,14 3:10, 17,19 4:10 5:22 6:10,16 7: 6,21,23,24 9:6,9 11:9 12: 10,14 14:2,4,11,15,21 16:2 18:8,14 19:1,5,10,20,23 20: 3,7 21:14,22 22:8 23:3,9, 13,14,19 26:11 37:20 38:1, 8 42:11,13 44:19,21 45:3 46:3,10,19,25 47:7 48:8,9 51:23 56:19 57:12 58:3,6, 9 59:18 60:1 61:20 63:11, 16,24 65:10 66:2 69:4 71: 11,20 73:8,22 74:13,21 75: 15 76:12 78:15,16 80:6 81: 14 82:25 84:4 85:9,11 88: 10 92:15 93:16 94:5,7 106: 1,3 107:13,15 108:11,18 109:15,21 113:4,13 114:24 115:1 116:3,14,21 117:2 118:4 120:11 121:1,3,12 122:2 123:5 131:23 135: 15,16 138:7 139:2,11,24 140:5,16,17 142:12 144:2 145:5,15 147:10,17 148:6 149:10,20,23 150:1,11 151: 3,3,4,7,15

Court's [27] 5:6 8:16 10:16 11:12 12:17 13:2 14:25 18: 24 19:20 34:25 50:17 55: 22 58:1 71:8 72:7 73:11, 25 74:16 75:16 84:2 101: 14 129:20 134:19,24 140: 16 148:16 150:4

courts [36] 4:3 5:2 7:19 8: 13,14,15 9:12 14:18 23:5 36:2,14,23 37:11 45:11 46: 19,19 51:11 56:24 57:9,19 58:11,25 59:14 60:22,23 75:11,12 90:22 109:2,13, 16 139:14 140:6 150:7 151:7,14

courts' [2] 70:4 140:15

cover [2] 60:2 100:7

covered [7] 5:4 6:13,23 72: 11 98:15 126:5 133:19

cradle [1] 8:22

create [13] 4:7,25 15:7 28: 19 37:6 44:8 46:16 49:8 105:4,21 106:22 129:7 144:16

created [2] 25:18 114:7

creates [1] 66:23

creating [3] 43:16 49:23 90:21

credit [1] 33:22

crime [3] 35:3 102:16 143: 1

crimes [1] 30:13

criminal [20] 19:21,25 29: 13 30:9,25 39:7 53:23 66: 2 83:15 84:19,22 86:13 95: 19 98:19 102:23 141:7 142:11 143:6 144:23 148: 13

curious [1] 24:19

curriculum [1] 10:20

custody [15] 19:25 27:25 29:23 31:7 34:13 35:11 40: 14 44:1,8 86:3 103:18 131: 16 141:11 142:3 145:2

## D

D.C [14] 1:10,20 35:20 36:3, 13 47:17 54:15 56:15 59:1 66:12 109:6 111:14 119:7 138:19

DACA [1] 84:3

daily [1] 64:18

data [2] 19:17,19

database [2] 33:20 39:14

date [3] 51:4 117:3,10

Davis [2] 49:18 106:3

day [5] 57:1 104:25 105:2,9 122:2

de [3] 110:20 111:5 134:20

dead [3] 89:24,24 90:23

deal [3] 35:14 105:19 120: 20

deals [1] 138:14

dealt [1] 109:2

decade [1] 37:17

decades [2] 27:10 55:22

decide [11] 41:9,13 88:6 100:21 111:2 121:6 122: 10 124:25 125:6 143:4,8

decided [6] 41:1 53:22 83: 24 142:15,23 143:17

decides [3] 83:21 127:25 141:8

deciding [2] 35:3,4

decision [42] 14:23 26:2 27:13 29:14 36:15 40:12 41:6 48:21 50:14 69:25 71: 8 75:5 78:11 83:19 100:20 103:10 118:13,17,18 122: 14,17,24 123:3 125:6,15,

21 126:4 127:14,19,23,25 128:2,6,7 129:3,10 141:17, 22 142:5,9 145:25 146:14

decision-making [4] 68: 21 69:15 83:14 151:5

decisions [10] 13:25 30:1 36:19 37:18 38:1 40:7 51: 19 74:15 97:19 125:12

decisis [5] 109:12,15,22 110:6 120:3

declaration [3] 77:4,6 79:4

declarations [1] 47:2

declaratory [24] 5:15,18, 20 6:1 46:25 47:6,8 58:7, 16 59:9 60:6 73:4,8 77:13 78:25 79:20 111:8 112:2, 15,23 118:11,24 147:9,10

declined [1] 7:24

decrease [2] 101:25 102:1

defective [1] 68:3

Defense [1] 137:5

define [1] 138:24

defined [2] 115:21 138:24

definitely [2] 110:13 136: 21

definition [3] 138:23 139:1, 4

degree [2] 51:7 53:9

delay [1] 117:2

Delaying [2] 117:6,10

delineated [2] 31:14 73:13

delves [1] 19:6

demonstrates [2] 37:10 52:22

Demore [3] 128:19,25 146: 2

Department [2] 1:20 74:11

depend [1] 28:22

depending [1] 100:15

deprive [1] 4:21

depth [1] 140:6

described [10] 4:9 28:5 31: 9 32:18 33:14 40:15 43:18 44:3 98:10 108:13

describing [2] 43:22 92:19

destabilizing [1] 21:25

detail [1] 43:1

detailed [1] 143:19

detain [35] 28:23,25 29:4,6, 12 30:10 31:11,25 40:14 41:14,22 54:8 83:21 85:3, 7,25 98:5,15 122:13,18 124:25 125:7 130:8,11 131:1,12,18 142:4,14,24 143:18 145:10,10 146:10, 20

detained [15] 29:10,10 30: 14 31:1 38:25 39:19,21 85: 25 86:15 98:5 129:2 131: 25 132:13,16 143:21

detainer [10] 94:16,17,19 104:8,10,19 125:16,25 126: 10 130:15

detainers [4] 83:11 86:16

103:20 104:4

detaining [4] 19:21 32:4 85:1 131:22

detains [1] 84:13

detention [36] 26:1,25 29: 16,20,21 30:1,6,20 31:9 40: 19,21 43:24 75:4 86:8 88: 19 96:3 97:7 102:1 103:5, 9 105:12 107:4 129:24 130:13,19 131:24 135:4 141:5,7 143:25 144:3,22 145:2,13,16 146:8

detentions [1] 82:8

determination [22] 30:15, 22 32:1,5 40:1 41:21,23 64:11 65:5 85:2,15,24 96: 4,7 141:4 142:17 143:22 144:22 146:5,11,16,19

determinations [2] 35:10 40:16

determine [3] 30:7 64:20 65:16

determined [2] 58:5 84:24

determining [1] 123:16

developments [1] 65:10

devise [1] 64:17

devote [2] 34:19 55:2

DH [1] 123:6

DHS [37] 3:12,16 4:17 6:12, 22 19:20 20:3,10 22:13 29: 23 30:2 31:5 33:9,20 35:7 40:11 42:9 43:22 47:12 52: 10 72:11,14 73:3 78:8 82: 5,10,16 122:18 123:12 130: 5 131:8 132:4 141:8 147: 12,18,24 148:7

DHS's [1] 146:5

dictate [1] 30:1

dictated [1] 32:15

dictates [1] 65:1

dictating [1] 10:19

dictionaries [2] 115:3 138: 21

dictionary [1] 138:22

difference [1] 147:8

different [19] 5:14 17:24 29:1 35:24 40:3 46:11,12 65:14 69:23 70:18 99:23 100:3 104:12 112:11 132: 3 133:8 137:11 147:17 149:24

differently [3] 80:1,14 81: 24

difficult [3] 51:18 96:11 135:2

difficulties [1] 21:1

dilemma [1] 86:7

direct [7] 10:16 11:14 15:3 78:11 86:11 105:7 142:19

direct/indirect [1] 18:1

direction [1] 139:13

directive [2] 42:9 73:1

directly [6] 10:18,21 17:10 49:24 77:9 92:4

directs [2] 105:3 129:5

disagree [4] 20:18 68:6 111:19 150:10

disavowed [1] 126:22

disclaiming [1] 125:2

disconnect [2] 66:23 67: 14

discontinue [1] 131:3

discretion [45] 4:12 14:24 15:3,7 23:10,20 24:13,15 26:7,16 28:18 30:23 31:13 34:14 41:8 42:14,18 43:13 51:9 54:7 64:23 67:1 68: 23 75:1 80:19 82:18 92:7 97:23 98:17,18,24 100:7, 10,18 101:16 102:15 104:1 122:10,13 123:21 124:5,24 130:21 145:9 148:7

discretionary [5] 27:9 74: 21 80:20 82:7 129:24

discuss [3] 44:14 52:18 89: 4

discussing [1] 139:6

disfavors [2] 11:19 13:17

displace [1] 4:11

displacement [1] 15:7

displaces [3] 28:18 31:12 148:6

disposal [1] 50:23

disputable [1] 98:14

dispute [2] 4:5 68:11

disputed [3] 48:4 85:10 87: 7

disputing [2] 5:25 63:3

disregard [3] 48:7,17 75: 14

dissent [1] 14:3

dissipates [2] 141:18,21

distinction [3] 11:2 78:24 79:18

distinctive [1] 11:8

distorting [1] 132:8

district [36] 3:17 7:20 9:6 16:2 18:8,14,24 19:1,10,20, 23 20:3,7 45:3 46:24 47:7, 17 63:16 76:19,20,21 82: 25 85:9 101:14 121:1,3,12 123:5 135:15,15 147:10,17 149:23 150:4,19 151:9

districts [1] 94:4

divisible [1] 35:5

divisions [1] 94:4

doctrine [1] 137:8

documents [1] 35:6

doing [9] 36:14,17 42:23 55:4 81:20 82:9 87:24 109: 7 123:20

dollar [2] 3:22 149:8

dollar's [4] 89:8,19,25 91: 11

dollars [1] 89:14

done [5] 20:3 37:22 43:7 110:9 137:5

door [1] 62:8

Official - Subject to Final Review

double [1] 108:18
down [8] 25:23 35:5 37:4 38:19 40:25 53:5 137:16 138:2
downstream [1] 149:17
drafted [1] 65:14
dramatic [4] 53:6,13,15,16
drastic [2] 76:13,14
draw [2] 19:16 78:23
drawing [3] 8:3 11:2 129:13
drill [1] 37:4
drive-by [3] 140:1,4,10
drop [3] 26:8,16 92:15
duration [4] 23:18 145:5 146:8,21
during [3] 20:8 30:10 146:8
duties [1] 25:19
duty [6] 23:16,17 28:17 34:16 141:18 148:1

**E**

e)(3 [1] 70:15
e-mails [1] 83:9
each [10] 4:4 22:15 24:4 32:17 33:21 43:6,17 50:8 147:24 150:15
earlier [4] 46:24 51:2 122:8 126:22
Earth [1] 57:6
easier [1] 65:4
easily [1] 76:15
eat [1] 17:4
eclipsed [1] 120:6
Edwards [1] 54:19
effect [12] 10:7 19:15 20:10 42:3 46:22 87:19 88:5 89:13 109:22 118:20,21 149:10
effective [2] 117:3,10
effectively [4] 5:24 13:12 76:18 81:22
effects [2] 15:25 149:18
effectuate [1] 142:3
effort [1] 24:24
efforts [1] 22:12
either [2] 86:7 110:1
Election [1] 13:22
elements [1] 35:1
eliminating [1] 75:8
ELIZABETH [5] 1:19 2:3,9 3:7 147:3
elsewhere [1] 26:6
emergency [2] 138:5 151:2
emphasize [1] 28:14
emphasized [1] 23:14
emphasizing [1] 95:6
employ [1] 84:6
employed [1] 59:1
employer [1] 12:23
empowered [1] 75:11
empty [1] 95:22

enacted [4] 59:10,23 110:9 148:22
enactment [2] 37:9 59:6
encompassed [1] 120:19
encounters [2] 33:9 148:10
encourage [1] 151:14
end [5] 65:14 113:8,10 128:4,8
ends [6] 96:8 100:22 129:9 137:9 145:16 146:6
energy [1] 55:6
enforce [11] 14:19 50:10,11,15,21 51:12 53:8,8 80:13 81:6,23
enforceable [10] 22:14 23:16 34:16 52:7,12 105:22 106:23 107:11 148:1,8
enforced [3] 51:14 53:10 80:1
enforcement [45] 3:13,16 4:12,20 7:9 14:18 16:3,4,8,9,14 18:12 20:4,13 22:12 23:10,20 24:13,15,25 28:18 31:13 34:14 42:17 43:12 48:24,25 51:6 54:6 78:8 83:8 84:14 92:5,6 94:22 97:5 99:2 100:8 101:16,25 147:12 148:7,9,21 150:16
enforcing [2] 128:5,5
engage [3] 18:7 56:20,24
engaged [3] 24:23 36:20 68:20
enjoin [5] 45:13,25 46:9 70:6 76:3
enjoined [3] 71:3 76:16,17
enjoining [3] 71:17,18 81:4
enjoins [1] 118:1
enough [4] 92:10 93:13 98:3,4
ensure [1] 65:6
enter [3] 6:16 46:25 73:12
entered [3] 47:8,10 147:10
entering [3] 45:6 46:20 47:21
entertaining [1] 63:16
entire [1] 88:22
entirely [5] 20:8 23:17 108:22 118:22 147:16
entitle [1] 149:25
entitled [2] 71:10 147:13
entity [2] 12:6 13:19
enumerated [1] 149:5
environmental [2] 50:10 55:7
envision [1] 101:7
EPA [5] 12:13 74:11 91:17,21 92:22
equally [1] 48:5
erase [1] 48:12
erasing [1] 110:25
erred [1] 37:11
erroneous [5] 18:18,22,25

19:5,8
erroneously [1] 88:7
error [5] 19:1 20:14 47:11 83:6 93:17
errors [5] 19:11,17 111:5 116:4 149:24
especially [5] 90:17 96:21 111:6 113:15 130:4
ESQ [3] 2:3,6,9
essence [2] 81:8 122:4
essential [1] 115:16
essentially [9] 20:1 46:15 82:5 100:6 106:6 110:8 120:11 135:17 145:8
established [4] 29:8 35:25 40:3,4
ET [6] 1:3,6 70:17 82:8 84:8 88:4
evanescent [1] 77:17
even [38] 3:22 8:22 18:13 19:15,18 21:8 28:9,24 33:3,3 59:8 60:5 64:12 67:24 73:6 89:9 90:3 92:2 93:8 98:10 129:14,21 130:3,6 134:10 138:22 140:5 142:15 143:16 144:5,16 145:4,14,14,19 146:12 149:7 150:18
event [1] 77:3
events [1] 17:15
everybody [6] 28:9,24 113:24 123:15 126:23 132:5
everyone [4] 98:15 99:11 100:1 150:25
everything [2] 110:8 144:25
everywhere [1] 150:25
evidence [9] 82:23 86:13 87:7,8,9,11,15 95:17 135:12
evolution [1] 60:14
evolve [1] 59:7
ex [1] 33:21
exact [2] 51:13 97:1
exactly [2] 103:7 126:20
example [18] 5:23 10:19 14:4 33:9 35:19 48:9 57:22 75:22 83:9 84:3 94:14 98:25 104:15 110:11 123:11 131:22 136:12,17
except [1] 52:24
exception [1] 99:5
exchanges [1] 141:2
exclude [1] 60:8
excluded [1] 20:10
exclusive [1] 123:10
excuse [3] 97:1,6 99:2
execute [2] 98:23,23
executive [30] 14:17 20:23 21:4 22:5,10 24:24 28:23 32:15 40:4 42:13 53:17,20 54:8 71:13 90:20 92:7 95:12 96:11 97:3,4,8 99:3,4,11,25 101:9 127:25 129:6

142:2 151:12
executive's [3] 51:9,18 100:18
exercise [11] 15:3 64:2 68:23 82:17 88:11,19 107:16 115:9,18 136:11 149:3
exercised [1] 67:1
exercises [3] 54:6 143:24 144:3
exist [2] 9:14 116:5
exists [5] 26:11 77:1,17 114:9 130:19
expand [2] 60:17,18
expanded [2] 59:15 119:19
expected [2] 9:22 140:9
expecting [1] 139:22
expedited [2] 70:19 72:3
expend [1] 85:6
expenditures [1] 105:16
expense [1] 18:10
experience [1] 56:2
explain [2] 23:1 77:8
explains [1] 149:3
explicitly [1] 41:8
exposed [1] 85:13
exposure [1] 77:1
expressly [1] 49:13
extending [1] 62:9
extent [7] 78:22 84:8 91:14 92:19 95:11 115:13 137:9
extraordinarily [1] 132:4
extraordinary [3] 32:14 51:2,6
extreme [5] 50:20 56:8,12 142:20 144:9
extremely [1] 96:23

**F**

f)(2 [1] 46:8
face [4] 53:16 103:15,18 111:13
fact [38] 11:4 12:18,24 32:6 39:13 46:3 52:2 76:16 77:15 79:15 80:5 82:7,10 85:10 87:7,9 91:3 92:3,4 93:3,3 94:13 95:17 98:3 105:20 109:13 114:7,25 121:12,13,22 124:7 135:3,6,11 140:17 145:4,12
facto [1] 134:20
factors [5] 39:6,9,24,25 121:6
facts [5] 10:14 15:23 19:6,7,8
factual [5] 18:24 19:4 34:22 87:5,5
failed [1] 68:19
failure [1] 67:10
faintest [1] 132:7
fairly [5] 35:18 120:6 132:13,15 140:14
faith [1] 101:23
fall [2] 30:25 74:9

falls [5] 64:12 78:10 102:9 126:23 133:21
far [3] 20:3 49:15 131:17
far-flung [1] 120:9
fault [1] 94:3
favorable [1] 13:18
feature [1] 6:21
federal [40] 3:21 4:3 10:20 13:22 35:3,3 47:1 48:9 53:23 64:19 65:7 66:1 74:9,15 75:11 76:19 80:18 83:20 84:23 85:5 86:23 90:19 91:22 92:16 94:8 97:24 105:4 108:23 112:7 129:6 142:13,23,25 149:2,3,11 150:9,14,20,23
feel [2] 17:4 83:16
felonies [1] 64:22
felony [4] 38:25 39:19,23 65:5
few [4] 57:19 88:6 134:3 138:18
fewer [2] 89:12 149:8
Fifth [1] 7:20
figure [5] 22:5,11 96:13 119:23 134:6
file [2] 125:17 150:11
final [18] 29:7,10 39:4,20 42:10,15 74:18 79:5 94:17 98:22 122:23 130:23,24 133:20 134:11 136:1,6 145:6
Finally [4] 4:24 75:8 116:20 149:22
find [6] 18:21 55:16 69:4 104:25 110:22 126:23
finding [7] 95:16 101:22 110:23 121:20 123:8 131:14 132:5
findings [11] 18:15,25 19:4 80:5 83:2,6 85:10 101:14 111:1 135:3,11
fine [3] 86:21 94:7 108:10
firmly [1] 74:1
First [34] 3:20 15:8 18:13 19:11 21:16 26:13 27:17 40:9 56:14 57:4 63:1 64:13 76:2 78:13 84:5,22 85:9 87:3 90:2,25 92:18 98:16 106:3 112:6 113:13 121:11 128:25 130:14 131:5 134:4 137:16 142:18 144:2 148:9
fiscal [4] 19:13 20:5,6 89:13
fish [1] 110:21
fit [3] 47:3 74:16 106:13
fits [2] 102:24 139:1
five [8] 4:13 35:20 47:20 111:11 113:11 114:20 119:9,9
fix [2] 81:13,21
fixing [1] 48:17
flawed [1] 18:16

Heritage Reporting Corporation

double - flawed

Official - Subject to Final Review

**flexible** [1] **59**:13
**Florida's** [1] **101**:8
**focus** [1] **3**:14
**focused** [4] **19**:13 **20**:4 **27**:13 **29**:21
**focuses** [2] **6**:8 **72**:8
**focusing** [1] **41**:20
**follow** [11] **67**:7,10,20,23 **70**:1 **73**:6 **77**:6,15 **115**:10 **116**:8 **145**:19
**follow-up** [1] **137**:24
**following** [1] **97**:2
**Footnote** [3] **118**:6,12,17
**force** [4] **34**:8 **57**:11,18 **106**:4
**forcing** [2] **53**:11,12
**foreign** [1] **136**:22
**forest** [1] **145**:3
**form** [11] **11**:14 **45**:7 **73**:12 **92**:8 **112**:8,10,13 **113**:16,22 **116**:18 **118**:10
**formally** [1] **118**:19
**formed** [2] **69**:6,11
**forms** [11] **6**:9 **37**:9 **60**:24 **94**:23 **111**:7,25 **112**:1,3,3,14,17
**forth** [4] **48**:21 **49**:4 **64**:10 **75**:19
**fortifies** [1] **49**:9
**forum** [1] **150**:19
**forums** [1] **4**:4
**found** [3] **7**:25 **104**:17 **121**:12
**Four** [4] **7**:14,14 **8**:21 **119**:19
**Fourth** [4] **57**:14 **111**:16 **131**:23 **141**:25
**frame** [1] **19**:12
**framers** [1] **50**:17
**framework** [5] **13**:2 **74**:17 **121**:21,23,24
**frankly** [1] **139**:21
**free** [2] **45**:7 **47**:12
**frequently** [3] **138**:7 **150**:12 **151**:2
**friend** [7] **45**:17 **47**:23 **77**:2 **118**:24 **147**:7 **148**:1,23
**friends** [3] **111**:14,15 **133**:13
**front** [1] **113**:8
**fulfill** [2] **22**:3 **105**:12
**function** [2] **5**:24 **45**:14
**fundamental** [2] **13**:6 **40**:19
**fundamentally** [5] **8**:16 **9**:15 **18**:15 **45**:21 **147**:7
**funding** [1] **4**:17
**funds** [3] **10**:20 **51**:20 **52**:10
**further** [1] **79**:21

### G

**gains** [2] **33**:15 **100**:14
**Garland** [1] **54**:18

**gave** [1] **97**:3
**GEN** [4] **1**:19 **2**:3,9 **3**:7
**General** [145] **1**:19,22 **3**:6,9 **5**:7,10,19 **6**:5 **7**:5,12,17 **8**:10,24 **9**:2,24 **10**:13 **11**:6,20 **12**:1,8,16 **13**:11 **14**:1,6,9,16,20 **15**:9,20 **17**:5,8,21 **18**:3,7,19 **19**:3 **20**:15,16 **21**:10,22 **22**:7,19,23 **24**:4,8,21 **25**:5,15,20,22,24 **26**:4,10,19,23 **27**:2,5,12,16,23 **28**:1,11,14 **29**:17 **31**:4,19,20 **32**:10 **33**:7 **34**:2,6,11 **36**:1,10,16 **37**:13,20,22 **38**:5,12 **39**:1 **40**:6 **41**:2,5,11,15,25 **42**:4,6 **43**:8 **44**:18 **45**:5,20 **47**:5 **48**:3,14 **49**:21 **50**:5,16 **51**:16 **52**:17,21 **53**:14 **56**:13 **58**:2,5 **59**:17 **60**:15 **61**:19 **62**:4,21,24 **63**:9,20 **64**:17 **65**:2,24 **68**:5 **69**:13 **71**:6 **72**:5,20 **73**:2,7,18 **75**:17 **77**:22 **79**:19 **88**:24 **90**:14 **92**:1 **95**:4 **107**:20 **109**:1 **110**:4 **127**:10 **129**:6 **130**:8 **133**:24 **140**:2 **144**:21 **147**:2,3,5 **150**:11
**generalized** [1] **113**:24
**generally** [4] **46**:3,11 **56**:16 **108**:12
**generic** [1] **35**:2
**generous** [1] **113**:15
**gestured** [2] **24**:17 **148**:25
**gets** [1] **67**:15
**getting** [6] **15**:22 **36**:4 **39**:16 **81**:20 **102**:7 **137**:15
**giant** [3] **46**:16 **112**:25 **113**:9
**give** [10] **15**:11 **38**:8,19 **43**:1 **45**:19 **64**:14 **87**:25 **115**:19 **140**:19 **151**:8
**Given** [11] **4**:16 **60**:9 **67**:13 **91**:3,19 **92**:7,12 **93**:13 **97**:4 **108**:16 **126**:5
**gives** [3] **106**:5 **139**:25 **150**:1
**giving** [2] **103**:12,12
**glad** [1] **61**:6
**Gonzalez** [8] **6**:10 **71**:8 **72**:8 **77**:24,24 **78**:24 **79**:3 **117**:19
**Gorsuch** [41] **44**:12,13,24 **45**:16 **46**:23 **47**:15,20 **48**:12 **49**:12 **50**:5 **79**:19 **80**:7,9,12,21,24 **81**:2,17 **82**:2,13 **108**:1 **109**:14,21,25 **110**:3,13 **111**:22 **112**:11,14,20,22 **113**:19,23 **114**:2,6,11,15,19,23 **119**:6 **134**:1
**Gorsuch's** [1] **62**:13
**got** [3] **55**:24 **89**:19 **143**:10
**govern** [2] **29**:20 **40**:7
**government** [58] **4**:6 **9**:25 **31**:24 **32**:3 **47**:2 **53**:5 **54**:

21 **55**:5 **57**:25 **65**:8 **66**:1 **70**:12 **80**:13 **81**:19,22 **83**:21 **84**:23 **85**:5 **86**:23,23 **87**:20 **91**:22 **96**:6 **102**:15 **103**:7,25 **104**:9,16,17 **105**:4,7,11 **118**:7,7 **119**:14,18 **128**:12 **134**:7,16 **135**:23 **136**:9 **137**:15 **138**:2,3 **142**:8,13,13,23,25 **143**:7,16,25 **149**:2,11,12 **150**:9,14 **151**:1
**government's** [9] **78**:4,6,9 **81**:5 **96**:3 **143**:10 **149**:4 **150**:21,24
**governs** [4] **40**:11 **48**:21 **49**:17 **110**:18
**grant** [1] **7**:24
**granting** [1] **5**:3
**gravity** [1] **39**:7
**greater** [1] **87**:25
**grievance** [1] **113**:25
**gross** [1] **93**:8
**ground** [5] **21**:25 **22**:13 **120**:12 **148**:4,10
**grounded** [1] **74**:1
**grounds** [1] **135**:10
**group** [1] **86**:22
**guess** [16] **19**:7 **32**:21 **48**:1 **52**:7 **54**:16 **60**:11 **62**:5 **70**:14 **85**:22 **89**:7 **91**:24 **97**:14 **128**:10 **129**:12 **135**:25 **146**:13
**guideline** [1] **73**:1
**guidelines** [49] **3**:18 **19**:15 **29**:19,25 **40**:7,20 **41**:20,21 **47**:13 **70**:17,21 **78**:7 **79**:5 **80**:2,2,8,13,16,18 **81**:4,20,21 **82**:4,15 **83**:10 **86**:2,25 **101**:18 **103**:7,15,18 **120**:24 **121**:4,21 **122**:1,16 **123**:6,16,18,23 **124**:5,10,20,23 **129**:23 **130**:12 **135**:19 **147**:18 **150**:16

### H

**habeas** [4] **48**:23 **49**:2 **107**:3,20
**half** [2] **90**:6 **91**:3
**halt** [2] **89**:24 **90**:23
**hand** [1] **111**:15
**hang** [1] **48**:1
**happen** [5] **33**:8 **53**:25 **101**:4 **137**:17,18
**happened** [2] **33**:5 **36**:22
**happens** [2] **101**:11 **127**:18
**happy** [1] **43**:9
**hard** [7] **8**:3 **19**:9 **77**:8,25 **89**:3,6 **128**:17
**harder** [3] **135**:5,9,9
**harm** [3] **81**:10 **106**:11 **108**:22
**harmed** [1] **114**:3
**harms** [6] **3**:22 **11**:22 **12**:25 **17**:13,18 **73**:24
**Harrison's** [1] **109**:4

**hat** [1] **48**:1
**health** [2] **17**:1 **20**:9
**healthcare** [4] **9**:22 **10**:8 **17**:1 **84**:20
**hear** [3] **3**:3 **47**:22 **48**:2
**hearings** [1] **71**:10
**Heckler** [3] **14**:15 **23**:13 **99**:1
**held** [7] **4**:11 **50**:22 **74**:10 **78**:2 **121**:1 **144**:2 **145**:5
**helpful** [1] **137**:17
**high** [3] **84**:25 **85**:12,20
**high-stakes** [1] **151**:5
**history** [14] **4**:1 **29**:13 **36**:18 **37**:5 **38**:10 **49**:7 **53**:19 **54**:16 **56**:17 **66**:18 **110**:7 **139**:2,11 **149**:20
**hold** [7] **11**:2 **75**:15 **107**:15 **111**:11 **142**:16 **143**:13 **150**:24
**holding** [1] **121**:2
**hole** [1] **113**:9
**holistic** [1] **64**:25
**Honor** [47] **78**:13 **81**:1,8 **82**:22 **83**:5 **84**:1 **85**:9 **86**:4 **88**:8 **89**:5 **90**:1,9,24 **92**:17 **93**:16 **94**:12 **95**:15,23 **96**:17 **99**:19,20 **101**:22 **102**:12 **103**:14 **106**:2,16 **109**:12 **111**:18 **112**:5,18 **113**:13 **117**:24 **120**:7 **121**:19 **122**:3,12 **124**:17 **125**:10 **128**:24 **131**:15 **132**:12,22 **133**:11 **135**:18 **136**:17 **144**:1 **146**:15
**hook** [1] **21**:6
**hope** [1] **38**:19
**hostility** [3] **12**:12 **13**:3,15
**hotly** [1] **86**:10
**however** [3] **15**:14 **117**:20 **119**:9
**huge** [1] **139**:21
**human** [1] **94**:21
**hypothetical** [5] **17**:9 **99**:25 **135**:2 **136**:9 **142**:7
**hypothetically** [1] **15**:10

### I

**ICE** [4] **29**:11 **40**:15 **82**:16 **101**:15
**Idaho** [1] **108**:17
**Idaho's** [1] **108**:21
**idea** [4] **30**:21 **132**:7 **142**:22 **148**:25
**identified** [1] **52**:2
**identify** [2] **28**:3 **32**:16
**idiosyncratic** [1] **137**:25
**ignore** [2] **57**:25 **120**:12
**ignored** [1] **20**:8
**ignores** [1] **46**:2
**ignoring** [2] **134**:18,22
**II** [12] **1**:22 **2**:6 **24**:12,17,17 **25**:2,7 **73**:19 **97**:25 **99**:14,18 **100**:14

**III** [17] **11**:4 **12**:4 **60**:20,25 **61**:15 **62**:3,5 **74**:4,17 **84**:2 **86**:6 **88**:21 **91**:2 **94**:24 **114**:4,9 **151**:14
**IIRAIRA** [2] **85**:16 **97**:2
**illegal** [3] **75**:7 **107**:4,17
**illegitimate** [1] **74**:7
**imagine** [2] **54**:13 **66**:7
**immediate** [2] **138**:3,4
**immediately** [4] **91**:4 **97**:10 **100**:22 **150**:23
**immensely** [1] **100**:18
**immigration** [27] **4**:20 **7**:3 **14**:13 **16**:10 **20**:13 **22**:12 **51**:5 **71**:3 **74**:15 **80**:1,14,18 **81**:6,23 **84**:7 **88**:22,25 **89**:11,16 **90**:17,18,22 **91**:15 **94**:8 **120**:25 **121**:5 **148**:21
**impeachment** [1] **53**:6
**impermissible** [1] **59**:16
**implement** [4] **6**:13,23 **64**:18 **72**:11
**implementation** [1] **71**:5
**implemented** [5] **4**:15 **21**:1 **31**:5 **43**:10,13
**implementing** [2] **70**:12 **71**:13
**implicates** [4] **13**:6 **46**:9 **60**:19,20
**implications** [1] **22**:9
**imply** [1] **132**:11
**important** [3] **49**:15 **76**:14 **107**:25
**importantly** [1] **96**:25
**impose** [3] **10**:10 **121**:5 **131**:7
**imposed** [1] **39**:9
**imposes** [2] **3**:22 **131**:11
**imposing** [1] **10**:7
**impossibility** [1] **95**:6
**impossible** [8] **4**:17 **20**:23 **23**:18 **44**:5 **95**:11,12 **96**:10 **147**:24
**improper** [1] **19**:16
**improve** [1] **16**:25
**INA** [16] **4**:7,15 **5**:1,4 **6**:13,23 **25**:18 **28**:16 **32**:19 **43**:11 **72**:11 **74**:4 **78**:5,6,10 **147**:25
**INA's** [1] **74**:1
**incarcerate** [1] **83**:19
**incidental** [1] **149**:17
**include** [6] **58**:14,16 **60**:13 **112**:1,21 **115**:22
**included** [2] **19**:23 **115**:15
**includes** [1] **39**:6
**including** [8] **26**:12 **36**:3 **42**:15 **48**:23 **60**:6 **83**:9 **118**:11 **145**:11
**incompatible** [2] **3**:24 **9**:15
**inconsistent** [6] **7**:15 **35**:18 **42**:25 **45**:21 **59**:18 **71**:7

Heritage Reporting Corporation

| | | | |
|---|---|---|---|
| **incorrect** [1] **29**:18 | **instantly** [2] **96**:8 **128**:9 | 20 **45**:11 **49**:25 **61**:3 **99**:4 | 10,11,11,13,24 **45**:16 **46**: | **139**:16 **148**:3 |

**incorrect** [1] **29**:18
**incredibly** [1] **21**:25
**incur** [3] **15**:25 **74**:8 **86**:2
**incurred** [3] **17**:2 **19**:14 **86**:9
**indeed** [3] **91**:12 **96**:19 **138**:22
**indefinitely** [3] **142**:17 **143**:13 **146**:13
**independent** [2] **19**:11 **149**:24
**indicate** [1] **146**:22
**indicated** [1] **46**:23
**indirect** [9] **3**:22 **9**:23 **11**:3 **15**:25 **17**:13 **106**:11 **149**:8, 10,17
**indirect/direct** [1] **11**:1
**individual** [28] **7**:7 **12**:5 **13**:20 **35**:13 **44**:1,3 **50**:12 **73**:10 **83**:17 **88**:12 **96**:5 **99**:7 **101**:14 **104**:6 **105**:15 **106**:5,17,21 **107**:2,24 **117**:15 **125**:3 **129**:1 **131**:21 **133**:14,15,19 **141**:21
**individuals** [24] **16**:14 **25**:1 **64**:20 **84**:7,9,13,25 **85**:7,17 **86**:14 **95**:19 **96**:1 **103**:19 **121**:14 **126**:14 **129**:8,8,22, 24 **131**:2 **132**:23 **145**:11 **146**:21 **148**:18
**inflexible** [4] **28**:17 **32**:17 **43**:16 **44**:9
**inform** [1] **21**:13
**informally** [1] **82**:17
**information** [4] **33**:15,17 **65**:7,25
**informed** [1] **110**:8
**infrequently** [1] **19**:6
**inherent** [1] **67**:3
**initial** [2] **116**:9 **128**:3
**initiate** [1] **141**:8
**initiated** [3] **32**:23 **33**:4 **34**:9
**initiating** [1] **128**:13
**injunction** [12] **5**:24 **6**:21 **70**:9 **71**:12 **76**:24 **81**:8,12 **117**:22 **118**:11,18,20,21
**injunctions** [8] **58**:15 **59**:8 **60**:8,21 **76**:5 **77**:18 **111**:8 **112**:23
**injunctive** [8] **58**:15 **70**:9 **72**:1 **76**:2,4 **112**:1,15 **118**:9
**injured** [1] **113**:6
**injuries** [2] **84**:12 **91**:3
**injury** [19] **7**:8 **9**:23 **10**:16 **11**:1,3,3,4,14 **12**:3,19 **16**:20 **17**:7 **23**:4 **81**:13 **84**:5, 10 **85**:23 **91**:8 **94**:24
**innovation** [1] **49**:20
**innovative** [1] **119**:16
**inquiry** [1] **65**:1
**insert** [1] **132**:3
**insofar** [1] **60**:17

**instantly** [2] **96**:8 **128**:9
**Instead** [10] **4**:21 **12**:23 **16**:12 **35**:8 **36**:22 **37**:7 **48**:16 **53**:4 **61**:3 **90**:20
**Institute** [2] **57**:6 **82**:18
**intend** [1] **95**:8
**intended** [7] **16**:8 **37**:6 **50**:18 **52**:6 **58**:14 **60**:2 **117**:13
**intent** [1] **49**:7
**inter** [1] **127**:3
**interest** [1] **117**:19
**interesting** [1] **49**:13
**interests** [5] **11**:11,23 **12**:9, 20 **91**:21
**interference** [2] **6**:17 **23**:5
**interim** [2] **47**:13 **117**:2
**interior** [1] **3**:13
**internal** [2] **123**:11 **124**:11
**interpret** [6] **15**:6 **21**:14 **46**:4 **62**:14 **72**:15 **145**:15
**interpretation** [10] **21**:23 **23**:2 **49**:11 **59**:20 **61**:13 **63**:15 **72**:8 **119**:3,24,25
**interpreted** [4] **28**:17 **44**:2 **70**:10 **72**:1
**interpreting** [3] **69**:20 **71**:24 **141**:6
**Interstate** [3] **108**:12,19,20
**intertextual** [2] **96**:20 **139**:10
**intolerable** [1] **144**:5
**intrusive** [2] **24**:23 **100**:15
**invalid** [5] **48**:10 **68**:9 **69**:17 **115**:9,25
**invalidity** [1] **115**:16
**invasion** [1] **100**:15
**investment** [2] **65**:17,18
**involve** [1] **37**:23
**involves** [1] **65**:17
**ISIS** [1] **104**:16
**Island** [1] **57**:6
**isn't** [27] **29**:3,16 **31**:18,22, 23 **33**:13 **40**:5 **56**:16 **59**:3 **61**:15 **64**:23 **68**:8 **70**:25 **81**:3,17 **83**:12 **85**:2,24 **88**:21 **90**:11 **96**:12 **99**:22 **103**:6 **107**:8 **110**:17 **136**:25 **142**:1
**issue** [32] **7**:20 **15**:4 **27**:18 **29**:3 **44**:23 **45**:12 **58**:6,7, 11 **60**:22 **63**:2,12,14 **90**:16 **115**:6,8 **117**:20 **119**:11 **120**:21 **123**:15 **128**:19 **134**:5 **135**:16 **136**:14 **138**:1 **139**:21,24 **140**:3,5 **150**:22, 25 **151**:10
**issued** [5] **3**:17 **5**:21 **33**:11 **37**:16 **78**:15
**issues** [5] **5**:11 **9**:5 **57**:23 **130**:3 **151**:8
**issuing** [1] **139**:14
**it'll** [1] **35**:14
**items** [1] **121**:14
**itself** [11] **21**:15 **24**:16 **43**:

20 **45**:11 **49**:25 **61**:3 **99**:4 **110**:16 **115**:24 **117**:11 **146**:17

## J

**JA** [1] **19**:23
**JACKSON** [36] **20**:15 **23**:23 **25**:21 **30**:4 **31**:18,22 **66**:5,6,14 **68**:6,13 **69**:22 **71**:21 **72**:18,21 **73**:15 **83**:12 **84**:17 **85**:18,21 **86**:17,19 **115**:5,13 **116**:1,13,25 **140**:24, 25 **141**:13,16,23 **143**:5 **144**:11 **145**:4,21
**Jaffe** [2] **49**:19 **59**:11
**jail** [1] **125**:16
**Jersey** [1] **83**:25
**jettison** [1] **75**:9
**job** [1] **20**:24
**joining** [1] **91**:19
**Joint** [1] **39**:5
**JUDD** [3] **1**:22 **2**:6 **73**:19
**Judge** [15] **15**:12 **57**:16 **76**:19,20,21 **86**:20 **93**:3,16 **94**:5,8,8 **137**:25 **150**:19,21 **151**:9
**judges** [4] **54**:14,18 **55**:4 **138**:18
**judgment** [17] **5**:15,18,21 **6**:1,15 **46**:25 **47**:6,8,10 **58**:7 **111**:8 **122**:5 **128**:4 **135**:7 **147**:9,11,21
**judgments** [6] **15**:2 **58**:16 **59**:9 **60**:7 **79**:20 **112**:2
**judicial** [6] **48**:24,24 **52**:14 **53**:4 **101**:11 **113**:16
**judicially** [9] **7**:8 **22**:14 **23**:4,16 **34**:16 **52**:7,12 **147**:25 **148**:8
**juncture** [1] **33**:18
**jurisdiction** [11] **45**:12 **61**:16 **62**:5,12,16 **63**:8,11,24 **70**:5 **107**:17 **139**:25
**jurisdictional** [19] **9**:8 **44**:22,25 **45**:4,6,8,8,15 **61**:9, 22,24 **62**:17,20 **63**:15,19, 22 **64**:1,4 **140**:1
**jurisdictions** [1] **150**:13
**Justice** [371] **1**:20 **3**:3,9 **5**:7, 17 **6**:3,25 **7**:10,14 **8**:7,13, 19,25 **9**:18,24 **10**:2,22 **11**: 17,25 **12**:3,11 **13**:9,14 **14**:3, 6,7,14 **15**:9,21 **16**:15 **17**:5, 6,8,19,23 **18**:5,17,20 **20**:15, 16 **21**:11,17 **22**:1,17,20 **23**: 22,23,24 **24**:6,10 **25**:3,6,8, 20,21,22,25 **26**:5,14,21,24 **27**:4,7,15,18,24 **28**:6,13,21 **30**:4 **31**:18,19,22 **32**:12,13, 20 **33**:23,24 **34**:3,7 **35**:12 **36**:2,9,12 **37**:12,15,21 **38**:3, 11,14,14,16,17 **39**:3 **40**:22, 22,24 **41**:4,7,12,18 **42**:2,5, 7,12,19,20,20,21 **43**:22 **44**:

10,11,11,13,24 **45**:16 **46**:23 **47**:15,20 **48**:12 **49**:12 **50**:5,6,6,7,25 **52**:4,16,19, 23 **54**:1,25 **56**:6,13 **57**:20 **58**:4,19,20,20,22,24 **60**:4 **61**:6 **62**:2,11,13,22 **63**:6,10 **64**:7,9 **65**:22 **66**:3,4,4,6,8, 8,11,14 **68**:5,13 **69**:22 **71**:21 **72**:18,21 **73**:15,16,22 **75**:17,24 **77**:21 **79**:19 **80**:7, 9,12,21,23,24 **81**:2,17 **82**:2, 13,14 **83**:3,12,15 **84**:17,20, 22 **85**:18,21 **86**:17,18,19, 20 **87**:13,16 **88**:13,17,24 **89**:6 **90**:7,10 **91**:5,7,24 **92**: 23 **93**:19,20,21,23,25 **95**:1, 21 **96**:9 **97**:13,15 **99**:9,17, 22 **100**:23,24,25 **101**:2 **102**: 3,4,5,13,21 **103**:2,3,6,21, 25 **104**:3,7,13,23 **105**:6,14, 17,24,25 **106**:8,20 **107**:1,6, 10,14,22 **108**:1,7,25 **109**:6, 14,21,25 **110**:3,13 **111**:22 **112**:11,14,20,22 **113**:18,23 **114**:2,6,11,15,19,23 **115**:5, 12 **116**:1,13,25 **117**:4,7,14, 16,17 **118**:2,22 **119**:5,5,12 **120**:16,16,18,22,23 **121**:10, 17,23 **122**:7,15 **123**:1,4,14 **124**:2,6,12,19 **125**:5,14,24 **126**:7,16,20 **127**:4,7,7,8,16 **128**:10,16 **129**:12 **130**:1,17 **131**:6 **132**:2,17 **133**:2,16, 19,22,24,25,25 **134**:2,3,14, 21 **135**:2,14,21 **136**:4,8,18, 20 **137**:3,10,14,23 **138**:8, 20 **139**:16,17,17,19,20 **140**: 22,23,23,25 **141**:2,2,13,16, 23 **143**:5 **144**:11 **145**:4,21 **146**:2,25 **147**:6 **148**:3 **151**: 16
**Justice's** [1] **97**:17
**Justices** [1] **144**:20
**justify** [1] **23**:5

## K

**KAGAN** [38] **32**:20 **33**:24 **34**:3,7 **42**:20,21 **66**:11 **77**: 21 **88**:24 **89**:6 **90**:7,10 **91**: 5,7,24 **92**:23 **93**:19,21,25 **127**:7,8,16 **128**:10,16 **129**: 12 **130**:1,17 **131**:6 **132**:2, 17 **133**:2,16,19,22,24 **137**: 14 **141**:3 **146**:2
**Kagan's** [1] **97**:16
**KAVANAUGH** [49] **14**:14 **23**:22,24 **24**:6,10 **25**:3,6 **32**:13 **50**:7,25 **52**:4,16,19, 23 **54**:1 **56**:6,14 **57**:20 **58**: 4,19,24 **66**:9 **86**:18 **97**:13 **99**:9,17,22 **100**:24 **101**:2 **102**:3 **119**:12 **134**:2,3,14, 21 **135**:2,14,21 **136**:4,8,18, 20 **137**:3,10,23 **138**:8,21

**139**:16 **148**:3
**keep** [3] **85**:25 **86**:3 **122**:16
**keeping** [1] **88**:5
**kettle** [1] **110**:20
**key** [1] **76**:8
**kick** [2] **129**:16,17
**kicks** [1] **32**:25
**Kim** [1] **128**:19
**kind** [32] **6**:17 **8**:5,18,25 **9**:10 **10**:16 **15**:7 **18**:9 **22**:14 **31**:20 **33**:15 **40**:10 **44**:8 **46**:5 **49**:12,23 **59**:24 **63**:17 **64**:9 **66**:11 **68**:10 **69**:23 **82**:23 **87**:14 **91**:8,15 **93**:12,12 **94**:9,22 **115**:13 **144**:16
**kinds** [15] **11**:23 **15**:25 **19**:16 **28**:19 **30**:1 **37**:7 **42**:16 **45**:12 **51**:22 **53**:21 **76**:4 **85**:13 **116**:2,4 **149**:17
**knows** [4] **35**:8 **61**:20 **70**:19 **151**:3

## L

**label** [2] **45**:8 **61**:24
**labor** [2] **50**:11 **55**:6
**lack** [5] **3**:20 **8**:5 **51**:6 **101**:21,21
**lacked** [1] **9**:20
**lacks** [4] **33**:10 **63**:11,11,18
**landing** [1] **57**:1
**language** [19] **15**:6 **31**:21 **34**:13 **44**:6 **46**:4,12 **47**:22, 25 **60**:1 **71**:15 **78**:11 **81**:4 **107**:8 **110**:11 **130**:7 **131**:9, 19 **133**:7,10
**large** [1] **37**:2
**largest** [1] **86**:12
**last** [11] **6**:11 **7**:13 **38**:18 **45**:1 **57**:8 **62**:11 **64**:7 **71**:8 **81**:5 **101**:2 **138**:9
**late** [3] **38**:8 **56**:23 **57**:1
**later** [2] **33**:14 **143**:3
**Laughter** [4] **47**:19 **56**:5 **66**:13 **93**:24
**law** [32] **7**:9 **14**:13,24 **16**:16 **19**:1 **20**:22,24 **21**:7 **22**:4 **47**:3 **50**:21 **53**:9 **55**:1,14, 16,22,23 **56**:1 **58**:9 **74**:4,9 **84**:14 **94**:22 **98**:7 **99**:12 **100**:2 **108**:4,6 **110**:19 **111**:5 **119**:15,16
**laws** [13] **16**:10 **50**:10,11,15 **51**:8,14 **53**:8,9,10 **80**:1,14 **81**:6,23
**lead** [4] **4**:20 **16**:13 **97**:20 **136**:15
**leading** [2] **139**:3,12
**learned** [2] **111**:14,15
**least** [18] **17**:4 **23**:3 **42**:24 **47**:1 **51**:10 **52**:25 **53**:8 **54**:22 **74**:10 **79**:7 **90**:25 **94**:14 **95**:15 **97**:24 **98**:14 **106**:16 **107**:19 **135**:9
**leave** [2] **21**:9 **29**:25

Official - Subject to Final Review

**left** [3] **75:**25 **87:**22 **119:**22
**legal** [11] **34:**25 **37:**10 **58:** 13 **65:**11,19 **69:**15 **112:**12 **113:**17,20 **115:**3 **138:**21
**legally** [7] **67:**4,6,12 **78:**18 **105:**21 **106:**23 **107:**11
**legion** [1] **26:**22
**legitimate** [1] **144:**18
**less** [9] **13:**18 **16:**14 **20:**3, 13 **76:**13,14 **88:**6 **89:**14,15
**levels** [1] **16:**4
**life** [1] **51:**18
**light** [1] **23:**6
**likelihood** [2] **8:**1 **137:**20
**limit** [4] **45:**15 **63:**21 **143:**20 **149:**21
**limitation** [2] **45:**2 **71:**25
**limited** [6] **3:**14 **12:**20 **16:** 11 **70:**4 **107:**8 **143:**7
**limiting** [1] **3:**24
**limits** [6] **14:**17,19 **25:**2 **113:**3,5 **148:**24
**Linda** [3] **6:**25 **14:**12 **97:**19
**line** [5] **6:**1 **8:**11 **61:**21 **77:** 16 **118:**23
**line-level** [1] **123:**12
**lines** [1] **128:**3
**list** [2] **39:**9 **111:**6
**listed** [2] **49:**14 **112:**1
**lists** [1] **112:**15
**literally** [2] **48:**7,16
**litigants** [2] **5:**25 **11:**24
**litigated** [3] **7:**19 **46:**21 **147:**20
**litigation** [1] **6:**24
**little** [15] **8:**20 **9:**21 **42:**21 **43:**1 **54:**2 **57:**7 **79:**21 **80:**4, 17 **95:**3 **107:**23 **110:**17 **112:**24 **139:**25 **151:**5
**local** [1] **64:**19
**logic** [3] **28:**6,7 **62:**23
**logical** [1] **116:**16
**long** [10] **5:**20 **31:**5 **34:**18 **36:**13 **43:**23 **59:**2 **80:**22 **109:**7,17 **143:**21
**long-term** [1] **16:**25
**longer** [3] **55:**11 **80:**19 **124:** 10
**look** [23] **16:**7 **28:**9 **34:**19 **37:**4,5 **38:**9 **49:**6 **70:**4 **88:** 14,16 **90:**10 **93:**1,2 **110:**16 **111:**18,22,24 **121:**6,24,25 **123:**18 **130:**7 **149:**20
**looked** [2] **19:**12 **123:**9
**looking** [6] **19:**19 **39:**4 **57:** 10 **88:**18 **116:**4,21
**looks** [1] **122:**19
**loophole** [1] **46:**16
**lose** [2] **140:**11 **145:**3
**loses** [1] **100:**14
**loss** [1] **84:**9
**lost** [1] **127:**9
**lot** [5] **18:**21 **54:**19 **86:**24 **104:**14 **149:**24

**lots** [1] **131:**10
**low** [1] **145:**23
**lower** [18] **5:**2 **7:**19 **8:**13,14, 15 **9:**12 **36:**2 **46:**18,19 **57:** 9 **109:**13,15,16,16 **140:**6, 15 **150:**7 **151:**7
**Lujan** [1] **113:**14
**lurking** [1] **113:**1

## M

**made** [33] **5:**22 **9:**6,25 **19:**1 **30:**23 **32:**1,4 **40:**11 **45:**17 **50:**2 **54:**21,24 **62:**7 **63:**22 **66:**20 **71:**16 **85:**15 **96:**6 **100:**20 **103:**10 **120:**8 **123:** 8 **126:**4 **127:**15 **128:**2,6,7 **129:**3,10 **131:**13 **144:**23 **146:**3 **147:**22
**main** [1] **55:**19
**mandate** [7] **4:**8 **23:**15 **32:** 17 **43:**16 **44:**9 **54:**5 **99:**3
**mandates** [4] **28:**19 **30:**19 **51:**12 **52:**7
**mandating** [1] **135:**17
**mandatorily** [1] **27:**21
**mandatory** [29] **22:**16 **23:** 16 **25:**19 **26:**25 **28:**2,17 **30:** 2,5 **31:**9,21 **43:**23 **52:**11 **60:**8 **74:**23 **76:**10 **80:**20 **82:** 5,6 **97:**7,12 **105:**12 **121:**15, 17,22 **123:**22 **131:**20 **132:** 25 **133:**3 **145:**13
**manhunt** [1] **34:**18
**manner** [2] **4:**15 **66:**25
**many** [11] **29:**4 **34:**17,19 **37:** 15 **74:**14 **88:**2 **119:**7,9 **140:** 18,18 **144:**19
**Massachusetts** [5] **12:**13 **74:**11 **91:**17,20 **92:**22
**matter** [17] **1:**13 **23:**1 **50:**14 **61:**12,15 **62:**3,4 **63:**14 **64:** 25 **68:**16 **82:**7,10 **95:**16 **114:**25 **121:**12,13 **135:**6
**mean** [45] **7:**1 **8:**22 **13:**12 **22:**13 **24:**2 **25:**10 **28:**17 **36:** 12 **48:**4 **53:**11 **55:**11 **56:**15 **57:**21,21,24 **62:**2,23 **66:**24 **68:**14 **70:**10 **82:**15,16 **85:**3, 22 **88:**6 **89:**7,10,16,21 **90:** 10 **93:**25 **94:**2 **95:**11 **109:** 16 **115:**7 **116:**14 **128:**19 **129:**12,15 **132:**8,15 **138:**24 **139:**20 **144:**13 **148:**5
**meaning** [7] **21:**15 **48:**6 **77:** 12 **117:**21,22 **140:**8 **143:**11
**means** [28] **20:**20 **21:**8,20 **22:**22,25 **24:**1,2,16 **25:**8,11 **28:**8,8 **38:**22 **46:**11 **55:**10 **68:**22 **96:**14,15,19,21 **98:** 18 **118:**19 **125:**7 **130:**6 **131:**16 **148:**16 **149:**14 **150:** 8
**meant** [6] **58:**9 **59:**22 **110:**2 **117:**25 **132:**13 **140:**9

**meantime** [1] **22:**10
**mechanisms** [1] **65:**6
**meet** [2] **101:**9 **116:**12
**members** [1] **151:**3
**memorandum** [9] **29:**7,11 **39:**4,20 **65:**1 **74:**18 **79:**5 **83:**8 **145:**7
**mental** [1] **39:**10
**mention** [1] **89:**17
**mentioned** [3] **51:**1 **119:**12 **141:**24
**merely** [2] **75:**14 **82:**10
**merits** [22] **4:**7 **8:**1 **15:**4 **20:** 17,19,20 **44:**17 **64:**8 **73:**25 **74:**18 **81:**25 **85:**19,21 **95:**2 **97:**16,21 **120:**15 **137:**20,21 **140:**21 **141:**1 **147:**23
**Merriam-Webster's** [1] **138:**22
**might** [28] **16:**5 **17:**2 **33:**22 **48:**10 **54:**13 **64:**3 **65:**3 **66:** 6 **68:**11 **76:**10 **82:**21 **85:**4 **86:**6,21 **89:**4 **109:**10 **118:** 20 **119:**2 **126:**7 **127:**8 **132:** 22 **134:**19 **137:**25 **140:**3 **142:**7,21 **143:**9 **148:**10
**military** [1] **39:**11
**million** [2] **3:**11 **20:**11
**minimum** [5] **92:**21,21 **128:** 24 **131:**15 **136:**24
**minute** [1] **52:**5
**misheard** [1] **110:**4
**mismatch** [1] **40:**10
**misread** [1] **117:**23
**misspoken** [1] **110:**2
**mistake** [2] **126:**17 **147:**23
**mistakes** [1] **9:**5
**misunderstanding** [1] **8:** 16
**misunderstands** [1] **147:** 8
**mitigating** [2] **39:**9,25
**mix** [1] **9:**1
**Mm-hmm** [1] **82:**2
**moment** [3] **110:**16 **125:**15, 18
**monetary** [1] **16:**24
**money** [8] **85:**6 **89:**15 **103:** 11 **123:**19 **134:**8,17,23 **135:** 24
**monitor** [1] **65:**12
**Monsanto** [1] **76:**13
**monster** [1] **111:**9
**months** [3] **7:**15 **8:**21 **142:** 8
**morning** [1] **3:**4
**most** [8] **47:**24 **49:**15,15 **54:** 7 **69:**3 **74:**19 **76:**14 **92:**7
**motion** [1] **138:**5
**move** [8] **10:**24 **13:**21 **20:** 17 **35:**13 **54:**11 **95:**2 **107:** 24 **117:**15
**MPP** [1] **7:**12
**much** [11] **24:**19 **44:**14 **50:**2

**76:**13 **79:**7,7 **101:**5 **102:**19 **113:**21 **135:**5,8
**multiple** [4] **9:**5 **74:**19 **150:** 12,13
**murder** [1] **148:**14
**must** [20] **16:**16 **28:**23 **29:**9, 13 **40:**1 **73:**3 **81:**14,15,19 **84:**16 **99:**6,10,11,25 **100:**1 **102:**25 **105:**11 **110:**1 **124:** 15 **146:**20

## N

**namely** [1] **109:**3
**narrow** [2] **31:**16 **95:**15
**narrowing** [1] **60:**11
**nation** [2] **58:**8 **151:**10
**nation's** [2] **4:**23 **75:**7
**national** [4] **3:**15 **4:**6 **148:** 19 **149:**12
**nationwide** [3] **3:**19 **6:**6 **60:** 21
**natural** [2] **103:**17 **115:**23
**nature** [3] **68:**10,14 **87:**5
**nearly** [1] **75:**9
**necessary** [1] **67:**11
**necessity** [2] **23:**11,21
**need** [6] **17:**22 **46:**1 **53:**2 **89:**8,9 **91:**11
**negating** [1] **110:**25
**negative** [1] **146:**19
**neither** [1] **137:**1
**net** [9] **15:**17 **16:**23 **17:**6 **18:** 2 **86:**20 **87:**18 **88:**4 **93:**7,9
**never** [12] **4:**14 **11:**3 **38:**5 **43:**13 **44:**1,5 **48:**3 **52:**9 **54:** 21 **98:**3,4 **129:**17
**new** [9] **37:**7 **50:**8 **61:**2 **71:**1, 2 **83:**25 **108:**2 **119:**24 **138:** 12
**next** [3] **46:**7 **116:**10 **137:**13
**nine** [1] **142:**8
**nobody** [2] **49:**18 **92:**14
**non-citizen** [15] **4:**9 **17:**17 **26:**13 **31:**6,8 **32:**17 **33:**14, 16,21 **40:**9,14 **41:**6 **64:**12 **82:**20 **149:**8
**non-citizens** [13] **3:**12 **16:** 6 **19:**22,25 **20:**11 **42:**10 **43:** 17 **71:**9 **73:**10 **83:**20 **141:**8 **144:**4 **148:**12
**non-enforcement** [1] **97:** 19
**non-party-specific** [1] **49:** 9
**none** [2] **79:**8 **90:**4
**nonenforcement** [1] **13:** 24
**note** [1] **118:**25
**noted** [1] **133:**13
**Nothing** [5] **41:**7 **99:**15,15 **103:**8 **134:**14
**notice** [10] **33:**11 **68:**19 **98:** 21 **103:**12 **125:**17 **127:**24 **128:**1 **130:**21 **145:**6,18

**noticed** [2] **49:**19,20
**notion** [1] **94:**2
**novel** [1] **4:**25
**November** [1] **1:**11
**novo** [2] **110:**20 **111:**5
**null** [2] **67:**22 **143:**4
**number** [7] **19:**21,24 **37:**23 **65:**13 **82:**8 **83:**1 **102:**8
**nuts** [1] **100:**9

## O

**obligate** [1] **131:**13
**obligation** [17] **11:**14 **22:** 15 **28:**3 **33:**2 **76:**25 **96:**3,8 **122:**24 **125:**21 **128:**8 **129:** 9 **130:**19 **131:**1,8,11 **132:**4 **148:**8
**obligations** [4] **75:**4 **80:**20 **97:**12 **101:**10
**obstacle** [1] **45:**6
**obtain** [2] **6:**1 **75:**21
**obtained** [1] **6:**7
**obviously** [9] **5:**11 **9:**4 **14:** 2 **51:**17 **53:**24 **58:**24 **68:**14 **90:**3 **138:**11
**occur** [2] **59:**12 **92:**14
**occurred** [1] **94:**25
**odd** [4] **110:**17 **112:**24 **113:** 9 **116:**14
**offense** [2] **35:**3 **39:**8
**offenses** [2] **148:**14,14
**offered** [2] **87:**6,8
**officer** [3] **40:**1 **77:**11 **122:** 18
**officers** [12] **3:**13 **29:**11,23 **34:**17 **65:**19 **82:**16 **101:**15 **120:**25 **121:**5 **123:**6,23 **124:**4
**officials** [7] **6:**12 **78:**3,8 **80:** 19 **92:**8 **123:**12 **147:**19
**offset** [1] **19:**2
**often** [3] **61:**23 **65:**17 **109:** 16
**okay** [19] **40:**25 **45:**16 **47:** 15 **61:**6 **64:**7 **81:**2 **102:**3 **112:**22 **121:**10 **123:**2 **127:** 5 **128:**16 **129:**12 **136:**4,8 **137:**13,23 **138:**9,9
**old** [1] **8:**21
**on-the-record** [1] **101:**22
**once** [12] **30:**22 **33:**4 **34:**9 **104:**5,10 **124:**19 **125:**5,12 **127:**11 **141:**20 **142:**11 **144:** 22
**one** [57] **3:**22 **8:**8 **13:**4,21 **15:**13,14 **17:**16 **21:**18 **23:**8 **25:**3,6 **33:**24 **35:**15 **36:**4 **39:**24 **40:**2 **43:**17 **45:**9 **49:** 16 **52:**9 **53:**24 **55:**14 **58:**23 **64:**8,12 **79:**13 **86:**12 **88:**9 **91:**13 **93:**22,23 **94:**8,14 **96:** 18 **100:**6 **101:**24 **102:**8 **106:**17 **108:**1,18 **109:**4 **111:**14 **112:**8 **116:**17 **124:**

Heritage Reporting Corporation

9 **129**:20 **139**:19 **141**:25 **145**:22 **148**:11 **149**:7,8,8, 25 **150**:15,19 **151**:9
**one's** [1] **55**:12
**onerous** [1] **132**:4
**ones** [2] **29**:5 **43**:15
**ongoing** [1] **127**:21
**only** [33] **6**:15 **26**:24 **27**:18 **29**:4 **31**:16 **40**:7,25 **42**:2 **67**:15 **73**:4 **75**:5,6 **77**:18 **84**:14 **96**:3 **100**:19 **102**:22 **106**:4 **107**:18 **116**:24 **118**: 8,23 **122**:12 **127**:11 **130**:20, 25 **131**:11 **135**:19 **137**:17, 18,18 **138**:6 **145**:6
**open** [1] **4**:4
**opening** [1] **119**:14
**operate** [3] **16**:8 **29**:19 **40**: 25
**operated** [3] **10**:18 **76**:8,9
**operates** [1] **49**:24
**operating** [1] **17**:11
**operation** [7] **5**:4 **6**:18 **70**: 6,11,24 **86**:25 **117**:21
**opinion** [5] **8**:21 **9**:3 **42**:12 **117**:20 **118**:3
**opportunity** [2] **56**:19 **73**:8
**options** [2] **45**:3 **150**:1
**oral** [6] **1**:14 **2**:2,5 **3**:7 **73**: 19 **118**:7
**order** [28] **20**:9,12 **42**:15 **63**: 3 **67**:6,11 **68**:17 **72**:25 **78**: 14,18 **94**:17 **98**:22 **101**:11 **108**:19,21 **116**:10,16 **118**:1 **128**:5 **129**:7 **130**:23,24 **133**:20 **134**:19,24 **135**:16 **139**:8 **146**:6
**ordered** [2] **44**:21 **64**:6
**orders** [13] **6**:11 **42**:10 **45**: 13 **47**:21 **76**:6,7 **77**:19 **78**: 2 **108**:13,15 **115**:20 **131**:12 **132**:6
**ordinarily** [4] **59**:19 **66**:19 **84**:2 **113**:16
**original** [1] **140**:8
**other** [43] **8**:9 **10**:10 **11**:23 **12**:21 **13**:21 **24**:1,11 **31**:24 **36**:14,21 **43**:15,21 **45**:17 **47**:23 **52**:12 **57**:22 **58**:1,15, 17 **69**:18 **76**:7 **77**:2 **83**:18 **84**:20 **85**:4 **86**:24 **89**:10,17 **90**:12 **95**:5 **96**:20 **109**:1 **110**:20 **111**:10,16 **118**:9,25 **124**:9 **127**:18,20 **128**:12 **131**:10 **133**:13
**others** [1] **39**:11
**otherwise** [10] **17**:2 **41**:9 **75**:15 **76**:23 **77**:12 **78**:15 **79**:2 **81**:24 **102**:20 **146**:19
**ourselves** [1] **56**:25
**out** [41] **8**:22 **15**:14 **21**:9 **22**: 6,11 **28**:3,4 **32**:16 **34**:16 **36**:19,21 **39**:5,17 **44**:3 **55**: 21 **56**:23 **58**:25 **70**:16 **79**:

14 **80**:21 **84**:18,19 **88**:5 **96**: 13 **98**:25 **104**:17,25 **109**:2, 18 **113**:18 **116**:24 **119**:23 **132**:22 **134**:6,6 **135**:14 **140**:2 **144**:20,21 **146**:2 **148**:12
**out-of-pocket** [1] **18**:10
**outlie** [1] **68**:12
**outline** [1] **120**:14
**output** [1] **36**:15
**outside** [3] **104**:25 **123**:7 **124**:5
**outsized** [1] **91**:2
**over** [15] **14**:3 **19**:24 **37**:16 **38**:4,4,4 **59**:8 **113**:1 **115**: 19 **116**:24 **123**:18 **132**:19 **134**:11 **144**:3 **149**:13
**overall** [3] **16**:4,14 **20**:13
**overarching** [1] **18**:11
**overlap** [1] **132**:25
**overmatch** [1] **35**:4
**override** [1] **40**:19
**overrule** [1] **138**:25
**oversight** [1] **51**:20
**overstate** [1] **56**:10
**overturning** [1] **35**:24
**overwhelm** [1] **87**:23
**own** [11] **3**:23 **15**:2 **16**:1 **29**: 8 **60**:19 **78**:18,20 **83**:22 **106**:4 **135**:7 **149**:18

**P**

**p.m** [1] **151**:18
**PAGE** [1] **2**:2
**pages** [7] **39**:4 **55**:2,21 **119**: 13,13,18,19
**paid** [2] **54**:15,19
**pain** [2] **81**:14,14
**pains** [1] **118**:17
**pairs** [1] **139**:4
**pandemic** [1] **20**:9
**papers** [1] **33**:10
**pardon** [1] **53**:22
**parole** [1] **83**:20
**paroles** [1] **84**:13
**parse** [1] **61**:21
**parsing** [1] **35**:1
**part** [12] **55**:19 **81**:7 **91**:18 **103**:14 **117**:24 **122**:4 **123**: 10 **126**:15 **131**:22 **136**:17 **142**:18,19
**participating** [1] **90**:4
**particular** [21] **15**:6 **24**:25 **25**:1 **30**:25 **41**:10 **44**:15 **45**: 10 **54**:5 **62**:9 **63**:12,17 **66**: 15 **72**:12,16,16 **75**:3 **82**:19 **84**:24 **85**:7 **125**:4 **138**:1
**particularly** [5] **59**:1 **75**:19 **91**:1 **92**:6 **93**:7
**parties** [6] **12**:21 **48**:18 **50**: 1 **60**:22 **61**:4 **69**:18
**parts** [2] **121**:9 **142**:18
**party** [11] **7**:9 **68**:10 **76**:17 **92**:4 **105**:22 **106**:24,24

**107**:12,14 **108**:23 **113**:20
**party-specific** [3] **60**:18 **62**:10 **69**:21
**passage** [1] **85**:16
**passed** [3] **16**:16 **20**:22 **129**:20
**passive** [1] **146**:17
**past** [2] **37**:17 **42**:22
**pause** [1] **140**:19
**pausing** [1] **150**:3
**paying** [2] **55**:8 **56**:16
**pays** [2] **86**:7,8
**penalty** [1] **81**:15
**pending** [21] **26**:1 **29**:24 **31**: 7 **32**:24 **33**:12 **40**:12 **41**:3, 5,17 **43**:24 **122**:13 **123**:1,3 **127**:12,18,19,23 **128**:22 **129**:10 **145**:25 **146**:16
**Pennsylvania** [2] **10**:5 **83**: 25
**people** [38] **29**:4 **30**:10,12, 14,16,24 **32**:4,7,8 **35**:10 **49**: 19 **81**:9 **83**:17 **86**:1,3,22 **88**:2,5,6 **89**:11,12 **97**:18 **102**:25 **103**:11 **104**:8 **116**: 2 **123**:24,25 **124**:15 **131**:8, 12 **132**:5 **136**:21 **140**:8 **142**:2 **143**:13 **149**:13,15
**per** [3] **16**:17 **68**:24 **142**:14
**perfectly** [1] **11**:21
**perhaps** [6] **17**:16 **76**:7 **100**:13 **109**:10 **142**:20 **143**: 3
**period** [5] **19**:15 **98**:10 **121**: 22 **145**:16 **146**:9
**periods** [1] **109**:17
**permissible** [4] **31**:15 **57**: 15 **58**:17 **145**:5
**permit** [3] **13**:24 **52**:10 **148**: 25
**permits** [2] **73**:9 **106**:11
**permitted** [2] **107**:19 **124**: 10
**persistently** [2] **102**:2 **135**: 4
**person** [35] **16**:11,12,16 **28**: 4 **33**:1,3 **34**:5,9,10,23 **39**: 19,21 **41**:10 **93**:4,6 **98**:5,6, 7 **104**:2,19 **105**:1,2 **106**:9, 13 **122**:20 **125**:16 **133**:3,4, 6 **142**:5,10,11,15 **143**:18, 21
**person's** [3] **29**:13 **81**:13 **146**:12
**personally** [1] **113**:6
**personam** [2] **76**:9 **77**:10
**personnel** [1] **39**:13
**persons** [2] **113**:4,5
**perspective** [1] **76**:15
**persuade** [2] **21**:12 **150**:18
**Petitioners** [25] **1**:4,21 **2**:4, 10 **3**:8 **74**:3,6,8,24 **75**:3 **78**: 23 **79**:3,11 **82**:25 **87**:6 **101**: 24 **125**:3,11 **128**:6 **130**:25

**132**:24 **135**:6 **138**:23 **145**: 8 **147**:4
**Petitioners'** [1] **75**:4
**pick** [5] **10**:23 **58**:22 **94**:5,7 **97**:15
**piece** [4] **56**:9,11 **88**:15,15
**pin** [1] **92**:16
**place** [15] **15**:8 **18**:13 **26**:13 **27**:1,17 **40**:9 **55**:12 **63**:1 **64**:13 **84**:6 **105**:8 **128**:23 **129**:17 **131**:5 **132**:19
**placed** [1] **94**:16
**places** [1] **131**:10
**plainly** [2] **5**:5 **69**:2
**plaintiff** [7] **66**:21 **67**:8,15 **68**:4,8 **69**:8,14
**plaintiffs** [1] **11**:5
**play** [3] **94**:6 **134**:6 **135**:14
**please** [2] **3**:10 **73**:22
**pocketbook** [1] **16**:20
**point** [44] **8**:2 **14**:10 **18**:11 **40**:13 **41**:15,19 **46**:18 **47**: 24 **54**:3,10 **56**:23 **57**:24 **58**: 23 **64**:3 **65**:3 **66**:17 **75**:1 **79**:20,22 **81**:18 **84**:11 **85**: 14,22 **107**:21 **108**:11 **113**: 18 **115**:8 **116**:24 **122**:22 **124**:13 **130**:16 **131**:3,5 **132**:22 **134**:11,12 **137**:14 **138**:14 **139**:13 **140**:20 **141**: 25 **148**:2 **149**:16 **150**:13
**pointed** [6] **15**:14 **58**:25 **98**: 25 **109**:1 **140**:2 **146**:2
**pointing** [1] **144**:20
**points** [13] **78**:13 **85**:8 **88**:9 **90**:1,24 **92**:18 **98**:16 **106**:2, 17 **112**:6 **113**:13 **144**:1,21
**policies** [10] **7**:3 **67**:4,7 **70**: 12 **71**:2,14,18 **89**:18 **92**:16 **150**:24
**policy** [20] **3**:21 **4**:5 **69**:25 **73**:1,1 **83**:22 **88**:15,16,25 **89**:11,16,24 **90**:17,18,22 **94**:9 **103**:7 **106**:15 **149**:11 **150**:9
**political** [3] **50**:18 **53**:20 **137**:8
**pool** [1] **95**:18
**Poor** [1] **9**:21
**population** [1] **86**:13
**portion** [1] **64**:15
**position** [15] **7**:15 **9**:19 **13**: 18 **20**:21 **35**:17 **50**:11 **51**: 10 **53**:3,12 **56**:2 **72**:6 **79**: 24 **119**:2 **150**:21 **151**:1
**posits** [1] **25**:8
**possess** [1] **24**:13
**possibilities** [1] **92**:11
**possibility** [2] **99**:6 **146**:18
**possible** [16] **5**:14 **9**:13 **10**: 15 **21**:5 **33**:8 **59**:3 **62**:6 **64**: 3 **65**:15 **75**:23 **96**:23 **98**:13, 14 **99**:14,21 **100**:8
**possibly** [3] **20**:25 **28**:5

**127**:17
**postulated** [1] **126**:14
**posture** [1] **147**:17
**potential** [2] **76**:25 **100**:8
**potentially** [1] **71**:16
**power** [13] **27**:9 **31**:24 **51**: 17 **67**:3 **90**:19,20 **98**:18 **113**:3 **115**:18,19 **123**:21 **129**:23 **143**:25
**powerful** [1] **87**:10
**powerless** [2] **52**:3 **58**:11
**powers** [8] **9**:17 **51**:21,25 **136**:12,13 **149**:4,5,5
**practical** [4] **22**:9 **23**:6,11, 21
**practically** [1] **118**:10
**practice** [10] **35**:25 **42**:22 **55**:1 **75**:10,13 **108**:10 **114**: 23,23 **120**:13 **139**:12
**pre-APA** [1] **75**:13
**precedent** [5] **14**:10 **50**:17 **52**:24 **97**:20 **128**:18
**precedents** [5] **8**:17 **10**:17 **11**:12 **12**:17 **73**:25
**precise** [1] **56**:18
**precisely** [4] **23**:10 **46**:21 **128**:20 **147**:21
**preclude** [3] **6**:4,6 **60**:13
**precluded** [4] **52**:13 **109**: 12,15 **110**:6
**precludes** [2] **5**:18 **63**:8
**preclusion** [1] **62**:14
**predicates** [1] **21**:19
**preexisted** [3] **37**:8 **58**:13, 17
**PRELOGAR** [117] **1**:19 **2**:3, 9 **3**:6,7,9 **5**:10,19 **6**:5 **7**:5, 12,17 **8**:10,24 **9**:2,24 **10**:13 **11**:6,20 **12**:1,8,16 **13**:11 **14**:1,9,20 **15**:20 **17**:5,8,21 **18**:3,7,19 **19**:3 **21**:10,22 **22**:7,19,23 **24**:4,8,21 **25**:5, 15,24 **26**:4,10,19,23 **27**:2,5, 12,16,23 **28**:1,11,14 **29**:17 **31**:4,20 **32**:10 **33**:7 **34**:2,6, 11 **36**:1,10,16 **37**:13,20,22 **38**:5,12 **39**:1 **40**:6 **41**:2,5, 11,15,25 **42**:4,6 **43**:8 **44**:18 **45**:5,20 **47**:5 **48**:3,14 **49**: 21 **50**:16 **51**:16 **52**:17,21 **53**:14 **56**:13 **58**:2,5 **59**:17 **60**:15 **61**:19 **62**:4,21,24 **63**: 9,20 **65**:2,24 **68**:5 **69**:13 **71**:6 **72**:5,20 **73**:7 **147**:2,4, 5
**premise** [2] **34**:22 **52**:5
**premised** [2] **72**:9 **108**:22
**prerogative** [1] **91**:16
**present** [2] **16**:6 **98**:11
**presented** [4] **120**:6,7,20 **140**:15
**presents** [2] **15**:4 **135**:1
**preserves** [1] **73**:11
**President** [6] **24**:12 **50**:22

53:22 **136**:25,25 **137**:1
**President's** [1] **136**:11
**presidential** [1] **4**:13
**press** [3] **52**:5 **54**:2 **79**:21
**pressing** [1] **9**:11
**pressure** [2] **79**:7,9
**presumably** [2] **84**:22 **85**:3
**pretrial** [1] **30**:5
**pretty** [11] **54**:17,24 **55**:17, 20 **56**:7,12 **57**:7 **119**:11 **128**:17,19 **143**:10
**prevail** [3] **101**:4,12 **134**:7
**prevailed** [1] **73**:25
**prevent** [6] **9**:9 **46**:18 **53**: 20 **71**:13 **98**:25 **123**:6
**prevented** [1] **147**:18
**preventing** [2] **6**:22 **64**:5
**prevents** [3] **6**:11 **71**:12 **106**:4
**previous** [6] **74**:22 **104**:21 **114**:22,23 **124**:2 **140**:17
**previously** [3] **63**:21 **114**: 14 **144**:3
**primarily** [1] **119**:15
**principle** [9] **3**:24 **7**:6 **9**:8 **11**:9 **14**:8,12,16 **46**:7 **98**:1
**principles** [9] **4**:12 **13**:7 **23**: 20,25,25 **42**:17 **43**:12 **46**:9 **98**:8
**prior** [9] **39**:7,22 **43**:7 **70**:15 **128**:12 **139**:2,12 **143**:21 **146**:11
**priorities** [14] **3**:17 **4**:22 **16**: 3,8 **18**:12 **29**:8 **39**:17 **40**:2, 4 **87**:25 **93**:4 **99**:2 **123**:7 **147**:12
**prioritizing** [1] **16**:10
**priority** [3] **23**:17 **124**:9 **132**:9
**prison** [2] **104**:25 **105**:9
**private** [4] **11**:23 **12**:5 **13**: 19 **108**:23
**probable** [3] **100**:1 **143**:2,9
**probably** [3] **97**:20 **98**:2 **118**:5
**probatory** [1] **60**:7
**problem** [17] **17**:12 **21**:5 **29**:6 **30**:17 **51**:5 **60**:16 **66**: 16 **81**:21 **98**:9,9 **99**:18 **121**: 15 **122**:25 **125**:12 **137**:15 **144**:17 **146**:15
**problematic** [1] **61**:5
**problems** [2] **54**:12 **79**:25
**procedural** [1] **91**:20
**procedure** [4] **73**:2 **112**:8 **115**:15 **139**:3
**procedures** [7] **67**:8,10,20, 23 **70**:1,21 **115**:11
**proceed** [5] **11**:22 **12**:24 **23**:12 **27**:11,16
**proceeding** [14] **6**:19 **26**: 15 **27**:1,19 **33**:4 **47**:14 **82**: 19 **111**:25 **112**:1,4,10,14 **116**:19 **145**:18

**proceedings** [23] **26**:8,9 **29**:24 **31**:7 **32**:22,25 **33**:12, 25 **34**:9 **40**:13 **41**:3,17 **43**: 25 **103**:20 **127**:12,20 **128**: 13,22 **129**:25 **131**:4 **141**:9 **146**:22,23
**proceeds** [2] **6**:14 **110**:19
**process** [4] **26**:12 **41**:19 **100**:9 **146**:4
**produce** [1] **46**:4
**Professor** [1] **109**:4
**program** [1] **138**:2
**programmatic** [2] **6**:17 **46**: 20
**programs** [2] **10**:24 **137**:15
**progression** [1] **116**:17
**prohibit** [1] **78**:20
**prohibited** [2] **41**:16 **77**:12
**prohibiting** [2] **44**:20 **70**:8
**prohibitions** [1] **92**:3
**prohibitory** [1] **76**:10
**prohibits** [2] **5**:2 **118**:9
**promptly** [1] **143**:11
**promulgated** [1] **123**:12
**proper** [3] **38**:9 **49**:10 **69**: 20
**properly** [4] **21**:13 **69**:6,11 **139**:14
**proposal** [1] **55**:15
**proposition** [1] **28**:23
**proprietary** [3] **11**:22 **12**: 20 **117**:19
**prosecute** [15] **24**:25 **30**:8, 16 **32**:6 **54**:8 **75**:6 **98**:7 **99**: 7,10,11 **100**:12,21 **130**:22 **142**:24 **143**:8
**prosecution** [2] **30**:11 **143**: 12
**prosecutor** [1] **30**:7
**prosecutorial** [16] **26**:7 **30**: 23 **32**:5 **54**:6 **74**:25 **82**:18 **97**:23 **98**:17,18,24 **100**:7, 10,18 **101**:17 **128**:3 **130**:21
**prospect** [2] **16**:5 **17**:16
**prosse** [1] **143**:4
**protect** [1] **4**:23
**protection** [1] **31**:17
**protest** [1] **7**:18
**protesting** [2] **8**:11 **68**:8
**prototypical** [1] **107**:7
**prove** [1] **87**:16
**proved** [1] **73**:23
**proves** [1] **87**:21
**provide** [2] **37**:8 **116**:9
**provided** [6] **66**:21 **115**:14, 20 **116**:22 **121**:21 **149**:19
**provides** [6] **111**:19 **112**:8 **113**:15,18 **117**:1 **139**:7
**provision** [20] **5**:8 **27**:5 **28**: 5,15 **31**:6 **32**:18 **36**:18 **44**: 2,4,8 **46**:13,18 **65**:21 **70**:15, 18 **71**:5 **79**:14 **96**:24 **100**:4 **122**:6
**provisions** [22] **4**:9 **5**:4 **6**:

13,23 **25**:18 **36**:25 **37**:24 **40**:20 **43**:6,10,18 **45**:9 **52**: 14 **70**:7 **71**:11,20 **72**:10,12, 14 **73**:14 **116**:16 **148**:11
**public** [6] **3**:15 **20**:9 **39**:11 **55**:24 **148**:19 **151**:13
**purpose** [2] **31**:2 **45**:22
**purposes** [10] **5**:9 **11**:4 **12**: 5 **31**:17 **48**:17 **63**:5 **79**:1, 22 **105**:5 **131**:25
**purse** [1] **51**:17
**pursuant** [3] **30**:23 **86**:15 **149**:4
**pursue** [3] **98**:19,20 **147**:14
**pursued** [1] **47**:11
**push** [2] **54**:17 **55**:20
**put** [20] **26**:8 **27**:21 **34**:18 **76**:12 **86**:5 **104**:9,10,18 **105**:8 **108**:10 **110**:15 **111**: 1 **113**:2,2 **125**:16,25 **126**: 10 **132**:6 **134**:19 **150**:23
**puts** [3] **14**:17 **150**:24 **151**: 1
**putting** [5] **19**:18 **111**:13 **129**:14 **130**:3,6

## Q

**qualify** [1] **148**:15
**quasi-sovereign** [3] **11**: 11 **12**:9,25
**question** [49] **15**:5 **19**:24 **21**:19 **29**:5,20 **33**:24 **34**:4, 4,7,12 **38**:18 **44**:25 **52**:6 **56**:4 **58**:23 **61**:7 **62**:11 **63**: 7 **64**:8 **85**:22 **86**:10,20 **87**: 3,8 **90**:8 **97**:16,21 **100**:14 **101**:3 **104**:21,22 **105**:7 **107**:25 **109**:3 **114**:9 **118**: 14 **120**:20 **124**:2 **128**:10 **129**:21 **130**:2,17 **132**:18 **137**:8,14,17,24 **138**:9 **140**: 14
**questioning** [2] **95**:5 **107**: 25
**questions** [14] **5**:6 **14**:22 **35**:13 **38**:20 **42**:8 **50**:7 **59**: 19 **62**:13 **75**:16 **97**:17 **110**: 19 **117**:15 **120**:6 **134**:4
**quick** [1] **139**:19
**quickly** [1] **137**:16
**quite** [5] **29**:1 **43**:3 **77**:3,3 **117**:17
**quote** [1] **78**:1

## R

**R.S** [3] **7**:1 **14**:12 **97**:19
**radical** [2] **35**:18 **54**:24
**Raines** [1] **51**:23
**raise** [2] **65**:12 **136**:14
**raised** [6] **66**:9 **108**:1 **109**:9 **134**:5 **136**:9,10
**raises** [3] **15**:5 **109**:3 **137**: 14
**ramifications** [1] **23**:6

**rare** [1] **54**:4
**rates** [1] **85**:12
**rather** [5] **49**:25 **64**:25 **75**:4 **82**:6 **101**:18
**re** [1] **52**:1
**re-implement** [1] **76**:22
**reach** [2] **20**:19 **67**:11
**reached** [2] **18**:14 **36**:8
**react** [1] **81**:9
**read** [12] **25**:10 **34**:13 **60**:1, 12 **67**:25 **78**:1 **100**:16 **116**: 15 **127**:17 **131**:19 **144**:15, 19
**reading** [12] **4**:19 **25**:13 **31**: 3 **61**:1 **66**:22 **77**:18 **97**:22 **103**:17 **129**:16 **131**:7 **132**: 2,11
**realize** [1] **55**:18
**really** [24] **9**:13 **19**:10 **23**:7 **24**:2,18,23 **29**:18 **32**:13 **34**: 24 **36**:20 **55**:12 **56**:4 **70**:25 **71**:4 **73**:6 **84**:8 **95**:8 **104**:7 **109**:2 **111**:23 **129**:15 **130**: 5 **132**:10 **141**:5
**realm** [3] **14**:13 **28**:20 **30**:9
**reapprehended** [1] **94**:20
**reason** [18] **6**:7 **11**:11,12 **12**:10 **16**:12 **22**:8 **31**:10,24 **48**:20 **53**:18,25 **63**:22 **83**: 10 **95**:7 **109**:11 **119**:3 **141**: 23,25
**reasonably** [2] **18**:8 **148**:2
**reasons** [7] **23**:8 **74**:19 **76**: 1 **96**:18 **100**:6 **101**:23 **120**: 14
**REBUTTAL** [3] **2**:8 **147**:2, 3
**recall** [2] **9**:25 **45**:1
**received** [2] **74**:2 **77**:4
**recent** [1] **55**:14
**recidivism** [6] **84**:16 **85**:12 **86**:9,9,14 **94**:23
**recognition** [2] **14**:25 **43**: 11
**recognize** [4] **11**:13 **14**:2 **19**:5 **56**:25
**recognized** [18] **10**:17 **14**: 16 **23**:9 **26**:6 **27**:10 **57**:11, 17 **71**:11 **73**:24 **74**:13 **83**: 23 **108**:9 **113**:14 **114**:24 **115**:1,3 **139**:2 **151**:4
**recognizing** [2] **9**:10 **13**:4
**recollection** [1] **47**:1
**record** [8] **15**:24 **19**:9 **39**:7 **87**:20 **94**:15 **95**:17 **124**:8 **135**:12
**redressability** [4] **5**:9 **79**: 23 **82**:24 **135**:10
**reducing** [2] **16**:9 **82**:8
**refer** [1] **103**:19
**referred** [1] **42**:21
**referring** [1] **104**:4
**reflects** [2] **12**:18,23
**reflexively** [2] **36**:5,23

**refrain** [3] **6**:12 **78**:5 **81**:15
**refused** [1] **108**:15
**regarding** [4] **85**:11 **86**:12 **127**:14 **135**:4
**regardless** [1] **84**:12
**regards** [1] **76**:8
**Regents** [1] **84**:4
**regulate** [1] **149**:15
**regulated** [2] **12**:22 **92**:4
**regulating** [1] **16**:1
**regulation** [8] **10**:6,18 **17**: 10 **49**:2 **68**:9 **69**:16 **72**:25 **108**:23
**regulations** [4] **70**:11,17 **71**:2 **119**:8
**rejected** [2] **7**:21 **119**:4
**relate** [1] **115**:6
**related** [2] **15**:13 **31**:23
**relates** [2] **8**:17 **32**:11
**relation** [1] **83**:15
**relationship** [2] **83**:7,13
**relative** [1] **126**:5
**release** [10] **31**:15,16 **34**:1 **35**:10 **40**:16 **41**:16 **53**:23 **96**:23 **106**:18 **131**:2
**released** [9] **33**:16 **86**:15 **94**:20 **105**:1,10 **129**:5,9 **141**:21 **142**:13
**releases** [2] **84**:13 **85**:14
**releasing** [1] **133**:7
**relevant** [1] **51**:4
**relief** [35] **5**:3 **6**:9 **7**:25 **45**:7 **46**:20 **58**:16 **60**:18,24 **62**: 10 **63**:17 **69**:21 **72**:1 **73**:4, 5,8,9,12 **76**:2,5 **77**:13 **78**: 25 **79**:17 **82**:9 **108**:14 **112**: 2,3,23 **116**:22 **117**:2 **118**:9, 10,12,24 **149**:25 **151**:2
**relinquished** [1] **149**:1
**relinquishment** [1] **149**:6
**rely** [4] **39**:13 **147**:13,19 **151**:7
**remained** [1] **19**:25
**remedial** [13] **38**:6 **45**:2,3 **59**:7,13 **62**:15 **64**:2 **111**:7 **112**:3 **113**:10 **140**:4,10 **150**:6
**remedies** [27] **4**:24 **6**:3 **20**: 19 **36**:24 **37**:7,8 **45**:10 **49**: 5,13 **50**:4 **58**:12,13 **60**:22 **61**:25 **73**:13 **75**:21 **79**:12, 16 **81**:10 **111**:10,20 **112**:16, 20,21,23,25 **138**:15
**remedy** [36] **4**:25 **5**:1,14 **35**: 14 **49**:9,15,24 **54**:11 **57**:15, 23 **58**:17 **59**:2 **61**:2 **62**:19 **63**:12 **64**:5 **66**:20,22 **67**:15 **68**:2 **69**:20 **74**:2 **75**:9 **76**: 13 **82**:3 **107**:24 **108**:2,8 **115**:23 **116**:10 **117**:13 **138**: 16 **139**:6,8 **147**:15 **150**:22
**remember** [1] **54**:23
**remiss** [1] **120**:10
**removable** [2] **3**:12 **33**:11

**removal** [66] **7**:4 **26**:8,12, 15 **27**:1,11,17,20,22 **29**:22, 24 **30**:21 **31**:2,7 **32**:22,24 **33**:3,4,12,25 **34**:9 **40**:8,12 **41**:3,17 **42**:11,15 **43**:25 **70**: 19 **72**:4 **82**:19 **94**:18 **98**:22 **103**:2,9,20 **122**:14 **123**:2, 15 **124**:15 **127**:12,14,19,19, 20,23,24 **128**:13,21 **129**:11, 25 **130**:23,23,24 **131**:12 **132**:6 **133**:20 **141**:4,9 **142**: 4 **145**:18 **146**:6,7,13,22,23
**removals** [3] **20**:2,4,6
**remove** [44] **4**:8 **9**:13 **10**:8 **26**:18 **30**:24 **32**:7,16 **41**:1, 9,14,23 **42**:10,14 **75**:3 **96**:5, 7 **102**:9,17,25 **103**:23 **104**: 1 **121**:7 **122**:11,17,18,20 **123**:16,19,20,24,25 **124**:15, 22 **125**:3,8 **126**:12,25 **127**: 5 **128**:7 **130**:9 **141**:17 **142**: 10,15 **143**:17
**removed** [9] **26**:3 **32**:2 **93**: 6 **94**:17,19 **96**:1 **104**:6 **146**: 1,17
**removes** [1] **79**:12
**removing** [3] **83**:11 **103**:13 **125**:19
**rendering** [1] **63**:5
**renewal** [1] **97**:9
**Reno** [2] **26**:5 **42**:11
**repeated** [1] **57**:6
**repeatedly** [4] **4**:10 **26**:6 **101**:24 **124**:18
**reply** [1] **119**:20
**report** [1] **118**:4
**Reporter** [1] **118**:5
**require** [10] **6**:11 **43**:23 **61**: 23 **72**:11 **78**:3,8,19 **86**:2 **125**:3 **141**:7
**required** [11] **27**:21 **47**:9 **67**:23 **68**:20 **72**:15 **78**:4,10 **81**:23 **84**:21 **119**:23 **129**:1
**requirement** [2] **103**:16 **131**:20
**requirements** [1] **68**:24
**requires** [3] **31**:8 **35**:1 **151**: 4
**requiring** [2] **10**:20 **44**:2
**reserve** [1] **118**:18
**reserved** [1] **118**:13
**residents** [1] **10**:9
**resolution** [1] **136**:13
**resolve** [2] **150**:2 **151**:10
**resolved** [1] **122**:24
**resolves** [1] **150**:25
**resort** [1] **53**:5
**resource** [3] **21**:13 **74**:25 **134**:4
**resources** [18] **3**:14 **16**:11 **34**:19 **64**:24 **65**:18 **97**:6,14 **98**:4,4 **101**:6,21 **104**:24 **105**:8,15 **126**:23 **132**:14 **135**:8 **148**:17

**respect** [24] **10**:19 **12**:8,21 **20**:2 **29**:19 **30**:19,21 **39**:18 **43**:14,20 **44**:7 **49**:25 **51**:19 **61**:4,25 **65**:10 **66**:1 **71**:14 **84**:21 **86**:22 **90**:17 **100**:17 **131**:14 **149**:15
**respectfully** [4] **54**:17 **88**:8 **94**:12 **133**:11
**respecting** [1] **113**:7
**respond** [4] **74**:3,24 **75**:18 **82**:11
**responded** [1] **95**:5
**Respondents** [5] **1**:7,23 **2**: 7 **4**:16 **73**:20
**Respondents'** [1] **4**:19
**response** [4] **48**:2 **53**:1 **62**: 12 **87**:1
**responses** [1] **87**:2
**responsibility** [3] **21**:3 **22**: 4 **53**:17
**responsive** [1] **90**:7
**rest** [1] **130**:17
**restrain** [6] **45**:13,24,25 **70**: 6 **76**:3 **79**:2
**restrained** [1] **101**:17
**restraining** [1] **76**:5
**restrains** [1] **118**:1
**restrict** [1] **24**:15
**restricted** [1] **107**:18
**restriction** [1] **9**:13
**restrictive** [1] **96**:23
**result** [9] **39**:14 **65**:15 **67**: 12 **68**:1,24 **69**:3,7 **83**:22 **95**:8
**retains** [2] **42**:13 **43**:12
**reverse** [2] **3**:19 **151**:15
**review** [18] **36**:25 **37**:24 **48**: 24 **49**:18 **52**:14 **53**:4 **55**:15 **110**:10,12,14,18,19 **111**:6, 12 **113**:16 **115**:21 **119**:15, 16
**reviewable** [2] **93**:16 **116**: 20
**reviewing** [2] **108**:11 **116**: 3
**reviews** [1] **48**:8
**revoke** [2] **108**:16 **115**:2
**rewrite** [2] **54**:25 **74**:4
**rid** [1] **81**:21
**rights** [4] **12**:22 **47**:11 **48**: 17 **147**:14
**rise** [1] **93**:9
**risk** [2] **84**:25 **85**:20
**risks** [2] **85**:13 **88**:3
**ROBERTS** [47] **3**:3 **6**:25 **7**: 10,14 **8**:7,19,25 **20**:16 **21**: 17 **22**:1,17,20 **35**:12 **36**:9, 12 **37**:12,15,21 **38**:3,11,14 **40**:22 **42**:20 **44**:11 **50**:6 **58**: 20 **66**:4 **73**:16 **93**:20,23 **95**: 1,21 **96**:9 **105**:24 **107**:22 **108**:25 **109**:6 **117**:4,7,14 **120**:16 **127**:7 **133**:25 **139**: 17 **140**:23 **146**:25 **151**:16

**Rock** [3] **23**:14 **97**:25 **130**:3
**rooted** [1] **97**:24
**Ruben** [1] **94**:15
**rule** [18] **11**:18 **12**:7,11 **13**:8, 16 **48**:21 **49**:25 **57**:22 **67**: 16 **68**:3,25 **77**:10 **78**:18 **92**: 19 **108**:17 **112**:7 **134**:20 **140**:21
**rule's** [1] **55**:11
**rules** [12] **12**:2 **13**:2 **75**:14 **91**:9,10,13,14 **94**:6 **97**:2 **113**:8,10 **115**:20
**ruling** [2] **3**:18 **58**:1
**rulings** [6] **37**:18 **140**:1,4, 10,16,17
**run** [6] **75**:4,6 **103**:1 **115**:16 **148**:20 **150**:14
**running** [2] **40**:16 **145**:23
**runs** [3] **6**:24 **96**:3 **103**:4

## S

**safety** [2] **3**:15 **148**:19
**sake** [1] **29**:2
**same** [24] **5**:8 **6**:21 **11**:23 **12**:2,20 **19**:21 **23**:8 **42**:16 **46**:13 **47**:7 **51**:22,25 **60**:20 **62**:22 **71**:16 **79**:8,22 **98**:9 **110**:10 **111**:4 **112**:9 **116**:8 **139**:13 **149**:13
**sat** [1] **54**:18
**satisfies** [1] **80**:15
**save** [1] **86**:24
**saying** [36] **18**:24 **24**:15 **28**: 7 **33**:2 **41**:19,22 **53**:22 **55**: 13 **56**:10 **60**:12 **63**:10 **67**: 21 **68**:15 **79**:4,11 **89**:7 **91**: 8,9,12 **92**:24,24 **97**:3 **102**:8, 11,14 **106**:5,10,14 **122**:9 **125**:25 **126**:21 **127**:11,13 **132**:9 **141**:4 **146**:10
**says** [45] **24**:1 **25**:10 **29**:11 **30**:6,13 **31**:11 **39**:1,19,20 **41**:12 **45**:11 **50**:9 **53**:7 **54**: 25 **59**:5 **60**:6 **63**:24 **69**:2, 10 **70**:5 **81**:13 **86**:23 **89**:19 **96**:6 **101**:8 **105**:20 **106**:21 **107**:12 **116**:11 **118**:6 **121**: 24 **122**:19 **123**:1 **124**:11,21 **125**:18 **128**:20 **129**:3,4 **130**:11 **134**:7 **135**:23 **141**: 5 **145**:8,24
**Scalia's** [2] **14**:3 **42**:12
**scheme** [1] **61**:11
**scholars** [2] **59**:11 **108**:4
**scholarship** [3] **59**:5 **108**: 7 **119**:23
**scope** [6] **23**:17 **44**:19 **49**: 17 **65**:20 **110**:18 **111**:12
**score** [1] **77**:23
**scramble** [1] **22**:12
**search** [1] **39**:14
**second** [8] **46**:6 **78**:22 **84**: 19 **132**:23 **133**:21 **136**:8 **142**:19 **144**:7

**secondly** [1] **120**:24
**Secretary** [3] **4**:21 **31**:16 **137**:5
**Section** [22] **5**:2 **6**:2 **25**:25 **36**:6 **37**:10 **39**:2 **40**:15 **48**: 19 **49**:4,16 **57**:19 **59**:23 **63**: 2 **74**:20 **75**:11 **107**:18,20 **110**:18 **111**:12 **116**:1 **132**: 20 **141**:6
**sections** [1] **88**:20
**security** [5] **3**:15,16 **4**:23 **148**:19,20
**see** [10] **19**:9 **20**:22 **25**:9,13 **29**:6 **42**:16 **53**:18 **105**:9 **118**:2 **126**:9
**seeing** [1] **30**:17
**seek** [9] **12**:24 **28**:3 **32**:15 **75**:21 **138**:2,3 **146**:5,12 **151**:2
**seeking** [7] **7**:8 **11**:10,21 **72**:10 **104**:5 **106**:18 **135**: 19
**seem** [3] **98**:8 **111**:9 **119**:10
**seemed** [1] **16**:2
**seems** [15] **7**:15 **21**:17 **36**: 22 **43**:2 **45**:23 **66**:11 **68**:1 **70**:8 **77**:25 **92**:25 **116**:15 **128**:17 **131**:7 **143**:23 **146**: 7
**seen** [2] **54**:24 **76**:15
**self-executing** [1] **78**:14
**self-inflicted** [1] **84**:9
**sense** [5] **68**:2 **70**:11 **79**:2 **83**:14 **91**:16
**senseless** [1] **148**:20
**sentence** [6] **39**:8 **111**:20, 21 **132**:23 **133**:21 **142**:12
**sentences** [1] **138**:16
**separate** [7] **5**:12 **17**:25 **57**: 17 **84**:18,18,19 **107**:20
**separately** [1] **50**:4
**separation** [3] **8**:18 **9**:16 **51**:25
**serious** [3] **39**:7 **84**:15 **148**: 13
**served** [1] **142**:11
**service** [1] **39**:11
**services** [1] **84**:15
**serving** [1] **119**:7
**set** [32] **4**:22 **29**:8 **39**:5,17 **40**:2,3 **47**:25 **48**:4,7 **49**:3 **54**:14 **55**:9,10 **57**:24 **60**:4, 9,12 **65**:6 **67**:22 **69**:10 **75**: 12 **92**:10 **110**:24 **111**:12 **114**:13 **115**:4 **116**:6 **123**: 21 **138**:10,24 **139**:5 **140**:9
**set-aside** [2] **63**:3 **138**:12
**sets** [1] **49**:4
**setting** [5] **48**:11,21 **63**:4 **67**:25 **99**:1
**seven** [2] **16**:17,18
**several** [1] **76**:1
**sex** [1] **148**:14
**shall** [67] **4**:10,11 **20**:20,21

**21**:8,8,15,20,20 **22**:16,21, 22,24,25 **24**:1,2,2,3,16,16 **25**:8,8,11,11,23 **28**:8,8 **29**: 10 **31**:11,12 **32**:19 **34**:12 **38**:22,22,25 **39**:19,21 **42**:9 **43**:15 **44**:6,7 **45**:11 **54**:8,8 **63**:24 **64**:17 **96**:14,14,15, 19,19,21,21 **129**:14,15,16 **130**:6,8,9,10,11,11 **131**:18 **134**:25 **147**:25 **148**:6,15
**shalls** [4] **22**:15 **28**:15 **52**: 11,12
**share** [2] **65**:25 **149**:13
**shares** [1] **6**:20
**sharing** [1] **65**:7
**Shepard** [1] **35**:6
**shouldn't** [4] **21**:7 **89**:5 **91**: 1 **92**:1
**show** [11] **11**:14 **15**:16 **16**: 23 **17**:6 **83**:4 **87**:18,19 **88**: 14 **89**:20 **91**:11 **93**:7
**showed** [3] **93**:12,15,17
**showing** [3] **83**:7 **89**:25 **124**:4
**shown** [2] **88**:4 **138**:11
**shows** [3] **19**:23 **88**:12 **92**: 20
**shut** [3] **62**:8 **137**:16 **138**:1
**shutting** [1] **53**:5
**side** [11] **19**:18 **45**:17 **48**:7 **49**:3 **63**:5 **77**:2 **89**:10 **95**:5 **109**:1 **118**:25 **133**:13
**side's** [1] **47**:24
**sides** [1] **23**:7
**significant** [1] **131**:25
**Silberman** [1] **54**:18
**similar** [4] **15**:14 **118**:10 **130**:2 **144**:23
**simply** [8] **37**:7 **61**:12 **82**:3 **97**:5 **115**:17 **124**:21 **125**: 22 **126**:4
**since** [2] **57**:7 **139**:15
**single** [5] **29**:15 **89**:16 **133**: 15 **149**:11 **150**:19
**Sisters** [2] **9**:21 **57**:7
**sit** [1] **104**:24
**sits** [1] **111**:10
**sitting** [2] **47**:17 **54**:23
**situation** [9] **15**:12 **21**:21 **54**:9 **89**:22 **107**:8 **126**:3 **129**:1 **142**:7 **151**:6
**situations** [1] **42**:17
**Sixth** [2] **111**:15 **150**:17
**skeptical** [1] **150**:20
**skepticism** [1] **92**:20
**skipped** [1] **116**:24
**slip** [2] **108**:3 **118**:3
**slippage** [1] **126**:3
**small** [3] **75**:6 **129**:22 **130**: 16
**sneak** [2] **49**:14 **124**:14
**social** [1] **84**:15
**solely** [2] **29**:12 **39**:22
**Solicitor** [8] **1**:19,22 **90**:14

92:1 95:4 109:1 140:2 144: 21

**solicitude** [3] 12:15,16,23

**solve** [1] 79:25

**somebody** [4] 30:8 41:1 104:17 122:11

**somehow** [1] 77:15

**someone** [23] 26:8 27:19 29:23 30:24 32:1 33:10,25 50:1 65:16 76:15 98:20 105:9 113:19 114:2 121:7 122:17 123:17 132:16 141: 17 142:24 143:1,8 146:17

**someone's** [3] 26:14 81: 10 131:24

**sometimes** [8] 15:2 37:1 38:1,4 48:4,6 108:15,15

**somewhat** [2] 57:1 87:3

**soon** [1] 141:22

**sorry** [11] 22:18 68:13 87: 13 100:25 101:3 109:20,24, 25 110:4 117:7 145:21

**sort** [16] 21:9 30:5 31:23 70: 3 86:6 91:15 92:19 94:10 99:8 109:8 113:15,17 116: 16 117:13 134:20 142:6

**sorts** [1] 77:19

**SOTOMAYOR** [82] 14:6 15:9,21 25:20,22,25 26:5, 14,21,24 27:4,7,15,18,24 28:6,13 32:12 33:23 40:23, 24 41:4,7,12,18 42:2,5,7, 19 44:10 87:13,16 88:13, 18 100:23,25 102:4,5,13, 21 103:2,3,6,21,25 104:7, 13,23 105:6,14,17,25 106: 8,20 107:2,6,10,14 120:17, 18,22,23 121:10,17,23 122: 7,15 123:1,4,14 124:2,6,12, 19 125:5,14,24 126:7,16, 20 127:4 141:2

**Sotomayor's** [1] 86:20

**sought** [4] 5:15 101:24 108:14 138:7

**sounded** [1] 35:17

**sounds** [1] 142:25

**soup** [1] 100:8

**southern** [2] 90:6 91:4

**sovereign** [6] 11:10 12:9, 25 13:4,5 91:16

**sovereignty** [3] 149:2,6,13

**space** [2] 9:14 10:17

**speaking** [4] 90:25 108:12 109:11 130:15

**special** [12] 11:18 12:7,12, 14,16,23 13:16 36:25 37: 24 61:11 91:8 92:20

**specific** [12] 14:17 18:13 60:5 61:21 80:5 86:14 88: 19 94:15 101:23 104:6 110:12,14

**specifically** [18] 5:1 14:11 31:14 47:24 52:13 61:17 63:23 72:23 83:9 85:15 94:

16 101:20 108:13 114:3,8 118:13 123:13 131:9

**specifies** [2] 112:10 130: 18

**specify** [1] 80:17

**speculation** [1] 93:11

**speculative** [4] 92:11 94: 10,13,24

**spelling** [1] 70:16

**spend** [5] 89:15 103:11 104:24 107:23 126:22

**spending** [6] 3:23 9:23 16: 1 123:19 149:9,18

**spin** [1] 80:21

**stab** [1] 21:11

**stage** [1] 7:23

**stages** [2] 26:11 42:14

**standard** [5] 18:22 55:1 74: 2 111:5 116:11

**standing** [51] 3:20 5:9,13 7: 1,2,18,23 8:5,12,12 9:11, 20 10:1,6 11:18,19 12:12, 15 13:16 14:4,22 15:12 16: 20,22 20:18 44:17 50:8,13 68:16 69:8 73:23 74:6,17 75:20 79:23 83:4 84:2 87: 11,17 88:10 89:2 90:5,14 97:15,16 113:8 137:19 148:23 149:19 150:5,7

**stands** [2] 97:19 147:16

**staple** [1] 36:15

**stare** [6] 47:22 109:12,15, 22 110:6 120:2

**start** [3] 56:24 128:11 143: 12

**started** [1] 57:4

**starts** [1] 146:4

**state** [33] 5:15 7:2,7,22 8: 11,12 9:11 10:5,24 11:19 12:12,15 13:16 15:11 35:2 50:12 59:25 64:19 65:13 66:2 77:20 88:3 89:18 91: 18 98:1 108:24 136:11,21, 23 142:12 148:25 150:7,10

**state's** [5] 7:18 28:1 30:18 83:22 89:13

**statement** [2] 124:21 127: 2

**statements** [1] 30:20

**STATES** [71] 1:1,3,15 3:5, 20,21 4:2,3,5 6:6 7:25 8:5 9:11,20,20 10:4,10,11,19 11:9,13,18,21 12:7,7,18,24 13:12,17,17 15:24 17:12 18:10 19:14 51:5,15 58:1 65:8,25 73:23 74:8,14 75: 2 77:6,11,14 85:4 86:2 87: 23 89:23 90:3,21 92:15,20 104:15 108:17 118:4 120: 8 124:8 126:4,13 129:2 130:20 146:1 149:1,9,12, 16,16 150:8,18

**states'** [6] 28:22 74:6 90:5 99:16 119:1 146:11

**status** [1] 65:5

**statute** [57] 6:8,18 21:15, 24 23:13 25:7,10,11,16 29: 25 34:8 35:2 38:8,23 43: 14 45:4,23,24 46:17 48:10, 11,15,16 49:1 50:3 60:25 61:2,12 64:5,16,25 67:25 69:2,10,20 70:9,13,22,24 71:18 72:15,22 105:20 107:21 110:12 115:22 117: 22 122:9 131:11 132:18 133:8 134:24 141:5 142: 14 143:20 144:15 148:22

**statute's** [4] 35:5 37:9 145: 19,24

**statutes** [9] 30:6,13 48:9 54:7 61:22 65:13 97:22 110:10,14

**statutory** [18] 4:22 15:1,6 23:1 36:25 37:24 46:4,6 53:17 59:20 61:11,13 63: 15 69:24 71:15,20 72:10 73:14

**stay** [2] 7:23,24

**step** [3] 55:7 114:10 149:23

**steps** [3] 53:6,13,15

**still** [9] 22:3,18,20 46:25 54: 12 69:18 97:14 145:7 147: 11

**stipulated** [1] 145:14

**stipulating** [1] 145:20

**STONE** [144] 1:22 2:6 73: 18,19,21 75:17,24 78:12 80:4,8,11,16,23 81:1,7,25 82:3,21 83:5 84:1 85:8,20 86:4 87:2,14 88:8,17 89:3 90:1,9,24 91:6,12 92:17 93:15 94:12 95:14,23 96: 17 98:12 99:13,19 100:5 101:13 102:11,18 103:1,4, 14,23 104:3,11,20 105:3, 11,15,23 106:2,16 107:1,9, 13,15 108:5 109:5,10,20, 23 110:1,5 111:17 112:5, 12,17,21 113:12 114:1,5, 13,17,22 115:12 116:7,23 117:1,6,9,24 118:22 120:5, 22 121:8,11,19 122:3,12, 22 123:3,8 124:1,7,17,23 125:9,20 126:2,13,18 127: 1,6,10,13,22 128:15,24 129:19 130:14 131:15 132: 12,21 133:11,18,23 134:10, 16 135:1,18 136:2,6,16,19, 24 137:7,22 138:6,20 140: 12 141:10,15,20 142:18 144:1 145:1 146:15

**stop** [3] 44:22 89:25 92:16

**stops** [1] 94:8

**straightforward** [1] 87:4

**strange** [1] 79:13

**strengths** [1] 100:14

**strictly** [1] 109:11

**strikes** [2] 77:21 91:24

**strive** [2] 101:9,10

**strong** [2] 43:4 117:12

**stronger** [1] 32:21

**strongest** [2] 99:14,21

**strongly** [4] 8:4,8 54:17 55: 20

**structural** [1] 51:25

**structure** [6] 3:25 8:18 9: 16 11:15 13:6 116:8

**students** [1] 10:9

**stymied** [1] 151:6

**subchapter** [1] 70:7

**subject** [9] 34:23 60:14 65: 16 76:24 84:7 85:10 103: 19 145:12 148:10

**submission** [1] 55:19

**submitted** [3] 82:25 151: 17,19

**subsection** [3] 42:9 46:7 95:20

**subsections** [1] 46:12

**subsequent** [2] 110:10 119:2

**subsequently** [1] 110:9

**subset** [4] 75:6 129:22,22 131:2

**substance** [1] 57:25

**substantiate** [1] 17:22

**substantive** [1] 116:11

**success** [2] 8:1 137:20

**successful** [3] 66:21 67: 14 137:19

**succinct** [1] 38:20

**sudden** [1] 35:22

**sue** [5] 4:2 13:12 53:24 134: 11 148:25

**suffer** [2] 76:20 91:2

**suffering** [2] 84:5 113:19

**suffers** [1] 84:11

**sufficient** [4] 12:4,6 74:10 83:24

**suggest** [8] 4:16 13:2 19: 13 59:25 69:16 70:3 96:21 120:4

**suggested** [1] 118:7

**suggesting** [4] 9:3 17:14 68:7 73:4

**suggests** [3] 58:10 118:25 119:1

**suing** [1] 13:4

**suit** [2] 6:14,18

**suits** [2] 89:23 150:12

**Summers** [1] 57:5

**superfluity** [1] 46:5

**superfluous** [1] 46:1

**supervise** [1] 85:6

**supervision** [2] 76:19 81: 14

**support** [2] 19:19 80:9

**supported** [2] 83:6 135:12

**Suppose** [2] 16:15 142:16

**supposed** [3] 90:18,19 119:22

**suppress** [1] 16:3

**SUPREME** [3] 1:1,14 118: 4

**Sure-Tan** [1] 14:11

**surely** [1] 91:15

**surge** [2] 87:21,22

**surprised** [1] 117:18

**surprising** [2] 91:1 96:11

**surrender** [2] 91:18,22

**Sutton** [3] 15:13 57:16 93: 3

**swallow** [1] 113:1

**swallowing** [1] 111:9

**sweeping** [3] 3:18 49:8,16

**symmetry** [1] 66:19

**synonymous** [1] 115:4

**synonyms** [2] 115:2,5

**system** [10] 64:18 65:23 72: 3 90:21 92:13 96:2 105:5 129:7 143:6 148:21

**systems** [1] 65:25

---

**T**

**table** [2] 45:10 150:14

**talks** [4] 64:16 70:24 97:25 111:24

**task** [1] 21:13

**Tatel** [1] 54:19

**tax** [1] 89:14

**taxing** [4] 3:23 16:1 149:9, 18

**teeth** [1] 92:21

**tells** [3] 29:11 110:21,22

**temporary** [1] 76:5

**tender** [1] 39:10

**term** [11] 4:10 6:11 7:13 45: 1 46:2,8 48:19 71:8 81:5 101:10 115:21

**terms** [11] 6:22 63:3 76:3 85:23 87:25 95:25 99:24 105:13 115:1 129:4 143: 24

**testimony** [1] 86:11

**TEXAS** [27] 1:6,22 3:5 7:11 16:6 55:25 77:4,19 80:15 83:15 84:11 85:3,13 86:1, 5,12 87:24 88:3,21 90:6,9 91:1,4,17,19 94:4 106:9

**Texas's** [7] 42:24 46:15 79: 25 81:18 83:19 85:2,24

**text** [18] 36:17 37:4 38:10 45:22 48:6 49:11 50:3 54: 15 55:9 56:17 59:25 66:17 74:1 99:15 124:11 145:19, 24 146:24

**textual** [2] 117:12 139:10

**Thanks** [1] 140:22

**themselves** [1] 71:3

**then-existing** [1] 108:10

**theoretically** [1] 100:3

**theories** [3] 8:12 9:10 12: 18

**theory** [12] 3:23 15:19 47:4 69:15 72:13 90:5 99:16 102:6 106:11 108:22 136:

15,23

**there'd** [1] **112**:25
**There's** [27] **12**:7 **26**:25 **35**:4 **46**:6 **53**:18,25 **54**:1 **64**:15 **66**:19 **67**:14 **70**:5 **79**:1 **87**:21 **88**:9,25 **90**:16 **92**:18 **97**:17 **100**:1 **104**:14 **116**:16 **118**:6 **121**:15 **129**:1 **132**:22 **135**:5 **143**:20
**thereby** [1] **10**:10
**therefore** [4] **29**:22 **30**:4 **33**:17 **81**:22
**They'll** [3] **58**:12 **89**:14,15
**they've** [3] **102**:2 **129**:10 **143**:16
**thinking** [2] **140**:19 **142**:6
**thinkingly** [1] **109**:18
**thinks** [3] **48**:10 **93**:17 **112**:13
**third** [1] **7**:9
**THOMAS** [6] **5**:7,17 **6**:3 **38**:15 **75**:17,24
**though** [8] **33**:20 **35**:7 **36**:19 **44**:25 **67**:21 **70**:8 **90**:3 **101**:21
**thoughtful** [1] **110**:7
**thoughtfully** [1] **109**:18
**thoughts** [1] **44**:15
**Thousands** [1] **37**:21
**thread** [1] **127**:10
**threats** [3] **3**:15 **84**:16 **148**:18
**three** [10] **55**:2,21 **119**:8,13, 13,18 **123**:9 **124**:9 **125**:11 **144**:1
**threshold** [1] **44**:22
**throughout** [3] **28**:16 **53**:19 **58**:8
**throwing** [1] **8**:23
**thrown** [1] **9**:4
**thrust** [1] **117**:25
**tie** [1] **101**:3
**tied** [1] **62**:15
**tight** [1] **96**:23
**Title** [2] **20**:10,11
**today** [5] **51**:3 **98**:11 **109**:9 **122**:2 **125**:18
**together** [3] **98**:2 **111**:19 **134**:19
**tolerable** [1] **144**:4
**took** [4] **14**:11 **19**:15 **79**:24 **118**:17
**tool** [2] **123**:11,11
**tools** [3] **50**:23 **51**:1,13
**top** [1] **46**:14
**toss** [1] **55**:21
**totality** [2] **121**:24 **122**:19
**totality-of-the-circumst ances** [1] **29**:14
**totally** [2] **34**:15 **143**:23
**touch** [1] **42**:8
**toughened** [1] **51**:8
**Town** [1] **23**:14
**tracking** [1] **35**:5

**tracks** [2] **92**:16 **94**:9
**tradition** [4] **4**:2 **97**:18,22 **149**:20
**traditional** [7] **37**:9 **58**:13 **60**:24 **74**:17 **76**:4 **113**:10, 22
**trafficking** [1] **94**:21
**training** [1] **124**:11
**transformed** [1] **4**:4
**transgress** [2] **25**:2,7
**transition** [1] **97**:2
**transposed** [1] **36**:24
**treat** [8] **22**:15 **30**:2 **61**:8 **82**:5,6 **88**:10 **121**:14 **129**:23
**treating** [1] **52**:11
**treats** [1] **74**:20
**trees** [1] **145**:3
**trial** [8] **73**:24 **80**:6 **85**:11 **86**:11 **87**:8 **93**:16 **94**:5,7
**tries** [1] **47**:2
**troubling** [2] **141**:24 **142**:1
**true** [4] **32**:20 **68**:22 **114**:5, 6
**truly** [4] **23**:15 **45**:4 **49**:8 **147**:25
**trumps** [2] **27**:8,9
**try** [5] **22**:11 **65**:6,20 **85**:6 **135**:25
**trying** [12] **18**:4,11 **21**:11 **56**:22 **60**:16 **61**:21,24 **65**:12 **96**:13 **124**:14 **134**:6 **144**:13
**Tuesday** [1] **1**:11
**turn** [1] **109**:18
**turning** [1] **22**:8
**twist** [1] **91**:13
**two** [32] **5**:12 **9**:21 **17**:25 **19**:11 **23**:7 **43**:6 **52**:8 **76**:4 **78**:13 **79**:14 **85**:8 **87**:2 **88**:9, 20 **90**:1,24 **92**:18 **96**:18 **97**:3,8 **98**:2,8 **100**:5 **101**:23 **102**:1 **104**:12 **106**:2,17 **112**:5 **113**:13 **121**:9 **142**:18
**two-year** [1] **98**:10
**types** [1] **59**:19
**typically** [4] **88**:10 **98**:17 **113**:17 **137**:1

**U**

**U.S.C** [1] **110**:11
**ultimately** [3] **7**:21,24 **146**:6
**unacceptably** [2] **85**:12,17
**unattended** [1] **87**:22
**unaware** [1] **126**:18
**unbridled** [1] **145**:9
**uncertain** [1] **23**:17
**unchanged** [1] **20**:1
**unconstitutional** [6] **24**:3, 11,20 **25**:12,14,17
**under** [77] **7**:1 **8**:5,23 **9**:4 **10**:24 **11**:13 **13**:5 **15**:15 **20**:9,11 **22**:14 **24**:13 **27**:3,21

**28**:5 **34**:25 **35**:25 **36**:6,24 **37**:10,18 **43**:4,5 **49**:5 **50**:17 **57**:15,18 **60**:19,25,25 **63**:2,23 **66**:25 **67**:9,20 **71**:11,14 **72**:14 **73**:5,13 **75**:11, 23 **76**:18 **79**:6 **81**:14,14,18 **88**:20 **89**:1 **95**:19 **96**:1,2 **97**:12 **99**:18 **102**:9 **104**:11 **106**:1,11,12,13,14,18 **111**:5 **113**:4 **128**:8 **130**:19 **131**:1,18 **132**:24 **136**:23 **139**:14 **143**:6 **145**:10,13 **148**:7,15 **150**:6
**undermined** [1] **83**:1
**underneath** [1] **115**:14
**understand** [16] **10**:13 **12**:17 **28**:22 **53**:11 **63**:8,13,14 **66**:18 **67**:24 **72**:7 **102**:6 **121**:1,3 **127**:16 **133**:18 **138**:13
**understanding** [1] **118**:16
**understands** [1] **131**:23
**understood** [10] **17**:24 **28**:25 **31**:5 **43**:23 **44**:6 **55**:11 **117**:20 **124**:1 **129**:17 **132**:15
**underused** [2] **102**:2 **135**:4
**undocumented** [1] **107**:12
**union** [2] **91**:18,19
**unite** [1] **56**:1
**UNITED** [23] **1**:1,3,15 **3**:4 **4**:2 **9**:19 **51**:5,14 **77**:5,11,14 **90**:5 **98**:3 **108**:17 **118**:4 **119**:1 **120**:8 **126**:3,13 **129**:2 **130**:20 **146**:1,11
**universal** [4] **4**:25 **46**:22 **57**:14 **150**:22
**universe** [1] **108**:7
**unlawful** [8] **63**:4 **74**:19 **75**:14 **79**:6 **110**:23 **111**:11 **139**:5 **145**:7
**unlawfully** [1] **82**:4
**unmanageable** [1] **34**:15
**unnoticed** [1] **108**:3
**unpack** [1] **24**:18
**unprecedented** [4] **49**:8, 24 **56**:3 **61**:2
**unquestionably** [2] **117**:10 **139**:7
**unreasonably** [1] **139**:8
**unthinkingly** [1] **109**:17
**until** [7] **96**:4 **100**:19 **127**:14 **128**:2 **142**:17 **145**:17 **146**:13
**unusual** [3] **54**:4,5,9
**unyielding** [2] **4**:8 **28**:19
**up** [14] **5**:23 **10**:24 **22**:5 **55**:5,17 **58**:22 **61**:7 **65**:6 **97**:15 **101**:3 **123**:10 **137**:9 **139**:3,12
**upheld** [1] **37**:18
**uses** [6] **32**:18 **46**:8,11 **48**:8,

19 **132**:19
**using** [2] **110**:10 **135**:7
**usual** [5] **91**:9,10,13,14 **101**:10

**V**

**vacate** [5] **35**:23 **48**:5,15 **49**:1 **75**:13
**vacating** [6] **3**:18 **37**:18 **78**:7 **110**:25 **115**:24 **119**:8
**vacatur** [46] **4**:25 **5**:5 **6**:6, 20 **35**:17 **36**:5 **37**:1 **44**:20 **46**:22 **57**:14,18 **58**:23 **59**:2, 12 **60**:2,13 **61**:10 **62**:19,25 **66**:9 **74**:2 **75**:8,22,22,25 **76**:2,12 **77**:1,9 **78**:13,14,25 **79**:25 **81**:3 **108**:2,8 **114**:9 **115**:23 **118**:24 **135**:19 **139**:5,14,20 **140**:18 **147**:9,16
**vacatur/declaratory** [1] **79**:17
**valid** [6] **67**:4,6,11 **68**:23 **115**:17 **143**:24
**validity** [1] **72**:2
**varied** [1] **65**:13
**variety** [1] **96**:20
**various** [3] **25**:18 **39**:11 **61**:20
**velocity** [1] **95**:25
**venue** [2] **111**:25 **116**:18
**versions** [1] **150**:6
**versus** [17] **3**:5 **12**:13 **13**:23 **14**:15 **15**:15 **42**:12 **51**:24 **57**:5,16 **74**:11 **83**:25 **91**:17,21 **92**:22 **93**:6 **99**:1 **108**:17
**vet** [1] **151**:8
**vice** [1] **88**:21
**view** [13] **12**:6 **36**:3 **42**:24 **71**:25 **75**:25 **78**:6,9 **80**:19 **89**:1 **127**:22 **128**:12 **137**:25 **142**:10
**views** [2] **71**:19 **78**:4
**vindicate** [2] **11**:10 **91**:21
**violate** [2] **24**:16 **74**:8
**violated** [2] **98**:7 **100**:2
**violates** [1] **99**:11
**violation** [3] **23**:12 **107**:4 **136**:12
**voice** [1] **146**:18
**void** [5] **48**:15 **67**:22 **68**:3 **69**:5 **78**:19
**voided** [1] **147**:18
**voluntary** [1] **83**:14
**voters** [1] **50**:23

**W**

**wanted** [2] **51**:7 **64**:14
**war** [3] **136**:11,13,22
**warranted** [1] **53**:15
**Washington** [2] **1**:10,20
**watch** [1] **105**:8
**way** [27] **5**:21 **8**:9 **22**:6 **25**:1 **31**:4 **36**:21 **47**:7 **62**:6 **66**:

22 **72**:12,16 **76**:14 **79**:13 **80**:14 **81**:6,9 **83**:23 **89**:1 **95**:24 **98**:22 **127**:3 **128**:4 **129**:20 **130**:22 **144**:18,19 **148**:20
**ways** [3] **5**:12 **65**:14 **101**:17
**week** [1] **16**:17
**weight** [1] **140**:1
**welcome** [3] **5**:6 **22**:25 **75**:16
**whatever** [4] **37**:17 **106**:13 **123**:22 **130**:5
**whatnot** [1] **142**:9
**whatsoever** [4] **78**:20,21 **79**:16 **87**:7
**Whereupon** [1] **151**:18
**whether** [55] **9**:25 **14**:23 **15**:5 **18**:8,23 **20**:25 **21**:1 **24**:20 **26**:2,12 **27**:14,20 **30**:16 **35**:4,4 **40**:8 **41**:6,22,23 **45**:2,4 **60**:25 **61**:21 **62**:13 **64**:11,20 **72**:9 **75**:20 **81**:9 **84**:12 **85**:11,16 **88**:11 **96**:4 **100**:11,20 **102**:12 **110**:21 **118**:18 **119**:24 **121**:7 **122**:11,13 **123**:16 **124**:3,16,25 **128**:1 **140**:13 **142**:9,24 **143**:8,17 **145**:25 **146**:16
**who's** [6] **32**:18 **44**:3 **68**:4 **76**:17 **98**:7 **114**:3
**whole** [8] **35**:24 **46**:17 **56**:8 **81**:18 **86**:24 **110**:20 **113**:1 **139**:4
**whom** [1] **29**:15
**whomever** [2] **69**:7 **148**:9
**will** [27] **15**:2,24 **16**:25 **17**:1 **40**:14 **80**:1,13,19 **81**:9,21 **85**:4 **88**:3 **90**:13,14 **93**:5,5, 5,6 **97**:6 **101**:4,5,9,15 **134**:6 **142**:24 **146**:18 **149**:16
**Williams** [1] **54**:19
**win** [2] **135**:22 **150**:15
**withdraw** [1] **104**:10
**withheld** [1] **139**:9
**within** [6] **72**:17 **74**:9 **94**:4 **120**:6 **123**:21 **140**:14
**without** [8] **32**:4,6 **40**:16 **80**:2,12,16,18 **111**:3
**witness** [1] **31**:17
**wondered** [2] **18**:23 **42**:25
**word** [6] **4**:11 **13**:15 **32**:19 **45**:24 **114**:12 **132**:3
**words** [12] **24**:1,11 **31**:24 **77**:5 **83**:18 **111**:11 **112**:9 **113**:11 **114**:21 **116**:9 **127**:20 **128**:12
**work** [6] **18**:12 **45**:24 **79**:18 **95**:24,24 **108**:18
**world** [4] **89**:18 **113**:24 **117**:12 **135**:6
**worried** [1] **143**:14
**worth** [6] **89**:8,19,25 **91**:11 **149**:22 **150**:3
**Wow** [1] **36**:9

Official - Subject to Final Review

**writ** [1] **37**:2
**writing** [1] **79**:13
**writs** [1] **60**:7
**written** [3] **73**:1,2 **134**:25
**Wynn** [1] **15**:15

### Y

**year** [5] **19**:13 **20**:5,6 **37**:17
 **142**:8
**years** [11] **4**:1,13 **9**:21 **54**:
 22,23 **55**:4 **97**:3,8 **119**:7
 **120**:13 **138**:19

### Z

**Zadvydas** [2] **106**:3 **107**:2
**zenith** [2] **90**:18,20
**zero** [1] **87**:6
**Zivotofsky** [1] **137**:11

Heritage Reporting Corporation